# Exhibit 2



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

TO:  HEADS OF CONCERNED CITY DEPARTMENTS AND AGENCIES

FROM:  JAMES F. HANLEY, COMMISSIONER

SUBJECT:  EXECUTED CONTRACT: SERGEANTS

TERM:  JUNE 1, 2005 TO AUGUST 29, 2011

Attached for your information and guidance is a copy of the executed contract entered into by the Commissioner of Labor Relations on behalf of the City of New York and the Sergeants Benevolent Association on behalf of the incumbents of positions listed in Article I of said contract.

The contract incorporates terms of an agreement reached through collective bargaining negotiations and related procedures.

DATED:  JAN 15 2010

OFFICE OF LABOR RELATIONS
REGISTRATION

OFFICIAL                    CONTRACT

NO:
10.010                      DATE:
                            JAN 15 2010

Sergeants' Benevolent Association
June 1, 2005 – August 29, 2011 Agreement

## TABLE OF CONTENTS

ARTICLE I - UNION RECOGNITION AND UNIT DESIGNATION ......................................... 1

ARTICLE II - UNION SECURITY DUES CHECKOFF ................................................ 1

ARTICLE III - HOURS AND OVERTIME ................................................ 2

ARTICLE IV - RECALL AFTER TOUR ................................................ 4

ARTICLE V - COMPUTATION OF BENEFITS ................................................ 5

ARTICLE VI - SALARIES ................................................ 5

ARTICLE VII - UNIFORM ALLOWANCE ................................................ 8

ARTICLE VIII - LONGEVITY ADJUSTMENTS ................................................ 8

ARTICLE IX - PAYMENT FOR HOLIDAY WORK ................................................ 9

ARTICLE X - LEAVES ................................................ 9

ARTICLE XI - VACATIONS ................................................ 10

ARTICLE XII - HEALTH AND HOSPITALIZATION BENEFITS ................................................ 11

ARTICLE XIII - HEALTH AND WELFARE FUND ................................................ 13

ARTICLE XIV - ANNUITY FUND ................................................ 14

ARTICLE XV - GENERAL ................................................ 14

ARTICLE XVI - UNION ACTIVITY ................................................ 19

ARTICLE XVII - NO DISCRIMINATION ................................................ 19

ARTICLE XVIII - NIGHT SHIFT DIFFERENTIAL ................................................ 19

ARTICLE XIX - OVERTIME TRAVEL GUARANTEE ................................................ 20

ARTICLE XX - GRIEVANCE AND ARBITRATION PROCEDURE ................................................ 21

ARTICLE XXI - LINE-OF-DUTY DEATH BENEFIT ................................................ 25

ARTICLE XXII - DEATH BENEFIT-UNUSED LEAVE AND COMPENSATORY TIME ..... 25

ARTICLE XXIII - OPTIONAL WORK DURING VACATIONS ................................................ 26

ARTICLE XXIV - NO STRIKES ................................................ 26

ARTICLE XXV - BULLETIN BOARDS ................................................ 26

ARTICLE XXVI - LABOR MANAGEMENT COMMITTEE ................................................ 26

ARTICLE XXVII - RADIO MOTOR PATROL ................................................ 27

ARTICLE XXVIII - NO WAIVER ................................................ 30

ARTICLE XXIX - SAVINGS CLAUSE ................................................ 30

ARTICLE XXX - FINANCIAL EMERGENCY ACT ................................................ 30

ARTICLE XXXI - TERM ................................................ 30

10.010

Case 1:20-cv-05441-KPF   Document 10-4   Filed 07/17/20   Page 4 of 63

Sergeants' Benevolent Association
June 1, 2005 – August 29, 2011 Agreement

*AGREEMENT* made this 15th day of Jan 2010 by and between the City of New York (hereinafter called "the City"), acting by the Commissioner of Labor Relations, and the Sergeants' Benevolent Association of the City of New York (hereinafter called "the Union" or the "SBA"), for the period from June 1, 2005 to August 29, 2011.

W I T N E S S E T H:

*WHEREAS*, the Sergeants employed by the City have duly designated the Union as their exclusive bargaining representative for the purpose of collective bargaining with the City with respect to wages, hours and conditions of employment; and

*WHEREAS*, the Union and the City desire to cooperate in establishing conditions which will tend to secure standards and conditions of employment consistent with the dignity of Sergeants, and to provide methods for fair and peaceful adjustment of disputes that may arise between the Union and the City; and

*WHEREAS*, as a result of collective bargaining the parties have reached an Agreement which they desire to reduce to writing;

*NOW, THEREFORE,* it is mutually agreed as follows:

## ARTICLE I - UNION RECOGNITION AND UNIT DESIGNATION

Section 1.
The City recognizes the Union as the sole and exclusive collective bargaining representative for the unit consisting of the employees of the New York City Police Department in the title of Sergeant.

Section 2.
Except as otherwise provided herein, for purposes of this Agreement, the terms "employee" or "employees" and "Sergeant" or "Sergeants" shall be interchangeable and shall relate solely to employees in the unit described in Section 1 of this Article.

## ARTICLE II - UNION SECURITY DUES CHECKOFF

Section 1.
All employees covered by this agreement shall be free to become and remain members of the Union in good standing.

*10.010*

**Section 2.**

The Union shall have the exclusive right to the check-off and transmittal of dues in behalf of each employee in the unit in accord with the Mayor's Executive Order No. 98, dated May 15, 1969, entitled "Regulations Regulating the Checkoff of Union Dues" and in accord with the Mayor's Executive Order No. 107, dated December 29, 1986, entitled "Regulations Governing Procedures for Orderly Payroll Checkoff of Union Dues" and any executive orders which amend or supersede said Executive Orders.

**Section 3.**

An employee may consent in writing to the authorization of the deduction of dues from the employee's wages and to the designation of the Union as the recipient thereof. Such consent, if given, shall be in a proper form, acceptable to the City, which bears the signature of the employee.

**Section 4.**

The parties agree to an agency shop to the extent permitted by applicable law, the provisions of such to be negotiated and contained in a supplemental agreement which will become part of this Agreement when and if agreed to.

## ARTICLE III - HOURS AND OVERTIME

**Section 1.**

a.  All ordered and/or authorized overtime in excess of the hours required of an employee by reason of the employee's regular duty chart, whether of an emergency nature or of a non-emergency nature, shall be compensated for either by cash payment or compensatory time off, at the rate of time and one-half, at the sole option of the employee. Such cash payments or compensatory time off shall be computed on the basis of fifteen (15) minute segments.

b.  In order to preserve the intent and spirit of this section on overtime compensation, there shall be no rescheduling of days off and/or tours of duty except as provided below. This restriction shall apply both to the retrospective crediting of time off against hours already worked and to the anticipatory reassignment of personnel to different days off and/or tours of duty except as provided below. Notwithstanding anything to the contrary contained herein, the Department shall not have the right to reschedule employees' tours of duty, except that the Department shall have the right to reschedule employees' tours of duty on fifteen occasions (effective July 9, 2008, twenty occasions) without payment of pre-tour or post-tour overtime provided that the Department gives at least 24 hours notice to the employees whose tours are to be rescheduled. The Department may also reschedule employees' tours of duty, without payment of pre-tour or post-tour overtime, for New Year's Eve, St. Patrick's Day, Thanksgiving Day, Puerto Rican Day, West Indies Day and Christopher Street Liberation Day, provided that the Department gives notice before 12:00 a.m. of the day(s) in question. The three (3) hour rescheduling limitation for the above named dates is also eliminated.

10.010

Section 2.

Notwithstanding anything to the contrary in this Agreement, employees assigned to the Detective Bureau and/or "Designated as Supervisor of Detective Squad" and/or "Designated on Special Assignment" shall receive overtime compensation in the following manner:

(a)   Effective January 1, 1986, all ordered and/or authorized overtime in excess of 40 hours in any week or in excess of the hours required of an employee by reason of the employee's regular duty chart if a week's measurement is not appropriate, whether of an emergency nature or of a non-emergency nature, shall be compensated for either by cash payment or compensatory time off, at the rate of time and one-half, at the sole option of the employee. Such cash payments or compensatory time off shall be computed on the basis of completed fifteen (15) minute segments.

(b)   In order to preserve the intent and spirit of this section on overtime compensation, there shall be no rescheduling of days off, except that for the purpose of night watch coverage an employee's swing period shall not be diminished by more than 8 hours. This restriction shall apply both to the retrospective crediting of time off against hours already worked and to the anticipatory reassignment of personnel to different days off. Prior to the completion of the steps in the grievance procedure under Article XX of this Agreement, the President of the S.B.A. may informally discuss a question in regard to the application of this Section 2(c) with the Police Commissioner and the Chairman of the Personnel Grievance Board in an effort to resolve the matter.

(c)   An employee who is specially assigned to duty involving travel outside New York City shall receive credit for eight (8) hours' work for each day of that assignment at the employee's straight time rate of pay. On days which are not the employee's regularly scheduled days, such credit shall be at the rate of time and one-half. When such employee performs duty in excess of 8 hours and such duty can be verified to the satisfaction of the employee's Commanding Officer, the Commanding Officer shall recommend to the Chief of Department that the employee be credited with appropriate overtime compensation.

Section 3.
Overtime shall be computed on a monthly basis and shall be paid no later than six (6) weeks after submission of the monthly report.

Section 4.
The parties shall meet in a labor-management committee to determine if the use of one of sergeants' regular days off to qualify at the range can be accomplished on non-compensable time under the Fair Labor Standards Act. In the event the parties cannot agree or find a way to accomplish the above, the parties agree that the use of a regular day off to qualify at the range shall be paid at the New York State minimum wage at straight time.

If the parties do agree that the range day can be done on non-compensable time, then the Union shall receive a credit of 0.05% to be applied to the salary schedule in a mutually agreeable manner.

# ARTICLE IV - RECALL AFTER TOUR

**Section 1.**
Any employee who is recalled to duty after having completed the employee's regular tour of duty but four (4) hours or more before the commencement of the employee's next regular tour and who is released without having been assigned to duty prior to the commencement of said next regular tour shall receive a minimum of four hours' pay pursuant to the regular overtime provisions of this Agreement, that is, in cash or compensatory time off at the sole option of the employee at the rate of time and one-half (i.e., the equivalent of six hours compensation at the employee's straight time rate).

**Section 2.**
Any employee who is recalled to duty after having completed the employee's regular tour of duty but six (6) hours or more before the commencement of the employee's regular tour and who is assigned to duty and then released from duty prior to commencement of said next regular tour shall receive a minimum of six hours' pay pursuant to the regular overtime provisions of this Agreement, that is, in cash or compensatory time off, at the employee's sole option, at the rate of time and one-half (i.e., the equivalent of nine hours' compensation at the employee's straight time rate).

**Section 3.**
In the event the actual time spent on recall defined in Sections 1 and 2 of this Article extends beyond the minimum periods provided therein, the employee shall receive pay pursuant to the regular overtime provisions of this Agreement for the full period of time actually spent on such recall.

**Section 4.**
Notwithstanding anything to the contrary provided in Sections 1 through 3 of this Article, any employee who is recalled to duty after having completed the employee's regular tour of duty but before the commencement of the employee's next regular tour and who is assigned to duty or held without assignment for a period which extends into the commencement of that next regular tour shall receive pay pursuant to the regular overtime provisions of this Agreement only for the actual time so assigned or held.

**Section 5.**
a.    Notwithstanding anything to the contrary in Sections 1 through 4 of this Article, any employee who is recalled to duty after having completed the employee's regular tour of duty but less than four hours before the commencement of the employee's next regular tour and who is released without having been assigned to duty prior to the commencement of that next regular tour shall receive pay in cash or compensatory time off at the employee's sole option, at the rate of time and one-half, for the actual time between the beginning of such recall and the commencement of that next regular tour.

b.    Notwithstanding anything to the contrary in Sections 1 through 4 of this Article, any employee who is recalled to duty after having completed the employee's regular tour of duty but less than six hours before the commencement of the employee's next regular tour and

1001

who is assigned to duty and then released from duty prior to the commencement of that next regular tour shall receive pay in cash or compensatory time off at the employee's sole option, at the rate of time and one-half, for the actual time between the beginning of such recall and the commencement of that next regular tour.

## ARTICLE V - COMPUTATION OF BENEFITS

Since the basic forty-hour week has not been changed by this Agreement, any modifications of a standard chart and use of other tours shall not affect current standard practice for the computation of compensation for holidays, vacation days, personal leave days, annuity fund contributions and other relevant benefits, which shall remain on the basis of an eight-hour workday calculation.

## ARTICLE VI - SALARIES

Section 1. - Salary Rates
The following base annual salary and increment rates shall prevail for employees during the term of this Agreement:

Class of Positions and Step

(i)     Sergeants promoted prior to 4/1/06

|          | Effective 6/1/05 | Effective 6/1/06 | Effective 5/31/07 | Effective 6/1/07 | Effective 6/1/08 |
|----------|----------|----------|----------|----------|----------|
| 1st Step | $69,376 | $71,561 | $71,561 | $74,423 | $77,400 |
| 2nd Step | $71,066 | $73,305 | $73,305 | $76,237 | $79,286 |
| 3rd Step | $72,418 | $74,699 | $74,699 | $77,687 | $80,794 |
| 4th Step | $78,695 | $81,174 | $83,833 | $87,186 | $90,673 |

|          | Effective 8/1/09 | Effective 8/1/10 |
|----------|----------|----------|
| 1st Step | $80,496 | $83,716 |
| 2nd Step | $82,457 | $85,755 |
| 3rd Step | $84,026 | $87,387 |
| 4th Step | $94,300 | $98,072 |

(ii)    Sergeants promoted on/after 4/1/06

|          | Effective 4/1/06 | Effective 6/1/06 | Effective 5/31/07 | Effective 6/1/07 | Effective 6/1/08 |
|----------|----------|----------|----------|----------|----------|
| 1st Step | $66,100 | $68,182 | $68,182 | $70,909 | $73,745 |
| 2nd Step | $66,250 | $68,337 | $68,337 | $71,070 | $73,913 |
| 3rd Step | $66,400 | $68,492 | $68,492 | $71,232 | $74,081 |
| 4th Step | $67,000 | $69,111 | $69,111 | $71,875 | $74,750 |
| 5th Step | $78,695 | $81,174 | $83,833 | $87,186 | $90,673 |

10010

|         | Effective 7/1/08 | Effective 8/1/09 | Effective 8/1/10 |
|---------|---------|---------|---------|
| 1st Step | $73,745 | $76,695 | $79,763 |
| 2nd Step | $73,950 | $76,908 | $79,984 |
| 3rd Step | $74,100 | $77,064 | $80,147 |
| 4th Step | $75,190 | $78,198 | $81,326 |
| 5th Step | $90,673 | $94,300 | $98,072 |

(iii)   <u>Sergeants Designated As Supervisors of Detective Squads or to Special Assignment:</u>

|         | Effective 6/1/05 | Effective 6/1/06 | Effective 5/31/07 | Effective 6/1/07 | Effective 6/1/08 |
|---------|---------|---------|---------|---------|---------|
| 1st Step | $82,915 | $85,527 | $85,527 | $88,948 | $92,506 |
| 2nd Step | $83,123 | $85,741 | $85,741 | $89,171 | $92,738 |
| 3rd Step | $83,332 | $85,957 | $85,957 | $89,395 | $92,971 |
| 4th Step | $90,331 | $93,176 | $96,229 | $100,078 | $104,081 |

|         | Effective 8/1/09 | Effective 8/1/10 |
|---------|---------|---------|
| 1st Step | $96,206 | $100,054 |
| 2nd Step | $96,448 | $100,306 |
| 3rd Step | $96,690 | $100,558 |
| 4th Step | $108,244 | $112,574 |

An employee shall advance one increment step annually on the anniversary date of the employee's appointment to the class of positions occupied.

<u>Section 2.</u>
A laid off employee who is returned to service in the employee's former title or in a comparable title from a preferred list, shall receive the basic salary rate that would have been received by the employee had the employee never been laid off, up to a maximum of two (2) years of general salary increases.

<u>Section 3.</u>      <u>General Wage Increase.</u>

a.    (i)    Effective June 1, 2005, Employees shall receive a rate increase of 3%.

      (ii)   Effective June 1, 2006, Employees shall receive an additional rate increase of 3.15%.

      (iii)  Effective June 1, 2007, Employees shall receive an additional rate increase of 4%.

      (iv)   Effective June 1, 2008, Employees shall receive an additional rate increase of 4%.

*10.010*

    (v)     Effective August 1, 2009, Employees shall receive an additional rate increase of 4%.

    (vi)    Effective August 1, 2010, Employees shall receive an additional rate increase of 4%.

b.    The increases provided for in this Section 3a above shall be calculated as follows:

    (i)     The increase in Section 3a(i) shall be based upon the base rates (which shall include salary or incremental schedules) of the applicable titles in effect on May 31, 2005; and

    (ii)    The rate increase in Section 3a (ii) shall be based upon the base rate (which shall include salary or incremental schedules) of the applicable titles in effect on May 31, 2006.

    (iii)   The rate increase in Section 3a (iii) shall be based upon the base rate (which shall include salary or incremental schedules) of the applicable titles in effect on May 31, 2007.

    (iv)   The rate increase in Section 3a (ii) shall be based upon the base rate (which shall include salary or incremental schedules) of the applicable titles in effect on May 31, 2008.

    (v)     The rate increase in Section 3a (v) shall be based upon the base rate (which shall include salary or incremental schedules) of the applicable titles in effect on July 31, 2009.

    (vi)    The rate increase in Section 3a (vi) shall be based upon the base rate (which shall include salary or incremental schedules) of the applicable titles in effect on July 31, 2010.

c.    The general increase provided in this Section 3 shall be applied to the base rates and salary grades fixed for the applicable titles, except to the extent that the base rates and salary grades are modified by Section 3.d. below.

d.    Employees promoted after April 1, 2006 shall be subject to the salary schedule set forth in Section 1. (ii) above.

Section 4.

Paychecks shall be delivered to commands by 3:00 p.m. on the Thursday preceding payday for distribution after 3:00 p.m. on said Thursday.

Section 5. - Salary Itemization

The Department shall make available in convenient places in each precinct the appropriate payroll work sheets for the purpose of enabling each employee to verify the salary components of the

10.010.

employee's paycheck. The parties will review further the feasibility of otherwise advising each
employee of all payroll components along with the employee's paycheck.

## ARTICLE VII - UNIFORM ALLOWANCE

Section 1.
In Fiscal Years 2004, through 2011 the City shall pay to each employee a uniform allowance of $980
in accord with the existing standard procedures.

## ARTICLE VIII - LONGEVITY ADJUSTMENTS

Section 1.

a.     Effective June 1, 2005, longevity adjustments shall continue to be paid as follows:

(i)    Upon the completion of five years of service, employees shall receive a longevity
       adjustment of $3,770.

(ii)   Upon completion of ten years of service, employees shall receive a longevity
       adjustment of an additional $1,000.

(iii)  Upon completion of fifteen years of service, employees shall receive a longevity
       adjustment of an additional $1,000.

(iv)   Upon completion of twenty years of service, employees shall receive a longevity
       adjustment of an additional $1,000.

b.     Effective July 1, 2008, longevity payments at the five, ten, fifteen and twenty year
       steps shall increase by $460.

c.     Effective September 1, 2010, longevity payments at the five and ten year steps
       shall increase by $600.

d.     Effective September 1, 2010, longevity payments at the fifteen and twenty year
       steps shall increase by $1600.

Section 2.

a.     The adjustment after the 5th and 10th years shall not be computed as salary for pension
       purposes until after completing 20 years of service.

       The adjustment after the 15th and 20th years shall not be computed as salary for pension
       purposes until after completion of 25 years of service.
       In the event this provision is declared invalid under the law, the parties shall reopen
       negotiations to resolve the issue of the increased cost of changing the effective date of the
       pensionability of the above adjustments. Such negotiations will be commenced forthwith.

10.010

Case 1:20-cv-05441-KPF   Document 10-4   Filed 07/17/20   Page 12 of 63

If no agreement is reached, an impasse may be declared and subsequent mediation and the impasse proceeding, if any, shall in all respects be conducted on an expedited basis.

b.   The calculation of night shift differential payments shall be based upon the same factors, amounts and methodology as previously utilized.

c.   ITHP and pension benefit calculations shall only include the amount of the longevity payment that is pensionable.

## ARTICLE IX - PAYMENT FOR HOLIDAY WORK

Each employee shall receive eleven (11) paid holidays annually, payments for which shall be made in accord with existing procedures.

## ARTICLE X - LEAVES

Section 1. - Sick Leave

a.   (i)   Each employee shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect which is service-connected pursuant to Section 14-122.1 of the Administrative Code.

(ii)  Each employee shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect, whether or not service-connected.

b.   The Chief of Personnel shall consult with representatives of the SBA regarding the enforcement of the sick leave program in order to insure that undue restrictions will not be placed upon Sergeants. Departmental orders in connection therewith shall be issued after consultation with the SBA.

Section 2 - Death-in-Family Leave

In the event of a death in an employee's immediate family and upon application to and approval of the employee's commanding officer or supervisory head, the employee shall receive leave with pay not exceeding four consecutive regular tours of duty. For the purposes of this section, the phrase, "immediate family," shall include any of the following: (a) a spouse or domestic partner, (b) a natural, foster or step-parent, child, brother or sister, (c) a father-in-law or mother-in-law, or (d) any relative residing in the employee's household. The commanding officer or supervisory head granting such leave shall verify the death and relationship of the deceased. If the deceased was in the military service of the United States at the time of the death, the employee requesting leave shall produce the official notice of death.

Section 3. - Military Leave

Military leave not exceeding a total of thirty (30) days in any one calendar year and not exceeding thirty (30) days in any one continuous period of such absence shall be granted with pay to any employee requiring such leave to satisfy military obligations.

10.0010

Section 4. - Special Excusals

Excused time accorded to other personnel employed by the City under circumstances such as excusals for the Dr. Martin Luther King, Jr. and the Senator Robert F. Kennedy funerals and the Moon Landing Observation Day shall be granted equally to employees covered by this Agreement. All compensating days off shall be subject to exigencies of the Department.

Section 5. - Leave to Attend Hearings

Individual employee grievants shall be granted leave with pay for such time as is necessary to testify at arbitration hearings.

Leave with pay shall be granted to three (3) employees who are named grievants in a group arbitration proceeding, for such time as is necessary for them to testify at their group arbitration hearings.

Leave with pay for such time as is necessary to testify at their hearings shall be granted to employees who, after final adjudication of proceedings under Section 210, paragraph 2h of the Civil Service Law are determined not to have been in violation of Section 210.

## ARTICLE XI - VACATIONS

Section 1.

The Department shall continue to provide authorized annual vacations of twenty-seven work days.

Section 2.

Employees may select individual vacation days at the time vacations are picked, provided that the maximum number of employees allowed to take such individual vacation days at any time shall be 2% of the Unit Rank Complement, and provided further that no employee may choose more than one of the following holidays as an individual vacation day: Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day. Any employee who fails to select such individual vacation days at the time the employee makes the regular vacation pick may select such individual vacation days at a later time subject to the exigencies of the Department. Such individual vacation days shall be treated as regular vacation picks.

Section 3. - Accrual of Vacation

If the Police Department calls upon an employee in writing to forego the employee's vacation or any part thereof that portion up to a maximum of three weeks of vacation shall be carried over until such time as it can be liquidated in the following calendar year subject to the following conditions:

    (1)    the selection of such vacation days shall be in the discretion of and subject to the exigencies of the Department; and

    (2)    the selection of such days in the following calendar year shall be made after the regular vacation picks; and

10.010

(3)     the utilization of this vacation time shall be restricted to the months of January through May and September through November.

It is the intention of the Police Department to allow an employee to request permission to accrue vacation consistent with this provision and to grant such requests which are reasonable.

## ARTICLE XII - HEALTH AND HOSPITALIZATION BENEFITS

Section 1.
The City shall continue to provide a fully paid choice of health and hospitalization insurance plans for each employee, not to exceed 100% of the full cost of HIP-HMO on a category basis. There will be an annual reopening period during the term of this Agreement for active employees to exercise their choice among medical plans.

Section 2.
Retirees shall have the option of changing their previous choice of Health Plans.  This option:

(a)     shall be a one time choice;

(b)     shall be exercised only after one year of retirement; and

(c)     can be exercised at any time without regard to contract periods.

The effective date of change to a new plan shall be the first day of the month three months after the month in which the application has been received by the New York City Health Insurance Program.

Effective with the reopener period for Health Insurance subsequent to January 1, 1980 and every two years thereafter, retirees shall have the option of changing their previous choice of health plans.  This option shall be exercised in accordance with procedures established by the Employer. The Union will assume the responsibility of informing retirees of this option.

Section 3.
a.     Effective July 1, 1983 and thereafter, the City's cost for each employee and for each retiree under age 65 shall be equalized at the community rated basic HIP/HMO plan payment rate as approved by the State Department of Insurance on a category basis of individual or family, e.g. the GHI-CBP/Blue Cross payment for family coverage shall be equal to the HIP/HMO payment for family coverage.

b.     If a replacement plan is offered to employees and retirees under age 65 which exceeds the cost of the HIP/HMO equalization provided in Section 3a, the City shall not bear the additional costs.

10.0010

c.   The City shall continue to contribute on a City employee benefits program-wide basis the additional amount of $35 million to maintain the health insurance stabilization reserve fund which shall be used to continue equalization and protect the integrity of health insurance benefits.

The health insurance stabilization reserve fund shall be used: to provide a sufficient reserve; to maintain to the extent possible the current level of health insurance benefits provided under the GHI-CBP/Blue Cross plan; and, if sufficient funds are available, to fund new benefits.

The health insurance stabilization reserve fund shall be credited with the divisions or reduced by the losses attributable to the GHI-CBP/Blue Cross plan.

d.   In the event that there is a Citywide or program-wide health insurance package which exceeds the cost of the equalization and stabilization fund described above, the parties may negotiate reconfiguration of this package which in no event will provide for costs in excess of the total costs of this Agreement as set forth herein. However, it is understood that the SBA will not be treated any better or any worse than any other Union participating in the Citywide or Program-wide Health Program with regard to increased health insurance costs.

Section 4.
Where an employee is suspended without pay prior to disciplinary trial for disciplinary reasons for more than 30 days, the employee shall receive full health and hospitalization benefit coverage during the period of the suspension following the first 30 days. Where an employee is subsequently restored to full pay status, as of the date of suspension, the employee shall be restored to full health and hospitalization coverage for the first 30 days of the suspension.

Section 5.  Health Care Flexible Spending Account.
a.   A flexible health care spending account shall be established after July 1993 pursuant to Section 125 of the IRS Code. Those employees eligible for New York City health plan coverage as defined on page 32, section 4(B) of the 1992 New York City Health Summary Program Description shall be eligible to participate in the account. Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year. Said contribution minimum and maximum levels may be modified by the MLC Health Advisory Committee based on experience of the plan. Any unfunded balance may be deducted from final salary payments due an employee.

b.   Expenses of the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered. In no case will any of the above expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

Case 1:20-cv-05441-KPF   Document 10-4   Filed 07/17/20   Page 16 of 63

c.    An administrative fee of $1.00 per week for the first year shall be charged for participation in the program. An employee's participation in the account is irrevocable during a plan year. At the close of the plan year any excess balance in an employee's account will not be refunded.

Section 6.

The applicable terms of the Health Benefits Agreement, dated July 22, 2005, is incorporated into this Agreement.

ARTICLE XIII - HEALTH AND WELFARE FUND

Section 1.

a.    Effective June 1, 2005, the City shall continue to contribute the pro-rata annual amount of $1,425 for each employee for remittance to the Health and Welfare Fund of the Sergeants Benevolent Association of the City of New York ("Welfare Fund") pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

b.    Effective July 1, 2008, the City shall contribute $1595 per annum to the Welfare Fund on behalf of retirees. Effective September 1, 2010, the City shall contribute $1675 per annum to the Welfare Fund on behalf of retirees.

c.    Pursuant to its commitment, the SBA will continue to provide benefits to employees' domestic partners.

d.    To the extent permitted by law, part of the amounts so contributed may be applied to maintain an appropriate legal services plan, pursuant to the terms of a supplemental agreement between the parties as approved by the Corporation Counsel.

e.    Effective June 1, 2005, employees who have been separated from service subsequent to December 31, 1970, and who were covered by the Health and Welfare Fund of the Sergeants Benevolent Association at the time of such separation pursuant to a supplementary agreement between the City and the SBA shall continue to be so covered, subject to the provisions of Sections 1 a, b, and c, hereof, on the same contributory basis as incumbent employees. Contributions shall be made only for such time as said individuals remain primary beneficiaries of the New York City Health Insurance Program and are entitled to benefits paid for by the City through such Program.

f.    Civil Legal Representation Fund
      Effective June 1, 2005, the City shall continue to contribute $75 per annum for each active Employee to the Welfare Fund to establish a civil legal representation fund pursuant to the terms of a supplemental agreement between the City and Union as approved by the Corporation Counsel. While these funds shall be administered by the applicable Welfare Fund, they are to be maintained in a separate account and shall not be

commingled with the other monies received by the Welfare Fund. Only the $75 provided above may be used for civil legal representation. No additional monies from the Welfare Fund may be used for civil legal representation.

g.    Such payments shall be made pro-rata by the City every twenty-eight (28) days.

Section 2.
Where an employee is suspended without pay for disciplinary reasons and is subsequently restored to full pay status as of the date of the suspension, the employee shall receive full Health and Welfare Fund coverage for the period of the suspension.

## ARTICLE XIV - ANNUITY FUND

Section 1.
Effective June 1, 2005, the City shall continue to contribute for each employee, on a twenty eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1119.69 per annum for each Sergeant and $1197.99 per annum for each Sergeant designated on Special Assignment or as Supervisor of Detective Squad in full pay status in the prescribed twelve (12) month period. Contributions hereunder shall be remitted by the City each twenty eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

Section 2.
Effective September 1, 2010, the City shall contribute an additional $261 per annum for each employee, on a twenty eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1380.69 per annum for each Sergeant and $1458.99 per annum for each Sergeant designated on Special Assignment or as Supervisor of Detective Squad in full pay status in the prescribed twelve (12) month period. Contributions hereunder shall be remitted by the City each twenty eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

Section 3.
Where an employee is suspended without pay for disciplinary reasons and is subsequently restored to full pay status as of the effective date of the suspension, the employee shall receive full Annuity Fund coverage for the period of the suspension.

## ARTICLE XV - GENERAL

Section 1. - Safety Helmets
The City agrees to furnish a safety helmet and equipment related thereto for each employee. Such headgear shall conform to Police Department specifications in effect at the time of this Agreement.

## Section 2. - Parking Facilities

It is the intent of the Department to make available without liability to the City, City-owned property and on-street locations adjacent to, near or part of police stations or other command locations, as parking facilities for the personal cars of employees. A single designated representative of the Department and a single designated representative of the SBA will survey locations in the vicinity of station houses to determine what space is available which could reasonably be used for police parking and, where space exists, the Department and the SBA will jointly request of the appropriate City agency designation of such locations. This expressed intent of the Department does not imply any obligation or commitment on the part of the City or the Department to make available any such location or parking facilities. Where such property is provided and so designated for this purpose, the City shall not be obligated to improve the same, nor to maintain it for parking. The City need not continue to provide such property for parking when the City, in its discretion, decides to make a different use of it.

All inquiries or complaints from employees concerning the subject matter or application of this section shall be referred directly to the SBA for investigation and review. The SBA shall screen and thereafter shall present only those inquiries or complaints which it believes are justified to the Commanding Officer of the Office of Labor Relations of the Police Department, or the Commanding Officer's designee, for discussion and possible adjustment.

This Section shall not be subject to the grievance procedure.

## Section 3. - Maintenance of Facilities

All commands and other Departmental places of assignment shall have adequate heating, hot water and sanitary facilities. The Union shall give notice to the Department of any failure to maintain these conditions. If not corrected by the Department within a reasonable time, the Union may commence a grievance at Step 3 of the grievance procedure concerning that failure.

## Section 4. - Private Hospital Accommodations for Line-of-Duty Injuries

It is the intent of the City to use its best efforts to secure private room accommodations in a hospital for employees injured in the line of duty. This Section shall not be subject to the grievance procedure.

## Section 5. - Information Exchange

a.      The Department will provide the Union with a copy of all Orders, Department Bulletins, "Open Door" issues, and press releases. The details of delivery shall be worked out between the parties.

The Department will provide to the Union on a semi-annual basis a computer printout containing names and addresses of employees, listed alphabetically.

b.      The Union will provide the Department with a copy of Union publications, bulletins and press releases.

Section 6. - Meal Areas

A representative of the Department and a representative of the SBA will meet to determine an adequate meal area for employees within each command and other Departmental places of assignment. This does not contemplate rebuilding or extensive remodeling.

Section 7. - Personal Folder

a.    The Personnel Bureau will provide the Union with a list of categories of items included in the Personal Folder with an indication of those confidential items which an employee is not permitted to review.

b.    Employees may view their folders on normal business days between the hours of 9 A.M. and 5 P.M. by appearing in person at the Employee Management Division, Personnel Bureau, 10th Floor, Police Headquarters. To avoid delay, employees should call the Employee Management Division at least one day in advance.

c.    The Department will upon written request to the Chief of Personnel by the individual employee, remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified "exonerated" and/or "unfounded".

Section 8. - Disciplinary Records

Where an employee has been charged with a "Schedule A" violation as listed in Patrol Guide 118-2 and such case is heard in the Trial Room and disposition of the charge at trial or on review or appeal therefrom is other than "guilty", the employee concerned may, after 2 years from such disposition, petition the Police Commissioner for a review for the purpose of expunging the record of the case. Such review will be conducted by a board composed of the Deputy Commissioner - Trials, Department Advocate, and the Chief of Personnel, or their designees. The Board will make a recommendation to the Police Commissioner. The employee concerned will be notified of the final decision of the Police Commissioner by the Deputy Commissioner - Trials.

Section 9. - Disciplinary Procedures

The parties, through a joint subcommittee, shall develop procedures to insure that:

a.    All disciplinary charges shall be brought in a timely fashion pursuant to the current departmental regulations.

b.    Departmental trials shall be held as promptly as possible, utilizing additional hearing personnel.

c.    Reimbursement shall be made for any period of suspension in excess of any penalty ultimately levied.

### Section 10. - Fixed Post Duty
A commanding officer may limit fixed post duty for a single employee to a single four-hour period.

### Section 11. - Meal Scheduling

a.   Employees shall not be assigned meals as a matter of practice during either the first hour and one-half or last hour and one-half of their tours.  In cases of emergency this practice may be altered.

b.   Field Commanders will be reminded that a meal period should ordinarily be assigned to Sergeants on parade and other details and that reasonable efforts should be made to assign meal periods.  This paragraph b is not subject to the grievance procedure.

### Section 12. - Lump Sum Payments
Where an employee has an entitlement to accrued annual leave and/or compensatory time, and the City's fiscal condition requires employees who are terminated, laid off or who choose to retire in lieu of layoff to be removed from the payroll on or before a specific date, or where an employee reaches the mandatory retirement age, the employer shall provide the monetary value of accumulated and unused annual leave and/or compensatory time allowances standing to the employee's credit in a lump sum.  Such payment shall be in accordance with the provisions of Executive Order 30, dated June 24, 1975.

Where an employee has an entitlement to terminal leave and the City's fiscal situation requires that employees who are terminated, laid off or retired be removed from the payroll on or before a specific date, or where an employee reaches the mandatory retirement age, the employer shall provide a monetary lump sum payment for terminal leave in accordance with the provisions of Executive Order 31, dated June 24, 1975.

### Section 13. - Interest Payments
Interest on wage increases shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days after execution of this Agreement or one hundred-twenty (120) days after the effective date of the increase, whichever is later, to the date of actual payment.  Interest on longevity and step-up increments, differentials and holiday pay shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days following its earning or one hundred-twenty (120) days after the execution of this Agreement, whichever is later, to the date of actual payment.  Interest on overtime pay shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days following its earning or one hundred-twenty (120) days following the employee's submission of an overtime report, whichever is later.  Interest accrued pursuant to this paragraph shall be payable only if the amount of interest due to an individual employee exceeds five dollars ($5).

Section 14. - Layoffs

Where layoffs are scheduled the following procedure shall be used:

1.  Notice shall be provided to the appropriate Union not less than 30 days before the effective dates of such projected layoffs.

2.  Within such 30-day period designated representatives of the Employer will meet and confer with the designated representatives of the appropriate Union with the objective of considering feasible alternatives to all or part of such scheduled layoffs, including but not limited to (a) the transfer of employees to agencies with retraining, if necessary, consistent with Civil Service Law but without regard to Civil Service title, (b) the use of Federal and State funds whenever possible to retain or re-employ employees scheduled for layoff, (c) the elimination or reduction of the amount of work contracted out to independent contractors and (d) encouragement of early retirement and the expediting of the processing of retirement applications.

    When a layoff occurs, the Department will provide the Union with a list of employees who are on a preferred list with the original date of appointment utilized for the purpose of such layoff.

Section 15. - Public Transportation

The City and the SBA will use their best efforts to effect free transportation on buses and subways for Sergeants.

Section 16. - Polygraphs

The current practice concerning the use of polygraphs in internal investigations shall be maintained during the term of this Agreement.

Section 17. - Probationary Period

Upon an employee's satisfactory completion of six (6) months of probation, the employee's commanding officer may recommend that the employee be granted permanent status.

Section 18.  Performance Compensation

The City acknowledges that each of the uniformed forces performs an important service that reflects the diverse missions of the City's uniformed agencies. In order to reward service of an outstanding, exceptional nature, each of the uniformed agencies will establish a performance compensation program to recognize and reward such service, tailored to the unique missions of the individual uniformed agency.

The parties agree that additional compensation may be paid to employees performing outstanding, exemplary, difficult and/or unique assignments. The City will notify and discuss with each affected union of its intent to pay such additional compensation and the individuals to be compensated.

The criteria for the granting of performance-based compensation shall be based upon outstanding performance in the work assigned, and/or performance of unique and difficult work.

The performance-based compensation payments provided for in this section shall be one-time, non-recurring cash payments subject to applicable pension law. An employee can receive no more than one payment annually.

This provision shall not affect any existing productivity programs covered in any existing collective bargaining agreements. Nor shall this provision be construed to waive any obligation of the City to negotiate over future productivity programs as required by applicable law.

## ARTICLE XVI - UNION ACTIVITY

### Section 1.
Time spent by Union officials and representatives in the conduct of labor relations shall be governed by the provisions of Mayor's Executive Order No. 75, as amended, dated March 22, 1973, or any other applicable Executive Order or local law, or as otherwise provided in this Agreement. No employee shall otherwise engage in Union activities during the time the employee is assigned to the employee's regular duties.

### Section 2.
Union Trustees and delegates shall be recognized as representatives of the Union within their respective territories and commands. For the purpose of attending the regular scheduled monthly delegate meetings, but not more than twelve (12) per year, there will be a 24-hour excusal for daytime meetings on the 1st, 2nd and 3rd platoons on the day of the meeting, and for evening meetings on the 2nd and 3rd platoons on the day of the meeting and the 1st platoon on the following day. If the delegate or officer is either sick or out-of-town on leave or assignment, or is required to appear in court, an alternate will be able to obtain this same excusal. The Union will provide the City with a list of those attending each such meeting, which shall be the basis for their payment.

### Section 3.
The parties shall explore a further clarification of Departmental rules and procedures to enable SBA delegates and officers to represent properly the interests of Sergeants. An appropriate Departmental order in this regard shall be issued.

## ARTICLE XVII - NO DISCRIMINATION

In accord with applicable law, there shall be no discrimination by the City against any employee because of Union activity.

## ARTICLE XVIII - NIGHT SHIFT DIFFERENTIAL

a.   There shall be a 10% night shift differential effective January 1, 1971 applicable to all employees assigned to rotating tours of duty for all work actually performed between the

hours of 4:00 P.M. and 8:00 A.M.  There shall be a 10% night shift differential effective January 1, 1971 applicable to all other employees for all work actually performed between the hours of 4:00 P.M. and 8:00 A.M., provided that more than one hour is actually worked after 4:00 P.M. and before 8:00 A.M.

b.   Where overtime compensation is to be calculated for tours in the regular duty chart, the overtime calculation shall be based on the rate paid for the tour to which the overtime is attached; for tours not in the regular duty chart, the overtime calculation shall be based on the rate paid for half or more of the hours of the tour to which the overtime is attached.

## ARTICLE XIX - OVERTIME TRAVEL GUARANTEE

### Section 1.
The assignment of an employee to a post not within the employee's permanent command (hereinafter referred to as "flying") shall in the first instance be accomplished so that the assignment originates and terminates within such employee's permanent command and within the employee's regular tour of duty.

### Section 2.
Overtime travel guarantee compensation shall continue to be paid as follows:

a.   In the event that an employee is assigned to a post outside the employee's permanent command and is required to report at such post at the start of the employee's regular tour of duty, the employee shall accrue an allowance for travel to the assigned post at the rate of time and one-half for 45 minutes of travel time if the assigned post is within the same patrol borough as the employee's permanent command or at the rate of time and one-half for 1-1/4 hours if the assigned post is in a different patrol borough from that of the employee's permanent command.

b.   In the event that an employee is assigned to a post outside the employee's permanent command and cannot return to the permanent command within the regular tour of duty, the employee shall accrue an allowance for travel to the permanent command at the same rate as stated in Subsection 2(a) of this Article.

### Section 3.
The overtime accrued pursuant to this Article for any one day shall be taken at the employee's sole option either all in cash or all in compensatory time off.

### Section 4.
In the administration of the provisions of this Article the arbitrator's award in OCB Docket No. A-212-72 shall be applicable.

### Section 5.
Notwithstanding anything to the contrary herein, employees assigned to the Detective Bureau and/or "Designated as Supervisor of Detective Squad" and/or "Designated on Special

10.010

Assignment" shall not receive Overtime Travel Guarantee compensation during the entire period of such assignment, except when assigned in uniform.

Section 6.

(1)    All claims for payment of compensatory time off which is earned pursuant to this Article on December 1, 1977 or thereafter must be submitted to the appropriate payroll personnel by the applicant within 180 days from the date payment is earned for payment in cash. All applications submitted after 180 days up to 365 days from the date payment is earned will be granted the appropriate compensatory time off only for claims under this Article.

(2)    If a request for payment is timely submitted and rejected by the Police Department, the grievant shall have 120 days from the date of receipt of a written rejection notice to file a grievance pursuant to this Article.

(3)    The above clarification shall apply only to claims under this Article earned on December 1, 1977 or thereafter.

(4)    This clarification applies to a grievance brought under this collective bargaining contract only. It has no applicability to any other legal remedy which an individual may have.

## ARTICLE XX - GRIEVANCE AND ARBITRATION PROCEDURE

Section 1. - Definitions

a.    For the purposes of this Agreement the term, "grievance," shall mean:

(1)    a claimed violation, misinterpretation or inequitable application of the provisions of this Agreement;

(2)    a claimed violation, misinterpretation or misapplication of the rules, regulations, or procedures of the Police Department affecting terms and conditions of employment, provided that, except as otherwise provided in this Section 1(a), the term, "grievance" shall not include disciplinary matters;

(3)    a claimed improper holding of an open-competitive rather than a promotional examination;

(4)    a claimed assignment of the grievant to duties substantially different from those stated in the grievant's job title specifications.

b.    For the purposes of this Agreement the term "Commanding Officer" shall mean the immediate Commanding Officer of the aggrieved employee.

c.    For the purposes of this Agreement the term "Reviewing Officer" shall mean the superior officer in charge of the next higher command or level above a Commanding Officer.

10.010

d.  For the purposes of this Agreement the term "Board" shall mean the Personnel Grievance Board to be composed of three (3) members, as follows:  a Deputy Commissioner or other designee of the Police Commissioner, who shall be Chairman of the Board, the Chief of Department or the Chief of Department's designee, and the President of the Union or the President's designee.

e.  For the purposes of this Agreement the term, "grievant," shall mean an employee or group of employees asserting a grievance or the Union or both, as the context requires.

Section 2.
The availability of the grievance or arbitration procedure shall not justify a failure to follow orders.

Section 3.
a.  Every grievant shall have the right to present a grievance in accord with the procedure provided herein free from coercion, interference, restraint or reprisal.

b.  The informal resolution of differences or grievances is urged and encouraged at all levels of supervision.

c.  Commanding Officers and Reviewing Officers shall promptly consider grievances presented to them and, within the scope of their authority take such necessary action as is required herein.

d.  Commanding Officers, Reviewing Officers and members of the Personnel Grievance Board shall consider objectively the merits of grievances with due consideration to the harmonious interrelationship that is sought to be achieved among all members of the force and for the good of the Police Department.

e.  Any employee may present the employee's own grievance through the first four steps of the grievance procedure either individually (with the aid of the employee's own counsel if the employee so chooses), or through the Union, provided, however, that the Union shall have the right to have a representative present at each step of the grievance procedure.

Section 4.
Under the grievance procedure herein a grievance must be initiated within 90 days following the date on which the grievance arose or the date on which the grievant should reasonably have learned of the grievance or the execution date of this Agreement, whichever date is the latest. Grievances shall be processed according to the following procedure:

STEP I.
A grievant shall present the grievance to the Commanding Officer either orally or in writing.  The Commanding Officer shall carefully consider the matter, make a decision thereon and advise the grievant of the decision within five (5) days of the grievance's submission.

## STEP II.

If the grievance is not satisfactorily adjusted at Step I, the grievant may seek the following review within ten days after receipt of the Step I decision. The grievant shall reduce the grievance to writing on Form P.D. 158-151 (in triplicate), setting forth a concise statement of the grievance and the results of the proceedings at Step I. The grievant shall forward two copies to the appropriate Reviewing Officer and retain one copy for personal use. The Reviewing Officer shall forward one copy to the Commanding Officer, requesting the Commanding Officer's comments. The Reviewing Officer shall carefully consider said grievance, make a determination, and notify the grievant and the Commanding Officer of the Reviewing Officer's decision within ten (10) days following receipt of the grievance.

## STEP III.

If the grievance is still not satisfactorily adjusted, the grievant may, not later than ten days after notification of the Reviewing Officer's decision, seek further review as follows:

The grievant shall prepare a report on P.D. 158-151 (in quintuplicate) setting forth a concise statement of the grievance and the results of the proceedings at Steps I and II. The grievant shall forward four copies of the report through official channels to the Chairman, Personnel Grievance Board, retaining one copy for personal use. The Board shall forward one copy to the Reviewing Officer, requesting the Reviewing Officer's comments thereon. The Personnel Grievance Board shall meet at least once a month on a date designated by the Chairman. At each meeting, the Board shall consider all grievances which, at least five days prior to such meeting, have been properly referred to the Board. The grievant may choose to have the grievant's representatives present at the meeting, at which time oral and written statements may be presented.

The Board shall carefully consider said grievance, make a determination and notify the grievant, the Commanding Officer and the Reviewing Officer, in writing, of its decision within seven days after the meeting at which the grievance is considered.

It is understood and agreed by and between the parties that there are certain grievable disputes which are of a Department level or of such scope as to make adjustments at Step I or Step II of the grievance procedure impracticable, and, therefore, such grievances may be instituted at Step III of the grievance procedure by filing the required written statement of the grievance directly with the Chairman of the Personnel Grievance Board; the Chairman or Chairman's designee shall convene a meeting of the Board within five (5) working days following receipt of the grievance, and the Board shall render its decision within five (5) working days following that meeting.

## STEP IV.

Where the grievance is not satisfactorily adjusted at Step III, the grievant may refer the grievance, not later than thirty (30) calendar days after notification of the Board's decision, to the Police Commissioner for determination; and the Police Commissioner shall make a determination within ten (10) working days following receipt of the grievance. This determination shall be made after appropriate consultation with any or all parties to the grievance, including the Chairman of the Board and/or the Board members; and copies shall be sent to the grievant and the Union.

10.010

Grievances which affect substantial numbers of employees may be compressed by elimination of the fourth Step of the grievance procedure.

Section 5.
At every step of these procedures, the grievant and the officer considering the grievance shall work for a satisfactory adjustment. At any step, the Commanding Officer, the Reviewing Officer, and the Board shall have the right to summon the grievant and any and all persons considered necessary to the equitable adjustment of the grievance. Proceedings shall be informal. The Chairman of the Personnel Grievance Board shall take such steps to implement the provisions concerning grievances as are necessary for the proper and effective operation of the procedures provided for herein. The Chairman shall resolve questions as to jurisdictional responsibility of Commanding Officers and Reviewing Officers and shall work out the operational details of the program. For these purposes, the Chairman shall issue orders and instructions through the Chief of Department not inconsistent with the provisions of this Article.

Section 6.
The grievance procedure established hereinbefore is designed to operate within the framework of, and is not intended to abolish or supersede, existing rules and procedures providing for additional methods of redress. These include, but are not limited to, the existing rights of a grievant to request an interview with the Police Commissioner.

Section 7.
Any or all of the foregoing grievance steps may be waived by the written consent of both parties.

Section 8.
Within twenty (20) days following receipt of the Police Commissioner's Step IV decision, the Union shall have the right to bring grievances unresolved at Step IV to impartial arbitration pursuant to the New York City Collective Bargaining Law and the Consolidated Rules of the New York City Office of Collective Bargaining. In addition, upon ten (10) days' written notice to the Union, the City shall have the right to bring directly to arbitration any dispute between the parties concerning any matter defined as a "grievance" herein. The City shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining, with a copy to the Union; and the matter shall proceed pursuant to the Consolidated Rules of the Office of Collective Bargaining.

A permanent rotating Panel of a minimum of five (5) Arbitrators shall be established, drawn from the official panel of the Office of Collective Bargaining, as agreed to by both parties. The members of the Panel shall be assigned on a rotating basis to arbitrate all grievances under this Section.

The assigned Arbitrator shall hold a hearing at a time and place convenient to the parties and a transcript shall be taken unless the taking of a transcript is waived by both parties. The arbitrator shall attempt to issue an award within ten (10) days after the completion of the hearing.

10.010.

The City and the Union shall each pay 50% of the fees and expenses of the Arbitrator and of all other expenses incidental to such arbitration. The costs of one copy for each party and one copy for the Arbitrator of the transcripts shall be borne equally by the parties.

Section 9.

In case of grievances falling within Sections 1(a)(1), or 1(a)(2) of this Article, the arbitrator's decision, and order or award (if any), shall be limited to the application and interpretation of the collective bargaining Agreement, rule, regulation, procedure, order or job title specification involved, and the Arbitrator shall not add to, subtract from, or modify any such Agreement, rule, regulation, procedure, order or job title specification. An Arbitrator's award shall be final and binding and enforceable in any appropriate tribunal in accord with Article Seventy-Five of the Civil Practice Law and Rules, except that awards as to grievances concerning assignment of the grievant to duties substantially different from those stated in the grievant's job title specification or the use of an open-competitive rather than promotional examination, shall be final and binding and enforceable only to the extent permitted by law. An Arbitrator may provide for and direct such relief as the Arbitrator determines to be necessary and proper, subject to the limitation set forth above and any applicable limitations of law.

Section 10.

The time limits contained in this Article may be modified by mutual agreement. In the event that the Department fails to comply with the time limits prescribed herein, the grievance may be advanced to the next step.

## ARTICLE XXI - LINE-OF-DUTY DEATH BENEFIT

In the event an employee dies because of a line-of-duty injury received during the actual and proper performance of police service relating to the alleged or actual commission of an unlawful act, or directly resulting from a characteristic hazard of police duty, through no fault of the employee's, a payment of $25,000 shall be made from funds other than those of the Retirement System in addition to any other payment which may be made as a result of such death. Such payment shall be made to the beneficiary designated under the Retirement System or, if no beneficiary is so designated, to the estate of the deceased.

## ARTICLE XXII - DEATH BENEFIT-UNUSED LEAVE AND COMPENSATORY TIME

If an employee dies while employed by the City, the employee's beneficiary designated under the Retirement System or, if no beneficiary is so designated, the deceased's estate shall receive payment in cash for the following as a death benefit:

a. All unused accrued leave up to a maximum of 54 days' credit;

b. All unused accrued compensatory time earned subsequent to January 1, 1971 which is verifiable by official Department records up to a maximum of two hundred (200) hours.

10.010

## ARTICLE XXIII - OPTIONAL WORK DURING VACATIONS

Section 1.
Any employee may volunteer to work for one five-day period during such employee's vacation leave. Whether the volunteer will be assigned to duty is within the discretion of the Department. If assigned to duty, the assignment shall be at the discretion of the Department to any regular platoon in any one command for the entire five-day period. No employee shall be discriminated against in the application of this Section because the employee is in the last year of service.

Section 2.
An employee who so volunteers shall be compensated at the employee's regular straight-time rate of pay for all work performed during the assigned platoon's regular hours of work. Except as otherwise provided in this Article, all other provisions of this Agreement shall be applicable to work so performed.

Section 3.
Contributions under Article XIII (Health and Welfare Fund) and Article XIV (Annuity Fund) of this Agreement shall not be paid for work performed pursuant to this Article.

Section 4.
For the purposes of Article XIX (Overtime Travel Guarantee) of this Agreement, the command to which an employee is so assigned for the five-day period shall be deemed that employee's "permanent command."

## ARTICLE XXIV - NO STRIKES

In accord with applicable law, neither the Union nor any employee shall induce or engage in any strikes, slowdowns, work stoppages, or mass absenteeism, or induce any mass resignations during the term of this Agreement.

## ARTICLE XXV - BULLETIN BOARDS

The Union may post notices on bulletin boards in places and locations where notices usually are posted by the employer for employees to read. All notices shall be on Union stationery, shall be used only to notify employees of matters pertaining to Union affairs, and shall not contain any derogatory or inflammatory statements concerning the City, the Department, or personnel employed by either entity.

## ARTICLE XXVI - LABOR MANAGEMENT COMMITTEE

Section 1.
The City and the Union, having recognized that cooperation between management and employees is indispensable to the accomplishment of sound and harmonious labor relations, shall jointly maintain and support a labor-management committee.

10.0010

Section 2.

The labor-management committee shall consider and may recommend to the Police Commissioner changes in the working conditions of the employees, including, but not limited to, the following subjects: the adequate levels of police coverage to ensure the safety of employees on duty; and excusal policy for employees appearing in court after the midnight tour. Matters subject to the grievance procedure shall not be appropriate items for consideration by the labor-management committee.

Section 3.

The labor-management committee shall consist of six members who shall serve for the term of this Agreement. The Union shall designate three members and the Police Commissioner shall designate three members. Vacancies shall be filled by the appointing party for the balance of the term to be served. Each member may designate one alternate. The committee shall select a chairman from among its members at each meeting. The chairmanship of the committee shall alternate between members designated by the Police Commissioner and the members designated by the Union. A quorum shall consist of a majority of the total membership of a committee. A committee shall make its recommendations to the Police Commissioner in writing.

At the request of either the Police Department or the S.B.A., a representative of the Mayor's Office of Labor Relations will sit in on the Labor Management Committee.

Section 4.

The labor-management committee shall meet at the call of either the Union members or the City members at times mutually agreeable to both parties. At least one week in advance of a meeting the party calling the meeting shall provide to the other party, a written agenda of matters to be discussed. Minutes shall be kept and copies supplied to all members of the committee.

## ARTICLE XXVII - RADIO MOTOR PATROL

In recognition of the findings and conclusions in the Report of the Impasse Panel, dated October 3, 1980, in BCB Case No. I-145-79, the Sergeants' Benevolent Association of the Police Department of the City of New York (the "SBA") and the City of New York (the "City") hereby mutually agree that the following safeguards and clarifications are necessary to alleviate the impact of solo supervisory patrol on the safety of Sergeants and that the following shall constitute the agreement of the parties:

### 1. Trigger Points.

Solo supervisory patrols (whether voluntary or involuntary) shall not be assigned unless the "trigger point" of two-man RMP's for the precinct and tour shall have been met. The current trigger points shall be those now in effect under Operations Order 85. Such trigger points may be increased by the City, but shall not be decreased during the term of the contract except on mutual consent.

10.010

Only marked RMP cars made up of two uniformed Police Officers actively assigned to regular precinct patrol for the particular precinct and tour shall be counted towards reaching the trigger point number. Once the trigger points are reached at the beginning of the tour, a supervisor may be assigned to solo supervisory patrol only if a Police Officer is actually assigned to perform and will perform solo patrol in an RMP car at the commencement of that tour in that precinct pursuant to Operations Order 85 as now in effect, except on the second platoon. A supervisor may be assigned to solo supervisory patrol during the second platoon once the trigger point for the particular precinct has been reached at the beginning of the tour, even if there are no Police Officers assigned to solo patrol. If, at any time during a tour, however, the number of two-man RMP cars on active street patrol falls below the trigger point for the particular precinct and tour except as a result of meals and other temporary situations, solo supervisory patrol shall be immediately suspended for the remainder of the tour and the patrol supervisor shall be provided an operator before resuming supervisory patrol. Except on the second platoon, solo supervisory patrol shall be suspended if all RMP cars assigned to solo patrol by Police Officers in that precinct pursuant to Operations Order 85 as now in effect have been taken out of service during that tour.

The provisions of this paragraph are subject to paragraph 7 below.

2. Equipment and Training.
The City shall supply and equip supervisors on solo patrol with operational portable radios, and shotguns, with adequate training in the use and care of that weapon. Adequate training shall be a condition precedent to assignment.

The training to be given to supervisors for solo supervisory patrol shall be the same as that received by Police Officers and shall include instructions that supervisors on solo supervisory patrol are to act prudently under all circumstances, are not expected to place themselves in peril or unnecessarily jeopardize their safety pending arrival of backup personnel and, if required by the circumstances on the scene at that time, shall await assistance without immediately taking action. Shotgun training will be given first to volunteers and then, only if staffing problems should develop, would other Sergeants be requested to go through this training. The Department will consult with the SBA on training procedures before their implementation. In addition, the Department will investigate and alleviate any problems of which they presently are or should become aware concerning defective radios or "dead" areas affecting supervisors on solo supervisory patrol.

3. Volunteers.
All solo supervisory patrols shall first be filled on a volunteer basis, and involuntary assignments shall be made only if no volunteers are available. Volunteers shall be limited to those Sergeants who are assigned to supervise precinct patrol on each tour in each particular precinct.

### 4. Solo Response.

Solo patrol supervisors shall not be dispatched or respond as primary response units, and shall not be dispatched or respond as back-up units except in emergencies when no other back-up RMP is available. In emergencies when no other back-up RMP unit is available, other RMP units on low-priority jobs will be dispatched before a solo supervisor is dispatched and RMP units on meal or otherwise temporarily out of service shall be dispatched before a solo supervisor is dispatched if the RMP units can be called back into service expeditiously.

### 5. Familiarity With Precinct.

A supervisor not familiar with the precinct or area which he is assigned to patrol shall be provided with an operator. Familiarity with the assigned precinct or area shall require the Supervisor to have had a minimum of three (3) months served in the precinct and to have engaged in thirty (30) tours of supervisory patrol in the precinct in the twelve (12) month period preceding the assignment. Each "tour" to be counted for the purpose of familiarization with the precinct shall be at least four (4) hours in duration of supervisory patrol performed in an RPM car. The system for recording time on supervisory patrol tours will be developed by the Department in consultation with the SBA.

### 6. Multi-Precinct Supervisory Patrol.

A supervisor assigned to patrol more than one precinct shall be provided with an operator.

### 7. Unusual Conditions.

In the event of an unusual condition occurring, the Commanding Officer shall have authority to assign a Police Officer as operator of a supervisor's vehicle on a given tour. If such condition continues for more than one week, a report with recommendations shall be forwarded to the Chief of Patrol.

When solo RMP for Police Officers is suspended due to an unusual condition, the Commanding Officer shall automatically suspend solo supervisory patrol. In addition, Commanding Officers are reminded that the conditions affecting solo supervisory patrol are such that they have the authority to declare an unusual condition for the suspension of solo supervisory patrol without having to suspend solo patrol for Police Officers.

### 8. Joint Committee.

The parties shall establish a joint Labor-Management Committee on Safety, consisting of equal representatives of the City and of the SBA, to consider and recommend changes in the program of solo supervisory patrol, including trigger point numbers. That Committee shall meet at the request of the City or the SBA, but not more frequently than every six months, except on mutual consent.

The Department will provide to the SBA all relevant reports and statistics compiled in the Department on the subject of solo RMP, as they become available, with the sole exception of high-level confidential analyses used for planning purposes.

10.010

9. Benefit Protection.

Supervisors shall not be in any way penalized, deemed to have assumed the risk or denied retirement or other benefits by virtue of their having volunteered for or been assigned to solo supervisory patrol.

## ARTICLE XXVIII - NO WAIVER

Except as otherwise provided in this Agreement, the failure to enforce any provision of this Agreement shall not be deemed a waiver thereof. This Agreement is not intended and shall not be construed as a waiver of any right or benefit to which employees are entitled by law.

## ARTICLE XXIX - SAVINGS CLAUSE

If any provision of the Agreement is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions of this Agreement.

## ARTICLE XXX - FINANCIAL EMERGENCY ACT

The provisions of this Agreement are subject to applicable provisions of law including the New York State Financial Emergency Act for the City of New York, as amended.

## ARTICLE XXXI - TERM

The term of this Agreement shall commence on June 1, 2005 and shall expire at midnight on August 29, 2011.



IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

CITY OF NEW YORK

SERGEANTS' BENEVOLENT
ASSOCIATION OF THE CITY OF
NEW YORK, INC.

BY *James F. Hanley*

JAMES F. HANLEY
Commissioner
Labor Relations

BY *Edward Mullins*

EDWARD MULLINS
President

APPROVED AS TO FORM:

BY _____
Corporation Counsel

DATE SUBMITTED TO THE
FINANCIAL CONTROL BOARD:

UNIT: SERGEANTS

TERM: June 1, 2005 to August 29, 2011

OFFICE OF LABOR RELATIONS
REGISTRATION

OFFICIAL                    CONTRACT

NO:
10010                       DATE:
                            JAN 15 2010



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period
    June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

    This is to reflect that the Impasse Panel's Report and Recommendations in OCB case #I-198-89 increased the number of appearances required by certain Sergeants as follows:

    Each employee promoted to Sergeant on or after July 1, 1990 shall be required to work three (3) additional tours per year beyond the number required for a similarly situated incumbent Sergeant. Effective July 1, 1995, as a result of the 1992-95 collective bargaining agreement, each employee promoted to Sergeant on or after July 1, 1990, after serving five (5) years in the rank of Sergeant, shall work the same number of tours per year as a similarly situated incumbent Sergeant who was promoted prior to July 1, 1990.

Very truly yours,

James F. Hanley



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period
    June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

This is to confirm our mutual understanding and agreement regarding Article XII of the above Agreement. If the stabilization fund referred to does not have sufficient monies to maintain the then current level of health insurance benefits provided under GHI-CBP/Blue Cross plan, payroll deductions in the appropriate amounts shall be taken from employees and retirees enrolled in such plan unless agreement is reached on a program wide basis to take the needed monies from the contributions to the welfare fund provided in Article XIII of the above Agreement.

Very truly yours,

*James F. Hanley*

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF THE SBA

BY: *Edward Mullins*

Edward Mullins, SBA President

**Sergeants Benevolent Association**



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

This is to confirm our mutual understanding and agreement regarding the method of calculation of the 20 and 25 years of service for the "pensionability" of longevity adjustments pursuant to Article VIII, Section 1(c) of the Agreement. The following categories of service for purposes of computing the 20 or 25 year pensionability of longevity differential payments shall be as follows:

- laid-off police time which has been purchased for pension credit
- prior City uniformed service
- prior State service credited under the pension law as uniformed service.

The following category of service shall be considered police service for purposes of computing the 25 year pensionability of longevity differential payment:

- prior City service, including trainee time.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF THE SBA
BY:

Edward Mullins, SBA President



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period
June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

This is to confirm our mutual understanding and agreement that the Sergeants Benevolent Association (SBA) has accepted and agreed to be bound by the terms of the December 1, 2000 to May 31, 2003 SBA Agreement. It is understood that up to $25 per each active employee per year to be allocated as a "Civil Legal Representation Fund" by the employer is subject to further discussions. The contributions which are provided could be for benefits other than civil legal representation expenses and if so, are subject to the employer's agreement.

These funds shall be administered by the applicable welfare fund; they are to be maintained in a separate account and shall not be commingled with other monies received by the welfare fund.

Very truly yours,

James F. Hanley

Sergeants Benevolent Association



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

## 40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period
    June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

The City and the SBA recognize that, pursuant to Administrative Code Section 12-127, the City is obligated to pay for the cost of line of duty injury prescription drugs for SBA members. The parties further recognize that a significant number of SBA members have utilized the SBA Health and Welfare Fund to pay for these prescription drugs without reimbursement by the City. The SBA agrees to waive any and all claims retroactively and prospectively against the City for the reimbursement of the cost of line of duty injury prescription drugs.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President

**Sergeants Benevolent Association**



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, N.Y. 10013

Re: SBA Agreement for the period
June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

This is to confirm that during negotiations for the successor agreement to this 2005-2011 agreement the parties shall negotiate the issue of increasing the City's contribution to the SBA Health and Welfare Fund as the first issue to be addressed. The issues to be negotiated shall include the intent of the parties to equalize the City's total contribution to the SBA Health and Welfare Fund with the total contributions made by the City to other health and welfare funds on behalf of other employees and that the SBA shall be responsible for the cost of such increased contributions.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
### 40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, New York 10013

Re: SBA Agreement for the period of June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

The City and the Sergeants Benevolent Association ("SBA") acknowledge that an Administrative Law Judge of the New York State Public Employment Relations Board in Case No. DR-119 (dated May 3, 2007) held that the subject of duty charts, as outlined in 1(d) of Chapter 143 of the Unconsolidated Laws, is a prohibited subject of bargaining. The City and PBA are appealing that determination and other unions have been granted permission by PERB to file amicus briefs.

The parties agree to continue in status quo pending a final and binding decision on that issue by PERB or a court of competent jurisdiction, and all appeals thereto, on the legal challenges to that decision. In the event the determination in DR-119 that duty charts are a prohibited subject of bargaining is affirmed, the parties will jointly support legislation to ameliorate the effect of the decision.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President

**Sergeants Benevolent Association**



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, New York 10013

Re: SBA Agreement for the period
    June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

This is to confirm the understanding between the City of New York ("City") and the Sergeants Benevolent Association ("SBA") regarding Sergeants assigned to Special Assignment ("SA") or as Supervisors of Detective Squads ("SDS").

Effective August 1, 2007, the City shall increase the current number of budgeted positions for SA and SDS assignments by 4.92% of the current SBA bargaining unit.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, New York 10013

Re: SBA Agreement for the period
June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

If another uniformed collective bargaining unit has an adjustment made to their salary schedule through the collective bargaining or arbitration process or otherwise during the time period covering June 1, 2005 through August 29, 2011, which results in a greater percentage wage increase, then, at the SBA's request, this agreement will be reopened for the purposes of negotiating the effect of that adjustment -- through the final steps of the bargaining process.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President

**Sergeants Benevolent Association**



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Sergeant Edward Mullins
President
Sergeants Benevolent Association
35 Worth Street
New York, New York 10013

Re: SBA Agreement for the period
June 1, 2005 to August 29, 2011

Dear Sergeant Mullins:

There shall be a labor-management committee established to study the equipment needs of first responders, including but not limited to, to the equipping of all members with powered-air gas masks.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF SBA

Edward Mullins, SBA President



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

March 30, 2009

Edward D. Mullins, President
Sergeants Benevolent Association
35 Worth Street
New York, NY 10013

**RE: SBA Agreement covering the period from 2005 through 2011**

Dear Mr. Mullins:

This is to confirm our mutual understanding and agreement regarding the above Agreement.

Effective the first day of the month following ratification of this Agreement a pilot program concerning Patrol Guide Procedures 205-01 and 205-45 will be established.

This pilot program will be implemented subject to the following terms:

a. The pilot program will provide that eligible employees, who request sick leave for an injury or illness, shall no longer be subject to home visitation and confinement, outside the hours of the employee's regularly scheduled tour of duty, except where the convalescence for the injury or illness requires home confinement in the opinion of the Department's Medical Division, after consultation with the employee's personal physician.

b. The following employees are not eligible to participate in the program:

    1) Any Employee who is designated as "chronic sick",
    2) Any Employee who is on modified assignment,
    3) Any Employee who is on dismissal probation,
    4) Any Employee who is on suspension.

c. The initial phase of the pilot program will run for a period of 15 months. Provided however, that in the event the initial phase of the pilot program is

Edward D. Mullins
March 30, 2009
Page 2

deemed to be successful, whereby the annualized average sick leave usage for the entire SBA bargaining unit in the 15 month period is less than the designated absence rate plus 10%, the pilot program will automatically be extended until the end of this contract term. If the second phase of the pilot program is successful, whereby the annualized average sick leave usage for the entire SBA bargaining unit in the second phase of the pilot program is less than the designated absence rate, plus 10% the parties will meet to discuss implementing the pilot program on a permanent basis.

d.   1)   For purposes of this agreement the "designated absence rate" is the average lost days, including both line of duty and non-line of duty sick leave, per member of service in the SBA bargaining unit for March 1, 2008 through February 28, 2009, which equals 8.85 days per year.

      2)   The Department, on the first day of each month, will review Sergeant availability for the preceding 365 days. In the event that Sergeant average sick leave for the entire SBA bargaining unit exceeds the designated absence rate for the preceding 365 day period by more than 10%, the previous Patrol Guide home visitation and confinement policies will be placed into effect the following day. Such procedures will remain in effect for the remainder of the month. Provided however, the Police Commissioner in his own discretion may permit the new procedures to remain in effect.

      3)   The following month another review of sick leave usage for the preceding 365 days will occur. When a monthly review results in a return to a level at or below the "designated absence rate" plus 10% the Department will resume the new visitation and confinement procedures the following day (the second day of the month).

If the above accords with your understanding, please execute the signature line below.

Very truly yours,

*James F. Hanley*

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF THE SBA.

BY:   *Edward Mullins*

Edward D. Mullins

"2011 – 2018" Sergeants Benevolent Association Memorandum of
Agreement ("SBA MOA")


**MEMORANDUM OF AGREEMENT** made this 24 day of February,      2015, ("*2011 – 2018
Sergeants Benevolent Association Memorandum of Agreement*") by and between the Sergeants
Benevolent Association ("the Union") and the City of New York ("the Employer");

### WITNESSETH

**WHEREAS**, the undersigned parties desire to enter into collective bargaining agreements,
including this *SBA MOA* and agreements successor to the existing unit agreement expiring on
August 29, 2011, to cover the employees represented by the Union ("Employees"); and

**WHEREAS**, the undersigned parties intend by this *SBA MOA* to cover all cost-related matters and
to incorporate the terms of this *SBA MOA* into the Successor Unit Agreement,

**NOW, THEREFORE**, it is jointly agreed as follows:

Section 1.      Term.

     The term of the Successor Unit Agreement shall be August 30, 2011 through August 29,
2018, eighty-four (84) months from the expiration date of the Predecessor Unit Agreement.


Section 2.      Continuation of Terms.

     All terms of the Predecessor Unit Agreement shall be continued except as modified
pursuant to this *SBA MOA.*

Section 3.      Prohibition of Further Cost-Related Demands.

No party to this *SBA MOA* shall make further cost-related demands during the term of this *SBA MOA*.


Section 4.      General Wage Increase

    a.  The general increases, effective as indicated, shall be:

       (i)    Effective August 30, 2011, Employees shall receive a rate increase of 1.0%.

       (ii)   Effective February 28, 2013, Employees shall receive an additional rate increase of 1.0%.

       (iii)  Effective February 28, 2014, Employees shall receive an additional rate increase of 1.0%.

       (iv)   Effective February 28, 2015, Employees shall receive an additional rate increase of 1.0%.

       (v)    Effective February 29, 2016, Employees shall receive an additional rate increase of 1.5%.

       (vi)   Effective March 30, 2017, Employees shall receive an additional rate increase of 2.5%.

       (vii)  Effective March 30, 2018, Employees shall receive an additional rate increase of 3.0%.

b. The increases provided for in this Section 4 a. shall be calculated as follows:

(i)     the increases in Section 4a. (i) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on August 29, 2011.

(ii)    the increases in Section 4a. (ii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 27, 2013.

(iii)   the increases in Section 4a. (iii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 27, 2014.

(iv)    the increases in Section 4a. (iv) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 27, 2015.

(v)     the increases in Section 4a. (v) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 28, 2016.

(vi)    the increases in Section 4a. (vi) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on March 29, 2017.

(vii)   the increases in Section 4a. (vii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on March 29, 2018.

c. The increases provided in this Section 4 shall be applied to the base rates and salary grades fixed for the applicable title.

Section 5.     Longevity Payments

Longevity payments will be increased with the increases listed in Section 4a. (iv)-(vii).

Section 6.     Health Savings and Welfare Fund Contributions

The May 5, 2014 Letter Agreement regarding health savings and welfare fund contributions between the City of New York and the Municipal Labor Committee, will be attached as an Appendix, and is deemed part of this *SBA MOA* and incorporated in the  Successor Unit Agreement.

Section 7.      Welfare Fund Contributions

Effective May 1, 2015, welfare fund contributions for both active and retirees will be decreased by $200 per annum.


Section 8.      Terminal Leave Lump Sum Payment

The resolution of the Board of Estimate of the City of New York dated June 27, 1957, states the following:

*Members of the Force shall be granted terminal leave with pay upon retirement not to exceed one month for every ten years of service, pro-rated for a fractional part thereof, provided, however, that no terminal leave shall be granted to an employee against whom departmental disciplinary charges are pending.*

Effective May 1, 2015, the parties agree that such employees as described in the Resolution above and are entitled to payment and who are members of the Union shall now be entitled to voluntarily choose the option of a one-time lump sum payment as their terminal leave benefit in lieu of their current terminal leave benefit prior to retirement. Such payments shall be made as soon as practicable after retirement.

In the event that a change in legislation is needed to effectuate this agreement, the parties agree to jointly support the necessary legislation to implement the terms of this Section 8.


Section 9.      Retiree Health Sub-Committee

There shall be a sub-committee with representatives of both the City and the Union to meet and discuss issues of health coverage for employees who retire prior to the age of 55 and have health benefits coverage from another employer. The parties shall share in the savings generated. The parties may agree to expand their discussion of issues regarding retiree health subject to mutual agreement.


Section 10.     Exchange of Work Days (Mutuals)

Effective the date of ratification of this Agreement, the Department shall implement a Pilot Program for twelve (12) months that will permit sergeants of the same assigned command performing similar duties to exchange tours voluntarily when there is no interference with police service and provided that the program does not generate any FLSA overtime. This Pilot Program is subject to the following provisions:

1. Sergeants are not permitted to perform two consecutive tours.(e.g. perform duty on a third platoon followed by a first platoon).

2. The exchanged tours may be on the same calendar day or on different calendar days (including RDOs).

3.  The mutual must be completed within one FLSA cycle. (Tours cannot be exchanged from different FLSA cycles).

4.  The mutual tour itself cannot generate overtime. A sergeant may receive pre-tour or post-tour overtime, but not overtime for performing the mutual tour (including a mutual tour on a RDO).

5.  Both sergeants must be qualified to perform the necessary duty.

6.  All mutual requests must be submitted at least five (5) days in advance and approved by the Commanding Officer. Requests for a mutual will not be unreasonably denied.

7.  Once a mutual has been approved by the Commanding Officer, both sergeants are scheduled to work the mutual tour.

8.  An absence on the first tour of a mutual does not void the second mutual tour. (The sergeant is still scheduled to perform the second mutual tour).

9.  There is no Administrative Sick on a mutual tour. (Sergeant must report Regular Sick).

10. Detective Rescheduling Rules are triggered by an absence on a mutual tour and permits the Department to reschedule any sergeant without 24 hour notice or the payment of contractual overtime to cover the mutual tour on any sergeant's scheduled work day.

Section 11.    Annual Leave Donation Program

A.  The City of New York and the Sergeants Benevolent Association, in order to assist uniformed members of the service in the rank of sergeant who have exhausted all available leave and need to take a prolonged absence from duty due to the medical emergency of an immediate family member, have agreed to implement a Pilot Program entitled "Annual Leave Donation Program," which shall expire on August 29, 2018. Sergeants who anticipate using a significant amount of leave to resolve issues caused by a major illness or medical condition of an immediate family member, may apply. The Pilot Program will be sponsored by the Department.

B.  All sergeants are eligible to participate as donors or recipients. Donations of accrued annual leave must be made in full day increments and will be debited from the donor's annual leave balance after review of the form and credited to the annual leave bank as full days. Only accrued annual vacation leave may be donated. Lost time, chart days, terminal leave, or any time which is not vacation is not eligible for this program. All donations of accrued annual leave are voluntary. Donations cannot be directed to a particular sergeant. Donations will be included in a pool of annual leave to be

dispersed by a joint Labor/Management panel. Donations into the "Annual Leave Donation Program" are not permitted in the calendar year of a sergeant's separation from the Department, and any such donations shall be retroactively withdrawn and returned to the individual.

C.   A sergeant must have donated at least one vacation day to the pool to be eligible for a disbursement during the life of the Pilot Program. A sergeant may donate a maximum of five vacation days per calendar year. A sergeant may receive a maximum disbursement equal to one year's vacation time that would be accrued by the sergeant in the same year. In cases of extreme hardship, the Labor/Management Panel may waive the required donation to the "Annual Leave Donation Program" prior to a disbursement, as well as, the maximum disbursement and donation limits.

D.   All decisions concerning the implementation of the "Annual Leave Donation Program" and the eligibility of the donor/donee will be mutually agreed upon by the Labor/Management panel. All decisions must comply with IRS Revenue Ruling 90-29. The decisions of the Labor/Management panel are final and not subject to review, appeal or any grievance procedures. The Labor/Management panel shall consist of four members, two members each from the SBA and the Department. A majority vote is necessary to receive a disbursement from the program.

E.   This "Annual Leave Donation Program" shall only be implemented in accordance with IRS Revenue Ruling 90-29 and as required by law.


Section 12.    Coordination of Shifts with Spouses and/or Registered Domestic Partners

In an effort to assist sergeants who are experiencing child care/family issues and have a member of the department who is either their spouse or a registered domestic partner, the Department shall upon ratification of this Agreement implement a Pilot Program for twelve (12) months that will permit sergeants to request a change of tour within their assigned command or request transfer to a command with an opening on their desired tour. Sergeants requesting said accommodations must submit a UF 49 to their commanding officer detailing the reasons for the accommodation for a tour change within their command or submit a UF 57 to their commanding officer for submission to the Personnel Bureau detailing the reasons for the accommodation.  The sergeant's request will not be unreasonably denied.

Section 13.    Fair Labor Standards Act Issues

Whereby, the parties intend to prevent potential future claims under the federal Fair Labor Standards Act ("FLSA"), the parties hereby agree as follows:

I.    Right to Schedule Chart Time

(a)    The NYPD shall have the right to schedule employee chart time in order to prevent sergeants from exceeding the FLSA overtime threshold in a 28-day cycle. This provision does not waive any rights the NYPD has to schedule chart time in the absence of an agreement.

(b)    The Union agrees to withdraw, with prejudice, the following cases and/or actions: Chart Time Improper Practice Petition (BCB-4086-14).

II.    Staggered Tours

(a)    The NYPD shall have the right to stagger the scheduled starting and finishing times of sergeants in order to prevent sergeants from performing off-the-clock work before the scheduled beginning of their tour. This provision does not waive any rights the NYPD has to alter starting and finishing times in the absence of an agreement.

(b)    Sergeants are not permitted to perform any work before their scheduled starting time or after their scheduled finishing time without the prior approval of a superior officer.

III.    Off-Duty Work

(a)    Sergeants assigned to Detective Track Commands, as defined in Administrative Guide Procedure 320-35 and Operations Order No. 19 of 2011, shall receive a stipend of $705 per year as compensation for up to one and one-half (1.5) hours of work each week performed off-duty via phone, e-mail, text, or in any other manner. The election of compensatory time is not available for off-duty work.

(b)    No sergeant assigned to Detective Track Commands shall spend more than one and one-half (1.5) hours per week on off-duty work without the prior approval of a superior officer. In the event this limit is exceeded under circumstances that made it impossible to obtain prior approval (e.g., as a result of an emergency), the sergeant must so notify a superior officer within 24 hours thereafter.

(c)    No sergeant assigned to any non-Detective Track Command shall spend any time on off-duty work without the prior approval of a superior officer. If a sergeant assigned to a non-Detective Track Command is contacted off-duty by a superior officer such approval is presumed.

(d)    Time spent receiving notifications will not qualify as off-duty work under this section.

IV.    <u>Definition of a Superior Officer</u>

For purposes of these paragraphs, a "superior officer" shall mean a person superior to that sergeant in that sergeant's chain of command.

V.    <u>Resolution of Disputes</u>

(a)    All claims arising from the application of the matters described in paragraphs II(b) and III, above, alleging violations of the federal Fair Labor Standards Act involving claims of off-duty work or pre or post-shift work, and all other claims involving the interpretation or application of these paragraphs, shall be subject to the Agreement's grievance and arbitration procedure as the final, binding, sole and exclusive remedy for such violations, and employees covered by this Agreement shall not file suit or seek relief in any other forum. The parties will take all steps necessary to ensure that claims within the scope of this paragraph are resolved pursuant to and in accordance with the grievance and arbitration provision of the collective bargaining agreement.

(b)    Arbitrators shall apply applicable law as it would be applied, and shall have such powers as would be exercised, by the appropriate court in rendering decisions on the claims covered by paragraph V(a), above.

(c)    The claims subject to resolution in accordance with paragraph V(a), above, shall not be arbitrated by way of a group grievance. All claims between a member and the Department must be decided individually.

(d)    The arbitrator shall have no authority or jurisdiction to process, conduct, or rule upon any group grievances, or to consolidate any individual claims in one proceeding absent mutual consent of the parties hereto.

V.    <u>Prohibition on Use in Any Proceeding</u>

Other than the up to 1.5 hours per week of off-duty work described in paragraph III(a), nothing contained in paragraph III shall be used in any proceeding to establish the compensability of time worked.

<u>Section 14.    Conditions of Payment.</u>

The general wage increases provided for in Section 4 of the *SBA MOA* shall be payable as soon as practicable upon execution of the *SBA MOA* and after the effective date of such increases.

Section 15.    Approval of Agreements.

This *SBA MOA* and the successor unit agreement are subject to approval in accordance with applicable law.

Section 16.    Incorporation of Certain Provisions into Other Agreements.

All applicable provisions of this *SBA MOA* shall be incorporated into the *Successor Unit Agreement*.

Section 17.    Savings Clause.

In the event that any provision of this *SBA MOA* is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions of this *SBA MOA*.

**WHEREFORE,** we have hereunto set our hands and seals this __ day of February 2015.

FOR THE CITY OF NEW YORK

By: _____
　　　ROBERT W. LINN
　　　Commissioner of Labor Relations

FOR THE SERGEANTS BENEVOLENT ASSOCIATION

By: _____
　　　EDWARD MULLINS
　　　President

9



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*

**RENEE CAMPION**
*First Deputy Commissioner*

**CLAIRE LEVITT**
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
CHRIS BERNER
*Chief of Staff*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

February 4, 2015

Edward D. Mullins, President
Sergeants Benevolent Association
31 Worth Street
New York, NY 10013

**RE: SBA MOA for the period August 30, 2011 to August 29, 2018**

Dear Mr. Mullins:

This letter confirms the parties' mutual understanding that the Sergeants Benevolent Association ("SBA"), in adopting the May 5, 2014 Letter Agreement regarding health savings and welfare fund contributions between the City of New York and the Municipal Labor Committee ("MLC"), does not waive any rights the SBA has regarding future MLC Agreements, or any rights the SBA has to negotiate any healthcare or welfare fund matters in future bargaining with the City of New York.

If the above accords with your understanding, kindly execute the signature line provided below.

Sincerely,

ROBERT W. LINN

ACCEPTED AND AGREED ON BEHALF OF SBA

BY: _____
Edward Mullins, SBA President



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*

May 5, 2014

Harry Nespoli
Chair, Municipal Labor Committee
125 Barclay Street
New York, NY 10007

Dear Mr. Nespoli:

This is to confirm the parties' mutual understanding concerning the following issues:

1.     Unless otherwise agreed to by the parties, the Welfare Fund contribution will remain constant for the length of the successor unit agreements, including the $65 funded from the Stabilization Fund pursuant to the 2005 Health Benefits Agreement between the City of New York and the Municipal Labor Committee.

2.     Effective July 1, 2014, the Stabilization Fund shall convey $1 Billion to the City of New York to be used to support wage increases and other economic items for the current round of collective bargaining (for the period up to and including fiscal year 2018). Up to an additional total amount of $150 million will be available over the four year period from the Stabilization Fund for the welfare funds, the allocation of which shall be determined by the parties. Thereafter, $ 60 million per year will be available from the Stabilization Fund for the welfare funds, the allocation of which shall be determined by the parties.

3.     If the parties decide to engage in a centralized purchase of Prescription Drugs, and savings and efficiencies are identified therefrom, there shall not be any reduction in welfare fund contributions.

4.     There shall be a joint committee formed that will engage in a process to select an independent healthcare actuary, and any other mutually agreed upon additional outside expertise, to develop an accounting system to measure and calculate savings.

1

5.    The MLC agrees to generate cumulative healthcare savings of $3.4 billion over the course of Fiscal Years 2015 through 2018, said savings to be exclusive of the monies referenced in Paragraph 2 above and generated in the individual fiscal years as follows: (i) $400 million in Fiscal Year 2015; (ii) $700 million in Fiscal Year 2016; (iii) $1 billion in Fiscal Year 2017; (iv) $1.3 billion in Fiscal Year 2018; and (v) for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis. At the conclusion of Fiscal Year 2018, the parties shall calculate the savings realized during the prior four-year period.  In the event that the MLC has generated more than $3.4 billion in cumulative healthcare savings during the four-year period, as determined by the jointly selected healthcare actuary, up to the first $365 million of such additional savings shall be credited proportionately to each union as a one-time lump sum pensionable bonus payment for its members. Should the union desire to use these funds for other purposes, the parties shall negotiate in good faith to attempt to agree on an appropriate alternative use. Any additional savings generated for the four-year period beyond the first $365 million will be shared equally with the City and the MLC for the same purposes and subject to the same procedure as the first $365 million. Additional savings beyond $1.3 billion in FY 2018 that carry over into FY 2019 shall be subject to negotiations between the parties.

6.    The following initiatives are among those that the MLC and the City could consider in their joint efforts to meet the aforementioned annual and four-year cumulative savings figures: minimum premium, self-insurance, dependent eligibility verification audits, the capping of the HIP HMO rate, the capping of the Senior Care rate, the equalization formula, marketing plans, Medicare Advantage, and the more effective delivery of health care.

7.    Dispute Resolution

    a.   In the event of any dispute under this agreement, the parties shall meet and confer in an attempt to resolve the dispute.  If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.
    b.   Such dispute shall be resolved within 90 days.
    c.   The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.
    d.   The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.
    e.   If the parties are unable to agree on the independent health care actuary described above, the arbitrator shall select the impartial health care actuary to be retained by the parties.
    f.   The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

Case 1:20-cv-05441-KPF   Document 10-4   Filed 07/17/20   Page 60 of 63

If the above accords with your understanding and agreement, kindly execute the signature line provided.

Sincerely,

Robert W. Linn
Commissioner

Agreed and Accepted on behalf of the Municipal Labor Committee

BY: _____

Harry Nespoli, Chair

3

## MEMORANDUM OF AGREEMENT

WHEREAS, the City of New York ("City") and the Sergeants Benevolent Association of the City of New York, Inc. ("SBA") have negotiated a Collective Bargaining Agreement for the term August 30, 2011 through August 29, 2018 ('2011-2018 Agreement') as described in a Memorandum of Agreement dated February 24, 2015; and

WHEREAS, the 2011-2018 Agreement provides for an annual lump sum stipend in the amount of $705 per year to be paid to Sergeants assigned to Detective Track Commands for up to one and one half hours of work each week performed off duty; and

WHEREAS, as issue has arisen as to the efficacy of making the payment in a lump sum as opposed to on a bi-weekly basis;

IT IS HEREBY AGREED as follows:

1.      Effective as soon as practicable, the $705 stipend payable to Sergeants assigned to Detective Track Commands, as defined in Administrative Guide Procedures, will be paid on a bi- weekly basis calculated by dividing the annual stipend by the number of bi-weekly pay periods in the calendar year.

2.      As soon as practicable, the City will pay, in a lump sum payment, the pro-rated $705 stipend to Sergeants assigned to Detective Track Commands for the period from May 1, 2015 to the date of implementation of the bi-weekly stipend payment described in paragraph 1 above.

3.      The $705 stipend for Sergeants assigned to Detective Track Commands described in this agreement will be counted in the Sergeants' regular salary for the purpose of the calculation of the FLSA overtime rate.

4.     The City will recalculate and pay Sergeants assigned to Detective Track Commands for any and all FLSA overtime worked from May 1, 2015 to the implementation date of the bi-weekly stipend payment described in paragraph 1 above, applying the stipend as part of the regular salary for the purpose of calculating the FLSA overtime rate.

5.     The parties agree that these payments are included in a member's annual compensation for pension calculation purposes, consistent with applicable law.

6.     The SBA agrees that this resolves all issues concerning the exclusion of the $705 stipend from the overtime calculation for Sergeants assigned to the Detective Track Commands as defined in the Administrative Guide Procedures.

Dated: April 4, 2016

**SERGEANTS BENEVOLENT ASSOCIATION**

By:

Edward Mullins, President

Dated: April 8, 2016

**THE CITY OF NEW YORK**

By:

Robert W. Linn,

Commissioner of Labor Relations

2