UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION, | Case No. 1:20-CV-05441-KPF |
| Plaintiffs, | **DECLARATION OF JOO-HYUN KANG IN SUPPORT OF THE COMMUNITIES UNITED FOR POLICE REFORM'S MOTION TO INTERVENE** |
| -against- | |
| BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD, | |
| Defendants. | |

Joo-Hyun Kang declares under penalty of perjury as follows.

1. I submit this sworn statement in support of Communities United for Police Reform's Motion to Intervene. I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2. I have been involved with police accountability issues in New York City since the mid-1990s. My previous relevant experience includes serving as Executive Director of the Audre Lorde Project, which was a founding member of the NYC Coalition Against Police Brutality, and worked with grassroots organizations to co-found the People's Justice coalition.

3. I am the Director of Proposed Intervenor Communities United for Police Reform ("CPR").

4. CPR is an organization that is a fiscally sponsored-project of the North Star Fund, which is a 501(c3) non-profit organization registered in the State of New York. CPR is a non-partisan, multi-strategy organization and campaign to end discriminatory and abusive policing, and works to build a lasting movement that advances community safety and reduces reliance on policing in New York. CPR runs coalitions of over 200 local, statewide and national organizations (including grassroots community organizing groups, other community-based organizations, policy organizations, legal organizations, research projects, labor, faith organizations, and others), bringing together community members, advocates, lawyers, researchers, and activists to work for change. CPR's work includes stakeholders from all five New York City boroughs and all walks of life, with particular focus on low-income communities of color, who are most impacted by abusive policing policies and represent many of the

communities that are most unfairly targeted by the NYPD and unrepresented by Defendants' interests.

5. I have been Director of CPR since 2012. In this role, I oversee the coordination of the planning and implementation of CPR's strategies (including community organizing, policy advocacy, legal, public education, civic engagement, strategic communications, and research) to advance CPR's mission; represent CPR in meetings with elected officials, serve as one of CPR's media spokespeople; and meet with members of communities impacted by discriminatory and abusive police practices.

6. CPR's principal goals include police transparency and accountability and it has consistently sought to ensure that its stakeholders and community members have meaningful access to information and records relating to NYPD's policing practices.

7. Most of CPR's work focuses on issues related to police transparency and accountability, especially the experiences of community members who have been directly affected by NYPD's discriminatory and abusive practices.  For example since 2012, CPR has been centrally involved with police reform efforts in New York City, including involvement in curbing NYPD's unconstitutional and discriminatory "stop-and-frisk" practices. In 2013, CPR secured the passage of the Community Safety Act in the City Council, a pair of bills directly related to police accountability: a law that increased transparency through establishing an Inspector General position and a ban on bias-based profiling. In 2015, CPR successfully advocated for the passage of New York State Executive Order 147, which created the Office of the Special Prosecutor to investigate cases where a person dies during an interaction with the police in the State of New York. In 2017, CPR secured the passage of the Right To Know Act law, requiring that NYPD officers notify and secure informed consent from New Yorkers before

conducting "consent searches." In 2019, CPR effectively advocated for the inclusion of a change to the City Charter as part of a ballot item. The ballot item included expanding CCRB's authority to investigate instances where police officers make false official statements, and passed with over 70 percent of the vote.

8. CPR has long fought to reverse policies that shield police misconduct, complaints of police misconduct, and disciplinary information and records from public view, including through legislation and by aiding individuals in seeking access to such information and records. It has expended enormous resources fighting for reforms, often opposed by both Plaintiffs and Defendants in this action.

9. For years, CPR led the effort to repeal § 50-a, through public education, policy advocacy, lobbying, strategic communications, testimony, community organizing, and coalition-building. This has included coordinating and preparing testimony of individuals and organizations, including those who have been harmed by the broad scope of § 50-a, to testify before the New York State Legislature in support of repealing § 50-a; organizing rallies and press conferences; organizing advocacy days, participating in discussions with elected officials to secure support; approaching Senator Jamaal Bailey to be the Senate sponsor of bill S3695; (the repeal § 50-a bill that preceded S8496, which is the repeal 50-a bill that Governor Cuomo signed on June 12, 2020); negotiating the final language of S8496 with the legislature; and coordinating the coalition that mobilized statewide support to pass the bill that repealed 50-a.

10. CPR formed a coalition to support a series of bills, including the #Repeal50a bill that the New York State Legislature passed and was signed into law by Governor Cuomo on June 12, 2020. This coalition of over 100 organizations included community organizations, legal organizations, policy groups, faith organizations, labor unions, and others. . CPR's coalition

brought together organizations that have been fighting against § 50-a to increase police transparency and accountability as well as community members who are survivors of abusive police practices and had been denied access to vital information and records because of § 50-a.

11.     This legislative action was the result of decades of lobbying and advocacy by a host of organizations, including CPR and many of its member organizations.

12.     The repeal 50- bill was part of CPR's #SaferNYAct package to the legislature, which included additional legislation for police reform.  In addition to the repeal 50-a legislation, two additional bills from the package—one requiring statewide reporting on police enforcement of low-level offenses and deaths in police custody, and one codifying and expanding executive order 147 related to the NYS Attorney General's authority as special prosecutor to investigate killings by police and deaths in police custody—were also recently signed into law.

13.     CPR moves to intervene in this case to protect its interests in its organizational mission of promoting police transparency and accountability through ready public access to information and records related to police misconduct, police misconduct complaints and discipline like those at issue here; in the full and prompt effectuation of the recent repeal of N.Y. Civil Rights Law § 50-a; and in its current and future use of the judicially enforceable right of access to government records inherent in New York's Freedom of Information Law.

14.     CPR's interest in rights of public access to documents, and the similar interests of individuals on whose behalf CPR advocates, are at stake in this action.

15.     CPR's interest in ensuring Defendants' promised reforms relating to transparency, accountability, and full access to police misconduct and disciplinary information and records in light of the repeal of § 50-a will be directly impaired if Plaintiffs prevail.  A permanent or even preliminary injunction against disclosure of the documents at issue would strike a direct blow at

CPR's goal of establishing ready and full public access to misconduct and disciplinary information and records.  In addition, if Plaintiffs succeed in—the establishment of novel rights against disclosure, those rights will undoubtedly be asserted elsewhere as a ground for avoiding disclosure.  This would inevitably impair CPR's ability to advance its mission of promoting police transparency and achieving police reform.  It could also undo organizing and policy accomplishments that CPR helped obtain through years of enormous effort and expense.

16. Transparency in the police misconduct and disciplinary process is an end in itself because it promotes accountability—so harm to that transparency alone is an impairment of CPR's interests.  But transparency is also a crucial means by which CPR works towards reform.  Ready access to police misconduct and disciplinary information and records allows CPR to better understand and quantify the impact of particular policing practices on communities, to intelligently allocate resources when seeking reform, to calibrate the policy responses it proposes, and to make its case for reform to the public and elected officials.

17. For CPR to effectively advocate for members of the community, access to records, including those involving unsubstantiated, unfounded, currently pending, or subject to a settlement agreement is necessary. In order for CPR to assess the integrity and effectiveness of the official disciplinary process, all records must be made available.

18. An injunction against disclosure of the documents at issue in this case will also threaten CPR's interest in asserting the public right of disclosure established by FOIL.  CPR has exercised the right of public access in order to obtain access to documents in the past and has advised others to access documents and information.  Indeed, CPR has at least one pending FOIL request directed to certain Defendants for police misconduct and disciplinary records, which has a high likelihood of embracing records falling into the categories that Plaintiffs seek to shield

from public view.  And CPR intends to seek disclosure of additional records in those categories in the near future—an intention that depends directly on the outcome of this action.

19. In addition to its own direct interest in exercise of FOIL rights, CPR works with individuals and other organizations who file similar FOIL requests.  This work has shown me how important ready and full public access to police data is to New Yorkers who lack the resources or information to fight endless battles with Defendants over FOIL requests or in discovery during civil suits.

20. For example, CPR expended significant resources helping Constance Malcolm—the mother of Ramarley Graham—seek information about the officers who killed her son, including the names, misconduct and discipline history of officers who engaged in misconduct.  CPR could have used these resources for other purposes if the information was available in a publicly accessible database.  If Plaintiffs succeed in thwarting such a database, CPR will be forced to expend resources helping other individuals who seek the basic transparency they need to obtain justice.

21. Granting the relief Plaintiffs request would also have a direct financial impact on CPR, organizations CPR partners with and individuals it represents, all of which will be forced to divert resources to obtain access to materials through other means.  Absent a public database, FOIL (in a potentially limited form) would be the only official means of accessing records.  Again, CPR would need to divert funds that could be used to further its mission in other ways in order to obtain disclosure through the more cumbersome and often daunting procedures that would be in place.

22. Defendants' interest in this matter are not aligned with those of CPR.  CPR and the NYPD (among other Defendants) have never been and still are not aligned on the legal,

factual, or policy issues concerning the disclosure of information and records related to police misconduct and discipline. Defendants are the party who responds to FOIL requests, frequently by taking positions adverse to disclosure. I do not see how they can also represent the interests of parties seeking full disclosure through FOIL or otherwise.

23. In the course of my work with CPR, I have seen firsthand that Defendants have taken inconsistent views on § 50-a. Political calculations and different interests among Defendants have always been obstacles to reform. For example, at the first 2019 senate hearing on § 50-a repeal, both the NYPD and CCRB were set to testify, but the Mayor's office reportedly pulled their appearances the morning of the hearing. They did not testify on the record until a later date.

24. While § 50-a was in effect, municipalities and their departments across the state developed policies and procedures blocking access to what § 50-a shielded. Based on my long experience with these issues, I believe there is a significant risk that those entrenched mechanisms will persist—whether by inertia or intent—without CPR's continued organizing, advocacy and lobbying.

25. Put simply, in my long experience fighting against police violence and for police transparency and accountability, Defendants have far more frequently been CPR's *opponents* than CPR's advocates. There is no reason to believe the repeal of § 50-a has changed Defendants' fundamental dispositions and interests with respect to disclosure. They therefore cannot be counted upon for a full-throated defense of the interests in public disclosure that CPR fights to advance and that the public is entitled to exercise.

26. I believe CPR's involvement could benefit the Court in deciding the important issues presented in this matter. CPR's role in § 50-a repeal and its deep knowledge of the

disciplinary systems and disclosure mechanisms at issue make it uniquely situated to contribute to legal and factual development.  CPR has been at the forefront of advocacy for police transparency and accountability for years.  It is intimately familiar with the legal arguments and policies at stake.

27. CPR is also well-versed in the NYPD's misconduct and disciplinary systems and CCRB's investigative and disciplinary prosecutorial systems and authority.  It has helped numerous individuals (some of whose declarations support this motion) in navigating those systems to seek disclosure.  And as the Declaration of New York City Public Advocate Jumaane Williams attests, CPR has expansive and in many cases unparalleled policy and community knowledge relevant to this case.

28. Because of the work CPR has done in the area of police reform, it is also well-positioned to develop the facts concerning the public interest in readily accessible misconduct and disciplinary records and to develop legal arguments pertaining to public right of access.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __28th__ day of July, 2020, in New York, New York.

Respectfully submitted,

_____
Joo-Hyun Kang