UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION,

        Plaintiffs,

-against-

BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD,

        Defendants.

Case No. 1:20-CV-05441-KPF

**DECLARATION OF CONSTANCE MALCOLM IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S MOTION TO INTERVENE**

Constance Malcolm declares under penalty of perjury as follows:

1. I submit this sworn statement in support of Communities United for Police Reform's Motion to Intervene. I have personal knowledge of the facts contained in this declaration and if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2. My teenage son, Ramarley Graham, was killed by New York City Police Officer Richard Haste in 2012.

3. On February 2, 2012, Richard Haste, John McLoughlin, and other officers broke down the door to our home, without a warrant, without warning, and without cause. The officers involved claim they entered our home and shot at my son because they saw Ramarley adjusting his waistband on the street and assumed he was concealing a gun. But after killing Ramarley, they found no gun.

4. Officer Richard Haste shot my son Ramarley in our home, in front of his grandmother (my mother) and his 6-year-old brother. My 6-year-old son saw his brother killed in the place where he should feel safest.

5. After my son was shot, his body was misidentified, and we were told it could not be located. For four days after my son's death, I could not even see my son's body. I spoke to Assemblyman Carl Heastie who helped with efforts to locate my son's body. Four days later, with Assemblyman Heastie's help, Ramarley's body—which had been recorded under the wrong name—was found. This also meant that Ramarley's name was left off the list of individuals who the NYPD killed.

6. After Ramarley was killed, my family and I tried to get information about that day, and about the officers involved. I knew that there were about 12 officers involved, and tried

to get the names of the officers, their precinct, and their role in my son's murder. But I was unable to access this information. I had no idea who to reach out to, where to turn, and how to try to get this information. I was completely lost. This was at a time when I was grieving given the senseless loss of my son, Ramarley.

7.   After an indictment against the involved officers was thrown out, Justice Committee became involved in my case. They connected me with Communities United for Police Reform ("CPR").

8.   Because CPR is directly involved in police accountability and transparency efforts, they know the process of seeking information about officers better than anyone else I talked to. CPR helped Justice Committee and me figure out who to talk to in order to request information, helped prepare me to talk to media and helped me to build support from elected officials. CPR also coordinated meetings that I could not have arranged without their help. For example, I was able to meet with Commissioner O'Neill after Richard Haste resigned to talk about why there still needed to be discipline on other officers who engaged in misconduct that led to my son's killing and surrounding the case.

9.   Since Ramarley was killed more than eight years ago, I have been fighting every day for the officers involved to be held accountable. Getting those officer's disciplinary records and getting records regarding my son's killing was a huge part of that fight. But because of § 50-a, I have been unable to get those full records and often could not even get basic information about the officers involved. For example, I met with Kevin Richardson, the head of the NYPD discipline unit multiple times, including on the first day of the disciplinary trial against Richard Haste. Even though the trial was going to start that day, Richardson refused to tell me what misconduct charges Haste was facing, claiming that 50a prevented him from being able to share

that, even though it would be stated in the courtroom. I had to rely on notetakers that CPR organized to be able to have information as basic as that.

10. After I spent three years trying to obtain information, a whistleblower (whose identity I do not know) leaked the names of three of the involved officers: Officer Richard Haste, Officer John McLoughlin, and Sergeant Scott Morris. The whistleblower also leaked the CCRB disciplinary records of Richard Haste to the media.

11. The leaked CCRB misconduct complaint history that media reported on showed that Richard Haste had 6 CCRB complaints and 10 allegations levied against him in a single 13-month period. This meant that he should have been under extra scrutiny and supervision by the NYPD but instead he was allowed to break down the door to my home and kill my son without a warrant or cause. The most recently filed CCRB complaint against Officer Haste occurred just 16 months before he killed Ramarley. I never was able to see a record of Richard Haste's NYPD misconduct complaint or discipline.

12. Without the whistleblower leaking this information, I might not have known the misconduct complaint history of the officer who shot and killed my son. I still don't know the names or the full history of misconduct and whether there was discipline related to many other officers involved, A whistleblower is not going to be involved each time a NYPD officer kills an individual, and the families should not have to rely on whistleblowers to access basic information about past misconduct complaints and whether there was discipline.

13. Almost six years after my son was killed, I continued to fight for accountability for my son and demanded that Sergeant Scott Morris and Officer John McLoughlin also be fired, I learned that John McLoughlin was put on probation for one year, but § 50-a has prevented me from learning whether he, like Richard Haste, has a long misconduct complaint and discipline

record. Even though Sergeant Scott Morris was the commanding officer on the scene with Haste and McLoughlin, § 50-a prevented me from obtaining his misconduct complaint and discipline record.

14. CPR filed a FOIL request with me and Justice Committee related to the NYPD's killing of my son. The City initially used § 50-a as one reason to refuse to release information to me. At one hearing on the FOIL request 5 years after Ramarley was killed (and which I attended using my own vacation days), the Judge reprimanded the City and told them that I should not have to wait 5 years to get the information I requested.

15. Although the City was ordered to respond to parts of the FOIL request, the records were heavily redacted and sent in bits and pieces. I believe the City only sent me what they wanted to send to withhold critical information. The City's response did not include the names of many of the officers involved or their misconduct complaint and discipline histories.

16. In support of its decision to not release records, New York City argued that because I was calling for police accountability—including disciplinary action for all the officers involved and release of information about the officers who were involved in killing Ramarley that this would put those officers' safety at risk. But even after a whistleblower released Richard Haste's CCRB misconduct record, his safety remained intact. Unlike Ramarley, the officers who killed him are safe. I never asked for the officers' addresses or any personal information. I only asked for information about the killing of my son, including the officers' misconduct and disciplinary records. I did not intend to hurt any officers; I only wanted to know if the officers had a misconduct complaint history that should have been acted on and disciplined before they killed my son and engaged in related misconduct. As far as I know, based on the limited information I received and what I have been able to determine without proper disclosure, most of

the involved officers were never disciplined at all for their roles related to the killing of my son, leaking false information about my son and other misconduct.

17. CPR helped me every step of the way in this very difficult legal process. Without CPR and Justice Committee, I would still have almost no information about my son's murder. Because the transcripts from disciplinary hearings were protected under § 50-a, CPR recruited volunteers to sit in the courtroom to take notes, so that we could have a record of the evidence. CPR explained what happened during the trial and helped me understand the process, because I was not familiar with the terminology being used. When I received the limited records from the City in response to my FOIL, CPR recruited volunteers to help review the information so they could help walk me through the contents of some of the documents to explain what the information showed. Without CPR's help, I would still know virtually nothing about the officers who killed my son other than Richard Haste's leaked misconduct history.

18. Because § 50-a made it nearly impossible for me to get information about the officers who killed Ramarley through official channels – and because I knew other families and police brutality survivors faced the same challenges, I got involved in advocacy efforts to repeal § 50-a. I dedicated a lot of time to those efforts. I met with elected officials, spoke publicly, spoke to media, and travelled to Albany, New York to testify before the New York State Legislature in support of the bill to repeal § 50-a., in addition to testifying at a hearing in NYC too.

19. In the years I have spent trying to hold these officers accountable and work to have § 50-a repealed, I have invested a lot in getting information about the officers involved and helping to make sure other families will be able to access information too. I gave up about a years' worth of paid work to focus on my case and on the § 50-a repeal efforts. Much of the time

that I attended proceedings or spoke to the media about police accountability, I had to take time off from work or use one of my rare days off to do this. During this time, I lost sleep and my health suffered. I currently have PTSD and depression.

20. Ever since I was put in touch with CPR, CPR helped me and stood up for my rights and interests. I cannot say the same of the City of New York. In my many attempts to get information about my son's death, I felt that the City was interested more in protecting its officers than in giving citizens information about, or even the names of, officers who have hurt them and their families.

21. My understanding is that Plaintiffs in this action are asking the Court to recognize their rights against public disclosure of the sorts of records I have been seeking ever since my son was killed. I think it is important for the Court to also understand the perspectives, interests, and rights of people like me. I do not think Defendants can do this. I know that CPR can.

Executed on this 28th day of July, 2020, in Bronx, New York.

I declare under penalty of perjury that the foregoing is true and correct.

                              Respectfully submitted,

                              */s/ Constance Malcolm*

                              Constance Malcolm