UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

UNIFORMED FIRE OFFICERS
ASSOCIATION; UNIFORMED
FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK; CORRECTION
OFFICERS' BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC.;
POLICE BENEVOLENT ASSOCIATION OF
THE CITY OF NEW YORK, INC.;
SERGEANTS BENEVOLENT
ASSOCIATION; LIEUTENANTS
BENEVOLENT ASSOCIATION; CAPTAINS
ENDOWMENT ASSOCIATION; and
DETECTIVES' ENDOWMENT
ASSOCIATION,

                Plaintiffs,

                -against-

BILL de BLASIO, in his official capacity as
Mayor of the City of New York; THE CITY
OF NEW YORK; FIRE DEPARTMENT OF
THE CITY OF NEW YORK; DANIEL A.
NIGRO, in his official capacity as the
Commissioner of the Fire Department of the
City of New York; NEW YORK CITY
DEPARTMENT OF CORRECTION;
CYNTHIA BRANN, in her official capacity as
the Commissioner of the New York City
Department of Correction; DERMOT F.
SHEA, in his official capacity as the
Commissioner of the New York City Police
Department; THE NEW YORK CITY
POLICE DEPARTMENT; FREDERICK
DAVIE, in his official capacity as the Chair of
the Civilian Complaint Review Board; and
THE CIVILIAN COMPLAINT REVIEW
BOARD,

                Defendants.

------------------------------------------------

Case No. 1:20-CV-05441-KPF

**DECLARATION OF JAMES BLAKE
IN SUPPORT OF COMMUNITIES
UNITED FOR POLICE REFORM'S
MOTION TO INTERVENE**

James Blake declares under penalty of perjury as follows:

1.      I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Motion to Intervene. I have personal knowledge of the facts contained in this affidavit, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2.      I am a retired professional tennis player. I played professional tennis from 1999 until my retirement in 2013, during which I won 17 career titles, played in multiple Grand Slam tournaments, and I represented the United States at the 2008 Beijing Olympics, where I reached the semifinals. Following my retirement, I remained involved in the professional tennis circuit, participating in sponsorship events.

3.      I am also an author. My second book, *Ways of Grace: Stories of Activism, Adversity, and How Sports Can Bring Us Together*, published in 2017, includes a discussion of my firsthand experience with police misconduct by the NYPD in 2015.

4.      On September 9, 2015, I was in New York City to make appearances on behalf of my corporate sponsors during the U.S. Open tennis tournament.

5.      During that trip, I stayed at the Grand Hyatt Hotel on 42nd Street. I was waiting in front of the hotel for a car to pick me up and take me to the tournament when a man sprinted towards me. Before I could process what was happening, I had been tackled to the street and handcuffed. It was only then that I learned that the man was a plainclothes NYPD officer.

6.      I was told that the officer believed that I was the leader of a credit card fraud scam—a man they believed to have been operating the scam out of my hotel for the past week. The officer said I matched the description: Black man, white shirt.

7.      I tried to explain who I was, what I was doing at the Hyatt and in NYC, and even volunteered that I could show the officers a plane ticket that would prove I had arrived just the prior night and could not have been someone operating a crime ring from the hotel for a week—

all to no avail.  The officer and other officers who joined him at the scene refused to believe that they had tackled and handcuffed the wrong man.

8.     I had been handcuffed for about ten minutes when another officer appeared to look at something on his phone. Shortly after, the officers removed the handcuffs and acknowledged that I was not the man they were looking for. No one apologized to me.

9.     I was in shock and disoriented, and did not think to ask for information about the officers—none of whom had given me their names.  When I was released, I had no information about the officers' names, badge numbers, or respective precincts.

10.     Because of the platform my career has given me, I was able to speak out to the press about the incident, which I believe to be a case of racial profiling.  The reports gained widespread attention.

11.     At first, NYPD and the City tried to discredit my account of what happened, implying that the no excessive force was used, and that I had only been handcuffed for a minute or two.

12.     But then video footage of the incident was released to the media.  I later received a public apology from Mayor de Blasio and NYPD Commissioner Bratton.

13.     I retained an attorney, who assisted me in filing a complaint with the CCRB.

14.     Because I filed a complaint, I was interviewed about the incident by both CCRB and NYPD's Internal Affairs Board ("IAB").  It was only through those interviews that I found out the name of the officer who tackled me and the names of the other officers involved.  I learned the officer who tackled and handcuffed me was named James Frascatore.

15.     During my interactions with CCRB and IAB, my lawyer and I both inquired about Officer Frascatore's misconduct and disciplinary records.  But in response to many requests, city agencies refused to turn over this information, citing § 50-a.

16.     Because I was denied access to records about the incident and about Officer Frascatore's history, my sense is that the public apologies I received were a public relations move as a result of my professional status.

17.     The only information I received about Officer Frascatore's prior record was through leaks to the media – not through official channels.  It is my understanding that prior to his use of force against me, multiple complaints had been filed against him involving incidents of excessive force against Black victims.

18.     While I was attempting to navigate the disciplinary process and understand how to obtain the information I needed, Joo-Hyun Kang, the Director of Communities United for Police Reform ("CPR"), reached other to me and my attorney.  She told us that her organization could be of assistance because CPR is familiar with NYPD's investigative and disciplinary processes.  CPR proved to be an invaluable resource and ally to me.

19.     I am lucky enough to have the resources to retain a top attorney.  But even a highly qualified attorney would have trouble navigating the public agency processes that I needed to navigate to pursue my complaint against Officer Frascatore and get information regarding my case and his prior conduct.  That was where CPR came in.

20.     CPR was able to provide expertise and knowledge that helped me and my attorney through the process.  CPR is well-versed in navigating the NYPD disciplinary process and has experience in negotiating with the City police accountability cases.

21.     CPR helped me in numerous ways: They helped explain the CCRB and NYPD disciplinary process to me.  It explained the possible outcomes of that process.  They helped prepare and support me for the NYPD trial that was prosecuted by the CCRB.  And they connected me with other victims of NYPD violence.

22.     CPR also helped me in understanding and identifying the types of information records I should be requesting.  My attorney and I had multiple meetings and communications with various City representatives.  Related to some of those meetings and communications, CPR strategized with my attorney and me to identify the types of questions and records my attorney would need to ask for.  Even when my attorney used the precise terms of art, the City denied my requests, citing § 50-a as a reason for those denials.

23.     Even though the City (through various agencies) met with me multiple times, I suspect those meetings were for appearances—especially as those meetings never resulted in me receiving meaningful information in response to my request.  Unlike CPR—which took an active role in advocating on my behalf—the City agencies seemed more focused on appearing to be cooperative than on actually taking steps to remedy the situation.

24.     It took two years before Officer Frascatore's NYPD disciplinary trial, prosecuted by the CCRB took place.  In part, that delay was caused by three last minute postponements of the trial agreed to by the NYPD administrative judge.  In each case, I had already purchased plane tickets from my home state of California and reserved accommodations in NYC so that I could attend the trial.  And in each case, the trial was postponed only a day or two before it was scheduled to take place.

25.     The first time the trial was postponed, I was told the day before the trial was scheduled to start.  The trial was then rescheduled to the week of Thanksgiving, causing me to cancel holiday plans.  But once again, it was delayed on short notice.  The third time, the trial was scheduled for the day after Mothers' Day, forcing me to decide to forego celebrating Mothers' Day with my wife and children.  But once again, at the last minute, I was told that the trial would not be going forward.  It seemed almost as if the NYPD and James Frascatore's police union attorney was trying to prevent my attendance by continuously throwing last-minute postponements that would make my attendance more burdensome.  I know that I am fortunate to have the ability to adjust my travel plans after each last-minute delay of the trial, but that many others would not the ability to make last minute changes to travel or professional schedules.

26.     After the disciplinary trial did finally take place in late 2017, CPR was able to find out Officer Frascatore's resulting discipline: the forfeiture of five vacation days.  Even though I had filed the complaint with CCRB, to my knowledge my own attorney was not informed of formal ruling on the trial, or of the resulting forfeiture of five days off—despite multiple requests for that information.  Without CPR's connections, resources and expertise in the area, I may never have learned that information.

27.     When the NYPD scheduled a second disciplinary trial for Officer Frascatore, related to other administrative discipline charges in the incident concerning me, I was not notified by the NYPD or the City of the trial.  I found out about it from CPR.  When discipline was ordered in that second trial, I found out about the discipline because media had been informed and CPR reached out to me with the information.

28.     I was denied access to Officer Frascatore's records by city agencies who invoked § 50-a, even while I was simultaneously offered public apologies by New York City officials. And, even though I had the resources to hire a highly skilled attorney, CPR's expertise proved crucial to helping my attorney and me navigate the CCRB and NYPD disciplinary processes.

Executed on this 24 day of July, 2020, in California.

I declare under penalty of perjury that the foregoing is true and correct.


Respectfully submitted,

James Blake