UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION,

        Plaintiffs,

-against-

BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD,

        Defendants.

Case No. 1:20-CV-05441-KPF

**DECLARATION OF NATASHA DUNCAN IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S MOTION TO INTERVENE**

Natasha Duncan declares under penalty of perjury as follows:

1. I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Motion to Intervene. I have personal knowledge of the facts contained in this affidavit, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2. My sister, Shantel Davis, was killed by New York City Police Detective Phillip Atkins on June 14, 2012.

3. From what I understand and what I was told by witnesses, Shantel was driving and had a traffic accident, crashing into another car. As a result of the crash, my sister was trapped under the airbag and could not move. Detective Atkins approached the car with his gun drawn telling her to get out, then reached into the window trying to pull her out and she was shot by him.

4. That night, I saw news reports in which the media vilified a "Jane Doe" killed by the police, calling her a "career criminal" and discussing her prior arrest record – including for arrests for crimes of which my sister was never found guilty. I did not know they were talking about my sister. I do not know how the media would have gotten information about her arrest record, but not gotten her name, unless the NYPD provided that information to the media.

5. Several hours after seeing those news reports, I learned that it was my sister who the NYPD officers had killed. NYPD did not even wait until after Shantel's family was notified of her death before they began releasing whatever information they could to attack her character – whether that damaging information had been adjudicated in court or not.

6. I tried to get information about the shooting from the police, but was unsuccessful. My community organized a volunteer group, who helped me canvass the

neighborhood for potential witnesses.  It was through my canvassing efforts that I learned that the shooter was Detective Phillip Atkins.  I also heard repeatedly that Detective Atkins had a reputation in the community for abusing his authority against community members.

7. I have never received Detective Atkins's official report about the events during which he shot Shantel.  Through a news article, I learned Atkins claimed his gun accidentally discharged.  But that information was never conveyed to me directly.

8. The Kings County District Attorney's Office investigated the shooting, but the investigation was closed less than a year after Shantel was killed.  The District Attorney's Office never informed me or my family that the investigation had been closed.  During Charles Hynes's tenure as D.A., I repeatedly asked for more information about the investigation and about Detective Atkins, and was repeatedly denied that information on the grounds that the office was still investigating.  I later learned that this was not true.

9. I tried to find witnesses and information myself.  Through my canvassing efforts, I identified potential witnesses.  Repeatedly, I even scheduled times in advance with the District Attorney's Office for the witnesses to give their statements.  But each time, the District Attorney's Office claimed they were unable to take the statement, because the person in charge of collecting statements was not available.  This led me to believe that the Office was not really investigating the case, and instead was trying to keep me at bay.

10. During Ken Thompson's campaign for District Attorney, he pledged that he would focus efforts on investigating officers who killed unarmed members of the community – including the officers who killed Shantel.  But after he was elected, my family and I never heard anything from his office about investigating Atkins.

11. I was overwhelmed by the process. I could not seem to get any answers from any of the City organizations that I contacted. And I did not even know how to navigate seeking accountability and transparency. I became connected with Justice Committee, and through them was connected with CPR a number of years ago when I was trying to obtain information about the officers involved in Shantel's death.

12. CPR and the Justice Committee helped me immensely in these efforts, and I do not know what I would have done without their help. For example, CPR helped me connect with District Attorney Eric Gonzalez, over five and half years after my sister was killed. Joo-Hyun Kang, the Director of CPR, was in a meeting with Mr. Gonzalez. At the meeting, she requested he sit down and meet with me about the investigation.

13. With CPR's help, I was able to meet with Mr. Gonzalez--six years after my sister's death. During this meeting, I learned, for the first time, that the DA's investigation had been closed for years—when I had been led to think it was still ongoing.

14. Also during that meeting, Mr. Gonzalez showed me video footage of the shooting. This was the first time that I saw the footage in which Atkins killed my sister. Even though I have requested a copy of that footage, I still have not received it.

15. In that same meeting, Mr. Gonzalez told me that the statute of limitations had already run, so there would be no way to bring a case against Detective Atkins.

16. CPR has directly helped me navigate the process of getting information about Shantel's death and her killer. Without CPR and Justice Committee, I would have no information aside from what was in the very limited news articles about the incident. And most of those articles focus entirely on vilifying Shantel for crimes for which she had not been convicted, rather than examining Atkins's conduct.

17. For example, through CPR and Justice Committee, I learned that Atkins had been the subject of six civil suits, and, at the time, the City had paid out settlements in four of those suits. CPR also was able to locate information about Atkins's salary year-to-year, through which I have been able to tell that he is still an NYPD officer. Without CPR and Justice Committee, I would know nothing about my sister's murderer, or even whether he was still working as a police officer.

18. Having a family member killed is traumatizing, but it is made worse when the families are kept in the dark and never given any information. In order for my family to heal, for Shantel to have a voice, and for me to rehumanize her, I need to have the facts about what happened. But for years, § 50-a has blocked my attempts to obtain these facts.

19. The little information I have received about Detective Atkins was through the community. For example, members of the community told me that Atkins received two weeks of modified duty after he killed Shantel. But this was never confirmed by any official statement, and to date, even after trying to find out from the City, I still do not know if he was disciplined, or even formally investigated.

20. In shielding its officers, NYPD relied on § 50-a and claims that releasing records would ruin the officers' "reputation" or put the officers in danger. But the NYPD did not care about my sister's character and reputation when they called her a "career criminal" or focused on pending allegations that had not been proven. And my sister lost her life – while as far as I have been able to learn (from unofficial sources), Detective Atkins just lost some vacation days. The NYPD's double standard in protecting "reputation" shows that their interests when it comes to disclosing sensitive information are aligned with their officers and against the public. Only

CPR and Justice Committee, which works closely with CPR, ever even considered my interest in public access to misconduct and disciplinary records.

21. Because § 50-a made it impossible for me to get information about the officer who killed Shantel, I became involved in repeal efforts since 2016. My work schedule makes testifying at hearings difficult. However, where I could, I would take time off from work to travel to Albany, to lobby the New York State Legislature in support of the bill to repeal § 50-a. I helped organize a march of families whose loved ones have been killed by police, calling for repeal of 50-a. I have done social media and educated people about the need to repeal 50-a. All those efforts would be undone if the law enforcement unions are allowed to get around the repeal of § 50-a and keep the taxpayers from knowing anything about the very officers whose salaries our tax dollars pay.

Executed on this 28th day of July, 2020, in Long Island, New York.

Respectfully submitted,

Natasha Duncan