Hon. Katherine Polk Failla
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *Uniformed Fire Officers Association et al v. DeBlasio et al,*
               No. 20-cv-5441 (KPF) (S.D.N.Y.)

Friday, July 31, 2020

Dear Judge Failla,

This is Towaki Komatsu again. I'm filing this letter motion to further supplement the application that I submitted to you earlier today to be granted permissive intervention in the case referenced above as an interested party or to appear in it as an amicus curiae in the alternative. I'm supplementing that application through this letter by providing you the following additional relevant information:

1. A relevant court transcript from *People v. Komatsu,* No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) that corresponds to the entirely frivolous and retaliatory criminal prosecution I experienced in retaliation for having lawfully engaged in self-defense against members of the NYPD who criminally assaulted, injured, stalked, harassed, seized, kidnapped, falsely arrested, and lied about on 12/26/17 as I conducted myself in an entirely lawful manner while standing on traditional public forums comprised of a public sidewalk and public corridor that is equivalent to a public sidewalk throughout the entirety of that ordeal.

2. Information about relevant and entirely truthful testimony that I provided the New York City Council against the NYPD and the CCRB during public hearings that were recorded on video and transcribed in writing as a result of arrangements that the City Council

made.

3. Relevant information about criminal acts that the Mayor and members of his NYPD security detail and other members of the NYPD committed on 3/18/19 at City Hall in relation to a public hearing that the Mayor conducted in which he and a member of his NYPD security detail criminally prevented me from lawfully completing my testimony.

First, the following is a link to the court transcript that was prepared from the 12/13/19 hearing in *People v. Komatsu,* No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020). The following lists reasons why the discussion that is shown in that transcript is relevant to my application to intervene or appear as an amicus curiae in this case:

a. Information that appears on pages 5 and 6 in that transcript pertain to a discussion about sharing NYPD personnel information that is the subject of *Uniformed Fire Officers Association et al v. DeBlasio* that was provided to me without a protective order in place and included what would have otherwise been confidential information that includes tax ID numbers of members of the NYPD that the NYPD and/or the Bronx District Attorney's office opted not to redact before causing me to be provided those records. The instant that those discovery records were in my hands without a protective order in place for them, those records were a public record that I had a protected First Amendment right to exercise in whatever way I chose that included being able to post those records publicly on the Internet for the world to see. This point is fully supported by the following findings from the Second Circuit's decision in *Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149 (2d Cir. 1991):

   i. A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit

of government, one which arguably most affects the day-to-day lives of the citizenry".

ii. Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

iii. "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

iv. "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

v. "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

vi. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes."

vii. The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

viii. Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

This point is also fully supported by the following findings from U.S. Supreme Court's decisions in **a)** *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) and **b)** *Craig v. Harney*, 331 U.S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947).

- *Nebraska Press Assn. v. Stuart*:

  "Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of

    exposure and public accountability. See, *e. g., In re Oliver, supra,* at 270-271; L. Brandeis, Other People's Money 62 (1933) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman")."

- *Craig v. Harney,* 331 U.S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947):

    "We start with the news articles. A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

b. Information that appears on pages 43 and 44 in that transcript pertain to a discussion about a face-to-face conversation that I had with Oleg Chernyavsky of the NYPD's Legal department about being provided the audit trail records that correspond to NYPD body-cameras in order to subject them to a comprehensive forensics audit to determine the extent to which members of the NYPD's criminal mob illegally tampered with and destroyed exculpatory video recording that certainly would have benefited me in *People v. Komatsu,* No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) and countless others who interact with the NYPD as it similarly tampers with and destroys video recording evidence that is recorded by its body-cameras. Mr. Chernyavsky's name is misspelled on page 43 and 44 in that transcript with his last name listed as "Trnovski" in line 15 on page 43 and his first name listed as "Olek" in line 1 on page 44. One of the reasons why this is relevant is because the Bronx District Attorney's office and NYPD lied in *People v. Komatsu,* No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) by claiming that my interactions with NYPD Officers Saquoi Harris and Steven Perez on 12/26/17 began at 7 pm on that date in spite of the fact that they began earlier. Also, the video recordings that

I received from Officer Harris' NYPD body-camera start at 7:17 pm. That circumstance naturally raises the question about where the video recordings are that he was required to have recorded with his NYPD body-camera between 7 pm and 7:17 pm on 12/26/17. By having the audit trail records, it would enable me to see all actions that members of the NYPD took in relation to the video recordings that were recorded by Officer Harris's NYPD body-camera on 12/26/17 during his interactions with me. Those records would show the date, time, and identity of any member of the NYPD who deleted parts of those video recordings, otherwise edited them, and accessed them. Concerning this point, the NYPD uses some of the same technology for its body-camera system that is used by other police departments in the U.S., including the Albuquerque Police Department. On 5/12/17, a news organization named Albuquerque Journal published a news article on the Internet at https://www.abqjournal.com/1002389/expert-police-vids-were-edited.html that was written by Ryan Boetel and is entitled "Police Camera Expert Says APD Videos Were Edited". The following is a relevant excerpt from that news article in which it was claimed that police officers illegally tampered with video recording evidence that was recorded by body-cameras that use the same technology that the NYPD uses for its body-cameras:

> "Kevin Angell, a former Florida police officer who consults law enforcement agencies on on-body camera technology and policies, said when he reviewed Evidence.com video files of the Hawkes shooting, he could tell that at least five of the videos had been edited prior to being uploaded to the cloud-based storage system used by the Albuquerque Police Department. He said the video titles began with "clip," which is how Evidence.com identifies altered videos. The title for original videos, he said in the affidavit, begin with "Axon_Flex_Video."
>
> "Several videos in the Hawkes case are designated as original videos, but the video downloaded is actually a clip," Angell said in the sworn statement that was notarized May 2 as part of a civil lawsuit brought by Hawkes' family against the city of Albuquerque and the officer who shot Hawkes. He was hired by Hawkes' family

> attorneys to analyze video evidence in the case.
>
> Angell said that five videos made the night of the shooting by police officers – one from the body camera of Tanner Tixier, one from Daniel Brokaw, and three from Sonny Molina – had been edited prior to being uploaded to Evidence.com."

In short, Bronx Criminal Court Judge Jeffrey Zimmerman that Mayor Bill de Blasio appointed as a judge illegally imposed an illegal retroactive protective order upon me during the 12/13/19 hearing in <u>People v. Komatsu, No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020)</u> that prohibited me from sharing any of the discovery material that I received as a result of that case unless it was for the purpose of submitting it other litigation. By issuing that illegal order, it certainly was an illegal prior restraint on my protected First Amendment freedoms and was therefore void and unenforceable as a matter of well-settled law. I didn't act in concern in anyone in order to have received that discovery material without a protective order in place for it. That instead occurred strictly by virtue of the incompetence and stupidity of the Bronx District Attorney's office and the NYPD. I thereafter had a perfectly valid legal right to reap the benefits of that incompetence and stupidity to befit the public's interest in government accountability, transparency, and public safety by exposing criminals in the NYPD's mob and deceit and incompetence by members of the CCRB and NYPD's Internal Affairs Bureau who condoned the illegal acts and omissions that members of the NYPD committed against me on 12/26/17. Also, when Bronx Criminal Court Judge Tara Collins was thereafter assigned to <u>People v. Komatsu, No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020)</u>, she illegally refused to issue an order that would compel the NYPD to provide me the audit trail records for NYPD Officer Harris' body-camera as she proved that she was a dutiful and subservient cat's paw of the NYPD like Judge Zimmerman had proven to be while he was assigned to that case.

On 5/9/19, I testified during a public hearing that was conducted inside of the main chamber inside of New York City Hall ("City Hall") to the New York City Charter Revision Committee. That hearing was recorded on video as a result of arrangements that committee made and video recordings that were recorded by video security cameras controlled by the NYPD. The video that committee arranged to be recorded of that hearing that is comprised of both audio and video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=PWeNHzcO6eO8. My testimony in that video begins at the elapsed time of roughly 4 hours, 30 minutes, and 15 seconds and occurred right after a member of the CCRB testified in it. In short, I used my testimony then to sharply criticize the Mayor, CCRB, and NYPD as I pointed out that my dealings with the CCRB proved that it is a useless organization in regards to providing oversight for how the NYPD operates. The next screenshot is from a video recording that I received from the NYPD in response to a Freedom of Information Law ("FOIL") demand that I submitted to it that was recorded on 5/9/19 as I testified in that hearing.



I appear in the preceding screenshot along the right side of it while sitting at the end of a table. The next screenshot is from that screenshot and shows me more clearly as I sat at the right end of that table.



That video and a few others that the NYPD provided to me in response to that FOIL demand confirms that the NYPD conducts video surveillance on people as they attend and testify lawfully in public hearings inside of City Hall that appears to clearly be a flagrant violation of the Handschu Agreement. The primary reason why I ordered the NYPD to provide me those video recordings was to use them to try to determine how effective I was as a public speaker during that hearing by determining the extent to which the audience, reporters, and government officials paid attention to my testimony and stayed at that hearing to listen to my testimony. It is often the case that when I testify in public hearings that are conducted by the City Council in City Hall and at 250 Broadway, my testimony is illegally scheduled by members of the City Council to be the last to occur in such hearings to marginalize my testimony by having it occur only after the majority of the audience, reporters, and government officials have opted to deny me proper due process by leaving those hearings before my testimony begins.

On 3/26/19, New York City Councilman Ritchie Torres was recorded by a video recording that was recorded by a video security camera that the NYPD controls and is installed inside of the Committee Room inside of City Hall as he flagrantly violated my First Amendment rights as a speaker and Fourteenth Amendment rights to due process and equal protection by paying attention to a cell phone that he was illegally then using in violation of applicable rules instead of the testimony that I was then presenting to him and a very limited number of other members of the City Council's Committee on Oversight and Investigations on account of the fact that the other members of that committee were then flagrantly violating my due process right to be heard by them then and there. The NYPD thereafter provided me the video recording that I just discussed as well as another video that its video security cameras recorded in that room on that date while I was in it in response to a FOIL demand that I submitted to it. The next screenshot is from the first video that I discussed above that was recorded in that room on 3/26/19 and shows Mr. Torres violating my due process rights as I testified while there clearly were no less than 3 TV screens from I could have otherwise presented a video during that hearing. I had requested arrangements to be made prior to that hearing by members of the City Council to let me use those TV screens to present video recordings from in conjunction with my testimony and was illegally ignored in violation of my due process rights. I pointed out that fact to Mr. Torres during my testimony as he was then the chairman of that committee. This screenshot also confirms that room was mostly empty as I testified. That hearing was originally scheduled to be conducted from inside of the main chamber in City Hall and was illegally switched to the Committee Room at the last minute by Rafael Perez of the City Council in violation of my Fifth Amendment and Fourteenth Amendment rights.



The next screenshot was created from the preceding screenshot and more clearly shows Mr. Torres as he illegally violated my rights and New York City Charter §1116 by using a cell phone as I testified.



The next screenshot shows how that room appeared less than one hour before I testified in that hearing and is from the same video recording that the preceding screenshot was created. This screenshot confirms that many people that included journalists (shown on the right) were then in that room.



As I testified to Mr. Torres in that hearing, it was recorded on video as a result of arrangements that the City Council made and was later transcribed in writing as a result of the City Council's arrangements. That video recording is available on the Internet at https://councilnyc.viebit.com/player.php?hash=PVKea3TdHUTv. My testimony begins at the elapsed time of 39 minutes and 34 seconds in that video recording. As I testified to him then for just a few minutes, I did so partly about the fact that I was illegally assaulted, harassed, and ejected on 3/18/19 from the public hearing that the Mayor held in the Blue Room located inside of New York City Hall that I discussed earlier in this letter. As I did so, I also played a video

recording for the benefit of U.S. District Judge Lorna Schofield, Mr. Torres, others in that room, and others who may have been watching the video broadcast of that hearing on the Internet and may yet still do so.

The video recording that I then played in conjunction with my testimony confirmed my claims about the public hearing that the Mayor conducted on 3/18/19 that I discussed above. Before I played that video recording then, Mr. Torres violated my Fourteenth Amendment due process and equal protection rights by subjecting me to selective enforcement that also relates to the "class-of-one" legal theory applicable to the Fourteenth Amendment. He did so by imposing an unlawful prior restraint on my First Amendment rights during that public hearing by asking me if there was any profanity in the video recording that I played in conjunction with my testimony. A diligent review of video recordings of City Council public hearings that he has conducted and otherwise participated in reveals that he has consistently not asked other members of the public who have testified in them whether they will use profanity in their testimony prior to the start of their testimony. In that respect, the fact that Mr. Torres asked me that question on 3/26/19 was disorderly conduct by him and very offensive to my First Amendment and Fourteenth Amendment rights. During that same public hearing on 3/26/19, I also reminded him that I talked with him on 3/18/19 around 5 pm in the area located just outside of the Broadway entrance to City Hall shortly after I had been illegally **a)** ejected from a public hearing that the Mayor conducted inside of City Hall and **b)** coerced by members of the NYPD to leave City Hall's compound. I reminded Mr. Torres during that 3/26/19 hearing about the sum and substance of what he and I discussed on 3/18/19 during that earlier face-to-face chat. I also told him then that I had recently visited the offices of the New York City Department of Investigations ("DOI") to

make a complaint to it about illegal acts that were committed against me on 3/18/19 in relation to the public hearing that the Mayor held that I discussed above. Moreover, I also reminded him about testimony that I gave to him on 3/26/18 during an earlier public hearing that he conducted for that same City Council Committee on Oversight and Investigations. The video recording that was recorded by the City Council of that 3/26/18 public hearing is available on the Internet at the following address:

https://councilnyc.viebit.com/player.php?hash=1diWh0EurD71

My testimony during that 3/26/18 public hearing begins at the elapsed time of 2 hours, 39 minutes, and 42 seconds from the beginning of that recording. Although I testified primarily to Mr. Torres during that hearing, some of my testimony during that hearing was also in response to good questions that New York City Councilman Kalman Yeger asked me during it. While I testified in that public hearing, I testified truthfully throughout it and my testimony lasted for just a few minutes. The following were some of the things that I testified about during that hearing:

    a. Members of the NYPD illegally subjected me to whistleblower retaliation by having prevented me from attending public forums that the Mayor held in 2017 and their actions constituted both voter fraud and voter suppression for the Mayor's benefit in violation of 5 U.S.C. §1502(a)(1) partly because those public forums were used as campaign events by the Mayor in 2017 as he ran for re-election as such. One of the public forums that the Mayor conducted that I was illegally prevented from attending was a public town hall meeting that was held on 10/4/17 in the Bronx that Mr. Torres conducted with the Mayor.

    b. Members of the NYPD illegally tried to prevent me from attending a public hearing that the Mayor held on 1/8/18 inside of the Blue Room located inside of City Hall. That public hearing partly concerned legislation on which Mr. Torres had worked that

    hindsight with respect to **a)** recent protest in New York City and **b)** my interactions with the NYPD overwhelmingly confirms was grossly inadequate reforms for the NYPD associated with the "Right-to-Know Act".

c. I was then defending against an entirely frivolous criminal prosecution that the Bronx District Attorney's office commenced against me roughly 12 days after I testified against the NYPD on 12/14/17 during a public hearing that was conducted by New York City Councilmembers Corey Johnson and Vanessa Gibson inside of the Committee Room located inside of New York City Hall that was recorded on video for the City Council's Public Safety Committee. That frivolous case corresponds to <u>People v. Komatsu,</u> No. <u>2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020)</u> that I prevailed in on 1/23/20 by virtue of its belated dismissal. I told Mr. Torres and Mr. Yeger during that 3/26/18 public hearing that that case stemmed from my having been illegally stopped, seized, and arrested by members of the NYPD while I was lawfully conducting myself on 12/26/17 as I was then walking in a public area. The video recording of the public hearing that was conducted by New York City Councilmembers Corey Johnson and Vanessa Gibson inside of the Committee Room located inside of New York City Hall for the City Council's Public Safety Committee is available on the Internet at [https://councilnyc.viebit.com/player.php?hash=iHTEDJq355gP](https://councilnyc.viebit.com/player.php?hash=iHTEDJq355gP). My testimony in that public hearing begins at roughly the elapsed time of 3 hours, 29 minutes, and 43 seconds from the beginning of that video and lasted for less than 4 minutes as I testified against the NYPD in a very damning way as I compared members of the NYPD to rapists who keep committing crimes until they are stopped and properly dealt with. At the end of my testimony, New York City Councilman proved that he is totally useless by telling me that

he didn't agree with much of what I stated as I testified. The recent and ongoing protests in New York City overwhelmingly prove that I was totally right about the NYPD as I testified on 12/14/17.

The next screenshot is from a video recording that the NYPD provided to me in response to a FOIL demand that I submitted to it that was recorded on 5/13/19 by 1 of 2 video security cameras it controls and are installed in a waiting area located just outside of the security screening area that is located in front of the NYPD's headquarters.



The NYPD illegally didn't provide me the video from the other video security camera in that waiting area in flagrant violation of FOIL and my First Amendment rights. That video camera

was installed in an area located in the upper-left corner of the screenshot above. I'm shown in that screenshot in the upper-left area as I wore a blue sweatshirt and had my left hand near my left hip as I talked with a journalist who, along with others journalists, was being illegally allowed by members of the NYPD to proceed past me and other members of the public who were then waiting in an orderly manner to attend a disciplinary hearing against Eric Garner's NYPD murderer. By allowing journalists to walk past me and receive preferential access to that disciplinary hearing, the members of the NYPD who are responsible for that and included Carlos Nieves of the NYPD's DCPI division flagrantly violated my First Amendment, Fifth Amendment, and Fourteenth Amendment rights that correspond to the following findings from the U.S. Supreme Court's decision in *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978):

> "the Constitution provides the press with no greater right of access to information than that possessed by the public at large"

Similarly, in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978), the U.S. Supreme Court's reinforced its findings in *Houchins v. KQED, Inc.* in the following way:

> "The First Amendment generally grants the press no right to information about a trial superior to that of the general public. "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public." *Estes v. Texas,* 381 U. S. 532, 589 (1965) (Harlan, J., concurring). Cf. *Saxbe v. Washington Post Co.,* 417 U. S. 843 (1974); *Pell v. Procunier,* 417 U. S. 817 (1974). See also *Zemel v. Rusk,* 381 U. S. 1, 16-17 (1965)."

Thank you for your time and consideration.

Sincerely,

Towaki Komatsu

s_/Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY  10460

Tel: 347-872-1205
E-mail: Towaki_Komatsu@yahoo.com