EXHIBIT "B"

**NYS ASSEMBLY**                    **JUNE 9, 2020**

information.

        MR. PALUMBO:  Sure.  And I guess there was some judicial discretion in that regard.  Can we agree on that, regarding whether or not they should disclose them, and that could go either way.

        MR. O'DONNELL:  In only the most limited fashion, and I am unaware of any recent times when they have been released.

        MR. PALUMBO:  So, is that the reason why you feel that this should move now to the FOIL statute because that, of course, has significantly less restraint and it would ultimately allow everyone, including the general public, to obtain these records?

        MR. O'DONNELL:  As you may be aware, my original bill only repealed 50-a.  In the repealing of 50-a, the people who are under 50-a are now subject to FOIL like all other public servants, and we wanted to ensure that their personal, with an "a", private information is not disclosed.  That was never the intention, but we wanted to make it very clear.

        MR. PALUMBO:  Understood.  And in this particular bill now, the items that will be disclosed, subject to the personal information being redacted, is essentially any complaint; is that accurate?  It makes no distinction regarding substantiated or unsubstantiated?

        MR. O'DONNELL:  I can address the substantiated versus unsubstantiated question.  It has been raised to me by a number of people.  One of the problems with putting a word like

"substantiated" into statute is we probably have to define it.  I can assure you there's not a police department in the State of New York that wants us to define how to substantiate or not substantiate. Additionally, the lesson we should have learned from the 1976 50-a law is that when you write things with verbiage, that verbiage gets interpreted by a court.  The man who led that charge, Senator Frank Padavan, who was a true public servant - sadly, he has now passed away - but before he died, said he never intended 50-a to be interpreted the way it is.  And so, no, we don't distinguish between those two things in this law.

MR. PALUMBO:  Understood.  And you do have a definition here regarding specific types of information like technical infractions on page 3, I guess it is, line 1, Section 9, that it's a *Minor rule violation by a person employed by a law enforcement agency as defined in this section, did not -- that did not involve interactions with members of the public, persons investigative enforcement* -- oh, I'm sorry, *Are not a public concern and are not otherwise connected to such persons investigative, enforcement, training, supervision or reporting responsibilities*.  So, regarding that section, that's really the only limitation on what the agency may determine is not disclosable?

MR. O'DONNELL:  That provision required quite a bit of negotiation.  Obviously, it's not my intention or anyone's intention for a violation for not having shiny shoes or something of the sort to be included in what that is.  Not having shiny shoes doesn't involve their job or their interaction with the public, and I can't

imagine anyone having a concern about the shininess of an officer's shoes.  So in the end, even though it may be a technical violation of the patrol guide, that is not the kind of information that we are seeking.

> MR. PALUMBO:  Thank you, Mr. O'Donnell.
>
> On the bill, please, Mr. Speaker.
>
> ACTING SPEAKER AUBRY:  On the bill.
>
> MR. PALUMBO:  Thank you, sir.  Now, amidst

what's going on around us nationally and internationally, I understand the need that this needs to be rushed through and the concerns of many.  But what's really critical, and I think is what is of significant concern to me is the unique nature of law enforcement is not being treated as if -- as many other professions; in fact, every other profession in New York State.  Their civil rights are of significant concern to me.  For example, 3020-a of the Education Law renders unfounded complaints against schoolteachers confidential.  Under the Public Health Law, Section 230, Office of Professional Conduct for Physicians seals and keeps, not subject to disclosure, any unfounded or unsubstantiated charges; in fact, pursuant to the Public Health Law, even administrative warnings are confidential.  So, legislators, it's a misdemeanor for someone to disclose a confidential investigation that's unfounded into any one of us.  City Council has similar rules. Under the Criminal Procedure Law, 160.50, 160.55, only by a court order is someone able to obtain a defendant's criminal history in the event that it's sealed or there is an -- an unfounded or otherwise -- or a

62

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

not guilty rendering by -- by a jury.

So, this is really a distinction that's very important because when you think about it, why would we make unfounded allegations against police officers public with mob rule going on right now in our society.  Some statistics that I think are certainly relevant here.  In 2018, and this is just the New York City Police Department, 98 percent of cases in the Civilian Complaint Review Board were unsubstantiated.  So now we might have active police officers who make a lot of arrests, as if -- looking as if they're doing something untoward because they have a lot of complaints against them.  And I can trust -- and trust me, I -- I can assure you that the police officer who, for example, is writing ten tickets a month versus the police officer who's writing 210 tickets in a month, the more active police officer who is doing his or her job appropriately will have a lot more complaints.  And you compare this to other states, and I know that there was some -- there is -- has been many discussion that these items are not subject to disclosure, and I'll suggest that I will disagree in that regard because it's subject to judicial discretion.  And as a lawyer, something that is material and relevant is important.

So, now we're going to have a number of complaints that will be available and subject to cross-examine -- examination of that police officer that are neither relevant nor material to the case at hand, but it will create some sort of a cloud that they are -- that they are not an appropriate -- or were not fit to act in particular situations.  And we have in California, they have a disclosure statute and only

63

allows the disclosure of substantiated findings of an incident involving the discharge of a firearm, use of force, a record relating to an incident in which a sustained finding was made by a law enforcement agency engaged -- of an officer engaging in sexual assault involving a member of the public, any record regarding dishonesty or lying.  And that's it, because that makes sense.  That it's relevant to a -- a criminal or even a civil proceeding.

So when we balance these things, the probative value versus the prejudicial effect is the test in a courtroom regarding the admissibility of what's called "propensity evidence."  That's all that this is now.  We're going to be providing this information to show that this police officer was -- was complained of, although it is unsubstantiated, didn't happen, he's had many -- or she has had many, many complaints and, as a result, they are doing something inappropriate here or it may otherwise fit within a -- a defense.

So, the problem is this:  That we don't have the ability for judges to render a decision on that particular relevance or whether or not it should even be out there.  Because then again, we've got other -- other issues regarding this being public now.  Since it's going to go to anyone, there's no lawful purpose necessary, that these databases may be created to simply harass in the court of public opinion a police officer.  Look, I'm a son of a police officer, my father was a Suffolk County homicide detective, interactions with police and the general public are uncomfortable.  When you get a speeding ticket, your heart races, you're not really thrilled about it.  Sometimes you're having a

bad day, you're late for work, you're grumbling, you're really

disappointed that this police officer who was just sitting on the side of

the road doing his or her job, wrote you a ticket because you were, in

fact, speeding.  Even if they write you another one a month later,

you're really not going to like that person.

So, this is what's so unique about this.  Those men

and women kiss their families and put on a bulletproof vest every day.

They could be in a fight any given time during the workday.  We don't

have those types of risks that we face.  We -- they face uncomfortable

situations every single day.  And when you look at the statistics, again,

because I have these from New York City, this is what our men and

women of law enforcement have done.  We don't need to paint every

single law enforcement officer with the same brush.  Every cop I

know that I've spoken to is appalled by what happened in

Minneapolis.  That wasn't police conduct, that was a murder.  And

you no longer -- you -- you can't legislate around criminal conduct.

You are no longer an officer when you engage in that type of conduct.

You're a crook, you're a criminal and he will go to jail for a long time,

hopefully as well as the rest of them that have been charged.  But

these are the people that we're talking about in New York, in our

State, the people that we're legislating against right now.

In 1990, there were 2,262 murders in New York City.

Last year there were 319.  Rapes in 1990, 3,126; last year, 1,755.

Robbery, 100,280; last year, 13,369.  Burglaries, 122,055; last year,

10,778.  These are the people we're talking about whose civil rights

we are trampling on by at least not controlling this legislation to only allow substantiated claims that are relevant to a proceeding.  Allowing all of it into the public is dangerous.

And so, when we couple that with what's been going on in this Legislature the past two years, eliminating cash bail, the Governor is talking about releasing prisoners over the age of 55 who are refusing to cooperate with Federal authorities declaring New York a sanctuary state, calls to defund the police, what's going on right here?  This is anarchy.  We need to get control of this.  This is making our families and neighborhoods less safe.  Let's not paint everyone with the same brush.  We have confidentiality for teachers.  The Childs Victim Act -- Victims Act that we passed opened up a number of lawsuits against teachers for molesting children.  Are they all going to be painted with that same brush?  Of course not.  Of course there are bad actors.  You can't legislate around criminal conduct.  I'll say it again:  30 some-odd -- what was it, 33,000 police officers and millions of interactions with civilian [sic] in New York City alone.  Millions of interactions, and we have but a handful that we can say there was untoward, inappropriate and criminal conduct, which is what it is.

I urge my colleagues to vote against this.  This is not the right way to fix this.  Obviously, as I said, we're doing this as a reactionary thing.  I don't think enough stakeholders have been involved in this to make this -- get this done right.  We had a problem with -- the -- the removal of cash bail was a terrible problem.  There

NYS ASSEMBLY                                        JUNE 9, 2020

was some amendments and changes in this year's budget, which still

create a number of problems.  We need to slow down and if you want

to fix this, this is not the way to do it.  I vote no.

ACTING SPEAKER AUBRY:  Mr. Reilly.

MR. REILLY:  Thank you -- thank you, Mr. Speaker.

Will the sponsor yield?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will

you yield?

MR. O'DONNELL:  With pleasure, sir.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. REILLY:  Thank you, Mr. O'Donnell.  I just

have a couple of questions.

MR. O'DONNELL:  Mm-hmm.

MR. REILLY:  When the legislation, the new revised

legislation was being drafted, was there any consultation with the law

enforcement community, including New York City Police

Department, Civilian Complaint Review Board, New York City

Corporation Counsel and the Mayor's Office?

MR. O'DONNELL:  The language in question that

goes beyond just repeal was language that was inserted by the State

Senate, and I'm unaware of who they spoke to, but I am confident,

given the number of iterations we went through, that they were

speaking to some of them.  It is my understanding that the Mayor is in

favor of full repeal.  I have no idea whether or not they spoke to the

Mayor.

67

MR. REILLY:  Okay.  With -- the New York City as it pertains -- I'll specifically ask a question about -- with my experience, with the New York City Corporation Counsel, there's a fund that the City has to settle cases brought upon by complainants that are seeking remedy against the City, against the New York City Police Department naming officers.  The New York City Corporation Counsel decides on which cases to settle and they don't give officers the ability to represent themselves in court, and then notify them of the settlement.  Would those types of scenarios and -- and cases be allowed through this legislation?

MR. O'DONNELL:  The truth is that your question is somewhat irrelevant in that the New York City Corporation Counsel's Office actually keeps a public record of every case against them involving the Police Department and what, if anything, they were settled for, including the names of the officers involved.

MR. REILLY:  So those -- those officers named are -- are open to public view now?

MR. O'DONNELL:  That is my understanding, yes.

MR. REILLY:  Well, wouldn't you say that violates 50-a currently if that was allowed, because we're saying that no records were available?  So, clearly, there are some records that are open to public view by request.

MR. O'DONNELL:  There is another mechanism that is also available, the New York City Comptroller is required to, when you sue the City of New York, you have to file a Notice of Claim I

68

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

believe within 30 days, and then there's a time that the City could try
to settle those lawsuits and do so quickly.  The Comptroller's Office
keeps a record of all those settlements, and that includes that
information, as well.  50-a was designed to prevent the police
departments from giving up that information, that is why it needs to be
repealed.

           MR. REILLY:  Okay.  So during the discussion on
the legislation, was there any input on unsubstantiated claims, as my
colleague mentioned before?

           MR. O'DONNELL:  Yes, and in contrast to previous
statements already made in this House about rushing, I've had this
legislation for five years, and I have had hundreds and hundreds of
hours of conversations about 50-a and about my belief that it needs to
be repealed, and different proposals with different language to do so.
At no time did any police PBA offer any suggestions other than, *No,
we can't repeal it*.

           MR. REILLY:  Okay.  Thank you.

           On the bill, Mr. Speaker.

           ACTING SPEAKER AUBRY:  On the bill, sir.

           MR. REILLY:  So, I think part of the -- as my
colleague mentioned earlier about the other protections of -- of work
of public servants that have protection of unsubstantiated claims being
presented, I want to put this into perspective that if you have officers
that are out doing their job, maybe they're in enforcement units like
narcotics enforcement, they often receive complaints from people that

NYS ASSEMBLY                                JUNE 9, 2020

are using it as a tool against them.  And I know that there are officers

that violate the trust of the public, and they should be held

accountable.  I fully understand that.  And I -- I understand that we

want to make sure that those cases that are substantiated and that we

know shows the bad actors, yeah, that should -- that can be released.  I

get that.  But when we start to release information that is not proven, it

is not substantiated, by putting out unsubstantiated claims, we are

essentially opening up those officers to public shaming just by the

mere fact that someone put in a complaint.

                Just to give you some insight, an unsubstantiated

complaint, according to CCRB is it couldn't be proven or disproven

and it's a preponderance of the evidence, so 5149.  If someone files a

CCRB against a New York City Police Officer and they withdraw

their complaint by not showing up, they can't get contacted, they can't

proceed to go forward, that's deemed an unsubstantiated complaint,

but it will still be on the officer's record.  The only thing we're asking

for is to be fair and balanced.  I mean, just yesterday we passed

legislation that made people accountable for calling 9-1-1 to create

false emergency response.  We're creating that with officers now if

you're going to allow unsubstantiated cases to public review.

                Now, if there's a basis for it in a criminal proceeding,

it's there.  If you look at the way we legislated in the past, and I may

not have been a part of those bills when I -- I wasn't in the -- the

Assembly at the time, but I think we made it -- made sure that you

couldn't use criminal arrest records when they're applying for jobs.

70

That's a personnel issue, right, that's hiring a job.  We've -- we've made it where you can't release mugshots, right?  I applaud that.  Only if it has law enforcement -- a law enforcement reason.  You know, these are things that we look to protect people's privacy.  That's what we're looking for here.  We want to make sure that it's fair and balanced.

When we -- when someone is charged with burglary and they go to trial and they have a prior conviction for burglary, you have to have a Sandoval hearing to make sure that you can use it in -- in the courtroom to charge that crime.  By releasing unsubstantiated CCRB's into public review, you're -- you're creating something that's just going to paint all those officers with a broad brush.  And, yes, there are bad actors, and we can hold them accountable.  I think that a full repeal is really going swimming -- swinging the pendulum way too far where we're not protecting everybody's rights.  I mean, that -- that's what we're trying to do, due process, the ability to have due process.

You know, under FOIL, it says that you can't release information that's going to give unfair balance or insight and create an unfair trial for someone.  Well, by releasing un -- unsubstantiated CCRB's, in essence you're doing that to police officers, your correction officers, your firefighters.  But just remember, in the Education Law, you don't release those unsubstantiated for not only teachers, but the other license holders that fall under the New York State Education Department.  This is a basic right that public servants

71

have.

Now, I'm not -- I'm not, like I said, I'm not against putting out substantiated when it's relevant.  It's the problem of those false accusations, those -- those lawsuits that are frivolous that the City settles as an example because they have a slush fund, because it's cheaper to give $5-, $10,000 away than to defend the officers.  Those are the cases that I'm worried about.  I'm not worried about the ones that deserve to be off the job.  If that's -- if that's the light that has to be shined on them, then that's fair.  But when you start to paint them all as if -- because there's going to be no context when this is released. There's going to be no context to say, *Unsubstantiated, well, the person couldn't -- didn't want to proceed*.  It's going to be in there.

So, all I ask is that we take a look at this and try and do it fair.  Present it in a fair and balanced way.  That's -- that's all I can ask for, and I think that's all that officers are asking for.  And I think the public would get their accountability, because we deserve our accountability.  Officers have to be held accountable, I agree 10,000 percent, but it's got to be fair.  It's what we ask for everybody else.  It's what we said about criminal justice reform, it's about fairness and that's all I ask.

So, I know you're going to probably pass this today, I understand it, I understand where you're coming from.  But I just hope that you take the opportunity to think about it.  Think about how you would like it if a constituent wants you to take care of something for them and you really can't do it, and you're trying, but you can't and

**NYS ASSEMBLY**                              **JUNE 9, 2020**

they're not happy.  But they blast you all over the place as being

useless, horrible, you -- they make up lies saying you said something.

But if it's a true thing, then, yeah, shine a light on it.  That's all I ask.

So, we can make some changes to make it where

unsubstantiated and we put a little accountability in it for the

information that's being released, maybe we can move forward on

that.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will Mr.

O'Donnell yield?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will

you yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER AUBRY:  Mr. O'Donnell

yields.

MR. RA:  Thank you, good to see --

MR. O'DONNELL:  Good to see you.

MR. RA:  -- hope you are well.  I just had really, just

one quick question as you went through this.  Is -- is this approach,

this new piece of law that we're putting in modeled after any of the

other states' statutes regarding access to police disciplinary records?

MR. O'DONNELL:  I would say it's more modeled

after the states that don't have a statute, which is many, including

Minnesota.  So with the murder of Mr. Floyd, within days the world

73

knew what the disciplinary history was of his murderer because there is no law preventing that.  And both the City of Minneapolis, as well as others, keep a running list of those complaints.  And so, that is instantaneous information that is available there.

In this particular case, it's putting it into FOIL, and thing about FOIL is there's a process.  And so, there is -- you file a FOIL complaint and there's a FOIL officer, and then the FOIL officer ignores you and then you file an appeal, and then the appeal ignores you, and then you have to go to court and a judge is going to have to decide whether or not you get your FOIL request, often so full of redactions you don't know what it means.  So, the suggestion that this is sort of an open book is not really accurate as it relates to FOIL.  There are limitations, there is a process and all -- frequently, one needs to go to court to access that information.

MR. RA:  Okay.  And then I know that there's two pieces of this in terms of that work that the, you know, would be done with redacting.  There's the shell, you know, language, that -- that applies really to, you know, that personal information, and then there's also some information that says a law enforcement agency "may redact" regarding technical infractions.  Can you expound about what the intent of that is?

MR. O'DONNELL:  Well, the -- there's some subjectivity in that.  And there's subjectivity in that into whether or not a particular technical infraction is, in fact, something that should be disclosed.  So the example I gave, shiny shoes, is actually a violation

of the patrol guide, and I would be very upset to learn that lack of shiny shoes was ever deemed a technical violation that was worthy of releasing.  Could there be technical violations that are worthy of releasing?  Could it be that somebody who has a very long disciplinary record outside of technical violations that they choose to release the technical ones, as well?  I'm not going to tell the Police Department how to do that, and I would not want them to be limited in their attempt to give full disclosure and compliance.

MR. RA:  Okay.  And -- so when somebody does make that FOIL request --

MR. O'DONNELL:  Yep.

MR. RA:  -- you know, we -- we all know, you know, with FOIL there's some level of specificity that's required when somebody's making a FOIL request.  So could, you know, presumably, somebody, if they were to say, you know, what if they're asking for something that -- that we think is technical in nature, could -- could the FOIL officer respond that, you know, *These are technical and we're redacting them*, or if they're asking for something specific, suppose they were asking about something -- I don't think they'd be asking about shiny shoes, but maybe something comparable to that that is also considered technical.

MR. O'DONNELL:  So, it's subjective, the police department gets to make a determination as to whether or not it's subjective.  And if you as a person seeking the information feel the police department is -- made that discussion incorrect, then you have

**NYS ASSEMBLY**                               **JUNE 9, 2020**

the right to go to court to say, *This violation is non-technical, or you may release it and I think you should because of these other circumstances.*

    MR. RA:  Thank you very much.

    Mr. Speaker, on the bill.

    ACTING SPEAKER AUBRY:  On the bill, Mr. Ra.

    MR. RA:  Thank you, Mr. Speaker.  You know, we've come back here a couple of times now since this, you know, whole situation started with -- with COVID-19 and, you know, we've all remarked many times about the unusual circumstances we found ourselves in, and I think even two weeks ago when we were here, I don't think we could have imagined where we are now.  We were, you know, happy to see different regions of the State were starting to reopen, even New York City, which had the -- the height of this is now into Phase 1 and we're moving forward.

    But as this was all happening, you know, something happened that really changed the conversation all over this country and, perhaps, all over the world.  And we've -- we've seen protests and demonstrations, many peaceful, other times people who -- who maybe wanted to I don't think necessarily deal with the situation, but maybe were taking advantage of the situation for their own purposes to -- to destroy and -- and hurt people, and that's a shame because it distracts from an important message and an important conversation.

    You know, this is a time when we've seen a lot of division despite the fact that the outrage over the killing of George

Floyd is near universal, if not universal.  I think we can all agree on that.  That officer was fired and charged, should have been fired and charged swiftly; the other officers, you know, that were there have -- have been fired, they've been charged.  And it's something that all of us that have seen that video, it -- it really does shake you to your core to see something like that happen.  And I can only imagine, though, how it shakes you to your core if you're one of the thousands and thousands of law enforcement officials in this State who went into that career out of a sincere desire to protect their communities.

And we've all heard in our offices from -- from people saying repeal 50-a, repeal 50-a.  And certainly under these circumstances, I think the easy thing to do is say, *Yes, let's -- let's do that.  Here's an opportunity to, you know, throw open the door for this information*.  But we've also -- I know in my office, I'm starting to hear from law enforcement officers themselves, I've started to hear from their families.  And I had a couple of conversations last week with spouses of law enforcement officials, and they're terrified.  They are watching their spouses go report for duty not knowing whether it was going to be -- they were going to be in the midst of a peaceful protest or they were going to be in the midst of some of the violence we've seen:  Officers being hit with bricks, Molotov cocktails thrown at police vans.  You know, all of the situations that we've seen in the last few weeks.  You know, I know that the spouse of a law enforcement official is -- has a very difficult life because every day they don't know if something's going to happen that's going to prevent

77

NYS ASSEMBLY                                   JUNE 9, 2020

their husband or their wife from coming home.

And we have to remember, my colleague talked about painting with a broad brush.  We have to remember we're talking about the same individuals who are there trying to keep our communities safe every day.  The department that, from what I can find in my research has lost, at least in the NYPD, 43 members to the coronavirus over the last few months.  That was reeling before that with a rash of suicides last year, ten suicides in 2019 of law enforcement officials, which should give you an idea of the stresses they undergo on a day-to-day basis.  And we also have to realize those are the same men and women who, in one of the darkest days in the history of this country ran in when everybody else was running out.  We lost 23 members of the NYPD on 9/11.  We've lost ten times that many since then to 9/11-related illnesses.  These are the same individuals that didn't ask, *Am I going to be safe if I report there*, either in the midst of the attack or afterwards.  They're the same individuals who went in without regard for that.  And many of them paid for it with their life that day and have in the days since because they -- they got sick from -- from breathing toxic air and got horrible, horrible illnesses.  And one of the real shames of it is up until recently, they had to continue to fight just for families to be protected who had been so deeply impacted by that day.

So, we have a FOIL law in this State which is an important piece of allowing for public disclosure of information.  Sunlight is the best disinfectant.  That's -- that's a phrase we hear all

78

the time, right?  But 50-a, when it was passed all those years ago, was designed to recognize the unique nature of these jobs of our law enforcement officers, our correction officers, of our -- of our firefighters.  That is a unique job.  And it exposes you to things that many of us can't even relate to in our -- in our day-to-day lives.  And because of that, this Legislature, many years ago, I don't know if there's -- maybe there's one or two that were here at the time, but decided that we needed some specific protections for the information of -- of these law enforcement officers so that they didn't just get FOILed and -- and you didn't have issues with -- I know one of the intents at the time was defense attorneys that -- that might FOIL all the disciplinary records of an individual and -- and use something in there, you know, to try to impeach their testimony at a trial or -- or, you know, perhaps otherwise embarrass an officer.

So, as we repeal this today, we are opening the door that any complaint that gets filed against an officer, substantiated or not, can get sent out to the public.  If somebody wants to go on a fishing expedition and get all this information and put it out in public, they -- they'll be able to.  And that is a great cause for concern for -- for myself, and I know it's a great cause for concern for -- for those law enforcement officers who go out there every other day with no other intention but to go report to duty and being there for their community.  And I'm sure there are days that are routine and calm, and there are days that are anything but.  And sometimes, you know, maybe under the current circumstances you have an idea of what

NYS ASSEMBLY                                    JUNE 9, 2020

you're going into when you report for duty, but other days you don't.
Nobody that reported for work on 9/11 knew what they were going to
deal with that morning.  Nobody who, you know, reports for work like
we've seen in -- several times in the last few years where -- where
officers were assassinated sitting in their cars, or somebody made a
false 9-1-1 call just to lure an officer to the scene so they could kill
them.

So, when that phone rings or the call comes over the
radio, they're not sure where -- where they're going, what they're
walking into.  And they hope for the best, hope that the call that's
come in is a legitimate call for help with a situation, but -- but they
don't really know.  And we have to look at these situations through
that lens, that when you're in a situation, you have to have your guard
up, right?  You -- you don't know what you're walking into and you
have to have your guard up.  We have to recognize the unique nature
of this job.  And there's no doubt that if somebody makes a complaint
that ends up being unsubstantiated, and maybe multiple complaints
that are unsubstantiated about an officer, and this goes out into the
public, I don't think it's difficult to see how it could expose that officer
and their family to potential danger as a result.

So, you know, we've done some good things over the
last few days.  I voted for -- for many bills that I think will -- will help
get information out to the public, will help improve the relationship
between -- between law enforcement and the community, but this
one -- and this is obviously the one getting the lion's share of the

80

NYS ASSEMBLY                                    JUNE 9, 2020

Instead of strengthening the rights of police officers, imagine if we protected the rights of nonviolent protesters on the ground who are getting beat up with batons every night.

With that, Mr. Speaker, I support this bill and I thank Danny O'Donnell, the sponsor, for championing this for so many years.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Ramos.

MR. RAMOS:  Mr. Speaker, will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER AUBRY:  Mr. O'Donnell yields.

MR. RAMOS:  Mr. O'Donnell, I'm certainly supportive of this bill and I appreciate the -- the dialogue that's going on here.  And I would like to ask a few questions just so that we can break it down.  There's a lot of aspects of this, perhaps, the -- the public doesn't understand, and it needs to -- and especially when there's efforts to cloud up the issue, I think we -- we need some clarity.  The difference between unfounded cases and unsubstantiated, unfounded is something that they're claiming didn't happen.  And unsubstantiated is something that might have happened, might not have happened, but they were unable to prove it either way.  Am I

97

correct?

MR. O'DONNELL:  Yes.

MR. RAMOS:  Thanks.  We heard mentioned here that unsubstantiated cases are not relevant.  But un -- unsubstantiated is not the same as not guilty, right?

MR. O'DONNELL:  That's correct.

MR. RAMOS:  It just means there wasn't sufficient proof, if it was one's word against the other, that -- that something happened.

MR. O'DONNELL:  That's correct.  And I'll provide a little factoid.  The last two years there were 4,000 complaints at the CCRB alleging racial profiling.  Do you know how many have been substantiated?  Zero.  Zero.  Which means to me very clearly that the process, whatever that may be, is fatally flawed.  Because they may not have all happened, but I absolutely refuse to believe that none of them did.

MR. RAMOS:  So, we heard from our colleagues here that there's no value in unsubstantiated cases in divulging that. First of all, your bill does not mandate what we do with that information, it just says that it -- it's discoverable, that the public can see it, right?

MR. O'DONNELL:  The public will have access to it through the FOIL process, subject to the limitations we have written into FOIL as it relates to police officers.

MR. RAMOS:  All right.  Out of 50 states, I

understand that only three states have a -- sim -- similar to what New York has, 50-a, that protects those -- those rights.  We hear about how all -- I mean how this is a bridge too far.  And this is something, you know, not good.  But yet most of the United States doesn't have anything like -- like 50-a.  And all we're asking for is some transparency, and I agree that down the road we should either, through policy, police department policy, or through legislation, talk about the inferences that -- that are derived as a result of -- of the information.  But on another pattern of questions that -- that we had here, we heard somebody say, *Why are we treating police officers with a double standard?  Why is it that we can't do this with teachers?*  We can't divulge their disciplinary record, but we can with police officers.  Now, teachers don't have the authority to take a life.  Am I correct?

MR. O'DONNELL:  We do not give them guns, Mr. Ramos.

MR. RAMOS:  All right.  And I would submit that the he who is much has given, much is expected.  And when somebody has the power to take a human life, I believe there should be more light shining on that person and what he does.

Thank you, Mr. O'Donnell.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RAMOS:  You know, I appreciate the -- the discourse that we had here and the tone of my colleagues.  You know, and -- and I could understand -- I could understand your perspective.  I

99

NYS ASSEMBLY                                    JUNE 9, 2020

could understand some of you saying, *Well, you know, we have good officers* and, you know, why should they be saying, *I can step in your shoes and understand what you're saying*.  I ask that you step in the shoes of a Puerto Rican man who was a police officer for 20 years and look at my perspective.  This bill does not say that anybody's -- it doesn't mandate any inference from information.  And the core of the problem is that throughout history, crimes against people of color have been unsubstantiated.  People have been lynched, murdered and found innocent.  So the fact that there's a record of unsubstantiated cases, it may or may not be relevant.  But I wouldn't dismiss it, as -- as -- as some of my colleagues do, as unimportant.  If an officer has 30 cases that are unsubstantiated complaints, and out of those 30 cases, 20 of them were people who didn't know each other who all said, T*his officer came up to me and started harassing me, and when I wouldn't cooperate he stepped on my toes and when I tried to push him away he arrested me for assaulting a police officer*.  Twenty unsubstantiated cases.  Now they're unsubstantiated, but isn't it relevant that there is a pattern here?  Isn't there some value to weed out an officer who might have a problem?  Who might be a problem and might be a risk to the public?  Now, I do agree that we can have inferences just from things that we see at face value.  You know, and I've heard people say, *Yeah, if an officer gets a lot of complaints from African-Americans then he should be called into question*.  This legislation doesn't do anything about that.  Those are policies that police departments must -- must take.  But I understand.  If an officer works in a minority

100

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

neighborhood, he's going to generate more complaints.  And I do understand that when police contact the public, in many cases it's not a very happy situation.  A difficult situation.  A police officer is getting there in the middle of a family fight, in the middle of an assault, in the middle of a conflict.  He's questioning somebody about something.  It's not a very pleasurable situation.  And sometimes it generates complaints.  And not all complaints are true, and not all are substantiated cases, meaning that an officer is innocent.  But there is value.  There is value in looking at the total picture.  And so if a person works in a community primarily of African-Americans and generates more complaints, that, in its face value, doesn't mean anything because the predominant race in that particular -- but -- but patterns of what happens are relevant.  Or if a person works in a predominantly white neighborhood and the only complaints they get are from African-Americans, that might tell us something.  The point is that this raw data is relevant and it's important and it goes towards trying to create a situation where we can help people of color in this dire situation that we are in in this country where people are being killed and police officers are getting off in the courts.  Being found guilty, being found unsubstantiated, and we're giving the public some tools with which to have justice.  But we don't obligate anybody to form any conclusions based on this raw data.  The fact that we would want to hide this -- is -- is troubling.  The fact that we wouldn't want to divulge this is troubling.  And it -- it's so important to our community and to our whole country that these things be looked at.

101

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

We want to bring back integrity to policing.  I want to be able to hold my head up high as having been a 20-year police officer, with pride that people will look at me and say, *You were part of a noble profession*.  I don't want them to see the images of people being abused.  Of arrogance.  Of speaking to people with disrespect.  And if police officers know that their records are going to be public, then perhaps we will be controlling human behavior.  Perhaps they will treat people with courtesy.  Perhaps they will not inflame a situation unnecessarily.  And that is the aim here, to change what we are seeing.  And in the end, I say to my brother officers, sister -- brother and sister police officers, *Your enemy is not the communities of color who are crying out for justice.  Your enemy are these bad officers who take it too far.  And you -- most of you are good officers.  But the minute you decide to defend them, the minute you decide to cover it up, the minute you decide to do nothing, you become complicit.  It's those officers that are causing you the problem where the whole world -- I know you feel that the whole world is coming down on you, but the problem is coming from the people at your side*.  What we're doing now and we need to do -- I agree with my colleague Mr. Barron that we need to do more.  And this legislation, although good, should not be the flagship of police reform.  We need to do so much more and make police officers mandated reporters.  We need to go to the scene of these incidents and make sure that negative investigations are not carried out and that investigations aren't tainted.  And that we constantly see police officers who are murdering people and we see it on videotape

102

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

and they get off in court, and we wonder why.  And he goes to the scene of the crime and how it's handed -- handled.  And I would like to see more legislation to that effect.

But I support this legislation as one element of what we need to do in this country.  To my brother and sister police officers, it's time for us all to reflect, and realize that the situation has become a runaway train.  What we saw in Buffalo where we see now a whole group of police officers - I think it was about 50 officers - who now decided to resign from their position because they object to officers getting in trouble for having knocked down an elderly man and practically fractured his skull, bleeding from his ear.  Think about it.  In what profession can you decide, *I'm not going to be -- work here in this unit anymore*.  They didn't resign from their job, they resigned from the unit.  How can police -- you work where we tell you to work. How can -- this is a runaway train, where this can happen and they say, *Well, we don't like that he got in trouble so we're not doing this anymore*.  They're permitted to do this?  Please, my colleagues, we need to open our eyes.  I understand your perspective.  Policing is an honorable profession.  We need fairness.  We shouldn't blame police officers for certain things.  And there are unfounded complaints against police officers.  But transparency is what helps all. Transparency, I would submit, is what protects police officers. Cameras will protect me as a police officer if I'm falsely accused. This transparency in the record -- if you don't have a pattern of doing the same bad thing, you have nothing to worry about.

103

So I -- I -- I proudly vote for this legislation.  I commend the sponsor.  I'm proud to cosponsor it as well.  I urge all my colleagues to please vote yes on 50-a.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Johns.

MR. JOHNS:  Yes, Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. JOHNS:  Mr. Speaker, look, I -- I plan on voting for this legislation, but I just want to give a little bit of background.  This bill, 50-a, is better than it was, not as good as it could be.  And that's not just my words.  That's the words coming from Mike Mazzeo and the Rochester Police Union.  This union is called the Locust Club.  Mike Mazzeo is the head of it.  But, Mr. Speaker, for years, before this incident ever happened in Minneapolis, for years they were talking about reform, and reforming 50-a was one of the things that they were talking about.  And I think what perplexes them is the fact that here's a police union that actually wants to reform 50-a, and they were never invited to the table, to even have a seat at the table to even talk about it.  And I know that they care about openness and transparency.  The police force in Rochester does a great job.  You'd never have a Minneapolis incident in Rochester.  But at the same time -- and I know that our Rochester Mayor, Lovely Warren, Police Chief La'Ron Singletary, they want openness and transparency.  It helps them do their work.  Getting rid of a few bad apples will make the rest of the police force look good.

104

**NYS ASSEMBLY**                              **JUNE 9, 2020**

So I do want to make everybody here understand that there are stakeholders in this, and when you rush a bill through bill drafting and it's out in two days, you can make some mistakes. We've seen it with bail reform, and a year later we had to come back and fix some of those mistakes. So I'm hopeful that we will get everybody to the table to be able to talk about what we talk down here as chapter amendments. For the folks back home, a chapter amendment just means that you wrote the book but maybe we need to add another chapter. And I think that maybe in this particular piece of legislation we should add some stuff to it to make it better.

I've been talking about real reform since before I got elected. And I'm in the 80 percent of Americans in the middle that want to do things better. And I think 80 percent of the Americans and the people in my district think like me, and we don't want extremes. We get one extreme saying one thing, and then we get another extreme that says let's defund the police departments. No one wants to defund or get rid of the Rochester Police force. I've lived in Webster all my life. We've got a Webster Police Department. The four towns that I represent, three out of the four have police departments: Webster, where I live; Fairport and East Rochester. No one wants to defund -- defund or get rid of those police departments. We would wind up going back to the Old West. You've seen with some of the disturbances recently, gun sales are up. They're through the roof. Women, more than ever before, are going out and buying weapons. They're buying shotguns, keeping them at home because

105

they're afraid somebody might come into the house.  If you defund and get rid of the police force, you're going to get the Wild West times a hundred.  It's not going to be a good thing.  So extreme -- extremism on the left or the right isn't a good thing.  I'm supporting this bill, even though I believe that we need to do some chapter amendments to make it better.

Thank you so much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Epstein.

MR. EPSTEIN:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. EPSTEIN:  Thank you.  I -- I really want to applaud the sponsor, the Caucus and all my colleagues for moving this bill forward.  This is a historic moment for the State of New York. This is an opportunity that doesn't come all the time.  And it comes in the course of tragedy that we've seen all over our -- our City and our State.  And let's be clear.  This is about people in our communities where in my neighborhood a month ago, a real lovely human being named Donni Wright, just on the street corner of 9th street and Avenue D, he saw some of his friends being questioned about -- from the police around social distancing enforcement.  Donni just came into the intersection.  He was assaulted by Officer Garcia.  We saw on videotape, many of us, what Officer Garcia did to Donni.  You know, it was violent.  It was aggressive.  Here today, the history of Officer

**NYS ASSEMBLY**                    JUNE 9, 2020

Garcia remains unknown.  This bill creates protections for survivors of police violence, for their complaints, for their witnesses and their families who've been brutalized.  And Donni was brutalized.  This will help him and his family.  The claim that the -- the police union has is that -- that we'll give out specific information, phone numbers, e-mails, so people will go to those police officer's homes.  That is specifically outlined in the bill that we cannot do this.  There's also additional protections beyond 50-a statute and FOIL that protect these officers.

This bill changes lives.  This bill will require the law enforcement community to stand up and say, *For the officers who aren't doing the right thing, we will get that information out there to the public*.  To the officers like Officer Garcia that we found out there were six other incidences, at least that we know of, where the City of New York spend hundreds of thousands of dollars, and to this day Officer Garcia remains on the force.  It's being paid by our taxpayer dollars today, even though one of my constituents was brutalized.

So I appreciate my colleagues saying we don't want to go too far.  I would argue that this bill doesn't go far enough.  We can't hide from the truth.  We can't, as our colleague Sayegh said, mob rule in our society.  This is not mob rule in our society.  This is our community talking about social and economic justice.  I've gotten thousands and thousands of e-mails from my constituents, phone calls non-stop, saying they understand the value of repealing 50-a.  They understand that people are hiding information.  And to the allegation

107

that all these cases are -- are 98 percent unsubstantiated, then there's
nothing to hide from.  I know.  I've been a victim of -- of police
assault, and my case was, quote, unsubstantiated.  But I know the
experience.  And I'm a white man with privilege, and they used their
power and privilege against me.  I can't imagine what the experience
is for my black and Latino friends and colleagues who I hear time and
time again, their experiences around on police stop and frisks and
assaults.  Here, with 50-a, we say we will get the information out.
We'll make it harder for the department to hide information.  We'll
make it harder to stop this information from going out.  We'll make it
harder that officers can hide behind this blue wall of silence.  That's
why.  That's why repealing 50-a is necessary.  It is one of the most
secretive laws in the country for hiding police misconduct.  We need
the sunshine of our laws to make this come out.  Will this law subject
police to greater disclosure?  Yes.  Do we think this is a good thing?
Absolutely.  That's exactly what we need to do.  That's exactly what
we intend to do.  This will provide more transparency to the families
of people like Donni Wright and Eric Garner who, maybe, with their
suffering get a little more justice.  And maybe officers who've engaged
in this pattern and practice of abuse will be disclosed.  And maybe we
can get them off the force because they have set a bad reputation not
just for our City and our State, but for our people in law enforcement.
They are not sending the right message.  They are not communicating
our values.  And they are not standing up for racial, social and
economic justice, which I know my colleagues firmly believe in.  This

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

shine a bright light on the original ills of our society, ills that we are
all responsible for and all guilty for and, again, myself included.  So, I
hope and urge my colleagues to vote in favor of this commonsense
transparency and sunlight that we so desperately need.  Thank you,
Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Fitzpatrick.

MR. FITZPATRICK:  Thank you.  Thank you, Mr.
Speaker.  I want to thank everyone for their passionate eloquence
today, it's been a very interesting debate.  But I have to say, what
troubles me is I remember after the Ferguson, Missouri incident,
watching the news and seeing a banner of Black Lives Matter, and the
marchers yelling and screaming, *What do we want?  Dead cops.
When do we want them?  Now*.  And I didn't hear any denunciation of
that kind of language from anybody.  No one on MSNBC, no one on
CNN, no politicians on the left side of the political spectrum.  It was
ignored.  And it was very unfortunate to see these -- these incidents,
Garner, Brown, Floyd, but no one is feeling sorry for the Dorn family,
nor for the gentleman in Oakland who was murdered.

The problem I have with this bill is that allowing
unsubstantiated claims to be made available is not only unfair, it plays
into the hands of those forces of anarchy that want to not just defund
and disband, but want to destroy the police departments of this
country.  There was a demonstration in my town just on Sunday and
another one planned for tonight with some of the most vile and

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

vitriolic language to burn Smithtown down, F the police, all of that

stuff.  I just want to say that the men and women in blue, the men and

women in the fire service and the men and women in the corrections

department, I support you, I stand with you, and like all of you, I

condemn what happened to these people, Mr. Floyd and others, that's

not you, those are the bad apples and they're getting the justice that

they deserve.  But I rise in opposition to this bill because this is not the

answer.  We are feeding red meat to the mob who wants to go after the

police department rather than work with them.

Nerves are raw right now, everybody's upset.  A lot of

people are angry on both sides.  We can work through this.  I live by

one simple rule:  I treat people the way I want to be treated.  And if

we all did that, we wouldn't have these problems.  I have friends of all

sizes, shapes, colors, et cetera, because I treat people the way I want to

be treated.  That's all we have to do.  But by providing a form of

transparency in terms of being able to get unsubstantiated claims

added to this -- to this record or -- or be -- to be visible, when other

interest groups, you know, are protected.  There's a fundamental

unfairness here.  I do not support this.  I am voting no on this bill.

And to the members of law enforcement and the fire department and

the corrections department, thank you for what you do.  I appreciate

everything that you do for us, for all of us.  Like you, I condemn the

bad apples, but what -- what's happening here today to you is wrong

and I will be voting no.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Ms. Woerner.

MS. WOERNER:  Thank you, Mr. Speaker.  Will the sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure, Ms. Woerner.

ACTING SPEAKER AUBRY:  Mr. O'Donnell yields.

MS. WOERNER:  Thank you.  Mr. O'Donnell, as I read the FOIL Law, I read that, "An agency can deny access to records or portions of records that, if disclosed, would endanger the life or safety of any person."  In that definition, would "any person" include a law enforcement officer?

MR. O'DONNELL:  Absolutely.

MS. WOERNER:  Thank you.  So, then, would I be correct in concluding that if an agency determined that releasing the unfounded complaints about an officer would put her or his safety at risk, that agency could deny access to those portions of the records?

MR. O'DONNELL:  Subject to judicial review if someone wanted to challenge said determination.

MS. WOERNER:  Thank you very much.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, Ms. Woerner.

MS. WOERNER:  We're here this week to establish a

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

framework of law in which a cultural shift towards a more just and equal society can finally emerge.  As I reviewed the package of bills this week, I approached them with the lens of will this build goodwill and better friendships for all, and will they be fair to all concerns?  I have to say on this bill, I received nearly 700 constituent communications in support of this bill.  And I also consulted with law enforcement to understand what their concerns might be.

After reviewing the original bill language that as Mr. O'Donnell says he has been working on for five years, the compromised language that sits before us and the body of law related to the Freedom of Information Law, I am satisfied that the existing framework of FOIL and the new language that has been added to it protects the private, personal information, as well as unfounded, unsubstantiated claims and satisfies those concerns.  And it highlights the fine work that good officers do while ripping away the shield from those who abuse their power.

Now, there will be some who say that by supporting this measure that provides for transparency and accountability, I am turning my back on law enforcement, so let me be clear:  Nothing could be further from the truth.  Over the six years that I have served in office, I have met with dozens, hundreds of local sheriff's deputies, city and village police officers, En Con officers, park police and forest rangers, and I know them to be honorable, just, kind and committed to protecting the communities they grew up in, raise their families in and have sworn to protect.  I think about the sheriff's deputy who travels

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

hundreds of miles in Washington County alone at night responding to domestic violence calls or chasing down drug traffickers who would poison our communities.  I think about the sergeant in Stillwater who 13 years ago started a program to collect old cellphones for victims of domestic violence to assure that they have a lifeline in their moment of need.  I think about the officer in Hudson Falls who ran into a burning building to save the lives of two members in his community.  I think about the young officer who stood with me at a drug take-back to take -- to get prescription pills that have wreaked havoc in our rural communities off the streets.

These men and women are the very best of our community and their everyday acts of heroism humble me; in fact, I would put their records up against those of any other police force because I know that they are sterling examples of how community policing should be done.  Our officers got into this job to protect their communities, not to protect bad cops.  This bill is about transparency and accountability, and this is the best way to ensure that the reputations of the upstanding officers that I know are not tarnished by those who would abuse their power.  Thank you, Mr. Sponsor -- Mr. Speaker, I'm pleased to support this bill.

ACTING SPEAKER AUBRY:  Thank you, Ms. Woerner.

Mrs. Gunther.

MRS. GUNTHER:  Thank you, Mr. Speaker.  And this is really a very emotional day for me.  I am the granddaughter of a

136

New York City Police Officer.  I'm the daughter of a New York City Police Officer.  I'm also the aunt of a New York City Police Officer. My cousins also were in the NYPD.  And I can remember as a young child when I was living in 161st Street in the Bronx that as we walked to St. Angela Merici School, my mother would say to me, *If anything goes wrong* -- there was always a cop on the street, and my mom would direct us to go to the cop because that was a safe place to go.

So today, you know, the only thing that I feel about -- I feel very emotional.  I know there are so many good police officers all across New York State.  But just like any other profession -- I'm a nurse, if I do something wrong, if I steal a medication, it goes on my record.  In many professions, that does happen.  And often, we can't get another job.  If we're drug-addicted and we go to rehab, it still remains on my record and my license.

So today, I'm asking that any unsubstantiated please be removed.  I can live with that.  But other than that, we want our children to feel that we can run to that police officer and to feel safe, that they're there to protect us, and most of them do.  And to me, it's a blessing to have a police officer on the street and the sheriff's department, and that our children should feel safe no matter what color, religion, they should feel safe.  My family is very eclectic.  I have a Latino grandchild.  I have a Latino daughter-in-law.  We -- I have a Majorcan.  We speak Spanish.  We speak English.  We are eclectic, and that's what the United States is all about.  And we are brothers and sisters and we are here to protect each one.  And, you

137

NYS ASSEMBLY                                    JUNE 9, 2020

substantiate or not.  I think that would be a very difficult thing to do

correctly.  And lastly, because I believe that if an -- an investigation

turned out to determine that an allegation is untrue, when that is

turned over the report will say this has turned out to be untrue.  And

so because of all those reasons, I chose not to try to do that in this

legislation.

           MR. GARBARINO:  Well, I mean there's -- there's a

difference between -- according to the police I spoke to there's a

difference between untrue or -- and unsubstantiated.  Specifically, one

of the officers told me that if something is found to be -- if there's a

complaint and -- and their investigation determines it to be true, okay,

then it's substantiated.  If there's a complaint but then there's -- after

further investigation either the -- the claimant doesn't want to --

doesn't want to pursue it or there's no -- there's no further proof that it

happened but there's -- there's not enough to say it didn't happen, it's

unsubstantiated or unfound -- it's unsubstantiated.  And then if it's

proven, then it goes in the file as an -- an exoneration.  So there's three

different things that are kept in the -- in the file, at least that my police

officers do.  So my question is, with the way this is currently written if

something -- say there's a complaint against a police officer that says,

you know, *He was -- he pushed me into the -- the squad car too --*

*squad car too hard, I hit my head.*

           MR. O'DONNELL:  Okay.

           MR. GARBARINO:  But then it doesn't go any

further than that.  That's still an unsubstantiated complaint that would

168

be released under this -- under this legislation.

MR. O'DONNELL:  Well, it could be.  The two things I would say to you is I hear where you're coming from, but if there were ten of them in the same month against the same officer, their inability to substantiate may not be a reflection of whether or not they occurred.  And I earlier mentioned to someone that in all complaints that the CCRB has investigated concerning racial profiling, zero percent have been substantiated.  So I'm not entirely clear what their processes or procedures are, but it defies logic that no complaints about racial profiling in the City of New York actually happened.

MR. GARBARINO:  Okay.  But I -- I -- I spoke to some of the City police officers, but I'm -- I'm speaking -- specifically I got most of my information from some of the officers out in Suffolk County, and they -- no, they don't have the -- the Civilian Review Board -- Complaint Review Board.  They -- they have -- they do it internally through Internal Affairs.  So, but the question is you now have these complaints, Internal Affairs has reviewed it.  It might not be ten in -- ten in a month.  It might -- what if it's two over ten years or ten over 20 years?  It's -- you know, why release these -- why release these unsubstantiated complaints?  You know, I -- I -- I get your point of ten in a -- ten in a week or ten in a month.  I -- I get, you know, that hypothetical, but there's -- there's the others on the other end.  Two in 20 years.

MR. O'DONNELL:  Mm-hmm.

169

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

MR. GARBARINO:  Why release the ones that can't be substantiated?

MR. O'DONNELL:  In my experience, albeit somewhat limited, with FOIL requests, FOIL requests are regularly denied and then they are appealed and then they don't turn anything over.  There's nothing in this legislation that's going to fundamentally change that FOIL process.  And so if, in fact, a police department determined or chose not to turn it over, the remedy is with the court to find whether or not that was an appropriate thing for them to do.  Again, if you're saying unsubstantiated, we would have to write a definition of substantiated, which I think would be very difficult to do and very unhappy for any department who was required to follow it.

MR. GARBARINO:  So, my -- so the follow-up question to that is -- so now if -- can the police station now -- or the -- the police have declined the FOIL request saying it's this is an un -- we think this was unsubstantiated so then you have to now then go to -- you appeal that decision.  If they deny it again it goes to court.  Can the judge then say, you know, *We don't want to release this.*  Do we give -- do we give the judge the power, under this legislation, to not release unsubstantiated complaints or is it all or nothing?

MR. O'DONNELL:  Our legislation -- my legislation does not change the power dynamic in that sense.  And so, yes, a judge can make a determination that it was inappropriate to turn over that information.

MR. GARBARINO:  Okay.  Could you see a -- a

NYS ASSEMBLY                                    JUNE 9, 2020

problem here, and I -- I -- I know defense attorneys.  I'm an attorney,

you're an attorney and I imagine you know some, too.  I know defense

attorneys that have told their clients that once they're arrested, the first

thing to do is make a complaint against the police officer.  Say

something -- you know, just get something in the file.  Is that a

concern now that all these false complaints that as a -- as a mechanism

for an attorney -- the client doesn't know, he might just -- most people

are going to do whatever -- I wish most people would do what I tell

my clients.  But most people are going to do what their -- their clients

say.  So in other words, they just make a complaint against the -- the

police officer.  Do you think there'll be a growth in this -- in those --

                MR. O'DONNELL:  I -- I wouldn't dream of

disparaging you or your colleagues.  I was a full-time public defender

in Brooklyn from 1987 to 1995.  At no time did I ever, in representing

some very serious criminals, recommended any of my clients follow

that process.  I never did that.  Now, did some of them possibly do it

on their own?  I can't comment because I don't know.  But no, I never

attempted to create dirt on an arresting officer as a mechanism for

trial.

                MR. GARBARINO:  Thank you.  Now, we just

talked about the FOIL requests.  Who can file a FOIL under this?  Is it

anybody?

                MR. O'DONNELL:  Well, pretty much anyone.

FOIL requests are generally filed by lawyers seeking information, the

press seeking information.  But anyone has the power to file one, yes.

**NYS ASSEMBLY**                                              **JUNE 9, 2020**

MR. GARBARINO:  So somebody can go and just FOIL every -- every police officer's personnel file in a certain precinct if they want to?

MR. O'DONNELL:  Well, I suppose they could. Anybody who has any experience in that realm would tell someone not to do it unless they want to wait for 17 years to get all the information.  So they've changed.  They need to be as narrow as possible if you want to get them answered at all, or answered in a timely fashion.

MR. GARBARINO:  So -- and I'm -- and I'm specific -- specifically talking about -- you know, I think 20 years ago there was a case, Court of Appeals case, The Daily Gazette v. Schenectady County.

MR. O'DONNELL:  It was mentioned earlier, yes.

MR. GARBARINO:  It was?

MR. O'DONNELL:  Yes.

MR. GARBARINO:  Okay.  Now, that case, it was -- so that case said -- the Court of Appeals specifically said the newspaper couldn't have access to this information because of 50-a. Now we're getting rid of 50-a.  The newspaper could now get access, they could FOIL that information.  That would be allowed under this law, right?

MR. O'DONNELL:  They would be allowed to ask for it, and subject to the provisions we're passing today, they maybe will get them or won't get them based on what the limitations are

172

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

we're putting in them.

MR. GARBARINO:  Okay.

MR. O'DONNELL:  I don't recall the specific
information they sought in that piece of litigation.

MR. GARBARINO:  It was personnel files because --
it was a group of police officers that were out on a bachelor party and
they got into an altercation with another group of people --

MR. O'DONNELL:  Correct, which --

MR. GARBARINO:  -- and they were looking for
personnel files.

MR. O'DONNELL:  -- makes you -- makes you
wonder why the non-work-related misbehavior of public employees
was not something that would be turned over.  But yes, 50-a, that's
what they hung their hat on, and it would -- this would allow them
subject to the limitations we're passing today.

MR. GARBARINO:  Another item that I -- a local
police officer brought up with me was in the past they've had --
they've had false accusations filed against them.  You know, they've --
they've actually questioned attorneys, *Can we sue?  Can we sue this
person for making this false accusation against me?*  They were
advised in the past, *No, you can't because there's no public harm to
you.  You know, there's -- it's -- it's in your file, yes.  But there's --
there's no public harm.  You're not -- you're not being harmed in any
way publicly.  It's -- you're not being disparaged publicly.*  Now that
these false -- potential false complaints are being released under this

173

or that can be released under this, would this now open up the ability for law officers, police officers to -- to sue these people who make these false complaints?

MR. O'DONNELL:  I don't care for the use of "open up" in your question, but I know of no legal basis why somebody who was harmed by that would not be able to seek legal redress.

MR. GARBARINO:  Okay.  Thank you.  And -- and the last question I have is really, what's -- what is the remedy you're searching for here?  To -- to release these files, what -- what is the -- not the purpose, but with this information being released, what's -- what's the remedy?  What are you -- what are you -- what are you looking for?

MR. O'DONNELL:  I'm trying to bring the State of New York to be relatively consistent with the rest of the country and not be an outlier by the way we -- with which we prohibit information about a concern group of public employees being available to the press, to the lawyers and to the media.  And if, in fact -- you know, other people earlier today have questioned about use at trial.  As if in a criminal defense case - which is all I really know - if you attempted to use that information that was unsubstantiated or untrue or whatever in -- in a trial, you'd be shut down by the judges I appeared in front of in Brooklyn, no less, quicker than you can possibly imagine.  So you both need a good faith basis and you need something else to -- to be able to use that information.  Obviously, that would vary on a case-by-case basis in the sense that if a defendant is accused of

174

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

that -- in this bill on Section 2, line 9, the definition of technical infraction means a minor rule violation by a person employed by a law enforcement agency as defined in this section as a police officer, peace officer, firefighter or fire -- or firefighter/paramedic, solely related to the enforcement of administrative departmental rules that do not involve interactions with members of the public, are not of public concern, and are not otherwise connected to such person's investigative, enforcement, training, supervision or reporting responsibilities.  So as we're talking about redacting records pertaining to technical infractions, does that include internal administrative procedure (unintelligible) supervisions, like a supervisor giving the subordinate orders and how to perform their duties?  And -- and -- and -- and let me just expand a little bit just so you know where I'm coming from.  In New York City there were 12 black and brown police officers who sued NYPD for fighting against an illegal quota system which was literally racially targeting specifically minority communities.  These are things that obviously were found unconstitutional by the court.  This was ordered internally.  This was an order by supervisors which are internal practices not dealing with the public, right, but eventually have an impact interacting with the public.  So again, my question is in that sense, does this include these type of management and supervision, and would they -- and would they be considered unsubstantiated if there will be someone to evaluate the situation?

MR. O'DONNELL:  So, Ms. Bichotte, that was a very

NYS ASSEMBLY                                    JUNE 9, 2020

long question.  I want to make sure I understand it correctly.
Obviously, if what you're saying is somebody internally ordered a
police officer to do or not do something that ended up with those
officers interacting with the public, then it would not be viewed as a
minor violation.  Because of paragraph -- excuse me, not paragraph --
because of line -- line a.  So a technical infraction cannot be an
interaction that ends up involving with interaction with members of
the public.  So if someone ordered officers to or to not do something
that ended up with interactions with the public, they would not be
considered technical.

            MS. BICHOTTE:  Good to know that.  Next question
is, you had mentioned about racial profiling complaints and they were
found un -- unsubstantiated.  Is that true?

            MR. O'DONNELL:  I'm sorry, you're going to have to
repeat that.  I what?

            MS. BICHOTTE:  Racial profiling complaints.  You
mentioned that they were found unsubstantiated.  Is that true?

            MR. O'DONNELL:  I have been told as a factoid that
the CCRB has found zero percent of their complaints about racial
profiling to be substantiated, which suggests to me that their processes
for substantiation are both flawed and inaccurate.

            MS. BICHOTTE:  Okay.  You had answered my next
question.  So, why do you believe that it was flawed and inaccurate?
Why?  Why do you think?

            MR. O'DONNELL:  Because I don't believe there's

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

any way for -- for thousands of complaints to result in zero percent substantiation.  Some day, some time, must have been.  So if you can't -- if you never find any case that's substantiated, you're either looking the wrong way, asking the wrong questions or applying the wrong standard.

      MS. BICHOTTE:  Okay.  So, Mr. O'Donnell, you know that this House had recently passed a racial profiling bill, correct?

      MR. O'DONNELL:  That's correct.  And I was very proud before you arrived to be a cosponsor with my dear friend Mr. Wright who used to carry that bill, and I would help him debate that bill here on the floor.

      MS. BICHOTTE:  Thank you.  And thank you for being a cosponsor.  And in that bill, the basis of the bill, obviously, was -- is to collect data on every stop, question and frisk.  Now, just so you know, Mr. O'Donnell, this bill was only passed here in the House, okay?  The -- the bill -- the companion bill was not passed in the Senate.  They had a different version that didn't collect data.  So my question to collecting data, do you think if in the event that we passed the same bill, the companion bill, 4615-A and S.1137-A, and that it would require for police officers to fill out a form and the Division of Criminal Justice Services collect that data, okay, do you think that would help these complaints that come through to be substantiated?  Do you think so?

      MR. O'DONNELL:  Not only do I think so, I'm fairly

194

certain -- and I've been corrected, it's the NYPD that investigates

racial profiling, not the CCRB.  I got my letters confused, I apologize.

        MS. BICHOTTE:  Okay.  Thank you about that.  So

the question is, also, so, you know, we were told that, you know, we

could not do both bills.  You know, it was either 50-a or racial

profiling.  And I guess there was some confusion.  Maybe they

thought 50-a would take the place of racial profiling.  I don't know.

Why -- why do you think so?  Why do you think there were police

unions who didn't want us to have both the repeal of 50-a and to pass a

racial profiling bill with data collection?

        MR. O'DONNELL:  It seems like you're asking me to

explain racism in America, and I'm going to choose not to do that and

to defer to someone who probably has more experience about that

than I do.

        MS. BICHOTTE:  I think -- I think one of the things

is that every bill that we're passing is not enough on its own, okay?

And we're here today, this week, to pass a comprehensive set of bills,

and I -- I believe that if we are data collecting from the police officers

and we are data collecting and exposing disciplinary actions with

50-a, with the repeal of 50-A, I think it would give more evidence of

the reality of what's happening, okay?

        MR. O'DONNELL:  Absolutely.  And that's the way

it's done in other states.  And it seems to me that repealing 50-a is the

first step to get the data necessary that we need to do the other work

we need to do.

**NYS ASSEMBLY**                          **JUNE 9, 2020**

MS. BICHOTTE:  Good.  I just want you to -- I have another question in terms of FOIL.

MR. O'DONNELL:  Okay.

MS. BICHOTTE:  The Buffalo -- the Buffalo Police Department has been under scrutiny for their culture of misconduct, okay?  And I don't know if you know, but the New York Civil Liberties Union had filed a lawsuit against the Buffalo Police Department after they refused to fulfill the FOIL request.  And, you know, it was on -- information on policing, stop and frisk, temporary detention, surveillance, technologies, things of that nature.  How a stun gun is being used, Taser weapons.  What they found is that after a few months, almost a year, the Department only provided one-fourth of the 39 categories of -- of records requested.  Under this bill, if NYCLU were to request data, would the -- this bill have any impact on getting that data that they've been fighting for for so many years?

MR. O'DONNELL:  This bill will provide a mechanism to prevent entities or the PBA to claim that any of the information in that data is not able to be turned over.  Once again, in reference to an earlier question, if you ask for way too much data, you're going to end up waiting a hell of a lot longer to get it.  It seems to me that what -- with today's repeal of 50-a, the FOIL process will be further scrutinized to ensure that the data that we are trying to make sure is available to the lawyers, to the public, to the press actually becomes available.

MS. BICHOTTE:  Thank you, Mr. O'Donnell.  I

196

appreciate it.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. BICHOTTE:  First, I want to thank my colleague - and I'm going to say his name, Mr. O'Donnell - for -- for being bold. For being bold, for introducing this bill and -- and fighting for this for all the years and -- and being on the front line of police reform.  This bill disclosure of law enforcement disciplinary records, it repeals the Section 50-a of the Civil Rights Law which was a law that was put in place since 1976.  The bill would repeal that section, but it would still protect personal records of the law enforcement, not putting the officer's safety at risk.  And as I mentioned, while I fully support the repeal of the 50-a as a standalone bill, it doesn't go far enough.  It's a bold bill, but it -- it needs to go a little bit because of the concerns of the internal practices.  Now, I was very happy to hear from Mr. O'Donnell that anything that can lead to the interaction with civilians would not be under the meaning of a technical infraction.  Okay?  So I'm -- I'm very, very happy to hear that.  Now, we all know about the NYPD 12, the 12 black and brown officers who sued NYPD because they were being forced to racially target communities of color, to over-police and to fill a quota.  Cops in New York City merits for a very long time was based on how many black and Latino people would be issued a warrant, which led to the disproportionate of black and brown men, in particular, in Rikers and prison for alleged low-level crimes, many of who -- who've been innocent.  With police

197

policies like Broken Window, which place like Ferguson where --
where like Ferguson adapted, where Michael Brown's death started
the whole Black Lives movement.  That's been an issue for a very long
time.  Now let's think about this for a minute.  The documentary
called *Crime + Punishment* won an Emmy by the way, where
(unintelligible) whistleblowers swarm in because they thought that
they (unintelligible).  And when you hear the recording of these
supervisors and their racist comments and their racist orders to
racially profile and target minority communities very, very
disappointing and very disturbing, which is why I'm happy that, under
this bill, they will not be covered under the technical infractions.
Okay?  And I'm also happy that whistleblowers will be protected, and
that they don't have to file a lawsuit to be protected.  And these cops,
that's what they did.  They had to file a lawsuit and they were
protected.  Furthermore, when we're having all of these complaints
from civilians, I'm happy to know that there are different means of
determining if they're substantiated. I'm happy to know that
unsubstantiated will be also open to the public.  I believe we can all
agree that we have a problem with the method in which law
enforcement is being executed in minority communities.  Whether we
are all -- whether we all want verbally admitted or not.  We must bring
an end to the loss of lives.  The mental anguish, the physical
dysfunction and the broken families.  George Floyd's death, through
excessive neck compression, did not have to happen.  Eric Garner's
death, through strangulation, did not have to happen.  Aaron Bailey's

death from bullets from -- following a traffic stop did not have to happen.  And it goes on.  We need comprehensive police reform to correct the long and deep-rooted bad relationships between minority communities and the police force.

ACTING SPEAKER AUBRY:  Ms. Bichotte, your time is up.

Ms. Simon.

MS. SIMON:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. SIMON:  I'm old enough to remember the 1970s and the movement for open government.  In 1974 New York passed this Freedom of Information Law - or FOIL as we call it - and expanded it in 1977 to, I quote, *achieve the greatest magnitude of openness in government without sacrificing personal and privileged information, and to help instill in the citizens of the State greater trust and confidence in the governmental institutions which are playing an increasingly important role in our daily lives*.  But in 1976 we also passed Civil Rights Law 50-a to prevent the so-called harassment by criminal defense attorneys who sought to impeach police officers' testimony with unsubstantiated prior bad acts.  And therein lies the issue.  50-a was turned on its head and used to shield officers from accountability for substantiated bad acts, and that is why I've proudly cosponsored this bill since 2016.  50-a was never intended to block disclosure of police misconduct from the public, but that is what has

199

my friends that, they would say, *Well, was he arrested?*  No, he was

not.  He was not arrested.

           In the end, we have to fight for justice.  You have to

acknowledge your own privilege.  If you don't acknowledge your own

privilege, you're never going to come around the bend.  So let me start

with thanks.  Thank you to my Speaker, Mr. Carl Heastie.  Thank you

to my Majority Leader, Mrs. Peoples-Stokes, for allowing me the

opportunity to do this.  Thank you to the staff:  Mr. Suggs, who sat in

silence for the last eight hours, Lou Ann Ciccone, Kathleen O'Keefe,

who allowed me to pester them for five weeks.  Thank you to the

members of the Caucuses - Ms. Wright, Ms. Davila, Mr. Kim - who

all stood with me when I made this case.  It's not lost on me that you

got yourself a fat gay Irish guy fighting against [sic] this -- this bill,

but I believe in it with all of my heart.

           And let me be very clear to members of the other

side:  There is not a bone of hatred in my body towards anyone.  This

was not written out of hate, that's not what this is.  It is an attempt to

level the playing field.  It is an attempt to get information into the

public.  And I know enough to know if you don't include

"unsubstantiated claims", as have been discussed, that information

will be filed away by the NYPD as it -- as if it never existed.

           So, we take one step forward today on transparency,

we allow people some degree of peace.  And to the mother of Eric

Garner, whose heart was broken, who still doesn't know as much

information as the family of Mr. Floyd, may I just say that justice

denied -- justice delayed is justice denied.  Perhaps this is a minor, minor step forward.  I'm honored today to be a member of this Body and I'm honored for all the yes votes on that board.  Thank you very much.

ACTING SPEAKER AUBRY:  Mr. O'Donnell in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Today, we have heard many eloquent speakers on both sides of the aisle, including my colleague, the sponsor.  And for those thoughtful comments, I am indeed grateful.  I'm extraordinarily thankful that in my Assembly District, the protests have also been attended by the police chiefs and the county sheriffs.  And the message has been two-fold:  The message has been racism is inappropriate; what happened was horrific; we should stand up in solidarity, in opposition of that.  But the message was also one of respect and thoughtfulness. And for that, I am deeply thankful.

I'm mindful that all of us are children of God.  And if we're God's children, then each of us is entitled to that respect because we're all part of the same family.  And I'm painfully aware that in the last few years, 50-a has been abused, as was pointed out by one of my colleagues, and expanded well beyond how it had been interpreted for the 40 previous years.  And so, here we are today to make statutory changes.  And one of the most difficult and challenging things we have as a Legislature, especially when we have a very contentious and

emotional issue and we all feel so strongly about the need to stand up against racism, is to act in a thoughtful, careful and balanced way.

Unfortunately, this bill, in my opinion, goes too far. We need to reform 50-a, I agree.  But what we're doing is we're allowing claims that were determined to be false, or untrue, or malicious, or unfounded to be -- to be available in the public, and we're doing nothing to protect the good reputation of our officers for unfounded claims.  And so I hope as we move forward that we look for a way to protect our officers against false, malicious, abusive claims while still ensuring transparency and openness in government. Thank you so much, sir.

ACTING SPEAKER AUBRY:  Mr. -- Mr. Goodell in the negative.

Mr. Ortiz.

MR. ORTIZ:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I have heard so much about the debate here today from one side to the other and this is -- this bill main objective, Mr. Speaker, is to give accountability.  To give accountability on those unscrupulous police officer who doesn't follow the rule.  Plain and simple.  We all can tell our stories, and I will tell you my story as an elected official.  I have been stopped by police officer and I have been stopped by police officer not only one day, but he called three other cops while they stopped me to search my car, for whatever reason, and they don't have no warrants.  I asked them what is the reason behind.  My son has been stopped many times.  My daughter

221

**NYS ASSEMBLY**                    JUNE 9, 2020

has been stopped, as well.  So we know how intimidating it can be by being stopped by a police officer, by being talking to a police officer and trying to ask questions to a police officer that at some time, they developed some kind of attitude behavior that they -- that we don't have the right to ask questions.  And when you follow up that police officer and look into the past of that police officer, it's very difficult to figure out if that police officer really have some kind of disciplinary action that happened to this police officer.

What I will tell you that I did follow one police officer and I find out that this police officer had disciplinary actions. Not only had disciplinary action, was taking away from my precinct and sent into another precinct in some place else.  That's not a way to move our police officer from one precinct to another.  What need to be done, Mr. Speaker, is that we need to go to the culture of the problem.  The culture of the problem is how our police officer have been trained, how that cancer has been developed and we want to stop that cancer and it's stopping now.

And I finish with this, Mr. Speaker, what we need to -- what we need in our country is to teach our children the lawful diversity and unity and humanity.  That's what we need to do, and that's what we need to do to move forward.  Thank you, Mr. Speaker, and I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Ortiz in the affirmative.

Mr. Pichardo.

222

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MR. PICHARDO:  Thank you, Mr. Speaker, for allowing me to explain my vote.  It's good back to be -- it's good to be back in the Chamber.  And, again, I want to thank my colleague, as well as the leadership in this House both the Lead -- the Majority Leader and the Speaker, but let's get back down to -- to brass tacks here.

So, the broad interpretation of 50-a in the Civil Rights Law basically created a publicly-funded agency that is not accountable to the public.  It is not sound policy to expect members of the public to trust an agency that has no accountability and transparency to them.  Again, let me remind my colleagues here in this Chamber that days after Mr. Floyd was murdered in front of our eyes, the Hennepin County Medical Examiner ruled that his death was a combination of cardiac arrest and several drugs in his system, without making any mention that the fact that he died through asphyxiation through pressure on the back and his neck.  And the -- fortunately and -- well, unfortunately and fortunately, we had video evidence to the contrary and what our government institutions, particularly Minneapolis, were asking us to do is not to believe our lying eyes.  It took two separate independent exams to basically prove the fact of what we saw in that tape, in that disgusting tape where that man's life was snuffed out.

So, when we ask our agencies both here in the Legislature, as well as in law enforcement, to earn our trust as a community, how do the public -- and how do we expect the public to

223

believe in these instances when there are government agencies who are primed to lie and to basically ask us to deceive.  With that, Mr. Speaker, I vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you so much. Mr. Pichardo is in the affirmative.

Mr. Buchwald.

MR. BUCHWALD:  Thank you very much, Mr. Speaker.  I rise in support of this legislation and, in particular, to thank its sponsor.  The process of repealing 50-a is too long in coming, but it has been a legislative process that he's been ably leading for the last five years.  I was, you know, proud in 2016 when Mr. O'Donnell's attempt to reform 50-a got a vote in the Governmental Operations Committee, and I believe our now Majority Leader was Chair of that Committee at the time, and so I want to thank her, as well, for her leadership.  But, ultimately, in 2016, though maybe many of us in the Assembly were willing to have that conversation, the simple fact was the other House, the State Senate, was not willing to have that conversation.  And, certainly, those who were not recognizing the need to make changes to 50-a were not engaged in the conversation.

So we are where we are today, and where we are today is a compelling need to repeal this law.  We are -- have to make sure that those who have lost their lives as a result of, in particular, police misconduct, know that they have not lost their lives in vain. And so, we, as legislators, have a special responsibility to ensure that we do everything we can to make sure that we are being responsive.

224

And though I'm proud to march with others and attend vigils, I'm even more proud to stand up today as a member of the State Assembly in support of this legislation.

So, I sincerely hope that we don't let this be the last step we take, that it's just the first step on a path towards combatting institutional racism in our government and in our society.  But today, I proudly vote yes for this legislation.  Thank you so much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.  Mr. Buchwald in the affirmative.

Mr. DenDekker.

MR. DENDEKKER:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I want to thank the sponsor of this bill, and I -- I also want to thank my Speaker and the rest of my colleagues.  I think it's so important that this representative type government has listened to the people that are fed up and have had it and want change.  And we are here to do some of that change here this week and the repeal of 50-a is a first step.  And I'm just so proud that this government and the way New York State is operating as a responsive legislative Body listening to the people that it represents.  So, I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Mr. DenDekker in the affirmative.

Mr. LiPetri.

MR. LIPETRI:  Thank you, Mr. Speaker.  I rise to

225

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

explain my vote.  Prior to becoming a State Legislator, I worked for
the New York City Corp Counsel where I defended the NYPD, FDNY
and correction officers.  During a multitude of depositions, oftentimes
I would invoke 50-a.  The purpose of 50-a is to prohibit and prevent
harassment, intimidation and embarrassment.  It protects against
fishing expeditions of disclosure of unverified and unsubstantiated
information.  In essence, it prohibits the dissemination of false claims,
false claims of which now this Legislative Majority wishes to
weaponize against our law enforcement, first responders and
correction officers.

          Frankly, at this time now, you have opened the flood
gates to frivolous requests.  I saw it time and time again; in fact, just
50 years ago, the purpose of 50-a was to prevent the use of these bad
faith probing that now will occur.  Mark my words, Mr. Speaker,
you're going to see databases now form where we're going to have all
these government groups that -- excuse me, these groups that despise
police will now create these databases of all this personnel
information, many of which is false, many of which is
unsubstantiated, but nevertheless will be disclosed.  Mistakes will be
made, addresses, personal information will, in essence, and inevitably
be disclosed, and those on social media will publish.  Threats have
already been issued over the years against our police officers, and now
those threats will turn to action because they have that information
available to them.

          It's so sad, Mr. Speaker, we saw just a few weeks ago

226

our law enforcement, first responders praised as heroes during this pandemic and, yet, now we're seeing the -- the winds change during these difficult times.  In essence, Mr. Speaker, we can't keep furthering division.  Whether your skin is black or your uniform is blue, people should not feel targeted in this country.  That, we can agree upon; however, Mr. Speaker, this legislation only makes our finest, New York's finest, more vulnerable to attacks.  For those reasons, I vote in the negative.

ACTING SPEAKER AUBRY:  Mr. LiPetri in the negative.

Mr. Barron.

MR. BARRON:  Thank you, Mr. Speaker.  We mentioned the CCRB and unsubstan -- unsubstantiated complaints a lot.  Do you know what the CCRB is?  Thirteen members, five appointed by the Mayor that pathetically is an apologist for the police, three are appointed by the Commissioner, that's eight of the 13, and then five are appointed by the City Council.  When a complaint comes in, they set up a panel of three, one from the Mayor, and one from his pal, the Commissioner, and one from the City Council.

So, they have to substantiate a complaint.  So if you have two police supporters that have to substantiate a complaint, two-to-one substantiates it, two-to-one makes it unsubstantiated.  So, they lied on a lot of these complaints.  That's why it's good to keep it all in.  And then after they substantiate a complaint, guess who it goes to who has the authority to determine their punishment?  The