**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Uniformed Fire Officers Association;
Uniformed Firefighters Association of
Greater New York; Correction Officers'
Benevolent Association of the City of New
York, Inc.; Police Benevolent Association of
the City of New York, Inc.; Sergeants
Benevolent Association; Lieutenants
Benevolent Association; Captains
Endowment Association; and Detectives'
Endowment Association,

                Plaintiffs,

    - against -

Bill de Blasio, in his official capacity as
Mayor of the City of New York; the City of
New York; Fire Department of the City of
New York; Daniel A. Nigro, in his official
capacity as the Commissioner of the Fire
Department of the City of New York; New
York City Department of Correction;
Cynthia Brann, in her official capacity as the
Commissioner of the New York City
Department of Correction; Dermot F. Shea,
in his official capacity as the Commissioner
of the New York City Police Department;
the New York City Police Department;
Frederick Davie, in his official capacity as
the Chair of the Civilian Complaint Review
Board; and the Civilian Complaint Review
Board,

                Defendants.

CASE NO. 20 Civ. 5441 (KPF) (RWL)

**BRIEF *AMICUS CURIAE* OF THE NEW YORK CITY COUNCIL PROGRESSIVE CAUCUS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................... 1

INTEREST OF AMICUS............................................................................ 3

ARGUMENT............................................................................................. 4

I.    For the City's Elected Representatives to Govern the Police, the Public Needs to Know About Complaints Against Police Officers. ................................... 5

    A.    Police Officers Are Supposed to Be Accountable to Elected Officials and the Public—but Often Are Not. .............................................................. 5

    B.    As the City Council Considers Police Reform, Open Public Records Are Essential to the Policymaking Process.................................................... 7

II.    As Public Officers, Plaintiffs' Members Have No Right to Keep Misconduct Investigations Related to Their Official Duties Secret. ................................. 9

    A.    Public Officials Are Constitutionally Accountable to the City and to the Public. .................................................................................................. 9

    B.    New York Courts Generally *Require* Agencies to Comply with Requests for Records of Complaints That Did Not Lead to Discipline. ............................. 11

    C.    FOIL Exceptions Are, In Any Event, Discretionary........................... 15

CONCLUSION ........................................................................................ 16

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bd. of Ed., Great Neck Union Free Sch. Dist. v. Areman*,
   41 N.Y.2d 527 (1977) ...........................................................................................15

*Canteline v. McClellan*,
   282 N.Y. 166 (1940) ...........................................................................................11

*Capital Newspapers Div. of Hearst Corp. v. Burns*,
   67 N.Y.2d, 562 (1986) .......................................................................................15

*Carpenter v. City of Plattsburgh*,
   105 A.D.2d 295 (3d Dep't 1985),
   *aff'd,* 66 N.Y.2d 791 (1985)........................................................................11, 15

*DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*,
   167 F.3d 784 (2d Cir. 1999).............................................................................2, 10

*Doe v. City of New York*,
   15 F.3d 264 (2d Cir. 1994)................................................................................10

*Fappiano v. New York City Police Dep't*,
   95 N.Y.2d 736 (2001) .......................................................................................12

*Fink v. Lefkowitz*,
   47 N.Y.2d 567 (1979) .......................................................................................12

*Forsberg v. Hous. Auth. of City of Miami Beach*,
   455 So. 2d 373 (Fla. 1984)................................................................................11

*Gardner v. Broderick*,
   392 U.S. 273 (1968)..........................................................................................5, 9

*Hearst Corp. v. City of Albany*,
   88 A.D.3d 1130 (3d Dep't 2011).......................................................................14

*Herald Co. v. Sch. Dist. of City of Syracuse*,
   104 Misc. 2d 1041 (Sup. Ct., Onondaga Cnty. 1980)..........................................13

*Hodgson v. McGuire*,
   75 A.D.2d 763 (1st Dep't 1980) .......................................................................11

*LaRocca v. Bd. of Educ. of Jericho Union Free Sch. Dist.*,
   220 A.D.2d 424 (2d Dep't 1995).......................................................................15

*Matter of Matt v. LaRocca*,
    71 N.Y.2d 154 (1987) ...................................................................................10

*Matter of Thomas v. Condon*,
    128 A.D.3d 528 (1st Dep't 2015) ...............................................................13

*New York Civil Liberties Union v. New York City Police Dep't*,
    32 N.Y.3d 556 (2018) ...................................................................................12

*Non-Resident Taxpayers Ass'n v. Municipality of Philadelphia*,
    478 F.2d 456 (3d Cir. 1973).........................................................................10

*Thomas v. New York City Dep't of Educ.*,
    103 A.D.3d 495 (1st Dep't 2013) .........................................................3, 12, 13

*Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of the City of New York*,
    392 U.S. 280 (1968).......................................................................................9

*Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of the City of New York*,
    426 F.2d 619 (2d Cir. 1970)........................................................................10

*Vill. of Brockport v. Calandra*,
    191 Misc. 2d 718 (Sup. Ct., Monroe Cnty. 2002),
    *aff'd,* 305 A.D.2d 1030 (4th Dep't 2003) ...........................................14, 15

**Statutes**

28 U.S.C. § 1983...................................................................................................11

N.Y.C. Charter § 28 ...............................................................................................4

N.Y.C. Charter § 29 ............................................................................................4, 5

N.Y.C. Charter § 40 ...............................................................................................4

N.Y.C. Charter § 254 .............................................................................................4

N.Y.C. Charter § 431 .............................................................................................5

N.Y.C. Charter § 1123 .......................................................................................5, 9

N.Y. Civil Rights Law § 50-a ..................................................................... *passim*

N.Y. Pub. Off. Law § 84.........................................................................................8

N.Y. Pub. Off. Law § 87............................................................................12, 13, 15

**Regulations**

N.Y.C. Admin. Code § 23-501 *et seq.* ...........................................................................................7

N.Y.C. Local Law 11 of 2011, § 1 ....................................................................................................7

**Other Authorities**

Esha Ray & Graham Rayman, *NYPD Cop Lied About Working Overtime, Got Promotion While Under Investigation: 'the Disciplinary System Is Dysfunctional'*, N.Y. Daily News (March 16, 2018), https://www.nydailynews.com/new-york/bilks-nypd-unearned-overtime-promoted-article-1.3877314 ..........................................................................................6

Jake Offenhartz, *Here Are NYC's Most Sued Cops Who Are Still On The Job, According To New Public Database*, Gothamist (March 7, 2019), https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database .......................................................6

Joseph Goldstein, *Promotions, Not Punishments, For Officers Accused of Lying*, N.Y. Times (March 19, 2018), https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html ......................................................................................................6

Joseph Goldstein, *'Testilying' By Police: A Stubborn Problem*, N.Y. Times (March 18, 2018), https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html ....................................................................................................5

Mary Jo White, et al., The Report of the Independent Panel on the Disciplinary System of the New York City Police Department (Jan. 25, 2019), https://www.independentpanelreportnypd.net/assets/report.pdf ................................................7

Tana Geneva, *NYPD's Culture of Impunity Sees an Officer Repeatedly Accused of Physical and Sexual Abuse Rising Through the Ranks*, The Intercept (July 6, 2020), https://theintercept.com/2020/07/06/nypd-culture-of-impunity ....................................6

## PRELIMINARY STATEMENT

New York City employs more the 325,000 people, including approximately 36,000 uniformed NYPD officers, more than 10,000 corrections officers, and an assortment of other police officers and peace officers sworn to uphold the law. The people of New York City have entrusted *amicus*'s members, in their role as City Councilmembers, with the power of oversight, the power to propose local laws and Charter amendments governing law enforcement in the City, and the power of the purse. *Amicus*'s members also, as elected officials and leaders in their community, have a duty to serve their constituents and to help them navigate City government. To perform these duties, sunlight on the workings of the City is critical. The City Council cannot investigate or reform what it does not know, and it often relies on journalists and advocates to shine a light on problems and misconduct and to allow the Council to target its own limited oversight resources effectively. *Amicus* believes wholeheartedly in the principle that law enforcement must serve the people, be accountable, and be subject to civilian control.

At this very moment, *amicus*'s members are formulating proposals for police reform. They have heard from tens of thousands of constituents who believe that a fundamental flaw in the City's current laws and procedures is that it fails to discipline officers who commit misconduct. To do the job that their constituents have entrusted them with, city councilmembers need to know the extent of the problem and what is causing it. Are meritorious complaints being rejected because of problems with CCRB procedures or personnel, because investigators lack resources, or because they are outside CCRB jurisdiction and being investigated by agencies themselves? Are decisionmakers appointed in a way that makes sure that they will act in the public interest? Is discipline being used to target whistleblowers rather than to promote accountability? And do members of the public have enough faith in the process that they will participate rather than fearing futility or retaliation? Making information about the disciplinary process available to the public—

and to journalists and advocates who can investigate and identify patterns—is critical to answering all of these questions.

The Progressive Caucus submits this brief to emphasize the critical public interest in a transparent disciplinary process—*especially* when a member of the public complains about a public servant, but the City does *not* impose discipline. Plaintiffs' members, like *amicus*'s members, hold office as a public trust. Section 50-a was offensive to the principle of public accountability and was for that reason repealed. Yet Plaintiffs now seek in large part to resurrect it under the guise of a constitutional right to privacy while serving the public and an assertion that the executive can bargain away the public's right to transparency. Plaintiffs' arguments are meritless and should be rejected.

***First***, *amicus* addresses the importance of transparency to governing the City—especially right now, as *amicus*'s members, their colleagues, and the public debate whether current laws and procedures governing discipline are fit for purpose and whether and how to reform them. In particular, this brief explains the critical importance of the very information Plaintiffs seek to keep private—namely, whether disciplinary procedures are actually resulting in discipline when public servants abuse the public trust.

***Second***, this brief explains the importance of open public records in keeping government accountable and rooting out misconduct. Both the Second Circuit and New York appellate courts have recognized the importance of these laws in the specific context of misconduct investigations. The Second Circuit has held that public employees do not have a protected liberty interest in nondisclosure of "disposition of misconduct charges." *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 792 (2d Cir. 1999). And—*expressly* rejecting the line of Committee on Open Government advisory opinions that Plaintiffs have cited—New York appellate courts have held

that "[t]here is no statutory blanket exemption for investigative records, even where the allegations of misconduct are 'quasi criminal' in nature or not substantiated." *Thomas v. New York City Dep't of Educ.*, 103 A.D.3d 495, 498 (1st Dep't 2013). Rightly so: the public (and the elected representatives they have charged with oversight) have a right to know whether the people they have entrusted with the power to take people's liberty and potentially even their lives are exercising it responsibly. Indeed, far from it being an abuse of discretion or unfair targeting for the City to comply with FOIL requests from public-interest groups, the City did exactly what cases like *Thomas* dictate that it was *required* to do under state law. And even if it had discretion in the matter, it is a basic principle of New York public records law that public bodies in New York have the broad (and unwaivable) discretion whether to invoke exceptions to disclosure under FOIL.

✳✳

Plaintiffs' theories, if accepted, would drastically curtail public accountability over the actions of people sworn to serve the public. Now more than ever, as the council and the public debate how to make law enforcement accountable to the people it serves and to regain their trust, it is not the time for secrecy. Plaintiffs' motion for a preliminary injunction should be denied, and their claims dismissed.

**INTEREST OF AMICUS**

*Amicus* is the Progressive Caucus of the New York City Council. The Progressive Caucus was formed in 2009 with the goal of advancing policies to build a more just and equal New York City. The Caucus is comprised of twenty-two Council members and the Public Advocate. *Amicus*'s members have campaigned on issues of police accountability and transparency, sponsored legislation to make the City's data open to the public and sought to use their oversight and budgetary powers to transform law enforcement in New York City. They have also advocated for the state legislature to repeal New York's police secrecy law, Civil Rights Law

§ 50-a, precisely so that a system of law enforcement that is transparent and accountable to the public it serves in New York City would be possible. As councilmembers, the Progressive Caucus's members have a particularly strong interest in receiving information regarding the police disciplinary process and police misconduct settlements because they are considering numerous potential policy responses to police misconduct, including legislation or Charter amendments, oversight hearings, and further budgetary responses in the next budget cycle.

Under the City Charter, councilmembers are specifically charged with investigation and oversight of City government, including the NYPD, Department of Correction, and the City's numerous other agencies that employ police officers and peace officers. N.Y.C. Charter § 29. The City Council has broad powers to enact local laws and to propose amendments to the Charter. N.Y.C. Charter §§ 28(a), 40. The City Council also has certain powers regarding the Mayor's budget submission. N.Y.C. Charter § 254. The Council, however, has nowhere near the investigative resources of the City's executive branch, and the executive branch may or may not cooperate fully on any given issue. Thus, for the Council to be able to effectively exercise its powers and to hold the executive to account, it depends heavily on the work of journalists and advocacy organizations to uncover problems.

**ARGUMENT**

Plaintiffs' claims, if accepted, would fundamentally undermine the new era of transparent, accountable policing that the repeal of New York's police secrecy statutes was intended to bring. On a more specific level, Plaintiffs' efforts to keep disciplinary complaints that have not led to discipline and settlements of misconduct complaints secret prevents *amicus*'s members from understanding whether the City's police discipline system is effectively holding those who betray the public trust accountable—and if not, how councilmembers can exercise the powers of their office to reform it.

I. **FOR THE CITY'S ELECTED REPRESENTATIVES TO GOVERN THE POLICE, THE PUBLIC NEEDS TO KNOW ABOUT COMPLAINTS AGAINST POLICE OFFICERS.**

   A. **Police Officers Are Supposed to Be Accountable to Elected Officials and the Public—but Often Are Not.**

City police officers are public officers, subject to the control of the Mayor through his appointment of the Commissioner of Police, whom he or the governor can terminate at will. N.Y.C. Charter § 431. Like all City employees, police are subject to the Charter and the Local Laws passed by the Council. Like all City employees, the Council may compel them to testify about matters relevant to their official duties, N.Y.C. Charter § 29(b), and, subject to certain constitutional limits, *see Gardner v. Broderick*, 392 U.S. 273, 277 (1968), if they refuse to testify, they can be dismissed from office, N.Y.C. Charter § 1123. In theory, at least, the New York City Charter reflects the fundamental principle that police are supposed to be accountable to elected civilian leadership.

As other *amicus* briefs in this matter reflect, those principles have not worked out in practice. There is a widespread belief that the Police Department institutionally resists civilian control and oversight and has created a culture of impunity by failing to discipline police officers who commit misconduct. Whistleblower accounts, leaks, and civil rights lawsuits have, for example, revealed systemic issues such as "testilying"—perjury by police officers—where the New York Times quoted a veteran officer as saying "[t]here's no fear of being caught."[1] A follow-up article revealed that just two out of eighty-one instances in which the CCRB found that a police officer committed perjury resulted in discipline, and that multiple officers whom federal judges expressly found lied under oath were later *promoted*, in one case with an official NYPD Twitter

---

[1]    Joseph Goldstein, *'Testilying' By Police: A Stubborn Problem*, N.Y. Times (March 18, 2018), https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

account posting to congratulate the officer.[2] Other news articles have revealed officers promoted while under investigation for fraudulently claiming overtime,[3] officers promoted after their conduct led to hundreds of thousands of dollars in settlements of civil rights suits,[4] and an officer promoted after multiple complaints of physical and sexual abuse that had led to the officer acquiring a nickname apparently related to that conduct.[5] Those allegations fundamentally undermine public confidence in the police—and yet the public cannot review records to determine whether those investigations were adequate to determine whether the complaints were true or not.

Precisely because laws like former Civil Rights Law § 50-a kept police disciplinary matters secret, it is difficult to determine the full scope of these problems, including how systematic they are and how to fix them. A report in 2019 by a panel consisting of former Southern District U.S. Attorney and SEC Chair Mary Jo White, former Eastern District U.S. Attorney Robert L. Capers, and retired Southern District Judge Barbara S. Jones—appointed by NYPD Commissioner O'Neill—was itself limited by Section 50-a, which it declared caused a "fundamental and

---

[2]   Joseph Goldstein, *Promotions, Not Punishments, For Officers Accused of Lying*, N.Y. Times (March 19, 2018), https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html.

[3]   Esha Ray & Graham Rayman, *NYPD Cop Lied About Working Overtime, Got Promotion While Under Investigation: 'the Disciplinary System Is Dysfunctional'*, N.Y. Daily News (March 16, 2018), https://www.nydailynews.com/new-york/bilks-nypd-unearned-overtime-promoted-article-1.3877314.

[4]   Jake Offenhartz, *Here Are NYC's Most Sued Cops Who Are Still On The Job, According To New Public Database*, Gothamist (March 7, 2019), https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database.

[5]   Tana Geneva, *NYPD's Culture of Impunity Sees an Officer Repeatedly Accused of Physical and Sexual Abuse Rising Through the Ranks*, The Intercept (July 6, 2020), https://theintercept.com/2020/07/06/nypd-culture-of-impunity.

pervasive lack of transparency into the disciplinary process and about disciplinary outcomes."[6] To be sure, the City Council has oversight power over the NYPD, but it must also exercise oversight over the rest of the City government, legislate, and perform its role in the budget process, all with far fewer resources than the executive branch of City government. It is thus all too easy to frustrate legitimate oversight through delay. And, in any event, the City Council was itself bound by Section 50-a until its repeal.

> **B.** **As the City Council Considers Police Reform, Open Public Records Are Essential to the Policymaking Process.**

To help the City Council prioritize oversight and formulate policy responses, then, Councilmembers like *amicus*'s members routinely rely on the work of the news media, advocacy groups, and academics to uncover problems and misconduct. Among the most critical tools that allow them to do so are Freedom of Information Law requests and open data—repositories of data that the City proactively makes available for outsiders to review and analyze. Indeed, the City Council has been at the forefront of mandating the public availability of data, including through Local Law 11 of 2012—which several members of the Progressive Caucus sponsored—which requires the City to make public data sets available through a citywide Open Data portal. N.Y.C. Admin. Code § 23-501 *et seq.*

As Local Law 11's findings section expressly noted, allowing public access not only "make[s] the operation of city government more transparent, effective and accountable to the public," but also "permit[s] the public to assist in identifying efficient solutions for government, promote innovative strategies for social progress, and create economic opportunities." N.Y.C.

---

[6]     Mary Jo White, et al., The Report of the Independent Panel on the Disciplinary System of the New York City Police Department 17 (Jan. 25, 2019), https://www.independentpanelreportnypd.net/assets/report.pdf.

Local Law 11 of 2011 § 1. Similarly, the state Freedom of Information Law declares that openness leads to not only "understanding" but also "participation." N.Y. Pub. Off. Law § 84. Sunlight, in short, is not only a disinfectant in government, but also how new ideas germinate and bloom.

That is precisely why the Progressive Caucus wants information to be public as the Council undertakes the difficult task of police reform. Councilmembers need to understand where in the process accountability is failing: is the problem personnel, procedures, budgets, substantive standards for discipline, or something else? If journalists are able to identify quickly evidence missed during an investigation or if FOIL requests about investigations indicate that certain types of complaints were dismissed with minimal investigation, either because of an institutional view that they do not matter or because of insufficient funding to investigate, that may suggest one set of policy reforms. If evidence exists but procedures prevent it from being used effectively, that may suggest another. And if data reveals that written or unwritten policies systematically tolerate conduct that any reasonable person would regard as unacceptable or that violates the standards that the Commissioner is theoretically supposed to be applying, that suggests still other reforms.

Open public records are also essential to the Council's oversight efforts. Councilmembers can question high-ranking officials better when they know more to start off with. Take the New York Times' "testilying" stories, for example: if NYPD brass are of the view that a federal judge's finding is insufficient to discipline an officer for perjury, they should be prepared to defend that view in an oversight hearing. If there was some other reason why those cases were deemed non-disciplinable, the public ought to know so that they can understand if, for example, the NYPD actually disagreed in good faith with the adverse credibility determination or if perjury is simply not considered a priority. As it is, the public and policymakers are left to resort to the scraps that

leak out through whistleblowers or civil rights lawsuits; they cannot conduct the kind of systematic analysis necessary for real substantive oversight.

⁂

The Council, in short, needs all the information it can get to determine how to use its legislative, oversight, and budgetary powers to produce an NYPD that is more transparent and accountable than it is today. Perhaps the single most important information in that effort is understanding why so few officers appear to be disciplined for conduct that seemingly warrants it. For councilmembers to understand how to reform police discipline, it is not sufficient to examine the cases where rogue officers actually were disciplined; it is important to examine why misconduct *failed* to lead to discipline, and whether misconduct complaints are being adequately investigated in the first place.

## II. AS PUBLIC OFFICERS, PLAINTIFFS' MEMBERS HAVE NO RIGHT TO KEEP MISCONDUCT INVESTIGATIONS RELATED TO THEIR OFFICIAL DUTIES SECRET.

### A. Public Officials Are Constitutionally Accountable to the City and to the Public.

City police officers are—as the Supreme Court recognized in a case involving a New York City police officer— "directly, immediately, and entirely responsible to the city." *Gardner*, 392 U.S. at 277. They "owe[ their] entire loyalty to it." *Id*. Police officers are "trustee[s] of the public interest, bearing the burden of great and total responsibility to [their] public employer." *Id.* at 277-78. Like all public employees, they "subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings." *Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of the City of New York*, 392 U.S. 280, 285 (1968). The City Charter provision at issue in *Gardner* and *Uniformed Sanitation Men*, Section 1123, is still on the books, and Judge Friendly held on remand in *Uniformed Sanitation Men*, it is constitutional provided that employees are given use immunity from criminal prosecution based on their

testimony. 426 F.2d 619 (2d Cir. 1970); *see also Matter of Matt v. LaRocca*, 71 N.Y.2d 154, 160 (1987) ("Public employees, charged with a public trust, do not have an absolute right to refuse to account for their official actions and at the same time retain their employment.").

Precisely because public office brings with it an expectation of public accountability, the Second Circuit has repeatedly resisted imposing a broad constitutional right to privacy from public disclosure for work-related matters for public employees. Indeed, Second Circuit precedent *specifically* rejects a constitutional right of privacy in disciplinary investigations or settlements. In a case where a school district in New York had disclosed findings—both of guilt and exoneration—to the public in a teacher disciplinary proceeding, the Second Circuit held that it could "more easily dispose" of the claim that "dissemination to the media of the results of his second disciplinary hearing stigmatized him and thereby wrongfully deprived him of his liberty interest under the Fourteenth Amendment." *DeMichele*, 167 F.3d at 792. "New York courts," it held, "have found that the disposition of misconduct charges does not constitute part of an employee's 'employment history' as that phrase is used in New York's FOIL." *Id.* There was thus "no basis for DeMichele's claim that the results of the proceeding were to remain private, and that Green's dissemination of that information deprived him of his liberty interest." *Id.* Rather, the Second Circuit has interpreted constitutional privacy claims regarding public records narrowly, covering only narrow issues such as HIV status. *See Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) (holding that "[c]ertainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record," while rejecting policy that required people with HIV to agree to be identified publicly to invoke administrative discrimination complaint process). That is right in line with the approach other circuits and state high courts have taken too. *E.g.*, *Non-Resident Taxpayers Ass'n v. Municipality of Philadelphia*,

478 F.2d 456, 460 (3d Cir. 1973) ("The contention that the federal employer, by releasing information belonging to it, thereby violates a constitutionally protected right of privacy, is sustained by no authority which has been called to our attention."); *Forsberg v. Hous. Auth. of City of Miami Beach*, 455 So. 2d 373, 374 (Fla. 1984) (rejecting right to privacy in public records). New York state courts too have rejected a cause of action under 28 U.S.C. § 1983 to keep public records secret. *Carpenter v. City of Plattsburgh*, 105 A.D.2d 295, 299 (3d Dep't 1985) (rejecting police officer's assertion of private right of action under Section 50-a and rejecting existence of constitutional right under Section 1983 claim), *aff'd,* 66 N.Y.2d 791 (1985) (affirming for reasons stated below).

Plaintiffs, in short, have no constitutional right to require the City to keep public records about their conduct in office private. To the contrary, "[p]olice officers are public officers." *Hodgson v. McGuire*, 75 A.D.2d 763, 763 (1st Dep't 1980) (citing *Canteline v. McClellan*, 282 N.Y. 166, 170 (1940) ("That the plaintiffs are public officers there is no doubt.")). Like every public officer in the state, they have no constitutional right to evade public scrutiny for their official actions.

> **B.** **New York Courts Generally *Require* Agencies to Comply with Requests for Records of Complaints That Did Not Lead to Discipline.**

Nor is there any merit to Plaintiffs' contention that their members are being singled out for disclosure. Far from the City being *prohibited* from disclosing disciplinary complaints, investigations, and settlement agreements, the Freedom of Information Law generally *mandates* that these types of information be made available upon request—and New York appellate courts have *specifically* held that investigations that did not lead to discipline as well as disciplinary settlements must be disclosed under FOIL.

FOIL establishes the principle that "[a]ll government records are presumptively open for public inspection unless specifically exempted from disclosure as provided in the Public Officers Law." *Fappiano v. New York City Police Dep't*, 95 N.Y.2d 736, 746 (2001). "Exemptions must be narrowly construed and the burden rests on the government agency to show that requested material qualifies for exemption." *Id.* FOIL "proceeds under the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government." *Fink v. Lefkowitz*, 47 N.Y.2d 567, 571 (1979). Until the repeal of Civil Rights Law § 50-a, the types of records at issue in this case were generally withheld under Section 87(2)(a) of the Public Officers Law, which exempts records "specifically exempted from disclosure by state or federal statute." *See, e.g.*, *New York Civil Liberties Union v. New York City Police Dep't*, 32 N.Y.3d 556, 560 (2018). Now, of course, Section 50-a has been repealed and the Section 87(2)(a) exemption is thus unavailable.

Plaintiffs instead attempt to rely on Public Officers Law § 87(2)(b)'s "unwarranted invasion of personal privacy" exemption. Leaving aside the fact that invoking exemptions is expressly discretionary, as discussed further below, Plaintiffs' argument fundamentally fails because New York appellate courts have held that Section 87(2)(b) does not categorically exempt investigations that failed to lead to discipline or settlement agreements from disclosure.

***First***, the Appellate Division has unequivocally rejected a blanket exception for investigations that did not lead to discipline and has expressly rejected state Committee on Open Government advisory opinions that purported to create such an exception. In *Matter of Thomas*, the Department of Education rejected a FOIL request for an investigation report by the Office of Special Investigations that deemed "unsubstantiated" allegations that a school failed to comply with the requirements of funding it received under the No Child Left Behind Act. 103 A.D.3d 495,

496 (1st Dep't 2013). The Records Access Officer relied on a line of Committee on Open Government advisory opinions asserting that disclosure of unsubstantiated complaints was an unwarranted invasion of personal privacy. *Id.* The First Department unequivocally rejected the advisory opinion, holding that "[t]here is no statutory blanket exemption for investigative records, even where the allegations of misconduct are 'quasi criminal' in nature or not substantiated." *Id.* at 498.[7] Before an agency even had the *option* of invoking a privacy exception, it was required to make a showing of "the effects of disclosure in conjunction with attendant facts." *Id.* It reiterated the importance of disclosing investigations that did not lead to discipline two years later in a different case involving the same requestor seeking records of an investigation into electioneering by a State Department of Education employee at a City school, finding that "there is a 'significant public interest' in the requested materials, which may shed light on whether this matter was adequately investigated," and the City failed to establish that "the claimed privacy interests outweigh this public interest." *Matter of Thomas v. Condon*, 128 A.D.3d 528, 530 (1st Dep't 2015).

Nor is any of this particularly unusual: the Appellate Division has similarly rejected a privacy exemption in the identities of dismissed traffic ticket recipients in the context of a FOIL request to determine whether politically-connected individuals were having tickets dismissed. While noting that "recipients of the dismissed tickets may 'be offended' by the disclosure of their identities," the court held this inadequate to warrant application of the privacy exemption to

---

[7]    It is little wonder that the Appellate Division found that the advisory opinions were entitled to little weight: the case that the Committee has generally cited for this proposition was a *dictum* in *Herald Co. v. Sch. Dist. of City of Syracuse*, 104 Misc. 2d 1041 (Sup. Ct., Onondaga Cnty. 1980). There, a trial court judge concluded that certain types of teacher disciplinary hearings were declared to be "private" by statute, and thus exempt under Public Officers Law § 87(2)(a). There, after noting that the issue was "not pertinent to its determination," the court briefly noted "[a]s an aside" its views on the privacy exemption. *Id.* at 1049. To say the least, that case provides little basis to imply a broad categorical exemption that appears nowhere in the statute.

prevent disclosure or redact their names. *Hearst Corp. v. City of Albany*, 88 A.D.3d 1130, 1132 (3d Dep't 2011). "Far outweighing that personal umbrage, however, is the public's interest in the circumstances surrounding respondent's administrative dismissal of tens of thousands of parking tickets, which necessarily requires the disclosure of the recipients' identities given the allegations that respondent afforded preferential treatment in dismissing tickets issued to certain classes of individuals." *Id.* at 1132-33.

So too here. The public has an imperative interest in determining whether public officers with the power to deprive people of their liberty, armed with lethal weapons, are being disciplined when they commit misconduct, as well as whether the disciplinary process is infected by favoritism or discrimination. Whatever personal embarrassment scrutiny Plaintiffs' members may incur by disclosure—and, to be clear, open records mean that Plaintiffs' members should be entitled to seek release of exculpatory information in those records too—pales in significance to the public interest in accountability.

***Second***, settlements about misconduct relevant to Plaintiffs' members' public duties generally cannot be withheld under the unwarranted invasion of personal privacy exception either. In *Village of Brockport v. Calandra*, the Appellate Division summarily affirmed a finding that a confidentiality clause in a Chief of Police's termination settlement was void as contrary to public policy given FOIL. *Vill. of Brockport v. Calandra*, 191 Misc. 2d 718, 724 (Sup. Ct., Monroe Cnty. 2002) ("The agreement's confidentiality clause directly conflicts with the public policy of FOIL"), *aff'd,* 305 A.D.2d 1030 (4th Dep't 2003). The Court agreed that the unwarranted personal privacy exception was "inapplicable" (as was the now-repealed Section 50-a), and "should not exempt from disclosure the disciplinary charges, financial retirement arrangements and negotiated settlement." *Id.* at 725. The court also noted that such settlements might affect the public fisc,

and "[a] confidentiality clause should not be allowed to trump the right of the public to access information regarding public expenditure." *Id.*; *see also LaRocca v. Bd. of Educ. of Jericho Union Free Sch. Dist.*, 220 A.D.2d 424, 427 (2d Dep't 1995) (upon *in camera* review, releasing settlement agreement with limited redactions and noting that "to the extent that the settlement agreement, or any part thereof, purports to deny the public access to it in its entirety, such a provision is unenforceable as against the public interest"). Thus, Plaintiffs' members cannot rely on contractual secrecy provisions; it has long been established that public policy invalidates such provisions. That is even more true to the extent that any such agreements purport to require the City effectively to seal its own investigative records in addition to the settlement.[8]

### C.    FOIL Exceptions Are, In Any Event, Discretionary.

Plaintiffs, in any event, have no right to *require* the City to invoke a FOIL exception. No such 'reverse FOIL' right exists under state law, as the Court of Appeals' affirmance in *Carpenter v. City of Plattsburgh* indicates. 66 N.Y.2d 791. There, the Appellate Division had found no private right of action under former Civil Rights Law 50-a against disclosure. 105 A.D.2d at 298. *See also Capital Newspapers Div. of Hearst Corp. v. Burns*, 67 N.Y.2d 562, 567 n.* (1986) (declining to reach police officer's standing because parties had stipulated to intervention). Section 87(2) of the Public Officers Law states that agencies "shall" make records available, but "may deny access" when an exception applies. That language is on its face discretionary, not mandatory, and does not confer upon Plaintiffs a right to dictate what the City does with its records.

---

[8]    For much the same reason, Plaintiffs' claim for injunctive relief in aid of arbitration is meritless; if a Collective Bargaining Agreement (which, under City law, is a matter between the executive and the unions) purported to restrict the applicability of FOIL, such a provision would be unenforceable as contrary to public policy. *See Bd. of Ed., Great Neck Union Free Sch. Dist. v. Areman*, 41 N.Y.2d 527, 533 (1977) (provision of CBA restricting access to public records was void as against public policy).

## CONCLUSION

Now, of all times, transparency about police discipline is essential. For the reasons above and those in Defendants' briefs, this Court should deny a preliminary injunction and dismiss the complaint.

Dated: New York, New York
August 14, 2020

Kirkland & Ellis LLP

/s/ Aaron Marks, P.C.
Aaron Marks, P.C.
Joseph M. Sanderson
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: +1 212 446 4800
Facsimile: +1 212 446 4900
aaron.marks@kirkland.com
joseph.sanderson@kirkland.com

*Counsel for Amicus Curiae Progressive
Caucus of the New York City Council*