Brian S. Fraser
**Akerman LLP**
520 Madison Avenue, 20th floor
New York, NY 10022
(212) 259-6472; (212) 880-8965 (fax)
Email:  brian.fraser@akerman.com
*Attorneys for Law Enforcement Action Partnership*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x

Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association,

        Petitioners/Plaintiffs,

                v.

Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Depart of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board,

Civ. Action No. 1:20-cv-05441-KPF

Respondents/Defendants.

----------------------------------------------x

## BRIEF *AMICUS CURIAE* OF LAW ENFORCEMENT ACTION PARTNERSHIP

*Amicus curiae* Law Enforcement Action Partnership ("LEAP"), by and through its undersigned counsel, Akerman LLP, hereby submits its brief in support of the position of the Defendants-Respondents, and of giving effect to the repeal of Section 50-a of the New York Civil Rights Law by the New York Legislature, as follows:

## I.   STATEMENT OF INTEREST OF THE *AMICUS CURIAE*[1]

Law Enforcement Action Partnership ("LEAP") is a nonprofit organization composed of current and former police officers, prosecutors, judges, corrections officials, and others from around the country with law enforcement backgrounds. LEAP's mission is to unite and mobilize the voice of law enforcement in support of reform of the criminal justice system, with the aim of making policing and law enforcement more effective and making communities safer. LEAP advocates for these goals by urging that law enforcement channel its resources toward the greatest threats to public safety, by promoting alternatives to arrest and incarceration, by addressing the root causes of crime and, perhaps as most relevant here, by working to better the relationships between police officers and departments and the communities they serve.

LEAP draws on the considerable experience in and knowledge of its members and associates in all parts and stages of the law enforcement process

---

[1] This brief was not authored, in whole or in part, nor was money contributed for its preparation or submission, by any party, a party's counsel, or any person other than the *amicus curiae*, its members, or its counsel.

to propose, promote and advocate for criminal justice, drug policy and community relations reforms that will make our communities safer and our system fairer and more constructive—and thus more just. Founded by five police officers in 2002 with an original focus on drug policy, today LEAP's speakers bureau numbers more than 200 current and former criminal justice professionals[2] who write, speak and advise, in the U.S. and abroad, on a host of related issues, including police-community relations, incarceration and its alternatives, strategies to reduce harm and changes to drug enforcement policies.[3] As examples, LEAP has: assisted in the passage of Proposition 1 in Michigan, which legalized and regulated adult use of marijuana in the state; provided support for Amendment 4 in Florida, which was aimed at restoring the voting rights of more than one million people who have served their time for felony convictions; spoke out in favor of Louisiana's Amendment 2, which ended the State's acceptance of non-unanimous juries in felony trials, a change that took a significant step in correcting disproportionate racial impact on juries; helped defeat Measure 105 in Oregon, and thus insuring that state and local law enforcement would not be compelled to enforce federal immigration laws and policies; and worked to pass Initiative 940 in Washington, which will

---

[2] A list of speakers associated with LEAP can be found at:
https://lawenforcementactionpartnership.org/category/speakers/ (last visited August 14, 2020).
[3] LEAP's principal issues of concern include police-community relations, incarceration, drug policy, harm reduction, and global issues. *See* Law Enforcement Action Partnership Press Kit, available at:
https://lawenforcementactionpartnership.org/wp-content/uploads/2018/01/2018-LEAP-Press-Kit.pdf (last visited August 14, 2020).

require law enforcement to receive violence de-escalation, mental-health, and first-aid training; and will also change standards for use of deadly force.

When LEAP has addressed these issues, it has done so as a voice for law enforcement professionals at all levels. The deep law enforcement experience of its members and speakers allows LEAP to weigh in with credibility and insight. Through speaking engagements, media appearances, court and legislative testimony, and support of allied efforts LEAP has been able to reach audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

Given the backgrounds and experiences of its members and speakers, and because the improvement of police-community relations is a core concern for us, LEAP is keenly interested in, and uniquely positioned to address, the issues raised in this case. We see as our primary responsibility the safety of the public, police officers and the communities they serve and work in. The issues raised in this case, including the effect of the repeal of Section 50-a of the New York Civil Rights Law, bear directly on this concern. The parties and other *amici* will no doubt fully address relevant case law on the issues raised in this case. But the Plaintiffs' arguments are also grounded in factual assertions about the realities of policing. It is those realities that LEAP hopes to help the Court understand.

## II.     INTRODUCTION

In the aftermath of the killing of George Floyd by Minneapolis police officers on Memorial Day of 2020 the New York legislature approved, and the

4

Governor signed, Senate Bill S8496. That bill repealed former Section 50-a of the New York Civil Rights Law, which had shielded from public view the records of investigative and disciplinary proceedings involving New York law enforcement officers. Prior efforts to repeal Section 50-a, like other bills aimed at increasing transparency and curbing police misconduct, had been unable to garner enough legislative support, especially in light of the persistent, significant and seemingly knee-jerk opposition from powerful police unions.[4] In the aftermath of George Floyd's death, and of other regrettably similar incidents, the groundswell of activism seen in New York and across the country, including some of the largest protests in the country's history, finally propelled the bill through the Legislature.[5]

To what should be no one's surprise, the position of the Plaintiffs in this case is the same as it has always been: a reflexive opposition to transparency where the conduct, and misconduct, of police officers is concerned. They should not be allowed to undo those legislative actions and thwart the will of the New York State Legislature, its Governor and its people on this issue of grave public concern. Because LEAP knows the value of transparency in matters of police conduct, it supports the complete repeal of Section 50-a of the

---

[4] *See* Reade Levinson, *Across the U.S., police contracts shield officers from scrutiny*, REUTERS UK, Jan. 13, 2017, available at https://uk.reuters.com/article/uk-usa-police-unions-specialreport/special-report-across-the-u-s-police-contracts-shield-officers-from-scrutiny-idUKKBN14X1SO?il=0.

[5] Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, NY TIMES, July 3, 2020, available at https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

New York Civil Rights Law, which will allow the public disclosure of records relating to law enforcement officers, including information about accusations of misconduct, investigations of complaints and their results. LEAP's members know that public access to this kind of information actually *promotes* the goals of effective law enforcement, including—indeed, especially—effective policing and officer safety. The transparency fostered by the repeal of Section 50-a is necessary to effective policing because it supports and promotes police accountability. And accountability, in turn, is the key to what LEAP's members know is absolutely critical to the goals of policing: trust between police officers and departments and the citizens and communities they serve.

In short, trust is critical to effective and cooperative policing. But it is just as important to note that the antithesis is also true: lack of trust between police officers and departments and the communities they serve, as is seen in so many communities these days, leads both to less effective policing and to greater risk to police officers. Where trust is absent, officers and departments are, not surprisingly, viewed categorically with suspicion and even seen as enemies. This creates more hazardous environments in which officers operate, and also reduces the level of cooperation between police and citizens that is often the key to effective policing.

The complete repeal of Section 50-a achieves the goal of fostering trust between the police and their communities, not to mention the will of the elected representatives of the people of New York. In an effort to undo those actions, Plaintiffs advocate for judge-made limitations on the disclosure of law

enforcement officers' disciplinary records. They do so in part by arguing, among other things, that the release of these records would invade the officers' privacy and create greater risks to their safety. Some of these arguments fail on their face; for example, the claims regarding officer privacy fail to account for the fact that Section 3 of Senate Bill S8496 requires a law enforcement agency responding to a request for law enforcement disciplinary records to redact specific categories of personal information from the record before disclosing the record, and allows the agency to redact portions of the record that only contain "minor, technical infractions that do not involve interactions with the public, are not of public concern, and are not connected to the officer's investigative, enforcement, training, supervision, or reporting responsibilities." Further, Section 4 provides the specific types of personal information that must be redacted from a law enforcement agency's response to a request for disciplinary records.

The Plaintiffs also claim, though, that increased public access to police disciplinary records will actually put officers at greater risk. LEAP knows, from the long experience of its members and speakers, that this is wrong. Indeed, as we will explain, the very opposite is true.

### III.   THE COMPLETE REPEAL OF SECTION 50-A OF THE NEW YORK CIVIL RIGHTS LAW SHOULD BE GIVEN EFFECT

#### 1. *Transparency Furthers Officer Safety, And Lack Of Transparency Places Their Safety At Greater Risk.*

On June 12, 2020, responding to the calls from the community locally and abroad, the New York State Legislature and the Governor repealed Section

50-a. Where prior efforts to increase transparency had failed over the years this one succeeded, no doubt in part as a result of an increased level of awareness of issues raised by the use of force, and especially deadly force, by police officers in recent months. Despite the significant support that ultimately arose for this measure,[6] the Plaintiffs would thwart the legislative will to increase transparency and accountability by law enforcement officers, as well as the soaring public sentiment behind it, by asking this Court to bar the disclosure of substantial categories of disciplinary records. Specifically, Petitioners seek the temporary, preliminary, and permanent injunction of the disclosure of law enforcement officers' records concerning disciplinary matters that are "non-final, unsubstantiated, unfounded, exonerated, or resulted in a finding of not guilty," ("Unsubstantiated and Non-Final Allegations") "or that regard settlement agreements entered into prior to June 12, 2020." (Pet. ¶ 1, Wherefore Clause, Dkt. 1-1). Their stated concern is that the disclosure of such information will "result[] in the publication and promotion of information that will absolutely destroy the reputation and privacy—and *imperil the safety*—of many of those firefighters and officers." Id. ¶ 1 (emphasis added).

LEAP has heard the claim that transparency puts officers in greater danger before, and in the past this claim has generally succeeded. But it is wrong, for two overarching reasons: because release of these records will not increase risks to officers, while the continued suppression of these records will.

_____

[6] *See* Jake Bittle, *The state legislature may repeal 50-a. Here's what that means.*, QUEENS DAILY EAGLE (June 4, 2020), https://queenseagle.com/all/50a-repeal-new-york-police-records-queens (listing supporters of the repeal measure).

a.  <u>Transparency Will Not Place Police Officers At Greater Risk</u>.

The safety of law enforcement officers is not inappropriately, improperly, or unreasonably impacted by the repeal of Section 50-a. Concerns about public disclosure of officers' identifying information are understandable, but are unfounded in this instance. This is in part true because the authors of Senate Bill S8496 anticipated and addressed these concerns by requiring, in the same bill, the redaction of such information from released records. In addition, New York law provides other legal protections, unaffected by the repeal of Section 50-a, that will protect the officers' privacy and safety. *See Dunnigan v. Waverly Police Dep't*, 279 A.D.2d 833, 834, 719 N.Y.S.2d 399, 400 (2001) ("Under Public Officers Law § 87(2)(a), an agency may deny access to public records which 'are specifically exempted from disclosure by state or federal statute'.").

The Plaintiffs' assertions that officer safety is placed at greater risk by public disclosure of disciplinary records are unsupported by empirical data, and the data there is seems to suggest the opposite.[7] While privacy, generally and as relates to officer safety, is certainly a valid and important concern, it is

---

[7] Stephanie Wykstra, *The fight for transparency in police misconduct, explained: New York's repeal of section 50-a — which allowed police to shield misconduct records — is a big win for activists, but there is more work to be done.*, VOX (Jun 16, 2020, 7:30am EDT), https://www.vox.com/2020/6/16/21291595/new-york-section-50-a-police-misconduct ("But advocates and researchers point out that there's no evidence that disclosing records will lead to physical harm against officers. In a recent survey of 344 police and sheriff offices in the 12 most transparent states, legal scholars Rachel Moran and Jessica Hodge saw scant evidence of physical harm to officers. As one criminologist put it, there's a 'total lack of data' when it comes to the claim that officers will be harmed as a result of disclosures.).

one for which protective measures are in place, and there is no evidence that they do not work. Perhaps more to the point, though, the truth, as LEAP's members and speakers have learned through experience, is just the opposite. Because shielding these records from public view has long promoted distrust between police and communities, that very lack of transparency has put officers in greater danger, and will continue to do so if the Plaintiffs have their way.

      b. <u>Shielding disciplinary records actually puts officers in peril.</u>

The lack of transparency in police disciplinary matters in New York under Section 50-a has made law enforcement officers' jobs harder and less safe because it has fostered a lack of trust. LEAP's members and speakers, and especially those who have served as police officers or administrators, know this firsthand. Trust between officers and citizens, between police departments and communities, is so critical to all the goals of effective policing—including officer safety—that its importance is nearly impossible to overstate. Where there is trust, where police officers are seen as protectors and not adversaries, officers are less threatened because there is less hostility to police officers and police departments. "Trust-building is not an optional, feel-good extracurricular activity for police, it is a core responsibility with a direct link to public safety." Brendan Cox, *Commentary: Open misconduct records to improve public trust in police*, TIMES UNION (Jan. 3, 2020), available at: https://www.timesunion.com/opinion/article/Commentary-Open-misconduct-records-to-improve-14948648.php. Experience tells us that where individuals

and communities trust police officers and departments to act fairly and responsibly, and to be straight up with them about what they do, the police are seen as less threatening and more protective, whether on a block, in a neighborhood, or in a city, county or State as a whole. And communities that feel less threatened are also less threatening. Officers who operate in communities where there is trust between citizens and the police simply face less risks.

Trust does not just arise, though; it must be earned. And where police officers and departments are concerned, the route to trust is to a great extent through accountability. LEAP's members and speakers know that where officers and departments are seen as accountable, as answerable for errors and for misconduct when they occur, they are simply trusted more. To some degree this is just human nature. When an incident involving the use of force by police occurs, and especially (though by no means exclusively) when someone's life is lost, it is not reasonable to expect communities to react to monolithic silence in any way other than to be distrustful. But even where misconduct does occur police can build trust by being transparent about it, by making the community feel that they share their concern for respect for the law and that the police, like citizens themselves, are accountable for their actions.

Moreover, Section 50-a, when it was in force, encouraged false narratives that themselves increased risks to officer safety. This, again, is human nature: when an accusation is greeted by silence, people naturally assume the worst. Lack of transparency on incidents involving use of force encourages false

narratives by suggesting, wrongly, that the police are always hiding or misrepresenting the facts.  In truth, many incidents of use of force are justified and many of the records the Plaintiffs would shield from view would demonstrate this. But Section 50-a shielded *all* records from view, virtually inviting citizens and communities to come to the worst conclusion every time. In this respect it is ironic that the Plaintiffs assert, as grounds for *less* transparency, that one reason to keep records of misconduct claims private is that accusations against police officers are easy to make. *See*, *e.g.*, Pet. ¶¶ 3, 39, Dkt. 1-1. This argument insults the intelligence of the communities that police officers serve. If the police do not have enough faith in the people they serve and protect to expect them to be able to evaluate the results of investigations fairly, why would those communities in turn have any faith in the police? And why would telling people nothing work better to foster trust?

 The police work for the communities that they serve. Shielding the disciplinary records of officers, including the Unsubstantiated and Non-Final Allegations, does a disservice to the law enforcement community because "what 50-a actually does is lump the honest, hard-working police officers in with those officers who have betrayed the public trust by allowing their misconduct to be shielded by outdated legislation." Brendan Cox, *Commentary*, *supra*.

Communities know that law enforcement officers, when effective, protect them, and they also understand that officers are human, and that mistakes, and even intentional misconduct, will happen. Officers and departments should be able to explain how and why something went wrong, and when they

do not, their silence will be perceived as an inability to do so that is a reason not to trust officers generally. Conversely, when the community sees that their police will be open about such incidents, even when an officer has made a mistake or worse, they will become more open to communicating with officers and developing constructive relationships with officers and police departments. We do an injustice not only to the community, but to police officers themselves, by shielding from everyone the results of these inquiries. And that lack of transparency breeds hostility, which places officers in more, not less, danger.

### 2. *Transparency is Critical to Effective and Safe Policing.*

Trust between the police and their communities not only makes police officers safer; it also makes them better at their jobs. When there is a lack of police accountability, which is how silence about police misconduct claims is inevitably perceived, law enforcement officers lose legitimacy in the eyes of those we serve. Another result of this loss of trust is a substantial reduction in police-community engagement that is an important part of any sensible policing strategy. "To prevent and solve crime, police need community members to cooperate and provide information about what they have witnessed. Folks will only cooperate if they trust us." *Id.* Where trust is absent, the chances of such cooperation are substantially diminished.

Our experience tells us that this is true on both a macro and micro level. Records of the investigations of police incidents contain information that advocates on behalf of public safety and communities alike need in order to hold public safety officers accountable to the communities they serve.  The

State Committee on Open Government has stated that Section 50-a "creates a legal shield that prohibits disclosure, even when it is known that misconduct has occurred." *Memorandum in Support of Legislation Submitted in Accordance with Assembly Rule III, Sec 1(f), Bill Number:* A2513, available at https://assembly.state.ny.us/leg/?default_fld=&leg_video=&bn=A02513&term =2019&Summary=Y&Memo=Y. Through the disclosure of these records, the public obtains information not only about past complaints and disciplinary records, but also about who the officers are that are policing their communities. Moreover, and even beyond what public disclosure may say about a particular officer, a climate of transparency helps the community view the police in general as a partner in public safety. By contrast, lack of transparency encourages communities to view the police as monolithic and unwilling to subject themselves to review, which (as noted) fosters distrust.

Among our number LEAP is proud to count many who have helped to administer police stations, districts and departments. We know that police departments and their managers have a responsibility to their officers to do everything they can, and give them every tool available, to make their work safer and more effective. In addition to promoting safety, trust is also an important tool in furthering these goals. Thus, while the view that these records should be publicly available may seem counterintuitive coming from law enforcement officers, and indeed it is not a view many in the law enforcement community, including many of us at LEAP, would have taken some years ago, time and experience have changed our view. Increased

14

transparency actually furthers the goal of safe and effective policing. This is what we have heard from communities we serve as we have tried, in various ways, to build trust with them after excessive use of force incidents. Silence in the wake of an incident involving use of force harmed our relationships with these communities, and this is true whether or not there were indications of fault on the part of officers.

The restoration and nurturing of that trust has long been a goal of LEAP, and that goal has never been more important than in these difficult times. For that reason, LEAP recently made increased transparency with regard to issues of police misconduct and increased accountability for police officers for use of deadly force the first items in its National Policing Recommendations, released on June 3, 2020 and available at:

https://lawenforcementactionpartnership.org/national-policing-recommendations/.

## **CONCLUSION**

For the reasons expressed in this brief, LEAP respectfully urges the Court to deny the Petitioners' request for a temporary, preliminary, and permanent injunction against the disclosure of law enforcement officers' records, and to permit the repeal of Section 50-a of the New York Civil Rights Law by the New York Legislature to take effect. Doing so will be good for both police officers and the citizens and communities they serve.

Respectfully submitted,

**AKERMAN LLP**

*/s/ Brian S. Fraser*
**Brian S. Fraser**
520 Madison Avenue, 20th Floor
New York, New York 10103
Telephone: (212) 259-6472
Email:  brian.fraser@akerman.com

**Joel D. Bertocchi** (*pro hac vice*
application pending)
71 South Wacker Drive, 47th Floor |
Chicago, IL 60606
Tel: (312) 870-8026
Facsimile: (312) 424-1900
Email: joel.bertocchi@akerman.com

**Enjoliqué Aytch Lett** (*pro hac vice*
application pending)
Fla. Bar No. 0104881
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

*Attorneys for Law Enforcement Action
Partnership*

August 14, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Brian S. Fraser, certify that on August 14, 2020, a true and correct copy of the foregoing document was filed through the CM/ECF system, which caused notice to be sent to all counsel of record.

<u>/s/ Brian S. Fraser</u>