UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association,<br><br>*Petitioners/Plaintiffs*,<br><br>v.<br><br>Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board;<br><br>*Respondents/Defendants*,<br><br>Communities United for Police Reform,<br><br>*Intervenor Defendant*. | Case No. 1:20-cv-05441-KPF |

**BRIEF OF *AMICI CURIAE* FORMER COUNSELS AND INVESTIGATORS OF THE CIVILIAN COMPLAINT REVIEW BOARD IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Janos Marton, Esq.
450 West 47th St. 2B
NY NY 10036
Tel: 917.848.6915

Jesse C. Rose, Esq.
The Rose Law Group, PLLC
3109 Newtown Ave; Ste 309
Astoria, New York 11102
Tel: 718.989.1864

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ............................................................................1

SUMMARY OF ARGUMENT ..................................................................................2

ARGUMENT ..............................................................................................................2

      A.  Information Released in the CCRB Database is the Product of
          Extensive Investigation and Review, and Does Not Involve the
          Officers' Personal Information ................................................................2

            1.  Each Allegation of Police Officer Misconduct Undergoes
                 Multiple Levels of Review Before a Final Disposition Is
                 Reached.................................................................................2

            2.  Investigators Who Research Misconduct Allegations are
                 Trained, Methodical, and Experienced. .......................................3

            3.  CCRB Investigations Do Not Involve the Use of Sensitive
                 Personal Information About Police Officers, and Neither
                 Would Publication of the Database..............................................4

      B.  Each of the Four Possible CCRB Dispositions are the Product of
          Extensive Agency Work, and the Public Release of Each Possible
          Outcome Serves a Public Interest ..........................................................5

      C.  Public Access to the CCRB Database Will Increase Public Trust in
          Police Accountability and the CCRB, While Allowing the CCRB to
          Better Perform its Mission ....................................................................8

            1.  The Investigation of Daniel Pantaleo for Eric Garner's Death
                 Undermined the Public's Trust in Police Accountability and
                 in the CCRB...........................................................................8

            2.  Publication of the Database Will Increase Public Trust in
                 Police Accountability and the CCRB .........................................9

            3.  Publication of the Database Will Allow the CCRB to Better
                 Fulfill its Mission...................................................................10

CONCLUSION.........................................................................................................12

## TABLE OF AUTHORITIES

**Cases**

*Gonzalez v. United States*, Case No. 12-cv-5226-JSR, 2013 WL 5289793,
　　at \*11 (S.D.N.Y. Sept. 19, 2013) ........................................................................11

*Lynch v. New York City Civilian Complaint Review Bd.*, 183 A.D.3d 512,
　　125 N.Y.S.3d 395, 399 (N.Y. App. Div. 2020) ...................................................3

*Luongo v. Records Access Officer, Civilian Complaint Review Bd.*,
　　150 A.D.3d 13, 26–27, 51 N.Y.S.3d 46, 58 (N.Y. App. Div. 2017) ..................10

**Statutes**

Rules of the Civilian Complaint Review Board, 38-A R.C.N.Y. § 1-31(b) (2018) ..3

**Other Authorities**

*Case Outcomes*, NYC Civilian Complaint Review Board (2002),
　　https://www1.nyc.gov/site/ccrb/investigations/case-outcomes.page..................6

Charles Campisi, *Blue on Blue: An Insider's Story of Good Cops Catching
　　Bad Cops* 115 (2018) .........................................................................................8

Derek Willis, Eric Umansky, & Moiz Syed, *The NYPD Files*, ProPublica,
　　July 26, 2020,  https://projects.propublica.org/nypd-ccrb/ .................................12

Gabriel Sandoval, *CCRB Review of NYPD Taser Use Shows Discrepancies*,
　　The City, Dec. 5, 2019, https://www.thecity.nyc/2019/12/5/21210637/
　　ccrb-review-of-nypd-taser-use-shows-discrepancies...........................................12

J. David Goodman, *Complaint Board Softened Report on Police Use of Tasers*,
　　N.Y. Times, Dec. 26, 2016, https://www.nytimes.com/2016/12/26/
　　nyregion/complaint-board-softened-report-on-police-use-of-tasers.html ..........12

J. David Goodman & Al Baker, *Wave of Protests After Grand Jury Doesn't
　　Indict Officer in Eric Garner Chokehold Case*, N.Y. Times, Dec. 3,
　　2014,  https://www.nytimes.com/2014/12/04/nyregion/grand-jury-said-to-
　　bring-no-charges-in-staten-island-chokehold-death-of-eric-garner.html ...........9

Jeffery C. Mays, *Fire the Officer in the Eric Garner Case? De Blasio Falters*,
　　N.Y. Times, July 17, 2019,  https://www.nytimes.com/2019/07/17/
　　nyregion/eric-garner-de-blasio-pantaleo.html ....................................................9

New York City Police Dep't Patrol Guide, No. 204-17 (2013),

https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page ...............5

NYC Civilian Complaint Review Board, *Executive Director's Monthly Report:*
    *May 2017* 11 (2017), https://www1.nyc.gov/assets/ccrb/downloads/pdf/
    20170510_boardmeeting_edmonthlyreport.pdf...................................................3

NYC Civilian Complaint Review Board, *Executive Director's Monthly Report:*
    *January 2020* (2020),  https://www1.nyc.gov/assets/ccrb/downloads/
    pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf .....................3, 6, 7, 8

Petitioner's Complaint at 2, *Uniformed Fire Officers Ass'n, et al. v. De Blasio*,
    Case No. 1:20-cv-05441-KPF (2020), ECF No. 1 ................................................6

Rocco Parascandola, *Exclusive: CCRB report shows police use Tasers too*
    *often, but NYPD says the findings are biased and flawed*, N.Y. Daily
    News, June 7, 2016, https://www.nydailynews.com/new-york/
    ccrb-report-shows-nypd-tasers-article-1.2665114 ...............................................12

Shawn Cohen, *CCRB moves to substantiate excessive force claim against Eric*
    *Garner chokehold cop*, N.Y. Post, June 1, 2017, https://nypost.com/2017/
    06/01/ccrb-moves-to-substantiate-excessive-force-claim-against-eric-
    garner-chokehold-cop/ .......................................................................................10

Thomas Tracy, *Civilian Complaint Review Board worker forced to resign for*
    *leaking information on cop who killed Eric Garner*, N.Y. Daily News,
    Mar. 24, 2017,  https://www.nydailynews.com/new-york/
    ccrb-worker-forced-quit-info-leak-killed-garner-article-1.3007427 ..................10

Yasmeen Khan, *5 Years After Eric Garner's Death, Activists Continue*
    *Fight for 'Another Day to Live'*, NPR, July 17, 2019,
    https://www.npr.org/2019/07/17/742473964/5-years-after-eric-garners-
    death-activists-continue-fight-for-another-day-to-liv .........................................9

Yoav Gonen, *Family Says Body-Cam Video Counters NYPD Account in*
    *Queens Taser Death*, The City, July 21, 2020, https://www.thecity.nyc/
    2020/7/21/21333559/nypd-body-cam-video-queens-taser-death .........................11

## INTEREST OF *AMICUS CURIAE*

*Amici* are former counsels and investigators from the Civilian Complaint Review Board ("CCRB") employed from 2000 to 2019, and served under the leadership of multiple mayoral administrations, CCRB Board Chairs, and CCRB Executive Directors. *Amici* are committed to ensuring that the CCRB can fulfill its mandate to effectively investigate and recommend action to address police misconduct, and publicly report on its findings. Collectively, *amici* have decades of experience working with the CCRB database and administering the CCRB's police accountability functions. As such, *amici* can offer additional context to demonstrate that, contrary to Plaintiffs' position, publication of the CCRB database carries a significant public interest that far outweighs the privacy interest asserted by Plaintiffs. Specifically, *amici*'s experience has shown them that the CCRB database is an essential police accountability tool, that information is extensively reviewed before it is placed in the database, and that lack of public access to the database impedes the CCRB's ability to fulfill its mandates and undermines public trust in police officer accountability.

The signatories of this brief who have worked for the CCRB include:

Janos Marton, Policy Counsel (2015-2016), Civil Rights Attorney
Arthur Albano, Investigator (2013-2017), Domestic Violence Advocate.
Dan Bodah, Investigator (2000-2007), JD, Fellow at Vera Institute of Justice.
Sarah Bridger, Investigator (2000-2003), Ass. Professor at Cali. Poly. St. Univ.
Scott Carlton, Investigator (2017-2018), Metropolitan Museum of Art.
Daniel Cooper, Investigator (2014-2018), Department of Education.
Perri Fagin, Investigator (2016-2018), CUNY School of Law 2023.
Nathaniel Flack, Investigator (2016-2018), Michigan Law 2021.
Isaac Forman, Investigator (2016-2018), Fordham Law 2021.
Emily Hebert, Investigator (2018-2019), Public Policy.
Lili Manuel, Investigator (2013-2017), University of Washington M.S.W.
Sophia Manuel, Investigator (2013-2015), Project Manager
Chart Rigall, Investigator (2018-2019), Political Communications Staffer.
Erin Sweeney, Investigator (2014-2016), Ass. Dep. Public Defender in Camden, NJ.
Abigail Shuster, Investigator (2014-2016), CUNY School of Law 2021.

Each of these signatories is willing to testify at a hearing (with the option of virtually appearing) if necessary regarding the information described herein.

## SUMMARY OF ARGUMENT

*Amici* seek to offer the court a better understanding of how the CCRB operates, lending context to how information in the disputed database is generated, what the information in the database means, and why its publication is important for public trust.

First, *amici* explain the CCRB investigative process, describing the rigor that goes into assessing an allegation of misconduct by a police officer, the extensive training that investigators undertake to conduct their work, and the layers of review that accompany a CCRB recommendation. *Amici* also specify what information is and is not included in such investigations, noting the absence of personal identifying information.

Next, *amici* turn to laying out clearly what each of the various CCRB dispositions employed by the agency and published in the database mean. In particular, amici clarify the term "unsubstantiated", and how its administrative meaning differs from common parlance. *Amici* argue that each of the four main CCRB dispositions merit publication to increase community understanding of policing practices.

Finally, *amici* explain how the publication of the CCRB database will allow the agency to better fulfill its mission to investigate alleged misconduct and inform the public of policing practices. At a moment when public trust in the NYPD is frayed; publication of the database will increase transparency and accountability, and actually assist the CCRB in how it understands its own role.

**ARGUMENT**

A.     **Information released in the CCRB database is the product of extensive investigation and review, and does not involve officers' personal information.**

1.     **Each allegation of police officer misconduct undergoes multiple levels of review before a final disposition is reached.**

The CCRB follows an extensive investigative process, honed by years of agency best practices.  Following the intake department's receipt of a complaint from a "civilian" (the agency term for a complainant filing an allegation against a police officer), an investigator begins evaluating the allegation. Once an investigation has been completed (process discussed *infra*), an investigator drafts a report that includes recommendations for review by their supervisor. If a supervisor is satisfied with the diligence of the investigation and accuracy of the investigator's analysis, the recommendation is sent to the agency Board for a vote. The recommendation options for each allegation are "substantiated", "unsubstantiated," "exonerated"," or "unfounded." (The meaning of these terms will be discussed *infra*.) Particularly complex or controversial investigations are likely to be reviewed as an intermediate step before reaching the CCRB, such as a policy counsel reviewing the legal analysis and ensuring the recommendation is consistent with internal agency policy.

A panel of the CCRB then reviews a batch of cases together. The CCRB is composed of appointees from the Mayor, Council Speaker, and NYPD Commissioner. Each Board panel that deliberates on recommendations includes one representative from each source of appointees.[1] The CCRB is assisted in such deliberations by senior members of the agency. By a vote of two Board members, a recommendation can be upheld, reduced, or (infrequently) elevated. The Board can

---

[1] Rules of the Civilian Complaint Review Board, 38-A R.C.N.Y. § 1-31(b) (2018). In emergency situations, representatives from only two entities are required. *See Lynch v. New York City Civilian Complaint Review Bd.*, 183 A.D.3d 512, 125 N.Y.S.3d 395, 399 (N.Y. App. Div. 2020).

also (infrequently) return a case for further investigation. The period from the moment of intake to the Board deliberation typically takes four to five months.[2]

By the time an investigation has been voted on by the Board and received the formal disposition that would be published (the subject of this litigation), it has been investigated by one or more investigators, reviewed by one or more supervisory or mid-level agency staff,[3] and voted on by a majority of three CCRB members.[4] In the experience of *amici,* it is highly unlikely that an allegation a reasonable person would consider frivolous could survive this process and result in a substantiation.

The final determination in a case, the far more detailed investigator report, and other records are then saved as part of a database that is accessible to agency personnel. This rich database allows investigators to then use that previous investigation - the factual and legal analysis, the precedent, the records of the officers and even civilians involved - and conduct a more thorough investigation on the next case to cross their desk.

### 2.    Investigators who research misconduct allegations are trained, methodical, and experienced.

*Amici* are composed primarily of former investigators, so this brief provides their insights into the rigor of the CCRB investigative process. A complaint is initiated when a civilian contacts the CCRB by phone, online, or in-person to report an alleged act of misconduct by a police officer.

---

[2] NYC Civilian Complaint Review Board, *Executive Director's Monthly Report: May 2017* 11 (2017), https://www1.nyc.gov/assets/ccrb/downloads/pdf/20170510_boardmeeting_edmonthlyreport.pdf.
[3] The management structure of investigative teams has taken a variety of shapes through the years, sometimes resulting in even further formal approval for case closure.
[4]  An allegation's journey doesn't end here. For "charges," the most serious disciplinary action that can be brought under the CCRB process for a substantiated complaint, a lengthy quasi-judicial process follows. And the NYPD Commissioner retains the power to modify all recommendations made by the CCRB, such as reducing an allegation from "substantiated" to "unsubstantiated" or dismissing the penalties associated with a substantiation. For the purposes of this brief, however, most allegations will be published in the database based on the outcome of the Board's determination.

From this point until a report is approved by an investigator's supervisor, the investigator is the primary CCRB staffer responsible for the outcome of the allegation.

CCRB investigators are trained in best practices for interviewing civilians and officers, procuring evidence at the site of alleged incidents, and interpreting case law related to the allegations. Each investigator is taught techniques for properly identifying police officers, evaluating body-worn camera footage, and analyzing cell phone videos. New investigators are carefully supervised, and agency-wide training occurs regularly.  An investigator will typically handle about 40 cases in their first year and 60-90 cases per year as their experience increases. This repetition quickly develops an investigator's skills for finding and reviewing evidence, conducting thorough interviews, and mastering the relevant law and internal policy for common misconduct allegations.

### 3.   CCRB investigations do not involve the use of sensitive personal information about police officers, and neither would publication of the database.

From *amici*'s extensive work investigating CCRB cases, there is no merit to the claim that releasing the outcome of CCRB investigations endangers police officers by revealing personal information. The CCRB database does not include the home addresses, personal phone numbers, email addresses, social security numbers, or other details of police officers as private citizens. Information held by the CCRB, including information reviewed about officers in the course of an investigation, is limited to official information relating to the officer's work as a public official. This includes an officer's name, shield number, tax identification number (a unique identifying code assigned by the police department), rank, assignment, gender, and race.  Other information is even more publicly available; for example, officers are required by the police Patrol Guide to

display their names and shield numbers to the public and provide them upon request.[5] Ranks are also indicated by the uniforms and insignias officers are required to wear in public.

Release of CCRB disciplinary records therefore does not endanger officers. CCRB data does not contain information from which officers or their families could be targeted. In fact, CCRB records only reveal information about the roles and activities of officers as public officials, not of their life as a private citizen.

**B.    Each of the four possible CCRB disposition are the product of extensive agency work, and the public release of each possible outcome serves a public interest.**

Each CCRB allegation that is fully investigated essentially reaches one of four dispositions. (If a civilian refuses or is unable to be interviewed, the case is disposed as "Complainant Uncooperative/Unavailable"). The CCRB defines the four dispositions as follows:

- **Substantiated**: *Sufficient credible evidence to believe that the subject officer committed the alleged act without legal justification.* Substantiated cases are sent to the police department with a disciplinary recommendation.[6] In 2019, 12% of investigated allegations were substantiated.[7]

- **Unsubstantiated**: *The available evidence is insufficient to determine whether the officer did or did not commit misconduct*.[8]

- **Exonerated**: *The subject officer was found to have committed the act alleged, but the officer's actions were determined to be lawful*.[9]

- **Unfounded**: *There is sufficient credible evidence to believe that the subject officer did not commit the alleged act*.[10]

---

[5] New York City Police Dep't Patrol Guide, No. 204-17 (2013), https://www1.nyc.gov/site/nypd/about-nypd/patrol-guide.page.
[6] *Case Outcomes*, NYC Civilian Complaint Review Board (2002), https://www1.nyc.gov/site/ccrb/investigations/case-outcomes.page.
[7] According to the CCRB's last published semi-annual report, from January 2020, 12% of allegations are substantiated. NYC Civilian Complaint Review Board, *Executive Director's Monthly Report: January 2020* (2020), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf.
[8] *Id.*
[9] *Id*.
[10] *Id.*

There seems to be little legal or policy argument against the publication of substantiated CCRB allegations, but there has already been discussion during this case over the category of outcomes labeled "unsubstantiated," which comprises 39% of allegations investigated, more than any other outcome.  The term has confused many since the CCRB's inception. For civilians participating in the CCRB process and outside observers, "unsubstantiated" is often taken for its common spoken usage, which is a synonym for "unfounded" or "didn't happen". Plaintiffs in this case seek to exploit this misunderstanding by conflating the CCRB's technical terms, "unsubstantiated" and "unfounded".[11] In a clever rhetorical device, Plaintiffs refer to the bucket of unsubstantiated, exonerated, unfounded determinations as "Unsubstantiated" for the rest of their brief.

The CCRB only substantiates a case when it meets a preponderance of evidence standard that an alleged act of misconduct has occurred. In practice, application of that preponderance standard has resulted in a stricter, more conservative standard that ranges from 51% likelihood to 90% likelihood depending on the supervising staff, agency leadership, and Board composition. (Many settle on the stricter "clear and compelling" standard). An unsubstantiated determination, then, is triggered by a varying level of uncertainty that causes a determination to fall short of that threshold of confidence.

The most common example of why a case is unsubstantiated is a "he said, she said" incident in which a civilian complainant and police officer simply offer differing, independently credible accounts of incidents that lack third-party witnesses or evidence. "Stop and frisks" are a common example of such cases. In such instances, determining that the allegation is unsubstantiated is

---

[11]  Petitioner's Complaint at 2, *Uniformed Fire Officers Ass'n, et al. v. De Blasio*, Case No. 1:20-cv-05441-KPF (2020), ECF No. 1.

neither intended to convey that the police officer behaved correctly nor that the allegation was false, simply that enough uncertainty remained to prevent a "substantiated" finding.

An unsubstantiated allegation, or more importantly, an individual or precinct-wide pattern of unsubstantiated cases, can be quite illuminating. An officer who has received a disposition of "unsubstantiated" for the same type of allegation repeatedly might raise flags which lead to a subsequent allegation receiving more scrutiny. Likewise, a series of unsubstantiated cases relating to a precinct-wide practice could raise questions about whether the NYPD Patrol Guide is being followed. Even the NYPD's Internal Affairs Bureau finds such information useful, reportedly monitoring officers who have a history of unsubstantiated excessive force allegations with the CCRB.[12] The public would benefit nearly as much from evaluating patterns of unsubstantiated cases as it would analyzing substantiated cases, given the far larger data set.

In contrast to "unsubstantiated" allegations, "unfounded" allegations have been determined not to occur.[13] Yet there are still important interests served by their publication. For example, repeated unfounded allegations against a department may indicate a level of community vitriol that should be addressed. Likewise, the publication of exonerations, the CCRB determination that most validate an officer's behavior, still serve an important public interest.[14] As generations of policing protests have demonstrated, whether a policing action complies with the letter of the law or the language of the NYPD Patrol Guide does not necessarily reflect community support for such behavior. Because exonerations often result from applying legal and technical standards that are

---

[12] Charles Campisi, *Blue on Blue: An Insider's Story of Good Cops Catching Bad Cops* 115 (2018).
[13] Only 9% of investigated CCRB allegations are determined to be unfounded. NYC Civilian Complaint Review Board, *Executive Director's Monthly Report: January 2020* (2020), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf.
[14] 35% of investigated CCRB allegations are determined to be exonerated. *Id*. https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf.

not well understood by the public, publishing these outcomes can inform more constructive public examination of the laws and rules governing police activity.

Finally, it is essential for a public database of CCRB misconduct allegations to contain all four dispositions because it is very common for a single incident to produce multiple allegations, each of which may be resolved differently. For example, a single incident involving an alleged discourtesy, alleged illegal car stop, and alleged use of force may result in one allegation being substantiated, one unsubstantiated, and another exonerated. In the last published CCRB semi-annual report, 24% of cases resulted in a substantiation, but only 12% of all allegations were substantiated.[15] Such full and proper context, especially when it leads to different outcomes, shows the nuance that comes from a thorough and impartial investigation, and increases the integrity of the process in the eyes of the public who evaluate it.

## C.   Public access to the CCRB database will increase public trust in police accountability and the CCRB, while allowing the CCRB to better perform its mission.

### 1.   The investigation of Daniel Pantaleo for Eric Garner's death undermined the public's trust in police accountability and in the CCRB.

The 2014 killing of Eric Garner shook New York City and the country.[16] Part of the outrage was generated by a civilian video that captured the grisly incident in full. Demands were made on multiple governmental and prosecutorial bodies to act in response, but an ill-considered deference to the federal government resulted in a long delay before the CCRB could begin its

---

[15] *Id.*

[16] J. David Goodman & Al Baker, *Wave of Protests After Grand Jury Doesn't Indict Officer in Eric Garner Chokehold Case*, N.Y. Times, Dec. 3, 2014,  https://www.nytimes.com/2014/12/04/nyregion/grand-jury-said-to-bring-no-charges-in-staten-island-chokehold-death-of-eric-garner.html.

investigation.[17] By the time Daniel Pantaleo was fired, a full five years had passed since Eric

Garner's death, leading to widespread incredulity about police accountability in New York.[18]

The CCRB's role was diminished in this process, even though the agency worked diligently

to substantiate an excessive force allegation, file charges, and prosecute Officer Pantaleo.[19] One

reason for public skepticism of the CCRB, in addition to the delay, was the agency's inability to

share Officer Pantaleo's record with the public, even though it was common knowledge among

the CCRB personnel that Pantaleo had a number of CCRB complaints and substantiated

misconduct allegations from two separate incidents. When an investigator did leak that information

he was fired, notably, well before Pantaleo himself was held accountable.[20] Had the database been

publicly available at the time, the CCRB would not have been perceived as blocking information

from the public, and wasteful litigation would have been avoided.[21]

>   2.    **Publication of the database will increase public trust in police accountability
>         and the CCRB.**

Prior to the repeal of 50-A, painfully little information about the outcomes of CCRB

investigations was available to New Yorkers — even those directly involved in a CCRB complaint.

Agency policy and state law had dictated that all a complainant received at the conclusion of their

---

[17] Jeffery C. Mays, *Fire the Officer in the Eric Garner Case? De Blasio Falters*, N.Y. Times, July 17, 2019,  https://www.nytimes.com/2019/07/17/nyregion/eric-garner-de-blasio-pantaleo.html.
[18] Yasmeen Khan, *5 Years After Eric Garner's Death, Activists Continue Fight for 'Another Day to Live'*, NPR, July 17, 2019,  https://www.npr.org/2019/07/17/742473964/5-years-after-eric-garners-death-activists-continue-fight-for-another-day-to-liv.
[19] Shawn Cohen, *CCRB moves to substantiate excessive force claim against Eric Garner chokehold cop*, N.Y. Post, June 1, 2017, https://nypost.com/2017/06/01/ccrb-moves-to-substantiate-excessive-force-claim-against-eric-garner-chokehold-cop/.
[20] Thomas Tracy, *Civilian Complaint Review Board worker forced to resign for leaking information on cop who killed Eric Garner*, N.Y. Daily News, Mar. 24, 2017,  https://www.nydailynews.com/new-york/ccrb-worker-forced-quit-info-leak-killed-garner-article-1.3007427.
[21] *See e.g., Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13, 26–27, 51 N.Y.S.3d 46, 58 (N.Y. App. Div. 2017) (reversing order and judgment of the Supreme Court, New York County (Alice Schlesinger, J.), entered July 27, 2015, directing production of summary of Officer Pantaleo's CCRB's records indicating (a) the number of substantiated complaints brought against intervenor before the July 17, 2014 death of Eric Garner and (b) any CCRB recommendations made to the Police Department based on such complaints).

investigation was a one to two-page letter in the mail. This letter included nothing more than the investigative disposition towards each allegation. It included little to no information about why and how those dispositions were reached, what steps were taken in the course of the investigation, or what the resulting penalties for misconduct might be.  After potentially suffering a life-changing indignity or violation of one's rights at the hands of the NYPD, complainants were kept completely in the dark as to what action, if any, would be taken in the aftermath.

Now, for the first time, civilians, researchers, policymakers, and elected officials would be granted genuine transparency, and be able to make informed decisions concerning their relationships with the NYPD. Most importantly, people directly impacted by alleged misconduct will be able to understand their own cases, the officers who allegedly did them harm, and their own neighborhood precincts. As other *amici* have articulated, a public database of CCRB records would also greatly benefit the discovery process and protect the integrity of trials where such records are sought.[22]

### 3.     Publication of the database will allow the CCRB to better fulfill its mission.

In just a few weeks since a version of the database at issue in this case was published by *Pro Publica*,[23] journalists have used it to report on police misconduct.[24] In the attached Exhibit A, a pair of individuals created an impressive visual representation of racism at work in New York by overlaying civilian complainant racial data with local demographic data - only one example of the novel analysis that this data can yield with fresh eyes. Such research can generate a positive

---

[22] The Southern District Court of New York has held that a police officer's CCRB records were improperly suppressed and could have been used for impeachment purposes to show bias by a defendant, even if it was unlikely to have changed the results of his trial. *See Gonzalez v. United States*, Case No. 12-cv-5226-JSR, 2013 WL 5289793, at *11 (S.D.N.Y. Sept. 19, 2013).
[23] Derek Willis, Eric Umansky, & Moiz Syed, *The NYPD Files*, ProPublica, July 26, 2020,  https://projects.propublica.org/nypd-ccrb/.
[24] Yoav Gonen, *Family Says Body-Cam Video Counters NYPD Account in Queens Taser Death*, The City, July 21, 2020, https://www.thecity.nyc/2020/7/21/21333559/nypd-body-cam-video-queens-taser-death.

feedback loop, with the CCRB learning from public engagement with the database about trends it may have missed in its own attempt to investigate misconduct.

When one of the *amici* was policy counsel at the CCRB, he led an investigation into NYPD TASER usage, then a relatively nascent police technology, using the database as his main guide. When the report was in late draft form, it was sent to the NYPD for a courtesy review. The NYPD then leaked the draft to *The Daily News*, which savaged the report.[25] Due to political pressure, the report was then shelved for months, and eventually released with less severe language on the risk of TASERs,[26] even as they were being distributed broadly throughout the police department. Years later, a follow-up report confirmed the dangers of TASERs.[27] Just this summer, George Zapantis was tragically killed by NYPD TASERs, not the first to die in recent years from their use.[28]

For an agency with limited resources, especially for policy analysis, there is no reason that access to data on misconduct investigations should be restricted. If any number of academic, think tanks, advocates, journalists, lawyers, and elected officials had access to the database in those intervening years, someone could have raised alarm bells around TASERs much earlier. Moving forward, hopefully such a cycle of inaction will never happen again.

## CONCLUSION

Beyond its role in pursuing disciplinary action against NYPD officers, the most valuable role of the CCRB is its archiving vast troves of data and information on modern policing. The NYPD is the largest police department in the United States, and the CCRB's database is the most thorough

---

[25] Rocco Parascandola, *Exclusive: CCRB report shows police use Tasers too often, but NYPD says the findings are biased and flawed*, N.Y. Daily News, June 7, 2016, https://www.nydailynews.com/new-york/ccrb-report-shows-nypd-tasers-article-1.2665114.
[26] J. David Goodman, *Complaint Board Softened Report on Police Use of Tasers*, N.Y. Times, Dec. 26, 2016, https://www.nytimes.com/2016/12/26/nyregion/complaint-board-softened-report-on-police-use-of-tasers.html.
[27] Gabriel Sandoval, *CCRB Review of NYPD Taser Use Shows Discrepancies*, The City, Dec. 5, 2019, https://www.thecity.nyc/2019/12/5/21210637/ccrb-review-of-nypd-taser-use-shows-discrepancies.
[28] Yoav Gonen, *Family Says Body-Cam Video Counters NYPD Account in Queens Taser Death*, The City, July 21, 2020, https://www.thecity.nyc/2020/7/21/21333559/nypd-body-cam-video-queens-taser-death.

record in human history of alleged and actual police misconduct. We have spent years contributing

thorough, rigorous information to this database. We have used this database to inform our work.

We believe that New York's public is entitled to do the same. For these reasons, along with those

cited by the Defendants and other *amici*, we urge the Court to permit the public dissemination of

CCRB data to the fullest extent permissible under the law.

Dated: August 14, 2020
     Astoria, New York

_____/s/Jesse C. Rose_____
Jesse C. Rose, Esq. (JR-2409)
*Attorney for Amici*
The Rose Law Group, PLLC
3109 Newtown Ave; Ste 309
Astoria, New York 11102
Jrose@theroselawgroup.com
718-989-1864

_____/s/Janos Marton_____
Janos Marton,
Policy Counsel (2015-2016),
Civil Rights Attorney

_____/s/Arthur Albano_____
Arthur Albano,
Investigator (2013-2017),
Domestic Violence Advocate.

_____/s/ Dan Bodah_____
Dan Bodah,
Investigator (2000-2007),
JD, Fellow at Vera Institute of
Justice.

_____/s/Sarah Bridger_____
Sarah Bridger,
Investigator (2000-2003),
Ass. Professor at Cali. Poly. St. Univ.

_____/s/Scott Carlton_____
Scott Carlton,
Investigator (2017-2018),
Metropolitan Museum of Art.

_____/s/Daniel Cooper_____

Daniel Cooper,
Investigator (2014-2018),
Department of Education.

_____/s/Perri Fagin_____

Perri Fagin,
Investigator (2016-2018),
CUNY School of Law 2023.

_____/s/Nathaniel Flack_____

Nathaniel Flack,
Investigator (2016-2018),
Michigan Law 2021.

_____/s/Isaac Forman_____

Isaac Forman,
Investigator (2016-2019),
Fordham Law 2021.

_____/s/Emily Gebert_____

Emily Hebert,
Investigator (2018-2019),
Public Policy.

_____/s/Lili Manuel_____

Lili Manuel,
Investigator (2013-2017),
University of Washington M.S.W.

_____/s/Sophia Manuel_____

Sophia Manuel,
Investigator (2013-2015),
Project Manager

_____/s/Chart Riggall_____

Chart Riggall,
Investigator (2018-2019),
Political Communications Staffer.

_____/s/Erin Sweeney_____
Erin Sweeney,
Investigator (2014-2016),
Ass. Dep. Public Defender in
Camden, NJ.


_____/s/Abigail Shuster_____
Abigail Shuster,
Investigator (2014-2016),
CUNY School of Law 2021.