# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association, | Case No. 1:20-cv-05441-KPF |

Petitioners/Plaintiffs,

-against-

Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board,

Respondents/Defendants.

## BRIEF OF *AMICI CURIAE* NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, LATINOJUSTICE PRLDEF, AND LAW FOR BLACK LIVES IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.    PUBLIC DISCLOSURE OF POLICE MISCONDUCT AND
DISCIPLINE RECORDS IS ESSENTIAL FOR TRANSPARENCY AND
POLICE ACCOUNTABILITY. ................................................................................ 3

    A.    Police Officers Must Be Held Accountable To The Public—
Especially To Communities Of Color, Who Are Most Directly
Impacted By Police Misconduct And Violence ........................................ 3

    B.    Public Disclosure Of Police Misconduct And Discipline Records Is
Critical To Police Accountability And, In Turn, Public Safety .............. 10

II.    IN RESPONSE TO A NATIONAL CONVERSATION ABOUT POLICE
MISCONDUCT, THE NEW YORK STATE LEGISLATURE
REPEALED SECTION 50-A TO REVERSE THE EXTREME
SECRECY OF POLICE MISCONDUCT INFORMATION. ............................. 15

    A.    Prior To The Repeal Of Section 50-a, New York Was A National
Outlier In Non-Disclosure Of Police Misconduct And Discipline
Records. .................................................................................................... 15

    B.    The New York State Legislature Repealed Section 50-a To
Promote Police Transparency And Accountability ................................. 18

III.    THIS COURT SHOULD NOT ALLOW THE POLICE UNIONS'
NARROW AND PRETEXTUAL INTERESTS TO OVERRIDE THE
PUBLIC'S INTEREST IN TRANSPARENCY, ACCOUNTABILITY,
AND RACIAL JUSTICE. ....................................................................................... 21

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

Page

**CASES**

*Davis v. New York,*
 10-cv-0699-AT (S.D.N.Y.) ..................................................................................... 5

*Floyd v. City of New York,*
 959 F. Supp. 2d 640 (S.D.N.Y. 2013) .................................................................... 5

*Floyd v. City of New York,*
 959 F. Supp. 2d 668 (S.D.N.Y. 2013) .................................................................... 5

*Floyd v. City of New York,*
 Opinion and Order, 08-cv-1034, Dkt. No. 372 (Aug. 12, 2013) ......................... 7, 8

*Garrison v. Louisiana,*
 379 U.S. 64 (1964) ................................................................................................. 10

*Jamison v. McClendon,*
 2020 WL 4497723 (S.D. Miss. Aug. 4, 2020) ........................................................ 6

*Ligon v. City of New York,*
 12-cv-2274-AT (S.D.N.Y.) ...................................................................................... 5

*Matter of Patrolmen's Benevolent Ass'n of the City of N.Y. v. de Blasio,*
 171 A.D.3d 636 (1st Dep't 2019) ......................................................................... 24

*Peer News LLC v. City & Cty. of Honolulu,*
 138 Haw. 53 (2016) ............................................................................................... 18

*Richmond Newspapers, Inc. v. Virginia,*
 448 U.S. 555 (1980) ............................................................................................... 11

*United States v. Robinson,*
 414 U.S. 218 (1973) ............................................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) .............................................................................................. 3, 25

**STATUTES**

Cal. SB1421 (Right to Know Act) (2018) .................................................... 11, 17, 18

Cal. SB1436 (Pitchess Law) .......................................................................................... 17

Del. Code Ann. tit. 11, ch. 92, § 9200(d) (2018) ........................................................ 17

Minn. Stat. § 13.43(2) ................................................................................................... 17

**TABLE OF AUTHORITIES**
**(continued)**

Page

N.D. Cent. Code § 44-04-18 ................................................................................................ 17

Ohio Rev. Code § 149.43 .................................................................................................... 17

Tenn. Code § 10-7-503 ....................................................................................................... 18

Wash. Rev. Code § 42.56.050 ............................................................................................. 18

Wis. Stat. § 19.34(10)(b) ..................................................................................................... 18

<u>**OTHER AUTHORITIES**</u>

Amelia Thomson-DeVeaux, Nathaniel Rakich & Likhitha Butchireddygari, *Why It's So Rare For Police Officers To Face Legal Consequences*, FiveThirtyEight (June 4, 2020), *available at* https://fivethirtyeight.com/features/why-its-still-so-rare-for-police-officers-to-face-legal-consequences-for-misconduct/ .................................................................... 5

Andrew Flanagan, *Over 750 Artists, Companies Call for Repeal of N.Y. Law Shielding Police Records*, NPR (June 9, 2020), *available at* https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/09/872899147/over-750-artists-companies-call-for-repeal-of-ny-law-shielding-police-records ............................................................................... 20

Annie McDonough, *Police reform activists and experts react to 50-a repeal*, City & State New York (June 12, 2020), *available at* https://www.cityandstateny.com/articles/policy/criminal-justice/police-reform-activists-and-experts-react-50-repeal.html ................................................. 20

Annie Sweeney & Jeremy Gorner, *Police misconduct cases drag on for years*, Chi. Tribune, June 17, 2012, *available at* https://www.chicagotribune.com/news/ct-met-cop-investigations-delayed-20120617-story.html ...................................................................................................... 14

Ashley Riegle, *Black Lives Matter co-founder says what protestors want is simple: Accountability*, ABC News (June 2, 2020), *available at* https://abc7.com/black-lives-matter-co-founder-says-what-protesters-want-is-simple-accountability/6226038/ ....................................................................... 19

Bernadette Hogan & Carl Campanile*, NY lawmakers pass bill that releases officer disciplinary records through FOIL*, N.Y. Post, June 9, 2020, *available at* https://nypost.com/2020/06/09/ny-passes-bill-that-releases-disciplinary-records-through-foil/ ................................................................................................ 21

# TABLE OF AUTHORITIES
## (continued)

**Page**

Bernadette Hogan, *Minority lawmakers push for police reforms to pass in Albany*, N.Y. Post, June 4, 2020, *available at* https://nypost.com/2020/06/04/minority-lawmakers-push-for-police-reform-to-pass-in-albany/ ........................................................... 21

Bradford Betz, *George Floyd riots: Cuomo, de Blasio announce NYC curfew*, Fox News (June 1, 2020), https://www.foxnews.com/us/george-floyd-cuomo-de-blasio-nyc-curfew ...................................................................................................... 23

Center for Policing Equity, *The Science of Justice: Race, Arrests, and Police Use of Force* 15 (July 2016), *available at* https://policingequity.org/images/pdfs-doc/CPE_SoJ_Race-Arrests-UoF_2016-07-08-1130.pdf ........................................................ 4

Civilian Complaint Review Board, *History*, *available at* https://www1.nyc.gov/site/ccrb/about/history.page ................................................................ 22

Comm. on Open Gov't, State of New York, Dep't of State, *Annual Report to the Governor and State Legislature* (Dec. 2014), *available at* https://www.dos.ny.gov/coog/pdfs/2014AnnualReport.pdf ................................................... 16

Curtis Gilbert, *Atlanta cop who killed Rayshard Brooks had prior controversial shooting*, American Public Media (June 17, 2020), *available at* https://www.apmreports.org/story/2020/06/17/officer-garrett-rolfe-atlanta-shooting ...................................................................................................................................... 9

Darwin Bond Graham, *Black people in California are stopped far more often by police, major study proves*, The Guardian, Jan. 3, 2020, *available at* https://www.theguardian.com/us-news/2020/jan/02/california-police-black-stops-force ..................................................................................................................................... 4

Dean Meminger, *Advocacy rally to repeal 50a law*, NY1 (Oct. 17, 2019) *available at* https://www.ny1.com/nyc/all-boroughs/news/2019/10/17/advocates-rally-to-repeal-50a-law .............................................. 19

Denis Slattery, *New York lawmakers vote to repeal 50-a, making police disciplinary records public*, N.Y. Daily News, June 10, 2020, *available at* https://www.nydailynews.com/news/politics/ny-legislature-50a-transparency-george-floyd-20200609-yew7soogazfmdg3cr3xlsbmwye-story.html ................................... 20

Ed Mullins, *Don't let activists and lawyers weaponize police-discipline records*, N.Y. Post, Apr. 14, 2019, *available at* https://nypost.com/2019/04/14/dont-let-activists-and-lawyers-weaponize-police-discipline-records/ ................................................. 21

Edika G. Quispe-Torreblanca & Neil Stewart, *Causal peer effects in police misconduct*, 3 Nature Human Behaviour 797 (Aug. 2019) ...................................... 9

# TABLE OF AUTHORITIES
## (continued)

Page

Ellen Moynihan, Denis Slattery & Chris Sommerfeldt, *Cuomo signs historic 50-a repeal bill, making N.Y. police disciplinary records public after decades of secrecy*, N.Y Daily News, June 12, 2020, *available at* https://www.nydailynews.com/news/politics/ny-cuomo-police-reform-disciplinary-records-20200612-5zryohkuwjew7ksjowhtswmsk4-story.html ........................ 20

Elliot C. McLaughlin, *Chicago officer had history of complaints before Laquan McDonald shooting*, CNN (Nov. 26, 2015), *available at* https://www.cnn.com/2015/11/25/us/jason-van-dyke-previous-complaints-lawsuits/ ................................................................................................................. 17

Eric Evans, *Police secrecy law keeps public in the dark about police misconduct*, NBC News (May 19, 2019), *available at* https://www.nbcnews.com/news/us-news/police-secrecy-law-keeps-public-dark-about-police-misconduct-n1006786 .............................................................................................................. 18

*Floyd v. City of New York*, Resp. to Pls.' Submissions on Department's Response to Court Order Regarding Facilitator's Recommendation No. 1, 1:08-cv-01034-AT, DKT No. 729-1 ...................................................................................... 14

Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of being killed by police use of force in the United States by age, race-ethnicity, and sex*, 116 Proc. of the Nat'l Acad. of Sci. 16793 (Aug. 2019), *available at* https://www.pnas.org/content/116/34/16793?source=post_page-----1a2ce329f8e0---------------------- .................................................................. 3

Greg Ridgeway, *Officer Risk Factors Associated with Police Shootings: A Matched Case-Control Study*, 3 Stat. & Pub. Pol'y 1 (2016), *available at* https://www.tandfonline.com/doi/full/10.1080/2330443X.2015.1129918?scroll=top&needAccess=true ................................................................................. 9

James P. McElvain & Augustine J. Kposowa, *Police Officer Characteristics and the Likelihood of Using Deadly Force*, 35 Crim. Just. & Behavior 505 (Apr. 2008) ...................................................................................................... 8

Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. L. & Pol'y Rev. 257 (2009) ....................................................................... 4

Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885 (2014) ............................... 6

Justin Nix, Bradley A. Campbell, Edward H. Byers & Geoffrey P. Alpert, *A Bird's Eye View of Civilians Killed by Police in 2015*, 16 Criminology & Pub. Pol'y 309 (Feb. 2017) ...................................................................................... 3

## TABLE OF AUTHORITIES
### (continued)

Page

Katherine J. Bies, *Let the Sunshine In: Illuminating the Powerful Role Police
    Unions Play in Shielding Officer Misconduct*, 28 Stan. L. & Pol'y Rev. 109,
    128 (2017)................................................................................................................ 11, 15

Kendall Taggart, Mike Hayes, *The NYPD's Secret Files*, Buzzfeed News (Apr.
    16, 2018), *available at*
    https://www.buzzfeednews.com/article/kendalltaggart/nypd-police-
    misconduct-database-explainer.............................................................................. 11

Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the
    Largest Movement in U.S. History*, N.Y. Times, July 3, 2020, *available at*
    https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-
    crowd-size.html...................................................................................................... 19

Letter to Majority Leader Stewart-Cousins and Speaker Heastie, Communities
    United for Police Reform (June 1, 2020), *available at*
    https://www.changethenypd.org/sites/default/files/snya_repeal50a_letter_to_le
    ader_speaker_6-1-2020_final_-_85.pdf................................................................. 20

Luis Ferré-Sadurní & Jesse McKinley, *N.Y. Bans Chokeholds and Approves
    Other Measures to Restrict Police*, N.Y. Times, June 12, 2020) *available at*
    https://www.nytimes.com/2020/06/12/nyregion/50a-repeal-police-floyd.html ................... 20

Mike Hixenbaugh, *Houston's police chief wins national praise — but faces local
    anger over shootings and transparency*, NBC News (June 3, 2020), *available
    at* https://www.nbcnews.com/news/us-news/houston-s-police-chief-wins-
    national-praise-faces-local-anger-n1223911.......................................................... 19

Monica Davey & Mitch Smith, *Chicago Protests Mostly Peaceful After Video of
    Police Shooting Is Released*, N.Y. Times, Nov. 24, 2015, *available at*
    https://www.nytimes.com/2015/11/25/us/chicago-officer-charged-in-death-of-
    black-teenager-official-says.html........................................................................... 17

N.Y.C. Dep't of Investigation, *Complaints of Biased Policing in New York City:
    An Assessment of NYPD's Investigations, Policies, and Training* (June 2019),
    *available at*
    https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf...................... 8

New York City Bar, *Report on Legislation by the Civil Rights Committee*,
    *available at* https://s3.amazonaws.com/documents.nycbar.org/files/2017285-
    50aPoliceRecordsTransparency.pdf....................................................................... 15

NYC Comptroller, Fiscal Year 2019 Annual Claims Report (2020), *available at*
    https://comptroller.nyc.gov/wp-content/uploads/documents/Claims-Report-
    FY-2019.pdf............................................................................................................. 6

# TABLE OF AUTHORITIES
## (continued)

Page

Patrick Lohmann & Chris Libonati, *Syracuse police took so long on misconduct investigations that some officers can't be disciplined*, Syracuse.com (July 13, 2020), *available at* https://www.syracuse.com/news/2020/07/syracuse-police-took-so-long-on-misconduct-investigations-that-some-officers-cant-be-disciplined.html.............................................................................................................. 14

Police Union Mem. in Supp. of Mot. to Intervene, Case No. 1:08-cv-01034-AT, ECF 445 (filed Mar. 6, 2014)................................................................................. 22

Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153, 155 (2019), *available at* https://scholarship.law.uci.edu/ucilr/vol10/iss1/6 ............................................. 17

Rachel Silberstein, *Advocates push for repeal of 50-a ahead of session*, Times Union, Dec. 24, 2018, *available at* https://www.timesunion.com/news/article/NYS-50-a-13488713.php................................... 18

Robert Lewis et al., *Is Police Misconduct a Secret in Your State?*, WNYC, *available at* https://www.wnyc.org/story/police-misconduct-records/ (Oct. 15, 2015) ........................................................................................................ 10, 15, 16, 17

Samuel Walker, Geoffrey P. Alpert & Dennis J. Kenney, *Early Warning Systems: Responding to the Problem Police Officer*, National Institute of Justice: Research in Brief (July 2001), *available at* https://www.ncjrs.gov/pdffiles1/nij/188565.pdf ..................................................... 13

Shaila Dewan & Serge F. Kovaleski, *Thousands of Complaints Do Little to Change Police Ways*, N.Y. Times, May 30, 2020, *available at* https://www.nytimes.com/2020/05/30/us/derek-chauvin-george-floyd.html........................ 18

Statement of Patrick J. Lynch, Public Hearing: Policing (S3695), repeals provision relating to personnel records of police officers, firefighters, and correctional officers, New York State Senate Standing Committee on Codes (Oct. 17, 2017), *available at* https://www.nycpba.org/media/35716/191017.pdf ............................................... 21

Tenth Report of Independent Monitor, *Davis v. City of New York*, 10-cv-0699-AT, Dkt. No. 496 ......................................................................................................... 8

Thibaut Horel et al., *The Contagiousness of Police Violence* (Nov. 2018), *available at* https://www.law.uchicago.edu/files/2018-11/chicago_contagiousness_of_violence.pdf........................................................... 9

**TABLE OF AUTHORITIES**
**(continued)**

Page

Trone Dowd, *NYPD Union Chief Is Very Sorry for Sharing a Racist Video That Calls Black People 'Monsters,'"* Vice News (Aug. 14, 2019). *available at* https://www.vice.com/en_us/article/mbmab3/nypd-union-chief-is-very-sorry-for-sharing-a-racist-video-that-calls-black-people-monsters..................................................... 23

U.S. Dep't of Justice, Eighth Report Assessing Settlement Agreement Compliance by Suffolk County Police Department (Dec. 18, 2019), *available at* https://www.justice.gov/crt/page/file/1257946/download..................................................... 7

U.S. Dep't of Justice, Investigation of the Chicago Police Department (Jan. 13, 2017), *available at* https://www.justice.gov/opa/file/925846/download.................. 6, 7, 10, 12

U.S. Dep't of Justice, Investigation of the Cleveland Division of Police 31 (Dec. 4, 2014), *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/04/cleveland_division_of_police_findings_letter .pdf ..................................................................................................................... 12, 13

U.S. Dep't of Justice, Investigation of the Ferguson Police Department 62 (Mar. 4, 2015), *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report_1.pdf......................... 4

U.S. Dep't of Justice, Suffolk County Police Department Technical Assistance Letter (Sept. 13 2011), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2011/09/14/suffolkPD_T A_9-13-11.pdf..................................................................................................................... 7

United States Dep't of Justice, Investigation of the Baltimore City Police Department (Aug. 10, 2016), *available at* https://www.justice.gov/opa/file/883366/download ............................................................. 12

Washington Lawyers' Committee for Civil Rights and Urban Affairs, *Racial Disparities in Arrests in the District of Columbia, 2009-2011* (July 2013), *available at* https://www.washlaw.org/pdf/wlc_report_racial_disparities.pdf......................... 4

William Finnegan, *How police unions fight reform*, The New Yorker (July 27, 2020), *available at* https://www.newyorker.com/magazine/2020/08/03/how-police-unions-fight-reform................................................................................................ 22, 23

## INTRODUCTION

*Amici curiae*—NAACP Legal Defense and Educational Fund, Inc., Lawyers' Committee for Civil Rights Under Law, LatinoJustice PRLDEF, and Law for Black Lives—are national legal advocacy organizations committed to eradicating the pernicious influence of racial discrimination in the criminal justice system.  They are deeply familiar with the impact of police abuse and violence on communities of color through their work and from the communities they serve.  In this brief, *amici* address a limited, but important, issue presented by the pending motion for a preliminary injunction:  the public's interest in transparency, accountability, and racial justice in law enforcement.

In the wake of the killings of George Floyd and Breonna Taylor, tens of millions took to the streets to rise up against police abuse and violence, particularly against communities of color. One of the central demands of this movement was dramatic change to America's flawed systems of police accountability.  Law enforcement agencies must be subject to robust and reliable internal investigations to hold officers accountable for misconduct, especially misconduct that violates the rights of those most vulnerable to police abuse.  But these oversight mechanisms are often deeply flawed.  Officers regularly discourage members of the public from reporting abuse, and even when individuals report serious abuses, they are frequently ignored altogether.  When police departments do conduct investigations, they are often cursory and routinely absolve officers who committed flagrant misconduct.  And in the event officers are found to have done something wrong, they often receive trivial punishments out of step with the severity of their abuses.  As a result, police officers' abuses of power remain unchecked, leaving the distinct impression that officers can violate the law with impunity.  Communities of color, disproportionately targeted for abusive policing, bear the brunt of these failures of accountability.

1

New York's repeal of Civil Rights Law Section 50-a—which, as interpreted by the NYPD and courts, was among the most secretive laws of its kind in the country—directly responded to public demands for police accountability, transparency, and racial justice. The repeal reflected a commonsense understanding that sunlight is the best disinfectant: public disclosure of police misconduct allows citizens and legislators to access necessary information about flaws in existing systems of police accountability, gives victims of police abuse some assurance of accountability for the harms they suffered, deters future misconduct, and makes clear to the public that misconduct within the police department should not be tolerated. While the police union plaintiffs in this case (hereafter, the "Police Unions") urged the retention of Section 50-a, the New York legislature, representing the will of New York residents, decided otherwise. New York has thus affirmed that the public interest is best served by transparency, not secrecy.

Having failed before the legislature, the Police Unions now ask this Court to eviscerate New York's reform and enjoin the disclosure of misconduct records related to so-called "unsubstantiated" cases—in which investigators believe there is not enough evidence to meet the standards of the Civilian Complaint Review Board ("CCRB") or the NYPD's Internal Affairs Bureau ("IAB") as to whether misconduct has occurred—or "non-final" cases. According to the Police Unions, these records cannot be released because they do not conclusively prove that officers engaged in misconduct. *See* Mot. for Prelim. Inj., 20-cv-05441-KPF, Dkt. No. 10-12, at 1. But part of the motivating force behind the repeal of Section 50-a was a distrust of these investigations and their conclusions. The bare fact that the CCRB or NYPD has deemed an allegation "unsubstantiated" tells the public little to nothing about the credibility of the charges, the evidence in support of those charges, or the diligence of the investigations. And without

access to claims deemed "unsubstantiated," the public has no way of knowing whether serious charges of misconduct are going unpunished—a necessary first step toward changing how police officers and departments operate in communities of color.  In other words, the Police Unions ask nothing less than blind trust in the very systems the public sought to reform by repealing Section 50-a.

It is unfortunate, but predictable, that the Police Unions—who have for decades fought efforts to curb systemic discrimination within the NYPD and to promote greater equity in police practices—have launched this last-ditch effort to avoid accountability.  But to be entitled to a preliminary injunction, the Police Unions must demonstrate that the injunction they seek is "in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  They cannot.

## ARGUMENT

### I.  PUBLIC DISCLOSURE OF POLICE MISCONDUCT AND DISCIPLINE RECORDS IS ESSENTIAL FOR TRANSPARENCY AND POLICE ACCOUNTABILITY.

#### A.  Police Officers Must Be Held Accountable To The Public—Especially To Communities Of Color, Who Are Most Directly Impacted By Police Misconduct And Violence.

Police violence is a tragic and unacceptable feature of American life, and communities of color suffer disproportionately from that violence.  For young men, police violence is a leading cause of death—and the violence is not color-blind.[1]  About 1 in every 1,000 Black men can expect to be killed by police—a rate 2.5 times higher than for white men.[2]  Black people killed by police are more than twice as likely to be unarmed as white people.[3]  And, even when the

---

[1] *See* Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of being killed by police use of force in the United States by age, race-ethnicity, and sex*, 116 Proc. of the Nat'l Acad. of Sci. 16793, 16793–94 (Aug. 2019), *available at* https://www.pnas.org/content/116/34/16793?source=post_page-----1a2ce329f8e0----------------------.
[2] *Id.*
[3] Justin Nix, Bradley A. Campbell, Edward H. Byers & Geoffrey P. Alpert, *A Bird's Eye View of Civilians Killed by Police in 2015*, 16 Criminology & Pub. Pol'y 309, 309 (Feb. 2017).

results are not fatal, police use force in their interactions with Black people 3.6 times more often than with white people.[4]

Police also enforce laws disproportionately against communities of color.  In San Francisco, Black people represented 26% of all police stops in the second half of 2018 even though they represented just 5% of the city's population.[5]  In California generally, police are more likely to search Black, Latinx, and Native American people, and they are **less** likely to find drugs or weapons compared to when they search white people.[6]  In Washington, D.C., while there is little difference in rates of drug use, there are significant disparities between white and Black people in drug arrests: almost 9 out of 10 arrests for drug possession are of Black people.[7]  These are not isolated examples.  Across the country, communities of color are intentionally targeted and disproportionately charged with violations of law.[8]

Disparities in police violence and misconduct are similarly present in New York.  For decades, the NYPD engaged in widespread racial profiling against Black and Latinx residents.  Indeed, in *Floyd v. City of New York*, this Court expressly found that "the NYPD implements its policies regarding stop and frisk in a manner that intentionally discriminates based on race" and that "the use of race is sufficiently integral to the policy of targeting 'the right people' that the policy depends on express racial classifications."  *Floyd v. City of New York*, 959 F. Supp. 2d

---

[4] Center for Policing Equity, *The Science of Justice: Race, Arrests, and Police Use of Force* 15 (July 2016), *available at* https://policingequity.org/images/pdfs-doc/CPE_SoJ_Race-Arrests-UoF_2016-07-08-1130.pdf.
[5] Darwin Bond Graham, *Black people in California are stopped far more often by police, major study proves*, The Guardian, Jan. 3, 2020, *available at* https://www.theguardian.com/us-news/2020/jan/02/california-police-black-stops-force.
[6] *Id.*
[7] Washington Lawyers' Committee for Civil Rights and Urban Affairs, *Racial Disparities in Arrests in the District of Columbia, 2009-2011*, 2-3 (July 2013), *available at* https://www.washlaw.org/pdf/wlc_report_racial_disparities.pdf.
[8] *See, e.g.*, U.S. Dep't of Justice, Investigation of the Ferguson Police Department 62 (Mar. 4, 2015), *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report_1.pdf; Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. L. & Pol'y Rev. 257 (2009).

640, 663 (S.D.N.Y. 2013).  This Court subsequently appointed a monitor, which is still in effect, to oversee the NYPD's compliance with the United States Constitution.  *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013).  This monitoring encompasses two additional federal class actions that identified widespread, unconstitutional conduct by the NYPD:  *Davis v. New York*, 10-cv-0699-AT (S.D.N.Y.), which challenged the NYPD's racially discriminatory and unconstitutional trespass-enforcement practices in public housing; and *Ligon v. City of New York*, 12-cv-2274-AT (S.D.N.Y.), which concerned the NYPD's discriminatory stops and arrests in private buildings it patrolled.[9]

Police misconduct and violence endure, in substantial part, because officers who violate the public trust often face little to no accountability for their actions.  Criminal prosecution of police officers is exceedingly rare.  On average, police fatally shoot about 1,000 people every year.[10]  Of the roughly 15,000 fatal police shootings since 2005, just 110, or 0.73%, ended with the responsible law enforcement officers being charged with murder or manslaughter.[11]  Only 42, or 0.28%, ended in convictions.[12]  With respect to civil liability, the doctrine of qualified immunity in practice "operates like absolute immunity" and "protect[s] law enforcement officers from having to face any consequences for wrongdoing," as Judge Carlton Reeves forcefully explained in a recent and widely-publicized opinion.  *Jamison v. McClendon*, 2020 WL 4497723, at *2 (S.D. Miss. Aug. 4, 2020).  And when civil liability is imposed, local governments generally indemnify individual officers against awards for money damages.  As a

---

[9] Amicus NAACP Legal Defense and Educational Fund, Inc. serves as co-counsel in *Davis*; amicus LatinoJustice PRLDEF served as co-counsel in *Ligon*.
[10] Amelia Thomson-DeVeaux, Nathaniel Rakich & Likhitha Butchireddygari, *Why It's So Rare For Police Officers To Face Legal Consequences*, FiveThirtyEight (June 4, 2020), *available at* https://fivethirtyeight.com/features/why-its-still-so-rare-for-police-officers-to-face-legal-consequences-for-misconduct/.
[11] *Id.*
[12] *Id.*

result, 99.8% of the dollars recovered by plaintiffs in lawsuits alleging civil rights violations by law enforcement are paid by the public, and not the officers who actually violated the law.[13]  In New York City, NYPD claims accounted for $220.1 million, or 36% of the total overall cost of resolved fiscal year 2019 tort claims.[14]

The limitations of these external legal mechanisms as a vehicle for police accountability highlight the importance of internal investigations.  But time and again, when the DOJ and other third parties examine law enforcement's internal disciplinary processes, they are found to be riddled with abuses of power, bias in favor of officers, inaccurate and incomplete records and investigations, and obstructionist policies designed to thwart accountabilty.

In Chicago, for example, a 2017 DOJ report found that the Chicago Police Department's internal disciplinary system was "broken" and "seldom h[eld] officers accountable for misconduct."[15]  Over a five-year period, the Chicago Police Department investigated 409 police shootings and concluded that just two, or 0.49%, of the shootings were unjustified.[16]  Not surprisingly, that low rate of "substantiated" complaints did not correlate with the actual credibility of the allegations:  "the City paid *over half a billion dollars* to settle or pay judgments in police misconduct cases" between 2004 and 2017—"without even conducting a disciplinary investigation in over half of those cases, and it recommended discipline in fewer than 4% of those cases it did examine."[17]  The DOJ uncovered a series of barriers to initiating police misconduct investigations, including "a formal policy against investigating many complaints

---

[13] Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885-1004 (2014).
[14] NYC Comptroller, Fiscal Year 2019 Annual Claims Report 18-20 (2020), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/Claims-Report-FY-2019.pdf.
[15] U.S. Dep't of Justice, Investigation of the Chicago Police Department 46 (Jan. 13, 2017), *available at* https://www.justice.gov/opa/file/925846/download.
[16] *Id.*
[17] *Id.* (emphasis added).

about force; referral of verbal abuse complaints to a process in which no discipline can be imposed even if misconduct occurred; [and] a failure to investigate anonymous complaints or complaints without a sworn affidavit[.]"[18]  The DOJ's review of complaints that "*were* investigated revealed consistent patterns of egregious investigative deficiencies that impede the search for the truth."[19]

A DOJ investigation of the Suffolk County Police Department ("SCPD") in New York—which uncovered racial biases against Latinx people, including discriminatory traffic stops and failures to timely complete investigations of hate crimes—also found serious flaws in the SCPD's investigation of police misconduct complaints.[20]  In a 2011 letter, the DOJ identified a number of issues with SCPD's handling of police misconduct complaints, including failures to (1) consistently investigate allegations of police misconduct, (2) maintain engagement with the complainant until resolution of the complaint, (3) properly track complaints, and (4) train supervisors on how to review and address the findings of internal misconduct investigations.[21]  Almost 10 years later, and after 6 1/2 years of DOJ monitoring, the SCPD has yet to achieve full compliance with the DOJ's recommendations.[22]

Again, the NYPD is no exception.  In *Floyd*, this Court recognized that reforming the NYPD's system of "monitoring, supervision, and discipline" of officers was "[a]n essential aspect" of remedying the Department's unconstitutional practice of stop-and-frisk.  Opinion and Order, 08-cv-1034, Dkt. No. 372, at 23 (Aug. 12, 2013).  In ordering the NYPD to "implement measures to adequately discipline officers," the Court relied on expert testimony demonstrating

---

[18] *Id.* at 50.
[19] *Id.* at 47 (emphasis in original).
[20] U.S. Dep't of Justice, Suffolk County Police Department Technical Assistance Letter at 11 (Sept. 13 2011), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2011/09/14/suffolkPD_TA_9-13-11.pdf.
[21] *Id.*
[22] *See* U.S. Dep't of Justice, Eighth Report Assessing Settlement Agreement Compliance by Suffolk County Police Department (Dec. 18, 2019), *available at* https://www.justice.gov/crt/page/file/1257946/download.

that without "improved citizen complaint procedures" and "improved disciplinary procedures," "the entire accountability system begins to collapse."  *Id.*  Yet, according to the most recent report by this Court's independent monitor, the NYPD's Internal Affairs Bureau investigated 2,947 civilian complaints related to race-and-bias-based policing from 2014-2019—and *did not substantiate a single one*.[23]  At the same time, the Monitor identified a number of problems with the NYPD's handling of the investigations, such as "[n]ot interviewing the complainant, or witness, or subject and witness officers"; asking questions that "suggested the investigator had already reached a conclusion" and/or "doubted the validity of the complaint or the credibility of the complainant"; and "[n]ot following up on leads."[24]  The Office of the Inspector General for the NYPD likewise found serious deficiencies in the NYPD's investigation of complaints of biased policing.[25]  And, according to the Inspector General, "[a]lthough low substantiation rates for biased policing complaints exist in other large U.S. cities, NYPD's zero substantiation rate stands out."[26]  Either every single complainant was mistaken about the facts underlying every single incident, or the NYPD—which has twice been found to conduct inadequate investigations—is failing to meaningfully investigate these critical complaints of constitutional consequence.

When disciplinary systems do not hold officers accountable, police officers who have previously endangered public safety continue to abuse their authority.  Officers with a history of shooting civilians are 51% more likely to do so again.[27]  A study of shootings by the NYPD

---

[23] Tenth Report of Independent Monitor, *Davis v. City of New York*, 10-cv-0699-AT, Dkt. No. 496, at 73.
[24] *Id.* at 75.
[25] N.Y.C. Dep't of Investigation, *Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training* 22-34 (June 2019), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf.
[26] *Id.* at 20.
[27] James P. McElvain & Augustine J. Kposowa, *Police Officer Characteristics and the Likelihood of Using Deadly Force*, 35 Crim. Just. & Behavior 505, 515 (Apr. 2008).

similarly showed that the "accumulation [of] negative marks" in an officer's personnel file was "a leading indicator for shooting risk," and that "officers rapidly accumulating negative marks in their file are at a more than three times greater risk of shooting."[28]  When lengthy records of misconduct are ignored by a disciplinary system, the results are both tragic and predictable. Before Atlanta officer Garret Rolfe fatally shot Rayshard Brooks in the back while Mr. Brooks was running away, 12 complaints had been filed against him, 9 of which were dismissed.[29] Among the complaints that failed to result in any discipline was another shooting of an unarmed Black civilian in 2015—in which the officers involved in the shooting filed a police report that did not even mention they had shot a man in the chest.[30]

The failure to discipline officers who abuse their authority not only leaves those particular officers free to repeat and escalate their misconduct—it helps create a culture of impunity in which other officers are more likely to engage in violence and other unlawful behavior.  A study in Chicago, for example, found that "police violence is contagious":  officers' exposure to colleagues who previously shot civilians increases the risk that the officers would themselves shoot civilians.[31]  "[W]ithin two years, exposure to a single shooting more than doubles a [peer officer's] probability of a future shooting."[32]  Another study found that a 10% increase in peers' prior misconduct increases an officer's later misconduct by 8%.[33]  These

---

[28] Greg Ridgeway, *Officer Risk Factors Associated with Police Shootings: A Matched Case-Control Study*, 3 Stat. & Pub. Pol'y 1, 5 (2016), *available at* https://www.tandfonline.com/doi/full/10.1080/2330443X.2015.1129918?scroll=top&needAccess=true.

[29] Curtis Gilbert, *Atlanta cop who killed Rayshard Brooks had prior controversial shooting*, American Public Media (June 17, 2020), *available at* https://www.apmreports.org/story/2020/06/17/officer-garrett-rolfe-atlanta-shooting.

[30] *Id.*

[31] Thibaut Horel et al., *The Contagiousness of Police Violence* at 1 (Nov. 2018), *available at* https://www.law.uchicago.edu/files/2018-11/chicago_contagiousness_of_violence.pdf.

[32] *Id.*

[33] Edika G. Quispe-Torreblanca & Neil Stewart, *Causal peer effects in police misconduct*, 3 Nature Human Behaviour 797, 797 (Aug. 2019).

empirical findings are buttressed by in-depth examinations of police department abuses by the

DOJ. The DOJ's investigation of the Chicago Police Department, for example, concluded that

the department's "failure to ensure the accurate reporting, review, and investigation of officers'

use of force has helped to create a culture in which officers expect to use force and never be

carefully scrutinized about the propriety of that use."[34]

### B. Public Disclosure Of Police Misconduct And Discipline Records Is Critical To Police Accountability And, In Turn, Public Safety.

There is a "paramount public interest in a free flow of information to the people

concerning public officials, their servants." *Garrison v. Louisiana*, 379 U.S. 64, 76 (1964). This

"paramount public interest" manifestly extends to information about whether police officers

conduct themselves properly while acting under color of law and while being paid with taxpayer

money. *Id.* After all, police officers are not simply public officials. They have enormous

power—the authority to stop, detain, arrest, and in some cases, use deadly force against members

of the public—that is inherently "subject to potential abuse." *United States v. Robinson*, 414

U.S. 218, 248 (1973) (Marshall, J. dissenting). When officers overstep their authority or misuse

their power, they risk violating the most fundamental rights of members of the public.

Although the public has every right to know how officers behave while acting on the

public's behalf, this country's systems of police accountability too often operate in the dark. In

many states, police misconduct records are not publicly available.[35] *See infra* at 15-17. As a

---

[34] Investigation of the Chicago Police Department, *supra* n. 15, at 41.

[35] Approximately 21 states treat misconduct records as completely confidential. Robert Lewis et al., *Is Police Misconduct a Secret in Your State?*, WNYC, *available at* https://www.wnyc.org/story/police-misconduct-records/ (Oct. 15, 2015) (cataloguing the 50 state approaches to disclosure of police misconduct records). These are: Alaska, Colorado, Delaware, District of Columbia, Idaho, Iowa, Kansas, Maryland, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, South Dakota, Virginia, and Wyoming. Prior to the repeal of Section 50-a, this list included New York. And before the passage of SB1421 ("The Right to Know Act") in 2018, this list included California. *See* Katherine J. Bies, *Let the*

result, citizens and legislators are deprived of the information they need to evaluate whether police departments are effectively holding officers accountable when they violate departmental policy or the law.  The public cannot know whether a law enforcement agency fails to properly investigate serious charges of police misconduct, or whether it imposes proportional discipline when abuses of authority are found.[36]  Without insight into how systems of police accountability function, or fail to function, the public can only guess at the right solutions and interventions to end police violence and misconduct.  And when well-performing systems are shrouded in secrecy, citizens and legislators in other jurisdictions lose the opportunity to learn from, and replicate, successful models of accountability.

The important goals served by transparency are severely undermined when the public is deprived of access to "unsubstantiated" complaints of misconduct.  When an allegation is deemed "unsubstantiated," it simply means that the investigating entity has concluded that there is not enough evidence to prove that misconduct did or did not occur.  Carefully examining patterns of unsubstantiated complaints, whether for a particular officer or across squads, units, or commands, can reveal potential systemic problems in the investigations of complaints and in officer conduct or supervision.

And because police accountability systems are deeply flawed, *see supra* at 6-10, the bare fact that an allegation of misconduct has been deemed "unsubstantiated" tells the public little to nothing about the credibility of the underlying charges or the thoroughness of the investigation. To begin with, there may be burdensome evidentiary requirements on complainants, like rules

---

*Sunshine In: Illuminating the Powerful Role Police Unions Play in Shielding Officer Misconduct*, 28 Stan. L. & Pol'y Rev. 109, 128 (2017).
[36] Kendall Taggart, Mike Hayes, *The NYPD's Secret Files*, Buzzfeed News (Apr. 16, 2018), *available at* https://www.buzzfeednews.com/article/kendalltaggart/nypd-police-misconduct-database-explainer.

that require complaints to be made in writing, which allow departments to disregard or dismiss allegations of serious misconduct on technical grounds.[37]  When civilian complainants do manage to meet a department's procedural requirements, police officials may cast aside complaints and deem them meritless without so much as a cursory investigation.  In Baltimore, for example, police officials systematically misclassified complaints—including charges that officers committed criminal assault, theft, domestic violence, and sexual assault—as "supervisor complaints," a designation that allowed the complaint to be closed without any investigation at all.[38]

When police officials do investigate a complaint, their investigations may be slipshod and heavily biased in favor of clearing officers of wrongdoing.  The DOJ's review of the Chicago Police Department uncovered, among other things, a widespread failure to interview witnesses or accused officers at all, biased questioning in favor of officers, and "witness coaching by [police] union attorneys."[39]  A DOJ investigation in Cleveland determined that the officers conducting use-of-force investigations made "little effort to determine the level of force that was used and whether it was justified," and that investigations were "cursory" and "appear to be designed from the outset to justify the officers' actions."[40]  Similar investigative deficiencies, and others, have plagued the NYPD, as documented by the NYPD Inspector General and the court-appointed Monitor.  *See supra* at 7-8.

As a result, shielding so-called "unsubstantiated" complaints deprives the public of any ability to know ***why*** civilian complaints result in no finding of misconduct and no discipline.

---

[37] United States Dep't of Justice, Investigation of the Baltimore City Police Department 140 (Aug. 10, 2016), *available at* https://www.justice.gov/opa/file/883366/download.

[38] *Id.* at 141–42.

[39] Investigation of the Chicago Police Department, *supra* n. 15, at 47.

[40] U.S. Dep't of Justice, Investigation of the Cleveland Division of Police 31 (Dec. 4, 2014), *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/04/cleveland_division_of_police_findings_letter.pdf.

Such findings may simply reflect a failure to follow basic investigative procedures such as interviewing witnesses, crediting uncontested witness testimony, and gathering and reviewing available evidence.  Indeed, the more flawed the system of accountability, the more likely it is to fail to thoroughly investigate and gather sufficient evidence to substantiate complaints. Shielding "unsubstantiated" complaints from public scrutiny, therefore, has the perverse effect of allowing the most abysmal systems to operate under the highest levels of secrecy.

The value of information about unsubstantiated complaints is clear from police departments' own "early-intervention systems"—a potential tool in curbing police misconduct. In 1981, the U.S. Commission on Civil Rights recommended that all police departments employ these "data-based tool[s] . . . to identify officers whose behavior is problematic and provide a form of intervention to correct that performance."[41]  A key input in these systems is civilian complaints; frequently, officers who are the subject of a specified number of complaints within a given timeframe are designated as candidates for intervention to prevent serious misconduct in the future.[42]  Even though these systems typically rely on the mere fact that complaints have been filed, research indicates that they can have a "dramatic effect on reducing citizen complaints and other indicators of problematic police performance"[43]—at least when early-intervention systems are not "inadequate and poorly utilized."[44]  The NYPD itself has long considered both substantiated and unsubstantiated complaints when determining whether officers

---

[41] Samuel Walker, Geoffrey P. Alpert & Dennis J. Kenney, *Early Warning Systems: Responding to the Problem Police Officer*, National Institute of Justice: Research in Brief, at 1 (July 2001), *available at* https://www.ncjrs.gov/pdffiles1/nij/188565.pdf.

[42] *Id.* at 2.

[43] *Id.* at 3.

[44] *See, e.g.*, Investigation of the Cleveland Division of Police, *supra* n. 40, at 31.

need to enter performance monitoring.[45]  It is, therefore, disingenuous of the Police Unions to contend that civilian complaints lack value unless they are "substantiated."

Preventing the disclosure of records related to findings that are "non-final" would likewise impede the public's understanding of how law enforcement operates and block long-overdue change.  Experience from across the country shows that internal disciplinary investigations can drag on for years—often under circumstances which suggest that delay is designed to thwart accountability altogether.  In Syracuse, for example, at least 47 officers in the last three years have evaded discipline because the police department failed to complete misconduct investigations within the 18-month period required by law.[46]  Likewise, after Chicago police officer Bruce Asken cracked open Greg Larkins' head with a baton, more than five years passed before the Independent Police Review Authority filed charges of excessive force against the officer—just long enough for Illinois' five-year statute of limitations on disciplinary action to expire.[47]  In New York City, the officers involved in the killing of Eric Garner in 2014 did not face internal departmental charges until four years later, in 2018,[48] and former officer Daniel Pantaleo, who conducted the chokehold killing Eric Garner, was not fired from the NYPD until 2019.[49]  It was not disclosed until Mr. Pantaleo's administrative trial that the NYPD's Internal Affairs Bureau had determined that Mr. Pantaleo violated department

---

[45] *See Floyd v. City of New York*, Resp. to Pls.' Submissions on Department's Response to Court Order Regarding Facilitator's Recommendation No. 1, 1:08-cv-01034-AT, DKT No. 729-1, at 9.

[46] Patrick Lohmann & Chris Libonati, *Syracuse police took so long on misconduct investigations that some officers can't be disciplined*, Syracuse.com (July 13, 2020), *available at* https://www.syracuse.com/news/2020/07/syracuse-police-took-so-long-on-misconduct-investigations-that-some-officers-cant-be-disciplined.html.

[47] Annie Sweeney & Jeremy Gorner, *Police misconduct cases drag on for years*, Chi. Tribune, June 17, 2012, *available at* https://www.chicagotribune.com/news/ct-met-cop-investigations-delayed-20120617-story.html.

[48] Daniel Arkin, *NYPD officers in Eric Garner case face disciplinary action*, NBC News, July 19, 2018, *available at* https://www.nbcnews.com/news/us-news/nypd-officer-eric-garner-case-will-finally-face-disciplinary-action-n892761.

[49] Ashley Southall, *Daniel Pantaleo, Office Who Held Eric Garner in Chokehold, Is Fired*, N.Y. Times, Aug. 19, 2019, *available at* https://www.nytimes.com/2019/08/19/nyregion/daniel-pantaleo-fired.html.

policy by using a forbidden chokehold on Mr. Garner, but nevertheless failed to take action against him for years.[50]

Allowing police departments to withhold records so long as an investigation is unfinished would create additional, pernicious incentives to postpone resolution of investigations.  Indeed, if a lapsed investigation is deemed "non-final," records might be forever insulated from public scrutiny.  At the very least, that approach would deprive the public of access to information for substantial periods of time—including during the immediate aftermath of an incident of misconduct, when the public's interest in pertinent information is often most pronounced—while a potentially dangerous officer continues to walk the streets.

## II.   IN RESPONSE TO A NATIONAL CONVERSATION ABOUT POLICE MISCONDUCT, THE NEW YORK STATE LEGISLATURE REPEALED SECTION 50-A TO REVERSE THE EXTREME SECRECY OF POLICE MISCONDUCT INFORMATION.

### A.   Prior To The Repeal Of Section 50-a, New York Was A National Outlier In Non-Disclosure Of Police Misconduct And Discipline Records.

Until 2020, New York was one of only two states with a statute that specifically exempted law enforcement officers' personnel records from public disclosure.[51]  As the New York State Committee on Open Government observed, Section 50-a made "New York . . . virtually unique among the states in its refusal to apply the same transparency to police and other

---

[50] Ashley Southall, *Police Investigators Determined Officer Choked Eric Garner*, N.Y. Times, May 13, 2019, *available at* https://www.nytimes.com/2019/05/13/nyregion/eric-garner-death-daniel-pantaleo-trial-chokehold.html.

[51] Robert Lewis et al., *supra* n. 35.  "Delaware is the only other state in the country that also has a law comparable to CRL 50-a that restricts the scope of law enforcement information available to the public."  New York City Bar, *Report on Legislation by the Civil Rights Committee* at 2, *available at* https://s3.amazonaws.com/documents.nycbar.org/files/2017285-50aPoliceRecordsTransparency.pdf; *see* Del. Code Ann. tit. 11, ch. 92, § 9200(d) (2018).  Prior to the passage of SB1421 (The Right to Know Act) in 2018, California also had a law enforcement specific statute, SB1436 (The "Pitchess Law"), which "made police officer personnel information confidential, including information relating to third-party complaints and resulting investigation reports."  Bies, *supra* n. 35, at 128.

uniformed services as applies to all other public employees."[52]  To be sure, the absence of

transparency into police misconduct records is a national problem, with some 21 states shielding

police misconduct records from almost all public disclosure.[53]  But New York's approach under

Section 50-a made it an outlier even among those states at the extreme end of the nondisclosure

spectrum.

   In about 12 states, by contrast, police misconduct records are generally available to the

public.[54]  In Minnesota, the public has access to "the existence and status of any complaints or

charges against" an officer, "regardless of whether the complaint or charge resulted in a

disciplinary action," as well as "the final disposition of any disciplinary action together with the

specific reasons for the action and data documenting the basis of the action."  Minn. Stat.

§ 13.43(2).  In North Dakota and Ohio, discipline records are similarly public.  N.D. Cent. Code

§ 44-04-18; Ohio Rev. Code § 149.43.  Some of these states presume public access but allow for

nondisclosure of records which fall under narrow exemptions based on concerns of personal

privacy.  Washington, for example, protects against disclosure of disciplinary records which are

"not of legitimate concern to the public," the release of which would be "highly offensive."

Wash. Rev. Code § 42.56.050.  Other states, like Wisconsin, withhold only those records which

pertain to an active investigation.  Wis. Stat. § 19.34(10)(b).

   Another 16 or so states strike various intermediate positions.[55]  In Tennessee, "all law

enforcement personnel records" are open for inspection by the public, subject to certain special

---

[52] Comm. on Open Gov't, State of New York, Dep't of State, *Annual Report to the Governor and State Legislature*
(Dec. 2014), *available at* https://www.dos.ny.gov/coog/pdfs/2014AnnualReport.pdf.
[53] *See supra* n. 35.
[54] Alabama, Arizona, Connecticut, Georgia, Florida, Ohio, Maine, Minnesota, North Dakota, Utah, Washington, and
Wisconsin.  Lewis et al., *supra* n. 31.
[55] Arkansas, Hawaii, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, New Mexico, Oklahoma,
South Carolina, Tennessee, Texas, Vermont, West Virginia, and California.  Lewis et al., *supra* n. 31; California

16

procedures, Tenn. Code § 10-7-503, but "local departments may still withhold such records by claiming they're pertinent to an active or recently-concluded criminal case."[56]  In Hawaii, disclosure of police officers' disciplinary records is appropriate where "the public interest in access to the records outweighs [the officer's] privacy interest."  *Peer News LLC v. City & Cty. of Honolulu*, 138 Haw. 53, 55 (2016).

The chasm between New York's secretive approach under Section 50-a, and the more transparent approaches adopted in a majority of states, is stark.  In October 2014, Chicago police officer Jason Van Dyke shot and killed Black teenager Laquan McDonald while he walked past the officers in the middle of a street.[57]  As a result of Illinois' comparatively transparent approach to police disciplinary records, Chicagoans were quickly able to question whether there had been a breakdown in Chicago's police disciplinary system.  The public learned that Van Dyke had been the subject of civilian complaints on at least 20 occasions.[58]  They learned that Van Dyke had been accused of excessive force multiple times, including one instance in which a Black Chicagoan was awarded $350,000 after Van Dyke used force so extreme the man needed shoulder surgery.[59]  They learned that complaints against Van Dyke included allegations that he had used a racial slur.[60]  And they learned that none of the complaints had resulted in discipline.

Likewise, after Derrick Chauvin killed George Floyd, the public discovered—as a result of Minnesota's more transparent approach—that Chauvin had been the subject of at least 17

---

joined this category following the 2018 passage of SB1421.  *See* Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153, 155 (2019), *available at* https://scholarship.law.uci.edu/ucilr/vol10/iss1/6.
[56] Lewis et al., *supra* n. 31.
[57] Monica Davey & Mitch Smith, *Chicago Protests Mostly Peaceful After Video of Police Shooting Is Released*, N.Y. Times, Nov. 24, 2015, *available at* https://www.nytimes.com/2015/11/25/us/chicago-officer-charged-in-death-of-black-teenager-official-says.html.
[58] Elliot C. McLaughlin, *Chicago officer had history of complaints before Laquan McDonald shooting*, CNN (Nov. 26, 2015), *available at* https://www.cnn.com/2015/11/25/us/jason-van-dyke-previous-complaints-lawsuits/.
[59] *Id.*
[60] *Id.*

prior complaints, including for shooting a civilian.[61]  The revelation that only two of those complaints resulted in discipline, and that the stiffest punishment Chauvin received was a letter of reprimand, fueled calls for reform of the Minneapolis Police Department's dysfunctional disciplinary system.[62]  As the outcry against misconduct and violence against communities of color grows, access to disciplinary records puts the public in a position to hold *departments* accountable for the hiring and firing of problematic officers—not just the offending officers.

In contrast, after former NYPD Officer Daniel Pantaleo choked Eric Garner to death, not even Garner's family could obtain access to Mr. Pantaleo's disciplinary records.  Attempts by the family's attorneys to secure those records under New York's Freedom of Information Law were rejected by the NYPD, citing Section 50-a.[63]  It was not until after the repeal of Section 50-a that the Civilian Complaint Review Board released the records, and the public finally learned that Officer Pantaleo was the subject of no fewer than 17 complaints in the five years before he killed Mr. Garner.

### B.    The New York State Legislature Repealed Section 50-a To Promote Police Transparency And Accountability.

For years, advocates and family members of New Yorkers killed by police tried, unsuccessfully, to persuade the Legislature to repeal Section 50-a.[64]  Mothers like Gwen Carr and Iris Baez, both of whom lost their sons in deadly chokeholds, cried out for reform that did

---

[61] Shaila Dewan & Serge F. Kovaleski, *Thousands of Complaints Do Little to Change Police Ways*, N.Y. Times, May 30, 2020, *available at* https://www.nytimes.com/2020/05/30/us/derek-chauvin-george-floyd.html.
[62] *Id.*
[63] Eric Evans, *Police secrecy law keeps public in the dark about police misconduct*, NBC News (May 19, 2019), *available at* https://www.nbcnews.com/news/us-news/police-secrecy-law-keeps-public-dark-about-police-misconduct-n1006786.
[64] Rachel Silberstein, *Advocates push for repeal of 50-a ahead of session*, Times Union, Dec. 24, 2018, *available at* https://www.timesunion.com/news/article/NYS-50-a-13488713.php.

not come.[65]  But the national movement following the killings of George Floyd and Breonna

Taylor spurred renewed and intense focus on New York's flawed and secretive system of police

discipline.

This year, tens of millions have taken to the streets to rise up against police abuse and

violence, particularly against communities of color.[66]  By some estimates, it has been the largest

protest movement in the history of this country.[67]  Central to these protests has been a demand

for greater accountability and transparency from law enforcement.  In Los Angeles, protesters

demanded an end to the culture of police impunity.[68]  As Patrisse Cullors, a leader in the Black

Lives Matter movement put it, accountability was at the core of what protesters expected from

their government:  after police violence, "[w]e barely get a sorry, we rarely get accountability

and we never get change."[69]  In Houston, as tens of thousands of protesters marched through the

City's downtown, Black Lives Matter organizers similarly called for the city's police department

"to be more transparent and to hold … officers accountable after fatal police shootings."[70]

In New York, focus quickly turned to Section 50-a.  Marchers held signs calling for the

---

[65] Dean Meminger, *Advocacy rally to repeal 50a law*, NY1 (Oct. 17, 2019) *available at* https://www.ny1.com/nyc/all-boroughs/news/2019/10/17/advocates-rally-to-repeal-50a-law.

[66] Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times, July 3, 2020, *available at* https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[67] *Id.*

[68] Ashley Riegle, *Black Lives Matter co-founder says what protestors want is simple: Accountability*, ABC News (June 2, 2020), *available at* https://abc7.com/black-lives-matter-co-founder-says-what-protesters-want-is-simple-accountability/6226038/.

[69] *Id.*

[70] Mike Hixenbaugh, *Houston's police chief wins national praise — but faces local anger over shootings and transparency*, NBC News (June 3, 2020), *available at* https://www.nbcnews.com/news/us-news/houston-s-police-chief-wins-national-praise-faces-local-anger-n1223911.

law's repeal,[71] and "Repeal 50-a" became a "rallying cr[y]" at protests.[72]  A broad coalition of community groups, including labor unions, advocates for children, temples and church networks, public defenders, civil rights organizations, and civil libertarians signed letters calling for reform.[73]  Hundreds of businesses did so as well.[74]

This time, the public calls for reform were answered.  After a greater than two-thirds majority in both the New York State Assembly and the Senate voted to repeal Section 50-a, Governor Andrew Cuomo swiftly signed the repeal into law.[75]  As Senator Jamaal Bailey explained on the floor of the New York State Senate, "[t]he silver lining on this incredibly dark cloud is that the sun is finally starting to shine on injustice.  Maybe it's the unmistakable . . . video evidence that we saw a live murder on TV, but it's done something to the consciousness of America."[76]  Governor Cuomo likewise explained that the repeal of Section 50-a reflected New York's judgment that "[p]olice reform is long overdue, [as] Mr. Floyd's murder is just the most recent murder."[77]  And the Governor stressed the critical importance of police transparency, noting that there had been "a breach of the trust … that has to be restored."[78]

---

[71] Andrew Flanagan, *Over 750 Artists, Companies Call for Repeal of N.Y. Law Shielding Police Records*, NPR (June 9, 2020), *available at* https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/09/872899147/over-750-artists-companies-call-for-repeal-of-ny-law-shielding-police-records.

[72] Annie McDonough, *Police reform activists and experts react to 50-a repeal*, City & State New York (June 12, 2020), *available at* https://www.cityandstateny.com/articles/policy/criminal-justice/police-reform-activists-and-experts-react-50-repeal.html.

[73] Letter to Majority Leader Stewart-Cousins and Speaker Heastie, Communities United for Police Reform (June 1, 2020), *available at* https://www.changethenypd.org/sites/default/files/snya_repeal50a_letter_to_leader_speaker_6-1-2020_final_-_85.pdf.

[74] Flanagan, *supra* n. 71.

[75] *See* Denis Slattery, *New York lawmakers vote to repeal 50-a, making police disciplinary records public*, N.Y. Daily News, June 10, 2020, *available at* https://www.nydailynews.com/news/politics/ny-legislature-50a-transparency-george-floyd-20200609-yew7soogazfmdg3cr3xlsbmwye-story.html; *see also* Luis Ferré-Sadurní & Jesse McKinley, *N.Y. Bans Chokeholds and Approves Other Measures to Restrict Police*, N.Y. Times, June 12, 2020) *available at*  https://www.nytimes.com/2020/06/12/nyregion/50a-repeal-police-floyd.html.

[76] Slattery, *supra* n. 75.

[77] Ellen Moynihan, Denis Slattery & Chris Sommerfeldt, *Cuomo signs historic 50-a repeal bill, making N.Y. police disciplinary records public after decades of secrecy*, N.Y Daily News, June 12, 2020, *available at* https://www.nydailynews.com/news/politics/ny-cuomo-police-reform-disciplinary-records-20200612-5zryohkuwjew7ksjowhtswmsk4-story.html.

[78] *Id.*

### III. THIS COURT SHOULD NOT ALLOW THE POLICE UNIONS' NARROW AND PRETEXTUAL INTERESTS TO OVERRIDE THE PUBLIC'S INTEREST IN TRANSPARENCY, ACCOUNTABILITY, AND RACIAL JUSTICE.

The Police Unions' asserted interest in "privacy"—a stalking-horse for their interest in avoiding repercussions for misconduct by police officers—cannot outweigh the substantial public interests in transparency, accountability, and racial justice vindicated by the people of New York's decision to repeal Section 50-a.  Indeed, their vigorous efforts to block the repeal of Section 50-a—and, with that abject failure, their filing of this lawsuit—is part of their longstanding resistance to greater police transparency, accountability, and racial equity.

The repeal of Section 50-a occurred over the vociferous opposition of the Police Unions and their leadership.  Police Benevolent Association ("PBA") President Patrick Lynch warned that the repeal of Section 50-a was a plan to "destroy[] the careers of dedicated public servants" pushed by "organizations and persons that represent criminals and those accused of crimes."[79] He urged legislators to avoid repealing the law to satisfy "the politics of the moment,"[80] and suggested that lawmakers who supported the repeal effort were "appeasing the criminals" and "appeasing the rioters."[81]  Sergeants Benevolent Association ("SBA") President Ed Mullins likewise called repeal a "reckless" measure touted by "activists" who "scare[d] into submission public officials eager to prove their far-left credentials."[82]  And he cautioned that repeal would not strike the appropriate balance between transparency and the "practical" needs of police.[83]  In

---

[79] Statement of Patrick J. Lynch, Public Hearing: Policing (S3695), repeals provision relating to personnel records of police officers, firefighters, and correctional officers, New York State Senate Standing Committee on Codes (Oct. 17, 2017), *available at* https://www.nycpba.org/media/35716/191017.pdf.

[80] Bernadette Hogan, *Minority lawmakers push for police reforms to pass in Albany*, N.Y. Post, June 4, 2020, *available at* https://nypost.com/2020/06/04/minority-lawmakers-push-for-police-reform-to-pass-in-albany/.

[81] Bernadette Hogan & Carl Campanile, *NY lawmakers pass bill that releases officer disciplinary records through FOIL*, N.Y. Post, June 9, 2020, *available at* https://nypost.com/2020/06/09/ny-passes-bill-that-releases-disciplinary-records-through-foil/.

[82] Ed Mullins, *Don't let activists and lawyers weaponize police-discipline records*, N.Y. Post, Apr. 14, 2019, *available at* https://nypost.com/2019/04/14/dont-let-activists-and-lawyers-weaponize-police-discipline-records/.

[83] *Id.*

repealing Section 50-a, the people of New York, through their elected representatives, disagreed—emphatically so.

Of course, the Police Unions' opposition to efforts to increase police accountability or to rein in the NYPD's persistent abuses of communities of color is nothing new.  During the mid-1960s, when our country last experienced mass uprisings to protest racial injustice, then-Mayor John Lindsay first attempted to bring civilian oversight to police discipline matters—an effort that the PBA successfully blocked.[84]  One poster from the union "showed a young middle-class white woman emerging from the subway onto the darkened street, looking frightened, with accompanying text that read, 'The Civilian Review Board must be stopped!  Her life … your life … may depend on it.'"[85]  As John Cassese, then-president of the PBA, explained, he was "sick and tired of giving in to minority groups with their whims and their gripes and shouting."[86]

Later, when Mayor David Dinkins, New York's City's first and only Black mayor, made a renewed effort to create a civilian review board in 1992, the PBA staged a "ferocious protest at City Hall"—with members "carrying guns" and "crude drawings of Dinkins" along with "racist placards" that referred to Dinkins as "the Washroom Attendant."[87]

More recently, the Police Unions have opposed the reforms required by the *Floyd* decision, stating that the improved monitoring systems, increased review of stops, body cameras, and updated training and reporting are onerous, unrequested, and cumbersome.[88]  They filed a

---

[84] Civilian Complaint Review Board, *History*, *available at* https://www1.nyc.gov/site/ccrb/about/history.page.
[85] William Finnegan, *How police unions fight reform*, The New Yorker (July 27, 2020), *available at* https://www.newyorker.com/magazine/2020/08/03/how-police-unions-fight-reform.
[86] Civilian Complaint Review Board, *supra* n. 84.
[87] Finnegan, *supra* n. 85.
[88] Police Union Mem. in Supp. of Mot. to Intervene, Case No. 1:08-cv-01034-AT, ECF 445 at 6 (filed Mar. 6, 2014).

lawsuit challenging the use of body-worn camera footage,[89] remarkably asserting that the footage constituted "personnel records" and therefore could not be made public under Section 50-a.  The court, in denying relief, noted that ruling "otherwise would defeat the purpose of the body-worn camera program to promote increased transparency and public accountability."[90]

After then-Officer Pantaleo killed Mr. Garner, PBA President Lynch proclaimed that Pantaleo was an "Eagle Scout" and "a model of what we want a police officer to be."[91]  And when the NYPD ultimately fired Pantaleo, Lynch proclaimed that "[t]he job [of being a police officer] is dead."[92]

This pattern of impunity and toxic racism has unfortunately continued to the present day.  Last year, SBA President Mullins shared a video that referred to Black people as "welfare queens," "scam artists," and "monsters," and instructed his audience to "[p]ay close attention to every word.  You will hear what goes through the mind of real policemen every single day on the job.  This is the best video I've ever seen telling the public the absolute truth."[93]  More recently, PBA President Lynch characterized protesters seeking reform in the wake of Floyd's and Taylor's killings as "terrorists."[94]

Nor have the Police Unions' histrionic predictions of chaos and disorder—put forward every time the public has made an effort to reform police practices—come to fruition.  Indeed, while the Police Unions raise the specter that transparency as to the misconduct records at issue here will somehow "imperil the safety" of officers, they make zero attempt to demonstrate that

[89] *Matter of Patrolmen's Benevolent Ass'n of the City of N.Y. v. de Blasio*, 171 A.D.3d 636, 637 (1st Dep't 2019).
[90] *Id.* at 638.
[91] Finnegan, *supra* n. 85.
[92] *Id.*
[93] Trone Dowd, *NYPD Union Chief Is Very Sorry for Sharing a Racist Video That Calls Black People 'Monsters,'"* Vice News (Aug. 14, 2019). *available at* https://www.vice.com/en_us/article/mbmab3/nypd-union-chief-is-very-sorry-for-sharing-a-racist-video-that-calls-black-people-monsters.
[94] Bradford Betz, *George Floyd riots: Cuomo, de Blasio announce NYC curfew*, Fox News (June 1, 2020), https://www.foxnews.com/us/george-floyd-cuomo-de-blasio-nyc-curfew.

any such thing has occurred in the states which have adopted a more transparent approach to police records than New York under Section 50-a.  Mot. for Prelim. Inj., Dkt. No. 10-12, at 2.

Allowing the Police Unions to prevail in their effort to thwart the repeal of Section 50-a would be a significant setback to racial justice, and to the public's efforts to hold the NYPD accountable for abuses in New York City's Black and Latinx communities.  It would send a message that not even the most important state reform to arise out of the largest mass demonstrations in our country's history can rein in police secrecy.  And it would deprive New Yorkers of critical information needed to transform a department that has systematically violated the rights of communities of color.  The Police Unions' requested injunction is not in the public interest.  *Winter*, 555 U.S. at 20.

## CONCLUSION

For the foregoing reasons, the Police Unions' motion for a preliminary injunction should be denied.

Dated: August 14, 2020

Alec Schierenbeck**
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
212-728-5837
aschierenbeck@omm.com

Arthur Ago**
John Fowler**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
202-662-8352
aago@lawyerscommittee.org

Juan Cartagena

Respectfully submitted,

/s/ Chris A. Hollinger
Chris A. Hollinger*
Bess I. Hanish*
Racquel B. Martin***
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111
415-984-8906
chollinger@omm.com

Jin Hee Lee
Ashok Chandran
John Cusick
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

Jose Perez                                212-965-3702
Nathalia Alejandra Varela                 jlee@naacpldf.org
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115                        * Admitted *pro hac vice*
212-219-3360                              ** Admission pending
                                         *** *Pro hac vice* admission forthcoming

*Attorneys for* Amici Curiae