UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association, | Case No. 1:20-cv-05441-KPF |

Petitioners/Plaintiffs,

-against-

Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board,

Respondents/Defendants.

**MEMORANDUM OF LAW OF PROPOSED INTERVENOR COMMUNITIES UNITED FOR POLICE REFORM IN OPPOSITION TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

| | |
|---|---|
| Baher Azmy | Alex V. Chachkes |
| Darius Charney | Rene Kathawala |
| Guadalupe V. Aguirre | Christopher J. Cariello |
| CENTER FOR CONSTITUTIONAL RIGHTS | Margaret Wheeler-Frothingham |
| 666 Broadway | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| New York, New York 10012 | 51 West 52nd Street |
| Tel: (212) 614-6464 | New York, New York 10019 |
| | Tel: (212) 506-5100 |
| | Fax: (212) 506-5151 |

*Attorneys for Proposed Intervenor*

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................... 1

II. FACTUAL BACKGROUND ............................................................................ 2

    A. The legislature repeals § 50-a. .............................................................. 2

    B. Defendants pledge to release all misconduct and disciplinary records ................ 5

    C. Plaintiffs sue ...................................................................................... 7

III. ARGUMENT ............................................................................................. 8

    A. Plaintiffs cannot show a likelihood of irreparable harm from disclosure. ............ 8

    B. The public interest in prompt disclosure vastly outweighs any claimed
        harm, tipping the balance of hardships against injunctive relief. ....................... 15

    C. Plaintiffs' claims are unlikely to succeed on the merits. .................................. 18

        1. Plaintiffs' contract claims are meritless. ................................................. 18

        2. Plaintiffs' stigma-plus claims are meritless. ............................................ 21

        3. Plaintiffs' equal protection claims are meritless. ...................................... 23

        4. Plaintiffs' Article 78 claim is meritless. ................................................. 25

IV. CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

*ACORN v. United States*,
  618 F.3d 125 (2d Cir. 2010)................................................................................................10

*Beal v. Stern*,
  184 F.3d 117 (2d Cir. 1999).................................................................................................8

*Birmingham v. Ogden*,
  70 F. Supp. 2d 353 (S.D.N.Y. 1999)..................................................................................25

*Brandt v. Bd. of Coop. Educ. Servs.*,
  820 F.2d 41 (2d Cir. 1987)..................................................................................................23

*Bursac v. Suozzi*,
  22 Misc.3d 328 (Sup. Ct. Nassau Cnty. 2008).....................................................................22

*City of Newark v. Law Dep't of City of N.Y.*,
  305 A.D.2d 28 (1st Dep't 2003) ..........................................................................................19

*Detroit Free Press Inc. v. U.S. Dep't of Justice*,
  829 F.3d 478 (6th Cir. 2016) (en banc) ...............................................................................22

*Feeseha v. TD Waterhouse Inv. Servs., Inc.*,
  305 A.D.2d 268 (1st Dep't 2003) ........................................................................................19

*Floyd v. City of New York*,
  770 F.3d 1051 (2d Cir. 2014)...............................................................................................10

*Floyd v. City of New York*,
  959 F. Supp. 2d 540 (S.D.N.Y. 2013)..................................................................................24

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)..................................................................................................8

*Gen. Motors Corp. v. Romein*,
  503 U.S. 181 (1992)..............................................................................................................21

*Gould v. N.Y.C. Police Dep't*,
  89 N.Y.2d 267 (1996) ............................................................................................................1

*Hyde v. KLS Prof. Advisors Group, LLC*,
  500 F. App'x 24 (2d Cir. 2012) ...........................................................................................13

*Jankowski-Burczyk v. I.N.S.*,
  291 F.3d 172 (2d Cir. 2002)............................................................................................24, 25

*Klein, Wagner & Morris v. Lawrence A. Klein, P.C.*,
    186 A.D.2d 631 (2d Dep't 1992) ........................................................................10

*Knox v. N.Y.C. Dep't of Educ.*,
    85 A.D. 439 (1st Dep't 2011) ............................................................................23

*Larocca v. Bd. of Educ. of Jericho Union Free School Dist.*,
    220 A.D.2d 424 (2d Dep't 1995) .................................................................18, 19

*In re Luongo v. Records Access Officer, Civilian Complaint Review Bd.*,
    150 A.D.3d 13 (1st Dep't 2017) ........................................................................14

*M/A-COM Sec. Corp. v. Galesi*,
    904 F.2d 134 (2d Cir. 1990) ..............................................................................19

*Martz v. Incorporated Village of Valley Stream*,
    22 F.3d 26 (2d Cir. 1994) ..................................................................................23

*Meese v. Keene*,
    481 U.S. 465 (1987) ..........................................................................................10

*In re N.Y. Times Co. v. City of N.Y. Fire Dep't*,
    4 N.Y.3d 477 (2005) ..........................................................................................25

*Nat'l R.R. Passenger Corp. v. Atchison Topeka and Santa Fe Ry. Co.*,
    470 U.S. 451 (1985) ..........................................................................................20

*Paloger v. Cohen*,
    37 Misc. 3d 1220(A) .........................................................................................10

*People v. David W.*,
    95 N.Y.2d 130 (2000) ........................................................................................22

*Progressive Credit Union v. City of N.Y.*,
    889 F.3d 40 (2d Cir. 2018) ................................................................................24

*Sampson v. Murray*,
    415 U.S. 61 (1975) ......................................................................................12, 13

*Savage v. Gorski*,
    850 F.2d 64 (2d Cir. 1988) ................................................................................13

*Simpson v. N.Y.C. Transit Auth.*,
    112 A.D.2d 89 (1st Dep't 1985) ........................................................................20

*Stewart v. U.S. I.N.S.*,
    762 F.2d 193 (2d Cir. 1985) ............................................................................9, 10

*Supreme Court Uniformed Officers Ass'n v. McCoy*,
  260 F. Supp. 672 (S.D.N.Y. 1966) ...................................................21

*In re Thomas v. N.Y.C. Dep't of Educ.*,
  103 A.D.3d 495 (1st Dep't 2013) .....................................................11

*Trump v. Deutsche Bank AG*,
  943 F.3d 627 (2d Cir. 2019)...............................................................8

*Valmonte v. Bane*,
  18 F.3d 992 (2d Cir. 1994)................................................................23

*Velez v. Levy*,
  401 F.3d 75 (2d Cir. 2005)................................................................21

*Washington Post Co. v. N.Y.S. State Ins. Dep't*,
  61 N.Y.2d 557 (1984) .......................................................................18

*Washington Post Co. v. U.S. Dep't of Health and Human Servs.*,
  690 F.2d 252 (D.C. Cir. 1982) .........................................................18

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).........................................................................8, 15

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*,
  339 F.3d 101 (2d Cir. 2003)..............................................................14

## Statutes, Rules, and Regulations

N.Y. Civil Rights Law § 50-a .................................................... *passim*

N.Y. Public Officers Law § 87 ................................................... *passim*

N.Y. Public Officers Law § 89(2-b) ...........................................11, 13, 14

38 RCNY 1-33(e)..................................................................................5, 6

## Other Authorities

Ashley Southall, *4 Years After Eric Garner's Death, Secrecy Law on Police
  Discipline Remains Unchanged*, N.Y. TIMES (Jun. 3, 2018),
  https://nyti.ms/2DPr6YF. .................................................................3

City of New York, *Data Transparency Initiative*, https://on.nyc.gov/3h0NyfC. ..........................6

Hon. Mary Jo White et al., *The Report of the Independent Panel on the
  Disciplinary System of the New York City Police Dep't* (2019),
  https://bit.ly/3aoeF1T. ...................................................................5, 6

N.Y. Senate, Floor Debate of June 9, 2020, https://bit.ly/2FmWHkN. ...........................................4

New York City Bar, *Report on Legislation by the Civil Rights Committee et al.*,
    NEW YORK CITY BAR ASSOCIATION 1, 2 (2020), https://bit.ly/3jK6O2O. ...............................3

Peter Zimroth, *Tenth Report of the Independent Monitor in* Floyd v. City of New
    York*, 08-cv-1034 (S.D.N.Y.)*, at 73 (Jan. 7, 2020), *available at*
    https://bit.ly/33Sadax (June 2019). .......................................................................................7

State of New York, Department of State Committee on Open Government,
    *Annual Report to the Governor and State Legislature*, DEPARTMENT OF STATE
    1, 3 (Dec. 2014), https://on.ny.gov/3fbCxGO. ..........................................................................3

Testimony for Oct. 17, 2019 Hr'g, N.Y. Senate Standing Committee on Codes,
    https://bit.ly/2DPhTzA. .................................................................................4, 17, 18, 24

Testimony for Oct. 24, 2019 Hr'g, N.Y. Senate Standing Committee on Codes,
    https://bit.ly/2E099X0. .......................................................................................................4

Tr. of June 17, 2020 Press Conference of Mayor Bill de Blasio, City of New
    York, https://on.nyc.gov/2DFqghb. ....................................................................................5

I.     **PRELIMINARY STATEMENT**

Just two months ago, after years of pleas from the most heavily policed communities in the state, New Yorkers decided that basic information about police discipline and misconduct should be publicly accessible.  The legislative judgment was crystal clear.  The public is entitled to know when the officers sworn to serve and protect it, endowed with firearms and color of law, have been the subject of complaints, and how those complaints were resolved.  The legislature found that the array of public interests served by that transparency—accountability, officer and community safety, responsiveness to community concerns—outweighs any private interests in confidentiality.  So it repealed § 50-a, rendering misconduct and disciplinary records "presumptively open for public inspection and copying" under New York's Freedom of Information Law (FOIL), *Gould v. N.Y.C. Police Dep't*, 89 N.Y.2d 267, 274-75 (1996).

Yet now comes one of the state's most politically powerful forces, the officers' unions, asking this Court to upend plainly expressed legislative will.  They do not question the soundness of § 50-a's repeal or the underlying political process.  They do not contest that under FOIL, Defendants must make misconduct and disciplinary records available to the public.  Instead, they launch a collateral attack, arguing that a variety of other sources of law—from their Collective Bargaining Agreements to the United States Constitution—in fact require a blanket, permanent injunction on release of various, imprecisely defined categories of records.  They use the word "modest."  Yet they ask this Court to reweigh the same interests the legislature just finished balancing, substitute their preferred weights, and bar disclosure of what appears to be the vast majority of records in Defendants' possession.  There is nothing modest about that.

This Court should reject Plaintiffs' request because they cannot satisfy a single one of the requirements for injunctive relief.  Their claimed irreparable harms—to reputation, safety, and employment prospects—are either factually unfounded or were accommodated in the legislative

process that resulted in § 50-a's repeal. *Infra* § III.A. Even if they could prove some harm, it would be overwhelmed by the public interest in full and immediate transparency—as attested to by community leaders, victims of police violence, elected officials, former police and other law enforcement officials, scholars, experts on policing policy and reform, data analysts, labor organizations, and others. *Infra* § III.B. And Plaintiffs' legal claims fail as a matter of law and fact. Among other defects, their contract claims cannot support an injunction against disclosure because Defendants have no power to contract out of the public access FOIL mandates. As for their constitutional claims, they do not even plead every element, let alone show that they are likely to prevail on the claims as a whole. *Infra* § III.C.

Plaintiffs have every right to exhaust their options in court. But their appeal to the powers of equity is hollow. They seek to preserve a status quo founded on a law that is no more, the artifice of which persists only because the natural and inevitable effects of § 50-a's repeal will take a bit of time to materialize. The legislature carefully considered the precise types of records at issue in this case and the precise interests Plaintiffs raised. It heard from every stakeholder, Plaintiffs included. And that representative body decided it was in the public interest to expose misconduct and disciplinary records to the light of day. The public—and particularly those communities who bear the daily brunt of the violence and misconduct § 50-a for so long shrouded—have an urgent interest in that day being today. And there is nothing remotely equitable about enjoining a sunrise long overdue. The public should see the records now. The request for a preliminary injunction should be denied.

## II.    FACTUAL BACKGROUND

### A.    The legislature repeals § 50-a.

Enacted in 1976, N.Y. C.R.L. § 50-a generally excluded from disclosure police "personnel records used to evaluate performance toward continued employment or promotion."

It was designed "to, among other things, prevent 'harassment' by criminal defense attorneys who sought to impeach officers with unsubstantiated prior bad acts."[1]  But the provision "expanded … to allow police departments to withhold from the public virtually any record that contains any information that could conceivably be used to evaluate the performance of a police officer."[2]

This expansion wrought extraordinary injustice, particularly in neighborhoods in which policing was most aggressive.  It destroyed community trust.  Declaration of Councilman D. Richards ("Richards Decl.") ¶¶ 8-9; Declaration of B. Cox ("Cox Decl.") ¶¶ 10, 12.  It kept officers with obvious disciplinary issues on the street, resulting in further misconduct.  Declaration of Dr. D. Jones-Brown ("Jones-Brown Decl.") ¶¶ 7-8; Declaration of A. Ritchie ("Ritchie Decl.") ¶ 15.  It blocked the families of victims of police violence from "obtain[ing] even very basic information."  Declaration of Senator J. Salazar ("Salazar Decl.") ¶ 4; Declaration of Kadiatou Diallo ("Diallo Decl.") ¶¶ 10-15.  And it "lent a shield of opacity to" police conduct, standing in the way of accountability and reform.  Declaration of Public Advocate J. Williams ("Williams Decl.") ¶ 12.  Yet for all § 50-a's disastrous effects, repeal proved difficult.  There is little doubt why:  The officers' "unions and departments stonewall[ed] all attempts at reform."  Declaration of Assembly Member M. Blake ("Blake Decl.") ¶ 9; Williams Decl. ¶ 17.  Time and again, the unions used their "considerable sway among lawmakers in Albany" to drown out calls for repeal from the relatively powerless communities most affected by secrecy.[3]

---

[1] New York City Bar, *Report on Legislation by the Civil Rights Committee et al.*, NEW YORK CITY BAR ASSOCIATION 1, 2 (2020), https://bit.ly/3jK6O2O.

[2] State of New York, Department of State Committee on Open Government, *Annual Report to the Governor and State Legislature*, DEPARTMENT OF STATE 1, 3 (Dec. 2014), https://on.ny.gov/3fbCxGO.

[3] Ashley Southall, *4 Years After Eric Garner's Death, Secrecy Law on Police Discipline Remains Unchanged*, N.Y. TIMES (Jun. 3, 2018), https://nyti.ms/2DPr6YF.

The legislative push that finally yielded repeal included two hearings in the fall of 2019 before the New York State Senate.  State legislators heard testimony from an enormous range of stakeholders on the impact of § 50-a—from community members to legal organizations to journalists to mayors.[4]  As always, the officers' unions and departments wielded immense influence in this process, resisting the slightest reform.  They advanced the same claims they do here, citing interests in privacy, safety, and reputation.  Salazar Decl. ¶¶ 9-10.  And the elected representatives they had in their corner harped on the categories of records at issue in this case— at a June 9, 2020 Floor Debate, several senators noted that repeal of § 50-a would render records pertaining to "unsubstantiated" and "unfounded" claims public.  N.Y. Senate, Floor Debate of June 9, 2020, at 1808-09, 1812-13, https://bit.ly/2FmWHkN (exchange between Senators Ashkar and Bailey); *id.* at 1836 (Sen. Borrello); *id.* at 1850 (Sen. Gallivan); *id.* at 1857 (Sen. Sepulveda).

The legislature had all of this before it in June 2020 as it considered a menu of legislative options—from full repeal down to modest revision.  *Compare* Senate Bill S8946, https://bit.ly/2DPyLGn (full repeal) *with* Senate Bill S4214, https://bit.ly/2XYwqjs (option for CCRB to petition court to permit disclosure).  The Senate passed the full repeal bill by a count of 40-22; the Assembly by 101-43.  On June 12, 2020, Governor Cuomo signed it into law.  It was a victory at last for people like Kadiatou Diallo.  Twenty years after her unarmed son, Amadou, was shot 41 times by officers—after two decades of seeking reform—she finally had "some sense of empowerment."  Diallo Decl. ¶ 13.  For people like her, § 50-a's repeal "will not bring [their] children back," but it is a step towards "justice."  *Id.*

---

[4] *See* Testimony for Oct. 17, 2019 Hr'g, N.Y. Senate Standing Committee on Codes, https://bit.ly/2DPhTzA (hereinafter "Oct. 17 Testimony"); Testimony for Oct. 24, 2019 Hr'g, N.Y. Senate Standing Committee on Codes, https://bit.ly/2E099X0 (hereinafter "Oct. 24 Testimony").

**B.**    <u>**Defendants pledge to release all misconduct and disciplinary records.**</u>

A week later, Defendants pledged to release records.  Said the Mayor, "This is historic because it will cover every active member of the police force….  [A]ll records for every active member, available in one place, online publicly."  Tr. of June 17, 2020 Press Conference of Mayor Bill de Blasio, City of New York, https://on.nyc.gov/2DFqghb.

When the Mayor pledged to release "all records," the statement presumably embraced everything produced by the City's byzantine misconduct and disciplinary system.  At issue in this case are records concerning certain of the complaints handled by that system.  But because of the system's "lack of transparency and plain-English explanations,"[5] determining which records is challenging.  The existing parties in this case—who one would expect to know the system better than anyone—have struggled to precisely articulate how complaints are categorized, processed, defined, and disposed of, so it is unclear what and how many records are at issue.  (Some of these topics are the subject of discovery requests to which CPR is not privy.)

Publicly available information about how the CCRB handles complaints within its limited jurisdiction does provide some insight into the types of records at issue here, while hinting at the dangers of imprecision.  Most complaints handled by CCRB can be categorized as follows: "Substantiated," meaning "misconduct is found to be improper based on a preponderance of the evidence"; "Unsubstantiated," meaning "there is not enough evidence to determine whether or not misconduct occurred"; "Unfounded," meaning "a preponderance of the evidence suggests that the event or alleged act did not occur"; "Exonerated," meaning "the event did occur but was not improper by a preponderance of the evidence"; and "Truncated," which

---

[5] Hon. Mary Jo White et al., *The Report of the Independent Panel on the Disciplinary System of the New York City Police Dep't* (2019) (hereinafter "Independent Monitor Report"), https://bit.ly/3aoeF1T; *see generally id.* at 7-16 (providing an overview of the NYPD's disciplinary process).

includes a number of dispositions in which an investigation could not be completed. 38 RCNY 1-33(e). From 2006 through 2020, the percentage of "Substantiated" complaints per year has ranged from 4% to 14%. *See* City of New York, *Data Transparency Initiative*, https://on.nyc.gov/3h0NyfC (complaints by disposition; last accessed Aug. 14, 2020).

Even within the CCRB, however, these dispositions tell only part of the story. As Professor Samuel Walker, an expert in criminology, explains, limitations inherent in the way misconduct is investigated naturally suppress the number of complaints that can be substantiated. Declaration of Dr. S. Walker ("Walker Decl.") ¶ 28. "[O]bjective evidence, in the form of independent witnesses or forensic evidence … is commonly very rare." *Id.* Michael Gennaco, an expert in police oversight, similarly explains that the dispositions of complaints often say more about the system that generates them than about the reality of what happened. Declaration of M. Gennaco ("Gennaco Decl.") ¶¶ 7-8, 10-11; *see* Jones-Brown Decl. ¶¶ 10-11; Declaration of S. Lerner ("Lerner Decl.") ¶ 6; Ritchie Decl. ¶ 8. So as to particular officers and their misconduct and disciplinary histories, there is "consensus of opinion among experts … that the vast number of complaints that are not sustained represent an important part of the overall picture of a police officer's performance." Walker Decl. ¶ 28.

Complicating matters further are different terminology, procedures, and definitions that may be used outside of CCRB. For example, the term "pending" or "non-final" could refer to a complaint pending before the CCRB, or one substantiated by CCRB, but awaiting an ultimate disciplinary decision by the NYPD—a process that could take years. *See* Independent Monitor Report, *supra*, at 5-6. The term "not guilty" is slippery in a similar regard—it could refer to the NYPD Commissioner's final decision overturning a "guilty" finding by an NYPD administrative judge, which follows the CCRB's finding of a substantiated complaint. As for the numbers,

CCRB's are not necessarily a representative sample.  Full publicly available information does not exist for the larger proportion of cases handled by the NYPD's Internal Affairs Bureau (IAB) or misconduct handled at other levels of the NYPD.  Limited public data suggests IAB substantiates an even lower percentage of cases.  For example, IAB has substantiated none of the 2,946 discriminatory profiling complaints—over which it has exclusive jurisdiction—from November 2014 through October 2019.  Peter Zimroth, *Tenth Report of the Independent Monitor in* Floyd v. City of New York*, 08-cv-1034 (S.D.N.Y.)*, at 73 (Jan. 7, 2020), *available at* https://bit.ly/33Sadax (June 2019).

###### C.      Plaintiffs sue.

In response to § 50-a's repeal and the Mayor's pledge to release all records, Plaintiffs brought this suit.   They seek to bar release of all records in cases that are "non-final, unsubstantiated, unfounded, exonerated, or resulted in a finding of not guilty"—an ambiguous request for reasons just explained—as well as those subject to "confidential settlement agreements."  Dkt. 10-2 at 2.  They claim release is barred by their Collective Bargaining Agreements; the Due Process and Equal Protection Clauses of the United States and New York State Constitutions; and past settlement agreements.  *Id.*  They allege that actions taken by Defendants to effectuate § 50-a repeal are "arbitrary and capricious."  *Id.* at 4.  And they seek both preliminary and permanent injunctive relief against disclosure of any record "that implicate[s] the privacy and safety concerns of officers."  *Id.* at 26-33.

On July 22, 2020, the Court granted Plaintiffs' request for a temporary restraining order over "complaints that are unsubstantiated or unfounded, those in which the officer has been exonerated, and those that are … pending [or] nonfinal, as well as [subject to] settlement agreements."  Dkt. 91 at 78-86.  "[F]or purposes of [that] proceeding," it "accept[ed] as true the well-pleaded allegations of plaintiffs' pleading" that disclosure would cause harms "that

transcend reputation, that affect employment, that affect safety." *Id.* at 82.  And it found "sufficiently serious questions going to the merits" to grant a TRO.  *Id.*

III.    **ARGUMENT**

To obtain the "extraordinary remedy" of a preliminary injunction, a movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21-22 (2008).  Although in some circumstances the Second Circuit permits injunctive relief on the lesser showing of "serious questions going to the merits of [the] claim," that standard does not apply where, as here, "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999).  In such cases, the injunction should be granted only if the moving party meets "the more rigorous likelihood-of-success standard."  *Id.*; *see Trump v. Deutsche Bank AG*, 943 F.3d 627, 639 (2d Cir. 2019) (collecting cases), rev'd on other grounds in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).  Plaintiffs lose on every factor.

A.    **Plaintiffs cannot show a likelihood of irreparable harm from disclosure.**

To demonstrate a likelihood of irreparable harm, the movant must show that "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks omitted).  Such injury must be impossible to remedy by money damages.  *Id.*  The memorandum of law Plaintiffs initially submitted in support of their petition in state court names several purported harms from disclosure, Dkt. 10-12: (1) "permanent reputational harm," *id.* at 10; (2) "loss of privacy," *id.*; (3) "threats to safety," *id.*; (4) "interfere[nce] with future employment

opportunities," *id.* at 3; and (5) "destr[uction] of valuable collectively bargained-for rights," *id.* at 3.  Each claimed harm fails for several reasons.

**Reputation and privacy.**  Plaintiffs do not explain concretely how disclosure of all of the records at issue would cause reputational harm.  They opt instead for generalities like, "[t]he data to be released include unsubstantiated accusations related to serious crimes" and that the "allegations may be false."  Dkt. 10-12 at 7.  That does not come close to showing actual and imminent harm from release of *any* particular record, let alone all of the many thousands at issue.  Some subset of the records at issue—Plaintiffs give us no way of defining which—may be unflattering in the abstract.  But that is not evidence that public access will cause actual harm to any particular officer's reputation.  And the vast majority of records they chose to sweep into the case will dryly report only basic facts about a complaint that was not substantiated.

There is every reason to be "highly skeptical" of Plaintiffs' speculative claims.  Cox Decl. ¶ 24.  As former Albany Chief of Police, Brendan Cox, explains "[t]he community is already aware of an officer's reputation based on how that officer interacts with the community." *Id.*  Good officers "will have a good reputation, regardless of minor misconduct records." *Id.* And "for an officer who already has a bad reputation in the community, releasing the lengthy misconduct records will not change people's viewpoint." *Id.*; *accord* Richards Decl. ¶¶ 17-18 (similar); Salazar Decl. ¶ 17 (similar); *see also* Gennaco Decl. ¶ 11 (transparency may "actually redound to the advantage of law enforcement's public reputation").

Even if Plaintiffs could overcome their evidentiary failings, the asserted abstract harm to reputation still, as a matter of law, "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction."  *Stewart v. U.S. I.N.S.*, 762 F.2d 193, 200 (2d Cir. 1985).  In *Stewart*, Plaintiff was an INS employee who was suspended for

improperly using his firearm while off-duty.  *Id.* at 196-97.  He sought injunctive relief, claiming

the INS's action caused him irreparable harm by "degrading and humiliating him in the eyes of

his peers, family, and community, thereby damaging his reputation and self-esteem."  *Id.* at 200.

The Second Circuit held that "[s]uch unfortunate effects either alone or in combination do not

constitute irreparable harm sufficient to justify injunctive relief."  *Id.*  And indeed, when some of

these very Plaintiffs tried to intervene in *Floyd v. City of New York*, the Second Circuit found

that their "claims of reputational harm" did not suffice as a "legally protectible interest" because

"there was no evidence in the record showing that the union members' careers had been

tarnished, that their safety was in jeopardy, or that they had been adversely affected in any

tangible way."  770 F.3d 1051, 1061 (2d Cir. 2014).[6]

The two cases Plaintiffs have offered as support for their reputational harm theory do not

say otherwise.  *See* Dkt. 10-12 at 6.  One, *Paloger v. Cohen*, is a trial level decision rejecting the

claimed reputational harm in that case.  37 Misc. 3d 1220(A), 2012 N.Y. Slip Op. 52098(U), *7

(Sup. Ct. Nassau Cnty. 2012).  The other was a dispute about the right to use a corporate name,

and the claim was harm to "reputation with clients, potential clients, and the legal community"—

it was a case about corporate goodwill and the risk of economic harm, not personal reputation.

*Klein, Wagner & Morris v. Lawrence A. Klein, P.C.*, 186 A.D.2d 631, 633 (2d Dep't 1992).

Plaintiffs do not appear to claim privacy-based harms that are separate and apart from

---

[6] Even outside of the especially rigorous injunctive relief context, something beyond speculative
and abstract harm to reputation is required.  *Compare Meese v. Keene*, 481 U.S. 465, 473-74
(1987) (plaintiff showed concrete injury from film criticism supported by "detailed affidavits"
documenting diminution of viewership, and thus impairment of "his ability to obtain reelection
and to practice his profession"); *ACORN v. United States*, 618 F.3d 125, 134 (2d Cir. 2010)
(NGO plaintiff demonstrated concrete injury from agency funding restrictions that affected its
"reputation with other agencies, states, and private donors," causing calculable damage to its
fundraising abilities).

reputational harm.  Any such argument would be untenable.  There are no generalized privacy rights inherent in misconduct and disciplinary records, "even where the allegations of misconduct are 'quasi criminal' in nature or not substantiated."  *In re Thomas v. N.Y.C. Dep't of Educ.*, 103 A.D.3d 495, 498 (1st Dep't 2013).  Plaintiffs point to an advisory opinion issued by the Committee on Open Government suggesting that privacy concerns *may* permit the government, in some circumstances, to claim applicability of a FOIL exemption, Dkt. 30-1— which, of course, Defendants do not do here.  But even before § 50-a's repeal, the First Department rejected the notion that this "non-binding" opinion recognized a "blanket exemption," finding that "public employees enjoy a lesser degree of privacy than others." *Thomas*, 103 A.D. 3d at 499.

The legislature, moreover, specifically considered, deliberated over, and addressed privacy concerns when it repealed § 50-a, by mandating redaction of "home addresses, personal telephone numbers, personal cell phone numbers, [and] personal email addresses," and other personal information concerning topics like "mental health" and "substance abuse assistance." N.Y. Public Officers Law § 89(2-b)(a)-(d); *see* Williams Decl. ¶ 17; Salazar Decl. ¶ 12 (similar).

***Employment prospects.***  Plaintiffs' broad claim of likely harm to future employment is similarly speculative and attenuated.  In any event, because any such harm, should it occur, is remediable by money damages, injunctive relief is inappropriate.

Plaintiffs again fail to provide any concrete account of how harm to employment prospects would directly or imminently flow from disclosure.  One could conjecture.  A police officer decides he wants to seek a job with another police department.  After receiving the application, the department looks the officer up in a database containing misconduct and disciplinary records and finds that the officer was accused of excessive use of force 20 times and

discriminatory profiling 4 times, but each complaint was unsubstantiated, unfounded, or exonerated.  Deterred by this lengthy history of complaints, and notwithstanding their lack of substantiation, the prospective employer decides not to hire the officer.

But Plaintiffs do not offer any specific evidence that anyone is imminently facing something like this—e.g., evidence about officers seeking employment, who prospective employers are, what information employers already can access regarding misconduct and disciplinary histories, how they interpret that information, and how public access to data would therefore change any employment calculus.  It is all bald, speculative assertion.  Without anything concrete, it is impossible to assess the veracity of any claim, or to compare any particular harm with any countervailing public interest.  (Surely, for example, the public interest prevails when it comes to the stylized officer in the previous paragraph.)

As Cox attests, public release of misconduct and disciplinary records provides a fuller picture of the important factors any employer should consider.  Cox Decl. ¶ 22.  He explains that whether or not there is a publicly accessible database of records, employers will in the ordinary course (rightly) ask about officers' misconduct and disciplinary histories and (rightly) expect truthful responses—in other words, assuming officers are truthful, the availability of a database would make no difference to an employment decision.  *Id.*  And, he explains that employers take a nuanced view, based on experience, of the content, timing, persistence, and dispositions of past complaints in determining what they indicate about an officer's past performance and fitness as a hire.  Id. ¶ 21.  "[G]ood officers who wish to lateral" will be able to do so, and those "with minor disciplinary records" will, too, as long as any "issue was dealt with and corrected."  *Id.* ¶ 20.

Even if Plaintiffs could show a risk of harm to officers' employment prospects, they would still lose because such harms are quantifiable.  *Sampson v. Murray*, 415 U.S. 61, 89-92

(1975); *see Savage v. Gorski,* 850 F.2d 64, 67-68 (2d Cir. 1988) ("Loss of employment does not in and of itself constitute irreparable injury" as "reinstatement and money damages could make [plaintiffs] whole for any loss suffered."); *Hyde v. KLS Prof. Advisors Group, LLC*, 500 F. App'x 24, 26 (2d Cir. 2012) (unpublished) (finding "difficulty in obtaining a job is undoubtedly an injury, but it is not … irreparable" because it can be remediated with money damages).

    *Officer safety.* Plaintiffs' speculation gives way to fear-mongering when they invoke risks to officer safety. To substantiate these claims, they say that "the news is replete with examples of police officers who have been targeted and killed because of their uniform," and they point to three such instances. Dkt. 10-12 at 28-29. These incidents are heinous and frightening. But they are senseless acts in no way motivated or aided by public access to misconduct and disciplinary information. There is no evidence that a database like those contemplated here is likely to directly contribute to such conduct. *See* Salazar Decl. ¶ 10 (noting unions' failure to substantiate safety concerns during legislative process); Richards Decl. ¶ 15 (same). In localities with broader disclosure of officer misconduct and disciplinary records, the release of those records has not been shown to impact officer safety. Declaration of J. Kalven ("Kalven Decl.") ¶ 10; Salazar Decl. ¶ 11. And as explained below (at 16), public access to records actually *increases* officer safety (in addition to public safety) by promoting trust.

    Plaintiffs also fail to account for the safeguards the legislature *did* build into FOIL when it repealed § 50-a. As Senator Julia Salazar explains, "the legislature was in no way indifferent to *legitimate* concerns regarding officer safety," and it was the subject of "many discussions" among legislators. Salazar Decl. ¶ 12; *accord* Richards Decl. ¶ 15. That is why the legislature provided for mandatory redaction of "home addresses, personal telephone numbers, personal cell phone numbers, [and] personal email addresses" to minimize the extent to which disclosure of

records would endanger officers.  N.Y. Public Officers Law § 89(2-b)(b).

The lone case Plaintiffs cite in support of their officer safety argument, *In re Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, proves how fundamentally misplaced those arguments are here.  150 A.D.3d 13 (1st Dep't 2017).  That case involved the "extensively publicized arrest and death of Eric Garner" at the hands of Officer Daniel Pantaleo, *id.* at 15, who was filmed choking Mr. Garner as Mr. Garner repeated, eleven times, "I can't breathe."  As a result, *Luongo* found, "hostility and threats against Officer Pantaleo ha[d] been significant enough to cause NYPD's Threat Assessment Unit to order around-the-clock police protection for him and his family."  *Id.* at 26.  That is a far cry from this case.  Pantaleo was filmed killing someone, prompting reported threats.  Plaintiffs offer no such evidence that public access to records merely documenting complaints would have that effect.

***Collective bargaining rights.***  Plaintiffs last claim that disclosure of records interferes with valuable collective bargaining rights.  The notion appears to be that if misconduct and disciplinary records are disclosed to the public, that would undermine Plaintiffs' intended use of the right in their CBAs to seek expungement of those documents from their "Personnel Files."  That is a non sequitur.  As explained in further detail below (at 19), the right to *seek* expungement is not a right against disclosure of what is currently contained in a personnel file, less even a right against disclosure of records held elsewhere.

Anyway, breach of contract is almost always remediable with money damages.  Granting an injunction on a breach of contract claim would "eviscerate the essential distinction between compensable and non-compensable harm."  *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003).  And insofar as Plaintiffs are claiming some damage that is intrinsic—that is, not quantifiable—flowing from breach of the CBAs, that is just a

repackaging of their other claimed harms from disclosure (i.e., harm to reputation, employment prospects, and so forth).  It rises or falls (and here falls) with those other purported harms.

    **B.**    **The public interest in prompt disclosure vastly outweighs any claimed harm, tipping the balance of hardships against injunctive relief.**

Because Plaintiffs cannot carry their burden of establishing actual, imminent irreparable harm flowing from disclosure, their request for injunctive relief fails.  But even if they could show such harms, injunctive relief is inappropriate for the independent reason that the public interest in prompt disclosure following § 50-a's repeal vastly outweighs any harms, tipping the "balance of equities" in favor of release.  *Cf. Winter*, 555 U.S. at 22 (injunctive relief inappropriate where public interest outweighs claimed harms).  Ample evidence proves it.

Prompt, full, and ready access to all misconduct and disciplinary records promotes accountability to the public.  The public has a basic interest in knowing when its public servants—those who are granted awesome power over the safety, liberty, and lives of people on the streets and in their homes—are accused of misconduct and how those complaints are disposed of.  Williams Decl. ¶ 14; Richards Decl. ¶ 10; Kalven Decl. ¶¶ 5, 11; Lerner Decl. ¶ 12.  So too the public has a keen interest in ensuring that those allegations are rigorously and expeditiously investigated.  Salazar Decl. ¶¶ 13-14.  Past victims of police misconduct and their families have a strong interest in discovering the disciplinary and misconduct histories of the officers who perpetrated the wrongs.  Diallo Decl. ¶ 3, 13; Williams Decl. ¶ 8; Salazar Decl. ¶¶ 4-7.  And the potential future victims of such misconduct, who reside in the communities most impacted by police policy, obviously have an immediate interest in avoiding it.

Accountability, in turn, promotes public trust—delivering a host of immediate and long-term benefits.  Richards Decl. ¶ 11; Williams Decl. ¶ 11, 15; Cox Decl. ¶ 19; Jones-Brown Decl. ¶ 9; Gennaco Decl. ¶¶ 5-6.  Mutual trust between officers and the community leads to safer and

better policing—another present and urgent interest for communities across the state.  Former Police Chief Cox explains that to "prevent and solve crime, officers need the community members to come forward"—something they will do "only … when they have trust in the police department."  Cox Decl. ¶ 12.  That trust requires that citizen "complaints are taken seriously, investigated, and … the officers are corrected and disciplined."  *Id.*  The trust that comes from transparency also promotes officer safety, contrary to Plaintiffs' speculation.  Cox explains that "officers are always safer when the community members trust us and have our backs."  Cox Decl. ¶ 19.  "[A]n officer is most at risk when the community believes that the police department is shrouded in secrecy and working to hide misconduct."  *Id.*

Transparency also roots out officers who should not be on the streets.  Lerner Decl. ¶ 11; Jones-Brown Decl. ¶ 7; Cox Decl. ¶¶ 20-23.  Full misconduct and disciplinary histories are highly predictive of future misconduct.  Walker Decl. ¶ 27; Gennaco Decl. ¶¶ 8-9; Lerner Decl. ¶ 11.  Public access to these records increases the chances that those officers undergo training or other remedial action that prevents future misconduct.  Walker Decl. ¶ 31; Gennaco Decl. ¶¶ 8-9; Ritchie Decl. ¶ 16.  Transparency concerning all records—substantiated or not, final or not—also encourages other victims to come forward, increasing the chances that officers who repeatedly commit misconduct are removed from the force.  This is particularly true of sexual and gender-based violence.  As Andrea Ritchie, an expert in the field, explains, "[t]ransparency is essential for creating a safe space for survivors to come forward."  Ritchie Decl. ¶ 14.  When they do, officers can be identified and removed, preventing future assaults.  Members of the public, of course, have a compelling and immediate interest in the removal of officers whose history of misconduct reveals a likelihood of future offenses.

Last, transparency permits the community, independent groups like CPR, and elected

officials to develop legislation and policies guided by full information.  Any well-run

organization would scrutinize all information it could to assess its performance.  Productive

dialogue on police policy requires "full, real time facts concerning past and present NYPD

conduct."  Williams Decl. ¶ 15; Richards Decl. ¶ 13.  Sensible policy helps keep people safe and

saves taxpayers money.  Oct. 17 Testimony at 29-35 (Testimony of C. Boyle).

        The evidence could not be clearer that to realize the above benefits, transparency in the

misconduct and disciplinary process must include records pertaining to all complaints and

allegations—no matter the disposition.  Gennaco Decl. ¶¶ 7-9; Salazar Decl. ¶¶ 13-14. Only full

transparency can build trust and accountability, especially in communities of color, where that

trust is most frayed.  Williams Decl. ¶ 12; Gennaco Decl. ¶ 5.  And only full transparency allows

for a robust assessment of the data, and thus calibration of appropriate policy.  Walker Decl. ¶¶

31-34.  Restricting the publication of records only to substantiated claims would squander the

benefits transparency is supposed to deliver.  *See* Blake Decl. ¶¶ 12-15; Richards Decl. ¶ 13; Cox

Decl. ¶ 25; Lerner Decl. ¶ 6; Ritchie Decl. ¶ 8-9; Kalven Decl. ¶¶ 13-14.

        The legislature decided just that.  It studied the public benefits of transparency.  It

considered amendments to § 50-a that would have left the records at issue here shrouded from

public view.  And it carefully evaluated the unions' claims that disclosure would harm officers'

reputations and privacy or threaten their safety.  But it also considered the interests of Kadiatou

Diallo, whose son, Amadou, was shot 41 times in 1999, and who 20 years later was still fighting

for transparency.  Diallo Decl. 4-5; 13.  It considered Constance Malcolm, Ramarley Graham's

mom.  Oct. 17 Testimony at 10-12 (Testimony of C. Malcolm).  And Gwen Carr, Eric Garner's

mom.  Oct. 17 Testimony at 4-7 (Testimony of G. Carr).  And Valerie Bell, Sean Bell's mom.

Oct. 17 Testimony at 1-3 (Testimony of V. Bell).  And Victoria Davis, sister of Delrawn Small.

Oct. 17 Testimony at 7-9 (Testimony of V. Davis).  And it considered the interests of millions of other people in the communities across New York who are most impacted by policing—historically and at this very moment—who have the most fundamental and urgent of interests in police transparency and the direct benefits it affords, and whose voices were for decades ignored.

The record before this Court, like the one the legislature relied upon in repealing §50-a, is not close.  The public interest vastly outweighs Plaintiffs' speculative harms.

### C.    Plaintiffs' claims are unlikely to succeed on the merits.

Plaintiffs' request for a preliminary injunction fails for the additional, independent reason that they cannot establish a likelihood of success on the merits.  Again, Plaintiffs do not contest in this action that under FOIL, the records at issue here are presumptively public.  Nor do they argue that any exemption to disclosure under FOIL applies—a claim that would fail in any event.  What Defendants seek is judicial recognition of some freestanding, broad-based right against disclosure that somehow trumps FOIL altogether.  They have no such thing.

### 1.    Plaintiffs' contract claims are meritless.

Plaintiffs advance two contract claims.  First, they claim their collective bargaining agreements completely bar the disclosure of any of the records at issue.  And second, they claim settlement agreements bar disclosure of records concerning the underlying complaint.

Whether or not these claims otherwise have merit (they don't), they could never support injunctive relief.  That is because municipalities and their agencies have no power to contract away the public's right of access under FOIL.  *See Washington Post Co. v. N.Y.S. State Ins. Dep't*, 61 N.Y.2d 557, 566-67 (1984) (agency cannot avoid disclosure with a mere "label of confidentiality"); *accord Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 690 F.2d 252, 263 (D.C. Cir. 1982).  An agency "cannot bargain away the public's right to access public records."  *Larocca v. Bd. of Educ. of Jericho Union Free School Dist.*, 220 A.D.2d 424,

427 (2d Dep't 1995); *accord City of Newark v. Law Dep't of City of N.Y.*, 305 A.D.2d 28, 32-33
(1st Dep't 2003).

      Each claim fails for other reasons, too.

      ***CBAs.*** Plaintiffs' CBA-based claim is based on terms in those provisions that read: "The
Department will upon written request to the Chief of Personnel by the individual employee,
remove from the Personnel Folder investigative reports which, upon completion of the
investigation are classified 'exonerated' and/or 'unfounded.'" Dkt. 10-2 at 14-15. Plaintiffs do
not claim that any officer has sought and been denied the right to remove records from his
"Personnel Folder"—that is, they do not and cannot claim a breach of the contract's plain terms.
Instead, Plaintiffs say that the right to seek expungement from a Personnel Folder would be
"nullified" by disclosure of records.

      In reality, then, Plaintiffs' claim sounds in the implied covenant of good faith and fair
dealing—the notion that a party cannot "do anything which has the effect of destroying or
injuring the right of the other party to receive the fruits of the contract," *M/A-COM Sec. Corp. v.
Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). But that argument does not work either, because it is
black-letter law that the covenant of good faith and fair dealing cannot "create independent
contractual rights." *Feeseha v. TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (1st Dep't
2003). So Plaintiffs' attempt to convert the right to have something removed from a Personnel
Folder—and thus not considered when, for example, an officer seeks promotion—into a blanket
right against public access to misconduct and disciplinary records cannot succeed.

      ***Settlement Agreements.*** Plaintiffs also argue that disclosure of some records would
breach settlement agreements between police officers and the NYPD. They do not attach the
agreements or quote any provision. Instead, they contend that since the settlements predate § 50-

a's repeal, § 50-a's protections are implicitly incorporated into them.  They rely on the general presumption that "valid applicable laws existing at the time of the making of a contract enter into and form a part of the contract."  Dkt. 10-12 at 22 (citing 11 Williston on Contracts § 30.19 (4th ed. 2020)).  That principle has no application here.[7]

First, this is no ordinary contract between private parties—Plaintiffs are trying to convert a law regulating government activity into a contractual provision against the government, and thus an implied right of action.  In such circumstances, "the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  *Nat'l R.R. Passenger Corp. v. Atchison Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985) (internal quotation marks omitted).  That is because "[p]olicies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts … would be to limit drastically the essential powers of a legislative body."  *Id.*  The principle holds even when a private party is otherwise in a contractual relationship with the government on related matters.  *Id.*  Section 50-a's now-repealed language contained nothing suggesting a "private contractual arrangement."  *Id.*  Nor did it create a private right of action against the government.  *Simpson v. N.Y.C. Transit Auth.*, 112 A.D.2d 89, 90 (1st Dep't 1985).  So it could not have created a contractual promise in perpetuity.

Second, as explained above, even if Defendants had *wanted* to provide a contractual promise that whatever confidentiality § 50-a afforded would last forever, they lacked any such authority.  Government agencies cannot contract around FOIL, which was also on the books at the time of the settlement agreements.  Plaintiffs had no right to assume from Defendants an

---

[7]As a proposed intervenor, CPR does not currently have access to any settlement agreements, but preserves all arguments that may be based on their particular provisions.

implicit promise that Defendants had no power to make.  On the contrary, with respect to matters unaddressed by the settlement agreements, Plaintiffs are in essence "employees of the State, subject in all respects to applicable legislation … and subject to any changes thereafter made in their employment by the legislature."  *Supreme Court Uniformed Officers Ass'n v. McCoy*, 260 F. Supp. 672, 674 (S.D.N.Y. 1966).

Third, even among private parties, it is simply not true that "all state regulations are implied terms of every contract."  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 188 (1992).  "For the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts."  *Id.* at 189. To hold otherwise would be to subject virtually every change in the law to scrutiny under the Constitution's Contract Clause—a provision Plaintiffs do not even raise—and "severely limit the ability of state legislatures to amend their regulatory legislation."  *Id.* at 190.  Because Plaintiffs do not allege that the existence or not of § 50-a affects any "bargained-for terms," § 50-a does not qualify as an incorporated implied term of the settlement agreements.  *Id.*

## 2.    Plaintiffs' stigma-plus claims are meritless.

Plaintiffs claim that public access to misconduct and disciplinary records would cause reputational harm that would violate each of their members' constitutional rights to due process—a "stigma-plus" claim.  A stigma-plus claim "requires a plaintiff to allege (1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden … in addition to the stigmatizing statement."  *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005).  Plaintiffs can demonstrate neither stigma nor plus.

***Stigma.***  Their stigma showing is deficient in at least two respects.  First, Plaintiffs do not even *allege* that any particular record contains false information, let alone that each is false.  Nor

does that fact flow from the nature of the records.  For example, "unsubstantiated" means that Defendants were unable, with their limited investigatory powers, to prove or disprove that particular conduct happened.  *Supra* at 5.  And "exonerated" means a Defendant confirmed the alleged conduct occurred, but found that the conduct was not deemed improper.  *Id.*  Plaintiffs are required to claim the falsity of each record to be disclosed and they have not done so.

Second, Plaintiffs have failed to prove injury to reputation with respect to any record or category of records.  As explained above (at 9-11), Plaintiffs cannot show that disclosure will cause any such harm.  Nor is it sufficient for Plaintiffs to argue that there may be a handful of records the disclosure of which may have that affect.  Plaintiffs chose to seek extraordinarily broad relief, so they must make a commensurately broad evidentiary showing.

Without evidence, Plaintiffs rely on analogies to sex offender registries or to a "Wall of Shame" including mugshots of drunk drivers, Dkt. 10-12, at 15-16.  But these examples are not analogous at all.  For example, in the sex offender case, the court explained that "the sexually violent predator label is a determination of status," while noting that the convicted sex offender's "name and exact address can be widely disseminated to and by any entity with vulnerable populations related to the nature of the offense committed by such sex offender."  *People v. David W.*, 95 N.Y.2d 130, 138-39 (2000) (internal quotation marks omitted).  As for mugshots, the New York trial court that issued that decision noted the "limitless and eternal notoriety, without any controls" caused by mugshots, *Bursac v. Suozzi*, 22 Misc.3d 328, 342 (Sup. Ct. Nassau Cnty. 2008); other courts, too, have recognized their propensity to "haunt the depicted individual for decades," *Detroit Free Press Inc. v. U.S. Dep't of Justice*, 829 F.3d 478, 485 (6th Cir. 2016) (en banc), "preserv[ing] the indignity of a deprivation of liberty, often at the (literal) expense of the most vulnerable among us," *id* at 486 (Cole, J., concurring).  Plaintiffs cannot

show that disclosure of these records works the same qualitative or quantitative harm.

*Plus.*  There is also no plus here, because Plaintiffs cannot show that they have suffered or will suffer any state-imposed burden with "a concurrent temporal link" to disclosure of records.  *Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994).  Plaintiffs say that "for some [officers], [it] will be a loss of employment," Dkt. 10-12 at 14.  But they do not explain why an officer would lose their job as a result of publication of records their employer already has access to.  Plaintiffs contend that for others, the plus will be "interfere[nce] with future employment opportunities," *id.*, because records "will be made available," Dkt. 91 at 73 (July 22, 2020 Hr'g).  That is speculation about the future, not proof of a tangible state-imposed burden "concurrent" with disclosure, *Martz*, 22 F.3d at 32.  *Supra* 11-13.

The cases Plaintiffs cite offer no help.  They cite *Valmonte v. Bane*, but that case makes clear that "the impact that defamation might have on job prospects" is "not by itself a deprivation of a liberty interest."  18 F.3d 992, 1001 (2d Cir. 1994).  The plus there was a state-imposed *legal requirement* that future employers consult the list on which the plaintiff was included.  *Id.* Plaintiffs also cite, *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44 (2d Cir. 1987), in which a teacher was fired for alleged sexual misconduct and was denied a name-clearing hearing.  The *firing* was the plus there.  *Brandt* does reference a showing "that prospective employers are likely to gain access to [plaintiff's] personnel file and decide not to hire him."  *Id.* at 45.  As *Valmonte* explains, that is about the "stigma requirement," not the plus.  18 F.3d at 1000 (quotation marks omitted).  And Plaintiffs' invocation of *Knox v. N.Y.C. Dep't of Educ.*, 85 A.D. 439, 440 (1st Dep't 2011), fails both because plaintiff was terminated *and* placed on a list with an official recommendation that future employers consider that status.

### 3.    Plaintiffs' equal protection claims are meritless.

Plaintiffs next claim that releasing disciplinary records would violate the Equal

Protection Clause.  "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment."  *Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 49 (2d Cir. 2018).  "[R]ational basis review contemplates a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it."  *Id.* (internal quotation marks omitted).

Many of the comparators Plaintiffs select make no sense.  They appear to be claiming differential treatment between themselves and "other state-regulated professions."  Dkt. 10-2 at 105.  The suggestion that a "state-licensed … medical physicist," *id.*, is similarly situated with a city-employed police officer is absurd on its face.  Plaintiffs narrow things down to the still-vague "other employees and elected officials of the City and other police officers who work in the City (e.g., those employed by the Port Authority, MTA, and New York State Troopers)."  *Id.* These officers "who work in the City" are not employed by the City, so it cannot be that Defendants are treating them more favorably—they do not treat them at all.

As for the "employees and elected officials" of the City, their misconduct routinely is disclosed.  Lerner Decl. ¶ 13; Richards Decl. ¶ 10.  In any event, there are plainly rational bases for different policies.  Officers patrol the streets with firearms; elected officials do not.  Salazar Decl. ¶ 15.  Police erect a "blue wall of silence" in response to complaints, Jones-Brown Decl. ¶ 10; *see Floyd v. City of New York*, 959 F. Supp. 2d 540, 617 (S.D.N.Y. 2013); there is no "green wall of silence" around the New York City Department of Environmental Protection.  The legislature also considered the strain officer misconduct imposes on the public fisc, and could have decided that addressing it immediately was a priority.  Oct. 17 Testimony at 29-35; *see*

*Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 179 (2d Cir. 2002) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all.").  Plaintiffs have to "negative" any conceivable basis for differential treatment, and they negative nothing.

### 4.      Plaintiffs' Article 78 claim is meritless.

"[F]ederal courts are loath to exercise jurisdiction over Article 78 claims," "[e]ven where a plaintiff has one or more federal claims still alive."  *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999).  But if this Court elects to do so, it should reject Plaintiffs' claim.  Plaintiffs argue that Defendants' decision to disclose records formerly covered by § 50-a is arbitrary and capricious.  But Defendants' reasoning makes perfect sense.  They previously treated the records as confidential under § 50-a.  Post-repeal, they are treating them as presumptively public under FOIL.  That decision is not arbitrary—it is mandatory.

Plaintiffs also use their Article 78 claim as a repository for stray bits of case law that recognize privacy interests in certain contexts—for example, the interests of surviving relatives of fallen 9/11 firefighters in a FOIL action.  Dkt. 10-12 at 25 (citing *In re N.Y. Times Co. v. City of N.Y. Fire Dep't*, 4 N.Y.3d 477, 485 (2005).  It is all completely irrelevant.  That Defendants in some instances have taken the position that some records are exempt from disclosure does not convert every subsequent decision that records are public into an Article 78 case.  So in the end, Plaintiffs' Article 78 claim boils down to a challenge to Defendants decision to make public records viewable in an online "reading room," a perfectly ordinary decision under FOIL that plainly accords with deep public interest.  This Court should permit Defendants to proceed.

## IV.      CONCLUSION

CPR respectfully requests that the Court deny Plaintiffs' request for a preliminary injunction.

Dated: New York, New York
      August 14, 2020

                        Respectfully submitted,

                        Orrick, Herrington & Sutcliffe LLP

                        By: */s/ Alex V. Chachkes*

| | |
|---|---|
| Baher Azmy | Alex V. Chachkes |
| Darius Charney | Rene Kathawala |
| Guadalupe V. Aguirre | Christopher J. Cariello |
| CENTER FOR CONSTITUTIONAL RIGHTS | Margaret Wheeler-Frothingham |
| 666 Broadway | ORRICK, HERRINGTON & SUTCLIFFE LLP |
| New York, New York 10012 | 51 West 52nd Street |
| Tel: (212) 614-6464 | New York, New York 10019 |
| | Tel: (212) 506-5100 |
| | Fax: (212) 506-5151 |