UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

Uniformed Fire Officers Association; Uniformed
Firefighters Association of Greater New York;
Correction Officers' Benevolent Association of the
City of New York, Inc.; Police Benevolent
Association of the City of New York, Inc.; Sergeants
Benevolent Association; Lieutenants Benevolent
Association; Captains Endowment Association; and
Detectives' Endowment Association,

**DECLARATION OF KAMI Z. BARKER**

No. 20 CV 05441 (KPF)

                                    Plaintiffs,

                        -against-

Bill de Blasio, in his official capacity as Mayor of the
City of New York; the City of New York; Fire
Department of the City of New York; Daniel A.
Nigro, in his official capacity as the Commissioner of
the Fire Department of the City of New York; New
York City Department of Correction; Cynthia Brann,
in her official capacity as the Commissioner of the
New York City Department of Correction; Dermot F.
Shea, in his official capacity as the Commissioner of
the New York City Police Department; the New York
City Police Department; Frederick Davie, in his
official capacity as the Chair of the Civilian
Complaint Review Board; and the Civilian
Complaint Review Board.,

                                    Defendants.

------------------------------------------------------------------------x

     **KAMI Z. BARKER** declares, pursuant to 28 U.S.C. § 1746 and subject to the

penalties of perjury, that the following is true and correct:

     1.    I am an Assistant Corporation Counsel in the office of James E. Johnson,

Corporation Counsel of the City of New York, attorney for defendants in the above-captioned

action.  I submit this declaration in opposition to plaintiffs' application for a preliminary

injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.  This declaration is based on the books and records of the City of New York and the public record.

## **FACTUAL BACKGROUND**

2.   In July 2014, § 50-a became part of the public discussion and debate surrounding criminal justice reform after New Yorkers began demanding more information regarding the death of Eric Garner during a police encounter.  See October 17, 2019 Testimony of Michael Sisitzky, from the New York Civil Liberties Union ("NYCLU"), to the Legislature, annexed to the Barker Decl. as Exhibit "A."

### **A.  Non-Governmental Public Databases of Police Disciplinary Records**

3.    In 2015, the Chicago nonprofit, Invisible Institute, launched the Citizens Police Data Project ("CPDP"), publishing nearly 250,000 complaints against more than 23,000 Chicago Police Department officers spanning decades.  Members of the public "can look up individual officers by name, [and] the database also allows for research into patterns of officer misconduct."  See "The Fight for Transparency in Police Misconduct, Explained," available at https://www.vox.com/2020/6/16/21291595/new-york-section-50-a-police-misconduct  (last visited August 11, 2020).

4.    In 2018, the New York State Committee on Open Government issued its 2018 Report noting that, "it is ironic that public employees having the most authority over peoples' lives are the least accountable relative to disclosure of government records."  See the Committee's 2018 Annual Report annexed hereto as Exhibit "B."

5.    On April 16, 2018, Buzzfeed News published, in an online searchable database, the disciplinary records of about 1,800 NYPD officers, who had been charged with misconduct between 2011 and 2015, which it received from an anonymous whistleblower.  See

"Here Are The Secret Records On Thousands Of New York Police Misconduct Cases," available at https://www.buzzfeednews.com/article/kendalltaggart/nypd-police-misconduct-database#.ujG5173Vb (last visited August 11, 2020).

6.      Later that year, the Legal Aid Society also created an online database called Cop Accountability Project statistics or "CAPstat," which includes data from lawsuits against NYPD officers, spanning over several years, as well as data on the leaked disciplinary records that came from BuzzFeed News.  See CAPstat available at https://www.capstat.nyc/ (last visited August 11, 2020).

7.      Also, in 2018, the Chicago nonprofit, the Invisible Institute, in partnership with the investigative journalism website "The Intercept," relaunched an expanded version of their online database, which, as of last year, contained nearly 250,000 complaints against more than 23,000 Chicago law enforcement officers, spanning three decades.  See "INVISIBLE INSTITUTE RELAUNCHES THE CITIZENS POLICE DATA PROJECT," available at https://theintercept.com/2018/08/16/invisible-institute-chicago-police-data/ (last visited August 11, 2020).

8.      In the Independent Panel on the Disciplinary System of the New York City Police Department's January 25, 2019 Report, the Panel wrote that "[t]he absence of [police disciplinary] information has engendered mistrust in the community, which questions whether the Department is sufficiently policing its own. … The current law [regarding § 50-a] keeps the public in the dark about police discipline, breeds mistrust, and reduces accountability.  Public confidence is vital to the Department's mission, and a shrouded disciplinary process undermines that confidence."  See page 5 of the January 25, 2019 Report of the Independent Panel on the Disciplinary System of the New York City Police Department, annexed hereto as Exhibit "C,"

which is also available at https://www.independentpanelreportnypd.net/pages/5.html (last visited August 11, 2020).

**B. City Policies Regarding Disclosure of Law Enforcement Disciplinary Records Prior to The Repeal of § 50-a**

9.   Beginning around 2004, the New York City Office of Administrative Trials and Hearings ("OATH") began publishing all disciplinary findings and recommendations for certain City employees, including, *inter alia,* Corrections Officers and Firefighters, reporting on decisions, dating back to the 1990s.   See   OATH's   website,   available   at https://www1.nyc.gov/site/oath/trials/decisions.page; see also the New York Law School's online database of OATH decisions, available at https://www.nyls.edu/cityadmin/ (last visited August 11, 2020).

10. In 2018, the NYPD narrowed its interpretation of the scope of § 50-a within its departmental policies. For example, when a FOIL request is made for body-camera footage, arrest reports, and other routine police reports completed in connection with an arrest, the NYPD Legal Bureau, beginning in 2018, no longer asserted § 50-a as a basis for nondisclosure.  See Oleg Chernyavsky's October 24, 2019 Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D."

11. Also, that year, the NYPD began publishing annual reports on its website, dating back to 2016, that provide aggregate discipline information, including disciplinary charges and penalties received.  See Oleg Chernyavsky's October 24, 2019 Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D."

12. Additionally, in 2018, the NYPD, in an effort to promote open disciplinary proceedings, began providing an updated trial calendar on its website.  See Oleg Chernyavsky's

October 24, 2019 Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D."

13. Later, the NYPD issued presumptive disciplinary protocols for members of the service, who have been determined to have committed domestic violence acts.  See Oleg Chernyavsky's October 24, 2019 Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D."

14. The NYPD also attempted to make some disciplinary information publicly available, including the release of anonymized summaries of disciplinary proceedings.  However, attempts to do so were blocked by the courts as violating 50-a after being challenged by police unions, including plaintiff Patrolmen's Benevolent Association ("PBA") here.   See Oleg Chernyavsky's October 24, 2019 Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D."; see also e.g. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc. v. de Blasio, 2015 N.Y. Misc. LEXIS 5358, 2015 NY Slip Op 32829(U) (Sup. Ct. N.Y. Cty. 2015), Patrolmen's Benevolent Ass'n of the City of N.Y., Inc. v. de Blasio, No. 153231/2018 (2019), annexed hereto as Exhibit "E"; Matter of Patrolmen's Benevolent Assn. of the City of N.Y. v. de Blasio, 171 A.D.3d 636 (1st Dep't 2019).

15. In 2018, the NYPD also appointed a three-person panel of independent experts to perform an independent and exhaustive review of the Department's disciplinary system. The panel was tasked with identifying areas where the Department could be more transparent and recommending areas of improvement. These independent experts issued a comprehensive report in January of 2019, and the Department agreed to adopt all 14 of their recommendations to improve the NYPD's disciplinary system, including supporting an amendment to section 50-a of the Civil Rights Law.  See Oleg Chernyavsky's October 24, 2019

Testimony to the New York State Legislature, mentioned below and annexed hereto as Exhibit "D"; see also "NYPD Appoints External Panel to Review Discipline Policies," available at https://www.wsj.com/articles/nypd-appoints-external-panel-to-review-discipline-policies-1529623277 (last viewed on August 11, 2020)

**C.  October 17, 2019 New York State Senate Hearing Testimony on the Repeal of § 50-a**

16. On October 17, 2019, Michael Sisitzky, from the New York Civil Liberties Union ("NYCLU") testified before the Legislature, stating, "Though 50-a was well known to public defenders and to organizations like the NYCLU that frequently submit public records requests concerning police policies and practices. 50-a forcefully entered the broader public consciousness following the July 2011 killing of Eric Garner."  See October 17, 2019 Testimony of Michael Sisitzky, from the New York Civil Liberties Union ("NYCLU"), to the Legislature, annexed hereto as Exhibit "A," which can also be found online at:

https://www.nysenate.gov/sites/default/files/testimonies_on_policing_s3695_repeals_provisions_101719.pdf and https://www.youtube.com/watch?v=9NabOdVMCTw&feature=youtu.be   (last visited August 11, 2020).

17. The Public Advocate for the City of New York, Jumaane D. Williams, testified before the Legislature on October 17, 2019, stating, "The interpretation and application of section 50-A deprives the public of information fundamental to oversight and lends a shield of opacity to the very public state and local police agencies that have perhaps the greatest day-to-day impact over the lives of citizens. … [repealing § 50-a] is crucial for enforcing accountability and improving police-community relations."   See Jumaane D. Williams' October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "F," which is also available at the aforementioned links.

18. Plaintiff PBA's President, Patrick Lynch, testified before the Legislature on October 17, 2019 as well, stating, "§ 50-a was enacted with overwhelming bipartisan support to protect police officers 'from the use of records—including unsubstantiated and irrelevant complaints of misconduct—as a means for harassment and reprisals,' a goal that all New Yorkers should share and one that, in the current climate and in light of technological advances over the last 43 years, is even more important in 2019 than it was when first enacted in 1976." See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

19. Mr. Lynch went on to state, "proposed legislation that would have such a drastic impact—stripping the civil rights of hundreds of thousands of New York union members, endangering the physical safety of countless families, destroying the careers of dedicated public servants—must be based on facts, not falsehoods."  See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

20. Mr. Lynch further testified that "[i]n addition to knowingly misleading both the public and elected officials, supporters of repeal completely ignore the serious risks to police officer safety and the reputational harm of publishing false allegations—which will unfairly impact the careers of good police officers who keep all New Yorkers safe. And just as troubling, the repeal of CRL § 50-a would leave police officers—who have been murdered simply because they are police officers—with fewer privacy rights and far less protection than any number of other professions."  See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

21. Mr. Lynch went on to describe the possible harm he believed a repeal would cause, stating, "with the wealth of personal information now available on the internet—including not only telephone numbers and home addresses, but also the names and addresses of close relatives—any unstable individual who takes published allegations of misconduct as inspiration or justification to harm a police officer or police family member needs only a few minutes searching in order to locate his or her target." See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

22. Mr. Lynch also stated, "[a]gainst this backdrop, it would be patently unfair to risk the lives and destroy the careers of well-performing, hard-working police officers by repealing CRL § 50-a." See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

23. Mr. Lynch also testified that "the repeal of CRL § 50-a would inexplicably allow for the publication of false allegations against police officers, which will not only unfairly tarnish their careers and reputations, but also see them being treated worse than a host of other professionals (none of whom deals with the same dangers as police officers). See Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

24. Finally, Mr. Lynch testified, "Out of approximately 20 million annual police/citizen interactions, in 2016 only 10,660 even resulted in a complaint to the CCRB (0.05%). despite CCRB making more than 1,000 public presentations in an effort to solicit more claims. And of those 10,660 complaints, CCRB—which has a well-earned reputation for its anti-police bias—was only able to substantiate 2.1% (226 complaints). The fact of the matter is that

virtually all police interactions result in no complaints, and virtually all complaints result in no finding of misconduct." <u>See</u> Patrick Lynch's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "G," which can also be found online at the aforementioned links.

25. Plaintiff COBA's President, Elias Husamudeen, also testified in front of the Legislature on October 17, 2019, stating, "[c]urrently, Correction Officers facing disciplinary hearings have their cases adjudicated by the Office of Administrative Trials and Hearings (OATH). And the rulings and recommendations of OATH judges concerning Correction Officers disciplinary matters are made public." <u>See</u> Elias Husamudeen's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "H," which can also be found online at the aforementioned links.

26. Franklin H. Stone, of the New York State Committee on Open Government, testified to the Legislature on October 17, 2019 that "New York is virtually unique among the states in its refusal to apply the same transparency to police and other uniformed services as applies to all other public employees. The Committee's review of the 48 states without provisions like Section 50-a does not reveal any greater challenges to the privacy and safety of law enforcement personnel." <u>See</u> Franklin Stone's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "I," which can also be found online at the aforementioned links.

27. Ms. Stone went on to testify, "Indeed, following the creation of a police misconduct database in Chicago that makes all police disciplinary records available online, the Chicago police union confirmed that there was 'no increase in threats against officers or their families' as a result of the public police misconduct database" that the Invisible Institute published.  The concerns being voiced by law enforcement representatives in New York are

quite simply irrational fearmongering that is not supported by facts." <u>See</u> Franklin Stone's October 17, 2019 Testimony to the Legislature, annexed hereto as Exhibit "I," which can also be found online at the aforementioned links.

**D.  October 24, 2019 New York State Senate Hearing Testimony on the Repeal of § 50-a**

28. The Assistant Deputy Commissioner of Legal Matters for Defendant NYPD, Oleg Chernyavsky, testified to the Legislature, stating, "We recognize, however, that lasting trust cannot be achieved without the application of a fair and transparent police discipline process. With more than 36,000 uniformed officers, the NYPD is by far, the largest police force in the nation. Each day, the men and women of the NYPD engage in one of the most complex, but also rewarding, jobs and do so upholding the oath they took and the honor their badge demands. This is what our Department expects. Yet, we know that officers are human beings. Like any other profession, sometimes our officers make mistakes during trying situations; and troublingly, a few betray the public trust which blemishes the Department, their fellow officers and the badge that they wear." <u>See</u> Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found online at:

https://www.nysenate.gov/sites/default/files/oct_24th_public_hearing_on_discovery_reform.pdf and  https://www.youtube.com/watch?v=h6I3xxmTYDw&feature=youtu.be  (last visited on August 11, 2020)

29. Mr. Chernyavsky went on to testify, "As currently constituted, the stringent requirements of Civil Rights Law 50-a breeds mistrust and a belief that the few officers who betray the public trust are never held accountable by the Police Department." <u>See</u> Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

30. Mr. Chernyavsky further testified, "The NYPD does not fear scrutiny; we welcome that discussion. Recognizing that a disciplinary system that is unbiased, clear, and consistent is essential to the Department and the public alike, the NYPD took the initiative to appoint a three-person panel of highly-respected experts to perform an independent and exhaustive review of the Department's disciplinary system. This blue-ribbon panel was specifically tasked with identifying areas where the Department could be more transparent and recommending areas of improvement. These independent experts issued a comprehensive report in January and subsequently, the Department agreed to adopt all 14 of their recommendations to improve the NYPD's disciplinary system, including supporting an amendment to section 50-a of the Civil Rights Law, which is among the reasons we are here today." See Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

31. He later stated, "The Department has attempted to make available some disciplinary information publicly. Attempts to release anonymized summaries of disciplinary proceedings have been blocked by the courts as violating 50-a." See Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

32. Mr. Chernyavsky continued by testifying, "Transparency, of course, need not come at the cost of officer safety, and officer safety need not come at the cost of transparency. For this reason, the NYPD unequivocally supports an amendment to Civil Rights Law 50-a. We support a careful balance between protection for our officers and the need for transparency. An amended 50-a should allow the release of the complaint, allegations or charges, the transcript of the hearing, any written opinion, and final disposition and penalty at the conclusion of a

discipline process for serious police misconduct. All this information has been previously shielded by 50-a. In serious discipline cases, this reformed approach would allow for the disclosure of cases after they have been adjudicated — providing the public greater transparency than before. Minor misconduct, such as uniform infraction or lateness, should continue to maintain their 50-a protections." See Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

33. He also testified, "This past year, the Department has taken many steps towards finding that balance. We have narrowed our interpretation of the scope of 50-a through changes in our Department policies. For example, when a Freedom of Information Law (FOIL) request is made for body-camera footage, arrest reports, and other routine police reports completed in connection with an arrest, the NYPD Legal Bureau is no longer asserting 50-a as a basis for nondisclosure. We have also begun to publish annual reports on our website, dating back to 2016, that provide aggregate discipline information including the disciplinary charge and the penalty received. To promote open disciplinary proceedings, an updated trial calendar can now be found on our website as well. Most recently, the Department has issued presumptive discipline protocols for members of the service determined to have committed domestic violence acts. The Department is dedicated to creating a disciplinary system that is equitable, fair and transparent." See Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

34. Finally, Mr. Chernyavsky testified, "Our officers are engaged in rewarding, but dangerous work. They accept these dangers because they have chosen a selfless profession devoted to making the lives of the people of New York City safer. It is our collective responsibility to find a meaningful and more balanced way to address calls for greater

transparency and accountability while promoting the fair administration of justice and ensuring a safe work environment for our officers."  See Oleg Chernyavsky's October 24, 2019 Testimony to the Legislature, annexed hereto as Exhibit "D," which can also be found at the aforementioned links.

35.     Mr. Lynch provided a follow-up testimony to the Legislature, stating "the FOIL statute states that an 'agency *may* deny access to records… that if disclosed would constitute an unwarranted invasion of personal privacy.'  Put differently, absent CRL § 50-a FOIL would *expressly permit* government agencies to release confidential police officer records…. See October 24, 2019 Testimony of Patrick Lynch, PBA President (emphasis his own), annexed hereto as Exhibit "J," which can also be found online at the aforementioned links.

### E.  The Black Lives Matter Protests Renews Attempt to Repeal § 50-a

36. On Memorial Day, May 25, 2020, George Floyd was killed in Minneapolis, Minnesota after Police Officer, Derek Chauvin, used a prohibited carotid hold on Mr. Floyd, applying his knee to Mr. Floyd's neck for at least eight minutes and 15 seconds.  See "How George Floyd Was Killed in Police Custody," available at https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html (last visited on August 11, 2020).

37.     As part of a nation-wide protest for criminal justice reform, which garnered historic levels of public engagement, thousands of New Yorkers marched the streets of New York City, demanding, among other things, to repeal § 50-a.  See "NYC protests reignite calls to repeal 50-a law protecting police records," available at https://www.newsbreak.com/new-york/new-york/news/1576838483469/nyc-protests-reignite-calls-to-repeal-50-a-law-protecting-police-records (last visited on August 11, 2020).

38. On June 6, 2019, Senator Jamaal T. Bailey of the New York State Legislature formally introduced the bill to repeal § 50-a (S8496/A10611).  A copy of the Bill can be found at https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=S08496&term=2019&Summary=Y&Text=Y (last visited August 11, 2020)

39. According to the Sponsor Memo of S8496, the State Senate Bill that repealed § 50-a:

> "FOIL already provides that agencies may redact or withhold information whose disclosure would constitute an unwarranted invasion of privacy. Recent changes to the Civil Service Law have created additional, non-discretionary protections against the release of certain sensitive information such as contact information. Furthermore, this bill adds additional safeguards in the FOIL statute. Finally, courts have the ability to protect against improper cross-examination and determine if police records are admissible in a trial, without the denial of public access to information regarding police activity created by § 50-a. The broad prohibition on disclosure created by § 50-a is therefore unnecessary, and can be repealed as contrary to public policy.
>
> Repeal of § 50-a will help the public regain trust that law enforcement officers and agencies may be held accountable for misconduct.

See Sponsor Memo, S8496, June 6, 2020, available at:

https://www.nysenate.gov/legislation/bills/2019/s8496 (last visited August 12, 2020).

**F.  Plaintiffs' June 9, 2019 Press Conference & Lobbying Campaign**

40.     On June 9, 2019, plaintiffs and other law enforcement unions gave a press conference regarding the imminent repeal of § 50-a.  See the New York City Law Department's Transcript of that Press Conference, annexed hereto as Exhibit "K," which can also be found at:

https://www.youtube.com/watch?v=9nhWAAKSDBQ (last visited August 11, 2020)

41.     At that press conference, Mr. Lynch, stated,  "None of the bills are been contemplated today or that were passed yesterday, or will be passed tomorrow, are initiatives that must be done right this moment, when emotions are running high, and people are not thinking clearly.  Most of these bills have been around -- excuse me -- for many years.  And the reason they haven't passed is because there are two sides to an issue.  And things get discussed, and modified, and let's talk about it.  But now, there's nothing to stop them.  Now, because of what happened, everybody is up there, and they're passing whatever they want.  So, we've been abandoned by everyone."  See the New York City Law Department's Transcript of that Press Conference, annexed hereto as Exhibit "K," which can also be found at aforementioned links, at p. 11, lines 5-15.

42. Mr. Lynch continued by discussing §50-a, stating, "You know, 50-a was enacted in 1976…  because defense attorneys were routinely pouring through police officer's personal jackets for unrelated, unsubstantiated, irrelevant complaints that has been in there for ten, fifteen years, and then using that against the police officer giving a testimony in a criminal case that had nothing to do with him. … Now it's been repealed under false pretense, that it's hiding police misconduct. … Now, we have to get rid of it because it's inconvenient."  See the New York City Law Department's Transcript of that Press Conference, annexed hereto as Exhibit "K," which can also be found at aforementioned links, at p. 11, lines 20-25, p. 12, lines 1-6, 15-16, 19-20.

43. Mr. Husamudeen, also spoke at the press conference and stated, "I don't think 50-a go[es] further enough.  I don't want inmates with correction officers' information in their cells, because that's where they [are] going to have it.  Why should our personal information … be floating around a jail?  It's dangerous.  It threatens not only me as a correction officer, it

threatens my family.  … for [the Legislature] to decide that our information is going to be – it might as well say, on the market. …  We gonna [sic] have inmates doing all kinds of things to stage situations, to set up New York City correction officers."  <u>See</u> the New York City Law Department's Transcript of that Press Conference, annexed hereto as Exhibit "K," which can also be found at aforementioned links, at p. 15, lines 13-19, p. 16, lines 6-10.

44. Mr. Husamudeen went on to state, "But I'm saying to the legislators, I'm saying to you the press, I'm saying to everybody that's listening to the voices, that we're saying to you, we deserve to be protected as we protect you.  There's no way that we protect you, and you don't protect us.  Somebody needs -- you need to say to the legislator, 'No.  Don't do this. Stop making these backdoor deals.'  They're gonna say, 'We spoke to you.'  Yes.  I testified. Yes.  They spoke to me.  But they didn't give me a chance to say what I really think.  They didn't give me a chance to really be at the table and say, 'No.  I don't think this good.  I don't think this is gonna work.'  No.  They already made up their minds what they gonna do."  <u>See</u> the New York City Law Department's Transcript of that Press Conference, annexed hereto as Exhibit "K," which can also be found at aforementioned links, at p. 16, lines 23-25, p. 17, lines 1-9.

45. On June 9, 2020, groups representing over 200,000 law enforcement officers in New York State, including plaintiffs, submitted a memorandum to the New York State Assembly opposing the proposed repeal of 50-a.  In this memo, plaintiffs argued that disciplinary complaints that "have not been fully investigated or substantiated are not reliable or fair indicators of an officer's conduct…and release of such records [] would expose the accused officer of serious safety concerns as well as unavoidable and irreparable harm to reputation and livelihood."  <u>See</u> Memorandum In Opposition, annexed hereto as Exhibit "L," which can also be

found online in a tweet by NYCPBA Legal at:

https://twitter.com/NYCPBA_GC/status/1270430606942515200?s=20   (last visited on July 29, 2020)

**G.  New York State Legislature's June 9, 2020 Floor Debate on the Repeal of § 50-a**

46. On June 9, 2020, the Legislature debated the repeal of §50-a on the Assembly Floor.  <u>See</u> the June 9, 2020 transcript are annexed hereto as Exhibit "M."

47. Assemblyperson Daniel J. O'Donnell, representing Manhattan Valley, Morningside Heights, and the Upper West Side, discussed the issue of unsubstantiated complaints of misconduct, "I can address the substantiated versus unsubstantiated question. It has been raised to me by a number of people. One of the problems with putting a word like "substantiated" into statute is we probably have to define it. I can assure you there's not a police department in the State of New York that wants us to define how to substantiate or not substantiate. Additionally, the lesson we should have learned from the 1976 50-a law is that when you write things with verbiage, that verbiage gets interpreted by a court."  <u>See</u> the June 9, 2020 transcript annexed hereto as Exhibit "M" at pp. 60-61.

48. Later, Assemblyperson O'Donnell responded to a question about information on unsubstantiated cases by stating "The public will have access to it through the FOIL process, subject to the limitations we have written into FOIL as it relates to police officers." <u>Id.</u> at 98. O'Donnell also acknowledged that if an agency determined that the release of unsubstantiated or unfounded complaints would endanger an officer's safety, the agency could withhold such records under the existing provisions of the Freedom of Information Law.  <u>See</u> the June 9, 2020 transcript annexed hereto as Exhibit "M" at 134.

49. Multiple members of the Assembly took to the floor to object to the bill on the ground that it would allow unsubstantiated or unfounded complaints of misconduct to be publicly disclosed. For example, Assemblyperson Palumbo objected to the bill, arguing that "We're going to be providing this information to show that this police officer was -- was complained of, although it is unsubstantiated." Id. at 64. Instead, he argued, the Legislature should revise "this legislation to only allow [disclosure of] substantiated claims that are relevant to a proceeding." See the June 9, 2020 transcript annexed hereto as Exhibit "M" at 66.

50. Similarly, Assemblyperson Reilly objected that the bill would allow for the release of "information that is not proven, it is not substantiated," and he, too, asked the Legislature to consider amending the bill to block disclosure of unsubstantiated claims. Id. at 70, 73. Likewise, Assemblyperson Ra objected that the bill was "opening the door that any complaint that gets filed against an officer, substantiated or not, can get sent out to the public." Id. at 79. Other Assemblypersons also opposed the bill on these same grounds. See the June 9, 2020 transcript annexed hereto as Exhibit "M" at 132-33, 221, 226.

51. But other members of the Assembly argued that the opportunity for public disclosure of information on unsubstantiated claims was a virtue, not a drawback, of the bill. Assemblyperson Ramos, a former police officer, argued that it would be useful for the public to be able to find out if an officer had numerous unsubstantiated complaints, especially involving similar conduct. Id. at 100-02; see also id. at 169 (Assemblyperson O'Donnell echoing this point). Other Assemblypersons speaking in favor of the bill noted that disclosure of unsubstantiated complaints would allow the public to inquire into the nature of the disciplinary process itself. See the June 9, 2020 transcript annexed hereto as Exhibit "M" at 169, 219, 227.

52. Representative O'Donnell also stated, in response to a question as to whether he had heard any input on unsubstantiated claims during his discussions of the bill, "Yes, and in contrast to previous statements already made in this House about rushing, I've had this legislation for five years, and I had had hundreds and hundreds of hours of conversations about 50-a and about my belief that it needs to be repealed, and different proposals with different language to do so. At no time, did any police PBA offer any suggestions other than, *No, we can't repeal it.*" See the June 9, 2020 transcript annexed hereto as Exhibit "M" at p. 69 (emphasis his own).

**H.  The Repeal of § 50-a**

53. On June 12, 2020, Governor Andrew Cuomo signed the repeal of § 50-a, eliminating the long-standing confidentiality of law enforcement disciplinary records. As a result, these records became available to the public pursuant to the Freedom of Information Law ("FOIL"). See "Cuomo signs historic 50-a repeal bill, making N.Y. police disciplinary records public after decades of secrecy," at https://www.nydailynews.com/news/politics/ny-cuomo-police-reform-disciplinary-records-20200612-5zryohkuwjew7ksjowhtswmsk4-story.html (last visited August 11, 2020)

54. In his press release, upon signing the repeal of Civil Rights Law §50-a, Governor Cuomo stated, "[T]he current law prevents access to both records of the disciplinary proceedings themselves and the recommendations or outcomes of those proceedings, leading to records of complaints or finding of law enforcement misconduct that did not result in criminal charges against an office almost entirely inaccessible to the public.  Repealing Civil Rights Law § 50-a will allow for the disclosure of law enforcement disciplinary records, increasing transparency and helping regain the public trust that law enforcement officers and their agencies

may be held accountable for misconduct.  See https://www.governor.ny.gov/news/governor-cuomo signs-say-their-name-reform-agenda-package (last visited August 11, 2020).

**I.  Post § 50-a Repeal**

55.    On June 17, 2020, Mayor de Blasio announced that the City would soon publish an online public database of police disciplinary records.  See "De Blasio Announces Changes to NYPD Disciplinary Records Release," available at https://www.ny1.com/nyc/all-boroughs/public-safety/2020/06/18/de-blasio-announces-changes-to-nypd-disciplinary-records-release (last visited August 11, 2020)

56.    Immediately, members of the public and the press, including ProPublica, began requesting these records from City agencies, particularly from the Civilian Complaint Review Board ("CCRB"). And the CCRB responded by producing the requested documents, pursuant to the new law.  See Dkt. No. 31.

57.    On July 26, 2020, ProPublica published the CCRB officer histories, including unsubstantiated allegations, of approximately 4,000 NYPD officers on a searchable, public, online database, which it received from the CCRB in response to a FOIL request made on July 9, 2020.  See Dkt. No. 31; see also "The NYPD Files," at:

https://projects.propublica.org/nypd-ccrb/ (last visited August 11, 2020)

**J.  Plaintiffs' Collective Bargaining Agreements with Defendants and Their Attempts to Arbitrate**

58.    Plaintiffs' Sergeants Benevolent Society ("SBA") and Corrections Officers Benevolent Association ("COBA") Collective Bargaining Agreements ("CBA") with defendants only permit their members to seek expungement of exonerated or unfounded disciplinary charges under certain conditions.  Under the SBA CBA, plaintiffs' members may only seek this relief in connection with "Schedule A" violations and only after two years from

the date of the disposition.   Under the COBA CBA, a member may request this relief after completion of the investigation.  Plaintiff Detectives' Endowment Association's ("DEA") CBA does not even have a clause regarding this relief.  All other plaintiffs' CBAs entitle their members to expungement after a finding of unsubstantiated or unfounded.  See relevant portions of plaintiffs' CBAs annexed hereto as Exhibit "N."

59.    Plaintiffs PBA, LEA, and CEA are the only plaintiffs who have demanded arbitration regarding this issue, and they only did so on August 3 and 4, 2020.  See PBA's August 4, 2020 arbitration demand, LEA's August 3, 2020 arbitration demand, and CEA's August 3, 2020 arbitration demand annexed hereto as Exhibit "O."

### K.  Finality of CCRB Determinations

60.    All CCRB disciplinary determinations, including those of "Unsubstantiated," "Unfounded," "Exonerated," and "Truncated," are final agency determinations, which can be challenged in an Article 78 petition.  See § # of the Kerry Jaimeson Declaration.

61.    Plaintiffs' and their members have challenged CCRB determinations in Article 78 petitions.  See e.g. Patrick Lynch, et. al. v. The New York City Civilian Complaint Review Board, Index No. 152235/2018 (Sup. Ct. N.Y. Cty. 2018); Matter of Daniel Pantaleo v. New York City Civilian Complaint Review Board, Index No. 100641/19 (Sup. Ct. N.Y. Cty. 2019), decisions of which are annexed hereto as Exhibit "P."

### L.  Defendants' Deposition Testimony and Declarations

62.    On August 6, 2020, plaintiffs deposed the CCRB's Assistant General Counsel, Kerry Jaimeson.  At this deposition, Ms. Jaimeson testified that FOIL requests are evaluated on a case-by-case basis, with exemptions applied only as appropriate.  See relevant

portions of the Jamieson deposition transcript, annexed hereto as Exhibit "Q," at 24: 3-5; 27: 14-23; 40: 18-20; 50: 4-11, 19-25.

63.     Ms. Jamieson also testified that nothing requires the CCRB to assert a categorical or reflexive application of the FOIL exemptions for certain types of records.  See relevant portions of the Jamieson deposition transcript, annexed hereto as Exhibit "Q," at 22: 5 – 23:16; 24: 16-17; 29: 9-16.

64.     On August 5, 2020, plaintiffs deposed Sheryl Montour, the New York City Fire Department's ("FDNY") Records Access Officer ("RAO").  At this deposition, Ms. Montour testified that FOIL requests are evaluated on a case-by-case basis, with exemptions applied only as appropriate.  See relevant portions of the Montour deposition transcript, annexed hereto as Exhibit "R," at 41:12 - 43:13.

65.     Ms. Montour also testified that nothing requires the FDNY to assert a categorical or reflexive application of the FOIL exemptions for certain types of records.  See relevant portions of the Montour deposition transcript, annexed hereto as Exhibit "R," at 43:3-13, 49:10-19.

66.     On August 7, 2020, plaintiffs deposed Laura Mello, the Department of Corrections' ("DOC") RAO.  At this deposition, Ms. Mello testified that FOIL requests are evaluated on a case-by-case basis, with exemptions applied only as appropriate.  See relevant portions of the Mello deposition transcript, annexed hereto as Exhibit "S," at 17:13 – 19:24; 35:9-21; 5:17 – 53:2; 60:12 – 61:9.

67.     Ms. Mello also testified that nothing requires the DOC to assert a categorical or reflexive application of the FOIL exemptions for certain types of records.  See

relevant portions of the Mello deposition transcript, annexed hereto as Exhibit "S," at 60:12 – 61:9; 77:25 – 75:14.

68.     On August 6, 2020, plaintiffs deposed Lesa Moore, the NYPD's FOIL unit Litigation Supervisor.  At this deposition, Ms. Moore testified that FOIL requests are evaluated on a case-by-case basis, with exemptions applied only as appropriate.  See relevant portions of the Moore deposition transcript, annexed hereto as Exhibit "T," at 27:7 – 28:15; 48:20 – 49:3.

69.     Ms. Moore also testified that nothing requires the NYPD to assert a categorical or reflexive application of the FOIL exemptions for certain types of records.  See relevant portions of the Moore deposition transcript, annexed hereto as Exhibit "T," at 27:7 – 28:15.

70.     On August 14, 2020, Jonathan Darche, the Executive Director of the CCRB, signed a sworn declaration discussing the methods and practices of the CCRB.  See Darche Decl., annexed hereto as Exhibit "U."

71.     On August 14, 2020, Kerry Jamieson, the Assistant General Counsel for the CCRB, signed a sworn declaration discussing the CCRB's methods and practices for responding to FOIL requests.  See Jamieson Decl., annexed hereto as Exhibit "V."

72.     The Memorandum of Understanding ("MOU") between the CCRB and the NYPD, referred to in the Darche Decl., is annexed hereto as Exhibit "W."

73.     The most recent version of the CCRB's FOIL manual, referred to in the Jamieson Decl., is annexed hereto as Exhibit "X."

New York, New York
August 14, 2020

_____
**KAMI Z. BARKER**