EXHIBIT "A"



ACLU of New York

1 Whitehall Street, 3rd Fl.
New York NY 10004
nyclu.org

Donna Lieberman
*Executive Director*

Robin Willner
*President*

Testimony of Michael Sisitzky
On Behalf of the New York Civil Liberties Union
Before the New York State Senate Committee on Codes
In Support of S.3695, Repealing Civil Rights Law Section 50-a

October 17, 2019

The New York Civil Liberties Union ("NYCLU") respectfully submits the following testimony today in support of S.3695, which would repeal Section 50-a of the New York Civil Rights Law. The NYCLU, the New York affiliate of the American Civil Liberties Union, is a not-for-profit, non-partisan organization with eight offices throughout the state and more than 180,000 members and supporters. The NYCLU's mission is to promote and protect the fundamental rights, principles, and values embodied in the Bill of Rights of the U.S. Constitution and the New York Constitution.

Defending New Yorkers' right to be free from discriminatory and abusive policing is a core component of the NYCLU's mission. Protecting this right requires robust systems for investigating abusive officers and holding them accountable. Fundamental to this effort is the ability to access basic information about how these systems operate and whether the outcomes they produce are just.

There is no greater legal barrier to this work than New York Civil Rights Law Section 50-a. Section 50-a cloaks the disciplinary records of police officers, correction officers, and firefighters in secrecy and has been used to shield evidence of law enforcement abuse from the public. The NYCLU expresses our full support for S.3695 and its companion bill in the Assembly, A.2513, which would repeal this antidemocratic provision and allow public access to the types of records most needed to guard against official misconduct by law enforcement.

I.   Background and History of Section 50-a

New York's Freedom of Information Law ("FOIL") begins by declaring that "a free society is maintained when government is responsive and responsible to the public, and when the public is aware of governmental actions."[1] It goes on to say that "[t]he people's right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality."[2] Section 50-a flies in the face of these principles.

Originally passed in 1976 as an attempt to limit defense attorneys' ability to impeach the credibility of police officers by bringing up unproven

---

[1] N.Y. Pub. Off. Law § 84
[2] *Id.*

1



allegations of misconduct, Section 50-a is now infamous for the harm it causes victims of police abuse and the damage it inflicts to the ideals of transparent governance.[3]

Section 50-a states that "[a]ll personnel records used to evaluate performance toward continued employment or promotion" of police officers, correction officers, and firefighters "shall be considered confidential and not subject to inspection or review without the express written consent of such [police officer, correction officer, or firefighter] ... except as may be mandated by lawful court order."[4]

The law's application by police departments and its interpretation in the judiciary has enabled departments to cover up their inaction on allegations of officer misconduct when confronted with demands for accountability – including from police abuse victims and grieving family members who have lost loved ones to police killings. It has been twisted to justify the secrecy of everything from body camera footage[5] to completely anonymized data about departments' use of force.[6]

On the national level, this provision makes New York State an outlier in elevating police personnel records to the level of state secrets. We are one of just two states to maintain a law specifically making these records secret. California, long part of an ignoble trio alongside New York and Delaware, recently took steps to open the books of certain records of police misconduct,[7] joining a group of 28 states that make police disciplinary records available to the public in at least some cases and leaving New York and Delaware to compete for last place in terms of transparency. Of the 28 states where at least some records are accessible, 13 states—a geographically and politically diverse group including, among others, Alabama, Arizona, Connecticut,

---

[3] While 50-a applies to records of correction officers and firefighters as well, the bulk of the public controversy and litigation surrounding the law's application have been in the context of police records, and police records are the main focus of testimony and broader advocacy around the repeal of 50-a.
[4] N.Y. Civil Rights Law § 50-a(1).
[5] Ashley Southall, "New York Police Union Sues to Stop Release of Body Camera Videos," N.Y. Times, Jan. 9, 2018, https://www.nytimes.com/2018/01/09/nyregion/new-york-police-union-body-camera-lawsuit.html.
[6] Graham Rayman, "NYPD Refuses to Reveal Precinct Use-of-Force Data, Citing State Law," N.Y. Daily News, May 10, 2018, https://www.nydailynews.com/new-york/nypd-refuses-reveal-use-of-force-data-citing-state-law-article-1.3981630.
[7] Liam Dillon and Maya Lau, "Gov. Jerry Brown Signs Landmark Laws that Unwind Decades of Secrecy Surrounding Police Misconduct, Use of Force," L.A. Times, Sep. 30, 2018, https://www.latimes.com/politics/la-pol-ca-police-misconduct-rules-changed-20180930-story.html.

2

Florida, Ohio, and Washington—start from the position that disciplinary records specifically are and should be open to the public.[8]

## II. Expansion of 50-a in the Courts

The current application of Section 50-a has moved far beyond the limited purpose the Legislature intended when the law was enacted. According to former State Senator Frank Padavan, who was the lead sponsor of the legislation that created 50-a, "the sole intention of the statute ... was to stop private attorneys from using subpoenas to gain unfettered access to the personnel records of police officers," and that the law "was never intended to block the public disclosure of records on police misconduct, including documented criminal behavior."[9] Over time, however, court decisions transformed and repurposed 50-a such that the withholding of these records is now the law's primary function.


ACLU of New York

The expansion of 50-a in the courts proceeded gradually at first, before rapidly accelerating in recent years. For years, 50-a's application appeared limited to requests for records in the context of active litigation as opposed to more general public records requests through FOIL. In 1986 the Court of Appeals affirmed a lower court decision holding that 50-a was "only intended to prevent a litigant in a civil or criminal action from obtaining documents in a police officer's file that are not directly related to that action,"[10] but just two years later, the Court allowed 50-a to block the release of records even in the absence of any ongoing litigation if there was a chance that those records could *potentially* be used in litigation.[11]

Though 50-a was well known to public defenders and to organizations like the NYCLU that frequently submit public records requests concerning police policies and practices, 50-a forcefully entered the broader public consciousness following the July 2014 killing of Eric Garner. Eric Garner was killed by a New York Police Department ("NYPD") officer, Daniel Pantaleo, who subjected him to a banned chokehold, and in the wake of his death, New Yorkers began demanding more information on how the NYPD holds its officers accountable for misconduct.

The NYPD responded with even more secrecy. In 2016, while New Yorkers were demanding greater transparency, the de Blasio administration

---

[8] Robert Lewis, Noah Veltman, and Xander Landen, "Is Police Misconduct a Secret in Your State?" WNYC, Oct. 15, 2015, https://www.wnyc.org/story/police-misconduct-records/.

[9] Brendan J. Lyons, "Court Rulings Shroud Records," Times Union, Dec. 15, 2016, https://www.timesunion.com/tuplus-local/article/Court-rulings-shroud-records-10788517.php.

[10] *Capital Newspapers Div. of Hearst Corp. v. Burns*, 67 N.Y.2d 562, 565, 496 N.E.2d 665, 667 (1986)

[11] *Prisoners' Legal Servs. of New York v. New York State Dep't of Corr. Servs.*, 73 N.Y.2d 26, 32–33, 535 N.E.2d 243, 246 (1988).


ACLU of New York

and the NYPD reversed a 40 year-old practice of releasing "personnel orders" that contained basic summaries of disciplinary charges and outcomes, claiming for the first time that this practice violated Section 50-a.[12] This robbed the public and the media of one of the only sources of information on whether officers who engage in serious misconduct face any measure of accountability. In a case involving a request for Civilian Complaint Review Board ("CCRB") records related to the officer who killed Eric Garner (a request that was opposed by the de Blasio administration), the Appellate Division expanded the types of records subject to 50-a's secrecy regime, holding that even basic summaries of prior substantiated instances of misconduct that are produced and held by an independent oversight agency constitute personnel records within the meaning of the statute.[13] In a later and astounding attempt to expand the law's scope, the Deputy Commissioner for Legal Matters argued in a 2018 letter to the Inspector General for the NYPD that Section 50-a even bars the release of aggregate, anonymized data on how many use of force incidents were reported in a given precinct.[14]

By far the most serious blow to police transparency and accountability came in a December 2018 ruling from the Court of Appeals deciding the extent of 50-a's reach. The case arose from an NYCLU FOIL request, in which we sought to better understand how disciplinary decisions were made within the NYPD by requesting copies of the recommended decisions issued by NYPD administrative judges. Our request explicitly did not seek any information that would have identified an individual officer. The Court rejected our request, and in so doing, expanded Section 50-a's reach so dramatically that now, unlike any other exemption in the state Freedom of Information Law (under which disclosure of covered records is still permissive and redactions are favored to withholding), Section 50-a now stands as a categorical ban on the disclosure of police personnel records.[15] The Court held that 50-a "mandate[s] confidentiality and suppl[ies] no authority to compel redacted disclosure," with the result being that not only are police departments permitted to withhold covered records, they are actually compelled to treat them as confidential and actively prevented from releasing them absent the specific procedures outlined in 50-a itself.[16]

---

[12] Rocco Parascandola and Graham Rayman, "Exclusive: NYPD Suddenly Stops Sharing Records on Cop Discipline in Move Watchdogs Slam as Anti-Transparency," N.Y. Daily News, Aug. 24, 2016, https://www.nydailynews.com/new-york/exclusive-nypd-stops-releasing-cops-disciplinary-records-article-1.2764145.

[13] *Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13, 22–23, 51 N.Y.S.3d 46, 55–56 (N.Y. App. Div.), *leave to appeal denied*, 30 N.Y.3d 908, 93 N.E.3d 1213 (2017)

[14] *NYPD Response to the Report of the Office of the Inspector General for the NYPP entitled "An Investigation of NYPD's New Force Reporting System* (May 4, 2018), https://www1.nyc.gov/assets/doi/oignypd/response/NYPD_Reponse_DOIForceReportin gSystemReport_50118.pdf.

[15] *New York Civil Liberties Union v. New York City Police Dep't*, 32 N.Y.3d 556, 118 N.E.3d 847 (2018)

[16] *Id.* at 570.

4



In the months since this ruling, courts have allowed 50-a to obscure even more records. In March 2019, a trial court blocked the NYPD from releasing completely anonymous summary reports on the outcomes of departmental disciplinary trials, even though the underlying records themselves would have remained confidential.[17] The following month, the Appellate Division held that personnel records remain subject to 50-a's blanket confidentiality even after an officer retires.[18] Litigation will likely continue around the margins of what constitutes a personnel record—running the risk that even more records may disappear from the public discourse—until the Legislature takes action to correct and reject this growing move toward secrecy through passage of S.3695.

### III. Records Hidden by 50-a are Matters of Vital Public Importance

The types of records that Section 50-a shrouds in secrecy are vitally important for public conversations about the impact that policing has on communities throughout New York. By forcing the public to rely on only the information that trickles out of police departments in leaks, Section 50-a frustrates the ability of advocates and policymakers alike to engage in meaningful and informed discussions about accountability. The public's trust in police is diminished every time a department resists sharing even the most basic information about what rules and procedures they have in place to respond to complaints of misconduct and what happens once those complaints start winding their way through opaque disciplinary systems. S.3695 will enable the public to understand more about how these systems operate by giving the public access to the information necessary to interpret them. We know this because of how much the public learns about police policies and practices whenever these types of records are leaked to journalists.

Shortly after Daniel Pantaleo killed Eric Garner, advocates sought access to information about his disciplinary record. Although New York City succeeded in court to block the release of Pantaleo's history of substantiated CCRB complaints, those records ultimately became public after they were leaked to reporters in 2017.[19] These records revealed that Pantaleo had seven disciplinary complaints and 14 individual allegations made against him before he ever put Eric Garner in a fatal chokehold. The CCRB had substantiated four of those allegations and recommended that the Department pursue the most serious charges available in all of them, but the NYPD disregarded these recommendations; in two of these instances,

---

[17] *Patrolmen's Benev Ass'n of the City of New York, Inc. v Blasio*, No. 153231/2018, 2019 WL 1224787 (N.Y. Sup. Ct. Mar. 11, 2019).
[18] *Hughes Hubbard & Reed, LLP v. Civilian Complaint Review Bd.*, 171 A.D.3d 1064, 1066, 97 N.Y.S.3d 671, 674 (N.Y. App. Div. 2019)
[19] Carimah Townes & Jack Jenkins, "The Disturbing Secret History of the NYPD Officer who Killed Eric Garner," ThinkProgress, Mar. 21, 2017, https://thinkprogress.org/daniel-pantaleo-records-75833e6168f3/.


ACLU of New York

Pantaleo received the weakest possible disciplinary penalty that could be imposed.[20] Once made public, Pantaleo's disciplinary history was described as "among the worst on the force."[21] The fact that an officer, who would later go on to kill someone using a banned procedure, already had a noteworthy history of engaging in misconduct and violating department rules is clearly something that the public has an interest in knowing. The repeal of Section 50-a will prevent future departments from evading this much needed scrutiny.

Again, journalists helped shine a light on NYPD discipline practices in April 2018, when Buzzfeed released a trove of leaked records for 1,800 NYPD employees who had been charged with misconduct between 2011 and 2015, including records covering at least 319 officers who were allowed to keep their jobs, even after they had committed offenses that were considered fireable under NYPD policy.[22] The public learned of three school safety officers who received a slap on the wrist in the form of five lost vacation days after being found guilty of using excessive force against students.[23] New Yorkers also learned that, despite the NYPD's assurance that they take false statements by officers seriously and despite official policy that generally *requires* the firing of officers who lie about a material matter, most of the more than 100 officers in the leaked database who were accused of "lying on official reports, under oath, or during an internal affairs investigation," were punished with as little as a few days of lost vacation.[24] Without this leak, 50-a would have kept the NYPD's failure to adhere to its own disciplinary rules secret; should S.3695 become law, the public will be able to undertake its own analysis of how these rules are applied without having to wait on department sources to blow the whistle.

Without repealing 50-a, it will be impossible to fully understand the factors that ultimately guide the application of department rules concerning discipline. In many police departments throughout the state, the ultimate power and discretion to decide and impose discipline rests with the head of a given department. Section 50-a amplifies the risks inherent in this centralizing of disciplinary decision-making authority in a single office capable of exercising discretionary authority in secret. Using New York City as an example, despite the existence of an independent CCRB with the power to investigate and prosecute a defined subset of misconduct complaints, New

---

[20] *Id.*
[21] *Id.*
[22] Kendall Taggart & Mike Hayes, "Secret NYPD Files: Officers Who Lie and Brutally Beat People Can Keep Their Jobs," BuzzFeed News, Mar. 5, 2018, https://www.buzzfeednews.com/article/kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious#.ckLYB7aBJq.
[23] Kendall Taggart & Mike Hayes, "Here's Why BuzzFeed News Is Publishing Thousands of Secret NYPD Documents," BuzzFeed News, Apr. 16, 2018, https://www.buzzfeednews.com/article/kendalltaggart/nypd-police-misconduct-database-explainer#.jawrOMqON1
[24] *Id.*

6



ACLU of New York

Yorkers are ultimately asked to trust the NYPD to police itself. Decisions about how—and indeed, whether—to discipline officers who violate the public trust are left entirely to the discretion of the NYPD Commissioner. The CCRB and even the NYPD's own Deputy Commissioner for Trials only have the power to make recommendations to the Commissioner about discipline. State and local laws combine to vest the Commissioner with absolute discretion over the final outcome and to allow the NYPD full control over where disciplinary proceedings take place and who has access to information on how these proceedings are resolved.

To its credit, the CCRB produces detailed reports on the outcomes of cases it investigates and prosecutes. The story told by this data, however, is serious cause for alarm. In 2018, the Police Commissioner imposed penalties weaker than those recommended by the CCRB in almost half of all cases that didn't proceed to departmental trials.[25] In the most serious cases that went to full administrative trials, the Commissioner imposed discipline consistent with CCRB recommendations in just 38 percent of cases.[26]

Missing entirely from these numbers, however, is any examination of the qualitative and substantive factors underlying the final decisions: namely, what specific rationale justifies the Police Commissioner in departing from recommended discipline in 62% of CCRB-prosecuted cases? Because of 50-a, the public has no insight into these determinations, and is instead asked to simply trust in the opaque process. S.3695 will ensure that New Yorkers are able to review not just statistical information on police discipline investigations and outcomes, but also the actual reasoning, policies, and analysis that produce that data.

Here again, leaks to the media have proven instructive and offer a glimpse of the information that S.3695 will make available. In August 2019, the recommended decision in the disciplinary trial of Daniel Pantaleo was leaked to the media, adding to the information that had already been leaked regarding his record in 2017.[27] In determining the appropriate penalty recommendation, the judge's opinion considered facts and holdings from a number of NYPD trials that exist as internal precedents within the NYPD's trial room.[28] In essence, there is an entire universe of NYPD case-law to which adjudicators turn for guidance but that the public is denied any opportunity with which to engage. Whether the Police Commissioner relies on similar factors in accepting or rejecting these recommendations is

---

[25] Civilian Complaint Review Board, *2018 Annual Report*, 40, https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018CCRB_AnnualReport.pdf.

[26] *Id.* at 35.

[27] Ashley Southall, "Officer in 'I Can't Breathe' Chokehold Was 'Untruthful,' Judge Says," N.Y. Times, Aug. 18, 2019, https://www.nytimes.com/2019/08/18/nyregion/daniel-pantaleo-eric-garner-chokehold.html.

[28] *Id.*



something that the public must be able to know if the public is to be expected to trust in the fairness of the final decisions.

It should not be this difficult to have informed conversations about police misconduct in New York State. Whistleblowers should not have to risk their jobs to leak information about police misconduct to the press, and New Yorkers should not be forced to rely on journalists reporting on these leaks to get answers to basic questions about accountability. All the while, victims of police misconduct are left guessing as to whether their abuser will face any consequence, and families whose loved ones are killed by police are left without closure, facing the prospect of never knowing whether the officer or officers responsible will be fired or simply forced to give up a few vacation days because 50-a mandates that the outcome remain secret.

Police officers are public officials entrusted with a great deal of power, including the ability to use force and deprive people of their liberty. New Yorkers deserve to know whether they are wielding that power responsibly. As NYPD Commissioner James O'Neill, himself, has stated in calling for changes to 50-a, "nothing builds trust like transparency and accountability."[29]

### IV. Existing Protections for Officer Privacy and Safety

Briefly, it is worth addressing the main arguments raised against repealing Section 50-a. Defenders of 50-a claim that the law is necessary to protect the privacy and safety of officers. These are obviously legitimate interests, but 50-a is wholly unnecessary to their vindication. S.3695 will repeal the special layer of secrecy applied to the personnel records of police officers, correction officers, and firefighters, but it will not remove the many adequate protections that exist elsewhere in New York law.

FOIL already allows agencies to withhold records or portions of records where disclosure would constitute "unwarranted invasion of personal privacy"[30] or where disclosure "could endanger the life or safety of any person."[31] These are the same standards that apply to the disclosure of every other public employee's records, allowing public access to disciplinary records while shielding more sensitive information from public view.

Indeed, the categories of information about which 50-a's supporters repeatedly express the greatest concern are already encompassed within

---

[29] James O'Neill, "Let NYC See Police Records, Now: We Must Reform State Law Keeping Disciplinary Actions Secret," N.Y. Daily News, Feb. 7, 2019, https://www.nydailynews.com/opinion/ny-oped-let-nyc-see-police-records-now-20190207-story.html.
[30] N.Y. Pub. Off. Law § 87(b).
[31] N.Y. Pub. Off. Law § 87(f).

8

FOIL's privacy and safety provisions: home addresses,[32] medical records,[33] and social security numbers.[34] An independent panel which reviewed the NYPD's disciplinary system reached the same conclusion that "other provisions of existing New York law would provide sufficient protection to officers' privacy and security interests," and reasoning that "a regime without § 50-a's blanket exemption for police personnel records would still afford officers meaningful protection."[35]

Without the wide sweep of 50-a, the difference will be that agencies will be required to justify withholding or redacting records based on these specific exemptions rather than continue to withhold all records as a matter of course. Departments can continue to respond to legitimate threats to privacy and safety, but not at the cost of denying the public the ability to engage in informed discussion and debate on accountability. Again, as the independent panel pointed out, "It bears emphasis that in the 40 years that the Department regularly posted Personnel Orders for inspection, there was no evidence that any officer was harassed as a result of posting ... If New York is to strike the proper balance between privacy and transparency, concern for officer safety must be respected, but not exaggerated."[36]

## V. Conclusion

We thank the Committee for the opportunity to provide testimony today and for its consideration of this critically important piece of legislation. The NYCLU looks forward to working with the Legislature to fully repeal Section 50-a and to end police secrecy in New York State.

**NYCLU**
ACLU of New York

---

[32] *See, e.g., Pasik v. State Bd. of Law Examiners*, 114 Misc. 2d 397, 407, 451 N.Y.S.2d 570, 577 (Sup. Ct. 1982), *modified*, 102 A.D.2d 395, 478 N.Y.S.2d 270 (1984).
[33] *See, e.g., Hanig v. State Dep't of Motor Vehicles*, 79 N.Y.2d 106, 588 N.E.2d 750 (1992).
[34] *See, e.g., Seelig v. Sielaff*, 201 A.D.2d 298, 299, 607 N.Y.S.2d 300 (1994).
[35] *The Report of the Independent Panel on the Disciplinary System of the New York City Police Department* at 45 (Jan. 2019), https://www.independentpanelreportnypd.net/assets/report.pdf.
[36] *Id.* at 45-46.

9