EXHIBIT C

# The Report of the Independent Panel on the Disciplinary System of the New York City Police Department

**The Honorable Mary Jo White, Panel Chair, Debevoise & Plimpton LLP**

**The Honorable Robert L. Capers, Arent Fox LLP**

**The Honorable Barbara S. Jones, Bracewell LLP**

**January 25, 2019**

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................1

I.     INTRODUCTION ..............................................................................................1

       A.    Overview ..................................................................................................1

       B.    Scope of the Panel's Review and Work ...................................................2

II.    THE NEW YORK CITY POLICE DEPARTMENT:  ITS MEMBERS,
       LEADERS, AND REPRESENTATIVES .........................................................3

III.   EXECUTIVE SUMMARY ................................................................................4

       A.    Lack of Transparency into the Disciplinary Process ...............................5

       B.    The Police Commissioner's Plenary Authority Over Individual Cases ...............5

       C.    Allegations of Favoritism, Bias, and Inconsistent Penalties .................6

       D.    Unnecessary and Excessive Delay in the Disciplinary Process .............6

       E.    Other Observations ..................................................................................7

IV.    OVERVIEW OF THE NYPD'S DISCIPLINARY PROCESS ..........................7

       A.    Overview ..................................................................................................7

       B.    Complaint Intake .....................................................................................8

       C.    Investigation ............................................................................................9

       D.    Prosecution and Disciplinary Recommendation ...................................10

       E.    Adjudication ...........................................................................................13

       F.    First Deputy Commissioner and Police Commissioner Review ...........13

       G.    Internal and External Oversight and Monitoring Bodies ......................14

KEY FINDINGS ............................................................................................................17

I.     THERE IS A FUNDAMENTAL AND PERVASIVE LACK OF
       TRANSPARENCY INTO THE DISCIPLINARY PROCESS AND ABOUT
       DISCIPLINARY OUTCOMES ......................................................................17

       A.    Civil Rights Law § 50–a Establishes a Legislative Exception to Public
             Access Under the New York State Freedom of Information Law ..........17

       B.    Many States Provide Greater Access to Police Disciplinary Files Than
             Does New York ......................................................................................18

       C.    The NYPD Interprets § 50–a Aggressively and the Courts Have Upheld
             This Approach ........................................................................................19

       D.    Lack of Disclosure and Limited Visibility Into the Disciplinary Process
             are Detrimental to Public Confidence and Oversight ...........................20

II.   THE POLICE COMMISSIONER HAS AND EXERCISES COMPLETE
      DISCRETION OVER DISCIPLINARY OUTCOMES ...........................................21

      A.   The Commissioner's Review and Evaluation of Disciplinary Decisions............21

      B.   The Police Commissioner's Case Review Procedures .......................................21

      C.   In Certain Cases, the Police Commissioner Must Detail the Reasons for
           Imposing Penalties Inconsistent with the Recommendations He Receives.........23

      D.   The Police Commissioner Frequently Departs from the Disposition and
           Penalty Recommendations He Receives.............................................................24

      E.   The Police Commissioner's Change of Penalty Letters Do Not Provide
           Meaningful Explanations for Departing from the Recommended
           Outcome ...........................................................................................................27

      F.   The Absence of Information in Change of Penalty Letters Has the
           Potential to Adversely Impact the Disciplinary Process.....................................27

III.  ALTHOUGH THE PANEL DID NOT IDENTIFY PERVASIVE
      FAVORITISM, THE PANEL IDENTIFIED A FEW CASES WHERE
      FAVORITISM MAY HAVE INFLUENCED THE DISCIPLINARY
      PROCESS OR OUTCOME ...............................................................................29

      A.   Preliminary Analysis of Disciplinary Case Data Involving Higher-
           Ranking NYPD Personnel Did Not Show Pervasive Favoritism.......................29

      B.   Disciplinary Decision Makers are Potentially Susceptible to Inappropriate
           Influences .........................................................................................................31

      C.   Operations Within the Department Advocate's Office Raise Particular
           Concerns About Outside Influences on the Disciplinary Process.......................31

IV.   CERTAIN PHASES OF THE DISCIPLINARY PROCESS INVOLVE
      UNNECESSARY AND EXCESSIVE DELAY .......................................................32

      A.   The NYPD Disciplinary Process is Lengthy......................................................32

      B.   Certain Factors and Phases in the Disciplinary Process Cause
           Unnecessary Delay in Disciplinary Case Adjudication......................................36

V.    OTHER OBSERVATIONS ................................................................................38

      A.   The Department's Handling of False Statement Cases .......................................38

      B.   The Department's Handling of Domestic Violence Cases ..................................41

      C.   The Department Lacks an Integrated Case Management System........................43

RECOMMENDATIONS ...........................................................................................44

I.    THE DEPARTMENT SHOULD SUPPORT AMENDMENTS TO § 50–a TO
      INCREASE TRANSPARENCY AND ENHANCE ACCOUNTABILITY ..............44

      A.   Section 50–a is an Unnecessary Barrier to Transparency and
           Accountability and Should be Amended to Allow Public Access to
           Information on Final, Substantiated Disciplinary Matters..................................44

II.    THE NYPD MUST GUARD AGAINST UNWARRANTED EXPANSION OF THE SCOPE OF § 50–a..................................................................46

III.   THE NYPD SHOULD ALSO ENHANCE ITS PUBLIC REPORTING IN LINE WITH THAT OF OTHER AGENCIES..........................................46

IV.   THE NYPD SHOULD PUBLISH TRIAL ROOM CALENDARS ..........................47

V.    THE DEPARTMENT SHOULD APPOINT A CITIZENS' LIAISON....................48

VI.   THE POLICE COMMISSIONER SHOULD ENHANCE THE DOCUMENTATION OF VARIANCES FROM DISCIPLINARY RECOMMENDATIONS ....................................................................................48

VII.  THE NYPD SHOULD ADOPT PROTOCOLS TO INSULATE DECISION MAKERS FROM EXTERNAL PRESSURES AND MINIMIZE THE APPEARANCE OF INAPPROPRIATE INFLUENCE OVER THE DISCIPLINARY PROCESS ................................................................................50

     A.   The Department Should Design and Implement Training and Policies Addressing and Memorializing Informal Communications Concerning Disciplinary Cases ..............................................................50

     B.   The Department Should Consider Adopting a Recusal Policy in Certain Disciplinary Cases .........................................................................50

VIII. THE DEPARTMENT SHOULD STUDY AND CONSIDER ADOPTING A DISCIPLINARY MATRIX ...........................................................................51

IX.   THE DEPARTMENT SHOULD TAKE MEASURES TO EXPEDITE DISCIPLINARY ADJUDICATIONS .........................................................................52

     A.   DAO Should Hire Additional Attorneys and Fill Vacancies on the Executive Staff ...............................................................................52

     B.   The Department Should Implement a "Fast Track" Review for Certain Disciplinary Cases .........................................................................52

     C.   DAO Should Limit Reconsideration Requests ...................................53

X.    THE DEPARTMENT SHOULD STRENGTHEN ENFORCEMENT OF FALSE STATEMENT DISCIPLINARY POLICIES ................................................53

XI.   THE DEPARTMENT SHOULD ADOPT PRESUMPTIVE PENALTIES IN DOMESTIC VIOLENCE CASES AS RECOMMENDED BY CCPC ....................55

XII.  THE DEPARTMENT SHOULD UPGRADE AND INTEGRATE ITS CASE MANAGEMENT SYSTEM ....................................................................................55

XIII. THE DEPARTMENT SHOULD RETAIN EXTERNAL EXPERTS TO CONDUCT PERIODIC AUDITS OF THE DISCIPLINARY SYSTEM.................56

CONCLUSION.................................................................................................................56

# BACKGROUND

## I.   INTRODUCTION

### A.   Overview

On June 21, 2018, Police Commissioner James P. O'Neill appointed an Independent Panel to conduct a review of the internal disciplinary system of the New York City Police Department ("NYPD" or the "Department") and to propose recommendations to improve it. The Panel consists of the Honorable Mary Jo White, its chair; the Honorable Robert L. Capers; and the Honorable Barbara S. Jones.[1] The Panel was given 120 days to complete its work; at the Panel's request, the completion deadline was extended to the week of January 21, 2019.

To carry out its mandate, the Panel surveyed Department policies and procedures governing how internal discipline cases are initiated, prosecuted, and resolved. It also examined the work of the entities that are centrally involved in the disciplinary process, including the Department Advocate's Office ("DAO"), which is situated within the NYPD, and the Civilian Complaint Review Board ("CCRB"), an independent, external agency, as well as the decision making of the Police Commissioner in disciplinary cases. This Report summarizes the Panel's work, findings, and recommendations.

The Panel has conducted its review independently. It did not establish an attorney-client relationship with the Department. Neither the Commissioner nor anyone else at the Department directed the Panel's investigation or determined its focus. The Panel provided this Report to the Commissioner on January 25, 2019, with notice that it would be released to the public on or about February 1, 2019. Neither the Commissioner nor anyone else at the Department was afforded an opportunity to edit or revise the Report prior to its release. No third party received an advance copy of the Report or was shown or read any portion of it. The Panel was not compensated.

During the course of its review, the Panel received the Department's full cooperation and was given full access to all requested documents and information. The Department made available all individuals whom the Panel sought to interview. On several occasions, the Department also responded to written questions, providing complete answers that often required input from multiple personnel and offices within the Department.[2]

---

[1] Mary Jo White is the Senior Chair of Debevoise & Plimpton LLP; she formerly served as Chair of the Securities and Exchange Commission and as the United States Attorney for the Southern District of New York. Robert L. Capers is co-leader of Arent Fox LLP's Government Enforcement and White Collar practice; he is the former United States Attorney for the Eastern District of New York. Barbara Jones is a partner at Bracewell LLP; she served as a federal judge on the U.S. District Court for the Southern District of New York for 16 years and before that as Chief Assistant to the District Attorney of New York County. Panel members were supported by other lawyers and staff from their respective firms.

[2] The Panel is especially grateful to Ann Prunty, Assistant Deputy Commissioner, Legal Matters, for her assistance in responding to requests.

B.      Scope of the Panel's Review and Work

1.      Information Gathering from Internal and External Stakeholders

To fulfill its mandate, the Panel consulted with an array of stakeholders, some of whom operate within, or work closely with, the Department, and others who are outside the Department, but have a strong interest in the functioning of its disciplinary system.  Each of those stakeholders provided valuable information to the Panel.

Within the Department, the Panel met with members from the Department's Legal Bureau, Internal Affairs Bureau ("IAB"), DAO, Risk Management Bureau ("RMB"), the Deputy Chief of Information Technology, the Office of the Deputy Commissioner of Trials ("DCT"), and the Offices of the First Deputy Commissioner and of the Police Commissioner, including with the First Deputy Commissioner and the Police Commissioner themselves.  The Panel observed trial proceedings and the Commissioner's bi-weekly review of disciplinary cases.

Not surprisingly, the Panel learned a great deal by meeting with external stakeholders, including individuals from the Office of the Inspector General of the NYPD ("OIG-NYPD"), the New York City Law Department, CCRB, the Commission to Combat Police Corruption ("CCPC"), District Attorneys for New York, Queens, Kings, and Richmond Counties, as well as Peter L. Zimroth, the federal monitor appointed as a result of stop-and-frisk litigation against the NYPD, and his team.  It had very useful meetings with elected officials and experts in the field. It also gained valuable insights from former NYPD police commissioners and officers and from representatives of the NYPD officers' unions, the Legal Aid Society, the New York Civil Liberties Union, the Center for Constitutional Rights, Communities United for Police Reform, other state and city officials, and the media.

2.      Review and Analysis of the Legal Framework

The Panel examined statutes, rules, and court decisions that, together, govern or set limits on the Department's disciplinary process.  This review included analysis of the protections and restrictions imposed by Civil Rights Law § 50–a, which was the subject of an important New York Court of Appeals decision issued shortly before the release of this Report.[3]  The Panel also examined provisions of the New York City Charter that govern the Commissioner's authority over the disciplinary process, and reviewed relevant agreements establishing the jurisdiction of CCRB and DAO in disciplinary cases.

3.      Review and Analysis of Materials, Reports, and Statistical Information
         Provided by NYPD and Other Stakeholders

The Panel examined disciplinary case files, organizational charts, variance memoranda and letters, data concerning disciplinary outcomes, reports detailing IAB investigations, DAO charging and other memoranda, bulletins to officers, staff rosters, and written procedures.  It also reviewed information that agencies and organizations outside of the Department prepared.  Of

---

[3] The Panel notes that these § 50–a restrictions govern not only the extent to which the Department may release information on disciplinary outcomes, but also the discussion of relevant cases and other information in this Report where the Panel was given access to and received information subject to the disclosure restrictions of § 50–a.

particular help were reports generated by the CCPC, CCRB, the federal monitor, and the Legal Aid Society. The Panel also reviewed relevant materials from other jurisdictions, including penalty matrices and disciplinary procedures used by other big-city police departments, and interviewed individuals with direct knowledge of other police departments.

4.      Limitations on the Panel's Review

The duration of the Panel's work was seven months, which necessarily limited what could be accomplished, and the Report notes several areas that deserve more scrutiny. Because of time constraints, the Panel selected a number of specific areas to focus on in its review.

The Panel members are attorneys and former law enforcement officers; they are not accountants, statistical analysts, or management consultants. The Panel structured its review, therefore, primarily around legal issues and public safety goals. Although the Report discusses issues such as technology and executive structure, the Panel is cognizant of its limitations in such areas. The Panel chose not to retain outside experts to assist its work, but recommends that the Commissioner enlist outside experts in certain areas as the NYPD continues its own efforts to improve the Department's disciplinary system.

## II.     THE NEW YORK CITY POLICE DEPARTMENT: ITS MEMBERS, LEADERS, AND REPRESENTATIVES

The New York City Police Department is the largest city police department in the country. The Department employs some 36,000 uniformed officers and 19,000 civilians and is responsible for policing the approximately 8.5 million residents of the five boroughs.[4]

The NYPD is divided into bureaus, each of which serves a separate function. The largest bureau is the Patrol Services Bureau, which oversees the majority of the Department's uniformed officers and is headed by the Chief of Patrol. It is divided into eight borough commands and further divided into 77 police precincts.

The NYPD's four investigative bureaus—the Detective Bureau, the Intelligence Bureau, the Counterterrorism Bureau, and the Internal Affairs Bureau—are charged with investigating crimes and terrorist activity, as well as monitoring and investigating police corruption and misconduct. The Department's administrative section consists of several different bureaus that provide support to NYPD officers. The Transit, Housing, and Transportation Bureaus police the City's subway system, public housing developments, and roadways, respectively.

Appointed by the Mayor, the Police Commissioner serves as the head of the NYPD. By law, the Commissioner must be a civilian.[5] Most commissioners have served in the Department prior to assuming their leadership role.

Other key leadership positions are the First Deputy Commissioner (now Benjamin B. Tucker), the Chief of Department (now Terence Monahan), and the Bureau Chiefs. Each of

---

[4] NYPD, *About NYPD*, https://www1.nyc.gov/site/nypd/about/about-nypd/about-nypd-landing.page.

[5] *See* New York City Administrative Code § 14-102.

these individuals reports to the Commissioner.  Fifteen Deputy Commissioners serve under the Commissioner and the First Deputy Commissioner, including the Deputy Commissioner for Legal Matters, the Deputy Commissioner of Trials, the Deputy Commissioner of Internal Affairs, and the Department Advocate.[6]  The position of Deputy Commissioner for Legal Matters, which has a critical role in Departmental disciplinary matters, has been vacant since July 30, 2018, when Lawrence Byrne retired.

As members of the Department, police officers are subject to extensive internal rules and regulations that govern their conduct.  The NYPD's Patrol Guide, for example and primarily, sets out the many rules that officers must follow in executing their official duties.  Officers who fail to abide by these rules may be subject to the Department's disciplinary process.

A number of unions represent the interests of officers.  The Police Benevolent Association is the largest of these unions, representing approximately 24,000 police officers.[7]  The Lieutenants Benevolent Association represents approximately 5,250 active and retired members who hold (or held) that rank.[8]  The Captains Endowment Association represents 2,100 members who hold (or held) the rank of Captain, Inspector, Deputy Inspector, Deputy Chief, and Surgeon.[9]  The Detectives' Endowment Association represents approximately 18,800 members who hold (or held) that rank, and the Sergeants Benevolent Association represents approximately 12,000 members who hold (or held) that rank.  These unions negotiate with the City and enter into agreements that govern compensation, benefits, dispute resolution, and other personnel issues.[10]

## III.   EXECUTIVE SUMMARY

This executive summary provides a brief overview of the Panel's key findings and recommendations.

The Panel centered its work on four core subjects:  (1) the lack of transparency into the disciplinary process and its outcomes; (2) the Commissioner's virtually unlimited discretion over disciplinary cases; (3) allegations of favoritism, bias, and inconsistent penalties; and (4) delay in

---

[6] *Id.*

[7] NYC PBA, *Who We Are*, http://nycpba.org/about-the-pba/who-we-are/ (last visited Jan. 8, 2019).  On January 14, 2019, the PBA announced that it had changed its name from the Patrolmen's Benevolent Association to the Police Benevolent Association.  *See PBA Comes a Long Way, Finally Takes 'Men' Out of Name*, The Chief (Jan. 14, 2019), http://thechiefleader.com/news/news_of_the_week/pba-comes-a-long-way-finally-takes-men-out-of/article_349ee152-15b2-11e9-9cc2-77243b7905ee.html.

[8] NYC LBA, https://nypd-lba.org/ (last visited Jan. 8, 2019); Borelli for New York, *NYC Lieutenants Benevolent Association Endorses Joe Borelli for City Council* (Aug. 25, 2017), http://josephborelli.com/nyc-lieutenants-benevolent-association-endorses-joe-borelli-for-city-council/.

[9] NYC Captains Endowment Association, https://nypdcea.org/ (last visited Jan. 8, 2019); Tom DePrisco for State Senate, *DePrisco Receives New York City Police Department Captains Endowment Association Endorsement* (Oct. 24, 2016), https://www.tomdeprisco.com/news/deprisco-receives-new-york-city-police-department-captains-endowment-association-endorsement.

[10] *See, e.g.*, Captains' Endowment Association 2012-2019 Agreement, (Aug. 6, 2018), *available at* https://www1.nyc.gov/assets/olr/downloads/pdf/collectivebargaining/2012-2019policecaptains-executedcontract4-1-2012-4-30-2019.pdf.

the resolution of cases.  Concerns in these core areas were brought to the Panel's attention by numerous stakeholders.

### A.    Lack of Transparency into the Disciplinary Process

Lack of transparency was one of the most frequent complaints that the Panel heard about the Department's disciplinary process.  Although certain oversight entities issue regular reports, the Department itself releases minimal data to the public on disciplinary outcomes or decision making.  The absence of such information has engendered mistrust in the community, which questions whether the Department is sufficiently policing its own.

To its credit, the Department recognizes the need to move toward greater transparency, and would like to do so.  Civil Rights Law § 50–a, however, which prohibits the Department from releasing police "personnel records" to the public, poses significant obstacles to achieving that goal.  The Panel recommends that the Department strongly support legislative efforts to amend Civil Rights Law § 50–a.  The current law keeps the public in the dark about police discipline, breeds mistrust, and reduces accountability.  Public confidence is vital to the Department's mission, and a shrouded disciplinary process undermines that confidence.

The Department should also guard against efforts to expand § 50–a beyond its required scope.  The definition of "personnel record" should be carefully and correctly interpreted so that investigative information, such as body-worn camera footage, is excluded from § 50–a's restrictions.  Finally, the Panel recommends that the Department reconsider whether it can, under existing law, begin publishing trial room calendars in order to provide the public and interested constituencies more meaningful access to disciplinary trials.

### B.    The Police Commissioner's Plenary Authority Over Individual Cases

By law, the Police Commissioner has complete authority over all disciplinary determinations for members of the service.  He reviews all disciplinary findings and penalty recommendations, and determines what, if any, discipline is warranted.  While the Commissioner considers the recommendations he receives from the various internal and external entities and offices involved in the disciplinary process, he has complete discretion to overturn a finding of guilt or modify any recommended penalties.[11]  If the Commissioner departs from a recommendation, he must, in certain but not all cases, state the bases for that departure in a written memorandum.  The Department has no written guidelines that inform the Commissioner's discretion in making or explaining his decisions.  Currently, neither the Commissioner's decisions nor his explanations are made public.

The Panel found no evidence that the Commissioner, who takes his disciplinary role very seriously, has abused his power.  The Panel nevertheless cannot evaluate whether appropriate or consistent discipline was imposed generally or in particular cases.  One relatively modest, but important recommendation the Panel offers to promote greater transparency and accountability is

---

[11] A police officer may challenge the Police Commissioner's disciplinary decisions by instituting an Article 78 proceeding.  *Montella v. Bratton*, 93 N.Y.2d 424, 430 (1999).  In such a proceeding, the penalty imposed by the Commissioner may be reversed only if it is "so disproportionate to the offense as to be shocking to one's sense of fairness."  *Trotta v. Ward*, 77 N.Y.2d 827, 828 (1991).

that the Commissioner issue written decisions in all cases in which he departs from a recommended outcome and that his decisions clearly and meaningfully state the reasons for his departure from the recommended discipline, including relevant precedent.

C.      Allegations of Favoritism, Bias, and Inconsistent Penalties

Allegations of systemic favoritism, bias, or significant inconsistencies in any adjudicatory system strike at the core of its legitimacy.  In light of the frequently voiced allegations of favoritism in the NYPD's disciplinary process by the media and echoed by various stakeholders, the Panel, among other steps, undertook a preliminary review of whether disciplinary outcomes reflect "white-shirt immunity"—punishing high-ranking officers (*e.g.*, lieutenants, captains, deputy inspectors, inspectors, and chiefs) more leniently than lower ranking members (*e.g.*, officers, detectives, and sergeants) for the same misconduct.  The Panel also investigated whether decision makers at various levels of the disciplinary process may be subject to inappropriate influence from inside and outside the Department.

The Panel found no direct evidence that high-ranking officers generally received more lenient discipline than other members.

The Panel's investigation into possible inappropriate influence revealed that certain decision makers may be susceptible to pressures, which could adversely affect the integrity of the disciplinary process.  In this regard, the Panel found that the Department Advocate is particularly vulnerable to internal and external influences.  To ensure the integrity of the disciplinary process, the Panel recommends that the Department establish protocols to insulate decision makers from inappropriate influences.  The Department should also adopt written guidelines requiring documentation of informal input about ongoing disciplinary cases from internal and external sources and a recusal policy prohibiting the involvement in disciplinary cases of anyone with a personal or familial connection to the officer whose conduct is at issue.

D.      Unnecessary and Excessive Delay in the Disciplinary Process

Many stakeholders have complained that disciplinary cases are resolved too slowly. Representatives from police unions emphasized that protracted disciplinary proceedings leave officers in a state of limbo, uncertain about their futures, and ineligible for promotion or transfer. Representatives from citizen advocate groups observed that delay engenders a belief that wrongdoers can continue to work and collect benefits when they should no longer be on the job.

The Department has recently made significant progress in more timely resolution of disciplinary cases.  There is, however, room for more improvement and a number of apparent ways to achieve it.  DAO is significantly understaffed; only 10 line attorneys handle full caseloads, some of whom are responsible for over 100 disciplinary cases.  Several supervisory positions within DAO have also been vacant or underutilized for some time, contributing to delayed resolutions.  Currently, decision making within DAO is also highly centralized in a manner that creates bottlenecks and slows the resolution of cases.  For example, nearly all settlements in DAO cases must be approved by the Department Advocate himself, even though there is no legal or institutional barrier to delegating such decisions to deputies, as has been done previously.  In light of these findings, the Panel recommends that DAO consider hiring at least

6

10 additional attorneys, filling other executive staff and supervisory positions, and implementing greater delegation of DAO decision making.

The Panel has identified other sources of delay that the Department should work to reduce or eliminate. For example, over 60% of the Department's disciplinary cases are settled without the necessity of a protracted trial proceeding, yet those settlements are fully reviewed by the First Deputy Commissioner and the Commissioner himself. The Panel recommends that the Department implement, at least on a pilot basis, a "fast track" review for settlements involving less serious offenses. Those cases could proceed to final resolution without review by the First Deputy Commissioner and the Commissioner. In cases prosecuted by DAO, the Panel further recommends that such settlements be approved by the Assistant Deputy Commissioner of DAO, a position that is currently vacant and that the Panel recommends be promptly filled. In addition, to address a significant source of delay resulting from the Department's reconsideration program in CCRB cases, the Panel recommends that DAO limit the number of cases that it asks CCRB to reconsider to those where new facts come to light or where it is apparent that issues of law were overlooked or incorrectly applied.

### E.     Other Observations

While the bulk of its work focused on the four areas discussed above, the Panel also identified issues concerning the Department's handling of false statement cases, domestic violence cases, as well as shortcomings in the Department's disciplinary case management systems that have the potential to negatively impact the disciplinary system. The Panel has significant concerns about the Department's disciplinary practices in false statement and domestic violence cases and recommends that the Department promptly adopt certain of the CCPC's longstanding recommendations related to those cases. These particular categories of discipline are critical to the integrity of the Department and to ensuring the fitness of officers to serve.

To better monitor disciplinary outcomes and related trends, the Panel recommends that the Department upgrade and integrate its disciplinary record-keeping and case management systems. The Department should also retain an external expert to periodically audit the disciplinary system to ensure that it is producing fair, unbiased, and consistent outcomes. In addition—and to further enhance consistency, transparency, and accountability—the Panel recommends that the NYPD evaluate disciplinary data and audits to determine whether that information can be leveraged to design and implement a disciplinary matrix to guide the Commissioner's exercise of his broad discretion over NYPD discipline.

## IV.     OVERVIEW OF THE NYPD'S DISCIPLINARY PROCESS

The Panel was struck from the outset, and throughout its work, by the lack of transparency and plain-English explanations of the NYPD's disciplinary system and process. We thus begin with an overview of the NYPD's disciplinary process in an effort to demystify it.

### A.     Overview

A complaint against a member of the service can be brought by a civilian complainant or fellow officer; the Department itself can also initiate a review of an officer's conduct based on its

7

internal monitoring.  While civilian complaints are voluntary, the Patrol Guide requires members of the service to report certain types of misconduct, including corruption, unnecessary use of force, abuse of authority, misuse of a firearm, false statements, and failure to properly perform patrol or other assignments.[12]  Failure to report such offenses is itself a disciplinary violation, although enforcement of the obligation appears lax.

Minor offenses and infractions are commonly addressed at the precinct level through Command Discipline.  The Patrol Guide, which governs the conduct of all NYPD officers, defines Command Discipline as a "[n]on-judicial punishment available to a commanding/executive officer to correct deficiencies and maintain discipline within the command."[13]  The offenses subject to Command Discipline are enumerated in Schedules A and B of the Patrol Guide, and include loss of Department property, loss of a shield, failure to keep proper records, and reporting to duty with improper uniform or equipment.[14]  Command Discipline is intended to address such misconduct without the need for a burdensome investigative and disciplinary process.[15]  Unlike other disciplinary penalties, Command Discipline does not require review and approval by the Commissioner.  Commanding officers are empowered to investigate offenses and penalize officers, and their determinations are final.[16]  Penalties for Schedule A and B violations range from a warning to the loss of 10 vacation days, depending on the severity of the offense.[17]

More serious offenses or misconduct are addressed through a formal disciplinary process.  That process typically proceeds in five phases:  (1) complaint intake; (2) investigation; (3) prosecution and penalty recommendation; (4) adjudication; and (5) First Deputy Commissioner and Police Commissioner review.  Penalties for more serious offenses include suspension without pay, loss of vacation days (up to 30 per offense charged), and termination from the Department.  In cases where criminal conduct is alleged, the NYPD also refers the complaint to the appropriate prosecutor.

B.      Complaint Intake

A complaint against an NYPD officer is typically lodged through either IAB or CCRB.  IAB receives the majority of complaints.  A complaint can be made in person at IAB's 24-hour command center, by phone, through an anonymous tip line, or in writing by letter or email.  3-1-1 or 9-1-1 calls involving a complaint about an officer are also referred to IAB, as are complaints received at local precincts.  In 2018, IAB logged more than 51,000 complaints, a 1.17% decrease from 2017.

---

[12] Patrol Guide § 207-21.

[13] Patrol Guide § 206-02.

[14] Patrol Guide § 206-03.

[15] *See* Patrol Guide, § 206-02.

[16] *See* Patrol Guide, § 206-02.  In a small number of cases involving more serious misconduct, where DAO has determined that Command Discipline is "non-discretionary," the commanding officer must first consult with DAO before departing from the recommended penalty.  After such consultation, the commanding officer retains the ultimate discretion over the appropriate penalty to impose, if any.

[17] Patrol Guide § 206-04.

8

CCRB is responsible for investigating complaints made by members of the public against officers involving allegations of use of force, abuse of authority, discourtesy, and offensive language (known as "FADO"). Like IAB, CCRB maintains a 24-hour hotline and accepts written complaints directly and through police precincts. CCRB confirms receipt of a complaint within seven days. In 2018, CCRB received 4,736 complaints, a 5% increase from 2017.

In addition to IAB and CCRB, the OIG-NYPD receives complaints about officers, which it usually refers to IAB or CCRB. The public also may lodge complaints in person at any precinct.

### C.      Investigation

A complaint received by IAB is initially referred to one of four places: (1) the Chief of Department, who may refer it to a local command; (2) IAB itself; (3) the NYPD's Force Investigation Division ("FID"); or (4) CCRB.

#### 1.      IAB

IAB investigates the majority of complaints alleging serious misconduct brought against officers. It employs a staff of approximately 350 sergeants and detectives, who review complaints, interview witnesses, gather evidence, and assess the allegations. At the conclusion of its investigation, IAB designates an allegation as substantiated, partially substantiated, unsubstantiated, or unfounded. An allegation is designated "unfounded" if IAB determines that it did not occur and "unsubstantiated" if the burden of proof is not met based on the evidence obtained.[18] To substantiate a complaint, IAB must find by a preponderance of the evidence that the conduct described in the complaint occurred. IAB can also exonerate an officer if it finds that the conduct occurred, but was proper.

#### 2.      Force Investigation Division

Operating under the supervision of the First Deputy Commissioner, FID focuses on police shootings and civilian deaths in custody. It was formed in July 2015, following the death of Eric Garner, in an effort to expedite investigations of the most serious use-of-force cases.[19] FID is obligated to launch an investigation immediately upon the occurrence of a triggering event and to circulate a preliminary report to senior executives within 48 to 72 hours of the incident, followed by a preliminary presentation to the Commissioner and the First Deputy within two weeks.[20] The First Deputy continues to receive monthly updates on all pending FID cases. In 2017, FID handled 74 cases; in 2018, FID handled 63 cases (as of December 24, 2018).

---

[18] A fifth category, "for information and intelligence only," commonly called "I & I," is used for complaints that are so clearly not credible that no investigation is required, or are duplicates of complaints.

[19] NYPD, *Use of Force Report* 9-10 (2017), https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2017.pdf.

[20] The Patrol Guide sets forth slightly different timelines for these steps. The NYPD has informed the Panel that those Patrol Guide provisions are earmarked for revision to conform with current practice.

### 3.        Civilian Complaint Review Board

As noted above, CCRB investigates civilian complaints involving force, abuse of authority, discourtesy, or offensive language.[21]  CCRB investigators review incoming complaints and make appropriate penalty recommendations if the allegations are substantiated.  In the course of conducting its investigations, CCRB can request records and other materials from the Department; it may also subpoena records if the Department fails to comply with a request.[22]

CCRB, like IAB, uses a preponderance of the evidence standard to evaluate allegations.[23]  CCRB may:  (1) determine that an allegation is substantiated, unsubstantiated, or unfounded; (2) refer the complaint to another investigative agency if it determines that the allegation is not within its jurisdiction;[24] (3) find that a case cannot be pursued because a witness is unavailable, unidentifiable, or uncooperative; or (4) indicate that the complaint has been resolved through an alternative means, such as mediation.[25]

### 4.        Criminal Conduct

If a complaint alleges criminal conduct, it may be referred to the District Attorney's Office or the United States Attorney's Office for investigation.  In most cases, the Department will await the conclusion of any such investigation before continuing its own disciplinary processes.  Such a referral can therefore cause extended delay in resolving Departmental discipline.

### D.        Prosecution and Disciplinary Recommendation

After the investigation is complete, the reviewing entity makes a recommendation for how to address any substantiated allegations of misconduct.  In some cases, it is recommended that an officer be subject to Command Discipline, or that the officer receive additional training.  For more serious cases, it is recommended that the officer be served with "Charges and Specifications" and proceed to trial.  The two bodies primarily responsible for prosecuting Charges and Specifications are DAO, which has responsibility for cases investigated by IAB,

---

[21] Although CCRB's FADO jurisdiction covers civilian complaints that involve the use of excessive force, all Level 3 force cases—cases that involve the use of physical force that is "readily capable of causing death or serious physical injury," including firearm discharges—are investigated by either IAB or FID.  Within that category, FID investigates all firearms discharges, fatalities related to police action, and cases when a subject of police action is seriously injured and death is likely; IAB investigates all other Level 3 incidents (*e.g.* where injuries are not life-threatening).  NYPD, *Use of Force Report* 2 (2017), https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2017.pdf.

[22] N.Y. C.P.L.R. 2301 *et seq.*; Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) § 1-23 (2018).

[23] Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) § 1-33 (2018).

[24] *Id*. at §§ 1-14, 1-33.

[25] *Id*. at § 1-33.  As an alternative to a formal investigation, mediation allows a CCRB complainant to speak with a respondent officer in person.  The process does not lead to discipline for the officer, but can resolve the complaint.

and the CCRB's Administrative Prosecution Unit ("APU"), which has responsibility for cases investigated by CCRB.[26]

           1.      Department Advocate's Office

DAO is composed of 21 civilian attorneys who are supported by approximately 40 uniformed and civilian personnel.  DAO reviews substantiated allegations, makes disciplinary recommendations, and prosecutes cases as necessary.  DAO can determine that Command Discipline or supplemental training is the appropriate remedy for a substantiated allegation.  In such cases, it will draft a letter describing the misconduct and the recommended remedy and will then refer the case back to the IAB investigator, who is responsible for ensuring that the Command Discipline penalty is imposed.  If DAO recommends "discretionary" or "open" Command Discipline, commanding officers may, in their discretion, accept or depart from DAO's penalty recommendations.  If DAO recommends "non-discretionary" Command Discipline, commanding officers may depart from DAO's recommendations only after consultation with DAO.

In more serious cases, DAO will file administrative charges known as Charges and Specifications and make penalty recommendations.  In making its recommendation, DAO considers a number of factors, including the nature of the misconduct, the officer's disciplinary history, and past performance.  To ensure consistency of treatment and outcomes across similar offenses, DAO maintains a database of disciplinary decisions that serve as guiding precedent.  DAO makes its penalty recommendations in the aggregate; they are not broken down by charge in multi-charge cases.

If DAO proceeds with Charges and Specifications, the case can be resolved either through settlement or a trial.  If the officer agrees to accept a settlement offer and plead guilty, the proposed settlement is sent to the First Deputy Commissioner and, ultimately, to the Commissioner for approval.

An exception to these procedures exists if the officer is a Probationary Police Officer ("PPO"), who may be terminated for any reason during his or her two-year term of probation.  In such cases, if the conduct in question meets the standard for Charges and Specifications, DAO refers the matter to RMB.  RMB then conducts its own investigation and analysis through its probationary monitoring unit and makes a recommendation to terminate, extend the officer's probationary period, and/or file Charges and Specifications.  RMB's recommendation is then sent to the Commissioner for approval.  If RMB recommends termination and the Police Commissioner endorses this recommendation, DAO files Charges and Specifications and the officer is terminated concurrently.  If the Commissioner finds that the officer should not be terminated, the case goes back to DAO for filing Charges and Specifications and the case proceeds along the normal process.

---

[26] NYPD & CCRB, *Memorandum of Understanding Between the CCRB and the NYPD of the City of New York Concerning the Processing of Substantiated Complaints* 1 (Apr. 2, 2012), https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/ccrb_nypd_mou_prosecution_of_substantiated_civilian_complaints_130402.pdf.

2.      Civilian Complaint Review Board/Administrative Prosecution Unit

Similar to IAB, CCRB makes disciplinary recommendations to the Commissioner on substantiated civilian complaints within its FADO jurisdiction.  Like DAO's recommendations, CCRB's penalty recommendations are made in the aggregate and not charge-by-charge.  As of April 2013, if Charges and Specifications are filed and a case is not settled, prosecutors from the APU conduct the trial in the Department's trial room.[27]  APU is composed of attorneys who work solely for CCRB.  They have the same authority to make settlement offers as DAO attorneys.  Those offers are sent to the Deputy Commissioner of Trials, the First Deputy Commissioner, and the Commissioner for approval.

In 2014, the Department implemented a "reconsideration" process that allows DAO to request that CCRB reconsider its disciplinary recommendation, both as to a finding of violation and recommended level of penalty.  Under that process, within 30 days of receiving CCRB's penalty recommendation in a contested case, DAO must submit a notice of its intent to seek reconsideration, followed by a formal memo explaining the reasons for the request.  CCRB may agree to reconsider a disposition or a penalty if it finds that:  (1) the penalty is inappropriate or excessive; (2) new evidence exists that was not previously known or available and could reasonably lead to a different finding or recommendation; (3) "[t]here are matters of fact or law which [were] overlooked or misapprehended"; or (4) reconsideration serves the interests of justice.[28]  Currently, no deadline applies to CCRB's response to a reconsideration request.  CCRB may also consider reconsideration requests submitted by DAO after the 30-day cutoff provided that:  (1) there is enough time to reconvene a panel before the 18-month statute of limitations expires;[29] and (2) there are extenuating circumstances, such as a misinterpretation or misapplication of the law or new evidence provided by the Department.  In the event that CCRB rejects a request for reconsideration, the Department may unilaterally assume—in limited circumstances—the prosecution of the case if the Commissioner finds that CCRB's prosecution would be detrimental to the Department.[30]

---

[27] Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) § 1-41 (2018).

[28] *Id.* at § 1-36.

[29] N.Y. Civ. Serv. Law § 75(4) (the limitations period is 18 months, running from the time the alleged offense occurred).

[30] NYPD & CCRB, *Memorandum of Understanding Between the CCRB and the NYPD of the City of New York Concerning the Processing of Substantiated Complaints* ¶¶ 2-5 (Apr. 2, 2012).  Those limited circumstances include "cases in which there are parallel or related criminal investigations or when, in the case of an officer with no disciplinary history or prior substantiated CCRB complaints, based on such officer's record and disciplinary history the interests of justice would not be served."  *Id.* at ¶ 2.  In such cases, CCRB's substantiation of the allegation would remain of record and undisturbed, even if the Police Commissioner concludes otherwise.

Figure 1 below shows the number of respondents for whom DAO sought reconsideration between 2016 and 2018:

**Figure 1:  Reconsideration Requests to CCRB 2016 – 2018**

|  | **2016** | **2017** | **2018**[31] |
|---|---|---|---|
| **Total number of respondents whose CCRB cases were finalized** | 688 | 522 | 422 |
| **Total number of respondents for whom reconsideration was sought** | 122 | 165 | 60 |
| **Percentage of respondents for whom reconsideration was sought** | 18% | 32% | 14% |

E.      Adjudication

If an officer elects to proceed to trial—or is not offered a settlement—the case is tried before the DCT or one of three Assistant Deputy Commissioners.  That process applies regardless of whether DAO or APU is prosecuting the case.  These proceedings are essentially bench trials:  they take place in an NYPD trial room; most parties are represented by counsel; and both sides are given the opportunity to present evidence and call witnesses.  Most trials last one to two days.  Trials are open to the public, but trial calendars are not published.

At the conclusion of the trial, the trial commissioner issues a written decision, which includes a finding of guilt (or a determination that the officer is not guilty) and a disciplinary recommendation, if applicable.  The trial commissioner makes those determinations and recommendations based on the evidence introduced during the proceedings.  In making the penalty recommendation, the trial commissioner consults DCT's precedential database of settlements and decisions.  Like DAO and CCRB, DCT trial commissioners make aggregate penalty recommendations, rather than recommendations on a charge-by-charge basis.  The written opinion is then sent to the First Deputy Commissioner for review.

F.      First Deputy Commissioner and Police Commissioner Review

A supervisor and two officers in the First Deputy Commissioner's Office are responsible for evaluating disciplinary cases and making their disciplinary recommendations.  The case file, including the First Deputy Commissioner's penalty recommendation, is then sent to the Police Commissioner's Office.

---

[31] The figures for 2018 reflect the full year's data for cases in which CCRB recommends Command Discipline, training, or instruction, but are current only through November 30, 2018 for cases in which CCRB recommends Charges and Specifications.

As noted, by law, the Commissioner has complete authority over Departmental discipline.[32]  Four officers on his staff are assigned to assist in disciplinary matters.  They prepare a case analysis which is presented to the Commissioner's Executive Officer and Chief of Staff, who also make their own recommendations.  Their recommendations, along with the recommendations of others involved in the process (*e.g.*, DAO, DCT, First Deputy Commissioner), are presented to the Commissioner for final review and disposition.

At a disciplinary committee meeting, the Commissioner makes a final determination whether discipline is appropriate and, if so, on the proper penalty.  The committee is composed of representatives from the First Deputy's Office, DAO, RMB, and a rotating three-star chief.  The Commissioner's decision is based on a number of factors, including the officer's tenure, disciplinary record, performance evaluations, and relevant precedent.  In CCRB cases, if the Commissioner departs from the disciplinary recommendation made by the DCT or CCRB, he must draft a variance memorandum explaining his reasons for departing.  The Commissioner imposes penalties in the aggregate, not charge-by-charge.

G.     Internal and External Oversight and Monitoring Bodies

A number of internal and external groups oversee and monitor the Department's disciplinary process.  The primary bodies that monitor or oversee the NYPD's disciplinary system are CCRB, the CCPC, the OIG-NYPD, RMB, and the federal court-appointed monitorship team led by Peter L. Zimroth.

CCRB is statutorily tasked with informing the public about its "operations, complaint activity, case dispositions and police department discipline."[33]  It publishes periodic reports, which include monthly statistics on Department discipline, as well as recommendations for changes in disciplinary policies, procedures, and training.[34]

The CCPC oversees the NYPD's anti-corruption activities.  Established by executive order in February 1995, it performs audits, studies, and analyses of the NYPD's policies and procedures relating to corruption controls.  The CCPC does not conduct investigations.[35]  It chooses particular areas to review based on specific anti-corruption concerns.  Pursuant to the executive order, the NYPD is required to turn over any documents, reports, files, or other information that the CCPC needs to perform its function.  The CCPC issues an annual report for public review, which includes updates on the NYPD's implementation of recommendations in prior reports.[36]

---

[32] New York City Charter § 434(a); New York City Administrative Code § 14-115(a).

[33] *See* CCRB, *Reports*, https://www1.nyc.gov/site/ccrb/policy/reports.page (last visited Jan. 4, 2019).

[34] *Id.*

[35] Office of the Mayor of the City of New York, Executive Order No. 18 (Feb. 27, 1995).  The CCPC was established in response to the police corruption identified by the Mollen Commission.  CCPC, *Twelfth Annual Report of the Commission* 1-2 (Feb. 2010), *available at* https://www1.nyc.gov/assets/ccpc/downloads/pdf/Twelfth-Annual-Report-February-2010.pdf.

[36] CCPC, *Annual Reports*, https://www1.nyc.gov/site/ccpc/reports/annual-reports.page (last visited Jan. 9, 2019).

Established in 2014 pursuant to Local Law 70, the OIG-NYPD has important additional oversight responsibilities.  The OIG-NYPD is independent of the Department and resides within the Department of Investigation.  It is tasked with "investigating, reviewing, studying, auditing and making recommendations relating to the operations, policies, programs and practices of the [NYPD]."[37]  It focuses on "[e]nhanc[ing] the effectiveness of the [ ] [D]epartment, [i]ncreas[ing] public safety, [p]rotect[ing] civil liberties and civil rights, and [i]ncreas[ing] the public's confidence in the police force, thus building stronger police-community relations."[38]  Its findings and recommendations are published in periodic reports.[39]  Those reports typically include an update about the NYPD's implementation of recommendations made in prior reports.[40]  Unlike the CCPC, the OIG-NYPD has independent investigative authority.

Internally within the NYPD, the RMB[41] "measures the performance of police officers and identifies officers who might be in need of enhanced training or supervision."[42]  RMB monitors patterns of potential officer misconduct and, if necessary, takes corrective action, including by recommending that Charges and Specifications be filed or that the officer be demoted.[43]  RMB's Performance Evaluation Section monitors officers who are on compulsory probation (after appointment or promotion) or on probation due to substandard performance or a disciplinary action.  Through its review of performance evaluations and disciplinary records, RMB may recommend that an officer be monitored.  At the conclusion of the monitoring period, RMB may recommend the discontinuation or continuation of the monitoring period.  RMB also evaluates the efficacy of the NYPD's training and policies.

Finally, certain of the Department's practices have been challenged in court as constitutional violations.  Most notably, the Department's stop-and-frisk practices are under review by a federal court-appointed monitor following an August 2013 federal court ruling that those practices were unconstitutional.  The monitor was appointed "to develop, in consultation with the NYPD and counsel for plaintiffs, a set of reforms of the NYPD's policies, training, supervision, auditing, and handling of complaints and discipline regarding stops and frisks and trespass enforcement.  The monitor must also assess progress on the NYPD's implementation of these reforms and report to the court twice a year on the City's compliance with the court orders."[44]

---

[37] Department of Investigation, *Inspector General for the NYPD*, https://www1.nyc.gov/site/doi/offices/oignypd.page (last visited Jan. 9, 2019).

[38] *Id.*

[39] Department of Investigation, *Reports*, https://www1.nyc.gov/site/oignypd/reports/reports.page (last visited Jan. 9, 2019).

[40] *Id.*

[41] RMB as a formal entity was established in March 2015.

[42] NYPD, *Risk Management*, https://www1.nyc.gov/site/nypd/bureaus/administrative/risk-management.page (last visited Jan. 9, 2019).

[43] *See id.*

[44] NYPD Monitor, *Overview*, http://nypdmonitor.org/overview/ (last visited Jan. 9, 2019).  The Panel also notes that members of the public exercise an additional layer of oversight through commencing civil actions against members

Although the monitor's mandate does not include the oversight or reform of the NYPD's disciplinary system as a whole, it does include an assessment of the need for improved monitoring, supervision, and discipline imposed on officers for stop-and-frisk misconduct. The monitor and Justice Ariel Belen, the court-appointed facilitator of the remedial process, have also met with various community stakeholders and conducted several focus groups to gather input and make recommendations relating to discipline of stop-and-frisk misconduct, such as the need for greater transparency and independent investigation of particularly serious officer misconduct, formalized data collection and sharing, and the repeal or reevaluation of Civil Rights Law § 50-a.[45] On December 20, 2018, the monitor filed a report recommending that IAB implement certain policies and training modules to improve the processing and investigation of profiling and bias-based-policing allegations.[46] The court approved those recommendations on January 3, 2019.[47]

---

of the NYPD for violations of their constitutional rights that arise, for example, from instances of use of excessive force, false arrest, and wrongful death.

[45] *See* New York City Joint Remedial Process Final Report, *Floyd v. City of New York*, No. 1:08-cv-01034-AT, Docket No. 597 (S.D.N.Y. May 15, 2018).

[46] Recommendation Regarding IAB Guide and Training on Profiling Investigations, *Floyd v. City of New York*, No. 1:08-cv-01034-AT, Docket No. 676 (S.D.N.Y. Dec. 20, 2018).

[47] *Floyd v. City of New York*, No. 1:08-cv-01034-AT, Docket No. 677 (S.D.N.Y. Jan. 3, 2019).

**KEY FINDINGS**

I.   THERE IS A FUNDAMENTAL AND PERVASIVE LACK OF TRANSPARENCY
     INTO THE DISCIPLINARY PROCESS AND ABOUT DISCIPLINARY OUTCOMES

     A.    Civil Rights Law § 50–a Establishes a Legislative Exception to Public
           Access Under the New York State Freedom of Information Law

     Under New York's Freedom of Information Law ("FOIL"), government records are
publicly accessible, unless exempt from disclosure by state or federal statute.[48]  Police
disciplinary files are subject to a specific exemption from disclosure under Civil Rights Law
§ 50–a.  Enacted in 1976, § 50–a mandates that "[a]ll personnel records used to evaluate
performance toward continued employment or promotion, under the control of any police
agency . . . shall be considered confidential and not subject to inspection or review without the
express written consent of such police officer . . . except as may be mandated by lawful court
order."[49]

     Additional provisions of the law establish a process for obtaining such court orders in
connection with litigation, including the requirement for *in camera* review of the documents at
issue for relevance and materiality.[50]  Another subsection permits village, city, and county
attorneys, prosecutors, or "any agency of government" to obtain such records if required in
connection with official duties.[51]

     The historical impetus for § 50–a was narrow:  it was designed to prevent defense
attorneys in criminal cases from impeaching the testimony of officers, in particular by
confronting them with unsubstantiated allegations.[52]  Subsequent amendments and court
decisions, however, set forth a broader purpose of protecting officers from harassment and
reprisals more generally.[53]  In one recent case, for example, the First Department denied an
application to disclose an officer's disciplinary history because of the risk of "hostility and
threats" unrelated to the litigation in which disclosure was sought.[54]  Critics argue that § 50–a
keeps from the public critical information about the workings of the NYPD's disciplinary system
and that the lack of transparency breeds mistrust.

---

[48] Pub. Off. L. § 87(2)(a).

[49] Civ. Rights L. § 50–a(1).

[50] Civ. Rights L. § 50–a(2), (3).

[51] Civ. Rights L. § 50–a(4).

[52] Budget Report on Bill No. 7635, Bill Jacket 1973, ch. 413 ¶ 6 ("This bill would afford some protection to police
officers who must testify in criminal proceedings."); Letter from District Attorney Merola, Bill Jacket 1976, Ch. 413
at 20 ("It has been brought to my attention that, often simply as a harassment tactic, defense attorneys in criminal
cases have been making an unrealistically high number of requests for personnel files of police officers.").

[53] *See* Mem. of Senator Marino and Member of Assembly Arthur J. Kremer, Bill Jacket 1981, ch. 778 at 9; Budget
Report on Bills No. 5402, Bill Jacket 1981, ch. 778 at 10.

[54] *Luongo v. Record Access Officer, Civilian Complaint Review Bd.*, 50 A.D.3d 13, 26 (1st Dep't 2017) (hereinafter
"*Luongo I*").

B.   Many States Provide Greater Access to Police Disciplinary Files Than Does
New York

The Panel has reviewed the laws of other states that govern the disclosure of police
disciplinary files.  Many states provide public access to police disciplinary files far beyond what
police departments in New York are permitted or required to disclose.  Thirteen states have laws
specifically designating internal police records as open to the public.[55]  Fifteen states disclose
only some police disciplinary files or require a balancing of the officer's privacy interest and the
public interest to determine whether disclosure is permitted.[56]  Twenty-two states, including New
York, largely preclude disclosure of police disciplinary files, mostly through exemptions in their
freedom-of-information laws applicable to all personnel records.  Within this group, only New
York and Delaware also explicitly restrict access to internal *police* records.[57]  Delaware's statute,
titled the "Law-Enforcement Officers' Bill of Rights," specifically mandates that all records
compiled in any internal investigation of an officer "shall be and remain confidential and shall
not be released to the public."[58]  California, long among the most restrictive states, late last year
amended its applicable law to designate as public certain records of police misconduct.[59]

---

[55] These states are:  Alabama (Ala. Code § 36-12-40); Arizona (Ariz. Rev. Stat. Ann. §§ 39-121-28, 38-1109);
California (Cal. Pen. Code § 837.2); Connecticut (by court ruling in *Perkins v. Freedom of Information Comm'n*,
228 Conn. 158 (1993)); Florida (Fla. Stat. § 119.01 *et seq.*); Georgia (Ga. Code Ann. § 50-18-72(a)(8)); Maine (Me.
Rev. Stat. tit. 30-a, §§ 503(1)(B)(5), 2702(1)(B)(5); Me. Rev. Stat. tit. 5, § 7070(2)(E)); Minnesota (Minn. Stat.
§ 13.43); North Dakota (N.D. Cent. Code § 44-04-18); Ohio (Ohio Rev. Code Ann. § 149.43); Utah (Utah Code
Ann. § 63G-2-301(3)(o)); Washington (Wash. Rev. Code § 42.56.001 *et seq.*); Wisconsin (Wis. Stat.
§ 13.36(10)(b)); *see also Is Police Misconduct a Secret in Your State?*, WNYC (Oct. 15, 2015),
https://www.wnyc.org/story/police-misconduct-records/ (last visited Jan. 19, 2019).

[56] *See, e.g.*, Mich. Sustained Comp. Laws §§ 15.243 § 13(1)(s)(ix) (allowing exemptions from release for personnel
records of law enforcement agencies only if "the public interest in disclosure outweighs the public interest in
nondisclosure"); Ark. Ann. Code § 25-19-105(c)(1) (permitting disclosure of records pertaining to an officer's
suspension or termination when a "compelling public interest" in disclosure is present); Hawaii Uni. Information
Practices Act § 92F-14 (permitting disclosure of records pertaining to an officer's dismissal); Ind. Code. § 5-14-3
(disciplinary records pertaining to an officer's demotion, suspension, or discharge are public); Okla. Open Records
Act § 51-24A.7 (declaring police personnel records confidential unless they related to "final disciplinary action"
resulting in loss of pay, suspension, demotion, or termination).

[57] Del. Code Ann. tit. 11, § 9200(c)(12).

[58] The Delaware statute appears even more restrictive than its New York counterpart.  Unlike Civil Rights Law
§ 50–a, the Delaware law contains no exemption for disclosure by and to government agencies for conduct of
official government functions.  *See* Civ. R. L. § 50–a(4).  The Delaware statute also contains a provision prohibiting
disclosure in civil litigation unless the subject officer is being sued for misconduct causing injury.  Del. Code Ann.
tit. 11, § 9200(d).  Courts have noted that the Delaware statute evinces "a strong public policy . . . favoring the
confidentiality of police personnel records." *Reyes v. Freeberry*, No. 02-1283-KAJ, 2005 WL 3560724, at *6 (D.
Del. Dec. 29, 2005).  Indeed, the Delaware Office of Attorney General has noted that the statute even prohibits
disclosure of "completed internal affairs investigations statistical summaries."  Del. Op. Att'y Gen. 16-IB02, 2016
WL 1072888, at *2 (Jan. 14, 2016) (noting that the statute prohibits disclosure of "all records *compiled as a result of
any investigation* subject to the provisions" the Delaware Law Enforcement Officers' Bill of Rights (quoting Del.
Code Ann. tit. § 9200(c)(12)) (emphasis added).

[59] Cal. Penal Code § 832.7.  The statute designates as public all records relating to firearms discharge or serious use
of force (whether substantiated or not), and all allegations of sexual assault or dishonesty (if substantiated).

C. The NYPD Interprets § 50–a Aggressively and the Courts Have Upheld This Approach

Since the 1970s—and until 2016—the NYPD periodically posted officers' "Personnel Orders" for inspection by members of the media assigned to Police Headquarters. Those orders recount the basic facts of substantiated disciplinary charges, including a description of the offense, the penalty imposed, and the offending officer's name. In 2016, however, the NYPD decided that continued posting of the Personnel Orders was inconsistent with § 50–a and discontinued the practice. The Commissioner and other NYPD officials told the Panel that the change was not the result of a changed legal analysis. Rather, the NYPD said its Legal Bureau became aware of the practice for the first time in 2016 when it was called upon to litigate a FOIL request for the Personnel Orders made by the Legal Aid Society. Upon learning of the practice, the Legal Bureau determined that it was inconsistent with § 50–a and advised that it stop. The NYPD's decision to stop publicly posting Personal Orders was met with sharp criticism. The public, the media, and advocacy groups rightly argued that the decision blocked one of the few avenues for the public to gain insight into the NYPD's internal disciplinary practices.[60]

The Legal Aid Society challenged the NYPD's reversal of its practices in court in *In the Matter of Justine Luongo v. Records Access Appeals Officer, NYPD*, 160232/2016 (N.Y. Sup. Ct. 2017) ("*Luongo II*"), arguing that § 50–a does not prohibit the disclosure of the Personnel Orders. The New York Supreme Court, however, found in the Department's favor, reasoning that: because the Department used the Personnel Orders to evaluate performance, they were within scope for § 50–a; there was a demonstrable potential for harassment if the records were to be disclosed; and the NYPD's previous practice of disclosing the Personnel Orders did not prevent the Department from changing its practice.[61] In its decision, the court relied, in large part, on two recent First Department decisions in cases brought prior to the 2016 change of practice. In *Luongo v. CCRB Records Officers and Daniel Pantaleo* ("*Luongo I*"), the court declined to order the release of a summary of the disciplinary history of the officer implicated in the 2014 death of Eric Garner.[62] In *Matter of New York Civil Liberties Union v. New York City Police Department* ("*NYCLU*"), the court held that disciplinary decisions relating to cases brought by CCRB were also protected by § 50–a.[63] Last week, on January 17, 2019, the Appellate Division, First Department, summarily affirmed the Supreme Court in *Luongo II*, relying on the Court of Appeals' recent decision in *NYCLU*, discussed below.[64]

---

[60] *See, e.g., Change State Law to Let Taxpayers Know About Police Discipline*, Editorial, Newsday (Sept. 7, 2016), https://www.newsday.com/opinion/editorial/change-50-a-law-to-let-taxpayers-know-about-police-discipline-1.12281518; *NYPD Needs to Let The Public Know More About Police Discipline*, Editorial, N.Y. Post (Mar. 3, 2018), https://nypost.com/2018/03/03/nypd-needs-to-let-the-public-know-more-about-police-discipline/; *see also End Secrecy About Police*, Editorial, The Times-Union (Albany, N.Y.) (Dec. 18, 2016), https://www.timesunion.com/tuplus-opinion/article/Editorial-End-secrecy-about-police-10805058.php.

[61] *In the Matter of Justine Luongo v. Records Access Appeals Officer, NYPD*, 160232/2016 (N.Y. Sup. Ct. June 1, 2017).

[62] *Luongo I*, 150 A.D.3d 13, 26 (1st Dep't 2017). *Luongo I* is pending in the Court of Appeals.

[63] 148 A.D.3d 642 (N.Y. App. Div. 2017). *NYCLU* was later affirmed by the Court of Appeals. *Matter of N.Y. Civil Liberties Union v. N.Y. City Police Dep't*, No. 133, 2018 WL 6492733 (N.Y. Dec. 11, 2018).

[64] *See Luongo II*, No. 160232/2016, slip op. at 2 (N.Y. App. Div. Jan. 17, 2019).

When *NYCLU* reached the Court of Appeals late last year, the court issued a sweeping interpretation of the reach of § 50–a, holding that even the release of redacted records is prohibited.[65] *NYCLU*, like each of the recent cases above, addressed the scope of § 50–a in the context of a FOIL request, not the Department's authority to release records on its own initiative or in response to a court order. But the *NYCLU* decision also included language suggesting that, regardless of whether a FOIL request has been made, the NYPD has no latitude to voluntarily release information that it cannot be compelled to release under § 50–a.[66] In the Panel's view, this language likely effectively overrules an older line of lower court cases holding that police departments could voluntarily disclose disciplinary outcomes pursuant to the "governmental function" exception in § 50–a(4).[67] In light of *NYCLU*, legislative action will be required to eliminate or lower § 50–a's barrier to transparency and accountability for NYPD disciplinary matters.

> D.  Lack of Disclosure and Limited Visibility Into the Disciplinary Process are Detrimental to Public Confidence and Oversight

Many people told the Panel that confidentiality of disciplinary records is especially hurtful to those injured or killed in police-related incidents and to their loved ones. Constance Malcolm, whose 18-year-old son Ramarley was shot to death by police officers in 2012, explained to the Panel that she had to fight "tooth and nail" for six years to obtain any information regarding the dispositions of disciplinary cases against three officers involved in her son's death. Retired professional tennis player James Blake, who was mistakenly tackled to the ground by an officer in a well-publicized 2015 incident, learned of the disposition of the officer's case months after the Commissioner's decision. Mr. Blake told the press, "I would expect the common courtesy of a notification from a city that claims to be improving the transparency of how its police department operates."[68] Jimmy Alvarado, a Brooklyn teen who was paralyzed when a pursuing officer fell on him, was not informed that the disciplinary case against the officer was closed when he chose to resign. Denying those directly affected by police misconduct access to information on police discipline serves no one's interest. More broadly, lack of transparency impedes the Department's efforts to show the public that it holds officers accountable for their conduct.

---

[65] *NYCLU*, 2018 WL 6492733 at *1-2, 6.

[66] *Id*. at *5 ("[T]hese distinct and mandatory New York provisions expressly operate to guarantee confidentiality notwithstanding FOIL's permissive disclosure regime.").

[67] *See Reale v. Kiepper*, 204 A.D.2d 72, 73 (1st Dep't 1994) (release of summary of transcript officers' disciplinary decisions was "in a nonlitigation context and in furtherance of an official function."); *Poughkeepsie Police Benevolent Assn. v. City of Poughkeepsie*, 184 A.D.2d 501, 501 (2d Dep't 1992) (release of summary of internal investigations of police misconduct by police department was "in furtherance of its official functions, unrelated to the purpose of Civil Rights Law § 50–a."). This is also the position the NYPD took regarding disclosure of anonymized summaries of personnel records in *Patrolmen's Benevolent Ass'n v. de Blasio*, No. 153231/2018 (N.Y. Sup. Ct.), which is currently pending before the Supreme Court in New York County. Resp'ts Mem. of Law in Supp. of Their Cross-Mot. to Dismiss, NYSCEF No. 15, at 7 (*citing Reale*, 204 A.D.2d at 73).

[68] Ben Feuerherd and Joe Tacopino, *Tennis Star James Blake Slams de Blasio, NYPD Over False Arrest*, N.Y. Post (Aug. 1, 2018), https://nypost.com/2018/08/01/tennis-star-james-blake-slams-de-blasio-nypd-over-false-arrest/.

The lack of transparency into NYPD disciplinary matters also frustrates external oversight.  In its meetings with the Panel, the Legal Aid Society described the obstacles § 50–a, as interpreted by the NYPD, imposes on its efforts to evaluate disciplinary outcomes for consistency and appropriateness.[69]  For example, the NYPD trial calendar is treated as a confidential document, even though disciplinary trials are open to the public.  In addition, the Department treats trial transcripts as personnel records subject to § 50–a because decision makers in the disciplinary process rely on them in formulating their recommendations and imposing penalties.  As a result, Legal Aid Society interns must be assigned to monitor trial rooms to determine when a case is called and must take careful, detailed notes if they want to meaningfully inform others of what occurred during the proceedings.  The end result is a system that is understandably perceived by the public and others as gesturing towards some transparency, but ultimately remaining largely closed to any external scrutiny.

II.    THE POLICE COMMISSIONER HAS AND EXERCISES COMPLETE DISCRETION OVER DISCIPLINARY OUTCOMES

As noted, at the conclusion of the disciplinary process, the Commissioner reviews all penalty recommendations and determines whether discipline is warranted and, if so, what penalty should be imposed.  While the Commissioner has complete discretion to change a finding of guilt or modify a penalty, in certain cases, he must set forth grounds for his departure in a written memorandum.  Currently, no written guidelines inform the Commissioner's exercise of his discretion or set standards for his written explanations.

A.    The Commissioner's Review and Evaluation of Disciplinary Decisions

Pursuant to § 434 of Chapter 18 of the City Charter, the New York City Police Commissioner has "cognizance and control of the . . . discipline of the department, and of the police force of the department."  Under § 14-115(a) of the City Administrative Code, the Commissioner "shall have power, in his or her discretion, on conviction by the commissioner, or by any court or officer of competent jurisdiction, of a member of the force of any criminal offense, or neglect of duty, violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming an officer, or any breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension without pay during such suspension, or by dismissal from the force."  While the Commissioner has delegated to other bodies the responsibility of reviewing, investigating, and prosecuting complaints, as well as making disciplinary recommendations to him, he has retained complete power and discretion to modify disciplinary decisions and frequently does so.

B.    The Police Commissioner's Case Review Procedures

The Commissioner reviews all disciplinary cases tried before DCT, as well as those that reached a pretrial resolution through settlement.  Following the First Deputy Commissioner's

---

[69] The Panel understands, however, that the Department posts outcomes of settlements and disciplinary cases tried by DCT on an intranet site accessible only to members of the service, so that there is at least an internal avenue of some transparency and accountability.

Office review, four attorneys within the Commissioner's Office undertake an initial review of the case, inquire of CCRB or IAB about certain facts in the record, if necessary, and then prepare a case summary for each officer subject to discipline. The case summary includes a synopsis of the incident and allegations, information concerning the officer (*e.g.*, rank, tenure, disciplinary record, etc.), and case memoranda by those who have previously reviewed the case (*e.g.*, DAO or CCRB, DCT, First Deputy), among other data points.

At the conclusion of this review, the four assigned attorneys present the case file and a case summary to the Commissioner's Office Commanding Officer and Executive Officer. In addition to reviewing the materials and consulting relevant precedent, the Commanding Officer and the Executive Officer have an opportunity to ask questions and solicit additional information. Following that review, the Commanding and Executive Officers, in consultation with the four attorneys, make a recommendation about each case. Those recommendations are then added to the case summary and presented to the Commissioner. The same process applies to settlements sent to the Commissioner for review and approval. Each case thus comes to the Commissioner for review with formal disposition recommendations from CCRB or DAO, DCT, the Commissioner's Commanding Officer and Executive Officer, and the First Deputy Commissioner.

### 1. Disciplinary Committee Meetings and Final Case Disposition

The Commissioner reviews and decides disciplinary cases at periodic (generally bi-weekly) disciplinary committee meetings.[70] Attendees at the meetings include members of the Commissioner's Office who reviewed the files and prepared the case summaries, the Chief of Staff and Counsel to the Commissioner, and representatives from the First Deputy's Office, RMB, and DAO, represented by the Department Advocate.[71] A rotating three-star chief also attends.

The Commissioner considers a variety of factors in making his ultimate disciplinary decisions. He is provided with a summary fact sheet, which includes the officer's name, rank, initial and current command assignment; nature and date of the offense; duty status (*i.e.*, full; modified duty, suspended with pay, suspended without pay, or resigned); annual performance evaluation (in both numeric and narrative form); number of arrests; number of medals; and key factors in the officer's disciplinary history (*e.g.*, number of Schedule B Command Disciplines, whether the officer was subject to dismissal probation, and whether the officer was involved in other substantiated cases).

The Commissioner may inquire about the information included in the fact sheet or request additional information about the officer or the case. At a disciplinary committee meeting that the Panel attended, the Commissioner inquired about certain officers' evaluations and performance reviews, including whether those reviews were authored by the same commanding officer. He also solicited additional information about certain officers' prior disciplinary history and, in one case, delayed making a final determination pending a response to his questions. On

---

[70] The Panel attended one of the Commissioner's meetings during its work.

[71] While the Department Advocate is a standing participant at these meetings, the Chair of CCRB is not, nor is any representative of the respondent officer.

occasion, the Commissioner contacts the officer's commanding officer directly to obtain additional information.

### 2.    Informal Input Prior to Final Disposition

The Commissioner may sometimes receive or provide informal input concerning officer discipline, which can affect his final determination.  For example, the Commissioner and members of his Office meet regularly with representatives from police unions.  Those representatives may seek to discuss disciplinary cases and lobby on an officer's behalf.[72]  The Panel was also informed that the Commissioner on occasion has contacted DAO prior to receiving its recommendation to express his own initial thinking on the case.  Because the Police Commissioner's interim view is likely to align with his final determination, stakeholders expressed concern that DAO may recommend a disposition that does not reflect its own best judgment in such cases.

### C.    In Certain Cases, the Police Commissioner Must Detail the Reasons for Imposing Penalties Inconsistent with the Recommendations He Receives

Under the Rules of the City of New York, for cases prosecuted by CCRB—whether tried before DCT or resolved by negotiated settlement—if the Commissioner intends to impose a penalty lower than that recommended by either CCRB or DCT, he must "include a detailed explanation of the reasons for deviating . . . including but not limited to each factor [he] considered in making his . . . decision."[73]  The memorandum is then sent to CCRB's Executive Director and forwarded to DAO, the CCRB attorney, and the officer's attorney; the memorandum is not separately sent to DCT.  CCRB and the officer "may respond to such notification within five business days of its receipt, after which the Police Commissioner will make a final determination."[74]  Following the comment period, the Commissioner memorializes his final disposition in a letter sent to the First Deputy Commissioner's Office, DCT, the CCRB attorney, and the officer's attorney.

In DAO cases, the Commissioner is not required to prepare such a memorandum.  By letter, however, he notifies DCT if he departs from the penalty that the DCT judge recommended.  These letters are forwarded to the First Deputy Commissioner's Office, DCT, DAO, and the officer's attorney.  For cases that are resolved through settlement (and do not originate from CCRB), the Commissioner is not required to prepare a memorandum if the ultimate disposition varies from the parties' agreement because the penalty is not viewed as a

---

[72] Stakeholders with whom the Panel spoke have noted that this type of input is not unique to the Commissioner or his office and is common within the Department; union representatives have informal conversations with the First Deputy Commissioner or members of his staff, as well as DAO.

[73] Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) § 1-45(g) ("In any case substantiated by the [CCRB] in which the Police Commissioner intends to impose discipline that is of a lower level than that recommended by the Board or by the Trial Commissioner, the Police Commissioner will notify the [CCRB] . . . .  Such notification will be in writing and shall include a detailed explanation of the reasons for deviating from the Board's, or, as the case may be, the Trial Commissioner's recommendation, including but not limited to each factor the Police Commissioner considered in making his or her decision.").

[74] *Id.*

departure from an existing recommendation.  The relevant commanding officer and the respondent's attorney are notified by letter of the change in penalty.

      D.      The Police Commissioner Frequently Departs from the Disposition and Penalty Recommendations He Receives

      Based on a review of relevant records, the Panel observed that, in recent years, departures from DCT and CCRB recommendations have not been infrequent.  As shown in Figure 2, from January 1, 2016 through November 21, 2018, the Commissioner departed from DCT's recommendation in a total of 61 of 459 cases (approximately 13%).  Of those 61 cases, the Commissioner departed downward from DCT's recommended penalty in 32 cases (approximately 52%); in the remaining cases, the Commissioner either increased the penalty or imposed a different penalty than the one recommended.

**Figure 2**



24

The Commissioner, in the period from January 1, 2016 through November 21, 2018, departed, in some way, more frequently in DAO cases than in CCRB cases.  As illustrated in Figure 3, below, the Commissioner departed in 37 of 228 DAO trial cases (16%); he departed in only 24 of 231 CCRB trial cases (10%).

**Figure 3**



Downward departures for the period from July 1, 2016 through November 21, 2018, however, were more prevalent in CCRB cases than in DAO cases.  As illustrated in Figure 4 below, in DAO cases, the Commissioner decreased the penalty in 15 of 37 cases (approximately 41%) and overturned DCT's guilty findings in only nine cases (24%).  By contrast, in CCRB cases, the Commissioner departed downward from DCT's recommended penalties in 17 out of 24 cases (approximately 71%).  In 10 of those 17 cases (approximately 42%), he overturned DCT's finding of guilt.

**Figure 4**



In DAO cases, the Police Commissioner occasionally departed from DCT recommendations of permanent dismissal and, instead, imposed voluntary separation.[75]  If voluntary separation is ordered, the Department requires the officer to enter into a "post-trial negotiated agreement," pursuant to which he or she must immediately file for vested retirement, forfeit pay for suspension days, and forfeit all leave.  The officer is also placed on dismissal probation to ensure that he can be dismissed if the voluntary separation is not effected.  The overall effect of voluntary separation is that the officer is entitled to collect a pension, if it has vested, and can inform future employers that he or she voluntarily left the Department.

---

[75] In the sample of cases that the Panel reviewed, no equivalent recommendation was made by CCRB.

E.      The Police Commissioner's Change of Penalty Letters Do Not Provide
        Meaningful Explanations for Departing from the Recommended Outcome[76]

In cases prosecuted by DAO, the Commissioner's "change of penalty notification letters"
do not set forth the basis for his imposition of a different penalty from that recommended to him.
Rather, the letter merely notifies the recipient that, based on his review of the record, the
Commissioner has determined that a different penalty is appropriate.  The letters that the Panel
reviewed cited only "the totality of the issues and circumstances," or generally indicated that the
Commissioner believed the officer did not act in bad faith.  The files reviewed by the Panel
included cases in which the Commissioner reduced the number of vacation days forfeited, or
converted a penalty of dismissal to one of voluntary retirement from the Department.

Notably, the variance memoranda prepared by the Police Commissioner's Office in
CCRB cases typically include greater detail than the Commissioner's penalty notification letters.
In the memoranda, the Commissioner may make reference to specific factors, such as the
officer's disciplinary record, performance evaluations, number of arrests, number of prior
complaints, and additional contemporaneous documentation of the incident.  By contrast, the
Commissioner's change of penalty letters in those same cases—as in the change of penalty
letters for DAO cases—do not provide this level of detail.  It is important to note that the
memoranda prepared pursuant to the rules governing CCRB cases are circulated to CCRB, DAO,
and the attorneys; they are not separately shared with DCT.  Therefore, even in those cases that
originate out of CCRB, the existence of a more detailed memorandum does not cure the
deficiencies of the Commissioner's change of penalty letter since it is not shared with all the
parties involved in the process.

F.      The Absence of Information in Change of Penalty Letters Has the Potential
        to Adversely Impact the Disciplinary Process

The Panel recognizes that the purpose of the change of penalty letters is to notify others
of the change, and not to provide a full explanation of the Commissioner's rationale.
Nevertheless, more detailed explanations would improve the process.  Because the letters do not
cite precedent or distinguish among cases, they are of limited usefulness to others involved in the
disciplinary process.  CCRB, DAO, and DCT trial judges, all of whom base their penalty
recommendations on precedent, would benefit from a better understanding of the
Commissioner's rationale.

More importantly, the absence of explanation for the Commissioner's departures may
undermine the legitimacy of the trial process.  Because the Commissioner can overturn a finding
of guilt, a cursory explanation for his decision undercuts the significance of the robust and
intensive trial process.  DCT conducts thorough trials, which include, in most cases, extensive
witness testimony.  At the trial's conclusion, the DCT judge generally issues a detailed, reasoned
opinion, setting forth his or her factual findings and conclusions.  The Commissioner's unilateral

---

[76] The case summaries that follow are at a high level and do not cite specific language from the variance
memoranda, per the restrictions of Civil Rights Law § 50–a and the temporary restraining order issued in
*Patrolmen's Benevolent Assoc. v. de Blasio*, No. 153231/2018, slip op. 32839 (N.Y. Sup. Ct. Apr. 11, 2018).

ability, without explanation, to overturn a trial judge's detailed findings can create the perception that the fact-intensive, adversarial trial process is a mere formalism devoid of real consequence.[77]

In addition, reliance on conclusory, boilerplate statements makes the disciplinary system more susceptible to complaints about favoritism and inconsistency. Without a reasoned explanation, it is impossible to determine if the Commissioner's decision to change an officer's penalty is attributable to his informed judgment or inappropriate partiality. Understandably, those who disagree with the Commissioner's determination are likely to assume the worst. Actual favoritism is also more likely to occur if the Commissioner does not have to meaningfully explain his departure rationale in detail.

The conclusory format of the letters further contributes to a perception that disciplinary decisions are arbitrary. Although each letter is relatively similar in substance, the penalty imposed for the same offense may vary from officer to officer. Thus, even if the Commissioner is tailoring penalties to fit the offense and officer, the nuances of the Commissioner's judgment are hidden from view.

As expected, a number of stakeholders with whom the Panel met have concerns about the Commissioner's encompassing discretion—and what they perceive (accurately) to be an unchecked power—to modify disciplinary outcomes and penalties recommended by CCRB or others. Advocacy organizations and police officer unions voiced sentiments, to varying degrees, that the Commissioner should not be accorded such broad discretion or at least should be more transparent and consistent in exercising his authority to change disciplinary outcomes.

Police unions, for example, perceive inconsistency both in the penalties imposed by different police commissioners, and in the penalties within each commissioner's tenure. They view the Commissioner as susceptible to outside political pressures. To be sure, those unions generally support the Commissioner's broad authority to approve or modify disciplinary outcomes, recognizing that his unique expertise, institutional knowledge, and significant experience produces more informed disciplinary decisions. But union representatives also fear that outside pressure from advocacy groups or elected officials could influence a commissioner to use his discretion to impose unnecessarily severe punishment. The Panel emphasizes that it did not find that the Commissioner abuses his discretion in this manner and is not recommending, as some have urged, that disciplinary decisions be made by an independent body or that the Commissioner's discretion be otherwise circumscribed. The advantages of the current model, in the Panel's view, outweigh its disadvantages. The Panel is concerned, however, that the Commissioner's unfettered discretion gives rise to the perception, whether justified or not, of bias or inconsistency, which undermines the confidence of the public and other constituencies in the integrity, fairness, and robustness of the NYPD's disciplinary system.

---

[77] The number of departures, in addition to the lack of explanations for changes, is also an issue. Stakeholders would likely perceive the trial process as more meaningful if the Police Commissioner departed from DCT's recommendations less frequently. Outcomes in the federal district courts, for example, are perceived to matter a great deal, in part, because fewer than 9% of verdicts are reversed on appeal. *See* United States Courts, *Just the Facts: U.S. Court of Appeals*, https://www.uscourts.gov/news/2016/12/20/just-facts-us-courts-appeals (last visited Jan. 9, 2019).

III.    ALTHOUGH THE PANEL DID NOT IDENTIFY PERVASIVE FAVORITISM, THE
        PANEL IDENTIFIED A FEW CASES WHERE FAVORITISM MAY HAVE
        INFLUENCED THE DISCIPLINARY PROCESS OR OUTCOME

    A.    Preliminary Analysis of Disciplinary Case Data Involving Higher-Ranking
       NYPD Personnel Did Not Show Pervasive Favoritism

        1.    Overview

In light of concerns about favoritism in the Department's disciplinary process, the Panel
conducted a preliminary review of whether, for example, so-called "white shirts" (lieutenants,
captains, deputy inspectors, inspectors, and chiefs) receive more lenient penalties than lower-
ranking members (officers, detectives, and sergeants) for similar misconduct.[78]  As discussed
below, the Panel's review does not support an inference that these higher-ranking NYPD
personnel have consistently received more lenient treatment.  In fact, at least in some cases, the
opposite appears to be true.

        2.    Analysis of Data Provided by the NYPD

To evaluate whether penalties are consistently applied across ranks, the Panel reviewed
summaries of all formal disciplinary action taken against uniformed members of the NYPD
during the years 2016 and 2017 (a total of 1,031 cases).[79]  The summaries provided to the Panel
identified the officer's rank and tenure, the nature of the misconduct and penalty imposed, and
prior disciplinary history, if any.

Disciplinary cases often involve multiple charges encompassing more than one type of
misconduct.  To maximize sample size and facilitate comparisons, the Panel considered only the
most serious misconduct charge in each case and set aside any lesser charges.[80]  Thus, the
Panel's findings do not account for variations in penalty that might be attributable to findings of
guilt on lesser charges.[81]

In addition, because the summaries often use slightly different descriptions of the offense
conduct, the Panel grouped substantially similar offenses for comparison purposes.  For example,
some officers were charged with "operating a motor vehicle while impaired by alcohol," while

---

[78] Of the uniformed officers, approximately 65% hold the rank of police officer, approximately 15% hold the rank of
detective, approximately 13% hold the rank of sergeant, and the remaining 7% hold other ranks.  *See* NYPD, *Crime
and Enforcement Activity in New York City C-1* (Jan 1 – Dec 31, 2017), *available at*
https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2017-enforcement-report.pdf.

[79] The summaries included all cases prosecuted by DAO and the CCRB's APU for which there was a final post-trial
disposition or a settlement.

[80] Cases in which an officer was found not guilty of any offense were also excluded from the analysis.

[81] For example, where an officer involved in an accident while driving under the influence was charged with
"Operating a motor vehicle while impaired by alcohol," "Being unfit for duty," and "Failing to inform the
department of a vehicle accident," the Panel used for comparison purposes only the highest level of misconduct—
here, "Operating a motor vehicle while impaired by alcohol"—and compared the penalty imposed to other cases
involving that offense as the most serious misconduct.

others were charged with "operating a motor vehicle while under the influence of an intoxicant." In its analysis, the Panel treated these offenses as equivalent.[82]

On this basis, the Panel identified 12 categories of misconduct (*i.e.*, 12 top-level offenses) that contained at least 25 or more cases (a total of 589 cases): (1) Stopping/Frisking/Searching Without Sufficient Legal Authority; (2) Failing to Perform Duties; (3) Making False Entries in Department Records; (4) Excessive Force or Force Without Necessity; (5) Failing to Properly Prepare Complaint/Report/Activity Log/Paperwork; (6) Failing to Safeguard Firearm; (7) Unauthorized or Improper Use of Department Property; (8) Engaging in Physical or Verbal Altercations; (9) Operating a Vehicle Unsafely or While Intoxicated; (10) Domestic Altercation; (11) Wrongfully Entering or Searching Premises; and (12) Unfit for Duty.

Because an officer's prior disciplinary history is a significant factor in determining the appropriate penalty, the Panel further focused its review only on those cases where the officer had no prior disciplinary history (a total of 369 cases). The Panel then evaluated the penalty imposed for each of the 12 categories by rank of officer.

The Panel's review of these cases showed that:

- Generally, "white shirts" did not consistently receive more lenient penalties than lower-ranking officers for similar misconduct.

- In five out of the above 12 categories—Making False Entries in Department Records, Failing to Properly Prepare Complaint/Report/Activity Log/Paperwork, Failing to Safeguard Firearm, Stopping/Frisking/Searching Without Sufficient Legal Authority, and Wrongfully Entering or Searching Premises—"white shirts" received, on average, harsher penalties than at least one rank of non-"white shirts".[83]

- In two out of the above 12 categories—Failing to Perform Duties and Unfit for Duty—"white shirts" received more lenient penalties than lower-ranking officers.

The Panel notes that the higher penalties that "white shirts" received do not appear to be attributable to a greater number of lesser charges.[84] With one exception, the higher-ranking

---

[82] It is important to note that the Panel's investigation was inherently limited by the kind of records and data maintained and generated by the Department. Most notably, and as referenced above, where an officer is charged with and convicted of multiple offenses arising out of the same predicate conduct, the Department recommends and imposes penalties on an aggregate basis without specifying what portion of the aggregate penalty is attributable to each specific offense. That practice impaired the Panel's ability to more accurately compare all types of misconduct and the corresponding penalties imposed because the Panel could not account for any increases in penalty attributable to a greater number of charged offenses in addition to the top offense that the Panel compared.

[83] For these categories, "white shirts" received, on average, harsher penalties than at least one lower rank (*e.g.*, officer and sergeant), but may have received lower penalties than other non-"white-shirt" ranks (*e.g.*, detective).

[84] As noted above, penalty recommendations—and the ultimate penalties imposed—are not broken down by charge, but are imposed in the aggregate.

NYPD personnel received higher penalties for the same or for a lower number of charged offenses.[85]

          B.      Disciplinary Decision Makers are Potentially Susceptible to Inappropriate Influences

The Panel also conducted a review of select disciplinary cases to look for the possible presence of improper influence on disciplinary outcomes for high-ranking or "connected" personnel, as has been alleged in media and other reports.[86]  The Panel's analysis suggests that, while the disciplinary process generally produced fair results, it may not have been free from all improper influence in particular cases.  As is true of any multi-step, complex decision-making process, the Department's disciplinary system is susceptible to improper influences or inequities, including in making decisions not to report misconduct at all.  And, during the course of its review, the Panel was made aware of certain fact patterns that suggest that, on occasion, officers failed to report incidents and impeded or otherwise interfered with ongoing investigations, including by "pulling rank" or exploiting their relationships with influential members in the Department.  The Panel has not reviewed sufficient evidence to conclude, however, that these practices represent the norm.  But any exception would be troubling, and the Panel identified at least three cases where that may have occurred.

Because of the restrictions imposed upon the Panel by § 50–a and the temporary restraining order issued by the court in *Patrolmen's Benevolent Ass'n of the City of New York v. de Blasio*, the Panel cannot report specifically on these cases.[87]

          C.      Operations Within the Department Advocate's Office Raise Particular Concerns About Outside Influences on the Disciplinary Process

Over the course of its work, the Panel observed that DAO, in particular, may be susceptible to pressures or outside influences, which could negatively impact the integrity of the disciplinary process.  Specifically, the Panel's review of DAO's operations suggested that the Department Advocate is particularly vulnerable to internal and external influences outside of the formal disciplinary process.[88]

The Panel heard from relevant sources that internal and external influences on the Department Advocate are of particular concern to those involved in the disciplinary process.

---

[85] The exception noted above involved a case where a captain was charged with failure to safeguard a firearm as well as with failure to secure an identification card and shield, an administrative offense.  It is important to note that in the overall Failure to Safeguard a Firearm category, lieutenants charged with this offense did not have a higher number of other charged offenses, suggesting that the exception does not negate the Panel's overall findings.

[86] The Panel reviewed a sample of disciplinary cases prosecuted by DAO that have led to allegations of "white-shirt" immunity.  The review included an examination of IAB and DAO case files, as well as interviews with members of the Department involved in the adjudication of those cases.

[87] As discussed above, Civil Rights Law § 50–a restricts disclosure of personnel records, limiting the Panel's ability to comment with more specificity.  The Panel also has not provided anonymized summaries of the files, in light of the temporary restraining order issued by the court in *Patrolmen's Benevolent Ass'n of the City of New York v. de Blasio*, No. 153231/2018, slip op. 32839 (N.Y. Sup. Ct. June 18, 2018).

[88] The Panel's findings are based on extensive discussions and interviews with members of DAO.

31

Members of the Department noted in discussions with the Panel that the Department Advocate frequently receives input about disciplinary cases outside the formal disciplinary process, including through informal direct communications or while attending functions, events, and ceremonies hosted by the NYPD and external organizations and stakeholders.  Those individuals with whom the Panel spoke indicated that the Department Advocate often inquires about certain cases after attending events or functions, suggesting that he is engaged in off-the-record discussions concerning those cases.  The Panel also understands that the Department Advocate generally attends these events unaccompanied by other DAO personnel, such as a high-ranking uniformed member of the Department, who could act as a filter for access to the Department Advocate and shield him from external inquiries regarding specific members' disciplinary matters.

The Panel spoke to the Department Advocate about this issue; he stated that he was directed by superiors to increase DAO's communication with various stakeholders, such as police unions, in order to increase their visibility into the disciplinary process.  The Department Advocate has found that his attendance at such functions has expanded communication with stakeholders and has been helpful in providing insight into DAO's process, disciplinary trends, and other aspects of the disciplinary process.  Although outreach and education are important, the Panel believes that the Department Advocate's presence at events hosted by or attended by stakeholders also potentially exposes him to improper influence or the appearance of such influence.

## IV.   CERTAIN PHASES OF THE DISCIPLINARY PROCESS INVOLVE UNNECESSARY AND EXCESSIVE DELAY

Delay in processing of NYPD disciplinary cases is a significant issue.  Stakeholders have long expressed the need for speedier disposition of disciplinary cases.  Representatives from police unions—especially the Police Benevolent Association and the Sergeants Benevolent Association—complained that officers are in limbo, unable to be promoted or transferred, and uncertain about their futures, while their cases languish.  Representatives from citizen advocate groups report that delay frustrates community members who want officers to be promptly sanctioned for wrongful conduct.  Those groups also complain that some officers continue to receive benefits, including overtime compensation, while charges are pending against them.  In some cases, they note that an officer may accrue enough on-the-job time to resign and collect a pension before his case is resolved.

### A.   The NYPD Disciplinary Process is Lengthy

The Panel reviewed NYPD data showing the average lifespan of disciplinary cases from January 1, 2016 through September 30, 2018.  It has also reviewed statistics included in the annual reports of the CCPC showing length of IAB disciplinary investigations.[89]

---

[89] The CCPC reviewed a representative sample of IAB investigations during the period from January 1, 2013 through August 30, 2016.  *See* CCPC, *Eighteenth Annual Report of the Commission* 15-18 (Aug. 2017), *available at* https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.

1.      Cases Settled by the Department Advocate's Office

Between January 1, 2016 and September 30, 2018, DAO settled 785 cases in which Charges and Specifications were brought against one or more uniformed members of the service. The average duration of the cases settled by DAO during this time period was 378 days, from filing of Charges and Specifications to final approval of the settlement by the Commissioner. This total includes an average of 303 days for DAO to negotiate a settlement; 13 days for the First Deputy Commissioner to review the settlement; and 62 days for the Police Commissioner to review and approve the settlement.

Figure 5 below shows the average time for DAO-settled cases broken out by phase (settlement negotiations, First Deputy review, Commissioner review) and year.

**Figure 5**[90]



---

[90] The total number of cases for each year shown in this figure account only for cases that went through the full disciplinary review process, including review by the Police Commissioner.  The average time for each preliminary step in the disciplinary process reflects a higher number of cases than the number of cases listed in the annual totals because not all cases proceeded to final resolution within that year.  The Panel notes that, shortly before finalizing the Report, it was provided with partial data from the final quarter of 2018, which indicated that the average time for settlement negotiations in DAO cases decreased from 340 to approximately 311 days.

2.      Cases Settled by the Civilian Complaint Review Board

Between January 1, 2016 and September 30, 2018, CCRB settled 159 cases in which Charges and Specifications were brought against one or more uniformed officers.  The average duration of the cases settled by CCRB during this time period was 702 days, from filing of Charges and Specifications to final approval of the settlement by the Commissioner.  This total includes an average of 602 days to negotiate a settlement; 23 days for the First Deputy Commissioner to review the settlement; and 77 days for the Police Commissioner to review and approve the settlement.

Figure 6 below breaks down these averages by year.

**Figure 6**[91]



[91] The total number of cases shown in this figure account only for cases that went through the full disciplinary review process, including review by the Police Commissioner.  The Panel notes that, shortly before finalizing the report, it was provided with partial data from the final quarter of 2018, which indicate that the average time for settlement negotiations in CCRB cases decreased from 696 days to 604 days.

3. Cases Resulting in Trials Before DCT

Between January 1, 2016 and September 30, 2018, DCT completed 406 trials involving one or more uniformed officers. The average duration of trial cases during this time period was 563 days. This total includes an average of 283 days for DAO trial preparation (in cases brought by DAO); 251 days for CCRB trial preparation (in cases brought by CCRB); 222 days for trials (measuring from the date of the first conference until DCT's final decision was sent to the First Deputy Commissioner); 18 days for the First Deputy Commissioner to review the final resolution of a trial; and 59 days for the Commissioner to reach a final determination.

Figures 7 and 8 below break down the averages by year.

**Figure 7**[92]



_____

[92] Separate data for trial preparation time in DAO and CCRB cases were available for analysis by the Panel. However, with respect to actual trial time, First Deputy Commissioner review time, and Police Commissioner review time, only combined DAO and CCRB case data were available.

**Figure 8**



**B.      Certain Factors and Phases in the Disciplinary Process Cause Unnecessary Delay in Disciplinary Case Adjudication**

The Panel notes that more specific and comprehensive data relating to the timing of NYPD's disciplinary cases were not readily available.  For example, the Panel could not obtain data showing the time for different stages of DAO's trial preparation or settlement negotiation (such as the time for review by the Department Advocate).  It should also be noted that the data that the NYPD provided to the Panel were generated specifically for the Panel's review; they are not contemporaneously maintained or available in the ordinary course of the NYPD's business, which makes it difficult for the Department to self-monitor the progression of disciplinary cases and ensure that it minimizes undue delay.

The available data and the Panel's interviews show that the Department has made significant progress in the timely processing of disciplinary cases over the past few years.  In particular, DCT has substantially reduced trial time.  In addition, the CCPC's reviews of IAB investigations indicate substantial improvement in the timeframe for its completion of investigations.  Nonetheless, the timeframes remain troublingly long.  As discussed below, there are steps that could be taken to expedite the disciplinary process.

36

1.      There is Significant Delay Associated with CCRB Settlement Cases

The Panel notes that CCRB cases take, on average, nearly twice as long to reach settlement as DAO cases.[93]  This disparity may reflect the fact that CCRB cases are legally and factually more complicated than DAO cases.  It may also be due to the reconsideration process, which adds significant time to the resolution of cases.[94]

2.      DAO is Significantly Understaffed

The time for trial preparation is, by far, the largest component of delay in DAO cases.  A major driver of this delay is understaffing.  As of December 13, 2018, DAO had 1,162 open cases that required adjudication and only 10 attorneys who handle full caseloads.[95]

DAO attorneys told the Panel that the problem has been exacerbated in recent years by the failure to fill vacancies and make new hires.  In their view, at least 10 new attorneys are needed, which would increase staffing on each trial team to two supervisors and four attorneys (all with full caseloads) and would ensure that cases are processed efficiently.

There are also vacant DAO supervisory positions on its executive staff that contribute to delay.  Currently, the positions of Assistant Deputy Commissioner ("ADC"), Executive Officer, and Executive Agency Counsel are vacant.  All are important to efficiency.  In particular, the ADC, a role which existed until 2013, had the authority to make decisions on behalf of the Department Advocate, sign off on recommendations, and steer cases.

Members of DAO told the Panel that filling these executive-level positions would greatly improve the flow of work through the office.  This is especially true as DAO's work has expanded in other areas beyond processing disciplinary cases.  DAO now, for example, issues responses to CCRB reports and provides information to the Mayor's Office as needed.

Staffing issues are not limited to DAO attorneys.  The office also currently lacks sufficient paralegal support.  The Panel learned during its work that DAO paralegals often assist attorneys with drafting memos and completing other substantive work.  The lack of paralegals has increased the burden on DAO's attorneys, who are unable to delegate tasks in order to focus on higher-level projects.

---

[93] Notably, there does not exist a corresponding delay in trial cases, where trial preparation periods are similar for CCRB and DAO.

[94] The Panel's mandate extends only to a review of the Department's own disciplinary policies and practices (and units and functions involved in enforcing those policies and practices), and, accordingly, the Panel has not undertaken a review of possible sources of delay within CCRB.  The Panel's work, however, points to delays in CCRB settlements as an issue.  Accordingly, the Panel urges both the Department and CCRB to further investigate the sources of these lengthy delays.

[95] Each team at DAO includes team leaders and team supervisors who have supervisory responsibilities that should prevent them from having full caseloads.  The Panel believes that the teams should be sufficiently staffed to allow the supervisors to be relieved of all but particularly complex or sensitive matters and be allowed to devote more time to effectively supervising their respective teams.

### 3. Decision Making Within DAO is Overcentralized

The Panel was also informed that nearly all final decision-making authority in DAO rests with the Department Advocate. It is not shared with his executive staff. Thus, although DAO executive staff is able to provide recommendations as to how cases should be charged and which penalties are applicable, the Department Advocate has directed that he review and provide final approval for each disciplinary case in which Charges and Specifications are recommended. He believes that his approval better assures consistency and enhances quality control.

As one would expect, centralization creates bottlenecks that contribute to delay. The impact of this centralization in slowing the disciplinary process is most apparent in the delays in settlement cases. More than three quarters of DAO cases are resolved by settlement, all of which must be personally approved by the Department Advocate.

Excessive centralization also causes delay in the reconsideration process. As noted above, DAO must inform CCRB of any reconsideration requests within 30 days of receipt of CCRB's proposed charges. The Panel was told that reconsideration memoranda are often prepared by DAO staff weeks before the deadline, but wait months for the Department Advocate to approve them. As a result, it is not uncommon for CCRB to reject the reconsideration request as untimely, which slows an already cumbersome process.

It bears noting that delays in the reconsideration process also occur at CCRB. There is no deadline by which CCRB must respond to a DAO reconsideration request, and no deadline often results in delayed decision making.[96] Unnecessary delay is particularly problematic in cases involving less serious offenses that could result in more prompt Command Discipline, because Command Discipline cannot proceed until CCRB has responded to a reconsideration request.

Notably, DAO previously used a "fast-track" program for certain reconsideration requests. This simplified process allowed a supervisor at DAO to approve charges from CCRB where there was agreement between CCRB and DAO that low-level discipline, such as Command Discipline Schedule A or instructions, was warranted. The Panel was told, however, that the current Department Advocate has ended the CCRB fast-track program and directed that he personally approve all disciplinary recommendations made by CCRB, including low-level penalties such as instructions.

## V.   OTHER OBSERVATIONS

### A.   The Department's Handling of False Statement Cases

An issue repeatedly brought to the Panel's attention is the Department's handling of cases in which an officer is accused of making a false statement in the course of his or her duties. Critics of the NYPD contend that the Department fails to treat false statement allegations with the seriousness that they deserve. The issues raised with the Panel included the way in which false statements are charged within the disciplinary system, the circumstances in which this

---

[96] The Panel understands that CCRB and DAO are considering implementation of a 90-business-day deadline for CCRB to respond to requests for reconsideration.

misconduct is not charged at all, and the practices that may, more generally, encourage or condone false statements within the Department.

### 1.    Charging False Statement Cases

There are three principal provisions under which an officer can be disciplined for making a false statement in connection with his or her official duties.

First, § 203-08 of the Patrol Guide prohibits "the intentional making of a false official statement" and provides for "disciplinary action, up to and including dismissal."[97]  Under this section, the presumptive penalty is dismissal for making an intentional false statement "regarding a material matter."  This level of punishment is not permissive; it "*will result* in dismissal" absent exceptional circumstances, as determined by the Commissioner on a case-by-case basis.[98]  Examples of conduct prohibited by § 203-08 include lying under oath during civil, administrative, or criminal proceedings; lying in a sworn statement or an official document or report; and lying during an interview conducted pursuant to Patrol Guide §§ 206-13 and 211-14.[99]  Pleading not guilty in a criminal case or denying a civil claim or administrative charge does not trigger § 203-08.[100]

Second, officers who make a false statement can be penalized under Patrol Guide § 203-10(5), known as the "Conduct Prejudicial" provision.  This catch-all provision prohibits an officer from "[e]ngaging in conduct prejudicial to the good order, efficiency, or discipline of the Department," including by making inaccurate or misleading statements in an official capacity.[101]  In contrast to § 203-08, § 203-10(5) does not carry a presumptive penalty of dismissal.

Third, officers who make a false entry in department records can be charged under Patrol Guide § 203-05.  Like § 203-10(5), § 203-05 also does not carry a presumptive penalty of dismissal.

### 2.    Inconsistency in How False Statements are Charged

While the Patrol Guide provisions cited above expressly forbid officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty.

In its most recent annual report, the CCPC noted that, from January 2015 through August 2016, most false statement-related cases were not charged under § 203-08, but rather under the more permissive provisions of the Patrol Guide.  Even where officers were found to have

---

[97]  Patrol Guide § 203-08.

[98]  *Id.* (emphasis added).

[99]  *Id.*

[100]  *Id.*

[101]  Patrol Guide § 203-10(5).

violated § 203-08, in the majority of cases, the Department's trial commissioners recommended punishments that allowed officers to remain employed despite the presumptive dismissal penalty.[102]  The Department's practices in this regard have been a "focal point" in the CCPC's annual reports for over 20 years, from 1996 to the present.[103]

The CCPC has repeatedly recommended that the NYPD charge false statement cases under § 203-08 where the facts support such a charge.  The Panel, from its limited work in this area, shares the concern that the Department does not do so and treats false statement cases too leniently.

### 3.      Failure to Charge False Statements

Several stakeholders told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge.  Proving this negative is difficult, but the concern was raised often enough to at least warrant more study by the Department.  Relatedly, the Panel learned that the Department seems reluctant to collect evidence from other law enforcement agencies that might provide the basis for false statement charges.  For example, historically, the Department did not appear to consistently gather and analyze information about arrests that prosecutors decline to charge because of officer credibility concerns or cases in which judges make adverse findings about officer credibility. [104]

When asked about the alleged under enforcement of the false statement provisions, Department representatives told the Panel that it is difficult to determine what constitutes a true false statement case (*i.e.*, one that is properly charged and punished under Patrol Guide § 203-08).  The Department Advocate, for example, noted that the Department must weigh many variables in false statement cases, including: (1) what the facts were; (2) whether the officer created a false narrative; (3) whether he introduced false facts; (4) whether the officer was merely mistaken; and (5) whether the officer was trying to obfuscate.

In addition, although there may be other contributing factors, the Panel believes that certain ambiguities inherent in the provision—as well as a lack of internal guidance on resolving those ambiguities in particular cases—may be driving under enforcement of Patrol Guide § 203-08.  As noted above, under Patrol Guide § 203-08, an officer's false statement must have been (1) intentional and (2) concern a material matter.  As the Department Advocate noted, intent can be difficult to determine because, often, the only evidence bearing on an officer's state of mind is circumstantial.  Proving that a false statement is material can also be difficult because the Patrol Guide is silent on whether the statement must be material to an investigation, an arrest, or some other development in the life of a criminal case.[105]  The Department also lacks any

---

[102] CCPC, *Eighteenth Annual Report of the Commission*, 113-116 (August 2017), *available at* https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.

[103] *Id.* at 12.

[104] The Department appears to be taking steps to remedy this historical failure.  The NYPD recently informed the court in the stop-and-frisk litigation that it had undertaken concrete steps to ensure that it aggressively investigates adverse credibility findings by courts.  The Panel addresses these steps in Recommendations, Part X.

[105] The elements of intentionality and materiality were added to Patrol Guide § 203-08 to address concerns that the provision was vague and subject to arbitrary enforcement, concerns that were especially problematic in light of the

guidance concerning when violations of Patrol Guide § 203-08, versus other provisions, should be charged.

### 4.  Practices that Encourage or Condone False Statements

One stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned. The specific practice that the stakeholder cited was the "handing off" of arrests, in which the actual arresting officer allows a colleague to prepare the arrest report, become the "arresting officer," and earn the overtime that often comes with that designation. Many stakeholders reported that supervisors tolerate this practice and that their tolerance promotes a culture in which more egregious falsehoods occur.

### B.  The Department's Handling of Domestic Violence Cases

The Panel examined how the Department disciplines its members when they are involved in domestic violence incidents. Officer-involved domestic violence ("OIDV") is of particular concern because of its implications for victims, the public, and the Department.

From a victim's perspective, there are special concerns in any domestic violence incident involving a police officer. Many members of the Department are armed, which can escalate domestic violence incidents and intimidate victims. Some Department members may also be able to intimidate victims in other ways because they may have access to information and databases that the civilian population does not, and may be familiar with the services and aid networks available to victims. There are also barriers that prevent OIDV victims from reporting abuse because the responding officer may be a coworker or friend of the perpetrator. A victim may fear that reporting an incident will result in a spouse or partner losing his or her job and livelihood.

As the Department recognizes, OIDV incidents implicate the Department's obligation to police its own members and to keep the public safe from those who may be ill-suited for the authority that comes with the job. Domestic violence incidents could be a warning sign for other issues in the execution of an officer's public-facing duties—such as the use of excessive force—and can call into question whether an individual possesses the temperament required to be an officer of the NYPD.[106]

### 1.  Review of OIDV Discipline in the NYPD:  2016-2017

The Panel has examined OIDV disciplinary cases that the Department adjudicated in 2016 and 2017. There were 36 cases in which a Department member was disciplined for

---

mandatory termination penalty. *See* NYPD Interim Order 4 of 2005 (introducing intentionality and materiality requirements); *Latino Officers Ass'n City of New York v. City of New York*, 209 F.R.D. 79, 85 n.46 (S.D.N.Y. 2002) (discussing claims in class action lawsuit brought by African-American and Latino officers alleging that false statement charges "are able to be used and manipulated in a discriminatory manner because they are so vague").

[106] *See* Anna Joseph, *Behind Closed [Blue] Doors:  Officer-Involved Domestic Violence and § 1983's Potential*, 2 J. L. & Pub. Aff. 230, 235, 249-50 (2017); Philip M. Stinson & John Liederbach, *Fox in the Henhouse: A Study of Police Officers Arrested for Crimes Associated with Domestic and/or Family Violence*, Crim. Just. Fac. Publ'ns at 1, 19, 25 (2013).

engaging in a domestic violence incident.  Thirty of the cases were resolved by settlement, and six by Department trial.  In 15 of the 36 cases, the officer had a prior disciplinary record.

The penalties in the 36 cases ranged from loss of 15 vacation days to dismissal.[107]  Two resulted in dismissal, and one in an officer agreeing to file for retirement.  All three of these cases involved physical violence.  Eight cases had dismissal probation as part of the penalty.[108]  In the remaining 25 cases, the sanction was typically loss of vacation or of suspension days along with counseling.[109]  The most severe penalty, other than dismissal, was 68 suspension days.  The typical penalty was the loss of 30 vacation days.  Counseling was included as a condition of the penalty in 24 out of the 36 cases.

Of the 36 cases, 28 involved a physical altercation.[110]  Many of these cases involved punching, slapping, kicking, or choking the victim, resulting in documented injuries including lacerations, bleeding, and bruising.  In some cases, the victim was physically restrained and prevented from escaping or calling for help; in others, the victim was threatened with a firearm or death during the incident.

Of the 36 cases, 10 involved members of the service for whom there was evidence of at least one prior domestic incident in their files.  In many of these cases, the prior matter was closed as unsubstantiated.  Three cases involved officers who had prior substantiated domestic incidents.  One of the three was removed from the Department, and two kept their jobs.  One officer, who was not dismissed, had eight prior domestic incidents in his file, two of which had been substantiated.

As a general matter, the Panel found that discipline for physical domestic violence was often less severe than that for driving under the influence of alcohol or discourtesy to a supervisor.  Those matters often resulted in penalties in excess of 60 vacation days and included dismissal probation.  Domestic violence penalties, however, were typically more severe than the penalties for unauthorized or excessive use of force.

Domestic violence disciplinary penalties are currently under review by the Department.  The Department shared with the Panel that it is considering increasing the penalties in these matters, making greater use of dismissal probation, and terminating offenders more often in appropriate cases.  The Department is also in the process of enhancing its counseling programs for offenders and is offering optional counseling for victims.

---

[107] The Panel only reviewed cases in which an officer was disciplined for a domestic violence incident.  It did not review domestic violence complaints that were ultimately unsubstantiated.

[108] As described above, dismissal probation is a one-year probationary period, which allows the Department to automatically terminate an officer if he or she engages in misconduct during the period.  Two of the eight officers who were placed on dismissal probation for domestic incidents left the Department during the probationary period.  One of these officers was terminated for additional misconduct unrelated to domestic violence, and the other filed for retirement.

[109] A vacation day penalty means the officer loses a paid vacation day; a suspension day penalty means the officer loses pay for each day (up to 30 days) while the disciplinary proceeding is pending.

[110] In 18 of these 28 cases, the penalty was loss of vacation or suspension days, up to 30 and 36, respectively.  In the remaining 10, the penalty included dismissal or dismissal probation.

As in the area of false statements, the Panel notes that the CCPC has made repeated and robust recommendations for how the Department can improve its handling of OIDV cases. According to the CCPC, however, the Department has not yet implemented its recommendations. The Panel's own analysis of OIDV disciplinary cases from 2016 and 2017, discussed above, confirms that assessment.

C.       The Department Lacks an Integrated Case Management System

Currently, the NYPD lacks a single, centralized case management system capable of logging and tracking disciplinary cases from beginning to end. Instead, each of the several bureaus involved in the Department's internal disciplinary process maintains its own case management system that is effectively siloed from the others (*i.e.*, data from one system cannot automatically be shared with another system).

While the Department historically has dedicated an extraordinary amount of resources to its information technology ("IT") systems related to traditional policing, it has not prioritized the IT systems used in its internal disciplinary system. Notably, none of the case management systems maintained by the various bureaus involved in the disciplinary process was created or substantially improved in the last five years.

The lack of integration between these several case management systems produces significant inefficiencies and unnecessary delays. For example, when IAB completes its investigation of a disciplinary case, its case file cannot automatically be sent to DAO's case management system. Instead, an IAB investigator must download the relevant case file from IAB's case management system and send it to DAO where a DAO attorney must then manually input the data from IAB's case file into DAO's separate case management system. In addition to creating inefficiency, the Department's ability to analyze data and statistics as they relate to the various stages of the NYPD's disciplinary process is hampered by the lack of a single case management system.

The lack of a centralized case management system may also undermine the Department's risk management efforts. Since November 2017, RMB has incrementally rolled out its own electronic system, called the Risk Assessment Information Liability System ("RAILS"), to identify and track uniform and civilian members of the service who may be more likely to commit disciplinary offenses. When a member of the service reaches a threshold with respect to predetermined criteria indicative of high-risk behavior, RAILS will trigger and send an alert to the member's commanding officer. Factors currently monitored by RAILS include CCRB cases, civil litigation, dismissal probation, and Command Discipline. At present, however, RAILS cannot easily obtain all relevant information and data relating to an ongoing disciplinary case due to the lack of a single case management system.[111] Hence, the lack of a centralized case management system hinders the Department's ability to effectively and proactively manage risk.

---

[111] The Panel understands that the Department is currently in the process of creating a centralized electronic personnel system, called TRAILS, which the Department expects to be fully functional within the next three months. While the implementation of TRAILS will likely help facilitate the Department's risk management goals, it nonetheless remains the case that, without a single, integrated case management system, RAILS must query several different systems in order to obtain information relating to ongoing disciplinary cases.

## RECOMMENDATIONS

### I.   THE DEPARTMENT SHOULD SUPPORT AMENDMENTS TO § 50–a TO INCREASE TRANSPARENCY AND ENHANCE ACCOUNTABILITY[112]

As interpreted by the Court of Appeals in the *NYCLU* litigation, Civil Rights Law § 50–a protects police "personnel records used to evaluate performance toward continued employment or promotion" from disclosure, including in response to a FOIL.  If a record falls within § 50–a's scope, the protection is absolute.  The Department cannot produce the record in response to a FOIL request, or on its own initiative, even if it is redacted to protect an officer's privacy.  Even the Department itself believes that § 50–a sweeps too broadly, and the Panel, along with many other constituents, agree fully with that assessment.  Officer privacy is a legitimate concern, but some meaningful disclosure is necessary if the public is to have confidence that the Department's disciplinary process works.

> ### A.   Section 50–a is an Unnecessary Barrier to Transparency and Accountability and Should be Amended to Allow Public Access to Information on Final, Substantiated Disciplinary Matters

It is now up to the Legislature to amend § 50–a and restrike the appropriate balance between privacy and transparency.  Drafting reform legislation is beyond the Panel's mandate, but there are several possible "fixes" that the Panel would favor.  One proposal that warrants consideration, as discussed further below, would be to amend § 50–a so that it applies only to the subpoenaing of disciplinary records in court cases, and not to FOIL requests.  Such a reform would limit § 50–a's application to its original purpose—protecting police disciplinary records from discovery in ongoing litigation—and would not leave officers unprotected outside of the court context.

As noted, New York is nearly alone in maintaining a statute specifically blocking police disciplinary records from disclosure under freedom of information laws.  Amending the law to permit FOIL disclosure would bring New York's statutory scheme more in line with those states that open police records to public scrutiny, thereby empowering citizens and enhancing public oversight of the disciplinary process.  Amending the law to eliminate special protections for personnel records of police officers would also put an end to the difficult questions of statutory

---

[112] It is noteworthy that the New York City Bar Association and the New York City Law Department have both called for legislative reform.  *See* New York City Bar, *City Bar Urges Repeal of Civil Rights Law 50–a to Allow Public Disclosure of Police Records Relating to Police Misconduct—Thirty Two Other Organizations Also Support* (Apr. 30, 2018), https://www.nycbar.org/media-listing/media/detail/city-bar-urges-repeal-of-civil-rights-law-50–a-to-allow-public-disclosure-of-police-records-relating-to-police-misconduct (last visited Jan. 9, 2019).  The New York City Law Department has stated, "If greater transparency is to be achieved, section 50–a of the state's civil rights law must be amended."  Dan M. Clark, *NYPD Can Withhold Disciplinary Records From Public, NY Court of Appeals Holds*, New York Law Journal (Dec. 11, 2018), https://www.law.com/newyorklawjournal/2018/12/11/nypd-can-withhold-disciplinary-records-from-public-ny-court-of-appeals-holds/.  The New York City Corporation Counsel, Zachary Carter, has similarly opined that "[t]o the extent that current law does not permit transparency into the disciplinary process, it should be changed."  Office of the Mayor, *Mayor de Blasio Outlines Core Principles of Legislation to Make the Disciplinary Records of Law Enforcement and Other Uniformed Personnel Subject to Disclosure* (Oct. 14, 2016),  https://www1.nyc.gov/office-of-the-mayor/news/820-16/mayor-de-blasio-outlines-core-principles-legislation-make-disciplinary-records-law (last visited Jan. 9, 2019).

interpretation that have resulted in increasingly restrictive readings of § 50–a.[113]  If the changes the Panel suggests were made in § 50–a in the interest of greater transparency and public scrutiny, other provisions of existing New York law would provide sufficient protections to officers' privacy and security interests.

Section 87(2) of the Public Officers Law, which enumerates the category of records exempt from presumptive FOIL disclosure, includes an exemption "if disclos[ure] would constitute an unwarranted invasion of personal privacy."[114]  Section 89(2)(b) of the law defines "[a]n unwarranted invasion of personal privacy" to include:  "disclosure of employment, medical or credit histories or personal references of applicants for employment" and "disclosure of information of a personal nature when disclosure would result in economic or personal hardship to the subject."[115]  A separate FOIL exemption also permits an agency to withhold documents "if disclosure could endanger the life or safety of any person."[116]  Thus, a regime without § 50–a's blanket exemption for police personnel records would still afford officers meaningful protection.

The Legislature could also choose to amend Public Officers Law § 89(2)(b) to protect against unwarranted disclosure of unsubstantiated allegations of police misconduct.  For example, a subsection could be added that would permit the Department to withhold from FOIL disclosure allegations against an officer that were unsubstantiated or unfounded.  The Panel recognizes that there is a legitimate public interest in knowing that an allegation could not be substantiated, but concern for officers' privacy might tip the balance in favor of non-disclosure.  Policing is a difficult and dangerous job, and keeping records of unsubstantiated allegations out of the public domain might be the preferable course.  On the other hand, the Panel sees great value in the disclosure of substantiated, final determinations.  The Panel invested considerable time and resources in studying the NYPD's mechanisms for resolving Charges and Specifications against officers.  The internal trial system affords due process to accused officers, permits robust adversarial confrontation, and provides fair, evidence-based outcomes.  There is no reason why these results should remain secret.

Section 50–a also includes provisions that govern the discoverability of disciplinary records in ongoing cases.  A court may issue a subpoena only on a clear showing of facts "warrant[ing] the judge to request records for review"; the judge must review the records *in camera* to determine whether they are relevant to the pending action; and before any record is released, it must be redacted to remove those portions that are not relevant.  This part of § 50–a was designed to prevent the disclosure of sensitive personnel records that could be used improperly to harass or embarrass officers on cross-examination.  The Panel therefore concludes that this mechanism should survive any reform of § 50–a.

Amending § 50–a to restrike the balance in favor of disclosure is important if the Department is to retain the trust of the communities it serves.  It bears emphasis that in the 40 years that the Department regularly posted Personnel Orders for inspection, there was no

---

[113] *See, e.g., NYCLU*, 2018 WL 6492733; *Matter of Daily Gazette Co. v. City of Schenectady*, 93 N.Y.2d 145 (1999).

[114] N.Y. Pub. Off. Law § 87(2)(b).

[115] N.Y. Pub. Off. Law § 89(2)(b).

[116] N.Y. Pub. Off. Law § 87(2)(f).

evidence that any officer was harassed as a result of a posting.[117]  In Chicago, an advocacy group posted some 240,000 police disciplinary records online in a searchable database, and no increase in threats against officers or their families has been reported.[118]  If New York is to strike the proper balance between privacy and transparency, concern for officer safety must be respected, but not exaggerated.

## II.    THE NYPD MUST GUARD AGAINST UNWARRANTED EXPANSION OF THE SCOPE OF § 50–a

Until § 50–a is amended, the Department should interpret it as narrowly as possible consistent with the Court of Appeals' ruling.  Most obviously, the Department should resist efforts to include arrest reports, police body camera footage, and the like in the definition of personnel records to which § 50–a applies.  An arrest report may be the subject of a disciplinary matter, but that does not convert it into a personnel record.  And footage from a body camera is no more a "personnel record" than footage from a surveillance camera affixed to a pole in the street.  Such footage may reveal police misconduct (or provide evidence that misconduct did not occur), but its principal purpose is not to evaluate an officer's performance for continued employment or promotion.[119]  If a police shooting were captured on a body camera and § 50–a were interpreted to prevent its disclosure, the public would be justified in decrying that outcome.

## III.    THE NYPD SHOULD ALSO ENHANCE ITS PUBLIC REPORTING IN LINE WITH THAT OF OTHER AGENCIES

Section 50–a poses no impediment to the release of anonymized statistical data about disciplinary outcomes.  At present, CCRB issues monthly, semi-annual, and annual reports that include these statistics.  CCRB's 2017 Annual Report, for example, states that "the DAO took some form of disciplinary action against 73% of the officers referred to it [and] [i]n cases where the NYPD pursued discipline, the most common form was Formalized Training (128, or 32%) followed by Command Discipline (108, or 27%)."  CCRB's reports also include tables that break down use of force allegations into categories—"Chokehold," "Flashlight as club," "Gun as club," "Handcuffs too tight," "Nonlethal restraining device," and "Pepper spray."  The specificity of such information helps inform the public about what is happening in the

---

[117] *See* Brief for Petitioner at 5-6, *Luongo II*, No. 160232/16 (N.Y. Sup. Ct. 2017).

[118] *See* Jamie Kalven, *Invisible Institute Relaunches the Citizens Police Data Project*, The Intercept, (Aug. 16, 2018), https://theintercept.com/2018/08/16/invisible-institute-chicago-police-data/ (last visited Jan. 9, 2019) ("For decades, the city of Chicago, the police department, and the police unions argued that various horrible consequences would ensue if officer names were made public—officers would be targeted, their families harassed, the security of police operations undermined, etc.  In the three years since we made the first limited release of police disciplinary information, nothing of that nature has been reported.").  Panel staff also interviewed Mr. Kalven and Kevin Graham, President of the Chicago Lodge of the Fraternal Order of Police, to confirm this assessment.  One incident of threats in a high-profile case was reported by Mr. Graham, though, as he acknowledged, it is unclear whether the information made available through the Citizens Police Data Project played any role.

[119] *Matter of Capital Newspapers Div. of the Hearst Corp. v. City of Albany*, 15 N.Y.3d 759, 761 (2010) (holding that firearms tags used by the Albany Police Department to track the use of department guns were not "personnel records" under the meaning of the statute); *see also Matter of Green v. Annucci*, 59 Misc. 3d 452, 455 (N.Y. Sup. Ct. 2017) (warning that under a broad reading of § 50–a, a FOIL respondent could cloak any record in secrecy by merely placing it into a personnel file).

community when police officers are interacting with the public.  Like CCRB, the CCPC also releases annual reports that are rich in statistical data.  And, since 2015, the OIG-NYPD has issued annual reports that provide further data and insights.  Its first report, for example, it reviewed 10 NYPD chokehold cases and recommended policy changes.  These reports do not identify any officer, but are invaluable resources and possible catalysts for reform.

None of this reporting was forbidden by § 50–a.[120]  Data compilations are not personnel records, even under the most restrictive interpretation of existing law.  The fact that CCRB, the CCPC, OIG-NYPD, and the federal monitor issue regular reports on Department discipline, while the Department does not, helps create the impression that the Department has something to hide.[121]  The Panel recommends that the Department join these agencies in publishing an annual report on police discipline to provide meaningful transparency about its disciplinary process and outcomes.

One model to consider for such a report is IAB's annual report, issued every year from 1996 to 2006, but then discontinued.  Like that publication, the report recommended here would include a comprehensive statistical overview of discipline initiated and concluded during the calendar year, broken down by precinct to the extent feasible.  It should show Commissioner variance rates (*i.e.*, the number of times the Commissioner varied up or down from a recommendation) and the penalties imposed by offense.  In addition, the report should also include the Commissioner's personal observations about the strength and efficiency of the disciplinary process, his views on where and what type of training and policies are or should be considered by the Department (including changes in approach to penalties for specific offenses), and the status of implementing the recommendations from the Panel and other stakeholders such as the CCPC and OIG-NYPD.  The Commissioner could also consider presenting a high-level summary of the annual report's findings and conclusions at a publicly held "town hall" meeting where citizens could pose questions.

## IV.   THE NYPD SHOULD PUBLISH TRIAL ROOM CALENDARS

The Panel also recommends that the Department release trial room calendars, which would apprise the public of when particular officers' cases may be observed.  To avoid any § 50-a concerns, such calendars need not include the Charges and Specifications at issue, but merely the officer's name, the date, and the trial room number.  That Legal Aid interns must now

---

[120] CCRB's reports also provide anonymized synopses of noteworthy incidents.  In March 2018, the Department attempted to publish such summaries, but at present cannot do so, due to the temporary restraining order in *Patrolmen's Benevolent Assoc. v. de Blasio*, No. 153231/2018, slip op. 32839 (N.Y. Sup. Ct. Apr. 11, 2018).  In the event of a favorable resolution of that case, the Panel urges the NYPD to immediately resume publication of such synopses.

[121] The Panel notes that, since the court in *Patrolmen's Benevolent Ass'n. v. de Blasio* ordered the Department to discontinue publication of anonymized synopses, the only disciplinary data the NYPD currently makes available are those required to be disclosed under local law.  Pursuant to Administrative Code § 14-160, the Department also publishes an annual list setting forth the number of officers at each command who meet any of four particular disciplinary categories (two substantiated CCRB complaints over the past three years; any IAB investigations resulting in suspension over the past five years; any finding of use of excessive force over the past three years; or any arrest related to job function in the past 10 years).  Pursuant to Administrative Code § 14-158, the Department publishes an annual summary and statistical analysis of all use of force incidents.  This Use of Force Report, however, does not provide information on the disciplinary outcomes of such incidents.

be stationed in the trial room to figure out when cases are called is disrespectful to stakeholders and a waste of their resources.  Publication of calendars would make the openness of the trial room much more useful.

## V.      THE DEPARTMENT SHOULD APPOINT A CITIZENS' LIAISON

The Department should also take steps to ensure that those harmed by police use of force have an accessible and respectful avenue to obtain disciplinary case information.  The Panel heard from multiple constituents that obtaining such information is difficult and the process is demeaning.  The Panel sees value in the appointment of a management-level executive dedicated to providing one-on-one attention to persons seeking information in these situations.  A thoughtful, assertive, and dedicated executive in this role would provide much-needed sensitivity and understanding to victims and family members who currently do not have a sympathetic and dedicated ear in the Department.  The Department would benefit as well.  As things currently stand, victims and family members are left to learn about the NYPD disciplinary process in a haphazard fashion—through some combination of plaintiffs' attorneys, criminal defense attorneys, community groups, and their own research.  The creation of the liaison role would let the NYPD tell that story itself.

The Panel understands that the scope of the liaison's substantive work will necessarily be circumscribed by § 50–a.  But even in the absence of § 50–a reform, the liaison can explain the steps of the process, confirm dates of trials or other relevant events, update individuals on a case's progress through those stages, and make an informed estimate as to when the case may be decided by the Police Commissioner.  In the final analysis, the Panel believes that the positive message conveyed simply by the allocation of respectful senior personnel and resources to the liaison role is itself important.

## VI.     THE POLICE COMMISSIONER SHOULD ENHANCE THE DOCUMENTATION OF VARIANCES FROM DISCIPLINARY RECOMMENDATIONS

The exercise of unfettered discretion has the potential to result in inconsistent outcomes, favoritism, and excessive leniency.  The Panel believes, however, that the Commissioner, who is responsible and accountable for the performance of every member of the NYPD, is also uniquely positioned to evaluate discipline.  However, against the backdrop of longstanding public concerns about the transparency of the disciplinary process and the legal obstacles to improving transparency, the Commissioner's unfettered discretion over disciplinary matters imposes a heightened responsibility on him to enhance public transparency and his own accountability for the decisions he makes.  There are a number of steps the Commissioner can take.

First, the Panel recommends that the Commissioner prepare variance memoranda in all disciplinary cases where he departs from a disciplinary recommendation—whether in a DAO or CCRB prosecution, a DCT trial or a settlement, and regardless of whether the departure is upward or downward.  Such memoranda are currently required only in cases prosecuted by CCRB, tried by DCT, and where the Commissioner departs downwards.  While the settlement process does not afford an officer all of the procedural protections afforded by a trial, in changing the disposition of a settled case, the Commissioner is substituting his judgment for an outcome negotiated and agreed to by the parties.  The parties and others involved in the

disciplinary process should know the reasons for the change. Those involved in the disciplinary process should be provided with the rationale behind the Commissioner's decision to impose a penalty that departs from their agreed-upon resolution.

Second, the Panel recommends that those departure memoranda include more robust and meaningful reasoning for departing from a particular recommendation or settlement agreement,[122] and reflect all relevant inputs that the Commissioner received during the life of the case, whether formal or informal. In addition to identifying the relevant metrics and facts addressed during the Commissioner's disciplinary committee meetings (*i.e.*, prior disciplinary history, rank, tenure, performance evaluations, and reviews),[123] the variance memoranda prepared by the Commissioner should include all relevant precedent. Including the precedent that the Commissioner relied upon could enhance consistency in disciplinary outcomes across similar offenses and could increase visibility into the Commissioner's considerations while holding him accountable to the process.

The memoranda should further include a record of any informal and external inputs received by the Commissioner, whether or not he believes that they affected his ultimate decision. For example, in cases where police unions or other stakeholders have urged the Commissioner to arrive at a certain disposition, the variance memoranda should reflect such input. Critically, the Commissioner should also refrain from opining on ongoing disciplinary matters until the case reaches his office. The Panel believes that the practice of contacting DAO with respect to certain disciplinary matters during the process provides the Commissioner with an unintended avenue for stifling an independent DAO determination before it reaches him.[124] Such communications also interfere with DAO's and DCT's discrete processes and, depending

---

[122] The OIG made this observation in its 2015 report, pointing to the lack of detail in the Commissioner's change of penalty letters in CCRB arrests at the time. *See* OIG-NYPD, *First Annual Report* 18 (Mar. 2015), *available at* https://www1.nyc.gov/assets/oignypd/downloads/pdf/annual_report_3-27-15.pdf. "The lack of transparency in the disciplinary determination process hinders accountability on the part of NYPD," OIG noted. "Fortunately," the report continues, "there have been recent changes to the New York City Rules which now require the Commissioner, in certain specific cases, to provide CCRB with a detailed written explanation of deviations from CCRB's disciplinary recommendation." The Panel agrees with this observation, but concludes that the same rationale applies to all disciplinary cases that the Commissioner reviews and in which he exercises his judgment and discretion to change the disposition or penalty.

[123] As noted above, one of the metrics included in the summary fact sheet presented to the Commissioner is the number of each officer's arrests. The Panel understands that those officers who record a high number of arrests may be productive officers who are more likely to encounter situations that could result in rule violations and, ultimately, discipline. In reviewing an officer's past disciplinary record, however, the Panel urges that this metric be evaluated with caution—solely as an objective data point—and not in a way that rewards productivity over proper conduct.

[124] As noted above, currently the Department Advocate is a standing participant in the Commissioner's periodic disciplinary committee meetings. The Panel recognizes that, as the head of DAO, the Department Advocate is well-suited to provide additional details about the nature of cases that DAO prosecuted. Similarly, the Chair of CCRB could be particularly informative in those cases that proceeded through the CCRB reconsideration process. While the Panel believes that the Commissioner is best positioned to determine who should attend the disciplinary committee meetings, it nevertheless recommends that the Commissioner consider whether the Department Advocate's presence is necessary at all disciplinary committee meetings and whether the Chair of CCRB or another appropriate CCRB representative should be given a seat at the table when CCRB cases are presented to the Commissioner.

on the nature of the input, could influence those offices' recommendations and undermine the integrity of the disciplinary regime.

## VII.   THE NYPD SHOULD ADOPT PROTOCOLS TO INSULATE DECISION MAKERS FROM EXTERNAL PRESSURES AND MINIMIZE THE APPEARANCE OF INAPPROPRIATE INFLUENCE OVER THE DISCIPLINARY PROCESS

### A.   The Department Should Design and Implement Training and Policies Addressing and Memorializing Informal Communications Concerning Disciplinary Cases

As discussed above, external stakeholders may initiate informal communications with the members of DAO, the First Deputy Commissioner's Office, and the Commissioner's Office concerning disciplinary cases.  There is no prohibition against NYPD personnel receiving or participating in such communications, which relate to, but which are outside of, the formal disciplinary process and protocols.  These communications create opportunities for improper external influence over the adjudication of cases or at least the appearance of such.  In addition, DAO, from time to time, receives informal internal inquiries on pending matters from the First Deputy or the Commissioner.

To ensure the integrity and independence of the disciplinary process, the Department should implement guidelines and provide training for all personnel in all three offices, including for the Department Advocate, the First Deputy, and the Commissioner.  Those guidelines should address factors that must be considered when discussing disciplinary cases through informal channels and should cover, among other things, the importance of maintaining public perception that the disciplinary process is free from inappropriate influence and what factors members should consider before participating in internal and external functions and events.[125]

The guidelines should further require proper documentation of all such informal communications.  Creating a record and maintaining logs of such communications are critical to ensuring accountability and, at the very least, internal transparency about those who have access to key decision makers within the Department.  Such logs should be made available for internal audit and inspection by the OIG-NYPD.

### B.   The Department Should Consider Adopting a Recusal Policy in Certain Disciplinary Cases

In light of concerns that decision makers who are involved in the disciplinary process could direct the course of certain cases involving individuals with whom they have a personal or familial relationship, the Panel recommends that the Department consider implementing a recusal policy intended to prevent the appearance of impropriety and a potential conflict of interest.  One option for the NYPD to consider is the policy currently applicable to the United

---

[125] The Panel notes that the practice currently in place within DCT is one option for the Department to consider here. In an effort to protect the impartiality of the DCT herself and DCT judges, members of that office advise judges on the propriety of attending certain NYPD and outside events.  In an effort to shield them from improper influence and the general appearance of impropriety, DCT judges are often accompanied to functions (where other stakeholders are in attendance) by other members of the office.

Department of Justice, which prohibits employees from participating in an investigation or prosecution of a person with whom they have a personal, familial, or political relationship.[126]

## VIII.   THE DEPARTMENT SHOULD STUDY AND CONSIDER ADOPTING A DISCIPLINARY MATRIX

The Panel did not identify obvious evidence of systematic bias or favoritism. Nevertheless, because of data limitations, the Panel cannot determine the level of consistency in the Commissioner's disciplinary decisions.  It is also clear that there is significant suspicion and speculation by the public that disciplinary decisions are not always fair, evenhanded, and consistent.  The Panel therefore recommends that the Department study and consider adopting a disciplinary matrix to help guide the Commissioner in exercising his broad discretion and to address public perceptions and misgivings about the disposition of cases and the imposition of appropriate penalties.[127]

The Patrol Guide already offers limited guidelines for penalties with respect to certain offenses.  For instance, Patrol Guide § 203-04 stipulates that dismissal is the presumptive penalty for the misuse of a firearm while unfit for duty due to excessive alcohol consumption.  But the Patrol Guide provides for a presumptive penalty for only a handful of violations.  What is needed is a more comprehensive, stand-alone framework governing all disciplinary cases, or at least for the most serious charges.

The Panel notes that several large city police departments have successfully implemented disciplinary matrices that may serve as useful models.[128]  The Panel is aware that the NYPD has considered the implementation of a matrix in the past, and strongly urges the Department to develop and adopt a nonbinding disciplinary matrix and launch a pilot program to test its efficacy.  The Panel believes the Department will benefit from implementing a matrix for at least three reasons.

First, even the perception of favoritism or systematic bias can undermine confidence in the legitimacy of the disciplinary system in the eyes of Department personnel and the public. Indeed, recent studies have found that disciplinary matrices may increase perceived organizational support for police departments among police officers.[129]  Further, a disciplinary

---

[126] *See generally* 28 C.F.R. § 45.2.

[127] The Panel did not review, more generally, whether the penalties the Department imposes for specific offenses are appropriate to accomplish the goals of the disciplinary system.  The Panel recommends that the Department undertake such a review as it considers the adoption of a disciplinary matrix.

[128] *See, e.g.*, Los Angeles Police Department, *Penalty Guide and Penalty Assessment Factors* (Sept. 15, 2016), *available at* http://assets.lapdonline.org/assets/pdf/AO_15.pdf; Denver Police Department, *Discipline Handbook: Conduct Principles and Disciplinary Guidelines* Appendix F (May 3, 2018), *available at* https://www.denvergov.org/content/dam/denvergov/Portals/744/documents/handbooks/dpd-discipline-handbook.pdf.

[129] *See* Paul D. Reynolds & Richard C. Helfers, *Do Disciplinary Matrices Moderate the Effects of Prior Disciplinary Actions on Perceived Organizational Support (POS) Among Police Officers?*, 20(4) Int'l J. Police Sci. & Mgmt. 272 (2018).

matrix may help the Department detect previously unseen trends indicative of favoritism, bias, or inconsistency in the system, if any exist.

The implementation of a disciplinary matrix would reinforce the Police Commissioner's accountability.  A matrix would not limit the Commissioner's discretion over disciplinary outcomes, but would provide helpful guidelines for him to consult when exercising that discretion.

Second, given the current legal obstacles to releasing personnel records and other information about disciplinary outcomes, implementing a disciplinary matrix may aid the Department in its efforts to be more transparent with the public.  At the very least, a publicized matrix would inform the public of the Department's view of what penalties are presumptively appropriate for specific types of misconduct.

Third, a matrix may increase efficiency in the system by providing CCRB investigators, DAO personnel, and representatives of accused officers a more concrete basis from which to negotiate settlements of uncontested Charges and Specifications.

## IX.   THE DEPARTMENT SHOULD TAKE MEASURES TO EXPEDITE DISCIPLINARY ADJUDICATIONS

### A.   DAO Should Hire Additional Attorneys and Fill Vacancies on the Executive Staff

The Panel found that every team at DAO that handles cases is understaffed.  The number of DAO attorneys should be increased by 10.  This would enable team leads and supervisors to focus on reviewing the work of line attorneys and handling the more sensitive or high-profile matters, rather than juggling supervisory duties and their own significant caseloads.  DAO should also hire an additional four paralegals.  The Panel learned that DAO agency attorneys often delegate tasks to paralegals so that they can focus on substantive legal work.  Increasing the number of paralegals at DAO will allow agency attorneys to process cases faster and more efficiently.

The vacant executive staff positions should also be filled promptly.  The executive staff should be given the authority to make final decisions on routine disciplinary matters, which would allow the Department Advocate to focus on cases where significant charges are recommended and on other duties commensurate with Deputy Commissioner-level responsibilities.  Most urgently needed is an ADC, who can make decisions on behalf of the Department Advocate when he is unavailable in addition to handling day-to-day routine management.

### B.   The Department Should Implement a "Fast Track" Review for Certain Disciplinary Cases

The Department should consider a "fast track" for settled cases involving less serious offenses where the officer has agreed to the findings and the penalty imposed in the settlement.  Such offenses may include, for example, failure to remain alert on post, unauthorized off-duty

employment, misuse of a Department computer, failure to safeguard a firearm, and vehicle and traffic violations.

Fast tracked cases could move to immediate resolution once a settlement has been reached, without review by the First Deputy Commissioner's Office or the Commissioner's Office. To maintain the Commissioner's control over disciplinary matters, appropriate reporting of all settlements would be made to both the First Deputy Commissioner and the Commissioner. If any troublesome trends or cases emerged, the Commissioner could revisit the fast track process and determine whether it requires modification.

### C.   DAO Should Limit Reconsideration Requests

DAO should limit the CCRB cases for which it requests reconsideration. In particular, DAO should not request reconsideration of disciplinary cases in which CCRB recommends Command Discipline, training, or instructions. In addition, DAO should request reconsideration of disciplinary cases in which CCRB recommends Charges and Specifications only when: (1) there are new facts or evidence that were previously not known to the CCRB panel, and such facts or evidence could reasonably lead to a different finding or recommendation in the case; or (2) there are matters of law which are found to have been overlooked, misapprehended, or incorrectly applied to a particular case by the CCRB panel. DAO should not request reconsideration where it merely disagrees with CCRB's conclusions, when those conclusions were based on a complete evidentiary record and an accurate understanding of the law.

DAO and CCRB should also adopt the change—currently under consideration—to impose a 90-business-day deadline on CCRB's responses to DAO requests for reconsideration. Currently, no deadline applies to this stage. The Panel believes 90 days should be more than sufficient time for CCRB to assess the request and respond, while still imposing a modicum of efficiency on the process.

## X.   THE DEPARTMENT SHOULD STRENGTHEN ENFORCEMENT OF FALSE STATEMENT DISCIPLINARY POLICIES

To address issues that contribute to the under prosecution of false statement cases, the Panel recommends that the Department issue official guidance to IAB investigators and DAO attorneys concerning when officers who make false statements should be charged under Patrol Guide § 203-08, as opposed to other provisions of the Patrol Guide without a presumptive termination penalty.

The Panel is also encouraged by recent steps the Department has taken to monitor prosecutions and civil proceedings, and maintain open lines of communication with all six local prosecutors,[130] both U.S. Attorney's Offices, and the Corporation Counsel.[131]  According to the

---

[130] In addition to the District Attorneys in each of the five boroughs of New York City, the Office of the Special Narcotics Prosecutor for the City of New York has citywide jurisdiction.

[131] By this recommendation, the Panel does not suggest that every declination to prosecute, adverse credibility finding by a judge, and civil award by a jury should result in Charges and Specifications. Each of these modalities is beset by its own set of limitations. The Panel does conclude, however, that each instance should be analyzed and critically examined for possible disciplinary action.

NYPD's January 14, 2019, update to the court in the stop-and-frisk litigation, the Department has established an Adverse Credibility Committee to collect and review referrals from those prosecutors.[132]  It has convened a Suppression Committee to evaluate evidentiary rulings casting doubt on officers' credibility.[133]  And it has begun to upgrade its primary disciplinary data platform, RAILS, to track relevant findings from civil lawsuits.[134]  The Panel applauds each of these steps and recommends they be pursued with all possible dispatch.[135]

In addition, the Panel agrees with many of the CCPC's recommendations as they relate to false statement cases and believes that the Department should implement them:  (1) the Department should investigate potential false statement cases aggressively, including by looking beyond an officer's explanation to determine whether any statements were intentionally false rather than merely mistaken; (2) the Department should enforce the termination provision in Patrol Guide § 203-08 when an officer has been found guilty of intentionally making a material false statement; (3) if the Commissioner elects not to terminate under § 203-08, he should meaningfully explain in writing the exceptional circumstances justifying a lesser punishment; (4) dismissal probation should be a part of the punishment in every false statement case, regardless of which provision of the Patrol Guide was violated; and (5) when appropriate, Charges and Specifications should be brought under § 203-08 and should not be reduced to avoid the presumptive termination penalty.[136]

The Panel also agrees with the CCPC that officers could benefit from more training in this area.  The CCPC has recommended that the Department provide regular trainings to officers, emphasizing that they are required by Department regulations to tell the truth in court proceedings, when providing information to assistant district attorneys, in criminal complaints, and in deposition testimony supporting those complaints.  The Panel agrees and recommends further that the training include clear and consistent instructions that there will be no "winking and nodding" at so-called "benign" false statements and that practices of "handing off" arrests would constitute a false statement and be prosecuted as such.

---

[132] *See* Response to Court Order Regarding Facilitator's Recommendation No. 1, *Floyd v. City of New York*, 1:08-cv-01034-AT, Docket No. 681-1 at 4-5 (S.D.N.Y. Jan. 14, 2019).

[133] *Id*. at 4.  An order by New York State Chief Administrative Judge Lawrence Marks, effective February 1, 2019, requires that all suppression rulings and adverse credibility findings be formally communicated from the clerk of the relevant court to the NYPD.  *See* Press Release, New York State Unified Court System, Chief Judge DiFiore Announces Implementation of New Measure Aimed at Enhancing the Delivery of Justice in Criminal Courts (Nov. 8, 2017), http://ww2.nycourts.gov/PRESS/PDFs/PR17_17.pdf.

[134] Response to Court Order Regarding Facilitator's Recommendation No. 1, *Floyd v. City of New York*, 1:08-cv-01034-AT, Docket No. 681-1 at 5-6 (S.D.N.Y. Jan. 14, 2019).

[135] In addition, the Panel notes that, on January 22, 2019, City Council Speaker Corey Johnson and Council members Rory Lancman, Jumaane Williams, and Donovan Richards introduced a package of new bills to the City Council to address, among other things, issues of transparency in the Department's disciplinary system and measures designed to foster better coordination and sharing of disciplinary information among the NYPD and local prosecutors' offices.  *See* Rocco Parascandola and John Annese, *City Council Bills Seek to Shed Light on NYPD Discipline System, Legality of Arrests*, N.Y. Daily News (Jan. 22, 2019), http://www.nydailynews.com/new-york/nyc-crime/ny-metro-city-council-bills-target-nypd-disciplinary-process-20190122-story.html.

[136] CCPC, *Eighteenth Annual Report of the Commission* 171-173 (Aug. 2017), *available at* https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.

XI.    THE DEPARTMENT SHOULD ADOPT PRESUMPTIVE PENALTIES IN
       DOMESTIC VIOLENCE CASES AS RECOMMENDED BY CCPC

Given concerns for the safety of domestic violence victims and the public, the Panel recommends that the Department adopt a written policy for discipline in domestic violence cases. The policy should increase the presumptive penalty in physical domestic violence cases in which the officer is the primary aggressor. In each such case, the NYPD should carefully evaluate whether the member is suited to be an officer.

The Panel notes that the CCPC has recommended that the Department adopt clear disciplinary guidelines for domestic violence.[137]  The Panel recommends that the NYPD promptly implement the following CCPC recommendations:  (1) in addition to forfeiture of vacation or suspension days and counseling, dismissal probation should be the presumptive penalty for physical domestic violence in which the officer is the primary aggressor; (2) where there is clear and convincing evidence that a member the of service has a history of physical domestic violence, termination should be the presumptive penalty; and (3) officers found guilty of domestic violence in a criminal proceeding should be terminated, regardless of whether there is a history of abuse.

By including dismissal probation in the penalty, the Department will convey both to officers and to the public that it recognizes the seriousness of the offense, while giving the officer an opportunity for rehabilitation. This approach also allows the Department to more easily terminate repeat offenders, which is important for addressing the often recurrent nature of this misconduct.[138]

XII.   THE DEPARTMENT SHOULD UPGRADE AND INTEGRATE ITS CASE
       MANAGEMENT SYSTEM

As noted above, the lack of an integrated case management system hampered the Panel's efforts to study issues of delay, inconsistency, and bias in the disciplinary system. The Panel recommends that the Department dedicate sufficient resources to create and promptly implement a centralized and fully integrated case management system, capable of tracking disciplinary cases from inception to final disposition.

The Panel recommends that the final product capture all relevant case criteria, including officer attributes (rank, disciplinary history, demographic information, etc.), type of misconduct, mitigating or aggravating circumstances, case disposition, age of case, length of time spent in each disciplinary phase, penalty recommendation, and penalty outcome. The case management

---

[137] *See id.* at 68-73; CCPC, *Sixteenth Annual Report of the Commission* 51-53 (Oct. 2014), *available at* https://www1.nyc.gov/assets/ccpc/downloads/pdf/Sixteen-Annual.pdf.

[138] The Panel notes that this recommendation is generally consistent with the disciplinary guidelines in Los Angeles and the proposed guidelines in Chicago. The Los Angeles Police Department's disciplinary matrix calls for removal from the department for a second domestic altercation offense. The proposed Chicago Police Department matrix considers repeat conduct to be an aggravating factor, warranting a penalty ranging from 31 days' suspension to termination. The Chicago matrix has not yet been implemented, due to pending litigation. As the largest city police department in the country, with more than 36,000 uniformed members serving more than 8 million citizens, the NYPD should be a leader in vigilantly policing its own when an officer engages in domestic violence.

system should also be able to track the progress of cases through each phase in the disciplinary process, provide automatic alerts to users when a case has not progressed within appropriate timeframes, and require users to explain the delay and estimate when the case will progress. The Panel further recommends that the Department dedicate additional IT resources to RMB, sufficient to enable the Bureau to identify and monitor additional risk factors, beyond those currently tracked by RMB.

## XIII.   THE DEPARTMENT SHOULD RETAIN EXTERNAL EXPERTS TO CONDUCT PERIODIC AUDITS OF THE DISCIPLINARY SYSTEM

The Panel was unable to conduct a systematic audit of disciplinary outcomes due in part to limitations in the Department's data collection and maintenance practices. The Panel believes that such an analysis is necessary to dispel perceptions that the disciplinary system is inherently unfair or biased and will help the Department achieve more consistent disciplinary outcomes. The Panel, therefore, recommends that the Department retain an external expert to conduct periodic audits of the disciplinary system in order to ensure that it is functioning fairly and efficiently. The Department could significantly benefit from such a review.

Because the disciplinary system is largely internal to the Department, it is important for the Department to receive periodic reports from an external entity with an independent perspective. Such robust statistical analysis would increase accountability by providing a review of disciplinary outcomes across different categories of comparison to ensure that the system is free from inherent bias. An independent auditor would assist the Department in identifying trends in police misconduct, enforcement, and discipline, thereby allowing it to course-correct, enhance training, and improve efficacy. Finally, the results of periodic audits would inform the Department in adopting a disciplinary matrix, as the Panel has recommended.

## CONCLUSION

The Panel commends Commissioner O'Neill for appointing an independent panel to conduct a review of the Department's disciplinary system, and we are honored to have been asked to serve as its members. External review can help an agency make improvements, but many executives are reluctant to let outsiders in to look. Commissioner O'Neill not only let us in, but also gave us full access to the information that was needed to conduct our review.

Most everyone we spoke with recognized the difficult and dangerous work that police officers do every day and agreed that the New York City Police Department does it best. But every Department member must be held to high standards by an exacting and fair disciplinary system if the Department is to maintain its strength and integrity, both in fact and in the eyes of the public it serves.

When an officer uses excessive force, engages in an unjustified stop and frisk, is disrespectful to a citizen, shades the truth in court, or otherwise abuses his or her authority, the entire Department is tainted and diminished. When that happens the Commissioner must hold the officer strictly accountable. Just as importantly, the Commissioner must be transparent with the public to demonstrate that the Department's disciplinary system is effective and fair—that discipline is handed out consistently and without favor.

56

There are many challenges to overcome and much to be done if the Department is to fulfill the commitment that the Commissioner made when he established this Panel.  The work is essential if the Department is to maintain, and, in some instances regain, the public's trust.  We hope that our work will be of some help in that critical and ongoing effort.

January 25, 2019
New York, NY

The Honorable Mary Jo White, Panel Chair

The Honorable Robert L. Capers

The Honorable Barbara S. Jones