# EXHIBIT G



**Police Benevolent Association**
Of The City Of New York, Inc.

NEW YORK STATE SENATE STANDING COMMITTEE ON CODES
**Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers**
October 17, 2019
Senate Hearing Room, 250 Broadway, New York, New York

## STATEMENT OF NYC PBA PRESIDENT PATRICK J. LYNCH

The Police Benevolent Association of the City of New York, Inc. ("NYC PBA") and its over 24,000 members, who patrol New York City's streets and do the difficult and dangerous work of protecting every resident, every visitor and every business operating within the five boroughs, submits this statement sharing our strong concerns regarding Senate Bill S.3695 and general efforts to repeal Civil Rights Law § 50-a ("CRL § 50-a")—a statute that for more than four decades has protected not only police officers and their families, but also firefighters, correction officers, paramedics, parole officers, and probation officers throughout New York State.

CRL § 50-a was enacted with overwhelming bipartisan support to protect police officers "from the use of records—including unsubstantiated and irrelevant complaints of misconduct— as a means for harassment and reprisals," a goal that all New Yorkers should share and one that, in the current climate and in light of technological advances over the last 43 years, is even more important in 2019 than it was when first enacted in 1976.

As discussed below, proposed legislation that would have such a drastic impact— stripping the civil rights of hundreds of thousands of New York union members, endangering the physical safety of countless families, destroying the careers of dedicated public servants—must be based on facts, not falsehoods. The facts should not be in dispute. Yet the entire campaign to repeal CRL § 50-a is premised on assertions that are simply and demonstrably incorrect—for example, claims that "no one [is] allowed access to police disciplinary records" under CRL § 50-a and "New York is one of only two states that still blocks access to police disciplinary records."[1] But CRL § 50-a is absolutely no bar to countless individuals and agencies responsible for police oversight accessing disciplinary records. And an independent study found that New York is one of the vast majority of states that limit public access to such documents; indeed, there are at least "23 states plus the District of Columbia where police disciplinary records are

---

[1] Jillian Jorgensen et al., *Go away 50-a! Pols hope new democrat-led Albany will repeal roadblock to NYPD transparency*, N.Y. Daily News (Nov. 11, 2018).

125 Broad Street, 11th Floor, New York, N.Y. 10004-2400 | 212-233-5531 | www.nycpba.org

pretty much always confidential."[2] In light of these and numerous other material misrepresentations, proponents of repeal have little credibility with respect to CRL § 50-a, and every legislator must understand that these activists have peddled inaccuracies in support of their position.

In addition to knowingly misleading both the public and elected officials, supporters of repeal completely ignore the serious risks to police officer safety and the reputational harm of publishing false allegations—which will unfairly impact the careers of good police officers who keep all New Yorkers safe. And just as troubling, the repeal of CRL § 50-a would leave police officers—who have been murdered simply because they are police officers—with fewer privacy rights and far less protection than any number of other professions.

Finally, it is important to note that much of the support for repeal comes from organizations and persons that represent criminals and those accused of crimes. Put simply, these entities cynically seek to repeal CRL § 50-a as a pure litigation tactic, which would enable them to use false and fraudulent misconduct allegations against police officers to derail criminal cases against their clients.

### *The History of CRL § 50-a*

In 1974, New York State enacted the Freedom of Information Law ("FOIL"), with the stated goal of providing the public with "access to the records of government." However, from the very beginning the Legislature recognized that this right to access would not be absolute and crafted various exemptions to the law including, for example, documents that would constitute an "unwarranted invasion of privacy" or "investigatory files compiled for law enforcement purposes."

Two years later, and in light of the fact that the existing protections of FOIL were *not* adequately safeguarding police personnel records,[3] the Legislature—including the Democrat-controlled Assembly—overwhelmingly voted to enact CRL § 50-a.[4] The purpose of the legislation was described as follows:

> In today's milieu police officers are bearing the brunt of fishing expeditions by some attorneys who are subpoenaing personnel records in an attempt to attack the

---

[2] Robert Lewis *et al.*, *Is Police Misconduct a Secret in Your State?*, WNYC News (Oct. 15, 2015).

[3] The Sponsor's Memo suggests that while CRL § 50-a "may have been necessary" in 1976, that is "no longer the case today" in light of subsequent changes to FOIL protecting against "unwarranted invasions of privacy." But, this timeline—which has also been advanced by repeal activists—is incorrect. The Court of Appeals has explained that "Section 50-a was first enacted into law some two years *after the passage* of FOIL . . . The Legislature was well aware of the use of FOIL to obtain [police personnel] records."

[4] The bill passed in the Assembly by a vote of 122 to 24. In the Senate, it easily passed with broad bipartisan support by a vote of 48 to 4.

2

officer's credibility, a tactic that has led to abuse and in some cases to the disclosure of unverified and unsubstantiated information that the records contain. It also has resulted in the disclosure of confidential information and privileged medical records.

Thus, the Legislature noted that while the *impetus* for CRL § 50-a was inappropriate conduct by attorneys, the *harm* being addressed was the release of confidential police officer information to the public.[5] As explained by the New York Court of Appeals, "the legislative purpose behind 50-a . . . was to protect the officers from the use of records—including unsubstantiated and irrelevant complaints of misconduct—as a means for harassment and reprisals." And it similarly explained in a subsequent decision that "the original legislation was sponsored and passed as a safeguard against potential harassment of officers through unlimited access to information contained in personnel files. 'It has become a matter of harassment of police officers that personnel records be constantly requested, scrutinized, reviewed and commented upon, sometimes publicly.'"

Importantly, given the incredible technological advances of the last 43 years, the protections of CRL § 50-a are needed now more than ever. In 1976, allegations of misconduct may have been printed in a local paper. In 2019, allegations of misconduct are sensationalized by media outlets hungry for clicks, are amplified by countless advocacy groups, politicians, and pundits, are the subject of a never-ending 24-hour news cycle, and are posted on the internet for the entire world to see. And with the wealth of personal information now available on the internet—including not only telephone numbers and home addresses, but also the names and addresses of close relatives—any unstable individual who takes published allegations of misconduct as inspiration or justification to harm a police officer or police family member needs only a few minutes searching in order to locate his or her target. The potential for harassment and reprisals—the harm the Legislature sought to protect against—has increased exponentially over the last four decades.[6]

### *CRL §50-a Provides Countless Individuals and Agencies with Access to Police Personnel Files*

CRL §50-a provides a thorough statutory framework that has been enforced for more than 40 years to balance the safety and privacy interests of police officers with the public's interest in transparency. The statute contemplates that "personnel records used to evaluate

---

[5] It also noted the importance of protecting civil liberties, stating that "as with all citizens, the civil rights of police officers must be protected" because "these rights are sacred."

[6] The argument raised in the Sponsor's Memo that existing FOIL exemptions are "sufficient for protecting police" is seriously misguided and dangerous. First, the application of FOIL exemptions like the "unwarranted invasion of privacy" is entirely discretionary, which means that they in fact provide *zero protection* for police officers. Second, time-and-time again government agencies have shown that they cannot be relied upon to safeguard sensitive information in the FOIL context. For example, in response to a recent FOIL request, New York City inadvertently produced confidential names and numbers on two separate occasions, with its lawyer stating "the words that were to be redacted were not actually blacked out. I have no explanation for it. It is an embarrassing situation. I really don't know why it happened." *See* Stephen Brown, *FOIL-ed again! City attorneys mistakenly release confidential information on NYPD's facial recognition program for second time*, N.Y. Daily News (July 14, 2019).

3

performance toward continued employment or promotion . . . shall be confidential," but provides numerous carve-outs and exceptions to that general rule. First, the statute expressly states that it is no bar to various officials and agencies with responsibility for police oversight accessing police personnel records. Second, it provides a clear mechanism for any "person" to access such files, either through a court order or the consent of the relevant officer. Accordingly, the repeal activists' claim that "no one [is] allowed access to police disciplinary records" under CRL § 50-a is plainly false.

The plain language of CRL § 50-a(4) states that the law simply "*shall not apply*" to numerous individuals and entities that the public has entrusted to oversee police officers. CRL §50-a does not apply to "a grand jury." It does not apply to "any district attorney." It does not apply to "the attorney general." It does not apply to any "county attorney." It does not apply to "a corporation counsel." It does not apply to a "town attorney" or a "village attorney." And it includes a catchall phrase, which makes clear that the law does not apply to "any agency of government which requires the records . . . in the furtherance of their official functions." Thus, even outside entities such as the New York City Civilian Complaint Review Board ("CCRB") — which is widely viewed as having an institutional bias against police officers—also have access to police personnel files.[7] As explained by Margaret Garnett—former Executive Deputy Attorney General for Criminal Justice in the Attorney General's Office and head of the division that has oversight over police shootings of unarmed individuals—in her experience "50-a hasn't impeded any criminal investigations" because "it's not a shield for exposure to prosecutors."[8]

The statute further includes a procedure whereby members of the public can access police personnel files either through a court order or via the consent of the police officer at issue. Importantly, the law contemplates a legal process that includes all interested parties—such as the person making the request and the police officer—having an opportunity to be heard. Indeed, cases where courts have conducted *in camera* reviews and then ordered the production of police personnel records are numerous.

### *Like New York, the Vast Majority of States Limit Access to Police Disciplinary Records*

New York is one of the vast majority of states that have made the reasoned decision to limit access to police personnel records. In fact, an independent study conducted by WNYC—which is certainly not a pro-police entity—found that there are "*23 states plus the District of Columbia where police disciplinary records are pretty much always confidential.*" Moreover, it found that in a further 15 states police personnel records have "limited availability."[9] And

---

[7] To the extent that activists do not believe that these oversight agencies are achieving "accountability," they should direct their advocacy at reforming the policies and processes of these agencies, as opposed to stripping the civil rights of hundreds of thousands of New Yorkers. As repeal activists have not articulated any realistic mechanism by which so-called "transparency" will engender "accountability," accessing individual officer files will serve no purpose other than to villainize and harass.

[8] Jeff Coltin, *Records standoff between NYPD and Vance continues*, City & State (July 17, 2018).

[9] Robert Lewis *et al.*, *Is Police Misconduct a Secret in Your State?*, WNYC News (Oct. 15, 2015).

4

even in the very small minority of states—such as Utah—where police records are sometimes public, "many of these states still make records of unsubstantiated complaints or active investigations confidential,"[10] unlike the situation that would exist if a repeal is successful. Thus, the repeal of CRL § 50-a could see New York earn the very dubious distinction of being dead last—50th out of 50 states—in protecting the safety and privacy of police officers and their families.

### *Recent Court Decisions Have Taken an Exceedingly Narrow Approach to CRL § 50-a*

The Sponsor's Memo cites a 2014 report for the assertion that courts have "expanded" CRL § 50-a to "allow police departments to withhold from the public virtually any record that contains any information that could conceivably be used to evaluate the performance of a police officer." However, court decisions from 2019—not 2014—make clear that the exact opposite is true. In fact, New York's appellate courts have been interpreting the statute so narrowly that documents indisputably "used in employee performance evaluations" are being found to fall outside the scope of CRL § 50-a.

The Third Department's recent decision in *Prisoners' Legal Services of New York v. New York State Department of Corrections & Community Supervision* is instructive. 173 A.D.3d 8 (2019). There, the Court was faced with the question of whether CRL § 50-a applied to use of force reports, which are used to detail any incident that a corrections officer "uses physical action to resolve." There was no dispute that these reports are used to "evaluate performance," indeed the Court noted that they could "prompt an investigation that may lead to disciplinary action or even criminal prosecution."

If the sponsors' assertion that courts are construing CRL § 50-a broadly were correct, there is no doubt that these use of force documents would be covered by the statute. But a unanimous panel of five appellate judges emphatically rejected that conclusion. Instead, they attempted to severely limit the application of CRL § 50-a through a new and additional requirement—according to the Third Department, it is not enough that a document is used to evaluate the performance of first responders, it now has to be "solely used for that purpose" to be protected. Moreover, the Third Department is not alone in devising novel approaches to narrow the scope of CRL § 50-a. Earlier this year, the First Department announced its own new CRL § 50-a standard—that in addition to being used to evaluate the performance of a police officer, the record must also be "primarily generated for, [or] used in connection with any pending disciplinary charges or promotional processes." *PBA v. de Blasio*, 171 A.D.3d 636 (1st Dep't 2019).

Despite CRL § 50-a being construed very narrowly, supporters of repeal nevertheless continue to make the same old "broad interpretation" argument, which again highlights that there is simply no legitimate basis or need to address CRL § 50-a.

---

[10] *Id.*

5

### *Absent CRL § 50-a, Police Officers Would Have Far Less Protection than other Professions*

The Sponsor's Memo erroneously claims that repeal will simply provide police officers with the same privacy protections as "all other public employees." However, New York State has confirmed that if CRL § 50-a were repealed, police officers would in fact receive *far less* protection than state-licensed professionals.[11]

The New York State Education Department—tasked with investigating misconduct related to virtually all licensed professions—states that unsubstantiated claims it receives are *not* public and many substantiated claims are in fact kept confidential. Specifically, "complaints are accusations of professional misconduct; *those that do not result in disciplinary action are confidential*."[12] Moreover, "minor forms of misconduct may be handled through advisory letters or administrative warnings . . . *these administrative actions are confidential*." In light of the fact that—unlike massage therapists, speech pathologists, interior designers, and geologists—police officers have been targeted for assassination on numerous occasions simply because of their uniform, the safeguards in place to protect them must be *more robust* than those of licensed professionals, *not less*.[13]

The same is true with respect to teachers, who have protections that are in many ways similar to CRL § 50-a. For example, Education Law § 6510(8) specifically states:

> The files of the Department relating to the investigation of possible instances of professional misconduct, or the unlawful practice of any profession licensed by the board of regents, or the unlawful use of a professional title or the moral fitness of an applicant for a professional license or permit, *shall be confidential and not subject to disclosure at the request of any person, except upon the order of a court in a pending action or proceeding.*

Moreover, the New York State Committee on Open Government recently issued an Advisory Opinion noting that pursuant to Education Law § 3020-a, whenever a teacher is acquitted of misconduct claims the "charges must be expunged from the employment record" in order "to preclude unsubstantiated charges from being used unfairly against or in relation to a tenured

---

[11] http://www.op.nysed.gov/opd/opdfaq.htm (FAQ, "How can I find out if there have been any disciplinary actions against a licensee?").

[12] *Id.*

[13] The list of state-licensed professionals that would have far stronger privacy protections in the event of a CRL § 50-a repeal includes: Acupuncturists, Architects, Athletic Trainers, Behavior Analysts, Certified Public Accountants, Chiropractors, Dentists, Dental Hygienists, Dietitian-Nutritionists, Engineers, Geologists, Interior Designers, Laboratory Technicians, Land Surveyors, Landscape Architects, Massage Therapists, Medical Physicists, Mental Health Practitioners, Midwives, Nurses, Occupational Therapists, Opticians, Optometrists, Perfusionists, Pharmacists, Physical Therapists, Podiatrists, Polysomnographic Technologists, Psychologists, Respiratory Therapists, Social Workers, Shorthand Reporters, Speech Pathologists, and Veterinarians. *See* http://www.op.nysed.gov/prof/.

6

teacher." Again, there is no valid justification for police officers to receive less privacy protection than teachers, yet that would be the reality of a CRL § 50-a repeal.

Finally, it is critical for the Codes Committee to understand why privacy rights are so important to police officers and why they absolutely need the protections of CRL § 50-a. The job of a New York City Police Officer is truly unique. They are charged with at all times abiding by every single rule and regulation in a Manhattan telephone-book-sized patrol guide, which is constantly being amended via mass emails from the Department. They are subject to tremendous scrutiny from their superior officers (sergeants, lieutenants, captains etc.), the Police Commissioner, the CCRB, the Internal Affairs Bureau, the NYPD Inspector General, the Mayor's Office, the City Council, City and State prosecutors, State and Federal Courts, the Federal Monitor, the media, advocacy groups, and the public. They are responsible for making split-second decisions under exceedingly stressful circumstances, which will be endlessly second-guessed by these entities and individuals (from the safety of their offices and with the benefit of unlimited time). They are sent out to implement the policies of high-ranking police officials and politicians—policies they have no role in creating, and yet they bear 100% of the blame when those policies fail. Moreover, the relatively small cadre of police officers who are tasked with the most critical and sensitive duties—namely, hands-on proactive enforcement to remove guns, narcotics and violent offenders from the streets—experience the greatest exposure to retaliatory complaints and heightened bureaucratic scrutiny. In short, there are innumerable ways that the best and brightest police officers can find themselves in disciplinary proceedings, through absolutely no fault of their own. Against this backdrop, it would be patently unfair to risk the lives and destroy the careers of well-performing, hard-working police officers by repealing CRL § 50-a.

### *CRL § 50-a is Crucial if New York State Believes it is Important to Protect Police Officers and Their Families From Physical Harm*

The confidentiality protections afforded by CRL § 50-a are absolutely vital to protect the safety of the tens of thousands of New York police officers and their families. To be clear, police officers are human beings; they are mothers and fathers and sisters and brothers; they are constituents and residents of New York's communities. It is well-documented that when criminals and others have been able to access police officer information, they have used it to harm, harass, and threaten. This is not limited to access to addresses and phone numbers. In this technological age, it should go without saying that access to details of an incident can be relied upon to identify and locate an officer or officer's family. For example:

- According to the U.S. Department of Justice, an alleged murderer recently attempted to send a mail bomb to the New York City police officers who arrested him. He had methodically "conducted internet searches and made telephone calls to determine the locations of the officers' residences." The bomb, however, was sent to the wrong address and the civilian who received the package was murdered when the bomb detonated.[14]

---

[14] Press Release, *Brooklyn Man Arrested for Using a Weapon of Mass Destruction*, United States Department of Justice (Feb. 28, 2018).

7

- According to NYPD Police Commissioner James O'Neill's testimony to the New York City Council, an arrested individual was recently able to locate the home address and telephone number of a New York City police officer and left the following threatening voicemail:

  *Hey, [officer's name], highway cop motherf\*\*ker. Hope all is well. I'll be seeing you very shortly. I hope you and your family on [address of officer's family] are doing very well. I'll see you soon.*

- According to the NYPD's Deputy Commissioner for Intelligence and Counterterrorism, threats against New York City police officers are so prevalent that the Department has had to create a special unit—the Threat Assessment and Protection Unit ("TAPU")—to handle them. Since 2016, TAPU has received over 1,000 threats, including a person who recently filed a CCRB complaint and then stated that a detective who died in the line of duty "got what he deserved" and that another police officer "was next."[15]

- In California, the identity of an officer involved in a shooting incident was recently leaked. Activists were able to track him down using a wedding website, and stormed his wedding celebration yelling "murderer." In the wake of the incident, the organizer said that "I think [police officers] need to be approached in spaces where they're a little more vulnerable."

- According to NYC Inspector General Margaret Garnett, CRL § 50-a is meant to protect officers from retaliation, as "some officers have required around-the-clock protection at their homes after being accused of misconduct."[16]

If Civil Rights Law 50-a is repealed, the safety of New York police officers and their families will be placed in jeopardy and a valuable weapon will be provided to those who would seek to do harm to members of law enforcement. Those who doubt that the repeal of CRL § 50-a would increase the risks to police officers need only look at the actions of the unhinged killer with a grudge who travelled from Maryland to New York City and murdered NYPD Police Officers Wenjian Liu and Rafael Ramos simply because of the uniform they wore. Revealing the names, circumstances of incidents, and allegations involving police officers would serve to increase the risks to police officers, and simply dismissing these risks will not make them go away. Nevertheless, there is nothing to suggest that the agitators for repeal have seriously considered the impact it would have on the safety of police officers, their families, and other

---

[15] Affidavit of John J. Miller, dated September 14, 2018. The Miller affidavit details numerous other threats and assaults that occurred following the release of police officer information, including (1) a retired police captain who was "violently assaulted" by an individual claiming to know "where the retired captain lived" and "that the captain had a new baby at home"; (2) a precinct commander whose "family received death threats by telephone" after his personal information was revealed; and (3) a police captain who received threats that she would be assaulted when she arrived at her home after protesters chanted her home address.

[16] Jeff Coltin, *Records standoff between NYPD and Vance continues*, City & State (July 17, 2018).

8

public servants, and in the event that a police officer or other public sector employee or his or her family is harmed as a result of ill-considered changes to the law, New Yorkers will look critically at those who disturbed a policy that has served to protect public safety workers for decades.

Finally, there is ample evidence that in the current climate, police officers are increasingly targeted by the public simply for being police officers—even without the reliance on confidential information. For example, in 2017, NYPD Police Officer Miosotis Familia was murdered by a man who had previously "ranted against police in a disjointed, 11-minute Facebook Live video" about unspecified allegations of misconduct. Recently, numerous videos have surfaced showing emboldened incendiaries threatening and physically assaulting New York City police officers. Indeed, in the last few months alone, NYC Police Officers have been shot, hit by cars, punched in the face, had concrete thrown at them from rooftops, been hit with plastic buckets, and pelted with Chinese food, milk, and water. This strongly reaffirms the purpose of CRL § 50-a. Increasing public access to confidential personnel files will only exacerbate this already volatile situation, and will directly undermine any effort to improve police-community relations.[17]

### *Repeal Would Result in Significant Reputational And Other Harms*

In addition to ignoring the dire safety risks, many proponents ignore the reputational harm that will be inflicted on police officers in the event that CRL § 50-a is repealed. As briefly discussed above, it has long been the public policy of New York State to keep unfounded and unsubstantiated allegations of misconduct confidential. This public policy reflects an awareness of the unavoidable and irreparable harm to one's reputation and livelihood resulting from the publication of unfounded accusations. In short, no matter the job, nobody—not state legislators, not police officers—should have unsubstantiated allegations ruin their lives and derail their careers. Nevertheless, the repeal of CRL § 50-a would inexplicably allow for the publication of false allegations against police officers, which will not only unfairly tarnish their careers and reputations, but also see them being treated worse than a host of other professionals (none of whom deals with the same dangers as police officers).[18]

---

[17] Advocates make a patently absurd and incredibly naïve argument regarding police officer safety: that some disciplinary records were released in Chicago and they are not aware of any "reports" of police officers being attacked as a direct result. This argument completely misses the point (as the activists know full well). If CRL § 50-a is repealed, the media will publish sensationalized stories based on unsubstantiated allegations of police misconduct. These accounts—specifically designed to be controversial to generate clicks and internet traffic—undoubtedly would contribute to a climate where certain individuals feel that it is acceptable to attack police officers.

[18] As an illustration of how far activists are willing to go to tarnish NYC Police Officers, Joo-Hyun Kang—the Director of Communities United for Police Reform—tweeted the following just *two days* after hero NYC Police Officer Brian Mulkeen was tragically killed in the line of duty:

"[PO Mulkeen] was the named cop in a case settled with accusations of false arrest and retribution."

This was a classic "nuisance" settlement, where New York City unfortunately makes a business decision that it is cheaper to pay a nominal settlement—here, $15,000—than to litigate the case in court, even

9

As City Councilmember Donovan Richards recently admitted:

> Many of our NYPD officers have believed that they would not get a fair shake, only to find that they were exonerated by a thorough [CCRB] investigation. . . . [T]hat happens in a lot of cases. In fact, the large majority of CCRB complaints are not substantiated. . . . I have to acknowledge that many times being a police officer involves making difficult decisions and walking a fine line. And while an individual might not like the way they were treated, there are times when something upsetting doesn't rise to the level of misconduct.[19]

Indeed, CCRB's own statistics completely undermine the case for the repeal of CRL § 50-a and in fact illustrate the remarkable work being done by NYC Police Officers. Out of approximately *20 million* annual police/citizen interactions, in 2018 only 10,660 even resulted in a complaint to the CCRB (0.05%), despite CCRB making more than 1,000 public presentations in an effort to solicit more claims. And of those 10,660 complaints, CCRB—which has a well-earned reputation for its anti-police bias—was only able to substantiate 2.1% (226 complaints). The fact of the matter is that virtually all police interactions result in no complaints, and virtually all complaints result in no finding of misconduct.

It would be patently unfair for a police officer to have allegations that are ultimately found to be unsubstantiated nevertheless published on the internet for the world to see. And that unfairness is further compounded by the fact that individuals regularly lodge false misconduct claims against police officers in the hope of financial gain, or to simply retaliate against police officers doing their jobs. For example, a recent video captured a man bragging about assaulting police officers and then filing lawsuits against the City, stating that the cops "get hurt and I get paid. I got three lawsuits, working on number four."[20]

### *Supporters of Repeal Would Have Police Officers Treated Less Favorably than those Convicted of Crimes*

To further illustrate the inequity of this proposed legislation, the repeal of CRL § 50-a would have police officers treated worse than those accused and even convicted of crimes. Specifically, under New York law those who receive favorable results in criminal cases automatically have their records sealed, and many records of criminal convictions may now also be kept confidential. By contrast, absent CRL § 50-a, police officers acquitted of misconduct will still have all allegations—including false claims—made public.

---

where the allegations are completely meritless. Nevertheless, Ms. Kang tweeted a link to the complaint which contained nothing more than unsubstantiated allegations of misconduct. That repeal activists are willing to sink this low and smear a police officer who had just died keeping our City safe is both troubling and telling.

[19] January 22, 2019 City Council Committee on Public Safety Hearing.

[20] *See* Rocco Parascandola *et al.*, *SEE IT: Man beaten by cops with batons in Washington Heights bragged about suing the NYPD BEFORE controversial clash*, N.Y. Daily News (Jan. 9, 2019).

10

In light of this incongruity, progressive commentators have now recognized that taking wholly inconsistent positions on CRL § 50-a and other issues—*i.e.*, being for privacy for criminal records, but against privacy for police records—in fact does far more harm than good. Indeed, one prominent public defender recently argued that reform values "require consistency" and noted that "calling for harshness for one leads to harshness for all." Moreover, the New York State Senate has plainly recognized the many harms associated with the publication of records of misconduct (much less the publication of mere allegations of misconduct)—indeed, in the Sponsor's Memo for Senate Bill S.6579-A (vacating marijuana records), Senator Bailey specifically cited the fact that public "records can follow a person for the rest of one's life and impact the ability to access jobs" and various other necessities. It is patently intellectually inconsistent to value the privacy concerns of those accused or convicted of crimes, while ignoring the privacy concerns of police officers and other first responders.

Moreover, according to progressive voices, there would be many unintended and undesirable consequences of a CRL § 50-a repeal. For example, during an October 4, 2019 New York Law School presentation entitled "Policing the Police—Enforcing Transparency and Accountability," panelists highlighted two likely outcomes of repeal:

- **The publication of police disciplinary records will adversely impact the most vulnerable police officers.** As noted above, given the innumerable rules and regulations that govern police officers and the incredible amount of oversight they face, there are countless ways that even the most competent police officer can find herself facing discipline. Accordingly, police discipline is inherently arbitrary—those who get brought up on charges are generally *not* so-called "bad apples," but rather are those police officers who fall victim to the biases of their supervisors (based on race, gender, appearance, popularity etc.). Thus, commentators have suggested that repeal—and the reputational and other harms it brings—will have a hugely negative impact on our minority and women police officers. It is the NYC PBA's membership—which, at 55% persons of color and 20% female, is significantly more diverse than the superior ranks of the NYPD—that will unfairly bear the brunt of a CRL § 50-a repeal.[21]

- **The publication of police disciplinary records may cause police departments to "circle the wagons" and impose less discipline.** Commentators have argued that if increased accountability is the goal, the repeal of CRL § 50-a will have the exact opposite effect. If supervisors know that alleging misconduct could lead to a front page story in the tabloids, or might destroy a police officer's reputation, or will place her at risk of physical harm, common sense dictates that they will think twice about pursuing discipline. As it stands now, police officers are in fact governed by robust systems of discipline that are already viewed by many to be overly punitive.

---

[21] For the avoidance of any doubt, the NYC PBA only represents NYC Police Officers, not superior officers like Captains and Lieutenants. Our members are on the receiving end of discipline, and do not discipline others.

11

### *Calls for the Repeal of CRL § 50-a are Based on Numerous Falsehoods*

The liberties that the repeal activists have taken with the record should speak volumes to any legislator willing to consider this issue with an open mind. Faced with a set of facts that plainly does not support repeal, activists have instead resorted to half-truths, misleading sound bites, and hashtags in a desperate attempt to gain access to sensitive police personnel files. By way of example only, they publicly claim that:

- "New York is now one of only two states that still blocks access to police disciplinary records," even though it is undisputed—as confirmed by an independent study—that in fact the vast majority of states protect such records.[22] This assertion was made by Cynthia Conti-Cook, who is perhaps the most vocal proponent of repeal.

- California no longer "blocks access to disciplinary records." In fact, California recently *amended* its law to provide public access to a narrow subset of records such as those relating to incidents involving an officer's discharge of a firearm at a person or where officer use of force results in "death or great bodily injury." It did not "repeal" the entire law or provide access to the entirety of an officers' personnel records, as the activists now call on the New York State Legislature to do.

- "No one [is] allowed access to police disciplinary records" under CRL § 50-a, even though the statute expressly provides that numerous individuals and agencies with police oversight are allowed access to police disciplinary records.

- They merely want police officers to "have the same level of privacy protection that other public employees, like teachers, and other state-licensed professionals expect regarding their disciplinary records," even though they know—and as the website they have specifically cited in support confirms—that repeal would in fact give first responders far less protection.[23]

- Repeal is necessary because courts are construing CRL § 50-a broadly, even though New York appellate courts have in fact recently bent over backwards to construe the statute as narrowly as possible.

All New Yorkers—and particularly our elected officials—should be troubled by the activists' attempts to repeal civil rights by false pretenses.[24]

---

[22] Jillian Jorgensen *et al.*, *Go away 50-a! Pols hope new democrat-led Albany will repeal roadblock to NYPD transparency*, N.Y. Daily News (Nov. 11, 2018).

[23] Cynthia Conti-Cook & Dan Quart, *Holding law enforcement accountable begins with full repeal of 50-a*, City & State (Feb. 6, 2019).

[24] Similarly, the activists may have the audacity to cite a NYC Bar Association report calling for repeal of CRL § 50-a. This report was authored by Cynthia Conti-Cook, who has been heavily involved in litigation challenging the law. Nevertheless, Ms. Conti-Cook did not disclose this clear conflict of interest in her original report. After this conflict was brought to the attention of the City Bar, it was

12

### *There is No Credible Evidence that New Yorkers Support the Repeal of CRL § 50-a*

Finally, it is extremely important to put the repeal movement in the proper context. It has been pressed mainly, if not exclusively, by advocate groups, many of which play an active role in support of criminals and the criminal accused in our justice system. These activists seek to repeal CRL § 50-a as a vehicle to call into question every police action, arrest, and conviction (not to mention tarnish the reputations of all police officers). Institutional providers of indigent defense services, for example, have made a concerted effort to weaponize police personnel records obtained in the course of their criminal defense activities, by funneling them to a sympathetic and sensationalistic press in order to poison jury pools and obtain acquittals for their criminally accused clients. However, there is no evidence that the public at large seriously questions police discipline throughout New York State or demands the disclosure of first responder personnel files.

Moreover, if the activists were truly interested in "accountability," rather than looking to repeal CRL § 50-a they would join the NYC PBA in seeking an improved disciplinary system— one that includes a fair process, and progressive and commensurate forms of preventive, supportive, and corrective discipline. As many have observed, there is simply no nexus between the "transparency" sought here—the wholesale publication of all police disciplinary records, including false and fraudulent claims—and the activists' alleged goal of "accountability."[25] Accordingly, instead of repealing a law that keeps New Yorkers safe in the name of so-called "accountability," elected officials and interested parties should focus on ensuring that a fair disciplinary system is in place—for example, through the use of truly neutral arbitrators, which the NYC PBA has advocated in favor of for years.

\*   \*   \*

In light of all of the foregoing, the NYC PBA strongly opposes any efforts to repeal Civil Rights Law § 50-a.

---

forced to issue a revised report stating that Ms. Conti-Cook "participated significantly in drafting the report" and is employed by the Legal Aid Society, which has "been engaged in litigation over the appropriate interpretation of the scope of section 50-a."

[25] Moreover, the hypocrisy of the repeal activists with respect to "transparency" should not go unnoticed by this Committee. Earlier this month, NYCLU—one of the most vocal advocates of repeal— successfully challenged a State law that would have required it to be transparent about its donors. As a state official noted, "everyone preaches transparency until transparency shows up on their own front door."

13