# EXHIBIT M

**TUESDAY, JUNE 9, 2020**                              **11:43 A.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

In the absence of clergy, let us pause for a moment of silence.

(Whereupon, a moment of silence was observed.)

Visitors are invited to join the members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the Journal of Monday, June 8th.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move

1

**NYS ASSEMBLY**                              **JUNE 9, 2020**

that we dispense with the further reading of the Journal of Monday, June the 8th and ask that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  I would like to start our day off with a quote from a young lady by the name of Lucille Clifton.  She is an award-winning author and poetry writer as well as an educator.  She's saying to us today, *In the bigger scheme of things, the universe is not asking us to do something, the universe is asking us to be something.  And that's a whole different thing.*  Again, Lucille Clifton.

Mr. Speaker, I wanted to welcome all the colleagues and staff in the Chambers and those who are participating remotely. We have on our desk a main Calendar, the main Calendar. Committees have met this morning and have produced an A-Calendar. At this time, Mr. Speaker, I would like to advance that Calendar.

ACTING SPEAKER AUBRY:  On Mrs. Peoples-Stokes' motion, the A-Calendar is advanced.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  Our principal for today will be taking up with the remaining bills and our Police-Community Relations package.  Those are Rules Report No. 63, 64 and 67.  We're also going to be taking up several local bills from the main Calendar as well as from the A-Calendar.

2

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Members should note that included in the main Calendar are about 60, 6 - 0, Calendar resolutions.  These resolutions were -- have been accumulating since we were here in our routine Session in March.  We expect to adopt these on the floor tomorrow in the same fashion as we would do privileged resolutions, all with one vote.  Members wishing to have their -- one -- their one of the 60 resolutions separated out for a separate vote should contact my office and we'll be happy to accommodate your request.  Otherwise, Mr. Speaker, all 60 of those we'll be asking you to take up on one motion on tomorrow.

I'd also like to remind colleagues and members that we will be operating under the same procedures as we did on yesterday, which I think went very well, by the way.

ACTING SPEAKER AUBRY:  I think it did.

MRS. PEOPLES-STOKES:  Yes.  Just a reminder, those participating by Zoom should use the "raise hand" function in order to be recognized for debate purposes and/or to explain your vote.  As in our previous remote Sessions, when we are on a fast roll call or Party vote, members wishing to be an exception will have to contact their Majority Leader's office or the Minority Leader's office.

With that said, Mr. Speaker, I believe we're ready to begin our work.  And we're going to start today on the main Calendar.  And we're going to go to page 144 and take up Calendar No. 193 by Ms. Darling, and then we're going to go to page 56 and take up Calendar No. 291 by Mr. Zebrowski.  Following that we'll go to page 56 and take up Calendar No. 294 by Mr. LiPetri.  Then we'll go to two

3

NYS ASSEMBLY                                    JUNE 9, 2020

Member Woerner bills, one of them -- both of them are on page 71,

and they are Calendar No. 7 -- 474 and 478.  In that order, Mr.

Speaker.

Thank you very much.

ACTING SPEAKER AUBRY:  Thank you very

much.  And I do believe you mean page number 44.  We don't want to

run ahead of ourselves.

The Clerk will read.

THE CLERK:  Assembly No. A05061-A, Calendar

No. 193, Darling.  An act in relation to permitting Iglesia La Luz Del

Mundo, Inc. to file an application for certain real property tax

exemptions.

ACTING SPEAKER AUBRY:  On a motion by Ms.

Darling, the Senate bill is before the House.  The Senate bill is

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report -- Calendar No. 193.  This is a fast roll call.

Any members wishing to be recorded in the negative are reminded to

contact the Minority and Majority Leader at the number previously

provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

4

The bill is passed.

Page 56, Calendar No. 291, the Clerk will read.

THE CLERK:  Assembly No. A07821, Calendar No. 291, Zebrowski, Jaffee.  An act authorizing the Commissioner of General Services to transfer and convey certain unappropriated State land to Rockland Recovery Homes, Inc.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Calendar No. 291.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07919, Calendar No. 294, LiPetri.  An act in relation to authorizing the Good Samaritan Hospital Medical Center to file an application for a real property tax exemption.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Calendar No. 294.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Majority or Minority Leader at the number previously provided.

    (The Clerk recorded the vote.)

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    The Clerk will read.

    THE CLERK:  Assembly No. A08609, Calendar No. 474, Woerner.  An act to amend the Public Officers Law, in relation to qualification for holding certain offices in the City of Saratoga Springs.

    ACTING SPEAKER AUBRY:  Read the last section.

    THE CLERK:  This act shall take effect immediately.

    ACTING SPEAKER AUBRY:  The Clerk will record the vote on Calendar No. 474.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

    (The Clerk recorded the vote.)

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Mr. Speaker, if you could please let the record show that Mr. Epstein is a no on this one.

    ACTING SPEAKER AUBRY:  So noted.  Thank you, Mrs. Peoples-Stokes.

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

NYS ASSEMBLY                                    JUNE 9, 2020

The Clerk will read.

THE CLERK:  Assembly No. A09590, Calendar No. 478, Woerner.  An act to amend the Public Officers Law, in relation to expanding the waiver of the residency requirement for the city attorney in the City of Mechanicville, Saratoga County.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Calendar No 478.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker.  I just rise to explain my vote.  And I -- I do appreciate Assemblywoman Woerner's requirement that the -- that the waiving of the local responsibility on hiring for this position, but I -- I think this is a larger issue we have to grapple with in the Assembly and that really has to do with whether we do these local waivers one by one makes sense.  Whether there's a system and structure in place to make sure that there's no local postings that we have available to members to know that there's local postings, and to ensure long-term that we have a system that we can all understand and make sure that it makes sense.  I don't think issue by issue, neighborhood by neighborhood, job by job is a good structure anymore, and I'm voting against this because I -- I

7

NYS ASSEMBLY                                    JUNE 9, 2020

would love to see us come up with a better system and structure

moving forward.

Thank you, Mr. Speaker.  I vote in the negative.

ACTING SPEAKER AUBRY:  Mr. Epstein in the

negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we can

go to page 15 on the main Calendar, we're going to take up Rules

Report No. 63.  It's by Ms. Fernandez, on debate.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A08226-B, Rules

Report No. 63, Fernandez, Heastie, Peoples-Stokes, Aubry, Reyes,

Pichardo, Epstein, Taylor, Richardson, Jean-Pierre, Hyndman, Blake,

O'Donnell, Perry, Hevesi, Simotas, Jaffee, Cruz, Rivera, Walker, Fall,

D'Urso, Sayegh, Niou, De La Rosa, Ortiz, L. Rosenthal, Hunter,

Gantt, Mosley, Bichotte, Carroll, Joyner, Glick, Lifton, Vanel,

Abinanti, Arroyo, Bronson, Crespo, DenDekker, Dinowitz, Fahy,

Frontus, Gottfried, Jacobson, McDonald, Nolan, Otis, Pretlow, Quart,

Ramos, Seawright, Simon, Steck, Thiele, Weinstein, Weprin, Wright.

An act to amend the Civil Rights Law, in relation to medical attention

for persons under arrest.

ACTING SPEAKER AUBRY:  An explanation is

8

requested, Ms. Fernandez.

MS. FERNANDEZ:  Thank you, Mr. Speaker.  This bill would recognize the duty to provide attention to the medical and mental health needs of a person in custody of a police officer, peace officer or law -- other law enforcement representative or entity.  The officer will have a duty to obtain assistance and treatment of such needs which are reasonable and provided in good faith under the circumstances.  Any person who does not receive this attention and as a result suffers serious physical injury or death, a significant -- a significant exacerbation of an injury or condition shall have a cause of action against the officer and/or entity.

ACTING SPEAKER AUBRY:  Mr. Morinello.

MR. MORINELLO:  Thank you.  Would the sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY:  Ms. Fernandez, will you yield?

MS. FERNANDEZ:  Yes, I do.

ACTING SPEAKER AUBRY:  The sponsor yields, Mr. Morinello.

MR. MORINELLO:  Thank you very much.  This is a duty to provide attention to two different aspects.  One is medical and one is mental health.  Am I correct?

MS. FERNANDEZ:  Yes.

MR. MORINELLO:  Okay.  Number one, what do you envision as "other law enforcement representatives or entities"?

9

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MS. FERNANDEZ:  A school crossing guard, mall security.  Anybody that is there to protect.

MR. MORINELLO:  All right.  So -- so this would cover anybody that is in a position to assist any individual.  And when you say school crossing guards, those are normally hired by the school districts rather than the municipalities.  But they would be subject to this also, correct?

MS. FERNANDEZ:  Yes.  Again, anybody that has responsibility of protecting the public.

MR. MORINELLO:  All right.  Next, "under arrest" is very self-explanatory, but "otherwise in custody of a police officer," what is your intent dealing with that particular portion?

MS. FERNANDEZ:  Different custody in situations after arrest or detained in the precinct before indictment.

MR. MORINELLO:  So the way it's written it's police officer arrest, but yet you say it still covers crossing guards and anyone else who's in a position to assist others.  So is that something that you're envisioning, or you intend to place in the bill in the future, or is that your interpretation?

MS. FERNANDEZ:  Really anyone in custody.  So...

MR. MORINELLO:  Crossing guards, they just help kids across the street normally.  So they wouldn't really wouldn't be involved in this, correct?

MS. FERNANDEZ:  No.  So, I --

MR. MORINELLO:  Okay.

10

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

MS. FERNANDEZ:  I think it depends on the circumstances.

MR. MORINELLO:  I'm trying to narrow it down, because what you're doing is, this is a civil liability so you're opening up individuals to expenses that may have no -- no ability to even understand that they're involved in this.

I have a couple more questions.  Is there a requirement that the individual request assistance?

MS. FERNANDEZ:  Not a requirement, but if they do, then the officer would be obligated to act and either find the assistance, call for the assistance, or if they're able, some are certified in CPR to provide the assistance.

MR. MORINELLO:  Okay.  Now, what if it is a non-visible, non-apparent physical injury and there is no request for assistance?  What would happen in that situation if they don't know they have to provide it?

MS. FERNANDEZ:  In reasonable good faith is what we're asking for.  Somebody could --

MR. MORINELLO:  Well, if -- if it's not visible and there's no request, yet they get sued in the end because there's some underlying internal injury that was not caused.  So what you're saying is, this can open any police officer, or anyone acting in consort with them, to liability even if they don't know that there is something there.

MS. FERNANDEZ:  Well, if there's no evidence or indication, then that's reasonable for them to not be liable.  But if

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

they're explaining it or showing distress and lack of concentration or slurred speech or unable to focus, that can be a reasonable reason to seek attention and help.

        MR. MORINELLO:  What's more concerning is the mental health needs.  I think we both need to agree that in most instances it takes trained psychiatrists, psychologists and professionals to determine internal mental health needs, yet you're placing -- yet this appears to place a burden on the police when they encounter someone if there's no outward manifestations.  Is that the intent of this?

        MS. FERNANDEZ:  It's about what is obvious to see. If the person is exasperated and acting in a manner that we can say is not of the norm, then that is a reasonable need for a good faith decision to be made to seek more help.

        MR. MORINELLO:  All right.  But the -- the issue becomes good faith or reasonable would be decided by a court or a judge.  So this here really puts them in a position to have to at least undergo the expense or the trauma of a trial and to be determined that their actions were reasonable and not unreasonable.  That -- that's what this appears to do.  As far as the mental health, what type of treatment do you envision?

        MS. FERNANDEZ:  A phone call.  Officers should not be expected to perform every act under the world to -- or over the world to -- to do what we're really asking.  We ask a lot of our officers.  But mental health, yes, is something that should be addressed by professionals, and what they can do is make a phone call

or a report on the radio, *Bring extra help because I can't help the situation.*

MR. MORINELLO:  So in essence, then, what this does is puts a burden on the police officer to determine any hidden defects, any hidden injuries or any -- any hidden mental.  And what I -- and your answer as far as reasonableness, yes, it could be determined by a court of law.  But it's my understanding the way this is written, that if someone brings an allegation, they're subject to be able to bring a lawsuit on this.  Am I correct?

MS. FERNANDEZ:  Only if it's -- if they suffer a serious physical injury, which would be obvious to see.

MR. MORINELLO:  Well, it's not always obvious.  It could be an internal injury.  That's the point I'm getting at.  Or a mental health, a schizophrenic --

MS. FERNANDEZ:  But if they're able to --

MR. MORINELLO:  -- a police officer --

MS. FERNANDEZ:  Sorry.  If they're able to --

MR. MORINELLO:  Well, that's all right.  So --

MS. FERNANDEZ:  -- show or speak, saying something like "I can't breathe," that is a reason to act in good faith to address that need and that concern.

MR. MORINELLO:  Well, that's an outward manifestation.  So I'm not talking outward manifestations.  But, I appreciate your time.

On the bill.

13

**NYS ASSEMBLY**                                              **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  On the bill, Mr. Morinello.

MR. MORINELLO:  Although I understand the need to protect the public at-large, this bill seems to put a burden - which would be a financial and an obligatory burden - on arresting officers for either mental illness, which is not outwardly manifested, or physical injuries which are not outwardly manifested.  The ultimate result may be a non -- a -- a trial where there is no finding, but it would still subject them to it.

Because of those reasons I urge my colleagues to vote no on this bill.  Thank you very much.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Fernandez, will you yield?

MS. FERNANDEZ:  I yield.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you very much.  I had some questions and I was hoping you could help clarify.  This bill purports to apply personal liability to police officers because it says, *When a person is under arrest or otherwise in custody, a police officer has this duty to provide attention to the medical and mental health needs of the person and obtain assistance and treatment.*  But it goes on to

14

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

say, then, that if the person suffers any injury or an exacerbation of existing injuries, the police officer could face personal liability.  Is that correct?

MS. FERNANDEZ:  They would likely be indemnified.

MR. GOODELL:  But this bill doesn't -- doesn't say that the entity that employs the police officer would be liable, it actually says that a person who is injured shall have a cause of action against such officer, correct?

MS. FERNANDEZ:  Or entity.  And existing law identifies that.

MR. GOODELL:  It -- it doesn't say "or," it says "and/or entity."  So it's -- a person could select to sue just the officer?

MS. FERNANDEZ:  Depending on the case and the evidence that show that there might have been direct action of this officer as in neglecting them or deliberately ignoring calls for help, then yes, it could become directly on the officer.

MR. GOODELL:  Now, as you know, we have a Good Samaritan law in New York State and, in essence, what the Good Samaritan Law says is that if a person stops who has no duty and offers medical care, you know, you may see somebody who is having a heart attack or is injured or otherwise needs medical care and stops, they're immune from liability.  They're exempt from liability as long as their actions were not grossly negligent.  Does the same standard apply to a police officer under this bill that's providing

15

NYS ASSEMBLY                                    JUNE 9, 2020

medical care?  In other words, as long as the police officer's action were not grossly negligent, does he have the same protection that a Good Samaritan would have?

          MS. FERNANDEZ:  Indemnification -- the law -- all the other laws apply and nothing would change.

          MR. GOODELL:  Well, my question, though -- and I apologize that -- you and I did talk earlier but sometimes I hear a debate from my colleagues or questions that sparks other -- other questions and so on, and I apologize for not asking you in advance. But my question is very specific.  Do the Good Samaritan exemptions from liability also apply in this situation, or alternatively, does this impose a direct affirmative duty on police officers to provide the medical care or arrange for medical care?

          MS. FERNANDEZ:  It would be up to a court to decide.  But they are provided indemnification and all the laws apply.

          MR. GOODELL:  We talked a little bit about qualified immunity.  Under current law, if a public official is operating within the scope of their duties -- in other words, they're not (unintelligible) but they're operating within the scope of duties, they have a qualified immunity from personal liability.  Would you anticipate that this law overrides that qualified immunity for a police officer under these circumstances, or would qualified immunity still apply as a defense?

          MS. FERNANDEZ:  They're already indemnified under the General Municipal Law and the Public Officers Law.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MR. GOODELL:  So you envision that the indemnity provisions that might apply under the Municipal Law or perhaps under union contracts those would still apply.  But of course, as you know, an indemnity provision means the judgment surrendered against the officer but then paid -- the judgment is then paid by the taxpayers.  That's what indemnity means.  The question, though, I have is are they immune from liability in the first instance under qualified immunity?

MS. FERNANDEZ:  All the statutes apply.

MR. GOODELL:  Okay.  Does this obligation of a police officer to provide attention to the medical and mental health needs of a person who might be in custody apply even if the health or mental health condition is unrelated in any way to the police action?

MS. FERNANDEZ:  Yes, because one wouldn't know immediately what are the underlying health things.  So it is my belief that a first action would be to act upon it and seek help or provide help if you're able.

MR. GOODELL:  So, as an example, if an officer receives a call or the police department receives a call about an individual who is acting in an erratic behavior - and we've seen that sometimes people who are talking loudly to themselves, they appear to be either on drugs or suffering from mental health - that the police officer would, upon responding, have an affirmative duty to seek medical care for that person?

MS. FERNANDEZ:  Yes, they should call for professionals to come and help deescalate.

MR. GOODELL:  If the police make a call, they arrive on the scene, they make the call, does the making of a call for medical assistance then absolve them from liability under this bill?

MS. FERNANDEZ:  If it's reasonable and in good faith -- under the circumstances, if it's reasonable and in good faith that they made an attempt to help this person in staying alive, then yes.

MR. GOODELL:  Now there are many police officers who are very concerned that this imposes a duty on them to become paramedics in addition to their police activities.  How would you respond to that concern?  Should a municipality, in order to avoid liability, require all their police officers to be also trained as paramedics?

MS. FERNANDEZ:  Reasonable and good faith under the circumstances.  But one in custody of government cannot be ignored or overlooked the other way.  So we're not expecting officers to do -- to be in these positions and do the most, but again, seek the assistance that you need to address the situation.

MR. GOODELL:  Again, thank you very much for your comments.  I appreciate them.

On the bill, sir.

ACTING SPEAKER AUBRY:  On the bill.

MR. GOODELL:  Under current law, our municipalities are responsible for providing appropriate medical care to anyone who is in their custody.  That's the current law.  And that

18

custody is triggered when the individual, you know, cannot leave or is under arrest.  It's not always obvious, though, that a person may need medical care.  For example, the symptoms of somebody who is having a stroke can be very similar to the symptoms of somebody who's very intoxicated.  They're both slurring speech, they both have trouble communicating.  Their coordination is -- is not good.  And sometimes it's hard to tell.  This bill imposes personal liability on a police officer.  If the police officer arrives on scene and doesn't, quote, "provide attention to the medical and mental health needs of the person and obtain backup medical support."  So under the terms of this legislative language, the police officer is not absolved from liability if he calls for medical support.  He has to provide it himself and call for backup.  Now, we don't expect our police officers to be trained paramedics.  That's not their role.  Their role is to secure the -- the crime scene, if there is one.  To respond to an active shooter.  To stop, you know, widespread vandalism or -- or chaos that they might show up to.  When they show up at a car accident, their immediate response is to secure the scene to make sure people aren't hurt, more people aren't hurt.  That there's not a follow-up pileup.  Then they do the investigation.  This bill, I think, would be much more appropriate if it made it clear that police officers do not have personal liability and they have qualified immunity if they're acting in good faith.  It should also be clear that the same standards that we apply to Good Samaritans apply to police.  We don't expect the police to be sued personally if when responding to the scene of a crime they provide an

19

NYS ASSEMBLY                                    JUNE 9, 2020

appropriate medical care.  And sometimes it's difficult to tell what's

appropriate or not if you're not a trained medical professional.  This

extends the mental health conditions, as my colleague noted, and

imposes personal liability if a police officer doesn't distinguish

between someone who is really drunk, high on drugs, or whacked out

on drugs, or is facing some other mental health issue.  And often our --

we're asking our police officers to respond in very dangerous and very

difficult circumstances like a violent domestic abuse situation.  And so

often our officers are attacked.  They respond to a call, the neighbors

say people are screaming.  They respond, they break up what appears

to be a domestic violence fight only to have the other spouse attack

them.  And then on top of this we impose on them the obligation to be

mental health professionals, to evaluate when that -- someone is

suffering from a mental health problem that needs medical treatment.

Or the characteristics of an emergency room triage to determine

whether or not they have to respond.  I think we're losing sight of the

fact that our police have a role to stop crime, to investigate crime, to

arrest those who commit crime.  We already have a general obligation

to provide medical care and treatment.  But it's not backed by the

personal liability of the officer.  It's the responsibility that applies to

the institution.  And that allocation that we currently have is the

proper allocation.  And telling a police officer in the State of New

York that, *If you don't make the right medical call or the right mental

health call in the middle of an emergency involving an active crime

scene, your personal assets are at risk, your family's financial security*

20

NYS ASSEMBLY                                    JUNE 9, 2020

*is at risk, and you better hope that the municipality will indemnify you*.  That's the wrong message to send.

For those reasons, I and many of my colleagues will not be supporting this bill.  I do want to end, though, on a positive note.  I appreciate my colleague's concern - which are shared by all of us - that our police do call for help, that we do respond quickly and appropriately in terms of seeking help for those who interact with any of our law enforcement professionals, whether it's police, fire or anyone else.  We all share that goal.  I applaud you for that goal and your thoughtfulness in pursuing that goal.  But I don't think imposing personal liability on police officers is the right approach.

Thank you so much, sir, and thank you to my colleague.

ACTING SPEAKER AUBRY:  Mr. Ramos.

MR. RAMOS:  Mr. Speaker, will the sponsor -- sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Ms. Fernandez, will you yield?

MS. FERNANDEZ:  Yes, I do.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. RAMOS:  Ms. Fernandez, the way I understand it, this bill requires police officers to get medical help in an obvious situation where a person is in distress or if a person expresses some kind of a psychiatric problems that are obvious, reasonable --

MS. FERNANDEZ:  Obvious.

21

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

MR. RAMOS:  -- that the police officer would be require to make a phone call, right?  I -- I hear a lot of gaslighting here, making this situation so difficult.  I was a police officer for 20 years, and the situation is not -- it's rarely any question as to what the situation is.  According to your bill, if a police officer puts his knee on somebody's neck and the person says, *I can't breathe.  Please just let me stand up.  I'm not resisting*, and the police officer does not do that and does not get medical assistance for that person, he would be in violation of this, right?

MS. FERNANDEZ:  Yes.

MR. RAMOS:  That's pretty obvious.  If a person is under arrest and says, *I'm going to kill myself*, a police officer should make a phone call.

MS. FERNANDEZ:  Yes.

MR. RAMOS:  This is -- I don't know how -- why we're twisting ourselves into pretzels to say that this is so -- such a burden on police officers to do what is their absolute duty.  And the -- you know, I heard here, *Well, you know, the police officers, they would -- they would suffer an expense if they're sued*.  But the person who is suing is also retaining attorneys.  And if they want to do a frivolous suit, they're also throwing away an expense at -- at doing that, right?

MS. FERNANDEZ:  Correct.

MR. RAMOS:  So, nobody's asking a police officer to diagnose anybody.  They're talking about what is obvious.  And it's

22

NYS ASSEMBLY                                    JUNE 9, 2020

usually not the case of an underlying condition.  It's usually the case of

somebody with their head split open who gets brought to the station to

be booked instead of brought to the hospital first to -- to be treated.

And in a case of -- of negligence like that, there should be some

liability.  If there's no liability, you can't change the behavior.  We're

asking for a law that says if there is a medical situation, a police

officer should get assistance.  Plain and simple.  No rocket science.

Nothing complicated about this.  And the officer should make a phone

call on psychiatric issues.  Now, I heard here about the Good

Samaritan.  Does this -- you know, Good Samaritans are covered,

right?  If somebody tries to help somebody, of course, and some -- it

doesn't work out well, then they're -- they're indemnified under the --

the Good Samaritan laws.  But if a police officer tries to get somebody

help, they're not in violation of this.

                MS. FERNANDEZ:  No.

                MR. RAMOS:  The Good Samaritan Law has nothing

-- that's a person who's trying to help somebody.  This addresses a

police officer who is not trying to help somebody.  If a police officer

has knocked over an elderly man and the elderly man is bleeding

through his ears and they walk over him and don't get assistance, are

they in violation of this?

                MS. FERNANDEZ:  Yes.

                MR. RAMOS:  Quite obvious.  This is what we're

seeing.  We're not asking a police officer to give somebody a blood

test to see if they have diabetes or not or -- or any kind of underlying

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

condition.  It's not reasonable to expect a -- a police officer to know about invisible physical conditions.  And your -- this law covers that.  It's -- it's quite obvious.  So I believe that the gaslighting should -- should end on this.  We should pass this law.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RAMOS:  The gaslighting on this should end.  This is not rocket science.  This is not -- I think the public is intelligent enough to see what we're trying to do here.  We have a -- a problem throughout the country where people are being harmed and police officers are -- are -- are dealt with with impunity.  We're -- we're not talking about invisible ailments, we're talking about somebody saying, *I can't breathe.  I'm going to die.  Mom, I'm going to die.  Mother,* and a police officer does nothing.  That's what we're talking about.  We've seen it.  Not once, we've seen it multiple times.  And that's what we've seen on video.  We don't know what has happened that has not been on -- on video.  And this -- this bill here covers that atrocity that we see happening throughout the country.  This brings accountability, and I applaud the sponsor and I urge all my colleagues to vote yes.

ACTING SPEAKER AUBRY:  Mr. Barron.

MR. BARRON:  Thank you very much, Mr. Speaker.  I was going to do something that you may not have heard or seen me do since I've been up here, but I was going to unraise my hand because Assemblymember Ramos was so good.  But I want to applaud

NYS ASSEMBLY                                    JUNE 9, 2020

the sponsor of this bill as well.  There's a reason for this bill that some people who have another kind of reality who have, in my opinion, a Mr. Roger's Neighborhood reality.  Officer Joe Bolton reality.  But we have another reality that includes racism and includes serious neglect. I had a case in my district with Akai Gurley, a young man who was in the Pink Houses, and he was going to the elevator with his friend.  The elevator was stopped on the floor above him, the 8th floor, he was on the 7th floor.  And the officers on the 7th floor were doing a vertical patrol in public housing when they go down the stairwell to make sure nobody's doing anything on the stairwell.  As soon as Officer Liang opened the stairwell, his gun was drawn, his finger was on the trigger, and the light was dim.  So he turned and he shot a bullet that struck Akai Gurley, just missed his friend, and Akai Gurley ran down two or three flights and he was dying.  The first thing the officer did was to call his supervisor to make sure he wasn't in trouble.  And then when he eventually got down the stairs, Akai Gurley was being kind.  They were trying to resuscitate him.  His friend was, and she knew nothing about CPR or anything.  The officer stepped over his body, and they refused to even try to give him CPR, which they're trained to do, or do anything to try to resuscitate him.  And he died.  I've had cases where the police arrived on the scene and someone was mentally disturbed. There was quite a few cases that I've had with them, so I dare not -- dare not try to name anybody and leave somebody out.  But instead of them calling up for a psychic -- psychological backup or psychiatric back up, they went in blazing with their weapons.  In one case, they

25

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

shot off the hand of a grandmother saying that she was coming at them with a knife.  There was 12 of them, and they had the -- the bulletproof jackets, they had 12-feet shields to block it, and they had a -- a restraining rod.  With the Eleanor Bumpur's case, the first shot shot her hand off where she had the knife, and the second shot blew a whole in her chest and killed her.  They didn't say, *She's in there, let's leave her alone.  She may not want to be disturbed.  Let's call somebody*.  And by the way, she was behind a couple of months in her rent - some say one month, some say three - and that's why they were coming to evict her, /and her eviction notice was a shotgun blast to her chest that killed her.  They didn't try to see if they could get somebody to talk to her.  So this bill is a life-and-death bill.  It is not one of these -- they always come up with scenarios and they come up with cases that don't exist for the most part.  They just make them up to protect the police, and some of my colleagues up here do this almost reflexively.

So, this bill, I want to commend the sponsor.  In the light of all that's going on, this is the least you could do.  How cold can you get?  This is the least you could do, and stop trying to find all of these technical things, made-up scenarios that you come up with because you don't want police officers to pay the consequences of their neglect.  And in many instances they're neglecting the medical attention needed after they're the ones who inflicted the pain and the harm on the black or brown individual, which is usually the case in our neighborhoods.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

So I'm definitely going to vote yes on this.  And it's just unfortunately [sic] that we have bills that really aren't, I don't think, addressing the root causes of these problems and making them pay severe penalties for killing us.  At least this one says you can be held personally liable for your neglect that could lead to someone's death.  I applaud the sponsor.

ACTING SPEAKER AUBRY:  Mr. Kim.

MR. KIM:  Thank you, Mr. Speaker.  Will the sponsor yield for a question?

ACTING SPEAKER AUBRY:  Ms. Fernandez, will you yield?

MS. FERNANDEZ:  Absolutely.

ACTING SPEAKER AUBRY:  Ms. Fernandez yields, sir.

MR. KIM:  Thank you, Ms. Fernandez.  If -- if this law was in place back in 2014, could the family of Eric Garner have filed a personal lawsuit against Officer Derek Chauvin?

MS. FERNANDEZ:  Yes.

MR. KIM:  I'm sorry, not Chauvin, Daniel Pantaleo.

MS. FERNANDEZ:  Yes.

MR. KIM:  Right.  Okay.  Thank you.  And if -- if this law was in place in a place like Minnesota, could the family of George Floyd file personal lawsuits against Officer Derek Chauvin?

MS. FERNANDEZ:  Yes.

MR. KIM:  Okay.

27

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

On the bill, please.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. KIM:  I think this is one of the more significant bills we're taking on today and this week.  You know, the Federal government is actually, as we speak, taking on the possibility of repealing qualified immunity entirely.  Now, this is about accountability.  And unlike the other bills, this has real consequences on how police officers conduct themselves.

So I wholeheartedly applaud the sponsor for her courage and for being brave enough to take this on and take this challenge on, and I support it and we should all support this bill one hundred percent.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Mosley.

MR. MOSLEY:  Thank you, Mr. Speaker.  Would the bill sponsor avail herself to a question?

ACTING SPEAKER AUBRY:  Ms. Fernandez, will you yield?

MS. FERNANDEZ:  Yes, I do.

ACTING SPEAKER AUBRY:  Ms. Fernandez yields.

MR. MOSLEY:  Thank you, Mr. Speaker.  As it was so noted by one of our colleagues who talked about the Akai Gurley shooting, would that officer, in that particular instance, would he have been held accountable, based upon your legislation, if your legislation would have been in law then?

28

**NYS ASSEMBLY**                              **JUNE 9, 2020**

MS. FERNANDEZ:  It would be up to the courts.  I can't really give you an opinion.

MR. MOSLEY:  Can you give me a scenario as to why back -- or can you explain as to why, for that case, there would not have been any culpability, or the culpability would have been based on him going to court compared to others where there would have been more culpability towards the officer?

MS. FERNANDEZ:  A suit could be brought, but ultimately, it would be up to the court.

MR. MOSLEY:  Okay.  So in terms of the -- I'm just trying to distinguish between what happened in Minnesota and what happened then.  Where is the distinction between the two?

MS. FERNANDEZ:  Same answer.  Different judge.

MR. MOSLEY:  Okay.

On the bill, Mr. [Sic] Speaker.

ACTING SPEAKER WOERNER:  On the bill.

MR. MOSLEY:  Thank you, Mr. [sic] Speaker.  I applaud my -- my colleague for this bill.  It's long overdue.  It's a bill that speaks to the fundamental responsibilities in large part that an officer is supposed to perform in terms of his duties -- his or her duty to the general public that they're sworn to serve and protect.  But as my colleague said earlier, if -- you know, this bill is too late for Eleanor Bumpurs or Akai Gurley or even Eric Garner.  We hope that going forward that this practice and pattern of officers neglecting the most fundamental issues that they are to address when they're

29

NYS ASSEMBLY                                    JUNE 9, 2020

protecting the people that they've been sworn to changes a practice where so many people known and unknown have lost their lives in the streets of our five boroughs and throughout the State of New York.

So I applaud the -- the sponsor of this bill and I applaud my colleagues for bringing up many of the points that I was going to bring up earlier.  But again, I -- I vote in the affirmative. Thank you so much.

ACTING SPEAKER WOERNER:  Thank you, Mr. Mosley.

Mr. Reilly.

MR. REILLY:  Thank you, Madam Speaker.  Will the sponsor yield for a quick question?

ACTING SPEAKER WOERNER:  Does the sponsor yield?

MS. FERNANDEZ:  Yes, I do.

MR. REILLY:  Thank you, Ms. Fernandez. Regarding this legislation, if an officer radios for -- to the dispatcher to have an ambulance respond or to transport a -- a person that's in custody to the hospital, which of course is their duty to do, and they should be doing it, and that's just a moral thing to do, I believe. Would that cover the reasonableness in rendering aid and doing as much as possible that they could do before the ambulance arrives or before they get medical attention at the hospital?  Would this -- would that cover?

MS. FERNANDEZ:  Yes.  That would cover because

30

NYS ASSEMBLY                                    JUNE 9, 2020

they made the attempt to -- they made the attempt to bring the person

to the assistance that is needed, the aid needed, and they would not be

liable.

ACTING SPEAKER WOERNER:  Thank you, Mr.

                    MR. REILLY:  Thank you.  I appreciate the

clarification.

                    ACTING SPEAKER WOERNER:  Thank you, Mr.

Reilly.

                    Mr. Walczyk.

                    MR. WALCZYK:  Thank you, Madam Speaker.

Would the sponsor yield?

                    ACTING SPEAKER WOERNER:  Will the sponsor

yield?

                    MS. FERNANDEZ:  Yes.

                    ACTING SPEAKER WOERNER:  The sponsor

yields.

                    MR. WALCZYK:  When this piece of legislation

talks about custody, does that include incarcerated individuals in the

State of New York?

                    MS. FERNANDEZ:  Yes.

                    MR. WALCZYK:  So are -- are inmates who are

incarcerated in New York State, are they always under the care of a

corrections officer?

                    MS. FERNANDEZ:  Probably not every minute of

the day, but in general, yes, they are under the care of the officer and

State or -- or city.

                                    31

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MR. WALCZYK:  If -- if an inmate is to purposefully hurt themselves, would you assume, under this law, that there's an underlying mental health issue with that inmate?

MS. FERNANDEZ:  One could assume.

MR. WALCZYK:  So wouldn't that open our corrections officers to this civil liability any time an inmate chooses to hurt themselves?

MS. FERNANDEZ:  If they don't try to seek help, then yes.

MR. WALCZYK:  Okay.  Thank you.

ACTING SPEAKER WOERNER:  Thank you, Mr. Walczyk.

Mr. Abinanti.

MR. ABINANTI:  Thank you, Mr. [sic] Speaker.  I'd like to commend the sponsor of this legislation and state my support. I want to concentrate on what is the most obvious and probably the most frequent circumstance, where an injured person is in the presence of, and maybe the custody of, if not in fact by being handcuffed, but in fact by being surrounded by law enforcement officials.  Where you have someone who's injured and others are watching and would like to come to the assistance, they often do not because of the presence of the police officers or other law enforcement officials who are controlling the circumstance.  All this legislation says is that those in charge of the situation have an obligation to make sure that anyone who is injured gets the care that

32

he or she needs, because their presence is preventing others from

coming to the aid of that person.  No reasonable person would have

rushed out into the middle of the street to aid the injured man who --

in Buffalo when there was a troop of law enforcement officials

walking down the center of the street, stepping over that person.

Under normal circumstances if the police officers were not there, any

reasonable person on the street would have come to that man's aid.

But given the circumstances, the presence of law enforcement

prevented others from coming forward, in fact.  This bill says that we

expect law enforcement to act as human beings towards other human

beings.  That they will come forward and do what we expect one

person to do for another person.  A reasonable thing:  provide some

assistance.

I think this is an excellent bill.  It basically says that

benign neglect is no longer acceptable and that we have to train each

other as human beings no matter what the circumstances are.  Thank

you for sponsoring the bill, and I support the bill.

ACTING SPEAKER WOERNER:  Thank you, Mr.

Abinanti.

Mr. Pichardo.

MR. PICHARDO:  Thank you, Madam Speaker.

Would the sponsor yield for a very quick question?

ACTING SPEAKER WOERNER:  Will the sponsor

yield?

MS. FERNANDEZ:  Yes.

33

**NYS ASSEMBLY**                              **JUNE 9, 2020**

ACTING SPEAKER WOERNER:  The sponsor yields.

MR. PICHARDO:  Well, thank you, Assemblywoman, for -- for carrying this bill.  I just had a really quick question regarding a case that happened not too long ago about a woman who gave birth on the floor of a cold county jail out in California and was crying for help and the -- the local sheriff and the folks who were supposed to monitor her.  Was there an obligation from them in this -- under this -- under this legislation in certain circumstances, was there an obligation for these folks who were -- incarcerated this young individual to render aid to that individual?

MS. FERNANDEZ:  Yes.  These are existing duties of our law enforcement officers.  Under government custody, you cannot be ignored.  So, yes.  This just reinstates that this is their duty.

MR. PICHARDO:  So, again, from my understanding and the reading of this legislation, it has to do with a reasonable rendering of aid in certain circumstances.  So the example that some of our colleagues gave before regarding the issue of custody, especially if an individual is under the custody of the State, in this particular case where there was no aid or attempt to render aid, this bill would cover that situation and basically say that there is a reasonable responsibility for folks who have individuals in their custody to render aid under these circumstances.  Is that correct?

MS. FERNANDEZ:  That is correct.

MR. PICHARDO:  All right.

34

On the bill, Madam Speaker.

ACTING SPEAKER WOERNER:  On the bill.

MR. PICHARDO:  Again, I want to commend my colleague for putting this legislation forward and making sure that, you know, that it's not just simply a moral obligation, but it's also a legal obligation.  If a person is in your custody, it's -- the automatic assumption is that that person is in your care at that moment, and that we need to make sure that we do everything that we can reasonably.  And most folks understand what that legal terminology means, which is reasonable, in order to make sure that that person is not only in -- in good health but also alive when the chain of custody changes.

So I commend my colleague for this legislation, and I support her endeavor in this.  And I will be voting in the affirmative when this bill comes to a vote.  Thank you, Madam Speaker.

ACTING SPEAKER WOERNER:  Thank you, Mr. Pichardo.

Mr. Sayegh.

MR. SAYEGH:  Thank you very much, Madam Speaker.  I just wanted to also voice my, really, support for the sponsor.  I had the pleasure of cosponsoring this bill, and -- and I hope that this bill would expand the importance of making sure whether individuals are in the custody of law enforcement or other departments and first responders, that individuals are given the proper care.  I think we all acknowledge that law enforcement and first responders are not really trained sometimes to be medical

35

NYS ASSEMBLY                                    JUNE 9, 2020

professionals.  But what we do expect is that the person who is either

arresting someone or caring for someone's health and property that

they take into consideration the circumstances.  And if a person is

suffering or seems to be suffering, then this policy and this bill would

encourage and -- and -- and -- and make it a responsibility and an

obligation to either treat the person or immediately call for expert

treatment.  I think this is expected.  And I'm looking at this bill also as

setting a norm and a standard also for individuals that are

incarcerated, whether in State prisons or hopefully at some day to

expand this to Federal prisons, where many inmates are not being

treated or given the proper care of those with diabetes, with high

blood pressure, with cardiovascular disease.  Their conditions are

largely ignored.  There has not been an emphasis on the treatment of

inmates and those in custody.  And what we're learning now, even

with this past pandemic and COVID-19 where Federal prison -- prison

officials are leading judges to feel that this -- their facilities are safe

when, in fact, we know there's no testing going on.  So they can't

determine whether the inmates are safe or not and whether they're

getting the proper care and treatment.

　　　　　　So I support the bill.  I support the spirit of the bill.  I

recognize there's situations that may arise that say sometimes may be

questionable.  But when you legislate, you legislate for the well-being

of the majority of individuals that can benefit from this type of

legislation.  So I will vote in favor of this legislation, and again, urge

my colleagues that this is a bill that does protect our citizens and is

36

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

something we should support.  Thank you very much.

ACTING SPEAKER WOERNER:  Thank you.  Mr. Sayegh.

Ms. Glick.

MS. GLICK:  Thank you, Madam Speaker.  I wish to point out a few things that I find somewhat troubling in the conversation.  And that is that the -- we want to ensure that the police have the opportunity to do their job without concern.  The flip side is, their job is to protect the public.  And in two recent cases over the last five years, two individuals not involved in any violent crimes found themselves essentially killed by the police despite indicating that they couldn't breathe.  This should shock the conscience of all of us.  For some time, New York City has recognized that there are emotionally-disturbed people, and they have established protocols. When those protocols are not followed and an injury or death results, that is on the officers involved.  I am also aware of the fact that there are instances, numerous instances, at least in New York City, where people are arrested, they're taken into custody.  They indicate they have medication that they need, and that medication is never provided. That happens probably more often than we know.  These are basic, basic things that we should expect, that people taken into custody who are either obviously injured, who indicate that they are in distress, that they indicate that they need certain medication -- someone could need asthma medication if they are -- have had their breathing disrupted, or even if they are upset it can trigger a -- an asthma attack and you can

37

NYS ASSEMBLY                                              JUNE 9, 2020

die.  We had a New York City Schools chancellor who was from the midwest and foolishly waited for an ambulance instead of taking a cab to the hospital, and he died from his asthma attack.  So, one might need medication and need it quickly, and not have to -- and should not be unable to obtain that because the police have decided not to respond or acknowledge that.  Now, we've had individuals who have -- there was an incident many years ago in Brooklyn where an obviously emotionally-disturbed individual was surrounded.  He was an Orthodox Jew.  He had a small hammer that was part of some ceremonial equipment, and he was shot several times by over a dozen -- half-dozen officers who had surrounded him and contained him, but never reached out for -- for the proper assistance for somebody who was obviously disturbed and not advancing on them, but had refused and might not have understood.  We also have people who have hearing disabilities, or people who have a different language and are not understanding commands in a very short period of time to drop something.  And yet their lives could be lost or they could be injured because the police have not recognized or responded to that emotional distress.

Now, my colleagues on the other side of the aisle are always concerned about the taxpayers' dollars.  New York City has spent literally millions of dollars every year in lawsuits brought to -- based on the fact that there have been actions undertaken by the police - and in some instances by an individual repeatedly - with excessive force.  So, this is an attempt to ensure that the police render care that

38

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

is obviously necessary either because somebody is injured or
somebody is emotionally distressed.  The fact that there have been
some folks who because of their hearing loss, the fact that they're
diabetic and when you're going into a diabetic coma you may be
slurring your speech and you may appear to be drunk.  The police
can't discern everything, but they should be able to call for assistance
when somebody is clearly not a threat to the public at-large.  After all,
in those instances the police are armed.  And these are individuals
who have committed no serious violent crime.  Mr. Floyd, I believe,
matched the description, matched the description of a forgery suspect.
A forgery suspect.  And he lost his life.  That's a capital -- we -- the--
he suffered capital punishment because he matched the description of
a forgery suspect.

So I applaud the sponsor.  And I think that as much as
when you don't want to deal with something and you call the police,
yes, it's a tough job.  But they also have to recognize when somebody
is in distress and ensure that they have the appropriate care rendered
to you.  I applaud the sponsor and hope that everybody will vote in
favor of this.

ACTING SPEAKER WOERNER:  Thank you, Ms.
Glick.

Mr. Blake.

MR. BLAKE:  On the bill.

ACTING SPEAKER WOERNER:  On the bill.

MR. BLAKE:  First, I want to commend the sponsor

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

for not just commonsense legislation, but legislation that will lead to the saving of lives.  One of our colleagues said this earlier, and I think it's important.  I think we're tired and done of the gaslighting that's happening here.  What is more important:  Your salary or our survival?  What's more important:  Your -- your pension or our protection for our livelihoods?  We're literally having a conversation right now on if someone needs medical assistance from a law enforcement official, will you help them.  What else do we need to see?  We saw it with George Floyd.  We saw it with Eric Garner.  We -- we see it over and over and over again.  And -- and when we talk about black lives matter, brown lives matter, while we say our lives matter it's not just that we have the injustice of what's happening from criminal injustice.  It's the sheer brutality and inhumanity happening against us.  So to be as direct, as heartfelt as I can be, vote for this bill so we can live.  Vote for this bill so we can survive.  I'm really tired of constantly hearing from people about, *Everyone else needs to be protected.  Everyone else needs to be okay.  Everyone else needs to get back home*.  When do we get back home?  When do we get to actually live?  I haven't heard one coherent argument why you'd be voting against this.  And if you weren't an officer, I would ask -- I've heard this notion about Good Samaritan and again, these things get tossed around.  If someone was in need of medical attention, wouldn't you go help them?  Wouldn't you pick up the phone?  Wouldn't you figure out a way to help them to survive?  Isn't that just commonsense?  And if someone is a police officer or in law

NYS ASSEMBLY                                  JUNE 9, 2020

enforcement in any way and they're choosing in those split seconds to pick up a phone and call their supervisor to make sure they still have a job rather than you living, they shouldn't have a job in the first place.

So I encourage all my colleagues to support the sponsor on this legislation which, again, is not just commonsense, it is about survival.  One more time!  What is more important:  Your salary or our survival?  I'll absolutely be voting in the yes and I thank the sponsor for her leadership on this bill.

ACTING SPEAKER AUBRY:  Ms. Wright.

MS. WRIGHT:  Good afternoon.  Thank you for the opportunity to speak on this bill.  I applaud the sponsor for bringing this bill.  It is simply obligating officers to provide or request medical attention and assistance to a person in custody who is showing distress.  At bare minimum, this establishes a model of professional conduct that we should demand from someone who has a duty of care to respond to reasonable, verbal and physical cues in assessing any situation.  And most importantly, this bill allows us to shift the burden of liability back where it should rest.  We're going to save our taxpayer dollars and force negligent officers to bear the burden.  This job -- the job of being an officer, a peace officer, is to care for and to serve the public.  It is already a requirement for officers to provide care and request it where a person is obviously injured or in distress.  Officers who fail to do so, fail to comply, are deliberately defying orders.  We should not be protecting that behavior.  Let's treat officers as the professionals we expect them to be.

41

**NYS ASSEMBLY**                           **JUNE 9, 2020**

I am very proud of this legislation.  I am glad to see us standing up for the community and understanding, and also honoring the work that our officers who do respond in well and good time do.

So thank you.  I will be voting in the affirmative and I would like to applaud our sponsor, once again, for bringing this very important piece of legislation.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Fernandez.

MS. FERNANDEZ:  On the bill.

ACTING SPEAKER AUBRY:  On the bill.

MS. FERNANDEZ:  The New York State -- or just the New York Police Department -- but in similar fashion, other departments all over the State -- they pledge -- and it's in writing -- to value human life, respect the dignity of each individual, and render their services with courtesy and civility.  Yet that hasn't always been the case.  It wasn't the case for Eric Garner.  It wasn't the case for George Floyd.  And it wasn't the case for Andrew Kearse, who was the inspiration for this bill.  Andrew was a Bronx resident that was arrested in Schenectady in 2017.  He was apprehended after running a red light and thrown into the back of a squad car, handcuffed.  And that's when the timer on his life went off.  For 17 minutes.  And at the beginning of that 17 minutes we saw Andrew fell ill.  He became short of breath.  He slumped over.  He couldn't keep his (unintelligible) right and he struggled to breathe.  And he begged the officer over and over and over again.  *Officer, I don't feel good.  Officer, please, I need*

42

*help.  Officer, please, I can't breathe.  Open the window.  Please, officer, I need help*.  He probably begged and said the word "please" 70 times, and that officer disregarded him, didn't believe him, and literally waved him off.  And it's all documented on the camera in the back of the car.  Anything could have been done.  That officer could have acted.  That officer could have turned back to say, *Are you sure?*  Something in good faith to check that this human was doing okay.  *I can't breathe*.  He uttered that 11 times.  After 17 minutes when they arrived at the precinct, Andrew was slumped over, unresponsive.  They dragged him out of the car, laid him on the sidewalk and then started to check and see if he was okay.  He was eventually pronounced dead right there on the sidewalk.  But we know and saw that he died in the back seat of that car.  But 17 minutes was all he had.  "I can't breathe" were his last words.  These haunting words stay with us.  If the officer had done something, listened to him, could Andrew have been alive today?  Unfortunately, we may not know.  But his fate was decided as soon as he sat in that car.  What was his crime?  Running a red light.  Was the disregard worth it?  Was it worth his life?  We have indemnification, and it exists.  But in cases when the officer deliberately did not act and showed malice, that's where this law comes into effect.  How often have black and brown Americans been subjected to the callous, negligent and fatal actions of the police?  We've seen all the videos.  "I can't breathe" has become a rallying cry.  But it is also a haunting reminder of just how little law enforcements care about our minority communities, our black and

brown communities.  A fact that we're all reminded of when George

Floyd died in Minneapolis.  Rather, he was killed in Minneapolis.

Andrew didn't have to die.  Neither did Eric.  Neither did George.

Neither did Breonna, or neither did any other person that is on the

long list that we have of those that have died in police custody

(unintelligible).

Police must act reasonably.  We trust them.  We call

for their help.  Sometimes it's not enough just to make a phone call,

but show that you care for this human life in your custody, in your

care, in your responsibility.  Especially when you were the ones who

put the cuffs on them.  Our law enforcement officers swore to an oath,

an oath to protect this community.  Their job is hard; I'll never deny

that.  The hours are tough, the work is grueling, and there's danger.

But to actively hear someone cry for help and beg for their life,

literally begging for their life and you don't give any attention or

regard for what is actually happening to them, that is a blatant

disregard for human life.  And that is a blatant disregard for the oath

that they swore upon.

This bill will require officers to provide medical

attention to those in custody who show medical distress, and failure to

do so, if it results in physical injury or death, they will be civilly

liable.  It's a good start towards accountability, and it is commonsense.

We entrust these people with our lives, for protecting our

communities.  But such callous neglect cannot be written off by

mistake or an oversight.  Not anymore.  We need to amend the broken

NYS ASSEMBLY                                    JUNE 9, 2020

system that allows this to happen.  A system predicted upon the
exploitation of black Americans cannot hope to succeed without real
foundational changes.  New York has always taken the wrong step
when it comes to police in our lower-income communities, from stop
and frisk to the three-strike rule.  We are complicit or actively
participating in a system that targets us.  We've made strides, like
yesterday.  That was a great day.  But there's still so much more to do.
We need to reconcile the fact that New York is not the bastion of
progress we tout it to be.  But it can be.  And yes, it will only be if we
keep fighting, if we keep working to make these changes.  It is work
that must be done for those who have passed.  The victims of malice
and negligence.  For Chantelle, for Genuine, for Andrew, for Ariel, for
Cherish, for Justin, for Justice, Sincere and Serenity -- the nine
children of Andrew Kearse and his wife, Angie.  They now have to
grow up without a father, and a story that will have them in fear of the
police.

                I thank everybody for supporting this bill and for
understanding that we need to have a sense of humanity when we are
in custody or in charge of another life.  And I need everyone to act.  I
want our police officers to act.  That's why I'm calling this bill the
"Andrew Kearse Act."  Because no more should somebody lose their
life because somebody just -- and I say "somebody", it's a police
officer.  But I'm tired of seeing people die because their life just didn't
matter to them.  Their cries didn't matter.  They were ignored.  And
again, we lose a member of our families.

NYS ASSEMBLY                                    JUNE 9, 2020

So I ask everybody to vote in the affirmative.  I thank this Body, I thank the Speaker, Majority Leader, the Caucus Chair and every advocate, especially Angie, his widow wife, for keeping this -- this need alive and further protecting our communities, making sure that they are heard and that their needs are met.

Thank you.

ACTING SPEAKER AUBRY:  On a motion by Ms. Fernandez, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 63.  This is a Party vote.  Any member wishing to be recorded as an exception to their Conference position is reminded to contact the Majority or Minority Leader at the number previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  The Republican Conference will be voting no.  If you would like to vote yes, please contact the Minority Leader's office right away.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Colleagues, this is a Party vote in the affirmative.  Members choosing to vote in the

46

negative should either come to the Chambers or call my office and
you will be so recorded.

ACTING SPEAKER AUBRY:  Thank you, Mrs.
Peoples-Stokes.

(The Clerk recorded the vote.)

Mr. Ortiz to explain his vote.

MR. ORTIZ:  Thank you, Mr. Speaker, for allowing
me to explain my vote.  First of all, I would like to thank the sponsor
for this commonsense piece of legislation.  It has taken so long to
really to begin to do everything that looked to me from the perspective
of being long over -- overdue.  Creating a duty to prevent -- to provide
attention to medical needs of a person by a police officer should be
just something natural.  It's a human being that they're dealing with.  I
used to oversee the Department of Corrections in the City of New
York many years ago, and I remember going to the -- the medical
facilities and trying to also to evaluate how the Correction Department
is dealing with inmates when they come through the -- to prisons.
And what kind of database, what kind of mechanism, what kind of
data do they collect from these inmates that are going to be in the
facility.  The sponsor has spoke very clearly and eloquent about the
importances of why this bill is needed.  But, Mr. Speaker, the reality
of life is there are still a lot of police officers out there and I hope that
they can get this clear.  Because Briana Ojeda, who was not an
inmate, she was just -- just a person who needed assistance by a police
officer by providing CPR.  And the mother is calling on this police

47

**NYS ASSEMBLY**                                                    **JUNE 9, 2020**

officer by asking him, *Can you please call somebody up?  Can you please provide CPR to this person, on this little girl?*  And guess what, Mr. Speaker?  The police officer just walked away by saying, *No, I don't know -- I -- I cannot provide those type of services*.  So this is a bill that will bring to light, and hopefully our law enforcement officers will be better prepared, Mr. Speaker, to deal with arrests to make sure they have the right data if an individual is suffering from asthma and so on, Mr. Speaker, that they will be able to take care.

Therefore, Mr. Speaker, I will be voting on the -- on the affirmative and I encourage -- encourage my colleagues to vote -- to do the same.  This is a (unintelligible) commonsense legislation.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Ortiz in the affirmative.

Ms. Cruz to explain her vote.

MS. CRUZ:  Thank you, Mr. Speaker.  Every day in this room, for most part of the year we pass legislation to either give rights or create deterrents.  The fact that we would have to create a law to incite an officer to call for help when someone is asking for it, to deter him from not failing to act, it just makes absolutely no sense in my brain.  That we are not recognizing the humanity of people that when someone says, *I cannot breathe*, every single person in this room would turn around and call for help.  That we would have to ask an officer to do that, I cannot understand.  I will say, often we create deterrents that are criminal and sometimes we create deterrents that

48

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

are financial.

I want to thank you, Nathalia.  I want to thank the sponsor for this bill, and our colleagues.  Next year we need to come back and create a criminal deterrent.  Because until we start to put people in jail who fail to get help, the same people that we are entrusting our community with, we're not going to see change.  I'm hoping that a couple of a million dollars in financial, how shall we say, deterrents can help.  But if it doesn't, let's come back here and change that.  Because when you have nine children who will never see their father because an officer, for more than almost ten minutes, ignored the pleas.  And this isn't an isolated incident.  We're seeing this all over the country.  We're seeing this in our own backyard.  And the fact that we are here having to pass a law that says, *You should get someone help or you're going to be held liable*, I cannot understand.

I'm going to vote in the affirmative because it's the right thing to do, just like it's the right thing to do to make sure we get someone to help you.

ACTING SPEAKER AUBRY:  Mr. Ramos -- Ms. Cruz in the affirmative.  Jumping the gun.

Mr. Ramos.

MR. RAMOS:  Mr. Speaker, I am proud to be a cosponsor on this legislation.  This legislation that protects the public, especially black and brown lives, that requires that police officers get medical assistance to somebody who is suffering distress.  And as my colleague said, it's sad that we actually have to pass a law that requires

49

**NYS ASSEMBLY**                              **JUNE 9, 2020**

police officers to get people medical attention.  I was a police officer for 20 years.  I swore that oath to help people, to protect lives, to save lives.  Not to -- to stand around and allow other colleagues to kill people or to do it myself.  And we heard here some clever attempts to establish some kind of a legislative intent that would serve -- I -- I guess to help officers who get sued.  I want to clarify something.  It was asked here that if a police officer calls an ambulance would that constitute getting help.  And, yes, that's part of it.  But if a police officer chokes somebody out and then 15 minutes later calls an ambulance, that doesn't get him off the hook.  The intent of this legislation is to get somebody help at the scene in a timely manner, in a proper method.  It is sad.  It's a sad state of affairs where we see the devaluation of black and brown lives.  Where a man's life in Staten Island was worth -- worth less than a loosie cigarette and he was killed.  Where a man's life is worth less than a $20 bill was given a death sentence and not given medical assistance.  It is a sad state of affairs.  And when we see these repeated incidents of abuse against people of color, there is always the excuse of, *He was resisting arrest*.  They're not resisting arrest, they're resisting death.

Mr. Speaker, I proudly vote in the affirmative and I urge all my colleagues do the same.

ACTING SPEAKER AUBRY:  Mr. Ramos in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir, to explain my vote.

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

I -- I agree with my colleagues that if a police officer sees someone who needs medical attention, they should call for assistance.  And that's not the issue here because that's the current law.  As it turns out, as legislators, we actually vote on language.  We don't just vote on concepts, we vote on language.  So what's this language say?  This language doesn't say an officer has the duty to provide care or call for help.  That's not what the language says.  The language says the officer has -- the officer has to provide care and -- and obtain assistance and treatment.  Our officers overall are very conscientious.  Sure, we've heard a few examples where they weren't.  And our hearts goes out to the victims of any improper police behavior.  We're there.  And when they don't act properly, under current law there's liability.  We heard the example of a person who was tossed in the back of a police car and they died on the way to the police station, and the City of Syracuse [sic] -- and the City of Syracuse [sic] paid out $1.37 million on that claim because what happened was wrong.  This bill goes beyond that.  It imposes personal liability on officers.  It doesn't -- it doesn't provide any exemptions for good faith like we have for -- for Samaritans.  And it requires that they provide care and call for help.

Let's vote on what the law is, and if that's not what we mean, let's change the law so it reflects what we want.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the negative.

NYS ASSEMBLY                              JUNE 9, 2020

Mr. Crespo.

MR. CRESPO:  Thank you, Mr. Speaker, to explain my vote.  It is amazing to be here today and to vote on this piece of legislation.  I think others have articulated.  First of all, thank you to the sponsor and to the Speaker for making this and all the bills that are related to this week's package possible.  I remember coming here to work in the New York State Legislature almost 17, 18 years ago, and it was in the aftermath of the Amadou Diallo shooting.  And I remember the package of police community relations bill that you, Mr. Speaker, and so many of our colleagues and former colleagues championed then.  And here we are, this many years later, still having to react and respond, unfortunately only having an opportunity to pass bills after a number of egregious acts have mobilized the community.  And it is unconscionable that that's what it takes.  It is unconscionable that the victims tend to be people who look like me and you, Mr. Speaker.  It is the reason why this bill is so important.  The decency of providing care.  As elected officials, we get elected.  Not everyone voted for us, but we represent them all.  Whether you're a Democrat, Republican or any other party, whether you came out to vote or didn't vote in that election, we now make rules and decisions that impact everyone.  And the same goes for officers.  You're there to protect and serve.  That includes the very people you may be there to hold and arrest.  And providing medical care when it's asked for is the most basic human reaction that not only officers should have, but every public servant.  I think this is the right thing.  It's unfortunate we have

52

**NYS ASSEMBLY**                    **JUNE 9, 2020**

to do this.  But while we see the examples that we see, and while those examples are people like -- like myself, yourself and so many of our colleagues, they happen to be people of color, something has to give.  And we're seeing a national mobilization expecting change. Today we achieve it with this bill.

I'm proud to vote in the affirmative, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Crespo in the affirmative.

Ms. Simon.

MS. SIMON:  Thank you, Mr. Speaker, to explain my vote.  You know, when a police officer is sworn in they take an oath to protect and serve.  To save lives, not to disregard them callously.  And when a police officer is sworn in, they do not take an oath to leave their humanity at the door, although some appear to have been encouraged to do so.  This bill only says that when someone is in custody, when a police officer has a duty of care they have to render that care.

I want to thank the sponsor for this legislation and I'm very proud to vote in favor.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Simon in the affirmative.

Ms. Bichotte.

MS. BICHOTTE:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I want to thank the -- my colleague for sponsoring this bill.  I'm so extremely proud of her.  This bill

53

NYS ASSEMBLY                                    JUNE 9, 2020

requires law enforcement to provide medical attention to people arrested or who are in custody who is expressing medical distress and are in pain.  Again, we have seen many who have cried, *I can't breathe.  I need help.  I don't feel good.  I'm in pain.*  Those who were murdered and neglected and treated with malice while in custody of law enforcement officers is another form of illegal capital punishment.  We've often done -- we often see this with the start of racial profiling, a bill that we just recently passed in this House, and we asked and demand accountability from police officers.  My brother, Wayne Bichotte, while he was in custody, he was sick.  He was sick probably before being in custody.  They finally released him from jail right before my mother tried to bail him out.  Later he died, in August of 2005.  He was a veteran.  This bill would also allow for families of the victims to sue.  Very extremely important bill.  We say their name, Javier Ambler, Eric Garner, George Floyd, my brother Wayne Bichotte and many more.

Thank you for this bill.  In the name of my brother, I will vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Bichotte in the affirmative.

Mr. Lavine.

MR. LAVINE:  Thank you, Mr. Speaker.  Almost every law enforcement officer I know and have ever known has gone into that field with the best of intentions and the best of motives.  This bill should not be necessary.  But for the last three-and-a-half years,

54

NYS ASSEMBLY                                    JUNE 9, 2020

Americans of good faith have had to defend not only what is good, but what is obvious.  Just two years ago, the President encouraged law enforcement officers to rough -- rough up those they had arrested.  Words have meanings.  This bill simply requires that authorities operate in good faith.  Now, my colleague may be theoretically correct that perhaps that is the state of the current law.  But if that is, indeed, the state of the current law and that -- and that is, indeed, true, then that law obviously is not working and we must obviously do better, which is what this bill is all about.

This bill is about good faith.  Nothing more, nothing less.  I will be voting in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Lavine in the affirmative.

Ms. Fernandez.

MS. FERNANDEZ:  I just want to thank this Body one more time.  This was a bill I worked very closely with, close with the family, and I want to commend them again one more time because the attention for this case would not have been without his widow wife, Angie Kearse.  And I just want to thank you again.

I absolutely vote in the affirmative.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes to explain her vote.

MRS. PEOPLES-STOKES:  Thank you.  I just want to call one name as I cast a yes vote for this piece of legislation:  India Walton.  India Walton was a very young lady who got connected with

NYS ASSEMBLY                                    JUNE 9, 2020

the wrong people.  I'm going to say she's actually from Rochester.

Connected with the wrong people, using the wrong product and ended

up incarcerated after a chase by police.  If she had gotten the kind of

service that she needed either from the police or once she was in the

Erie County Holding Center, that beautiful aspiring young lady would

still be with us.  She did not get it.  She is no longer with us because

no one decided to care for her.  That is what this legislation seeks to

deal with.  Now mind you, Erie County's -- the taxpayers are going to

pay out a lot of money, and the City of Buffalo has paid out a lot of

money for these sorts of infractions in the past and they probably will

in the future.  But at some point, the people who create the problem by

not providing assistance should be responsible, and not the taxpayers.

I think -- I mean, I know way too many officers personally that I know

would never let this happen.  Not because they're police officers, but

because they're caring human beings and they care for humanity.

They understand their job is to protect and serve.  But there are just

that few, and we've seen them on film and we know the results of their

inaction.  We would like to not see that anymore.

So I want to thank the sponsor for this legislation,

thank the Speaker for bringing to the floor, and I'm grateful to my

colleagues that are voting in support of it.

ACTING SPEAKER AUBRY:  Are there --

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  There are some

additional votes that need to be reflected.  The following Republicans

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

are voting yes on this:  Mr. Ra, Mr. Montesano, Mr. Reilly, Mr.

Garbarino and Mr. Johns.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.  So

noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

Speaker.  If we can move to our next debate.  It is on page 16, it's

Rules Report No. 67 and it's sponsored by Member O'Donnell.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A10611, Rules Report

No. 67, Committee on Rules (O'Donnell, Heastie, Peoples-Stokes,

Aubry, Arroyo, Bichotte, Bronson, Burke, Carroll, Colton, Crespo,

Cruz, DenDekker, Dickens, Epstein, Fernandez, Frontus, Gottfried,

Hunter, Hyndman, Jacobson, Jean-Pierre, Lifton, McDonald, Nolan,

Otis, Pichardo, Pretlow, Ramos, Reyes, Richardson, D. Rosenthal,

Rozic, Seawright, Simon, Simotas, Steck, Taylor, Thiele, Walker,

Weinstein, Wright, Ortiz.  An act to amend the Civil Rights Law and

the Public Officers Law, in relation to the disclosure of law

enforcement disciplinary records; and to repeal Section 50-a of the

Civil Rights Law relating thereto.

ACTING SPEAKER AUBRY:  Mr. O'Donnell, a

[sic] explanation is requested.

**NYS ASSEMBLY**                              **JUNE 9, 2020**

MR. O'DONNELL:  With pleasure.  This bill - a version of which has been pending in this House for five years - has two separate, distinct components.  The first component is the full repeal of Section 50-a of the Civil Rights Law, a law that was passed in 1976 that exempted a certain group of public employees from having their information disclosed.

The second provision in this bill involves amending the -- the laws regarding the Freedom of Information Law.  FOIL -- because of 50-a, FOIL did not -- was not applied to those employees.  And so, we have written into the FOIL statutes additional protections for those police officers so that certain information, such as their home addresses, their phone numbers, their Social Security numbers, et cetera are clearly not subject to the Freedom of Information Law.

ACTING SPEAKER AUBRY:  Mr. Palumbo.

MR. PALUMBO:  Thank you, Mr. Speaker.  Would the sponsor yield, please, for a few questions?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure, sir.

ACTING SPEAKER AUBRY:  Mr. O'Donnell yields.

MR. PALUMBO:  Thank you, Mr. O'Donnell.  And now this -- the -- the law as it currently stands is a Section of 50-a that's going to be repealed.

MR. O'DONNELL:  Mm-hmm.

58

**NYS ASSEMBLY**                              **JUNE 9, 2020**

MR. PALUMBO:  There -- could you just explain the current process in order to receive records, that there's a court order application that could ultimately be obtained to release some of that information; is that correct?

MR. O'DONNELL:  It's a little bit more complicated than that.  Historically, it was originally written to not include an absolute bar to getting those records.  In the years since 1976 up until last year, the courts have expanded what that rule is to say it's an absolute bar for the release of any records.  We are just one of three states that has such a bar, and because of the interpretation of the courts, there is no method available for people to receive those records.  If one were to try to get those records, the court would be required, based on the Court of Appeals decisions, to not allow them to be disclosed.

MR. PALUMBO:  Unless they could prove materiality and so forth, right, that it would be relevant and material because it -- I know they've been doing that in my county, in Suffolk County, for some time upon on application in limited circumstances as far as the relevance and material nature of the -- that was the determination to release them, in very limited fashion, I'll certainly agree with you in that regard.

MR. O'DONNELL:  There are certain abilities, I know there are certain current cases in New York City where in criminal matters, criminal defense lawyers have applied to get around the rule.  But other than that, it's an absolute bar for the release of that

59

NYS ASSEMBLY                                    JUNE 9, 2020

information.

MR. PALUMBO:  Sure.  And I guess there was some judicial discretion in that regard.  Can we agree on that, regarding whether or not they should disclose them, and that could go either way.

MR. O'DONNELL:  In only the most limited fashion, and I am unaware of any recent times when they have been released.

MR. PALUMBO:  So, is that the reason why you feel that this should move now to the FOIL statute because that, of course, has significantly less restraint and it would ultimately allow everyone, including the general public, to obtain these records?

MR. O'DONNELL:  As you may be aware, my original bill only repealed 50-a.  In the repealing of 50-a, the people who are under 50-a are now subject to FOIL like all other public servants, and we wanted to ensure that their personal, with an "a", private information is not disclosed.  That was never the intention, but we wanted to make it very clear.

MR. PALUMBO:  Understood.  And in this particular bill now, the items that will be disclosed, subject to the personal information being redacted, is essentially any complaint; is that accurate?  It makes no distinction regarding substantiated or unsubstantiated?

MR. O'DONNELL:  I can address the substantiated versus unsubstantiated question.  It has been raised to me by a number of people.  One of the problems with putting a word like

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

"substantiated" into statute is we probably have to define it.  I can assure you there's not a police department in the State of New York that wants us to define how to substantiate or not substantiate. Additionally, the lesson we should have learned from the 1976 50-a law is that when you write things with verbiage, that verbiage gets interpreted by a court.  The man who led that charge, Senator Frank Padavan, who was a true public servant - sadly, he has now passed away - but before he died, said he never intended 50-a to be interpreted the way it is.  And so, no, we don't distinguish between those two things in this law.

   MR. PALUMBO:  Understood.  And you do have a definition here regarding specific types of information like technical infractions on page 3, I guess it is, line 1, Section 9, that it's a *Minor rule violation by a person employed by a law enforcement agency as defined in this section, did not -- that did not involve interactions with members of the public, persons investigative enforcement* -- oh, I'm sorry, *Are not a public concern and are not otherwise connected to such persons investigative, enforcement, training, supervision or reporting responsibilities*.  So, regarding that section, that's really the only limitation on what the agency may determine is not disclosable?

   MR. O'DONNELL:  That provision required quite a bit of negotiation.  Obviously, it's not my intention or anyone's intention for a violation for not having shiny shoes or something of the sort to be included in what that is.  Not having shiny shoes doesn't involve their job or their interaction with the public, and I can't

NYS ASSEMBLY                                    JUNE 9, 2020

imagine anyone having a concern about the shininess of an officer's
shoes.  So in the end, even though it may be a technical violation of
the patrol guide, that is not the kind of information that we are
seeking.

       MR. PALUMBO:  Thank you, Mr. O'Donnell.

       On the bill, please, Mr. Speaker.

       ACTING SPEAKER AUBRY:  On the bill.

       MR. PALUMBO:  Thank you, sir.  Now, amidst
what's going on around us nationally and internationally, I understand
the need that this needs to be rushed through and the concerns of
many.  But what's really critical, and I think is what is of significant
concern to me is the unique nature of law enforcement is not being
treated as if -- as many other professions; in fact, every other
profession in New York State.  Their civil rights are of significant
concern to me.  For example, 3020-a of the Education Law renders
unfounded complaints against schoolteachers confidential.  Under the
Public Health Law, Section 230, Office of Professional Conduct for
Physicians seals and keeps, not subject to disclosure, any unfounded
or unsubstantiated charges; in fact, pursuant to the Public Health Law,
even administrative warnings are confidential.  So, legislators, it's a
misdemeanor for someone to disclose a confidential investigation
that's unfounded into any one of us.  City Council has similar rules.
Under the Criminal Procedure Law, 160.50, 160.55, only by a court
order is someone able to obtain a defendant's criminal history in the
event that it's sealed or there is an -- an unfounded or otherwise -- or a

NYS ASSEMBLY                                    JUNE 9, 2020

not guilty rendering by -- by a jury.

So, this is really a distinction that's very important because when you think about it, why would we make unfounded allegations against police officers public with mob rule going on right now in our society.  Some statistics that I think are certainly relevant here.  In 2018, and this is just the New York City Police Department, 98 percent of cases in the Civilian Complaint Review Board were unsubstantiated.  So now we might have active police officers who make a lot of arrests, as if -- looking as if they're doing something untoward because they have a lot of complaints against them.  And I can trust -- and trust me, I -- I can assure you that the police officer who, for example, is writing ten tickets a month versus the police officer who's writing 210 tickets in a month, the more active police officer who is doing his or her job appropriately will have a lot more complaints.  And you compare this to other states, and I know that there was some -- there is -- has been many discussion that these items are not subject to disclosure, and I'll suggest that I will disagree in that regard because it's subject to judicial discretion.  And as a lawyer, something that is material and relevant is important.

So, now we're going to have a number of complaints that will be available and subject to cross-examine -- examination of that police officer that are neither relevant nor material to the case at hand, but it will create some sort of a cloud that they are -- that they are not an appropriate -- or were not fit to act in particular situations. And we have in California, they have a disclosure statute and only

63

NYS ASSEMBLY                                    JUNE 9, 2020

allows the disclosure of substantiated findings of an incident involving the discharge of a firearm, use of force, a record relating to an incident in which a sustained finding was made by a law enforcement agency engaged -- of an officer engaging in sexual assault involving a member of the public, any record regarding dishonesty or lying. And that's it, because that makes sense. That it's relevant to a -- a criminal or even a civil proceeding.

So when we balance these things, the probative value versus the prejudicial effect is the test in a courtroom regarding the admissibility of what's called "propensity evidence." That's all that this is now. We're going to be providing this information to show that this police officer was -- was complained of, although it is unsubstantiated, didn't happen, he's had many -- or she has had many, many complaints and, as a result, they are doing something inappropriate here or it may otherwise fit within a -- a defense.

So, the problem is this: That we don't have the ability for judges to render a decision on that particular relevance or whether or not it should even be out there. Because then again, we've got other -- other issues regarding this being public now. Since it's going to go to anyone, there's no lawful purpose necessary, that these databases may be created to simply harass in the court of public opinion a police officer. Look, I'm a son of a police officer, my father was a Suffolk County homicide detective, interactions with police and the general public are uncomfortable. When you get a speeding ticket, your heart races, you're not really thrilled about it. Sometimes you're having a

64

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

bad day, you're late for work, you're grumbling, you're really

disappointed that this police officer who was just sitting on the side of

the road doing his or her job, wrote you a ticket because you were, in

fact, speeding.  Even if they write you another one a month later,

you're really not going to like that person.

                    So, this is what's so unique about this.  Those men

and women kiss their families and put on a bulletproof vest every day.

They could be in a fight any given time during the workday.  We don't

have those types of risks that we face.  We -- they face uncomfortable

situations every single day.  And when you look at the statistics, again,

because I have these from New York City, this is what our men and

women of law enforcement have done.  We don't need to paint every

single law enforcement officer with the same brush.  Every cop I

know that I've spoken to is appalled by what happened in

Minneapolis.  That wasn't police conduct, that was a murder.  And

you no longer -- you -- you can't legislate around criminal conduct.

You are no longer an officer when you engage in that type of conduct.

You're a crook, you're a criminal and he will go to jail for a long time,

hopefully as well as the rest of them that have been charged.  But

these are the people that we're talking about in New York, in our

State, the people that we're legislating against right now.

                    In 1990, there were 2,262 murders in New York City.

Last year there were 319.  Rapes in 1990, 3,126; last year, 1,755.

Robbery, 100,280; last year, 13,369.  Burglaries, 122,055; last year,

10,778.  These are the people we're talking about whose civil rights

NYS ASSEMBLY                                    JUNE 9, 2020

we are trampling on by at least not controlling this legislation to only

allow substantiated claims that are relevant to a proceeding.  Allowing

all of it into the public is dangerous.

              And so, when we couple that with what's been going

on in this Legislature the past two years, eliminating cash bail, the

Governor is talking about releasing prisoners over the age of 55 who

are refusing to cooperate with Federal authorities declaring New York

a sanctuary state, calls to defund the police, what's going on right

here?  This is anarchy.  We need to get control of this.  This is making

our families and neighborhoods less safe.  Let's not paint everyone

with the same brush.  We have confidentiality for teachers.  The

Childs Victim Act -- Victims Act that we passed opened up a number

of lawsuits against teachers for molesting children.  Are they all going

to be painted with that same brush?  Of course not.  Of course there

are bad actors.  You can't legislate around criminal conduct.  I'll say it

again:  30 some-odd -- what was it, 33,000 police officers and

millions of interactions with civilian [sic] in New York City alone.

Millions of interactions, and we have but a handful that we can say

there was untoward, inappropriate and criminal conduct, which is

what it is.

              I urge my colleagues to vote against this.  This is not

the right way to fix this.  Obviously, as I said, we're doing this as a

reactionary thing.  I don't think enough stakeholders have been

involved in this to make this -- get this done right.  We had a problem

with -- the -- the removal of cash bail was a terrible problem.  There

66

NYS ASSEMBLY                                    JUNE 9, 2020

was some amendments and changes in this year's budget, which still create a number of problems.  We need to slow down and if you want to fix this, this is not the way to do it.  I vote no.

ACTING SPEAKER AUBRY:  Mr. Reilly.

MR. REILLY:  Thank you -- thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure, sir.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. REILLY:  Thank you, Mr. O'Donnell.  I just have a couple of questions.

MR. O'DONNELL:  Mm-hmm.

MR. REILLY:  When the legislation, the new revised legislation was being drafted, was there any consultation with the law enforcement community, including New York City Police Department, Civilian Complaint Review Board, New York City Corporation Counsel and the Mayor's Office?

MR. O'DONNELL:  The language in question that goes beyond just repeal was language that was inserted by the State Senate, and I'm unaware of who they spoke to, but I am confident, given the number of iterations we went through, that they were speaking to some of them.  It is my understanding that the Mayor is in favor of full repeal.  I have no idea whether or not they spoke to the Mayor.

67

**NYS ASSEMBLY**                              JUNE 9, 2020

MR. REILLY:  Okay.  With -- the New York City as it pertains -- I'll specifically ask a question about -- with my experience, with the New York City Corporation Counsel, there's a fund that the City has to settle cases brought upon by complainants that are seeking remedy against the City, against the New York City Police Department naming officers.  The New York City Corporation Counsel decides on which cases to settle and they don't give officers the ability to represent themselves in court, and then notify them of the settlement.  Would those types of scenarios and -- and cases be allowed through this legislation?

MR. O'DONNELL:  The truth is that your question is somewhat irrelevant in that the New York City Corporation Counsel's Office actually keeps a public record of every case against them involving the Police Department and what, if anything, they were settled for, including the names of the officers involved.

MR. REILLY:  So those -- those officers named are -- are open to public view now?

MR. O'DONNELL:  That is my understanding, yes.

MR. REILLY:  Well, wouldn't you say that violates 50-a currently if that was allowed, because we're saying that no records were available?  So, clearly, there are some records that are open to public view by request.

MR. O'DONNELL:  There is another mechanism that is also available, the New York City Comptroller is required to, when you sue the City of New York, you have to file a Notice of Claim I

68

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

believe within 30 days, and then there's a time that the City could try

to settle those lawsuits and do so quickly.  The Comptroller's Office

keeps a record of all those settlements, and that includes that

information, as well.  50-a was designed to prevent the police

departments from giving up that information, that is why it needs to be

repealed.

       MR. REILLY:  Okay.  So during the discussion on

the legislation, was there any input on unsubstantiated claims, as my

colleague mentioned before?

       MR. O'DONNELL:  Yes, and in contrast to previous

statements already made in this House about rushing, I've had this

legislation for five years, and I have had hundreds and hundreds of

hours of conversations about 50-a and about my belief that it needs to

be repealed, and different proposals with different language to do so.

At no time did any police PBA offer any suggestions other than, *No,*

*we can't repeal it*.

       MR. REILLY:  Okay.  Thank you.

       On the bill, Mr. Speaker.

       ACTING SPEAKER AUBRY:  On the bill, sir.

       MR. REILLY:  So, I think part of the -- as my

colleague mentioned earlier about the other protections of -- of work

of public servants that have protection of unsubstantiated claims being

presented, I want to put this into perspective that if you have officers

that are out doing their job, maybe they're in enforcement units like

narcotics enforcement, they often receive complaints from people that

NYS ASSEMBLY                                    JUNE 9, 2020

are using it as a tool against them.  And I know that there are officers

that violate the trust of the public, and they should be held

accountable.  I fully understand that.  And I -- I understand that we

want to make sure that those cases that are substantiated and that we

know shows the bad actors, yeah, that should -- that can be released.  I

get that.  But when we start to release information that is not proven, it

is not substantiated, by putting out unsubstantiated claims, we are

essentially opening up those officers to public shaming just by the

mere fact that someone put in a complaint.

                    Just to give you some insight, an unsubstantiated

complaint, according to CCRB is it couldn't be proven or disproven

and it's a preponderance of the evidence, so 5149.  If someone files a

CCRB against a New York City Police Officer and they withdraw

their complaint by not showing up, they can't get contacted, they can't

proceed to go forward, that's deemed an unsubstantiated complaint,

but it will still be on the officer's record.  The only thing we're asking

for is to be fair and balanced.  I mean, just yesterday we passed

legislation that made people accountable for calling 9-1-1 to create

false emergency response.  We're creating that with officers now if

you're going to allow unsubstantiated cases to public review.

                    Now, if there's a basis for it in a criminal proceeding,

it's there.  If you look at the way we legislated in the past, and I may

not have been a part of those bills when I -- I wasn't in the -- the

Assembly at the time, but I think we made it -- made sure that you

couldn't use criminal arrest records when they're applying for jobs.

NYS ASSEMBLY                                    JUNE 9, 2020

That's a personnel issue, right, that's hiring a job.  We've -- we've
made it where you can't release mugshots, right?  I applaud that.  Only
if it has law enforcement -- a law enforcement reason.  You know,
these are things that we look to protect people's privacy.  That's what
we're looking for here.  We want to make sure that it's fair and
balanced.

When we -- when someone is charged with burglary
and they go to trial and they have a prior conviction for burglary, you
have to have a Sandoval hearing to make sure that you can use it in --
in the courtroom to charge that crime.  By releasing unsubstantiated
CCRB's into public review, you're -- you're creating something that's
just going to paint all those officers with a broad brush.  And, yes,
there are bad actors, and we can hold them accountable.  I think that a
full repeal is really going swimming -- swinging the pendulum way
too far where we're not protecting everybody's rights.  I mean, that --
that's what we're trying to do, due process, the ability to have due
process.

You know, under FOIL, it says that you can't release
information that's going to give unfair balance or insight and create an
unfair trial for someone.  Well, by releasing un -- unsubstantiated
CCRB's, in essence you're doing that to police officers, your
correction officers, your firefighters.  But just remember, in the
Education Law, you don't release those unsubstantiated for not only
teachers, but the other license holders that fall under the New York
State Education Department.  This is a basic right that public servants

71

NYS ASSEMBLY                                     JUNE 9, 2020

have.

Now, I'm not -- I'm not, like I said, I'm not against putting out substantiated when it's relevant.  It's the problem of those false accusations, those -- those lawsuits that are frivolous that the City settles as an example because they have a slush fund, because it's cheaper to give $5-, $10,000 away than to defend the officers.  Those are the cases that I'm worried about.  I'm not worried about the ones that deserve to be off the job.  If that's -- if that's the light that has to be shined on them, then that's fair.  But when you start to paint them all as if -- because there's going to be no context when this is released.  There's going to be no context to say, *Unsubstantiated, well, the person couldn't -- didn't want to proceed*.  It's going to be in there.

So, all I ask is that we take a look at this and try and do it fair.  Present it in a fair and balanced way.  That's -- that's all I can ask for, and I think that's all that officers are asking for.  And I think the public would get their accountability, because we deserve our accountability.  Officers have to be held accountable, I agree 10,000 percent, but it's got to be fair.  It's what we ask for everybody else.  It's what we said about criminal justice reform, it's about fairness and that's all I ask.

So, I know you're going to probably pass this today, I understand it, I understand where you're coming from.  But I just hope that you take the opportunity to think about it.  Think about how you would like it if a constituent wants you to take care of something for them and you really can't do it, and you're trying, but you can't and

**NYS ASSEMBLY**                              **JUNE 9, 2020**

they're not happy.  But they blast you all over the place as being

useless, horrible, you -- they make up lies saying you said something.

But if it's a true thing, then, yeah, shine a light on it.  That's all I ask.

So, we can make some changes to make it where

unsubstantiated and we put a little accountability in it for the

information that's being released, maybe we can move forward on

that.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will Mr.

O'Donnell yield?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will

you yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER AUBRY:  Mr. O'Donnell

yields.

MR. RA:  Thank you, good to see --

MR. O'DONNELL:  Good to see you.

MR. RA:  -- hope you are well.  I just had really, just

one quick question as you went through this.  Is -- is this approach,

this new piece of law that we're putting in modeled after any of the

other states' statutes regarding access to police disciplinary records?

MR. O'DONNELL:  I would say it's more modeled

after the states that don't have a statute, which is many, including

Minnesota.  So with the murder of Mr. Floyd, within days the world

NYS ASSEMBLY                                    JUNE 9, 2020

knew what the disciplinary history was of his murderer because there is no law preventing that.  And both the City of Minneapolis, as well as others, keep a running list of those complaints.  And so, that is instantaneous information that is available there.

In this particular case, it's putting it into FOIL, and thing about FOIL is there's a process.  And so, there is -- you file a FOIL complaint and there's a FOIL officer, and then the FOIL officer ignores you and then you file an appeal, and then the appeal ignores you, and then you have to go to court and a judge is going to have to decide whether or not you get your FOIL request, often so full of redactions you don't know what it means.  So, the suggestion that this is sort of an open book is not really accurate as it relates to FOIL.  There are limitations, there is a process and all -- frequently, one needs to go to court to access that information.

MR. RA:  Okay.  And then I know that there's two pieces of this in terms of that work that the, you know, would be done with redacting.  There's the shell, you know, language, that -- that applies really to, you know, that personal information, and then there's also some information that says a law enforcement agency "may redact" regarding technical infractions.  Can you expound about what the intent of that is?

MR. O'DONNELL:  Well, the -- there's some subjectivity in that.  And there's subjectivity in that into whether or not a particular technical infraction is, in fact, something that should be disclosed.  So the example I gave, shiny shoes, is actually a violation

74

NYS ASSEMBLY                                    JUNE 9, 2020

of the patrol guide, and I would be very upset to learn that lack of

shiny shoes was ever deemed a technical violation that was worthy of

releasing.  Could there be technical violations that are worthy of

releasing?  Could it be that somebody who has a very long

disciplinary record outside of technical violations that they choose to

release the technical ones, as well?  I'm not going to tell the Police

Department how to do that, and I would not want them to be limited

in their attempt to give full disclosure and compliance.

                    MR. RA:  Okay.  And -- so when somebody does

make that FOIL request --

                    MR. O'DONNELL:  Yep.

                    MR. RA:  -- you know, we -- we all know, you know,

with FOIL there's some level of specificity that's required when

somebody's making a FOIL request.  So could, you know, presumably,

somebody, if they were to say, you know, what if they're asking for

something that -- that we think is technical in nature, could -- could

the FOIL officer respond that, you know, *These are technical and

we're redacting them*, or if they're asking for something specific,

suppose they were asking about something -- I don't think they'd be

asking about shiny shoes, but maybe something comparable to that

that is also considered technical.

                    MR. O'DONNELL:  So, it's subjective, the police

department gets to make a determination as to whether or not it's

subjective.  And if you as a person seeking the information feel the

police department is -- made that discussion incorrect, then you have

75

NYS ASSEMBLY                                  JUNE 9, 2020

the right to go to court to say, *This violation is non-technical, or you may release it and I think you should because of these other circumstances.*

> MR. RA:  Thank you very much.
>
> Mr. Speaker, on the bill.
>
> ACTING SPEAKER AUBRY:  On the bill, Mr. Ra.
>
> MR. RA:  Thank you, Mr. Speaker.  You know,

we've come back here a couple of times now since this, you know, whole situation started with -- with COVID-19 and, you know, we've all remarked many times about the unusual circumstances we found ourselves in, and I think even two weeks ago when we were here, I don't think we could have imagined where we are now.  We were, you know, happy to see different regions of the State were starting to reopen, even New York City, which had the -- the height of this is now into Phase 1 and we're moving forward.

But as this was all happening, you know, something happened that really changed the conversation all over this country and, perhaps, all over the world.  And we've -- we've seen protests and demonstrations, many peaceful, other times people who -- who maybe wanted to I don't think necessarily deal with the situation, but maybe were taking advantage of the situation for their own purposes to -- to destroy and -- and hurt people, and that's a shame because it distracts from an important message and an important conversation.

You know, this is a time when we've seen a lot of division despite the fact that the outrage over the killing of George

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Floyd is near universal, if not universal.  I think we can all agree on

that.  That officer was fired and charged, should have been fired and

charged swiftly; the other officers, you know, that were there have --

have been fired, they've been charged.  And it's something that all of

us that have seen that video, it -- it really does shake you to your core

to see something like that happen.  And I can only imagine, though,

how it shakes you to your core if you're one of the thousands and

thousands of law enforcement officials in this State who went into that

career out of a sincere desire to protect their communities.

              And we've all heard in our offices from -- from

people saying repeal 50-a, repeal 50-a.  And certainly under these

circumstances, I think the easy thing to do is say, *Yes, let's -- let's do

that.  Here's an opportunity to, you know, throw open the door for this

information*.  But we've also -- I know in my office, I'm starting to

hear from law enforcement officers themselves, I've started to hear

from their families.  And I had a couple of conversations last week

with spouses of law enforcement officials, and they're terrified.  They

are watching their spouses go report for duty not knowing whether it

was going to be -- they were going to be in the midst of a peaceful

protest or they were going to be in the midst of some of the violence

we've seen:  Officers being hit with bricks, Molotov cocktails thrown

at police vans.  You know, all of the situations that we've seen in the

last few weeks.  You know, I know that the spouse of a law

enforcement official is -- has a very difficult life because every day

they don't know if something's going to happen that's going to prevent

their husband or their wife from coming home.

And we have to remember, my colleague talked about painting with a broad brush.  We have to remember we're talking about the same individuals who are there trying to keep our communities safe every day.  The department that, from what I can find in my research has lost, at least in the NYPD, 43 members to the coronavirus over the last few months.  That was reeling before that with a rash of suicides last year, ten suicides in 2019 of law enforcement officials, which should give you an idea of the stresses they undergo on a day-to-day basis.  And we also have to realize those are the same men and women who, in one of the darkest days in the history of this country ran in when everybody else was running out. We lost 23 members of the NYPD on 9/11.  We've lost ten times that many since then to 9/11-related illnesses.  These are the same individuals that didn't ask, *Am I going to be safe if I report there*, either in the midst of the attack or afterwards.  They're the same individuals who went in without regard for that.  And many of them paid for it with their life that day and have in the days since because they -- they got sick from -- from breathing toxic air and got horrible, horrible illnesses.  And one of the real shames of it is up until recently, they had to continue to fight just for families to be protected who had been so deeply impacted by that day.

So, we have a FOIL law in this State which is an important piece of allowing for public disclosure of information. Sunlight is the best disinfectant.  That's -- that's a phrase we hear all

NYS ASSEMBLY                                    JUNE 9, 2020

the time, right?  But 50-a, when it was passed all those years ago, was designed to recognize the unique nature of these jobs of our law enforcement officers, our correction officers, of our -- of our firefighters.  That is a unique job.  And it exposes you to things that many of us can't even relate to in our -- in our day-to-day lives.  And because of that, this Legislature, many years ago, I don't know if there's -- maybe there's one or two that were here at the time, but decided that we needed some specific protections for the information of -- of these law enforcement officers so that they didn't just get FOILed and -- and you didn't have issues with -- I know one of the intents at the time was defense attorneys that -- that might FOIL all the disciplinary records of an individual and -- and use something in there, you know, to try to impeach their testimony at a trial or -- or, you know, perhaps otherwise embarrass an officer.

So, as we repeal this today, we are opening the door that any complaint that gets filed against an officer, substantiated or not, can get sent out to the public.  If somebody wants to go on a fishing expedition and get all this information and put it out in public, they -- they'll be able to.  And that is a great cause for concern for -- for myself, and I know it's a great cause for concern for -- for those law enforcement officers who go out there every other day with no other intention but to go report to duty and being there for their community.  And I'm sure there are days that are routine and calm, and there are days that are anything but.  And sometimes, you know, maybe under the current circumstances you have an idea of what

79

NYS ASSEMBLY                                    JUNE 9, 2020

you're going into when you report for duty, but other days you don't.

Nobody that reported for work on 9/11 knew what they were going to

deal with that morning.  Nobody who, you know, reports for work like

we've seen in -- several times in the last few years where -- where

officers were assassinated sitting in their cars, or somebody made a

false 9-1-1 call just to lure an officer to the scene so they could kill

them.

So, when that phone rings or the call comes over the

radio, they're not sure where -- where they're going, what they're

walking into.  And they hope for the best, hope that the call that's

come in is a legitimate call for help with a situation, but -- but they

don't really know.  And we have to look at these situations through

that lens, that when you're in a situation, you have to have your guard

up, right?  You -- you don't know what you're walking into and you

have to have your guard up.  We have to recognize the unique nature

of this job.  And there's no doubt that if somebody makes a complaint

that ends up being unsubstantiated, and maybe multiple complaints

that are unsubstantiated about an officer, and this goes out into the

public, I don't think it's difficult to see how it could expose that officer

and their family to potential danger as a result.

So, you know, we've done some good things over the

last few days.  I voted for -- for many bills that I think will -- will help

get information out to the public, will help improve the relationship

between -- between law enforcement and the community, but this

one -- and this is obviously the one getting the lion's share of the

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

media attention, this one is a problem for me, because I get what people are saying about wanting transparency.  Transparency is important across the board.  By the way, at some point maybe we can look in the mirror when it's regard to transparency, because, you know, last week we were talking about this, but we didn't even have Committee agendas 'til, you know, Sunday, so I don't think we even gave the public, you know, a chance to fully understand what we're working on.

But I ask that we all look at this through the lens of, you know, we have to have those important conversations about race.  We're all outraged about George Floyd, but doing something that could potentially make a job that is already very difficult inherently dangerous, potentially more dangerous, is not the way we should be going.  I'll be voting in the negative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Giglio.

MR. GIGLIO:  Am I on?

Thank you, Mr. Speaker.  On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GIGLIO:  As my colleague just said, we are discouraging people from even entering the field of law enforcement if we -- if we're afraid to protect them.  And as we've said often that there is more good people out there than bad.  And I just wonder, you know, you wonder as -- as a human being how much hate is in people's hearts and how can we control that?  Sometimes there's

**NYS ASSEMBLY**                              JUNE 9, 2020

nothing we can do to control people that are bad, on either side, either

the criminal or the police officer.  And I think it's unfortunate that

today, we have completely concentrated only on the police officers

and law enforcement, including corrections.  It just seems to me that

we're targeting them for no real good reason besides some of the bad

things that some of these people did.  And I know what's going to be

said, *Oh, it's only the bad apples or you can't excuse them.*  You're

right, hate is never excusable.  Their actions are never excusable.  But

there is a way to go about it, and I think to try to punish police, all

police for what's going on is way past that.

There's another thing I wanted to talk about today,

and I'd like to just -- just say this:  You know, not too long ago in our

Chambers it got very contentious in there, and the word "racist" was

thrown at other members because of the way they were going to vote,

or the way they were arguing the bill.  And during that debate, and

during that contentious period, the Majority Leader spoke up at the

end of it and said, *You know, at some point, people, we're going to*

*have to have this conversation, we're going to have to make everybody*

*uncomfortable.*  Well, I was sitting there that day and I said to myself,

Joe, get up and say how about now.

So, now I'm going to say it:  How about now?  How

about we sit in our Chambers, we put a task force together and finally

talk this out.  It doesn't have to be over a bill.  It doesn't have to be

over laws, it has to be all of us sitting there together deciding what's

best.  I believe that our members are the best in the country.  I believe

**NYS ASSEMBLY**                    **JUNE 9, 2020**

we can come up with those answers, I truly do.  This is not the way to
do it half the time, one on one side, one on the other, criticizing
everything somebody says if you don't agree with it?  So, here's my
proposal, let us get together, let us find out that hate will never be
justified.  Let us move forward, and as long as we have hope we can
keep on trying.  But this is what I'd like to do.  I'd like to either get a
task force and get us all in those Chambers together at one point and
start talking about the issues that we've been talking about regarding
these laws and everything else that's happened in New York City or
the rest of New York State.

And I have a proposal.  I think you should put a
good-hearted person in charge of it.  And my suggestion would be the
Majority Leader, the one who said it, the one who has a good heart
and the one I trust.  That's what I believe today.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

Mr. Barron.

MR. BARRON:  Thank you, Mr. Speaker.  I thought
the prior speaker was going to put me in charge of the conversation.

(Laughter)

But let me say this:  All of this demonstration that
happened didn't happen because people wanted to see, in my humble
opinion, watered-down legislation that is acceptable to the Governor,
acceptable to the leadership in these two Bodies.  I applaud the
sponsor of this piece of legislation for being consistent with it over
five years; however, honesty compels me to say, *Big deal, you have to*

**NYS ASSEMBLY**                                   **JUNE 9, 2020**

*give up your background*.  And you're talking about the CCRB not substantiating?  Well, don't -- why don't you finish the conversation. Every complaint and resolution from the CCRB goes to the Police Commissioner, and 95 percent of the times, the Police Commissioner gives them a -- a slap on the wrist, or nothing, they get away with it.

So this bill, we're talking about background information?  The minute one of us are killed in the streets unjustifiably, the first thing that comes out is all the background information on the victims of police murder and police brutality, even though that particular incident, the person was totally innocent and unarmed and not committing a crime, but all of the background information comes out on those individuals.  And people make it appear as though, *He got what he deserved because look how bad his background was*.  Well, when that officer shot him, when that officer beat him down, he didn't have his background information on his chest.  They dug that up later.

These demonstrations, and I've warned this country and I've warned this City, when peaceful methods for justice and systemic change are ignored or rejected, violence is inevitable.  These bills will not stop the next explosion, because they're weak.  A police officer, we have to deal with when they're committing the act, every one of you sitting in here, you know if a police officer comes up to you and you're innocently moving about in your neighborhood and they attack you and call you out of your name, you could care less what their background is, you want to know how do we get that one to

84

NYS ASSEMBLY                              JUNE 9, 2020

jail?  How do we get that one off the streets?  Every time we have
these things, they say they need retraining, they need cultural
sensitivity, we need to have a conversation on race so that we can
understand you better, so they can understand black people better, so
they can understand that if you want to talk about looting, we were
looted from Africa, stolen and brought here to build the economic
foundation for Capitalism.  You want to talk about looting?  The land
of the indigenous people were looted by the Founding Fathers of this
sinful, racist, parasitic, predatory Capitalist nation.

    Let's talk about looting.  Look what you steal.  You
steal other countries and their diamond mines and gold mines, steal
human beings, steal land and build a racist, Capitalist system for
profit.  And then you send your police out to protect your property and
your person.  So what happens?  In the black community, we live in
domestic colonies.  Domestic colonies.  Yeah, we need to talk about
racism, but the system that is fatally flawed is Capitalism.  Its ideology
is racism, its institutional practice is racism, but the system is
Capitalism.

    And so, we'll talk about race as though we want to be
included in this racist, Capitalist system that needs systemic change.
So when people rise up -- and you know, this is about the tenth time
I've worked on a package of reforms around the death of an innocent
black civilian, unarmed not committing a crime.  And for those of you
who say, *Oh, we -- we say it's murder, that officer, we agree, cops
agree that George Floyd was murdered and that -- he needs to go to --*

NYS ASSEMBLY                                JUNE 9, 2020

you don't have to go all the way to Minnesota.  Why didn't you say

something about Amadou Diallo?  Why didn't you say something

about Sean Bell?  Why didn't you say something about Eric Garner?  I

could spend the rest of my time making the list.  You were silent, and

your silence is consent.  It is disingenuous for you now.  You're going

to talk out against this.  Why?  Because of the pressure the protests

has put on everybody.  Burning down a police center, senseless -- a

station.  And I have no mercy for Macy's.  Looting mercies -- Macy's

and Gucci, I don't think we should destroy those properties, those

small businesses in our neighborhoods.  That's why people are scared.

For a minute there, the stock market dropped.  It's going back up now,

that's why they panicked.  That's why we had a curfew.  That's why

some of you and Nancy Pelosi in Washington with the Kente cloth

taking a kneel -- a knee.  Hypocrisy.  Goodell, the Commissioner of

Football, *Oh, Colin Kaepernick, he was right, he was right; I'm sorry*.

Because you're scared now because the system is in trouble all over

the world.

          So, when we come up with legislation, we have to

come up with legislation that makes them pay consequences.  This

doesn't do that.  I'm supporting it because my colleague worked hard

on it and it need -- it needs to be done.  This doesn't do that.  How

many times are we going to ban the chokehold?  We say it over and

over, this is about the tenth time I heard that, *Let's codify it.  You

know, it's against the policy, but let's codify it*.  Couldn't even get both

Houses and the Governor to agree with racial profiling, which is

86

**NYS ASSEMBLY**                                              **JUNE 9, 2020**

against the Constitution, and that had to be a one-House bill.  And any time you have this hypocritical Governor saying, *Bring me a bill, I can't wait, I'll sign it tonight*, you know it's ineffective.  You know it's not going to hurt the police.  So, you go ahead and pass all this legislation -- and by the way, for the record, I supported it all.  I think it's weak.  I think some of the advocates wanted this bill badly.  And look at that, they made this bill -- they made this bill the prized package.  We got to repeal 50-a.  They made this bill, the background check.  Like that's going to stop them from murdering us.  A background check.  You want to do something?  Don't have a special prosecutor.  Have an independent prosecutor, not a special prosecutor in the AG's Office who's not going to prosecute police.  Have an elected civilian complaint review board, like the City Council is -- is looking at now with Council Member Inez Barron, an independent, an elected complaint review board that has the power to investigate, prosecute and have binding consequences for the police.  They have to go to jail.  Jail.  They tell me, *Oh, Charles, but they need cultural sensitivity, they need to understand the black community, the plight of black people*.  Fine.  If they murder us, give them 25 years to life.  I will buy them a black history book to read in jail.  You need consequences.  And we've come up with this.

I hope I'm wrong.  I never wanted to be more wrong on something in all my life.  This is not going to put the flames out.  These bills are not going to stop a worse uprising.  You think the fires in Minneapolis and the fires in Ferguson and the fires in Baltimore

NYS ASSEMBLY                                    JUNE 9, 2020

and all over the country was something?  Wait 'til you see the flames next time if we don't take a serious, serious approach to dealing with this issue.  It's been with us for a long time.  I've been at it for 50 years.  So, pardon me if I'm not excited about a package of legislation that I've seen 50 times.

This is not the answer.  I agree with Minneapolis, we need to dismantle the police department and come up with a new process, a new structure.  When you hear, *Abolish the police, abolish prisons, and dismantle police*, you think it's crazy, radical stuff.  But if you would listen to people that have constructive ideas on how to sell up -- set up public safety agencies that can actually keep the public safe.  The police don't know if they're going to come home, the average black mother doesn't know if their black son is going to come home.  And their black son, 90 percent of us, I'm not talking about any other minority element, they go out there unarmed, they've got to meet police officers that are armed to the teeth.  They even have military equipment.  We need to demilitarize it.  They have tanks.  Military equipment in police departments.  This is a fascist police state.  You could sit here and legislate like you did something and have your press conferences, and everybody get a little piece of a bill so it'll make them look good to their constituents and for their reelection.  That's the priority sometimes around here.  But the reality is when we go back to our communities, there's nothing more lethal, nothing more violent than poverty.

And look at that budget you passed in April.  Nothing

88

on poverty.  The one before that, nothing on poverty.  Since I've been

up here, since I've been in the City Council, placating poverty.  Oh

now, now that the stuff has hit the fan and the flames are up, de Blasio

found a whole lot of money to defund the police, and said even the

Commissioner is with him on that.  Oh, where -- where did you get

that idea from?  So, we got to watch out for the cooptation, co-opting

the movement trying to sound like us, defund the police, de Blasio.

Really?  Hypocrite.  The Governor, can't wait to get 50-a, hypocrite.

The Leaders of this Assembly and the Leader of the Senate are

working in concert and I think that is the problem.  And then they

come to you and of course y'all attack somebody like me, *Don't take it

personal*; this is not personal, this is all political and the personal part

is that my people are dying and I really don't care what you think

about.  But our people are dying?  You all can take all of your bows

for this weak legislation.  But I'm telling you, it's not going to hold.

Even when people were marching to get some kind of reform, they

were beating the heck out of us.  I know my own people around me,

we went to different demonstrations, Keron Alleyne who is the

Deputy District Manager in Community Board 5, he and his wife

Ameria were at a demonstration to have this day come so we could do

something.  The police touched his wife.  He ain't letting -- no black

man's going to let nobody touch their wife, he went to investigate,

they threw him down on the floor, punched him in his face, hit him in

his ribs, and arrested he and his wife.

        So, I don't have no more patience for gradual reform.

**NYS ASSEMBLY**                               **JUNE 9, 2020**

It failed.  Every time we try to gradually reform something, it has failed.  We need radical, systemic change.  And if there is anything called a "good cop", a good cop doesn't watch bad cops commit crimes.  And if you do, then you are acting in concert with the bad cop.  Just like all of those police officers that marched by that poor old man who was bleeding out of his ear that was mentioned, but what you didn't mention is that every one of those police officers should have been arrested.  Not the one or two for assault, but everybody that stepped over him, everybody that looked at him and walked by, which were tens of them that did that, should be arrested for acting in concert for assault.  That's not going to happen.  *We're going to get their backgrounds.*  And when we try to get something like their backgrounds like this, you make a big deal over that.  You make that the issue.  *Well, suppose it's not substantiated.*  Well, even when it is substantiated, the Police Commissioner has total control over the consequences in CCRB.  That's why we need an independent one, elected with power, and take the power away from the Police Commissioner.

I would be happy -- I would think you were sincere if you would embrace an independent, an independent prosecutor.  If you would embrace the restructuring, the dismantling of the Police Department and coming up with a new structure and new ideas.  Maybe the police shouldn't respond to mental health situations.  Let some other team do that.  Maybe they shouldn't come into communities where youth that they don't understand, let another

90

**NYS ASSEMBLY**                              **JUNE 9, 2020**

agency do that.  We have --

        ACTING SPEAKER AUBRY:  Thank you.

        MR. BARRON:  -- officers that are out of control and

this legislation doesn't do it, but I'm voting in favor.

        ACTING SPEAKER AUBRY:  Ms. Hyndman.

        And good luck.

        MS. HYNDMAN:  Will the sponsor yield?  I have to

go after that.

        (Laughter)

        MR. O'DONNELL:  Sure, Ms. Hyndman.  Go ahead.

        MS. HYNDMAN:  Since you already answered this,

you explained why we just can't FOIL police departments, how long,

just for the record, again, how many years have you had this bill?

        MR. O'DONNELL:  I've had this bill over five years.

        MS. HYNDMAN:  Over five years.  Do you happen

to know why or how the general public knew so much about the

allegations against the officer, Derek Chauvin, in Minneapolis,

Minnesota?

        MR. O'DONNELL:  Mr. Floyd's murderer, you

mean?

        MS. HYNDMAN:  Yes, Mr. Floyd's murderer, yes.

        MR. O'DONNELL:  The State of Minnesota has no

restrictions on access to that information.  The City of Minneapolis

actually keeps a website where they list the allegations against their

police officers, and advocates in the state keep their own running list.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

So we were able to learn within days what that officer's history was. That could not happen in New York --

        MS. HYNDMAN:  Okay.

        MR. O'DONNELL:  -- under current law.

        MS. HYNDMAN:  Under current law.  So, once we pass this bill, we could have officers that have records as long as Mr. Chauvin in Minneapolis and still be in the police department, the probation department, the sheriff's department, or corrections?

        MR. O'DONNELL:  You have the ability as a citizen, as a reporter, as a lawyer to file a Freedom of Information request with the department they work for to ask them for that information.  They don't give you that information, you have to file an appeal.  If you don't win the appeal, you have to go to court.  If you go to court and they give you a copy of -- of the document you requested, which is redacted within an inch of its life, you have a judge decide whether or not that is in compliance with FOIL.

        MS. HYNDMAN:  Thank you very much.

        MR. O'DONNELL:  You're very welcome.

        MS. HYNDMAN:  Mr. Speaker, on the bill.

        ACTING SPEAKER AUBRY:  On the bill, Ms. Hyndman.

        MS. HYNDMAN:  I have received approximately 600 requests to repeal 50-a.  Now, as we know, it will happen, we'll vote on it today.  So for the correction officers, police officers, probation officers and sheriffs, they may have records that may be

NYS ASSEMBLY                              JUNE 9, 2020

similar already to the officer in Minneapolis, but it doesn't mean that

they will be removed from the police department or any police

departments.  They will still continue to work for these departments

throughout the State of New York.  They will still be in a position to

protect and serve.  This just shines a light on the records that these

officers may have.  It doesn't remove them from office.  It doesn't

penalize them.  It means that we, in New York State, can create a

website, as the sponsor said, to look at the records of these officers

when it comes up.

          So as -- as my colleaguer [sic] said earlier, sunshine

is a disinfectant.  We'll be able to look at these officers and say

whether or not they're being -- protecting and serving the

communities.  But it doesn't remove them, and I think that's what the

key word is here.  So if an officer decides to spit at young people on

Hollis Avenue in Queens as of last week, he will be suspended but he

will not be removed.  Someone who is supposed to protect and serve

communities that they do not respect will still be in office.

          So it has taken many years for us to get to this point.

And while I am going to vote yes on this bill, I think it's important to

highlight that many mothers and fathers tell their children when they

leave -- before they leave the house how to act and talk and walk

when it comes to interacting with police officers because they're afraid

their children, their brothers, their fathers, their mothers, their

daughters, won't be home that evening.  So while I understand that

there is fear amongst officers, there's also fear amongst families, black

families, Latino families, throughout the State of New York and
throughout the country.  So if officers decide that they want to
disrespect communities or if they're in situations where they are over
their heads, it doesn't mean you have to lash out.  It's no amount of
training.  We're asking you to deescalate situations, not inflame
situations.  So -- and for Queens, for my district, where I have a police
precinct that's still under Federal monitor, I want to make sure the
officers -- and I know they work hard, don't get us wrong.  I know
how hard they work.  But as these protests proliferate throughout the
country is because they want to see change happen.  And I want to see
it happen in my lifetime.  So for all of those 600 some-odd people
who e-mailed my office, yes, we will be repealing 50-a.  But this is
just one step in a long line of legislation that has to occur in the State
of New York and throughout the country to make sure that Black
Lives Matter, not just in this State but across the country and
throughout the world.

        I will be voting in favor of this legislation.  I thank
the sponsor and I urge my colleagues to do the same.

        ACTING SPEAKER AUBRY:  Thank you, Ms.
Hyndman.

        Mr. Kim.

        MR. KIM:  Mr. Speaker, on the bill, please.

        ACTING SPEAKER AUBRY:  On the bill, sir.

        MR. KIM:  Mr. Speaker, this is the -- the People's
House.  This is not the Police House.  It's not the Corporate House.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

It's the People's House.  And Article 50-a is not just about privacy rights for police officers, it's about what happens in a system when politically powerful forces influence the law and our policies.  When Article 50-a was first passed in 1976, the law was intended to protect officers who served as witnesses for the prosecution during cross-examinations.  Now after years of expensive legal fees, the lobbyists behind the police have extended the law and essentially bought their officers protection while nonviolent protesters tonight are being thrown away in jail for 24 hours with absolutely no rights.  So how did we get to this point?  The truth is, we did this to ourselves.  In the last ten years there is a close to 50 percent increase of funding for the NYPD.  The New York City Comptroller just reported out that in the last five years there's been a 22 percent funding increase and 6 percent increase of police officers.  The NYPD is a $6 billion corporation that has massive influence over our policies, and they have the ability to continue to buy their members legal protection and immunity.  And it's not just the NYPD.  You know, we see this pattern everywhere.  During this -- during this pandemic, nursing home corporations and their shareholders secured a blanket immunity for themselves by the Governor before we even reached the peak of COVID-19.  We have a duty right here, right now, to steer the People's House away from the Corporate House.  You know, what we're witnessing, all the pain, all the suffering, is the net aggregate for the lack of accountability these past 40 years over corporate and special interests.

**NYS ASSEMBLY**                              **JUNE 9, 2020**

Just recently I uncovered the sinister -- that sinister corporate executives used to grant themselves immunity before they lifted even a finger to help the most vulnerable nursing home patients. And now a week later, multiple videos are released of the dehumanization of black and brown bodies at the hands of police officers who act within the same protective immunity shields as these corporate executives. You know, we -- we are continually gaslit into a reductive story that somewhere out there evil must be controlled. That we must dominate over them so we rid ourselves of any variables that might harm us. It's a simple story to inject in order to pit ourselves against one another. In order for special interest groups and corporations to cover up their moral depravity. However, the people and the People's House are seeing through it now. You know, they know that the story is a product of systems and ideologies manipulating us to run, to turn on one another, and suppress what is true inside all of us, which is we are here to take care of one another. To help one another. That is a life well-lived.

This week the package of police account -- accountability bills, including the repealing of Article 50-a, is about us telling our people that they are right. We should be centering all of our policies to strengthen and protect the rights of our people. Of all of our people, regardless of their background or immigration status. Instead of jumping to protect the private equity firms behind nursing homes with corporate legal immunity, imagine if we actually strengthened and protected the rights of our nursing home residents.

NYS ASSEMBLY                                    JUNE 9, 2020

Instead of strengthening the rights of police officers, imagine if we protected the rights of nonviolent protesters on the ground who are getting beat up with batons every night.

With that, Mr. Speaker, I support this bill and I thank Danny O'Donnell, the sponsor, for championing this for so many years.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Ramos.

MR. RAMOS:  Mr. Speaker, will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER AUBRY:  Mr. O'Donnell yields.

MR. RAMOS:  Mr. O'Donnell, I'm certainly supportive of this bill and I appreciate the -- the dialogue that's going on here.  And I would like to ask a few questions just so that we can break it down.  There's a lot of aspects of this, perhaps, the -- the public doesn't understand, and it needs to -- and especially when there's efforts to cloud up the issue, I think we -- we need some clarity. The difference between unfounded cases and unsubstantiated, unfounded is something that they're claiming didn't happen.  And unsubstantiated is something that might have happened, might not have happened, but they were unable to prove it either way.  Am I

97

NYS ASSEMBLY                                    JUNE 9, 2020

correct?

        MR. O'DONNELL:  Yes.

        MR. RAMOS:  Thanks.  We heard mentioned here

that unsubstantiated cases are not relevant.  But un -- unsubstantiated

is not the same as not guilty, right?

        MR. O'DONNELL:  That's correct.

        MR. RAMOS:  It just means there wasn't sufficient

proof, if it was one's word against the other, that -- that something

happened.

        MR. O'DONNELL:  That's correct.  And I'll provide a

little factoid.  The last two years there were 4,000 complaints at the

CCRB alleging racial profiling.  Do you know how many have been

substantiated?  Zero.  Zero.  Which means to me very clearly that the

process, whatever that may be, is fatally flawed.  Because they may

not have all happened, but I absolutely refuse to believe that none of

them did.

        MR. RAMOS:  So, we heard from our colleagues

here that there's no value in unsubstantiated cases in divulging that.

First of all, your bill does not mandate what we do with that

information, it just says that it -- it's discoverable, that the public can

see it, right?

        MR. O'DONNELL:  The public will have access to it

through the FOIL process, subject to the limitations we have written

into FOIL as it relates to police officers.

        MR. RAMOS:  All right.  Out of 50 states, I

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

understand that only three states have a -- sim -- similar to what New York has, 50-a, that protects those -- those rights. We hear about how all -- I mean how this is a bridge too far. And this is something, you know, not good. But yet most of the United States doesn't have anything like -- like 50-a. And all we're asking for is some transparency, and I agree that down the road we should either, through policy, police department policy, or through legislation, talk about the inferences that -- that are derived as a result of -- of the information. But on another pattern of questions that -- that we had here, we heard somebody say, *Why are we treating police officers with a double standard? Why is it that we can't do this with teachers?* We can't divulge their disciplinary record, but we can with police officers. Now, teachers don't have the authority to take a life. Am I correct?

            MR. O'DONNELL: We do not give them guns, Mr. Ramos.

            MR. RAMOS: All right. And I would submit that the he who is much has given, much is expected. And when somebody has the power to take a human life, I believe there should be more light shining on that person and what he does.

            Thank you, Mr. O'Donnell.

            On the bill, Mr. Speaker.

            ACTING SPEAKER AUBRY: On the bill, sir.

            MR. RAMOS: You know, I appreciate the -- the discourse that we had here and the tone of my colleagues. You know, and -- and I could understand -- I could understand your perspective. I

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

could understand some of you saying, *Well, you know, we have good officers* and, you know, why should they be saying, *I can step in your shoes and understand what you're saying*.  I ask that you step in the shoes of a Puerto Rican man who was a police officer for 20 years and look at my perspective.  This bill does not say that anybody's -- it doesn't mandate any inference from information.  And the core of the problem is that throughout history, crimes against people of color have been unsubstantiated.  People have been lynched, murdered and found innocent.  So the fact that there's a record of unsubstantiated cases, it may or may not be relevant.  But I wouldn't dismiss it, as -- as -- as some of my colleagues do, as unimportant.  If an officer has 30 cases that are unsubstantiated complaints, and out of those 30 cases, 20 of them were people who didn't know each other who all said, T*his officer came up to me and started harassing me, and when I wouldn't cooperate he stepped on my toes and when I tried to push him away he arrested me for assaulting a police officer*.  Twenty unsubstantiated cases.  Now they're unsubstantiated, but isn't it relevant that there is a pattern here?  Isn't there some value to weed out an officer who might have a problem?  Who might be a problem and might be a risk to the public?  Now, I do agree that we can have inferences just from things that we see at face value.  You know, and I've heard people say, *Yeah, if an officer gets a lot of complaints from African-Americans then he should be called into question*.  This legislation doesn't do anything about that.  Those are policies that police departments must -- must take.  But I understand.  If an officer works in a minority

100

**NYS ASSEMBLY**                                              **JUNE 9, 2020**

neighborhood, he's going to generate more complaints.  And I do understand that when police contact the public, in many cases it's not a very happy situation.  A difficult situation.  A police officer is getting there in the middle of a family fight, in the middle of an assault, in the middle of a conflict.  He's questioning somebody about something.  It's not a very pleasurable situation.  And sometimes it generates complaints.  And not all complaints are true, and not all are substantiated cases, meaning that an officer is innocent.  But there is value.  There is value in looking at the total picture.  And so if a person works in a community primarily of African-Americans and generates more complaints, that, in its face value, doesn't mean anything because the predominant race in that particular -- but -- but patterns of what happens are relevant.  Or if a person works in a predominantly white neighborhood and the only complaints they get are from African-Americans, that might tell us something.  The point is that this raw data is relevant and it's important and it goes towards trying to create a situation where we can help people of color in this dire situation that we are in in this country where people are being killed and police officers are getting off in the courts.  Being found guilty, being found unsubstantiated, and we're giving the public some tools with which to have justice.  But we don't obligate anybody to form any conclusions based on this raw data.  The fact that we would want to hide this -- is -- is troubling.  The fact that we wouldn't want to divulge this is troubling.  And it -- it's so important to our community and to our whole country that these things be looked at.

101

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

We want to bring back integrity to policing.  I want to be able to hold my head up high as having been a 20-year police officer, with pride that people will look at me and say, *You were part of a noble profession*.  I don't want them to see the images of people being abused.  Of arrogance.  Of speaking to people with disrespect.  And if police officers know that their records are going to be public, then perhaps we will be controlling human behavior.  Perhaps they will treat people with courtesy.  Perhaps they will not inflame a situation unnecessarily.  And that is the aim here, to change what we are seeing. And in the end, I say to my brother officers, sister -- brother and sister police officers, *Your enemy is not the communities of color who are crying out for justice.  Your enemy are these bad officers who take it too far.  And you -- most of you are good officers.  But the minute you decide to defend them, the minute you decide to cover it up, the minute you decide to do nothing, you become complicit.  It's those officers that are causing you the problem where the whole world -- I know you feel that the whole world is coming down on you, but the problem is coming from the people at your side*.  What we're doing now and we need to do -- I agree with my colleague Mr. Barron that we need to do more.  And this legislation, although good, should not be the flagship of police reform.  We need to do so much more and make police officers mandated reporters.  We need to go to the scene of these incidents and make sure that negative investigations are not carried out and that investigations aren't tainted.  And that we constantly see police officers who are murdering people and we see it on videotape

**NYS ASSEMBLY**                    **JUNE 9, 2020**

and they get off in court, and we wonder why.  And he goes to the scene of the crime and how it's handed -- handled.  And I would like to see more legislation to that effect.

But I support this legislation as one element of what we need to do in this country.  To my brother and sister police officers, it's time for us all to reflect, and realize that the situation has become a runaway train.  What we saw in Buffalo where we see now a whole group of police officers - I think it was about 50 officers - who now decided to resign from their position because they object to officers getting in trouble for having knocked down an elderly man and practically fractured his skull, bleeding from his ear.  Think about it.  In what profession can you decide, *I'm not going to be -- work here in this unit anymore*.  They didn't resign from their job, they resigned from the unit.  How can police -- you work where we tell you to work.  How can -- this is a runaway train, where this can happen and they say, *Well, we don't like that he got in trouble so we're not doing this anymore.*  They're permitted to do this?  Please, my colleagues, we need to open our eyes.  I understand your perspective.  Policing is an honorable profession.  We need fairness.  We shouldn't blame police officers for certain things.  And there are unfounded complaints against police officers.  But transparency is what helps all.  Transparency, I would submit, is what protects police officers.  Cameras will protect me as a police officer if I'm falsely accused.  This transparency in the record -- if you don't have a pattern of doing the same bad thing, you have nothing to worry about.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

So I -- I -- I proudly vote for this legislation.  I commend the sponsor.  I'm proud to cosponsor it as well.  I urge all my colleagues to please vote yes on 50-a.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Johns.

MR. JOHNS:  Yes, Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. JOHNS:  Mr. Speaker, look, I -- I plan on voting for this legislation, but I just want to give a little bit of background.  This bill, 50-a, is better than it was, not as good as it could be.  And that's not just my words.  That's the words coming from Mike Mazzeo and the Rochester Police Union.  This union is called the Locust Club.  Mike Mazzeo is the head of it.  But, Mr. Speaker, for years, before this incident ever happened in Minneapolis, for years they were talking about reform, and reforming 50-a was one of the things that they were talking about.  And I think what perplexes them is the fact that here's a police union that actually wants to reform 50-a, and they were never invited to the table, to even have a seat at the table to even talk about it.  And I know that they care about openness and transparency.  The police force in Rochester does a great job.  You'd never have a Minneapolis incident in Rochester.  But at the same time -- and I know that our Rochester Mayor, Lovely Warren, Police Chief La'Ron Singletary, they want openness and transparency.  It helps them do their work.  Getting rid of a few bad apples will make the rest of the police force look good.

104

**NYS ASSEMBLY**                                    JUNE 9, 2020

So I do want to make everybody here understand that there are stakeholders in this, and when you rush a bill through bill drafting and it's out in two days, you can make some mistakes. We've seen it with bail reform, and a year later we had to come back and fix some of those mistakes. So I'm hopeful that we will get everybody to the table to be able to talk about what we talk down here as chapter amendments. For the folks back home, a chapter amendment just means that you wrote the book but maybe we need to add another chapter. And I think that maybe in this particular piece of legislation we should add some stuff to it to make it better.

I've been talking about real reform since before I got elected. And I'm in the 80 percent of Americans in the middle that want to do things better. And I think 80 percent of the Americans and the people in my district think like me, and we don't want extremes. We get one extreme saying one thing, and then we get another extreme that says let's defund the police departments. No one wants to defund or get rid of the Rochester Police force. I've lived in Webster all my life. We've got a Webster Police Department. The four towns that I represent, three out of the four have police departments: Webster, where I live; Fairport and East Rochester. No one wants to defund -- defund or get rid of those police departments. We would wind up going back to the Old West. You've seen with some of the disturbances recently, gun sales are up. They're through the roof. Women, more than ever before, are going out and buying weapons. They're buying shotguns, keeping them at home because

105

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

they're afraid somebody might come into the house.  If you defund and get rid of the police force, you're going to get the Wild West times a hundred.  It's not going to be a good thing.  So extreme -- extremism on the left or the right isn't a good thing.  I'm supporting this bill, even though I believe that we need to do some chapter amendments to make it better.

Thank you so much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Epstein.

MR. EPSTEIN:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. EPSTEIN:  Thank you.  I -- I really want to applaud the sponsor, the Caucus and all my colleagues for moving this bill forward.  This is a historic moment for the State of New York.  This is an opportunity that doesn't come all the time.  And it comes in the course of tragedy that we've seen all over our -- our City and our State.  And let's be clear.  This is about people in our communities where in my neighborhood a month ago, a real lovely human being named Donni Wright, just on the street corner of 9th street and Avenue D, he saw some of his friends being questioned about -- from the police around social distancing enforcement.  Donni just came into the intersection.  He was assaulted by Officer Garcia.  We saw on videotape, many of us, what Officer Garcia did to Donni.  You know, it was violent.  It was aggressive.  Here today, the history of Officer

106

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Garcia remains unknown.  This bill creates protections for survivors
of police violence, for their complaints, for their witnesses and their
families who've been brutalized.  And Donni was brutalized.  This will
help him and his family.  The claim that the -- the police union has is
that -- that we'll give out specific information, phone numbers,
e-mails, so people will go to those police officer's homes.  That is
specifically outlined in the bill that we cannot do this.  There's also
additional protections beyond 50-a statute and FOIL that protect these
officers.

This bill changes lives.  This bill will require the law
enforcement community to stand up and say, *For the officers who
aren't doing the right thing, we will get that information out there to
the public*.  To the officers like Officer Garcia that we found out there
were six other incidences, at least that we know of, where the City of
New York spend hundreds of thousands of dollars, and to this day
Officer Garcia remains on the force.  It's being paid by our taxpayer
dollars today, even though one of my constituents was brutalized.

So I appreciate my colleagues saying we don't want
to go too far.  I would argue that this bill doesn't go far enough.  We
can't hide from the truth.  We can't, as our colleague Sayegh said, mob
rule in our society.  This is not mob rule in our society.  This is our
community talking about social and economic justice.  I've gotten
thousands and thousands of e-mails from my constituents, phone calls
non-stop, saying they understand the value of repealing 50-a.  They
understand that people are hiding information.  And to the allegation

107

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

that all these cases are -- are 98 percent unsubstantiated, then there's

nothing to hide from.  I know.  I've been a victim of -- of police

assault, and my case was, quote, unsubstantiated.  But I know the

experience.  And I'm a white man with privilege, and they used their

power and privilege against me.  I can't imagine what the experience

is for my black and Latino friends and colleagues who I hear time and

time again, their experiences around on police stop and frisks and

assaults.  Here, with 50-a, we say we will get the information out.

We'll make it harder for the department to hide information.  We'll

make it harder to stop this information from going out.  We'll make it

harder that officers can hide behind this blue wall of silence.  That's

why.  That's why repealing 50-a is necessary.  It is one of the most

secretive laws in the country for hiding police misconduct.  We need

the sunshine of our laws to make this come out.  Will this law subject

police to greater disclosure?  Yes.  Do we think this is a good thing?

Absolutely.  That's exactly what we need to do.  That's exactly what

we intend to do.  This will provide more transparency to the families

of people like Donni Wright and Eric Garner who, maybe, with their

suffering get a little more justice.  And maybe officers who've engaged

in this pattern and practice of abuse will be disclosed.  And maybe we

can get them off the force because they have set a bad reputation not

just for our City and our State, but for our people in law enforcement.

They are not sending the right message.  They are not communicating

our values.  And they are not standing up for racial, social and

economic justice, which I know my colleagues firmly believe in.  This

NYS ASSEMBLY                                    JUNE 9, 2020

repeal goes a long way in advancing those beliefs.

                Again, I want to thank our sponsor, I want to thank our leadership and our Speaker for moving this forward.  I thank our Caucus for pushing so hard on this agenda.  I encourage all my colleagues to vote in support of this historic legislation.  Thank you, Mr. Speaker.

                ACTING SPEAKER BLAKE:  Thank you, Mr. Epstein.

                Mr. Manktelow.

                MR. MANKTELOW:  Thank you, Mr. Speaker.  On the bill.

                ACTING SPEAKER BLAKE:  On the bill.

                MR. MANKTELOW:  On the bill.  Today we're talking about lives.  We're talking about lives of individuals.  Today here on this floor in the Assembly we're debating Bill No. 10611, also known as the 50-a bill.  Why are we here today?  Because the loss of life.  The many tragic deaths that I've heard all day long, all day yesterday, on the floor, from my office.  The death of Mr. Floyd.  We are now looking at multiple pieces of legislation on the Assembly floor because of these deaths, tragic as it is.  Absolutely.  Lives matter.  Why?  Because as we've heard from many other Assemblymembers today, Black Lives Matter.  And I want to say that one more time.  Absolutely, Black Lives Matter.  Because of the COVID-19 that we're going through here in New York State, we have lost so many lives.  So, so many lives.  And as we all know, COVID-19 doesn't care what

109

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

color we are, what part of the State we're from.  It comes in and

attacks.  And some of those lives that we lost are dear to my heart.

Some of those lives that are residents of the nursing homes that are in

our communities back home.  Approximately 6,000 lives we have lost

in the nursing homes.  Six thousand lives.  Do I know the makeup of

those lives?  Absolutely not.  I'm sure there's white folks there, Puerto

Ricans, Hispanics, blacks.  I don't know the makeup of those.  But this

is what I do know.  Each and every one of those lives, no matter

where they come from in this State, absolutely matters.  As we -- as

we look at the pieces of legislation, making sure we take care of the

people that we represent.  There was a directive that came down on

March 25, 2020.  It came down from the Governor's office as well as

the State Department of Health, directing our nursing homes to

readmit residents of that nursing home if they have the COVID or they

have symptoms of the COVID.  Those lives matter.  A few weeks ago

on this floor, our Ranker from the Health Committee offered up a

piece of legislation, an amendment, to bring to the floor to have those

loss of lives investigated and who was responsible.  It was very

unfortunate; we couldn't even get that -- that amendment to the floor.

Six thousand lives.  Again, 6,000 lives.  Each and every one of those

lives matter.

               We're here today because we've heard all along,

Black Lives Matter.  And I'll say it again.  Absolutely, Black Lives

Matter.  Last night we were briefed on two of the upcoming bills that

we may take a look at.  The first bill, Bill No. 1601-C, establishes the

110

**NYS ASSEMBLY**                           **JUNE 9, 2020**

Office of Special Investigation to investigate and prosecute a police or peace officer in certain circumstances.  The next bill, 10002-B, creates the Law Enforcement Misconduct Investigative Office.  Here are two bills.  Where's the third bill?  If we're really here about people, taking care of our people and that lives truly matter, where is the third bill?  Where is the bill that establishes the Office of Special Investigation for nursing home deaths related to the COVID-19?  Each and every one of those lives matter.  If we're going to hold our police officers at such high standards as we should, absolutely, men and women of integrity.  I'm so proud for the men and women that serve in my district.  I have the utmost respect for each and every one of those individuals and what they have to go through each and every single day.  But at the same time, these lives matter.  At the same time, if we're going to hold our police officers to this level, why on earth are we not holding the Governor and the Department of Health at the same level?  Why do those 6,000 lives not matter?  Why is there not a piece of legislation here protecting those 6,000 lives, wondering what happened to those individuals?  Yes, they deserve to have that looked at.  And today I just ask and say that all of these lives absolutely do matter.  And absolutely, Black Lives Matter.  Those from minority communities.  These lives all matter.  So as we move forward I ask, let's work on pieces of legislation on this floor together to look at each and every one of those lives.  And again, it's my privilege to sit here and speak about those lives and to say here, yes.  Every life matters.  Every black life matters, every life of any minority matters.

111

So I applaud what we're doing in the Assembly this week, looking at those things and looking at those lives. So again, thank you for the time, Mr. Speaker, and all these lives matter.

ACTING SPEAKER BLAKE:  Thank you.

Mr. Dilan.

MR. DILAN:  Thank you, Mr. Speaker.  Will the sponsor yield for one brief question?

ACTING SPEAKER BLAKE:  Will the sponsor yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER BLAKE:  The sponsor yields.

MR. DILAN:  First, Mr. O'Donnell, I want to thank you for being a champion on this issue for so many years, even before it became politically popular.  But my question is specifically on language, and I just want to make sure that I'm not interpreting it wrong.

MR. O'DONNELL:  Mm-hmm.

MR. DILAN:  We discussed this in one of the Caucus subcommittees, and I'm still concerned about it so I want to get an answer from you.  It's on page 2, first paragraph, Section 9.  It's the Section B that says"... not of public concern."  I'm assuming that it would be the police department that would decide if a matter is not of public concern or not.  And I just want to know why this section -- I think I know why it was in the bill, but I think -- wouldn't it be better served in not having this section in the bill?

112

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MR. O'DONNELL:  It is some of the language that I found most troubling when trying to draft it.  However, there are things that really aren't of a public concern about an officer's conduct.  If it doesn't involve interaction with other people.  The example I previously gave, which was non-shiny shoes.  And so, it is included there to provide additional layers of protection, and with the certainty that if it's invoked or lied upon, an individual has the ability to go to court and say it was improperly used.

MR. DILAN:  Okay.  So I guess, then, if the NYPD or any other police department broadly determined that something that is of significance but from their perspective decided it was not of public concern, that can be addressed in court?

MR. O'DONNELL:  Absolutely.  If they were to redact or not provide something and that was their justification, that -- that would have to be argued in court to determine whether or not the FOIL law was being misconstrued by the department.

MR. DILAN:  Okay.  Thank you, Mr. O'Donnell. Thank you for your years of work on this issue.

On the bill, Mr. Speaker.

ACTING SPEAKER BLAKE:  On the bill.

MR. DILAN:  First I want to say, my compliments to the Speaker and to the Caucus and to every member of this Body for, one, bringing the bills to the floor, and two, having a genuine discussion from all perspectives on the bill.  Our people are looking for a systemic change.  Real systemic change so that we know the

value of our lives are equal under the law enforcement purview.  And we've heard a lot of discussion about the bad apples.  We've heard a lot of consensus about the bad apples, and we've heard consensus about what happened in Minnesota being wrong from just about every member in this Body.  And from every -- even from the Police Commissioner in New York City, which I thought in my life I would never hear a police commissioner say something like that.  So I view that as progress, but not enough.  Not enough.  In this political climate, we should be taking further steps to ensure that when our people have their constitutional rights trampled, their State laws being violated, that we don't have a system - and I'm not talking about individual officers, I'm talking about departments, I'm talking about prosecutors - that they don't have a system that is going to shield this wrongdoing.  That is all our people want.  That's all we want.  That is all.  Nothing more, nothing less.  And I really hope we take more steps to ensure that basic premise because I have friends who are in Federal law enforcement.  The first thing they tell me in -- in casual gatherings, we discussed this stuff, you know, at barbecues at -- at my house and they say very simply, *You know, when we're hired, we're told don't violate someone's constitutional rights because the Justice Department will come down on you.*  Why aren't we doing the same thing here?  When you violate a person's constitutional rights in this State, when you violate criminal laws that protect people in this State, whether you are a police officer or not, you should be prosecuted to the highest extent of that law.  You shouldn't get a special law because

114

NYS ASSEMBLY                                    JUNE 9, 2020

you are a police officer.  That -- that's all we want.  And you say "bad apples" -- and when I say to -- to -- to the good cops out there who don't say nothing, like my colleague Phil Ramos said, this is what puts you at risk.  This is exactly what puts you at risk.  We need not only a revolution in the streets -- that's not what we want.  We're not for anarchy.  We need a revolution of our minds, of the way we think about this.  We need to let officers know that if you are a mandatory reporter, which is something that I believe should be in this, that you're not the rat.  You're not the whistleblower.  You're doing things that will keep other good cops safe.  You know, I've had good cops die.  Like Rafael Ramos, an example of a good cop, my constituent.  You know, he died needlessly.  You know, and it's always the innocent that paid the crimes for the bad apples.  So when you have a culture that doesn't give up your bad apples in fear of being quote, unquote, "the rat" or the whistleblower, that's the mindset that we need to change.  And that's what will protect good cops, in my mind.  Having laws in situations that treat people fairly will protect everybody.  Like in that same discussion we talked about how heartwarming it was to see people of all races gather for change via a peaceful protest.  But when those protests turn violent and my local commanding officer was hit with a brick in the face -- you know, I remember talking with some people in my yard and they were saying, Well, yeah, the protests are good, but just think about it, Dilan.  If it were a crowd of largely black and brown people and they threw a brick at a police officer, would anybody leave there not arrested?

115

**NYS ASSEMBLY**                         **JUNE 9, 2020**

What would they do to that crowd?  Now, I'm not saying that that should be condoned.  What I'm saying is it should be treated the same in every circumstance.  You know, throwing a brick or any projectile at a police officer is wrong, period.  But so is violating someone's rights and blatantly murdering them on the street.  And without video think that you're going to get away with it because the, quote, unquote, "system" is going to protect you, that's wrong.  And this is the systemic change that we are all looking for.  It's the reason why I've stayed in this Body.  It's the reason why I'm here.  And I believe in Speaker Heastie's leadership.  He said it very early on in his Speakership, so I know that he means it.  A message to just everyone. We watched bail reform.  We watched it happen.  We were happy about it.  And some people may say it was a mistake.  We could have a disagreement on that.  But I know everything good that we gain out of this package has the potential to be revisited.  Just like bail.  So let's talk about real progress and let's talk about being strong for our people out there who are expecting, like I said in Conference, the pen to be mightier than the sword.  That's our job.  That is our job.

So I think this is a good -- a good first step.  But I agree with -- with Charles Barron in one respect.  Why is this bill -- which I'm going to vote for, by the way -- why is this bill the priority of this package?  Yes, it'll help a little bit.  And I certainly understand why because I served in the City Council's Public Safety Committee. We've done constant oversight of NYPD attorneys, and during my, you know, 12 years of experience conducting oversight, NYPD's

**NYS ASSEMBLY**                                   **JUNE 9, 2020**

lawyers have a tremendous amount of things that they do not believe are of public concern, which is why I'm concerned about that language in this bill.  But I do trust the work of my colleague.  I know he is a -- a very good attorney, a great attorney, in fact, and that his heart's in the right place.

And I want to say one last thing as I wrap up.  I remember being on the City Council, being the -- actually the -- the deciding vote on -- being the veto-proof vote on stop and frisk in the City when it was passed, and I remember being the deciding vote on the Inspector General bill when it was passed and there was a lot of pressure on me.  And I couldn't understand why they would come to me to vote with them when the two precincts I serve have the highest stops and frisks in the whole City.  Like, I didn't understand that at all.  But I remember telling them I couldn't give them my vote, and then I had to watch it come full circle this year when, you know, Mike Bloomberg ran for president and just simply could not shake this issue.  Now, I'm not specifically going after Bloomberg and what he did and the way he did it, I'm just citing history.  Bloomberg paid the political price for being on the wrong side of this issue.  So the message to us is we do not need to water down these bills because those who hide behind this issue, it doesn't go away.  Sooner or later you will pay the political price from the people for being on the wrong side of this issue.

So, with that, you know, I -- I certainly hope that this is not the end.  I hope we go for the systemic change that our people

117

NYS ASSEMBLY                                    JUNE 9, 2020

demand and -- and hope for.  Brother Barron mentioned a -- a
legislative item that -- that I'm currently drafting about how the PR
machines of police departments - not individual police officers, but
the departments - bringing up every derogatory item that comes up
when there's a high-profile officer-involved shooting or arrest.  But
meanwhile, if an officer does something, the department that he works
for, by contract, can't even talk to him for 48 hours.  How is that
balanced?  How is that balanced?  So even in the case of George
Floyd, you know, they talked about the fact that he had coronavirus.
Really?  Did the family give you medical authorization to release the
fact that he had coronavirus?  I sure hope so.  But why is that part of
the discussion?  Because it's setting up the system to give potential
justification as to the reason why he couldn't breathe.  Are you
serious?  We all saw why he couldn't breathe.  But if there was no
video, trust me, that would have been part of the justification.  And
the fact that he wasn't properly charged in the first place is another
systemic change that we're looking for.  That happened here, right?
That happened here in the case of -- of Eric Garner.  It happened to
Eric Garner.  Those cops weren't properly charged by the DA's
offices.  These are the systemic change that our people want, and I
hope we all are here in a bipartisan manner to make sure that they
have it.

                  Thank you, Mr. Speaker.  I intend to vote yes.

                  ACTING SPEAKER BLAKE:  Thank you.

                  Ms. Cruz.

                              118

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MS. CRUZ:  Thank you, Mr. Speaker.  Will the sponsor yield for some quick questions?

ACTING SPEAKER BLAKE:  Will the sponsor yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER BLAKE:  The sponsor yields.

MS. CRUZ:  Thank you, Mr. O'Donnell.  And thank you for your fight that brings us here today.  Can you provide a quick definition for a technical infraction?

MR. O'DONNELL:  We don't really have one.  So it is vague.  It is left somewhat vague on purpose in order to allow it to be interpreted and to allow the individual to challenge that interpretation.

MS. CRUZ:  And the technical --

MR. O'DONNELL:  But there is wording, if you would like me to read it.

MS. CRUZ:  My apologies.

MR. O'DONNELL:  Okay.  A technical infraction means a minor rule violation by a person employed by a law enforcement agency as defined by this section as a police officer, peace officer or firefighter or firefighter/paramedic solely related to the enforcement of administrative department rules that, a, do not involve interactions with members of the public; b, are not of public concern; and c, are not otherwise connected to such person's investigative, enforcement, training, supervision or reporting --

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

reporting responsibilities.

MS. CRUZ:  Could a failure to maintain or comply with rules related to filing reports be considered a minor infraction?

MR. O'DONNELL:  No.

MS. CRUZ:  Could a failure to properly affix or display a badge be considered a minor infraction?

MR. O'DONNELL:  Absolutely not.

MS. CRUZ:  And as you stated before - my apologies - can it include allegations of retaliation against whistleblowers?

MR. O'DONNELL:  No.

MS. CRUZ:  Can it include physical and verbal fights between officers?

MR. O'DONNELL:  No.

MS. CRUZ:  And as you stated earlier, we don't really care if they fail to shine your shoes, but we would want to know, for example, if they purposely covered their badge number or their name.

MR. O'DONNELL:  Well, if they were to have covered their badge or their name, that would've involved interacting with the public and, therefore, it would be required to be included.

MS. CRUZ:  And so this bill ensures that what are actually minor infractions will not be disclosed, correct?

MR. O'DONNELL:  Correct.

MS. CRUZ:  Thank you.

Mr. Speaker, on the bill.

120

**NYS ASSEMBLY**                    **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  On the bill, Ms. Cruz.

MS. CRUZ:  I rise today as a proud cosponsor of bill A.10661, and in support of a full and unequivocal repeal of Civil Rights Law 50-a.  I want to thank the sponsor, the Speaker, the Caucus, especially the advocates and their families who are so truly the victims here, and who for decades have cried out for justice.

Mr. Speaker, I am an attorney by trade.  As an attorney, I have a license to practice law.  In exchange for the privilege of practicing law, I am subject to a character and fitness screening, as well as my obligation and my duty to follow the rules of professional conduct set forth by the State of New York.  Judiciary Law Section 90.1 requires that before admitting a person to the Bar of the State of New York, the Appellate Division of the Supreme Court must be satisfied that he or she possesses the character and general fitness requisite for an attorney and counsellor-at-law.  Unless otherwise ordered by the Appellate Division, no person may be admitted to practice without having received a certificate of proper committee, attesting that it has carefully investigated the character and fitness of the applicant and that he or she is -- has good character and is fit to practice.  Should an attorney be disciplined, whether by admonition, censure, suspension or disbarment, all of this information is made available to the public and published in the Law Journal, where much, if not all of the information that is critical to practicing law is contained, printed and issued daily.  Additionally, should an

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

attorney be disciplined, that attorney has the affirmative duty to inform each and every single one of our clients of this disciplinary action.  Multiple other licensed professionals - teachers, nurses, doctors and even funeral directors are subject to public disclosure of their disciplinary complaints.  It should be noted, like all of these professions listed here, I, as an attorney, cannot carry a gun and I'm not trained to utilize deadly force when necessary.  Yet my conduct, mainly my bad conduct, is public record.  Civil Rights Law 50-a prevents the public from receiving critical information about the police officers that serve our communities.  Officers entrusted with an immense amount of power.  In recent years, 50-a has been invoked -- invoked to remove NYPD's disciplinary summaries, including CCRB prosecutions that had been previously publicly available.  And I want to reiterate that.  They had been previously publicly available. (Unintelligible) a public (unintelligible) to (unintelligible) an officer's disciplinary history and to refuse to answer community members' and reporters' many calls to identify officers who have committed acts of brutality.  Members of over-policed communities like mine are in turn left without recourse to understand whether police or other oversight of accountability systems have made any efforts to eradicate systems of abuse.  This results in mistrust.  And so when people say the police cannot police themselves, they're not lying.  This is what we mean. Judge Willett from Texas compared the increasing secrecy to kudzu, a nearly uncontrollable creeping vine that blocks access to sunlight. Slowly strangling fields and forests in its wake could create an

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

environmental devastation by outcompeting other species for resources, mainly light, imperative for survival, and acts to block their access by growing over and shading them with their leaves.  Native plants, as a result, die.  Similar to the death of these native plants, our communities are dying.  They're being asphyxiated by the injustices perpetuated in our society.  And while we do not always have the power to legislate away systematic oppression, today we do.

In Detroit Free Press v. Ashcroft, Supreme Court stated that a major purpose of the First Amendment is to protect the free discussion of governmental affairs.  Public access helps inform the public of the affairs of government.  That is why many of you can see us from home today.  Direct knowledge of how their government is operated enhances the public's ability to affirm and protest government's efforts.  When the government selectively chooses what information it allows the public to see, it can become a powerful tool for dissection.  In the 8 minutes and 46 seconds that Derek Chauvin's knee pressed into George Floyd's neck, in the 8 minutes and 46 seconds that Mr. Floyd took his final breaths and they were pushed out of his chest by the weight of Mr. Chauvin's knee, crushing his neck and crushing his life.  Robbing him of the -- of the vibrancy of his life and mortality.  People of color around this City have felt that.  We felt the compression tighten around our necks, and something finally broke.  The residual frustration and anger resulting from centuries of systematic oppression and police brutality drove hundreds of us, thousands of us, to protest around our City.  I was immediately

**NYS ASSEMBLY**                          **JUNE 9, 2020**

reminded of Mr. Eric Garner, whose death six years ago remains so raw and so painful that most of the people of color in our City cannot drive the image of him laying in the pavement, begging for his life. And that image was leaked.  Not released because of the overreaching secrecy of 50-a, but leaked.  That Officer Pantaleo, the officer administering the deadly chokehold, had seven disciplinary complaints and 14 allegations against him.  This is not to say that all cops are bad.  But they are charged with the responsibility of representing the best of us, and not the worst.  And we not only rely on them to be judicious and tempered in their conduct, but we demand it.  Similarly, as members of our community we are entitled to know when officers have acted badly in order to ensure that our system of law, the same system that police have sworn to uphold, can identify and bring justice to those who have committed these atrocities against our communities.

This is absolute necessity.  Transparency in government.  As has been identified by the advocates and attorneys, transparency in government can have a community therapeutic value that provides an outlet for our communities' concerns, hostility and emotions.  The structural role that acts and serves by exposing the public to information necessary for self-government (unintelligible) is very important.  The benefit of public access is the role that government and transparency plays is our -- in our constitutional system.  For decades police advocates have argued that 50-a is meant to protect the privacy of officers and their families.  And today we saw

124

**NYS ASSEMBLY**                                    JUNE 9, 2020

colleagues across the aisle bring up painful memories of officers lost during 9/11, officers who have killed themselves and other ways in which they have died over the last years.  These are disingenuous and manipulative tactics.  This gaslighting has got to stop.  Because one has nothing to do with the other.  We deserve transparency.

It should be noted that New York and Delaware are the only two states left with this archaic law.  And theirs is not nearly as expansive as ours is, and that's going to change today.  The best role that we can serve as elected officials is not only to write and pass legislation, but to ensure that there's oversight, transparency and accountability.  And that we, as guardians, the keepers, the protectors of our neighborhoods, that we begin the therapeutic healing process in our communities.  How?  With legislation that demands transparency. How?  With financial capital dedicated not -- not a -- not to a $1 billion police state, but to programs that enrich the lives of our constituents, irrespective of wealth, race, religion or their background. How?  By bringing a message home that we love you, that we care about you and that we're going to prove this by investing in you.  In your housing, in your healthcare, in your education and reentry programs.  As soon as this law goes into effect, we take that first step in providing this to our communities by opening the doors to government and allowing New Yorkers to finally demand that their police departments provide them with the transparency that they deserve.

And because of that I will be voting in the

125

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

affirmative.  Thank you, Mr. Speaker.

          ACTING SPEAKER AUBRY:  Thank you.

          Ms. Glick.

          MS. GLICK:  Thank you, Mr. Speaker.  First of all, I want to congratulate and thank my friend Danny O'Donnell for pursuing this for so long.  And I'm very pleased to hear all of my colleagues talk about how they agree that the murder of Mr. Floyd was horrific.  Now of course we wouldn't have known about this as a murder without the videotape.  So I want to thank the young woman who risked being roughed up herself by taking that video.

          Now, we may think, and I -- I -- I agree, that most officers act appropriately.  And the percentage of the force that is, in fact, the minority of officers who violate the rights of the public, I won't put a percentage on that.  Let's just say that it's a small amount.  But there is a culture of silence in the police department.  And it is reminiscent of the denizens of organized crime who also had a code of silence.  When a few cops step up to complain about another officer's inappropriate actions, they're called a rat.  They are ostracized.  I'm going to do a little history here, because remember Serpico?  It became a cause célèbre.  He raised the issue of corruption in the police department, and he was almost killed for his -- for his trouble.  I remember Patrick Dorismond.  This was a young man who was a security guard.  And an undercover police officer who may not have appropriately identified himself got into a scuffle with Mr. Dorismond, who ultimately died as a result of that encounter.  And I

**NYS ASSEMBLY**                                              **JUNE 9, 2020**

remember Mayor Giuliani saying -- as was referenced to one of the things one of my colleagues said about how the victim is denigrated -- Mayor Giuliani said at the time, *Well, he's no altar boy*.  And of course it was demonstrated that he had, in fact, been an altar boy.  He had two children - I believe it was two children - and they went without a father for the rest of their lives.  One of my colleagues made -- raised the issue that the -- and -- and I've written to the Police Department going back to Ray Kelly -- or maybe it was Bratton 1 -- raising the issue of police officers who have cases against them that wind up costing people not only their lives or injuries, but the taxpayer dollars.  And they say, *Well, you know, the Corporation Counsel sells a lot of cases because they view them as a nuisance*. And of course that happens with the MTA and uneven sidewalks for DOT.  But this is someone with a gun.  And this is someone who has the ability to remove your liberty from you.  So it's very different. And I am reminded that this isn't anything new.  Yes, we have people in the streets raising their voices, perhaps much more dramatically than anything we have seen because it is worldwide.  Because across the world, people are recognizing that people of color, indigenous people, have not been treated fairly.  In the '60s after another set of disruptions - I will refer to them as uprisings; the President will call them riots - there was a Presidential commission started, the Kerner Commission.  And I'm just going to read just a little bit from a report on the Kerner Commission because I think it is instructive to us today.

*Pent-up frustrations boiled over in many poor*

*African-American neighborhoods during the mid- to late-60s, setting off riots that rampaged out of control from block to block. Burning and battering and ransacking property, raging crowds created chaos,* et cetera, etc cetera. *Many Americans blamed the riots on outside agitators or young black men, they may have represented the largest and most visible group of rioters. But, in 1968, the Kerner Commission turned those assumptions upside-down, declaring white racism—not black anger—turned the key that unlocked urban American turmoil. Bad policing practices, a flawed justice system, unscrupulous consumer credit practices, poor or inadequate housing, high unemployment, voter suppression, and other culturally embedded forms of racial discrimination all converged to propel violent upheaval on the streets. And as black unrest arose, inadequately trained police officers and National Guard troops entered affected neighborhoods, often worsening the violence. This presidential-appointed panel reported white society is deeply implicated in - at the time the terminology was "ghetto". White institutions created it, white institutions maintain it, and white society condones it.* That was in 1968.

This very, very minor bill which will unmask the disciplinary records of police officers is just one piece of what we need to do to change, to change the direction of our country. Now, in 1968 we did not have nearly as many people of color in legislative bodies. We are seeing the people ask for change, demand change, and we must change. It is our obligation to redress the grievances that

**NYS ASSEMBLY**                         **JUNE 9, 2020**

people rightfully and righteously ask of us.  I believe that we must and will see change come, one way or another.  So we should get on board.  We should stop making excuses.  And probably spending more money than we should in one place and take some of those resources and put them where they are needed.  So I don't see it as eliminate the police, but I see it as an appropriate reallocation of resources to ensure that we finally, finally do the right thing.

Words echo in my head, *How long?  Too long*.  Let's do it now.  I'm happy to vote in favor.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Vanel.

MR. VANEL:  Thank you, Mr. Speaker.  First, I'd like to thank the sponsor for carrying this bill for five years and for making sure to -- to help push justice with respect to this in his career.  Mr. Speaker, in case you didn't know, I'm a black man.  And I was born a black man and I'll die a black man.  And an esteemed poet from the South penned some words that sounded like this:  *Say it loud, I'm black and I'm proud*.  Now, being black, many people have come and asked me questions recently in the past couple of years.  Like, they ask, *Why did Colin Kaepernick, your fraternity brother, take a knee four years ago?*  They ask, *Why do demonstrators demonstrate?*  But more fundamentally, they ask me as a black man, *What am I asking for?  What do I want?*

And, you know, that's a tough question.  It's a difficult question.  You know, it's complicated.  I get confused

129

**NYS ASSEMBLY**                                        JUNE 9, 2020

sometimes to, you know, address, you know, what -- what do we want?  I don't know if I have the proper education to explain the nuances of the societal ills, but if I try to answer the question, I might just simply close my eyes and just imagine.  I'd imagine if I was to live in a New York where I was able to walk to Central Park and be able to bird watch without my skin color being used as a weapon against me.  I continue to imagine, imagine I was able to go for a run in my neighborhood without the fear of someone trying to hunt me down and kill me.  I continue to imagine, imagine being able to watch a basketball game and at halftime, being able to go to the store to buy candy and be able to come back home without being killed.  What do I want?  I want to feel safe just like you.  Like your sons, like your brothers, like your uncles, like your friends.  I just want to feel safe.

To the people of the 33rd Assembly District, to the people out there across the City, across the State protesting, to the good cops, which are the majority, we see you.  We're here fighting for you.  This bill is one of the bills in this package that is a -- would help change what?  This will help change to make sure that good [sic] cops can't hide.  That's what it is.  Too often in New York State we don't know what the records are.  We want to make sure that good [sic] cops can't hide -- I'm sorry, the bad cops can't hide.  This bill matters.  I'm proud of these packages of bills.  But will these bills change everything overnight?  No.  There's much work to do.  But I'm proud to be able to stand here and try to help make -- improve the situation in New York State.

Martin Luther King once said that the arc of the moral universe is long, but it bends towards justice.  And today with this bill, and with the packages of bills that we're doing, we're trying to bend the arc of moral justice, the arc of morality in New York State towards justice.  And, Mr. Speaker, I'm voting yes for the bill.

ACTING SPEAKER AUBRY:  Thank you, sir. Mr. Carroll.

MR. CARROLL:  Thank you, Mr. Speaker. On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. CARROLL:  Transparency is essential for a free society to exist.  Transparency is essential in our police departments and those who are vested to protect and serve us because how, as a civil society, can we monitor them, can we look over them without having access to those records.  That's what this bill is about.  It's about transparency.  It won't fix all the ills of racism, but what it will do is start to bring sunlight into the structures of the police departments around our State.  And, of course, structures and institutions have a way about changing people.  All of them do.  And we are all affected by them.  And the structural and institutional racism that affects all of us, myself included, needs rooting out, needs sunlight.  We're all guilty.  What this bill does is try to shine a little bit more light so that we can do a better job at reforming ourselves and at making a more just and perfect society.  It won't fix everything.  We will be here again, but this bill and the package of bills I think helps

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

shine a bright light on the original ills of our society, ills that we are all responsible for and all guilty for and, again, myself included.  So, I hope and urge my colleagues to vote in favor of this commonsense transparency and sunlight that we so desperately need.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Fitzpatrick.

MR. FITZPATRICK:  Thank you.  Thank you, Mr. Speaker.  I want to thank everyone for their passionate eloquence today, it's been a very interesting debate.  But I have to say, what troubles me is I remember after the Ferguson, Missouri incident, watching the news and seeing a banner of Black Lives Matter, and the marchers yelling and screaming, *What do we want?  Dead cops. When do we want them?  Now*.  And I didn't hear any denunciation of that kind of language from anybody.  No one on MSNBC, no one on CNN, no politicians on the left side of the political spectrum.  It was ignored.  And it was very unfortunate to see these -- these incidents, Garner, Brown, Floyd, but no one is feeling sorry for the Dorn family, nor for the gentleman in Oakland who was murdered.

The problem I have with this bill is that allowing unsubstantiated claims to be made available is not only unfair, it plays into the hands of those forces of anarchy that want to not just defund and disband, but want to destroy the police departments of this country.  There was a demonstration in my town just on Sunday and another one planned for tonight with some of the most vile and

132

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

vitriolic language to burn Smithtown down, F the police, all of that stuff. I just want to say that the men and women in blue, the men and women in the fire service and the men and women in the corrections department, I support you, I stand with you, and like all of you, I condemn what happened to these people, Mr. Floyd and others, that's not you, those are the bad apples and they're getting the justice that they deserve. But I rise in opposition to this bill because this is not the answer. We are feeding red meat to the mob who wants to go after the police department rather than work with them.

Nerves are raw right now, everybody's upset. A lot of people are angry on both sides. We can work through this. I live by one simple rule: I treat people the way I want to be treated. And if we all did that, we wouldn't have these problems. I have friends of all sizes, shapes, colors, et cetera, because I treat people the way I want to be treated. That's all we have to do. But by providing a form of transparency in terms of being able to get unsubstantiated claims added to this -- to this record or -- or be -- to be visible, when other interest groups, you know, are protected. There's a fundamental unfairness here. I do not support this. I am voting no on this bill. And to the members of law enforcement and the fire department and the corrections department, thank you for what you do. I appreciate everything that you do for us, for all of us. Like you, I condemn the bad apples, but what -- what's happening here today to you is wrong and I will be voting no. Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: Thank you, sir.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Ms. Woerner.

MS. WOERNER:  Thank you, Mr. Speaker.  Will the sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure, Ms. Woerner.

ACTING SPEAKER AUBRY:  Mr. O'Donnell yields.

MS. WOERNER:  Thank you.  Mr. O'Donnell, as I read the FOIL Law, I read that, "An agency can deny access to records or portions of records that, if disclosed, would endanger the life or safety of any person."  In that definition, would "any person" include a law enforcement officer?

MR. O'DONNELL:  Absolutely.

MS. WOERNER:  Thank you.  So, then, would I be correct in concluding that if an agency determined that releasing the unfounded complaints about an officer would put her or his safety at risk, that agency could deny access to those portions of the records?

MR. O'DONNELL:  Subject to judicial review if someone wanted to challenge said determination.

MS. WOERNER:  Thank you very much.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, Ms. Woerner.

MS. WOERNER:  We're here this week to establish a

134

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

framework of law in which a cultural shift towards a more just and equal society can finally emerge.  As I reviewed the package of bills this week, I approached them with the lens of will this build goodwill and better friendships for all, and will they be fair to all concerns?  I have to say on this bill, I received nearly 700 constituent communications in support of this bill.  And I also consulted with law enforcement to understand what their concerns might be.

After reviewing the original bill language that as Mr. O'Donnell says he has been working on for five years, the compromised language that sits before us and the body of law related to the Freedom of Information Law, I am satisfied that the existing framework of FOIL and the new language that has been added to it protects the private, personal information, as well as unfounded, unsubstantiated claims and satisfies those concerns.  And it highlights the fine work that good officers do while ripping away the shield from those who abuse their power.

Now, there will be some who say that by supporting this measure that provides for transparency and accountability, I am turning my back on law enforcement, so let me be clear:  Nothing could be further from the truth.  Over the six years that I have served in office, I have met with dozens, hundreds of local sheriff's deputies, city and village police officers, En Con officers, park police and forest rangers, and I know them to be honorable, just, kind and committed to protecting the communities they grew up in, raise their families in and have sworn to protect.  I think about the sheriff's deputy who travels

135

**NYS ASSEMBLY**                                        JUNE 9, 2020

hundreds of miles in Washington County alone at night responding to domestic violence calls or chasing down drug traffickers who would poison our communities.  I think about the sergeant in Stillwater who 13 years ago started a program to collect old cellphones for victims of domestic violence to assure that they have a lifeline in their moment of need.  I think about the officer in Hudson Falls who ran into a burning building to save the lives of two members in his community. I think about the young officer who stood with me at a drug take-back to take -- to get prescription pills that have wreaked havoc in our rural communities off the streets.

These men and women are the very best of our community and their everyday acts of heroism humble me; in fact, I would put their records up against those of any other police force because I know that they are sterling examples of how community policing should be done.  Our officers got into this job to protect their communities, not to protect bad cops.  This bill is about transparency and accountability, and this is the best way to ensure that the reputations of the upstanding officers that I know are not tarnished by those who would abuse their power.  Thank you, Mr. Sponsor -- Mr. Speaker, I'm pleased to support this bill.

ACTING SPEAKER AUBRY:  Thank you, Ms. Woerner.

Mrs. Gunther.

MRS. GUNTHER:  Thank you, Mr. Speaker.  And this is really a very emotional day for me.  I am the granddaughter of a

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

New York City Police Officer.  I'm the daughter of a New York City

Police Officer.  I'm also the aunt of a New York City Police Officer.

My cousins also were in the NYPD.  And I can remember as a young

child when I was living in 161st Street in the Bronx that as we walked

to St. Angela Merici School, my mother would say to me, *If anything*

*goes wrong* -- there was always a cop on the street, and my mom

would direct us to go to the cop because that was a safe place to go.

So today, you know, the only thing that I feel about --

I feel very emotional.  I know there are so many good police officers

all across New York State.  But just like any other profession -- I'm a

nurse, if I do something wrong, if I steal a medication, it goes on my

record.  In many professions, that does happen.  And often, we can't

get another job.  If we're drug-addicted and we go to rehab, it still

remains on my record and my license.

So today, I'm asking that any unsubstantiated please

be removed.  I can live with that.  But other than that, we want our

children to feel that we can run to that police officer and to feel safe,

that they're there to protect us, and most of them do.  And to me, it's a

blessing to have a police officer on the street and the sheriff's

department, and that our children should feel safe no matter what

color, religion, they should feel safe.  My family is very eclectic.  I

have a Latino grandchild.  I have a Latino daughter-in-law.  We -- I

have a Majorcan.  We speak Spanish.  We speak English.  We are

eclectic, and that's what the United States is all about.  And we are

brothers and sisters and we are here to protect each one.  And, you

**NYS ASSEMBLY**                           **JUNE 9, 2020**

know what?  We stand with our police officers and we stand for those

who are dis -- disproportionately feeling unsafe in the United States

today.  God bless America and let's move forward.  Thank you.  And I

vote --

        ACTING SPEAKER AUBRY:  Not yet.

        Mr. Taylor.

        MR. TAYLOR:  Thank you, Mr. Speaker.  Will the

sponsor yield?

        MR. O'DONNELL:  With pleasure.

        MR. TAYLOR:  Thank you.  Question --

        MR. O'DONNELL:  Mr. Taylor, I can't actually hear

you.

        MR. TAYLOR:  You can't hear me.

        ACTING SPEAKER AUBRY:  You're having some

problem with your audio, Mr. Taylor.

        MR. TAYLOR:  Is that better?

        ACTING SPEAKER AUBRY:  Not -- keep trying.

        MR. TAYLOR:  One two, check one.  Mic check,

one two.  Better?  I'm working here.

        ACTING SPEAKER AUBRY:  Keep --

        MR. TAYLOR:  Hopefully that's better.

        ACTING SPEAKER AUBRY:  Raise the voice.  You

need your preacher's voice.

        MR. O'DONNELL:  As they say on Broadway, *Sing

out, Louise*.  Okay?

138

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

(Laughter)

MR. TAYLOR:  Okay.  Well, thank you, Mr.
Speaker.  I appreciate this -- this opportunity and I thank the sponsor
for yielding -- yielding.  You said this bill was introduced, it was five
years ago.  In your research in doing this bill, presenting this, have you
run across any opportunities where any states -- I think there are three
of us left that have this 50-a, have you encountered anywhere where
officers were harmed as a result of information that was published?

MR. O'DONNELL:  I'm unaware of any.  Certainly in
Minnesota, which has no such restrictions, I'm unaware of anyone
ever being harmed because that information is available.

MR. TAYLOR:  Thank you.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. TAYLOR:  Thank you.  I -- I want to follow one
of my colleagues.  I am a black man, and what I find -- and I don't
want to be -- no.  Let me start here.  I don't want to be apologetic for
what I'm thinking and how I'm feeling.  When I'm with my son, who is
24, I hug him like a little kid because I'm always concerned when will
I see him again.  He travels, he's a -- a Penn State graduate and I
shouldn't have that concern.  And I remember being in school with my
colleagues working on my divinity, and all my colleagues and their
cohort were all white.  And they couldn't imagine that I had to tell my
son how to drive, what to do when stopped by a police officer.  There
are a lot of wonderful cops out there.  But I think someone mentioned

139

NYS ASSEMBLY                          JUNE 9, 2020

earlier about this as being overreaching or unbearing, you need to be in a black man's position when he's driving and stopped by a police officer in any town in U.S.A. America.  The question is, *What did I do wrong -- you automatic -- this is me.  What did I do wrong, I know I wasn't speeding.  Well, what is this going to be?  What is this encounter going to be and am I going to make it home tonight?*  Those are real conversations.

          And I think when we look at the history, this bill goes back to 1970-something, I think about Clifford Glover, ten years old that was shot.  I think about Michael Stewart.  I think about Eleanor Bumpurs, who was mentioned.  And so, there's a litany of cases that have happened in our lifetime, in my lifetime and it -- it has not always been pleasant.  Now, that's not to -- to say all police officers are bad.  That's not what this legislation is about.  This is about rooting out those that will allow others to do things.  So when you look at the man that was knocked down in Buffalo, they marched over this guy.  There's no way you can tell me that no one had compassion enough to stop and say, *Let me help this individual regardless of what's going on around us, we need to do that.*  And if you have the mindset that it's okay with you, and he appeared to be white, imagine what happens in a black community at night and you're black and they're white.  It could be a lot uglier than that.

          So, I think on the nature of what we're talking about here, it's not cops are bad generally.  There are some bad cops out there and we want to make sure that if you're going to do that, then

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

you're going to be held accountable to the highest degree.  I am a retire -- I'm not retired, but I am a former military police officer, so I understand what it means to deescalate, what it is to be courteous even when you're spat on, cursed at and called everything but a child of God, you have a responsibility.  And we need to make sure that if you're going to take that job, if you're going to take that pledge, then you need to be responsible and held to the highest high.  And I don't think that this conversation, and it's gone on for hours, about we're turning our backs on cops.  We're doing -- this is the furthest thing in the world.  And if you are that woman and that man that is a good cop, and there are a lot of you out there, I work with you in my district, I work with you in other places, you already know, I don't have to -- I don't have to qualify that.  But I think we're wrong to believe that in the perfect world, everything is -- is -- is well.  I think more conversation could be had.  But not for a moment, not for one moment are we of the mindset that this bill is going to eradicate racism that's in America, that it's going to fix the black platform.  We need to look at the education, the housing and employment and how we are going from uneducated schools straight to prison.  When we start to fix those things collectively, and we can go in those rooms and Kumbaya and do it, but there are lot of things that need to be done and this bill is just one step in that direction.

I understand.  I've got a lot of friends that are cops, and I -- I get that.  But this is not an attack on cops.  And I want to dispel that.  This is a -- a -- a [sic] incident, it's an opportunity to stop

141

**NYS ASSEMBLY**                                       **JUNE 9, 2020**

bad behavior, bad behavior and looking the other way.  We want to know, if you're in our neighborhoods, we want to know.  And if you're there and you're doing the right thing, we'll stand with you all day long.  But if you're wrong, we're coming at you.  And that's how it should be if we're talking about doing this across the board.

Thank you, Mr. Speaker, and thank you for the sponsor that allows me -- that yield.  I will be voting in the affirmative on this bill.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, Mr. Taylor.

Ms. Darling.

MS. DARLING:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. DARLING:  I was told from childhood that the system was broken.  I would think about how the Founding Fathers of this country came together to draft the rules, conversations about freedom and the absence of religious persecution.  I would think about the irony that these men who spoke and wrote of freedom were on stolen land being served tea by slaves.  The irony that these men who spoke and wrote of freedom were on stolen land being served tea by slaves.  The story just did not add up.

I had an epiphany this year.  These men were able to have the vision of freedom in the presence of slaves because the men determined that people of African descent were not men.  They were

142

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

not even considered human.  People of African descent were characterized as beasts, dark devils, savages, disgusting creatures who needed their guidance.  And this is America.  The system is not broken.  The current system in America was built deliberately.  What we have here is exactly what the Founding Fathers intended.

I am of African descent.  I've had to learn about and experience the plight of my beautiful people.  My beautiful people who struggle every day to attain the American Dream, the American Dream that seems out of reach for the very people who built America.  But America has offered us all the nightmares we can manage.  We have nightmares of slavery.  We have nightmares of the Reconstructive era.  We have nightmares of the Civil Rights Movement.  We have nightmares of the war on drugs.  We have nightmares of dismal neighborhoods.  We have nightmares of being brutally murdered by law enforcement.

Most recently, we have the nightmare of George Floyd's murder.  This was a clear example of how some people in the system view people of African descent, like we are nothing.  Like we are worthless.  To watch a man be murdered in the street by someone hired to protect and serve, I and millions of others will live with that nightmare forever.  The tragic and disgusting murder of George Floyd is a time for pause, a time for reassessment and a time to determine what we need to do to prevent any more of these tragic and disgusting events.

This tragic and disgusting event is not the time to

143

NYS ASSEMBLY                                              JUNE 9, 2020

condemn all law enforcement.  I am in full support and gratitude to

my brothers and sisters in blue who are professional and humane.  For

the other ones, this legislation will allow for the much-needed

transparency so police departments can better determine who deserves

to wear a shield and who should never be shielded.  The system needs

a massive rebuild, and this legislation places us one step closer to an

America where I, nor any person of African descent, is viewed or

treated like we are worthless.

              I would like to thank the sponsor of the bill and I'm

voting in the affirmative.  Thank you.

              ACTING SPEAKER AUBRY:  Thank you.

              Ms. Richardson.

              MS. RICHARDSON:  Mr. Speaker, I rise today full

of pride.  I'm so proud of the New York State Legislature right now

because we have arrived at a moment so long overdue for New

Yorkers around this great State.  As we stand here today, speaking on

repealing 50-a, the section of the Civil Rights Law that was covering

the misdealings of police officers and peace officers and alike, which

amounted to a lot of pain through the brutality and mistreatance [sic]

afflicted on people who just simply didn't deserve it.

              Before I get all emotional, I just want to look back at

the sponsor of this bill, Mr. O'Donnell, a man not of my same gender,

a man not even of my same race.  But because he's not prejudiced, he

was able to see me and to see men that look like me.  And you would

think - and I'm speaking more to my viewership who is at home - you

144

NYS ASSEMBLY                                    JUNE 9, 2020

would think it is an African-American person that has this bill, but it's not.  And so, I think it's important to note that, that this is a Body that is full of color through our ethnicity.  We are a Body full of color in the way that we think and that it takes really a coalition to change the narrative of a system that is broken and that has disenfranchised communities for a very long time.

Now, Mr. Speaker, I've got to be honest now because you know that's all I know how to do.  There are a lot of people, Mr. Speaker, who are very upset that the New York State Legislature is passing this legislation today, and they want to try to make this legislation about something that it is not.  We are not looking into anyone's personal business.  We don't want your Social Security, we don't want your telephone number, we don't want your home address.  But you know what we do want?  We want that if you take an oath to protect and serve, that you don't become an abuser.  We want that if you take an oath to protect and serve, that you uphold yourself to the highest level of accountability.

Far too often, Mr. Speaker, in communities - particularly in communities of color - that has not been the case.  Police brutality has ran rampant.  Most notably, there was just a police officer that my colleague, I'm sure, will speak about, was found on camera pushing down a protester essentially causing her a concussion and then when you look back at the record, this police officer is notorious in the community for causing harm and, you know, abuse to communities of color.  Now 50-a is going to allow us to -- with the

145

repeal of 50-a, we are now going to be able to see those records, track the patterns and course correct when necessary.  So, when we spoke to our communities and said that we were going to be relentless in the pursuit of justice, Mr. Speaker, I don't know if they thought that we were joking, but we are here in this moment and we are going to do that, because justice, transparency, clarity and reassurance is what New Yorkers deserve.

And, quite frankly, Mr. Speaker, we also have to talk about the other side of this.  Anyone who is opposing this piece of legislation, the question we submit to you today is what do you have to hide?  What do you have to hide?  Doctors' records of performance, nurses' records of performance, even us as legislators, records of performance are public.  So is my address, unfortunately.  Right?  So, I don't have anything to hide.  What do you have to hide?  So, don't make this about Blue Lives Matter.  Don't -- don't -- don't do that.  Don't do that.  Because that's a -- it's a -- it's a miscarriage in terms of the truth, and our people deserve for the transparency that they seek to be delivered to them in a righteous way.

And so I just want to end by saying, Mr. Speaker, because I don't need to speak here for a whole lot of hours because my colleagues are eloquent in the way that they are laying out the case here today, and I am very confident that we will get to an affirmative vote, but now is the time.  Our communities are crying out.  People have taken to the streets to -- to seek -- to seek the justice.  Too many men and women have lost their lives to law enforcement individuals

146

who have had long history of records of abuse prior to it becoming a death situation, causing pain in our -- in our community.  And so, I just want to say thank you to all of my colleagues who are a rainbow coalition of what New York looks like.  I do stand here to affirm to you today that Black Lives Matter.  But the truth is, Mr. Speaker, all lives do matter, it's just black lives, we have to put a focus on right now because of what's going on in this country.  But you're not going to divide us.  We will continue.  We will continue to keep our eyes on you and we are going to ensure that the right thing is done by our constituencies.  And so with that, Mr. Speaker, I vote in the affirmative.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Dickens.

MS. DICKENS:  Thank you, Mr. Speaker.  Will the sponsor of the bill yield?

ACTING SPEAKER AUBRY:  Mr. O'Donnell, will you yield?

MR. O'DONNELL:  With pleasure, my colleague. Go right ahead.

MS. DICKENS:  Thank you so much.  Thank you. As my colleague had asked something very similar, but on the -- the repeal of 50-a, it's the records of the officers, but certain information is redacted, is that correct, on the personal life of the police officers or the peace officers and their families, and if -- if I am correct in saying and asking you that if that is the correct -- if it is so, can you tell us

147

what will be redacted and what is included in the bill?

MR. O'DONNELL:  This involves Section 2 (b), the amendment to the Public Officers Law Section 89.  They shall redact the following information:  Medical history of a person employed, which is necessary because I believe ADA Federal law prohibits that anyway, the home addresses, personal telephone numbers, the personal cell phone numbers, personal e-mail addresses from a person employed by a law enforcement agency or a family member of such person, or a complainant or such person named in a law enforcement disciplinary record, except where required pursuant to Article 14 of the Civil Service Law, and Social Security Numbers or the use -- any employee's use of an Employee Assistance Programs, mental health services or substance abuse assistance.

MS. DICKENS:  Thank you.  Then that means that's really -- what's really included in this bill, the repeal of 50-a, is the disciplinary records of peace officers; is that correct?

MR. O'DONNELL:  By repealing 50-a, we allow for that, and the -- the FOIL Law is amended to permit the police department to do so in accordance with FOIL.

MS. DICKENS:  Thank you.  Thank you, Mr. O'Donnell.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, Ms. Dickens.

MS. DICKENS:  Forty years ago and, unfortunately,

148

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

it's still very relevant today in 2020, as part of a speech Martin Luther King said, *I think America must see that riots do not develop out of thin air.  Certain conditions continue to exist in our society which must be condemned as vigorously as we condemn riots.  But in the final analysis, a riot is the language of the unheard.  And what is it that America has failed to hear?  It has failed to hear the plight of the black poor that has worsened.  It has failed to hear the promises of freedom and justice have not been met.  It has failed to hear that large segments of society are more concerned about tranquility and the status quo than about justice, equality and humanity.  So, in a real sense, our nation's summer of riots are caused by our nation's winters of delay.  And as long as America postpones justice who stand in the position of having these recurrences of violence over and over again, social justice and progress are the absolute guarantors of riot prevention*.  As one of my constituents writes, *It is not a movement, it is a lifestyle*.

Yes, this bill, the repeal of 50-a, is about life, my colleagues.  It's about life.  It's not about anti-police for we all recognize that most officers of the law that have been sworn to protect and serve are, indeed, doing just that, protecting and serving.  But unfortunately, it is the few that we today refer as to as bad apples that has infected the barrel and has brought up and used 50-a to further increase and enlarge that wall of blue science [sic] that -- that has permeated the history of -- of police in this country.  Most officers of the law, law enforcement, would never fear the repeal of 50-a, for it is

149

NYS ASSEMBLY                               JUNE 9, 2020

about the -- the disciplinary records that this is seeking.  I feel strongly, though, that mental and medical records that entail the taking of medicines that are known to impact on cognitive ability and show the mental state of a person carrying a gun should be included.  But alas, it is not.

And yes, I personally have been stopped, not so long ago, by a police officer in my district who stopped me and when -- and he had his hand on his gun and when I asked him why was I stopped -- and I was frightened, I was frightened for my life and I kept my hands up on the steering wheel so he could see them, and why was I stopped, and he said because you were talking on the cell phone.  And it was only after I showed him that my cell phone was in my pocketbook, that my car had a phone in the -- the car itself where I did not have to use my hands to use it, did he then just turn without saying anything, just handed me back my license, because I did not state, and my license had not been changed, that I was an elected in that community.  I was just a black woman.  And he just turned and walked away from me as if he had been in the right and he was forced to admit, and he wouldn't admit when he was first forced to just walk away from me.

So, I commend the bill's sponsor.  I commend Assemblyman Danny O'Donnell for standing up for what is right.  We talk about that we treat others as we would like to be treated ourselves.  If this were the case, if this was what was being done, then this bill would not have to be an asterisk.  That policy would not have

150

NYS ASSEMBLY                          JUNE 9, 2020

to be changed, that we would not have to legislate laws to protect people.  If I'm arrested, my full background is exposed not only in courts, but in the public media.  If that is the case -- and that's before I'm pronounced guilty.  And you're supposed to be innocent until proven guilty.  So, yes, I do commend you, Assemblyman Danny O'Donnell.  And, yes, you're not ethnically like me, you're white and I'm black.  You're a man, and I'm a woman, but, yet, you have recognized that there is a true inequity existing here across America and we're starting with an embryo here in the State of New York to make the necessary changes to not eradicate the system, because that's not what this is going to do.  What this does is to try to equalize the bar in a court of law so that just like my history is open to the public when I am before the court, so should a police officer's.

So, I commend for you for having the strength to -- to bring this legislation forth, to fight for the repeal of 50-a.  I -- I thank you, Assemblymember O'Donnell.  I thank you, my colleagues.  I thank you, Mr. Speaker, and I vote in the affirmative.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Mosley.

MR. MOSLEY:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. MOSLEY:  First and foremost -- thank you, Mr. Speaker.  First and foremost, I'd like to thank the bill sponsor for his internal fortitude, his courage and resiliency over these past five years

151

NYS ASSEMBLY                                    JUNE 9, 2020

to carry this bill when it wasn't the most popular thing and, when nobody was looking, still championing its cause and its eventual passage today.

Before I get into my comments, I just want to be clear that the intent of this bill shall, one, allow for law enforcement agencies to continue to cooperate with oversight agencies and provide them with the access to all information that is relevant to their oversight duties. It would also allow for oversight agencies to release findings and recommendations in disciplinary investigations and proceedings, subject to existing FOIL protections. These things don't change. As soon as this law goes into effect, though, New Yorkers from across the State will be able to demand and get from their police departments who are these officers who are currently employed who have a history of misconduct. This bill will allow for New Yorkers to finally find out officers who are currently in their streets, in their precincts who have racked up years worth of complaints for excessive force or illegal stops, or any other type of misconduct.

And last, but certainly not least, this intent of this bill will make it possible to find out whether police departments have ignored repeated patterns of complaints about officers. Police departments won't be able to hide that they knew about and ignored excessive complaints -- excessive force complaints of a particular police officer.

That's what the intent of this bill will talk about, but now, the substance of my conversation. Why do we have to wait?

NYS ASSEMBLY                                    JUNE 9, 2020

There's no need for a commission, there's no need for an auxiliary group or organization that tells us what we already know, that the outcome of when we don't do this is a George Floyd.  The outcome for when we don't do this is an Eric Garner.  The outcome of when we don't do this is countless other individuals who didn't have -- have someone record it or -- or videotape their encounters who have lost their lives or lost their dignity, who have been disrespected in front of their families and friends and community.  I know one of my colleagues so noted, and I know that he didn't mean it in jest, he talked about, you know, transparency and the committee agendas and -- but the far greater agenda that we need to be talking about is the agenda of my life as a black man.  The agenda of my life and my children's lives, and whether or not we will make it home safely, whether they're in my presence or not.  This bill is about accountability, transparency and how performance is related to them.  My grandfather who raised me as his own was a decent man, Private First Class Marine, he was a moral man with a moral compass.  But he didn't leave that moral compass and that level of decency and humanity at the door.  He took it with him to his beat.  He took it with him when he went to the precinct.  He took it with him when he was encountering those he was told and instructed to serve and protect each and every day that he walked the streets of Brooklyn, New York.

So, this is about power given back to the people. This is about not making sure that the status quo has a foot on our necks that should be tolerated.  So, I thank the sponsor because

NYS ASSEMBLY                                        JUNE 9, 2020

ultimately we know that no one bill is a silver bullet, that this

collection of bills are not a collection of silver bullets that will resolve

all issues and concerns that we may have, but they are -- they're a -- a

-- a -- they're pointing us in the right direction.  This malignant tumor

of police brutality has to be carved out, and I think that this bill, the

repeal of 50-a, is one of those scalpels that will do a tremendous job in

removing that malignant tumor so that police officers have a level of

decency and accountability to the men, women and children they have

sworn to protect.  And I'll be proud to vote in the affirmative, Mr.

Speaker.  Thank you so much.

               ACTING SPEAKER AUBRY:  Thank you, Mr.

Mosley.

               Ms. Wright.

               MS. WRIGHT:  Will the sponsor yield?

               MR. O'DONNELL:  With pleasure --

               ACTING SPEAKER AUBRY:  Mr. O'Donnell, will

you yield?

               MR. O'DONNELL:  With pleasure, Ms. Wright.

               ACTING SPEAKER AUBRY:  Mr. O'Donnell yields

again.

               MS. WRIGHT:  Thank you very much.  I am, like

many of my constituents, I am not that familiar with the Public

Officers Law and the Civil Rights Law and all of the laws that are

governing our police officers, so I'm always learning this a little more

as we do our work.  I'm going to ask you to walk me through exactly

154

NYS ASSEMBLY                                JUNE 9, 2020

what it is that we are going to allow to be exposed, what we are going to -- and what we're going to be shielding and/or what's going to be outside the scope.  So, would an officer's employment records of indiscretions inside the police -- the -- would -- inside the office, inside the command station, would they be captured under this rule?

MR. O'DONNELL:  If they involve a disciplinary record, yes, they would.

MS. WRIGHT:  And if it were just listed as bad performance, not disciplinary record, would there be a way for us to actually capture the work or the misdeeds or the record of that interaction?

MR. O'DONNELL:  Certainly, if that discipline involved interacting with the public or in performance of their duties, yes, it would.

MS. WRIGHT:  Okay.  So are we able through this law, not through the FOIL, just through this law, able to do anything other than address interactions with the public in the performance of their duty as an officer in that -- under the auspices of them being a representative of the police force?

MR. O'DONNELL:  Well, it would involve any instances of allegations of misconduct that leads to an investigation, a report, an exhibit, a hearing, all of those things, certainly it would, including, I would suggest, internal affairs investigations, which those are conducted when they believe an officer is committing a crime.

MS. WRIGHT:  Okay.  So if I made a complaint

155

against -- if I were a police officer and I made a complaint against another officer, do you think that that might be picked up in this -- under these rules?

        MR. O'DONNELL:  It could be, but under the fact pattern as presented by Ms. Woerner, it could very well be shielded if that is the case.

        MS. WRIGHT:  Okay.  Thank you very much --

        MR. O'DONNELL:  And that would be in the discretion of the police department.

        MS. WRIGHT:  Thank you.  On the bill, please.

        ACTING SPEAKER AUBRY:  On the bill, Ms. Wright.

        MS. WRIGHT:  I don't think I've ever received as much mail as I have regarding the passage of 50-a.  Thank you to our sponsor for bringing this bill forward, to our Speaker for ushering us through this moment and assuring that we take advantage of this opportunity to enact legislative changes.  This discussion of 50-a is a learning opportunity.  While initially created to protect officers from perceived abuse during cross-examinations, this law has been broadly interpreted and its meaning expanded to effectively prohibit the production or use of any record that contains any information that could conceivably be used to evaluate the work performance of an officer.

        This broad interpretation has resulted in perverse outcomes.  This broad interpretation has allowed an -- allowed

officers after officer, in case after case to hinder proper investigations and to frustrate the justice.  So I'm very happy to be here today as we make it clear that the employment records of police officers and peace officers are discoverable, and that law enforcement agencies shall comply with requests for law enforcement disciplinary records by producing employment records as defined in these sections and limited only by the stated exclusions which shall be narrowly defined and interpreted.

Today, we are trying to reconcile a hard truth, those whom we have trusted to dispense justice and mercy have retreated from their stations and hid in shadows of brutality, abuse and manipulation.  But today, this bill will expose systemic shortfallings and correct our laws so that it is clear, disciplinary records include a myriad of other employment records and they are subject to review and disclosure when there is an investigation into an officer's job performance.  My community, like others, all over this State, has responded in this moment with a shrilling outcry that should send chills down all of our spines.  The people demand accountability and transparency from those who have sworn to protect and serve our communities.  The repeal of 50-a is one part of establishing a system that reports to the people, affords oversight and review.  The -- the repeal of 50-a is one step towards restoring the trust between community, police and our Judiciary.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Blake.

NYS ASSEMBLY                                        JUNE 9, 2020

MR. BLAKE:  On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. BLAKE:  Mr. Speaker, colleagues, allow me first to ask that we take a moment of silence for those that have been lost and called home way too early, as we're here right now as George Floyd will be laid to rest in Houston.

(Whereupon, a moment of silence was observed.)

We pause and, first, we acknowledge and thank the sponsor for his incredible work and standing up for justice, and using his breath to speak out for those who don't have a chance to speak out themselves.  Allow me to commend our colleagues for doing the right thing here and saying enough is enough in what has happened in this journey.  We come at this hour right now hurting.  We are socially distant because of a virus that has been attacking our physical systems, but we're also unable to breathe because of a virus of criminal injustice.

We're not supposed to be here today, colleagues.  The Session was going, according to plan in 2020, we would have departed by now, but we're here because we have to breathe life back into our homes and our communities, and we have to breathe life back into the black and Latino people who are sick and tired of injustice.  There are too many names we have lost over the years.  Too many times we have been here.  But we're here because there's power in the name.  David in the Bible, usually when they refer to him, you spoke of David and Goliath and, often, they would speak of how would you

158

NYS ASSEMBLY                              JUNE 9, 2020

defeat this giant, this one that is impossible to be taken down.  That's what many of us feel often about the criminal injustice system and police brutality.  When you think about our police departments, many have their origins of slave patrols.  Or you think about the NYPD and its creation in 1845, we understand that we watched a modern day lynching of George Floyd.  It was this generation's Emmett Till moment; blatant brutality once again against a black man.

That mindset of supremacy and brutality and militarized police force has occurred over and over again:  Eric Garner, Ramarley Graham, Tamir Rice, Trayvon Martin, Kalief Browder, Andrew Kearse, Anthony Baez, Abner Louima, Amadou Diallo, Breonna Taylor, Ahmaud Arbery and George Floyd.  Today we bring justice.  Today we say that Black Lives Matter.  It's continued in this journey where we understand that policies matter.  We decided to pause, but not stop speaking out.  We are tired as black people being told to wait.  And when I say black, I don't just mean African-American, I mean African-American, African, Latino, Caribbean, all of us of African descent.  We couldn't breathe due to coronavirus, and we can't breathe because of police brutality.  Your silence has become violence.  So breathe, and be the premise that we can still live.

Life has not been easy in these past two weeks.  For many of us, it's been a reminder of what we've experienced for years.  In the Bronx, we had a march on Grand Concourse, or maybe you saw it in Minneapolis, or LA to London.  Maybe it was in Brooklyn where

NYS ASSEMBLY                                JUNE 9, 2020

you saw cop cars being driven into people and then being told, *You didn't see that*.  Last week on Brook Avenue in the Bronx, we literally had a war zone where I watched as people were beaten in the streets in 2020.  See, help me to understand how we continue to be a society that spends millions of dollars to lock up people, but we can't find money for summer youth programs.  Why did I use my breath earlier this year to vote against the Budget and why is it tied to now?  Because I couldn't, with any right mind, say to our community that we've endured brutality over and over again, but, yet, everything is fine right now.  But however, in that spirit of David, we use this vote today to take down the Goliath of institutionalized racism, the Goliath of police brutality, the Goliath of a prison industrial complex, the Goliath that went from slavery to Jim Crow to slave patrols to a police force, the Goliath of 50-a.  We take back our breath on this day.

Why am I speaking out in this manner?  Because it reminds me that as a person of faith that even our Savior was one who experienced criminal injustice.  See, you have to realize that the Pontius Pilate listened to the crowd instead of doing the right thing. I'm asking you not to listen to the PBA, but listen to the people.  Don't stop marching, because your marching has allowed to us to get to this day.  Don't stop moving, don't stop prodding, don't stop preparing. You allowed us to get here right now to repeal 50-a.  Lives for justice. And I'm not speaking in some theoretical sense.  See, Mr. Speaker and colleagues, the simple verse of Psalm 150:6 said it simply, "Let everything that has breath praise the Lord."  It's impossible for me to

phrase if I can't breathe.  It's impossible for the instruments to have
that ability of harmony without breath.  It's impossible for the strings
and the cymbals to do what they can without breath within them.  And
when you put your knee on our neck or you stop and you have an
illegal chokehold, all you're doing is denying us what's happening.
There's a pandemic of poverty, a pandemic of privilege, a pandemic of
hope, disparity, a pandemic of economic injustice that came before
this moment of repealing 50-a.  Coronavirus tried to take us out, but
we get to be here right now to say we breathe justice once again.

I'm not here just speaking as if this is new to me.  I've
endured police brutality twice in my life.  In 1999, I was told that they
heard that I was yelling at a cop, despite the car being 400 feet away
going in the opposite direction.  In 2016, while as an elected official
trying to deescalate a situation, I was tossed against the gate and they
only let go of me because they recognized me; however, my name and
my title should not lead to a level of justice that someone else cannot
get.  Now, this is just a spiritual defibrillator to give us breath once
again.  Raise the Age, breathe life.  Discovery, breathe life.  Speedy
trial, breathe life.  Bail reform, breathe life.  Ending racial profiling,
breathe life.  Providing medical assistance, breathing life.  But
repealing 50-a, we breathe life and justice.

Think about this:  Too often we're hearing about just
the hashtag of #BlackLivesMatter, but we're not asking ourselves, why
do we say it?  Because over and over again, you look at my blackness
as if something's wrong with me.  Over and over again, you make it

161

**NYS ASSEMBLY**                                           JUNE 9, 2020

seem like I'm a criminal, I'm a thug, like I'm not smart enough, that I don't deserve to live.  And what we do today is bring justice.  Justice means you should build schools and not jails.  Justice means you've got to stop brutalizing our black and Latino men and women.  Justice means that I am tired of crying.  I'm tired of us dying.  I don't need any more hearings.  I don't need task force or commissions.  Racism is clear.  It is obvious, it is palpable, it is real.  I'm tired of my mother being afraid about me walking outside, and all the other black mothers that are wondering right now how exactly will we survive.  Before you do these things, stop talking to me about the other side.  I'm not here for an All Lives Matter conversation.  I'm here because you keep going after black people.  You literally lynched us on a screen and then you're surprised about why we're upset.

So don't stop now.  Don't stop now.  George Floyd, Eric Garner, Breonna Taylor, Sandra Bland, Andrew Kearse, Kalief Browder, on and on and on and on, say their names for justice.  I don't need you to shield your badge number if you are believing you're doing the right thing.  Yes, there are officers who are doing the right thing, I acknowledge that; however, if I would have done exactly the same thing, I'd be in jail right now.  And all we're saying is we want to live.  I am tired of having this pain.  It's that understanding that we follow in the tradition of our Native American brothers and sisters who had their opportunities taken from them.  It's the understanding that too often within public housing you tell us to socially distance, but you also can't breathe there, as well.  We just want to live.  We

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

just want to breathe.

So, maybe this might be my last time standing before you, but as someone who has almost died twice in my life, when I was born with a heart murmur and they didn't know if I would make it, or when I fell asleep at a wheel in 2001. The only reason I'm still here is because God watched over me. What is the purpose of us being elected officials, in particular, elected officials in 2020, if we will be silent as people are being lynched in front of our eyes. Our ancestors can smile down on today, because we finally did something that had been waiting for too long. Not only will I vote yes and vote with pride, I vote yes because "Let everything that has breath praise the Lord." Thank you.

ACTING SPEAKER AUBRY: Thank you.

Mr. Colton.

MR. COLTON: (Unintelligible) an emotion-filled debate. But it has been a debate where people have listened to each other, and I think that's something that's very important. This legislation, I do not see as being anti-police or pro-police. I think what we must judge every piece of legislation by is whether or not it promotes transparency, which is very important in healing the distrust and the mistrust that has existed for decades and centuries. Whether or not it is specific in terms of a fair specification of the characteristics of the -- the conduct or the requirements that we are imposing upon people in New York, and whether or not it will permit the fair and effective law enforcement and public safety of all the people of New

163

**NYS ASSEMBLY**                                     **JUNE 9, 2020**

York.  When we come to emotional issues, we need to remember that every controversy involves people and families.  The family of George Floyd was absolutely devastated by a horrific murder, taking away from them a father, a brother, a son.  And that's something that they will remember for, really, the rest of their lives.  And so, it is something that is going to generate a lot of emotion and anguish and feeling.  And that's only normal.  I remember in my district, the -- one of my constituents was the family of Wenjian Liu, who together with Detective Rafael Ramos, was murdered also.  And I've seen day after day, year after year, the anguish that continues in the parents of Wenjian Liu, in the wife of Wenjian Liu.  They experienced also this terrible devastating loss from a horrific murder.  Sitting in a police car, not doing anything to anybody, and being executed because they were police officers.  Both of these officers were also people of color.  But the key here is the devastating impact it has on their family and on society.  And so when we look at legislation like this, we have to be very careful not to talk about the anger of it or concentrate on just negative.  We must be positive in what we can do to undo the future course of events like this.  Prevent events like this from happening. And that's the criteria I use in deciding on my vote on each piece of legislation.  Most of the pieces of legislation in this bill meet that criteria.  There are a few that do not, and I will vote no on those.  But this particular piece of legislation, I believe, discloses the disciplinary record of police officers.  Protects the personal information so that police officers will not be endangered by the information being

exposed or -- or released.  The only concern I do have about this
legislation is that it also discloses what may be unfounded allegations
that someone could make against a good police officer, and that will
be disclosed, I believe, or could be disclosed.  It may not be.  There
may be ways that, you know, this -- this will go through a FOIL
procedure and the courts will have interpretations.  But it would be a
negative thing if a good police officer's character and reputation were
unfairly manipulated by simply making unfounded allegations which
would then have to be released as part of the disclosure of his record.
I would much prefer to see that there be some kind of a due process
hearing of allegations before they came out.  But I believe that
because of the history of what has gone on, because of the
circumstances, because of the distrust that has existed between
communities and police, I think that it is the right thing to do.  It is the
transparent thing to do.  And I think it will promote better law
enforcement to permit 50-a to be repealed, and that a new procedure
be substituted in order to be able to disclose disciplinary proceedings
that may be brought against a police officer.

                Therefore, I am going to vote in the affirmative on
this piece of legislation.  But we have to be very careful that it does
not become a climate of anti-police behavior where people manipulate
the records of police officers by including in them, inserting in them,
unfounded allegations.  Because if that happens, it will definitely
pervert the intentions that we have, and it would certainly present a lot
of problems that we would have to come back and adjust to make sure

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

that it does not interfere with effective law enforcement and attracting good police officers to be part of our police force.  I very strongly support the police.  I believe most police officers are good police officers.  But I must condemn - as universally people have done - bad police officers.  Police officers who -- who did the thing that was done to George Floyd.  That police officer and the one standing around that police officer clearly were wrong, and that's one of the reasons why we were able to get as far as we have in this particular package of bills.  Because universally, people of all races, of all genders, of all ethnicities recognize that what that police officer did was wrong and we must do something to make sure that does not continue to happen in the future.  So this package and this bill, I believe, complies with the criteria that I have to make sure that it is transparent, that it is clear and specific in terms of what it requires, and that it will promote the effective law enforcement and public safety that is so crucial if our society is to get back on track and to be the kind of America that the promise of America has that we really haven't achieved yet in -- in its full meaning.  But we have to keep moving towards it.  And so I am not pessimistic.  I am optimistic.  And I believe that we can and will do better, and I believe that as long as we stay together and not become simply anti-police or anti-anyone, because hate is the enemy of all good.  Hatred and bias are the enemies.  When it is directed against any one group or any one person, it is directed against all of us and it promotes basically bad things, not good things.  So hopefully this will be a step in the right direction, and hopefully that as a result

166

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

of this, we will have a better relationship between the police and the community, a better relationship between all of us, and that together we will work to make this a much better and stronger and more transparent State.

Thank you, Mr. Speaker.

ACTING SPEAKER MCDONALD:  Mr. Garbarino.

MR. GARBARINO:  Thank you, Mr. Speaker.  Will the sponsor yield for a couple of questions?

ACTING SPEAKER MCDONALD:  Will the sponsor yield?

MR. O'DONNELL:  With pleasure.

ACTING SPEAKER MCDONALD:  The sponsor yields.

MR. GARBARINO:  Thank you.  Thanks, Danny.  I have a couple of questions, and maybe I missed it during this long debate.  You might've already answered some of them.  So, if I -- if I did, I'm sorry.  But can you please go over why - I don't know if you did address it - why unsubstantiated or unfounded complaints are being a part of this legislation, they're being released under this?

MR. O'DONNELL:  Well, there's a variety of explanations.  One, is the history of 50-a, which is if you define something in a -- in a way that allows the court to interpret what that means, you're opening the door to allowing the interpretation to be ever expanded.  B, because I didn't want to take it upon us to tell local police departments what process or procedures they should use to

167

NYS ASSEMBLY                                        JUNE 9, 2020

substantiate or not.  I think that would be a very difficult thing to do correctly.  And lastly, because I believe that if an -- an investigation turned out to determine that an allegation is untrue, when that is turned over the report will say this has turned out to be untrue.  And so because of all those reasons, I chose not to try to do that in this legislation.

MR. GARBARINO:  Well, I mean there's -- there's a difference between -- according to the police I spoke to there's a difference between untrue or -- and unsubstantiated.  Specifically, one of the officers told me that if something is found to be -- if there's a complaint and -- and their investigation determines it to be true, okay, then it's substantiated.  If there's a complaint but then there's -- after further investigation either the -- the claimant doesn't want to -- doesn't want to pursue it or there's no -- there's no further proof that it happened but there's -- there's not enough to say it didn't happen, it's unsubstantiated or unfound -- it's unsubstantiated.  And then if it's proven, then it goes in the file as an -- an exoneration.  So there's three different things that are kept in the -- in the file, at least that my police officers do.  So my question is, with the way this is currently written if something -- say there's a complaint against a police officer that says, you know, *He was -- he pushed me into the -- the squad car too -- squad car too hard, I hit my head.*

MR. O'DONNELL:  Okay.

MR. GARBARINO:  But then it doesn't go any further than that.  That's still an unsubstantiated complaint that would

168

**NYS ASSEMBLY**                    **JUNE 9, 2020**

be released under this -- under this legislation.

MR. O'DONNELL:  Well, it could be.  The two things I would say to you is I hear where you're coming from, but if there were ten of them in the same month against the same officer, their inability to substantiate may not be a reflection of whether or not they occurred.  And I earlier mentioned to someone that in all complaints that the CCRB has investigated concerning racial profiling, zero percent have been substantiated.  So I'm not entirely clear what their processes or procedures are, but it defies logic that no complaints about racial profiling in the City of New York actually happened.

MR. GARBARINO:  Okay.  But I -- I -- I spoke to some of the City police officers, but I'm -- I'm speaking -- specifically I got most of my information from some of the officers out in Suffolk County, and they -- no, they don't have the -- the Civilian Review Board -- Complaint Review Board.  They -- they have -- they do it internally through Internal Affairs.  So, but the question is you now have these complaints, Internal Affairs has reviewed it.  It might not be ten in -- ten in a month.  It might -- what if it's two over ten years or ten over 20 years?  It's -- you know, why release these -- why release these unsubstantiated complaints?  You know, I -- I -- I get your point of ten in a -- ten in a week or ten in a month.  I -- I get, you know, that hypothetical, but there's -- there's the others on the other end.  Two in 20 years.

MR. O'DONNELL:  Mm-hmm.

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

MR. GARBARINO:  Why release the ones that can't be substantiated?

MR. O'DONNELL:  In my experience, albeit somewhat limited, with FOIL requests, FOIL requests are regularly denied and then they are appealed and then they don't turn anything over.  There's nothing in this legislation that's going to fundamentally change that FOIL process.  And so if, in fact, a police department determined or chose not to turn it over, the remedy is with the court to find whether or not that was an appropriate thing for them to do. Again, if you're saying unsubstantiated, we would have to write a definition of substantiated, which I think would be very difficult to do and very unhappy for any department who was required to follow it.

MR. GARBARINO:  So, my -- so the follow-up question to that is -- so now if -- can the police station now -- or the -- the police have declined the FOIL request saying it's this is an un -- we think this was unsubstantiated so then you have to now then go to -- you appeal that decision.  If they deny it again it goes to court.  Can the judge then say, you know, *We don't want to release this.*  Do we give -- do we give the judge the power, under this legislation, to not release unsubstantiated complaints or is it all or nothing?

MR. O'DONNELL:  Our legislation -- my legislation does not change the power dynamic in that sense.  And so, yes, a judge can make a determination that it was inappropriate to turn over that information.

MR. GARBARINO:  Okay.  Could you see a -- a

170

NYS ASSEMBLY                                          JUNE 9, 2020

problem here, and I -- I -- I know defense attorneys.  I'm an attorney,

you're an attorney and I imagine you know some, too.  I know defense

attorneys that have told their clients that once they're arrested, the first

thing to do is make a complaint against the police officer.  Say

something -- you know, just get something in the file.  Is that a

concern now that all these false complaints that as a -- as a mechanism

for an attorney -- the client doesn't know, he might just -- most people

are going to do whatever -- I wish most people would do what I tell

my clients.  But most people are going to do what their -- their clients

say.  So in other words, they just make a complaint against the -- the

police officer.  Do you think there'll be a growth in this -- in those --

MR. O'DONNELL:  I -- I wouldn't dream of

disparaging you or your colleagues.  I was a full-time public defender

in Brooklyn from 1987 to 1995.  At no time did I ever, in representing

some very serious criminals, recommended any of my clients follow

that process.  I never did that.  Now, did some of them possibly do it

on their own?  I can't comment because I don't know.  But no, I never

attempted to create dirt on an arresting officer as a mechanism for

trial.

MR. GARBARINO:  Thank you.  Now, we just

talked about the FOIL requests.  Who can file a FOIL under this?  Is it

anybody?

MR. O'DONNELL:  Well, pretty much anyone.

FOIL requests are generally filed by lawyers seeking information, the

press seeking information.  But anyone has the power to file one, yes.

171

MR. GARBARINO:  So somebody can go and just FOIL every -- every police officer's personnel file in a certain precinct if they want to?

MR. O'DONNELL:  Well, I suppose they could. Anybody who has any experience in that realm would tell someone not to do it unless they want to wait for 17 years to get all the information.  So they've changed.  They need to be as narrow as possible if you want to get them answered at all, or answered in a timely fashion.

MR. GARBARINO:  So -- and I'm -- and I'm specific -- specifically talking about -- you know, I think 20 years ago there was a case, Court of Appeals case, The Daily Gazette v. Schenectady County.

MR. O'DONNELL:  It was mentioned earlier, yes.

MR. GARBARINO:  It was?

MR. O'DONNELL:  Yes.

MR. GARBARINO:  Okay.  Now, that case, it was -- so that case said -- the Court of Appeals specifically said the newspaper couldn't have access to this information because of 50-a. Now we're getting rid of 50-a.  The newspaper could now get access, they could FOIL that information.  That would be allowed under this law, right?

MR. O'DONNELL:  They would be allowed to ask for it, and subject to the provisions we're passing today, they maybe will get them or won't get them based on what the limitations are

172

**NYS ASSEMBLY**                    **JUNE 9, 2020**

we're putting in them.

MR. GARBARINO:  Okay.

MR. O'DONNELL:  I don't recall the specific
information they sought in that piece of litigation.

MR. GARBARINO:  It was personnel files because --
it was a group of police officers that were out on a bachelor party and
they got into an altercation with another group of people --

MR. O'DONNELL:  Correct, which --

MR. GARBARINO:  -- and they were looking for
personnel files.

MR. O'DONNELL:  -- makes you -- makes you
wonder why the non-work-related misbehavior of public employees
was not something that would be turned over.  But yes, 50-a, that's
what they hung their hat on, and it would -- this would allow them
subject to the limitations we're passing today.

MR. GARBARINO:  Another item that I -- a local
police officer brought up with me was in the past they've had --
they've had false accusations filed against them.  You know, they've --
they've actually questioned attorneys, *Can we sue?  Can we sue this
person for making this false accusation against me?*  They were
advised in the past, *No, you can't because there's no public harm to
you.  You know, there's -- it's -- it's in your file, yes.  But there's --
there's no public harm.  You're not -- you're not being harmed in any
way publicly.  It's -- you're not being disparaged publicly.*  Now that
these false -- potential false complaints are being released under this

173

NYS ASSEMBLY                                    JUNE 9, 2020

or that can be released under this, would this now open up the ability for law officers, police officers to -- to sue these people who make these false complaints?

        MR. O'DONNELL:  I don't care for the use of "open up" in your question, but I know of no legal basis why somebody who was harmed by that would not be able to seek legal redress.

        MR. GARBARINO:  Okay.  Thank you.  And -- and the last question I have is really, what's -- what is the remedy you're searching for here?  To -- to release these files, what -- what is the -- not the purpose, but with this information being released, what's -- what's the remedy?  What are you -- what are you -- what are you looking for?

        MR. O'DONNELL:  I'm trying to bring the State of New York to be relatively consistent with the rest of the country and not be an outlier by the way we -- with which we prohibit information about a concern group of public employees being available to the press, to the lawyers and to the media.  And if, in fact -- you know, other people earlier today have questioned about use at trial.  As if in a criminal defense case - which is all I really know - if you attempted to use that information that was unsubstantiated or untrue or whatever in -- in a trial, you'd be shut down by the judges I appeared in front of in Brooklyn, no less, quicker than you can possibly imagine.  So you both need a good faith basis and you need something else to -- to be able to use that information.  Obviously, that would vary on a case-by-case basis in the sense that if a defendant is accused of

174

NYS ASSEMBLY                                    JUNE 9, 2020

assaulting a police officer and in that assault he gets beaten up and then there are ten previous cases where this officer assaulted other arrestees, that would clearly be relevant to the question at hand in front of a criminal jury.  It would also be relevant in a civil action against the police department.  And so the idea you could just bring it up willy-nilly and not connect it to the facts is not the way things worked when I was there.

MR. GARBARINO:  But my -- my question is though now I can go to a precinct now and FOIL somebody's police -- police record whether or not there was -- there was an assault, whether or not there's an underlying action, so --

MR. O'DONNELL:  And I'm fairly certain you don't work -- walk into a precinct and file a complaint.  I think you file a complaint --

MR. GARBARINO:  Well, I --

MR. O'DONNELL:  -- through a Department, and the department has a FOIL officer and the FOIL officer will then deal with the FOIL complaints as they come in.

MR. GARBARINO:  But what -- what I'm saying is I get -- I -- I want this -- I want this information on this specific officer. I have -- there's -- there's no -- he didn't do anything to me, I just want to know what he's got in his file.  I find out that over 20 years he's got ten complaints.  What -- what's the purpose of me having that information?  What is -- what is --

MR. O'DONNELL:  What you're getting to the heart

175

NYS ASSEMBLY                                    JUNE 9, 2020

of is when something is so tangential and to other things -- and does

FOIL permit that.  We don't change the fundamental rules of FOIL.

We just provide protections for these officers in terms of their medical

history, whether or not they got drug treatment, whether or not their

Social Security number -- all those things we provide an additional

layer of protection.  FOIL does have other protections.  I am not

familiar with all of them.

        MR. GARBARINO:  50-a set up protections and --

which is -- which has been said in The Daily Gazette v. Schenectady.

You know, people were not entitled unless they were specifically

allowed in the bill.  We're now getting rid of 50-a, which gets rid of

those protections.  FOIL does not have -- you know, I can go to the -- I

can go to a town and FOIL anybody's building record and they'll give

it to me.  There's no -- this is now -- I believe based on the rules of

FOIL, anybody can go now and FOIL a -- a record because it falls

under FOIL.  It doesn't have that 50-a protection.  You can -- you can

FOIL that personnel record and there doesn't have to be any

connection.  It's -- it's allowed under FOIL.

        MR. O'DONNELL:  Yeah, but that is currently the

law for every other employee.  We're not creating a specific negative

thing for police officers.  If you chose to, you could FOIL a State

agency and ask them for certain kinds of information and they were

going to give it to you.

        ACTING SPEAKER MCDONALD:  Mr. Garbarino,

your time has expired.  Thank you.

**NYS ASSEMBLY**                              **JUNE 9, 2020**

Ms. Walker.

MS. WALKER:  Thank you, Mr. Speaker.  Will the sponsor rise for --

MR. O'DONNELL:  Ms. Walker, with pleasure.

MS. WALKER:  Thank you.  So the concept of 50-a has existed on the books in the State of New York for a number of years.  Can you -- I'm sure you know this because I believe I heard you mention it earlier.  Can you let us know when this 50-a was added to our New York State laws?

MR. O'DONNELL:  In 1976, Ms. Walker.

MS. WALKER:  In 1976.  And during this time, are you aware of any occurrences where information regarding past disciplinary occurrences were reported by a FOIL request or otherwise to the public?

MR. O'DONNELL:  You mean were they released to the public?

MS. WALKER:  Were they released?

MR. O'DONNELL:  No, I'm not.

MS. WALKER:  Thank you.  Thank you, Mr. O'Donnell.

On the bill, Mr. Speaker.

ACTING SPEAKER MCDONALD:  On the bill.

MS. WALKER:  According to some of the records that I've been able to locate, 50-a initially got on the books, as Mr. O'Donnell pointed out, in the year 1976.  However, over the course of

177

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

many years, when the documents were required or requested to be
released, the NYPD in particular released such documentation.  It
wasn't until the year 2016 under Commissioner Bratton where when a
FOIL request for the records of Pantaleo with respect to the Eric
Garner case were requested that all of a sudden now the NYPD
determined, *Hold on, 50-a is in place.  We are not allowed to release
these records*.  In fact, the New York Civil Liberties Union took that
decision to court.  And notwithstanding decades of information being
released with respect to the disciplinary records of police officers, the
courts decided that they were going to legislate from the bench and
determine that not only were these particular personnel records
forbidden to be released, but also laid out a number of other records
that should be released, including body camera footage.  In June of
2018, Police Commissioner James O'Neill appointed an independent
panel to conduct a review of the internal disciplinary system of the
NYPD, and there were a number of findings in this report.  One of
such findings states that, *The current law keeps the public in the dark
about police discipline, it breeds mistrust and it reduces
accountability.  Public confidence is vital to the Department's mission
and should -- and -- and a shrouded disciplinary process undermines
that confidence.  In addition to that, it also teaches that there are a
number of circumstances, according to the patrol guide, where other
police officers not may, but must, must, in many instances require -- it
requires members of the service to report certain types of misconduct
including corruption, unnecessary use of force, abuse of authority,*

178

*misuse of a firearm, false statements, and failure to properly perform patrol or other assignments.  Failure to report such offenses is itself a disciplinary violation.*  And so I say today that we are talking also about the fact that we need to release the records of police officers who we consider to be bad apples.  But this also allows for an opportunity for those individuals who allow these bad apples to -- to hide behind a color of blue silence to be exposed as well.  So not only must the reports be allowed to be released of the officer who have engaged in a reign of terror on communities, but if you are the police officer who sits back and allows this to happen, you will be exposed as well.  One of the premises that we've seen take place -- of course we know about the travesty of George Floyd and the modern-day lynching that took place in that situation.  And before I jump to the point where I wanted to call this a lynching, I took a look at an article that was written in the *Baltimore Sun*.  And apparently there was a Maryland Lynching Truth and Reconciliation Committee that established a working definition for what constitutes a racial terror lynching.  And it reads:  *The unlawful killing of an African-American by white mob violence, often with the apparent complicity of state and local officials, intended to incite racial terror and subservience to white supremacy*.  It went on to say that, *The flagrant disregard for black lives is a tragic but undeniable symptom of the pervasive racism that persons -- that poisons our institutions and it weakens our community and demeans civility itself*.  So again, we saw the lynching which occurred with George Floyd and the history of lynchings

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

throughout our society.  One of the things that came out was the fact that the officer who committed this infraction, this injustice, this crime, had a history of personnel and disciplinary encounters.  So I submit to you that whenever we get to this point where this type of egregious occurrences occur, that they are not isolated incidences.  In fact, there are situations where there were signals that something is about to happen that will shock the conscience of this nation if someone had just known or been able to hear of the fact that this bad apple was allowed to remain on the police force in the face of 17 other infractions.

I just had an experience like that within our community where there was a police officer, Officer D'Andraia, who exhibited a reign of terror locally within our communities.  And we kept saying to a number of folk like, *You can file a complaint through CCRB.  You don't have to get this complaint through other officers.  You can file this complaint in many different situations.*  And we kept saying this guy has been punching, beating, shoving regular every day people in our communities for far too long.  We even took these complaints up the ladder to the Police Commissioner, to the Mayor.  And they were ignored.  It was not until this particular police officer shoved violently a young protestor to the ground, causing her to have seizures and a concussion that, *Eureka, he's a bad apple and he should be brought through a disciplinary process.*  In fact, in addition to him being brought through that process, today he had to turn himself in to the New York -- to the Brooklyn District Attorney's

180

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Office and is or will be arrested for a crime.  When he pushed this young lady it was for no lawful law enforcement objective.  It was purely him acting out on his biases.  Biases, you say?  Well, what makes you think that he had biases?  Well, we did some Google searching since we couldn't get any personnel records.  What did we find?  That in Suffolk County this very same police officer was pulled over in a traffic stop.  And during this traffic stop, in the Judge's decision we learned that he had the emblem of the Confederate flag on the back of his pickup truck.  Huh.  You think that this individual with this Confederate flag and the dirty and nasty -- nasty history that it brings to most African-Americans would be allowed to be in a community that is predominantly African-American to exhibit through his actions the very type of racist ideologies through force that we've seen historically in our nation.

So today, if we had had the opportunity to have this information, we could have stopped him in his tracks before he ultimately wound up causing someone's seizure on the ground.  But thankfully what we knew was exposed for the entire world to see, and now he's being made an example of to say that any time that you try to utilize this type of brute force in our communities, you will be held accountable for it, and now you will be exposed to it.

One of the other things that we also learned was that the Bronx District Attorney, Darcel Clark, as well as the Brooklyn District Attorney, Eric Gonzalez, just recently last year received a FOIL request in order to release the names of police officers who had

credibility issues with respect to their prosecutorial offices.  Those names were released.  And so I want to honor them for having the foresight and the courage to stand up in the face of adversity and allow for those individuals to be exposed.  One of the things that we are having conversations about is the fact that when these names are exposed, it allows for a level of community and police relations to exist.  There's also this huge call to defund police departments.  That people are taking, you know, taking it away to say that we're saying let's get rid of police departments.  No.  But in fact, in New York City the MTA Police at one point in time was not under the NYPD, and if they were under a different level of jurisdiction, that perhaps they wouldn't have been covered by the -- by this thing 50-a, where we're seeing that there was another reign of terror that had been exhibited in our train stations where people were being harassed by police officers, where there was an uprising of the community to say that the MTA Police has to stop.  In addition to that, New York City School Safety used to be a division that was under the Department of Education but then it became under the NYPD, and we started to see and have conversations about a school-to-prison pipeline where it didn't have to be theo -- theo -- theoretical, but it was happening each and every day in a child's academic experience because now the NYPD was within their schools.  So one of the things that perhaps folk are saying is to take those resources and take those particular police jurisdictions and put them back where they belong.  Put the MTA Police back to the MTA.  Put School Safety back to the Department of Education so that

NYS ASSEMBLY                                        JUNE 9, 2020

our young people are allowed to grow in an environment that does not
-- that does not criminalize them.  And also to put people who are just
going about their everyday businesses within the MTA to be able to
go to work in peace.

One of the things that we've also noticed was that just
recently, within the years 2018, there were -- 2017, there were 817
cases of investigations for profiling filed against police officers
throughout the NYPD, 378 in the year 2018.  And so we know that
these occurrences are still taking place.  We recognize that they are
still racially-motivated, and we appreciate that at this point in time
with the passage of 50-a that now these individuals will be brought to
justice and exposed.

I will be voting in the affirmative and I encourage my
colleagues to do the same.

ACTING SPEAKER AUBRY:  Mr. Sayegh.

MR. SAYEGH:  Thank you very much, Mr. Speaker.
And I'd like to thank the sponsor and the Speaker for initiating not
only this bill, but a whole battery of bills and legislation that really
truly addresses what I've always fought for, and that is equity.  Equity
in education.  Equity in worker's rights, immigrants rights, women's
rights.  And this is an issue and a concern that has really caused
tremendous harm and injustice to many of us.  And even though we
look at the Minneapolis incident, that is only one of a long pattern of
instances and circumstances that really caused our nation, our entire
communities across from coast to coast and even on the global level,

183

this heightened concern for addressing inequity.  And -- and although many may -- may be concerned about the level of protests, I'm an advocate of speaking out.  I'm an advocate of protests.  If you have an issue, a concern, address it.  We teach our kids even at the very elementary levels of education that in order to promote change, you really need to speak up and you need to address what the issues and concerns are of the day.  And today I've listened and all of us have heard this passionate debate on 50-a, and I believe very strongly that the debate is necessary.  That change is necessary.  Today I would be voting in favor of change, although I may have some reservations as far as unsubstantiated evidence and information.  I really believe that as time goes on, any time you promote change it's --  it may be difficult, but change is a vehicle that allows us to move forward, allows us to modify, if necessary.  This Body of Legislature has taken on some very important issues the last couple of years, at least during my tenure on the Assembly.  We've taken on many issues.  And recently, criminal justice reform.  We took on bail reform.  And we recognized when we made major changes to bail reform, we reached out to law enforcement.  We reached out to individuals and specialists that get involved with bail reform, and we made modifications.  You know, and this is the way change takes place.

So as I look at 50-a, I recognize the need for transparency and I recognize the injustice that has been caused to many families and individuals over the years.  But I also recognize that it's not fair and it's not proper to pin any injustice on a whole

profession.  And I, myself, have dealt for many years with law enforcement officials, especially in the City of Yonkers in Westchester County, and I can attest to the tremendous efforts that law enforcement individuals have taken to improve community relations. To work with children in school.  To really volunteer, especially during the last pandemic with distributing food to food pantries and really try to do what is required of a police officer.  Not just safety and security, but to really be involved with the community at-large.  As an educator for many years, I've witnessed law enforcement officials come into our buildings and improve relationships with students and law enforcement officials.  I've witnessed this last two years, especially in the City of Yonkers, when our football program was having a serious problem, first responders, police officers and fire department representatives took on a role to be mentors and helped tremendously with financing sports and developed two major teams. One was the Yonkers Force, and one was Yonkers Pride.  And it tremendously improved the football program, the sports program. And the reason I say that is because, you know, I look at other professions; education, for example, that I've been involved for nearly 40 years.  I had the support of labor and rank-and-file teachers when we worked to take out ineffective teachers that did not address the needs of our children.  I am aware, as an attorney, when we deal with healthcare and medical malpractice how doctors joined in and healthcare professionals in making sure that healthcare professionals that committed medical malpractice were taken and held accountable

NYS ASSEMBLY                                    JUNE 9, 2020

for their actions.  And in law enforcement, I understand throughout

the debate we speak about some bad apples, but we tend to show, in

my opinion, more emotion against the profession, which is, in my

opinion, wrong.  And I feel that our work with law enforcement is

necessary.  Our collaboration, our cooperation is necessary.  To hear

many of us speak about defunding and unfunding law enforcement

really is ridiculous.  You know, I look at law enforcement in America

and I, being a student of international affairs for many years,

recognize law enforcement in other parts of the country where you

can't protest and you can't take to the streets and you can't criticize

governments.  And punishment is much more severe than what we've

seen.  Now having said that, does that justify any injustice or any --

any extensive use of force?  No.  And this is why our effort should be

geared on working with law enforcement officials to make sure that

hiring practices are such that whoever we hire in law enforcement

should be reflective of the communities they serve, which means let's

hire more police officers and first responders that are of minority

groups and ethnic groups.  Because this is not a black-and-white issue.

This is the disenfranchised.  This is communities of color.  This is

ethnic communities, immigrant communities that are feeling the same

harm and the same burdens.  I've reached out to law enforcement

officials, and they've been more than willing to accept a responsibility

to put more effort into making sure that the police academies and the

training that takes place for law enforcement officials includes a

greater amount of time and hours in the areas of multiculturalism,

186

NYS ASSEMBLY                                   JUNE 9, 2020

diversity, sensitivity training, policing skills and strategy.  And I say

policing -- I've witnessed and was involved in a protest in Yonkers

that included over 1,000 individuals.  And because of policing

strategies - in my opinion, effective policing strategies - there was not

one arrest made that entire day.  And that's a tribute to the skills that

officers are trained to do and had.

            So when I support a bill like 50-a, I do so because we

all recognize the need for important change.  And we understand that

this is a system that needs to be modified, needs to be corrected, and

we need to handle it in a way where we do it through collaboration.

We don't do it through making sure at the end of the day there's

winners and losers and pointing fingers.  We need to recognize our

nation needs a strong law enforcement body to continue, but to talk

about unfunding is ridiculous.  I look at other foreign countries, and

when I hear last week a Russian foreign minister criticized the way we

in America deal with protestors, it's really not only unsensible, but it's

really derogatory.  It's derogatory to our Democracy, to our principles.

Do we have wrongdoings?  We sure do.  In every field.  Do we need

to address them?  We sure do.  Do we do it by finger-pointing and

putting down each other and fighting each other?  That's not the way

to do it.  You know, I've always believed in -- in mediation.  I believe

in conflict resolution and arbitration.  And we're no different.  We're

debating important issues.  Our goal at this point is to pass 50-a to

move on, to bring in law enforcement, first responders, and to work

out a process that puts those that violate their pledge of duty, you

187

NYS ASSEMBLY                                    JUNE 9, 2020

know, and hold -- hold them accountable.  And many of us forget, three weeks ago, four weeks ago, I remember most of us were going and celebrating healthcare workers, going around blowing our horns at hospitals, and then we went on an entire program of celebrating our heroes; enforcement officers, police officers, first responders, EMS, fire department officials.  And we forget too quick who was once a month ago our heroes, we can't look at them as our enemies and nemeses.

So I preach and I recommend that not only do we pass 50-a, but we continue to look at methods and processes to get rid of systemized, derogatory and degrading policies and procedures that have impacted each and every one of us, especially in urban America. As an Arab-American, I witnessed firsthand, especially after 9/11, you know, the amount of tremendous negative impact that I faced and many in my community have faced because of the negative media and stereotyping.  And this goes on, of course, in communities of color and immigrant communities.  So, yes, we need to address our concerns.  We need to put forth methodologies.  We need to make sure that we do it with collaboration, and in this case with law enforcement officials, with first responders, to treat them with respect. To bring them on board to recognize that change is necessary, and we cannot have murders and tragedies like each and every one of us have witnessed in America, to continue to see this and witness it.

So thank you, Mr. Speaker, and I would be voting in the affirmative.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  Mr. Lavine.

MR. LAVINE:  Thank you, Mr. Speaker.  These are days filled with tragedy, grief and despair.  We must do our best to change that.  We have had bad days like this before.  I have been thinking of April the 4th, 1968, when New York's Senator, Federal Senator, Robert F. Kennedy - whose hometown was my hometown of Glen Cove - was speaking to a group of black Americans in Indianapolis when he first learned that Dr. King had been murdered.  His heartfelt words resonate as much today as they did with Americans, myself included, on that day of seeming hopelessness.  *My favorite poet*, Kennedy said, *was Aeschylus,* who long ago wrote, *In our sleep pain which cannot forget falls drop by drop upon the heart until, in our own despair, against our will, comes wisdom through the awful grace of God.*  But wisdom that has come from our grief is the same today as when RFK said it.  And these are his words:  *What we need in the United States is not division.  What we need in the United States is not hatred.  What we need in the United States is not violence or lawlessness, but love and wisdom and compassion toward one another, and a feeling of justice towards those who still suffer within our country, whether they be white or they be black.*  There's another piece of wisdom for us here.  We must all stand together for a more perfect union.  Our battle - and this has been expressed by colleagues on both sides of the aisle - our battle is for justice, and each and every one of us - black, white, brown, Christian, Jew, Muslim, Sheikh, Atheist, and those of us who are in law enforcement and those of us

189

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

who are not in law enforcement - must all be in this together.  The great disparities in justice that confront our nation today will not be remedied by any of the bills that address law enforcement that we will pass here in these days.  I, for one, fear that we deceive ourselves believing otherwise.  The police cannot be the scapegoats for the injustices of our society.  Our battle must be for justice, for housing, for healthcare, for education.  Our battle is also to make sure that each of us become anti-racists.  These were Bobby Kennedy's words on April the 4th, 1968, and sadly, we would lose him only two months later.  In his words, *Let us dedicate ourselves to what Aeschylus wrote so long ago, to tame the savageness of man and make gentle the life of this world.  Let us dedicate ourselves*, he went on, *to that and say a prayer for our country and for our people.*  Yes, today, let us say a prayer for our country and for our people.

I will vote in the affirmative, and I want to thank Assemblymember O'Donnell and Speaker Heastie.  Finally, let's remember Bobby Kennedy and let's tell it like it is.  *Let us stand together.  If we don't, our nation will fall apart.*  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Joyner.

MS. JOYNER:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill.

MS. JOYNER:  I would like to commend the leaders of both Houses and the Caucus for advancing these pieces of

NYS ASSEMBLY                                      JUNE 9, 2020

legislation.  In the words of Sam Cooke, it's been a long, long time

coming.  But change is going to come.  The world can't wait for

perfect.  But do we look at the end of the Jim Crowe laws and the

Civil Rights Movement as a failure because it didn't end racism?  No.

Today we are seeing transparency matters.  Accountability matters.

Participation matters.  And many of these bills have lingered around

for years, but the political will -- the will of the Majority said no

longer will we wait.  So I encourage everyone, keep the same energy

on this issue and all of the issues that will continue to uplift our

communities.  Martin Luther King said, *Darkness cannot drive out*

*darkness.  Only light can do that.  Hate cannot drive out hate.  Only*

*love can do that*.  So we are not eliminating racism today, but we are

saying to our communities, *Your voice matters*.

       So I'm looking forward to voting in the affirmative

for this piece of legislation and those that will follow.  Thank you.

       ACTING SPEAKER AUBRY:  Thank you.

       Ms. Bichotte.

       MS. BICHOTTE:  Thank you, Mr. Speaker.  Will the

sponsor yield?

       ACTING SPEAKER AUBRY:  Mr. O'Donnell,

you've been asked to yield.

       MR. O'DONNELL:  With pleasure.

       ACTING SPEAKER AUBRY:  Mr. O'Donnell

yields.

       MS. BICHOTTE:  Thank you.  Mr. O'Donnell, it says

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

that -- in this bill on Section 2, line 9, the definition of technical infraction means a minor rule violation by a person employed by a law enforcement agency as defined in this section as a police officer, peace officer, firefighter or fire -- or firefighter/paramedic, solely related to the enforcement of administrative departmental rules that do not involve interactions with members of the public, are not of public concern, and are not otherwise connected to such person's investigative, enforcement, training, supervision or reporting responsibilities.  So as we're talking about redacting records pertaining to technical infractions, does that include internal administrative procedure (unintelligible) supervisions, like a supervisor giving the subordinate orders and how to perform their duties?  And -- and -- and -- and let me just expand a little bit just so you know where I'm coming from.  In New York City there were 12 black and brown police officers who sued NYPD for fighting against an illegal quota system which was literally racially targeting specifically minority communities.  These are things that obviously were found unconstitutional by the court.  This was ordered internally.  This was an order by supervisors which are internal practices not dealing with the public, right, but eventually have an impact interacting with the public.  So again, my question is in that sense, does this include these type of management and supervision, and would they -- and would they be considered unsubstantiated if there will be someone to evaluate the situation?

　　　　　　　　　　MR. O'DONNELL:  So, Ms. Bichotte, that was a very

NYS ASSEMBLY                                      JUNE 9, 2020

long question.  I want to make sure I understand it correctly.

Obviously, if what you're saying is somebody internally ordered a

police officer to do or not do something that ended up with those

officers interacting with the public, then it would not be viewed as a

minor violation.  Because of paragraph -- excuse me, not paragraph --

because of line -- line a.  So a technical infraction cannot be an

interaction that ends up involving with interaction with members of

the public.  So if someone ordered officers to or to not do something

that ended up with interactions with the public, they would not be

considered technical.

      MS. BICHOTTE:  Good to know that.  Next question

is, you had mentioned about racial profiling complaints and they were

found un -- unsubstantiated.  Is that true?

      MR. O'DONNELL:  I'm sorry, you're going to have to

repeat that.  I what?

      MS. BICHOTTE:  Racial profiling complaints.  You

mentioned that they were found unsubstantiated.  Is that true?

      MR. O'DONNELL:  I have been told as a factoid that

the CCRB has found zero percent of their complaints about racial

profiling to be substantiated, which suggests to me that their processes

for substantiation are both flawed and inaccurate.

      MS. BICHOTTE:  Okay.  You had answered my next

question.  So, why do you believe that it was flawed and inaccurate?

Why?  Why do you think?

      MR. O'DONNELL:  Because I don't believe there's

any way for -- for thousands of complaints to result in zero percent substantiation.  Some day, some time, must have been.  So if you can't -- if you never find any case that's substantiated, you're either looking the wrong way, asking the wrong questions or applying the wrong standard.

MS. BICHOTTE:  Okay.  So, Mr. O'Donnell, you know that this House had recently passed a racial profiling bill, correct?

MR. O'DONNELL:  That's correct.  And I was very proud before you arrived to be a cosponsor with my dear friend Mr. Wright who used to carry that bill, and I would help him debate that bill here on the floor.

MS. BICHOTTE:  Thank you.  And thank you for being a cosponsor.  And in that bill, the basis of the bill, obviously, was -- is to collect data on every stop, question and frisk.  Now, just so you know, Mr. O'Donnell, this bill was only passed here in the House, okay?  The -- the bill -- the companion bill was not passed in the Senate.  They had a different version that didn't collect data.  So my question to collecting data, do you think if in the event that we passed the same bill, the companion bill, 4615-A and S.1137-A, and that it would require for police officers to fill out a form and the Division of Criminal Justice Services collect that data, okay, do you think that would help these complaints that come through to be substantiated?  Do you think so?

MR. O'DONNELL:  Not only do I think so, I'm fairly

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

certain -- and I've been corrected, it's the NYPD that investigates

racial profiling, not the CCRB.  I got my letters confused, I apologize.

        MS. BICHOTTE:  Okay.  Thank you about that.  So

the question is, also, so, you know, we were told that, you know, we

could not do both bills.  You know, it was either 50-a or racial

profiling.  And I guess there was some confusion.  Maybe they

thought 50-a would take the place of racial profiling.  I don't know.

Why -- why do you think so?  Why do you think there were police

unions who didn't want us to have both the repeal of 50-a and to pass a

racial profiling bill with data collection?

        MR. O'DONNELL:  It seems like you're asking me to

explain racism in America, and I'm going to choose not to do that and

to defer to someone who probably has more experience about that

than I do.

        MS. BICHOTTE:  I think -- I think one of the things

is that every bill that we're passing is not enough on its own, okay?

And we're here today, this week, to pass a comprehensive set of bills,

and I -- I believe that if we are data collecting from the police officers

and we are data collecting and exposing disciplinary actions with

50-a, with the repeal of 50-A, I think it would give more evidence of

the reality of what's happening, okay?

        MR. O'DONNELL:  Absolutely.  And that's the way

it's done in other states.  And it seems to me that repealing 50-a is the

first step to get the data necessary that we need to do the other work

we need to do.

195

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

MS. BICHOTTE:  Good.  I just want you to -- I have another question in terms of FOIL.

MR. O'DONNELL:  Okay.

MS. BICHOTTE:  The Buffalo -- the Buffalo Police Department has been under scrutiny for their culture of misconduct, okay?  And I don't know if you know, but the New York Civil Liberties Union had filed a lawsuit against the Buffalo Police Department after they refused to fulfill the FOIL request.  And, you know, it was on -- information on policing, stop and frisk, temporary detention, surveillance, technologies, things of that nature.  How a stun gun is being used, Taser weapons.  What they found is that after a few months, almost a year, the Department only provided one-fourth of the 39 categories of -- of records requested.  Under this bill, if NYCLU were to request data, would the -- this bill have any impact on getting that data that they've been fighting for for so many years?

MR. O'DONNELL:  This bill will provide a mechanism to prevent entities or the PBA to claim that any of the information in that data is not able to be turned over.  Once again, in reference to an earlier question, if you ask for way too much data, you're going to end up waiting a hell of a lot longer to get it.  It seems to me that what -- with today's repeal of 50-a, the FOIL process will be further scrutinized to ensure that the data that we are trying to make sure is available to the lawyers, to the public, to the press actually becomes available.

MS. BICHOTTE:  Thank you, Mr. O'Donnell.  I

**NYS ASSEMBLY**                    **JUNE 9, 2020**

appreciate it.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. BICHOTTE:  First, I want to thank my colleague - and I'm going to say his name, Mr. O'Donnell - for -- for being bold. For being bold, for introducing this bill and -- and fighting for this for all the years and -- and being on the front line of police reform.  This bill disclosure of law enforcement disciplinary records, it repeals the Section 50-a of the Civil Rights Law which was a law that was put in place since 1976.  The bill would repeal that section, but it would still protect personal records of the law enforcement, not putting the officer's safety at risk.  And as I mentioned, while I fully support the repeal of the 50-a as a standalone bill, it doesn't go far enough.  It's a bold bill, but it -- it needs to go a little bit because of the concerns of the internal practices.  Now, I was very happy to hear from Mr. O'Donnell that anything that can lead to the interaction with civilians would not be under the meaning of a technical infraction.  Okay?  So I'm -- I'm very, very happy to hear that.  Now, we all know about the NYPD 12, the 12 black and brown officers who sued NYPD because they were being forced to racially target communities of color, to over-police and to fill a quota.  Cops in New York City merits for a very long time was based on how many black and Latino people would be issued a warrant, which led to the disproportionate of black and brown men, in particular, in Rikers and prison for alleged low-level crimes, many of who -- who've been innocent.  With police

197

NYS ASSEMBLY                                      JUNE 9, 2020

policies like Broken Window, which place like Ferguson where --

where like Ferguson adapted, where Michael Brown's death started

the whole Black Lives movement.  That's been an issue for a very long

time.  Now let's think about this for a minute.  The documentary

called *Crime + Punishment* won an Emmy by the way, where

(unintelligible) whistleblowers swarm in because they thought that

they (unintelligible).  And when you hear the recording of these

supervisors and their racist comments and their racist orders to

racially profile and target minority communities very, very

disappointing and very disturbing, which is why I'm happy that, under

this bill, they will not be covered under the technical infractions.

Okay?  And I'm also happy that whistleblowers will be protected, and

that they don't have to file a lawsuit to be protected.  And these cops,

that's what they did.  They had to file a lawsuit and they were

protected.  Furthermore, when we're having all of these complaints

from civilians, I'm happy to know that there are different means of

determining if they're substantiated. I'm happy to know that

unsubstantiated will be also open to the public.  I believe we can all

agree that we have a problem with the method in which law

enforcement is being executed in minority communities.  Whether we

are all -- whether we all want verbally admitted or not.  We must bring

an end to the loss of lives.  The mental anguish, the physical

dysfunction and the broken families.  George Floyd's death, through

excessive neck compression, did not have to happen.  Eric Garner's

death, through strangulation, did not have to happen.  Aaron Bailey's

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

death from bullets from -- following a traffic stop did not have to happen.  And it goes on.  We need comprehensive police reform to correct the long and deep-rooted bad relationships between minority communities and the police force.

ACTING SPEAKER AUBRY:  Ms. Bichotte, your time is up.

Ms. Simon.

MS. SIMON:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. SIMON:  I'm old enough to remember the 1970s and the movement for open government.  In 1974 New York passed this Freedom of Information Law - or FOIL as we call it - and expanded it in 1977 to, I quote, *achieve the greatest magnitude of openness in government without sacrificing personal and privileged information, and to help instill in the citizens of the State greater trust and confidence in the governmental institutions which are playing an increasingly important role in our daily lives*.  But in 1976 we also passed Civil Rights Law 50-a to prevent the so-called harassment by criminal defense attorneys who sought to impeach police officers' testimony with unsubstantiated prior bad acts.  And therein lies the issue.  50-a was turned on its head and used to shield officers from accountability for substantiated bad acts, and that is why I've proudly cosponsored this bill since 2016.  50-a was never intended to block disclosure of police misconduct from the public, but that is what has

199

happened again and again and again.  The public was largely unaware of 50-a until Eric Garner was killed at the hands of an NYPD officer, and we all saw how it both shielded the officer from public accountability and impeded racial justice.  The public saw how the Garner family's efforts to obtain Officer Pantaleo's disciplinary records through FOIL were denied, citing 50-a.  The public saw that the NYPD seemed to prioritize the protection of police misconduct.  The misconduct that we all saw on video over the public and further dividing communities of color from the police who swore an oath to protect and serve them.

Today, I am proud that we will right this terrible wrong and let the sunshine in.  For as Justice Brandeis has told us, *Sunlight is the best disinfectant.*  I want to thank Speaker Heastie and Majority Leader Peoples-Stokes for their unfailing leadership and commitment to justice.  I want to commend the sponsor of this bill for his zealous advocacy for the repeal of 50-a.  And I want to thank most especially the families and friends of victims of police misconduct, the advocates and my colleagues of color who have fought so hard to repeal 50-a for so long.  I also want to highlight the work of the New York State Open -- Committee on Open Government, who have been bringing to light the issue of surrounding 50-a for many years.  And, yes, I even want to thank the more than 6,000 people who e-mailed me and tweeted at me and called my office since the murder of George Floyd, demanding the repeal of 50-a.

This week, I have been voting with my colleagues for

NYS ASSEMBLY                                    JUNE 9, 2020

justice.  On this repeal of 50-a, I will again cast my vote for justice and I will vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Lentol.

MR. LENTOL:  Thank you very much, Mr. Speaker. First of all, I want to thank Mr. O'Donnell for, once again, leading us down a path to get some equality in our system.  I don't want to be repetitive with what's already been said, but I know in my own heart that the horrific killing of George Floyd is a reminder to me and everyone else that racism and inequality continue to exist in our society.  And, once again, it's blown open the doors of frustration that we saw explode into the streets for a number of days now.  Protesters have been out there raising their voice for change and reform.  And that's why we're here.  The people got ahead of us, like they always do.  And they've actually moved on, as a matter of fact.  They're already past 50-a.  But we're working through the emotions that they have worked through themselves and it's important that we acknowledged and heard their pleas for change.

You know, the virtue of good government has always been to promote transparency and accountability, as so many have already said.  And that is exactly what we're doing here today by the repeal of 50-a.  And that will help restore the public trust in law enforcement, I believe.  And we have real momentum now by enacting this.  Maybe it doesn't go far enough, as some have suggested, but we can do more.  And we have to follow the people,

201

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

like we always do, and see what they say about change, and listen to the people and get it done.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, Mr. Lentol.

Ms. Davila.

MS. DAVILA:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, Ms. Davila.

MS. DAVILA:  I've been listening to all of my colleagues today, and every and each of one had so many great points. But the bottom line is that this bill, it doesn't go far enough.  People want us to pass it, the sponsor of this bill is magnificent; thank you. But I want to say that this is the only thing that we have at the moment.  Right now, we have to bring some type of solace and peace into our communities.  We need to bring hope.  And with that said, that's why we're all here.  We're going to pay -- pass legislation that is going to bring hope.  Systematic problems are going to be systematic, and we have to continue to chip on that blue wall.  We have to continue.  It's not perfect, but it's what we have right now.

And I want to also commend the Caucus members for -- for being so present in that, getting all of the bills that were passed, and we have so much more to go.  But I'm going to be voting in the affirmative because I want to bring some type of peace to those mothers that have lost their children to -- to all of this violence that is

NYS ASSEMBLY                                   JUNE 9, 2020

completely unnecessary.  No one is above the law, only God Himself.
And with that said, I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Seawright.

MS. SEAWRIGHT:  Thank you, Mr. Speaker.  Like
most New Yorkers and most Americans, I'm deeply distressed by the
shocking television images of violence in major cities across the
country, including here in New York State.  A couple of days ago, I
joined the protesters marching up York Avenue in front of our
community office here in Yorkville.  New York State currently has the
most restrictive law in the country regarding transparency.  I want to
thank the Speaker and commend the bill sponsor, Chairman Danny
O'Donnell, for fighting year after year after year to get this legislation
passed.

And I have a -- a question for the bill's sponsor.
Given the culture on college campuses, what impact do you think that
the repeal of 50-a will have with university police on our campuses
around the State?

ACTING SPEAKER AUBRY:  That is a question for
you, Mr. O'Donnell.

MR. O'DONNELL:  Thank you, Ms. Seawright, it's
lovely to see you.  I believe that they're covered -- they would be
covered under the new FOIL statute.

MS. SEAWRIGHT:  Okay.  Thank you.  These are
terrible tragedies on a long list --

**NYS ASSEMBLY**                                                    **JUNE 9, 2020**

MR. O'DONNELL:  Yes.

MS. SEAWRIGHT:  -- and a long history of the people that have died, and I believe that repealing Section 50-a will go in a long way in ensuring justice is served for the victims of police misconduct in New York.  And, again, I thank you, Chairman O'Donnell, for sponsoring this important piece of legislation.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Abinanti.

MR. ABINANTI:  Thank you, Mr. Speaker.  Today we face a dual crisis, a pandemic and an epidemic, a worldwide health crisis and a nationwide moral crisis.  The health crisis is the result of a failure of nations to prepare for what we have known for years was coming.  The moral crisis is the result of our nation's failure to confront the racial injustice that has plagued our country from its very beginning.  Both are devastating our brothers and sisters in our minority communities.  At the same time, both are intensely impacting all of our communities.  The response to the COVID crisis was to shelter and socially distance.  Remarkably, the response to the moral crisis has been to bring people together, to have them unite.

In my district, the 92nd District, there have been eight rallies stating very clearly that Black Lives Matter.  Eight rallies in the 92nd Assembly District.  Black and white, rich and poor, young and old.  And it was heartening to see so many young people out on the street standing and yelling and saying, *It's time for change*.  And interestingly, they all targeted 50-a as -- as the symbol of the need to

204

change a system that has empowered police misconduct.

So, I'm speaking now on this bill, the repeal of 50-a, but this is an important measure, but it's also a symbol for all of the legislation that we've been working on, some of which we passed yesterday and some of which we're passing today.  I have found that I have received more e-mails, somewhere in the neighborhood of 1,500 e-mails calling for the repeal of 50-a.  We've received telephone calls, people stop me at the rallies.  As I said, 50-a has become the symbol of what needs to be done.

But I support this legislation not only because of my district, but because it's the right thing to do.  It provides a shield for information like only two other states have done, way too much of a shield.  And I can't figure out the rationale for the shield.  All I've heard during the debate was it protects law enforcement officials from possible ridicule.  On the other hand, Mr. Speaker, what I see is that it facilitates secrecy, it facilitates bad decisions on personnel matters and it prevents real scrutiny by the public of personnel decisions.

This is not only about New York City.  We have communities of all sizes and police departments of all sizes, and those communities have a right to know what their local officials are doing, how they're evaluating their law enforcement.  They have a right to look over the shoulders of their local officials and see who they're disciplining, who they're keeping on their police departments, who they're letting walk down the street with a badge and a gun.  And when we do away with 50-a, they will be able to continue that scrutiny

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

day after day and make sure that their local officials are making the right decisions. And those bad decisions, unfortunately, as we have heard over and over again have had severe impacts. As I've said before, they're devastating our brethren of color.

This disclosure that we're talking about here is only one piece, but it's a very important piece. We're talking here, Mr. Speaker, not just about bad cops. Some cops just don't have the temperament to carry a gun and a badge and go confront a protest, or to stop people on the street and maintain their cool. Some just don't deal with those circumstances the way they should. And so, it's not just about substantiating complaints, it's about a history. And those who are watching carefully will see a pattern emerge, and that's where the local law enforcement officials have to look over the shoulders of their other law enforcement officials and make the right decisions. Those who misuse their power, Mr. Speaker, have not only hurt those upon whom they wreak violence, but have also betrayed those who appointed them, their communities, and they've betrayed their fellow officers. So this package was long-needed. It's unfortunate that we needed a series of tragedies to spur us to action.

In 19 --1963, Martin Luther King spoke of his dream to erase the divisions between black and white people. But in 1968, his vision changed. He saw his dream was not possible unless he confronted two dual threats: White supremacy and economic inequality. One of my colleagues a moment ago referred to a speech by Robert F. Kennedy, also in 1968, and I'd like to refer to that speech

206

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

as well, because Kennedy spoke of social injustice as a kind of violence.  He termed it, *A slower, but just as destructive type of violence.  The violence of indifference, inaction and slow decay.  A slow destruction of a child by hunger.  Schools without books and homes without heat.*  And just the other day, Barack Obama, President Barack Obama, noted that we have to remember that for millions of Americans, being treated differently on account of race is madly normal, whether dealing with the health care system or the criminal justice system, or just jogging down the street.

And so, we've seen police violence erupt again. We've seen police misuse the power and the weapons that we have given them to protect us.  But, Mr. Speaker, police violence is only the latest reminder that the seeds of hate are spreading like weeds, growing in the minds of the weak, the ignorant and the desperate. And they're being fed, they are being fed now by a man in Washington who wreaks political and economic harvest by cultivating division, anger and hate.  A man who now controls the most powerful machine in the world, the United States Government.  And from the White House, he spews hate and encourage hate -- encourages hatred.

Now, I cannot speak from personal experience about the hurt caused by the twin evils of which Martin Luther King spoke. But I can speak about the America that I want to live in, where I want my kids and my grandchildren to grow up, where hatred is not a dominant emotion and poverty is not a permanent condition passed on from one generation to another.  And so, what I have said at the rallies

207

that I've gone to is that we have to remember what the Greek philosopher Plato said 2,500 years ago when he said, *The price of apathy towards public affairs is to be ruled by evil men*.  And so, we need to encourage all of our citizens not to be satisfied with what we do here in the Legislature, but to educate, to motivate and activate people of goodwill everywhere, and that's the vast majority of our country, but to bring them together to recognize the danger that hate poses to our way of life, and to promote hope, respect and cooperation.  As Michelle Obama recently said, *If we want to hope to -- if we want to -- If we ever hope to move past racism, it's up to all of us, black, white, everyone, to look, to do some self-examination and listen to those whose lives are different from our own*.

        So, Mr. Speaker, we've got to go out and make sure everyone understands that we stand together for American values, social and economic fairness for all, and we need all of our governments at all levels to send the message that acts of hatred, whether committed by police officers or whoever, are unacceptable. And this package, I believe, will motivate and facilitate governments all across New York State to move forward, to examine what it is they're doing, what their police officers and other officials are doing, and to do the right thing.  We cannot say that All Lives Matter if we don't say that Black Lives Matter.

        So, Mr. Speaker, I think we can move forward.  I think this Legislature is leading the way, but we can only move forward if we move forward together.  Together, we have hope.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Together, we will not fail.  I want to end by commending the sponsor and the -- the Leaders of the Legislature for putting these bills before us and for pushing for passage.  I think we're going the right way. We're not going to solve all of the problems, but we're taking some big steps and we're sending a message that hate, whether it's by someone with a badge and a gun, or someone else on the street who decides to shoot up a church or go into a synagogue is not acceptable, and it's particularly not acceptable when the person is acting on behalf of the community with a badge and a gun.

     Thank you, Mr. Speaker.

     ACTING SPEAKER AUBRY:  Thank you.

     Ms. Niou.

     MS. NIOU:  Thank you, Mr. Speaker.  I was wondering if our amazing sponsor of the bill would be willing to answer a couple of questions for me.

     MR. O'DONNELL:  Of course, yes.

     ACTING SPEAKER AUBRY:  Mr. O'Donnell yields, Ms. Niou.

     MS. NIOU:  Mr. O'Donnell, thank you so much for taking the time.  I know you must be very tired standing there today.  I just wanted to say, again, thank you, but I wanted to ask a couple of questions that some folks may have already asked and, also, I know that you have been answering, but I just wanted to clarify.  And the other speaker before me had just spoken about this, but how many other states have this special protection for their officers and their law

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

enforcement?

MR. O'DONNELL:  There are currently only three: The State of New York, the State of Delaware and the State of California, which requires an asterisk.  California used to have a bill just like ours.  In 2018 the Legislature attempted to modify it, which has been an utter failure, and that is why I didn't attempt to modify, I went for full repeal.

MS. NIOU:  And so bringing that up, you've -- you've sponsored this bill for five years now.  Why did you sponsor this bill in the first place?

MR. O'DONNELL:  At a hearing I attended, the Governor's Committee on Open Government came and said, *If you want transparency then you must repeal 50-a*.  Additionally, some of this is known, I did not have an easy or happy childhood and the pain -- when people experience pain resonates with me.  And so, the mothers of the people who have died at the hands of the police who attended such hearings literally broke my heart.  And so, it was clear to me that it required -- transparency required repeal, and humanity and decency required it, too, that's why I did it.

MS. NIOU:  Thank you for sharing that with me and with all of us.  I -- I also wanted to ask, you know, because you're -- you're talking about transparency and you're talking about needing that to make change.  But this bill, it doesn't change any disciplinary procedures, right?  It doesn't -- or make it so that there's any -- any more likely for any officer to suffer any other consequences that are

210

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

different, right?

MR. O'DONNELL:  This bill merely repeals 50-a and sets up the structures so that FOIL can be used for police officers.  It does not change their ability to be fired, it doesn't change their union contract, it doesn't do any of those things.  Although, I would be shocked if having access to all this information doesn't end up leading to some changes in those areas, as well.

MS. NIOU:  Thank you so much.  I really appreciate all of what you -- what you just said because I think that you're right.  I think that, you know, that transparency is such an important first step because it might be the thing that leads to all of the things that -- that are -- it would bring more visibility, I think, to a lot of the things that are wrong that are happening.  Do you believe that, I guess, that this -- that this piece of legislation is long overdue?

MR. O'DONNELL:  (Laughter)  Yes.  I think since 1976, this law has been abused and misinterpreted over and over again, and I think it's long overdue for it to be repealed.  And I'm very proud that the word "repeal" is in the statute, because it was very important to me.

MS. NIOU:  Thank you for sharing that.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, Ms. Niou.

MS. NIOU:  I believe that we are long overdue for police reform in this country and that New York State should take the

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

lead.  Incident after incident of police brutality, murder and institutional racism has eroded the trust between law enforcement and communities of color.  Having the repeal of 50-a will -- will bring transparency for folks and -- but I also believe that nothing short of systemic reform can really begin rebuilding that trust.  We don't have a broken system and we don't have a system that is needing fixing or patching, because our system is working exactly the way that it is designed, and it is designed in a way that is racist.  It is designed racist.  And -- and only reforming all of our systems can we actually have real change.

And you know, I am the only Asian-American woman in the entire New York State Legislature.  And -- and we also feel this aching pain in our communities, and we need to stand up in solidarity with our black and brown communities because -- because as other speakers have said, silence is violence.  And so, we need to make sure that we are -- we are speaking up.  We have, as a country, a justified rage at the racist violence that has taken the lives of so many people, the lives of George Floyd, Breonna Tailor, Ahmaud Arbery, Eric Garner, Trayvon Martin and so many others.  The horror at this ongoing violence and hurt has caused trauma for so many people for so long that it has become normal.

And I think that, you know, we don't have all the answers here today, and we also know that we have to do things better and we're asking for solidarity.  We're asking for action and we've -- we've, you know, we've -- we've fought for those things, but I think

NYS ASSEMBLY                                      JUNE 9, 2020

that what we need to do is we also need to make sure that we have an ability to make sure that we are acknowledging what's right in front of us. And it's that, you know, and I'm going to take the words from my friend, Christine, and I'm going to say that, you know, right now this piece of legislation is a step forward. It gives us eyes, but it doesn't give us teeth.

And so, I think that it's really important that we are also keeping in mind Martin Luther King's words, right, that, you know, we could take the first step in faith, we don't have to see the whole staircase. And I think that, you know, we can move forward, we can take these first steps in faith and I think that, you know, it does give us the tools to be able to look to see what are those systemic things that are consistently, you know, hurting all of us. And we need to make sure that we acknowledge that as we make these changes, that we ask those questions of who we want to be as a country, who we want to be as a State and, you know, is this the future that we want for our generations to come? Because we have to do the essential work right now to dismantle racism, to dismantle a deeply-rooted system of institutional racism that deprives people of color of equal rights. And we have to say it out loud that as black Americans are fighting for all of us, we have to fight for them.

You know, we, as a legislative Body, have to recognize that our rights, or liberties, our freedom are all tied together and -- and it's time for our legislative Body to stand in front of and for black and brown bodies. So, thank you so much, Mr. Speaker.

213

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  Thank you.

Ms. De La Rosa.

MS. DE LA ROSA:  Thank you, Mr. Speaker.  I want to -- on the bill, please.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. DE LA ROSA:  Well today, as we already heard, George Floyd's family is laying him to rest.  And today, a daughter is saying goodbye to her father, whom she declared to the world has changed the world, all because a police officer viewed his life as disposable.

Violence has been inflicted on our communities consistently.  Racial disparity and discrimination and violence cannot continue to be the only constant for people of color.  People have taken to the streets across this nation, because the streets do belong to the people.  They are tired and rightfully angry.  I say, let them march if it will move us towards change and if it will move us towards justice.  We need everyone to understand that the experiences of people of color at the hands of law enforcement in America, what those experiences are.  If you have not had that experience, a negative experience, then realize that you stand in privilege.  But do not minimize the experience of those that have suffered, of those that have felt the pain of discrimination and racism.

Repealing 50-a today will begin to deliver justice for all of the black and brown mothers who have lost their children on the streets of America.  For those black and -- and brown mothers who

214

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

have seen their children die due to the sin of racism.  Today, I look forward to voting in the affirmative when the time comes, and I -- but I also implore us to look at this as just one stop on the road to justice. We must also look at the treatment of those individuals who are incarcerated and bring compassion and dignity for the lives of those who languish behind prison walls.  Today, I also reclaim justice for those lives who have been lost in custody.  We uplift their names in this moment, as well.  We uplift the names of Kalief Browder, Layleen Polanco, Leonard Carter, Benjamin Small, Valerie Gaiter and James [sic] Floyd.  For them, we must continue to do the work of bringing justice for our communities.

I also want to thank the Speaker for his leadership in this moment, his uncompromising leadership and his uncompromising commitment to justice.  I also want to thank the sponsor of this legislation, who I personally know to be a man who believes in equality, a man who has fought his entire career to make sure that the voices of those that have been marginalized come to the forefront.  I feel proud to stand in this Chamber today as his colleague.  And I -- and I hope that as we see everything that is happening in our communities, we take this moment of tragedy as a -- also as a moment of education of mobilization so that change can continue to come for our communities.  The ugly legacy of racism in America cannot be the legacy that we leave for our children tomorrow.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

On a motion by Mr. O'Donnell, the Senate bill is

NYS ASSEMBLY                                    JUNE 9, 2020

before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 67.  This is a Party vote.  Any member wishing to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the number previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This is a Party vote.  The Republican Conference is in the negative on this particular bill.  Those Republicans who would like to vote yes are encouraged to contact the Minority Leader's Office right away.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, this will be a Party vote in the affirmative.  And, likewise, should a member decide that they'd like to vote in the negative, they can contact the office, we'll be happy to record their vote.

ACTING SPEAKER AUBRY:  Thank you both.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes to explain her vote.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker, for the opportunity to briefly explain my vote.  I want to commend the sponsor here, and I certainly want to commend the Speaker for allowing this to get to the floor.  But I want to commend the sponsor because he and I were in the same room when the Office

216

of Open Governments came in more than once to Government Ops Committee and said that this legislation needed to be repealed. It was the only piece that did not provide for FOILs across the State in a fair and equitable manner. And so, I appreciate that he took that information and put it into legislation and finally, we're in a position where we can have it on the floor and get it approved.

The thing that distresses me most about this whole debate that I've been listening to all day is people keep talking about this is some -- this is against somebody. This is not against anybody. This is for some people. This is for many mothers, grandmothers and parents who, quite honestly, look like me. It's for them. It's not against anyone. And, clearly, transparency is one of the most important core values that we have when you have a relationship between the community and public servants. Commitment to transparency is something that we hear on a regular basis from the good government people and from the public. How can we allow anybody that earns a public dollar as a public servant, much like we are, to not be transparent in how they perform their work, to not be transparent and accountable in how they perform their work on the public dollars that taxpayers pay for. We have to do this, Mr. Speaker.

So, again, I want to commend all of my colleagues for all the great words that were said today, but let's just keep in mind that we can't legislate morality, but we can tell people who we hire as the public that they have to be transparent about the way they do their job.

**NYS ASSEMBLY**                              **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes in the affirmative.

Mr. O'Donnell.

MR. O'DONNELL:  What a day.  It's been a very long day and it's allowed me to do a lot of reflection about how it is that we are here and how it is that I came to think and believe what I think and believe.  I grew up in a segregated community.  There were no people of color where I lived.  People of color who are like Mr. Ramos were sent to Brentwood, where he lives.  People of -- people who were black were sent to Central Islip.  And at 17 years of age, I went to college in Washington, D.C., in a majority black city, and my education began.  Many friends, many, many friends, were guests at my wedding after all these years, have taught me a lot about what their life was like that was different than the life that I had had.  It wasn't such a happy life I had, but I -- it was a life of privilege, I came to be aware.

I went to law school back in New York and Eleanor Bumpurs was murdered while I was a law student.  And it took my breath away, how could this be happening here and now?  When I came -- became a public defender in Brooklyn during the crack years from '87 to '95, I spent a great many hours reading and trying to get -- figure out police reports and police information.  And the stories I can tell, the stories that could go in a book about the information that was withheld, the lies that were told, the misrepresentations.  I once had a police officer admit to perjury while testifying.  And when I would tell

218

my friends that, they would say, *Well, was he arrested?*  No, he was

not.  He was not arrested.

             In the end, we have to fight for justice.  You have to

acknowledge your own privilege.  If you don't acknowledge your own

privilege, you're never going to come around the bend.  So let me start

with thanks.  Thank you to my Speaker, Mr. Carl Heastie.  Thank you

to my Majority Leader, Mrs. Peoples-Stokes, for allowing me the

opportunity to do this.  Thank you to the staff:  Mr. Suggs, who sat in

silence for the last eight hours, Lou Ann Ciccone, Kathleen O'Keefe,

who allowed me to pester them for five weeks.  Thank you to the

members of the Caucuses - Ms. Wright, Ms. Davila, Mr. Kim - who

all stood with me when I made this case.  It's not lost on me that you

got yourself a fat gay Irish guy fighting against [sic] this -- this bill,

but I believe in it with all of my heart.

             And let me be very clear to members of the other

side:  There is not a bone of hatred in my body towards anyone.  This

was not written out of hate, that's not what this is.  It is an attempt to

level the playing field.  It is an attempt to get information into the

public.  And I know enough to know if you don't include

"unsubstantiated claims", as have been discussed, that information

will be filed away by the NYPD as it -- as if it never existed.

             So, we take one step forward today on transparency,

we allow people some degree of peace.  And to the mother of Eric

Garner, whose heart was broken, who still doesn't know as much

information as the family of Mr. Floyd, may I just say that justice

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

denied -- justice delayed is justice denied.  Perhaps this is a minor, minor step forward.  I'm honored today to be a member of this Body and I'm honored for all the yes votes on that board.  Thank you very much.

ACTING SPEAKER AUBRY:  Mr. O'Donnell in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Today, we have heard many eloquent speakers on both sides of the aisle, including my colleague, the sponsor.  And for those thoughtful comments, I am indeed grateful.  I'm extraordinarily thankful that in my Assembly District, the protests have also been attended by the police chiefs and the county sheriffs.  And the message has been two-fold:  The message has been racism is inappropriate; what happened was horrific; we should stand up in solidarity, in opposition of that.  But the message was also one of respect and thoughtfulness. And for that, I am deeply thankful.

I'm mindful that all of us are children of God.  And if we're God's children, then each of us is entitled to that respect because we're all part of the same family.  And I'm painfully aware that in the last few years, 50-a has been abused, as was pointed out by one of my colleagues, and expanded well beyond how it had been interpreted for the 40 previous years.  And so, here we are today to make statutory changes.  And one of the most difficult and challenging things we have as a Legislature, especially when we have a very contentious and

220

NYS ASSEMBLY                              JUNE 9, 2020

emotional issue and we all feel so strongly about the need to stand up against racism, is to act in a thoughtful, careful and balanced way.

Unfortunately, this bill, in my opinion, goes too far. We need to reform 50-a, I agree.  But what we're doing is we're allowing claims that were determined to be false, or untrue, or malicious, or unfounded to be -- to be available in the public, and we're doing nothing to protect the good reputation of our officers for unfounded claims.  And so I hope as we move forward that we look for a way to protect our officers against false, malicious, abusive claims while still ensuring transparency and openness in government. Thank you so much, sir.

ACTING SPEAKER AUBRY:  Mr. -- Mr. Goodell in the negative.

Mr. Ortiz.

MR. ORTIZ:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I have heard so much about the debate here today from one side to the other and this is -- this bill main objective, Mr. Speaker, is to give accountability.  To give accountability on those unscrupulous police officer who doesn't follow the rule.  Plain and simple.  We all can tell our stories, and I will tell you my story as an elected official.  I have been stopped by police officer and I have been stopped by police officer not only one day, but he called three other cops while they stopped me to search my car, for whatever reason, and they don't have no warrants.  I asked them what is the reason behind.  My son has been stopped many times.  My daughter

221

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

has been stopped, as well.  So we know how intimidating it can be by being stopped by a police officer, by being talking to a police officer and trying to ask questions to a police officer that at some time, they developed some kind of attitude behavior that they -- that we don't have the right to ask questions.  And when you follow up that police officer and look into the past of that police officer, it's very difficult to figure out if that police officer really have some kind of disciplinary action that happened to this police officer.

What I will tell you that I did follow one police officer and I find out that this police officer had disciplinary actions.  Not only had disciplinary action, was taking away from my precinct and sent into another precinct in some place else.  That's not a way to move our police officer from one precinct to another.  What need to be done, Mr. Speaker, is that we need to go to the culture of the problem.  The culture of the problem is how our police officer have been trained, how that cancer has been developed and we want to stop that cancer and it's stopping now.

And I finish with this, Mr. Speaker, what we need to -- what we need in our country is to teach our children the lawful diversity and unity and humanity.  That's what we need to do, and that's what we need to do to move forward.  Thank you, Mr. Speaker, and I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Ortiz in the affirmative.

Mr. Pichardo.

222

**NYS ASSEMBLY**                              **JUNE 9, 2020**

MR. PICHARDO:  Thank you, Mr. Speaker, for allowing me to explain my vote.  It's good back to be -- it's good to be back in the Chamber.  And, again, I want to thank my colleague, as well as the leadership in this House both the Lead -- the Majority Leader and the Speaker, but let's get back down to -- to brass tacks here.

So, the broad interpretation of 50-a in the Civil Rights Law basically created a publicly-funded agency that is not accountable to the public.  It is not sound policy to expect members of the public to trust an agency that has no accountability and transparency to them.  Again, let me remind my colleagues here in this Chamber that days after Mr. Floyd was murdered in front of our eyes, the Hennepin County Medical Examiner ruled that his death was a combination of cardiac arrest and several drugs in his system, without making any mention that the fact that he died through asphyxiation through pressure on the back and his neck.  And the -- fortunately and -- well, unfortunately and fortunately, we had video evidence to the contrary and what our government institutions, particularly Minneapolis, were asking us to do is not to believe our lying eyes.  It took two separate independent exams to basically prove the fact of what we saw in that tape, in that disgusting tape where that man's life was snuffed out.

So, when we ask our agencies both here in the Legislature, as well as in law enforcement, to earn our trust as a community, how do the public -- and how do we expect the public to

223

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

believe in these instances when there are government agencies who are primed to lie and to basically ask us to deceive.  With that, Mr. Speaker, I vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you so much. Mr. Pichardo is in the affirmative.

Mr. Buchwald.

MR. BUCHWALD:  Thank you very much, Mr. Speaker.  I rise in support of this legislation and, in particular, to thank its sponsor.  The process of repealing 50-a is too long in coming, but it has been a legislative process that he's been ably leading for the last five years.  I was, you know, proud in 2016 when Mr. O'Donnell's attempt to reform 50-a got a vote in the Governmental Operations Committee, and I believe our now Majority Leader was Chair of that Committee at the time, and so I want to thank her, as well, for her leadership.  But, ultimately, in 2016, though maybe many of us in the Assembly were willing to have that conversation, the simple fact was the other House, the State Senate, was not willing to have that conversation.  And, certainly, those who were not recognizing the need to make changes to 50-a were not engaged in the conversation.

So we are where we are today, and where we are today is a compelling need to repeal this law.  We are -- have to make sure that those who have lost their lives as a result of, in particular, police misconduct, know that they have not lost their lives in vain. And so, we, as legislators, have a special responsibility to ensure that we do everything we can to make sure that we are being responsive.

And though I'm proud to march with others and attend vigils, I'm even more proud to stand up today as a member of the State Assembly in support of this legislation.

So, I sincerely hope that we don't let this be the last step we take, that it's just the first step on a path towards combatting institutional racism in our government and in our society.  But today, I proudly vote yes for this legislation.  Thank you so much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.  Mr. Buchwald in the affirmative.

Mr. DenDekker.

MR. DENDEKKER:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I want to thank the sponsor of this bill, and I -- I also want to thank my Speaker and the rest of my colleagues.  I think it's so important that this representative type government has listened to the people that are fed up and have had it and want change.  And we are here to do some of that change here this week and the repeal of 50-a is a first step.  And I'm just so proud that this government and the way New York State is operating as a responsive legislative Body listening to the people that it represents.  So, I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Mr. DenDekker in the affirmative.

Mr. LiPetri.

MR. LIPETRI:  Thank you, Mr. Speaker.  I rise to

225

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

explain my vote.  Prior to becoming a State Legislator, I worked for the New York City Corp Counsel where I defended the NYPD, FDNY and correction officers.  During a multitude of depositions, oftentimes I would invoke 50-a.  The purpose of 50-a is to prohibit and prevent harassment, intimidation and embarrassment.  It protects against fishing expeditions of disclosure of unverified and unsubstantiated information.  In essence, it prohibits the dissemination of false claims, false claims of which now this Legislative Majority wishes to weaponize against our law enforcement, first responders and correction officers.

Frankly, at this time now, you have opened the flood gates to frivolous requests.  I saw it time and time again; in fact, just 50 years ago, the purpose of 50-a was to prevent the use of these bad faith probing that now will occur.  Mark my words, Mr. Speaker, you're going to see databases now form where we're going to have all these government groups that -- excuse me, these groups that despise police will now create these databases of all this personnel information, many of which is false, many of which is unsubstantiated, but nevertheless will be disclosed.  Mistakes will be made, addresses, personal information will, in essence, and inevitably be disclosed, and those on social media will publish.  Threats have already been issued over the years against our police officers, and now those threats will turn to action because they have that information available to them.

It's so sad, Mr. Speaker, we saw just a few weeks ago

226

our law enforcement, first responders praised as heroes during this pandemic and, yet, now we're seeing the -- the winds change during these difficult times.  In essence, Mr. Speaker, we can't keep furthering division.  Whether your skin is black or your uniform is blue, people should not feel targeted in this country.  That, we can agree upon; however, Mr. Speaker, this legislation only makes our finest, New York's finest, more vulnerable to attacks.  For those reasons, I vote in the negative.

ACTING SPEAKER AUBRY:  Mr. LiPetri in the negative.

Mr. Barron.

MR. BARRON:  Thank you, Mr. Speaker.  We mentioned the CCRB and unsubstan -- unsubstantiated complaints a lot.  Do you know what the CCRB is?  Thirteen members, five appointed by the Mayor that pathetically is an apologist for the police, three are appointed by the Commissioner, that's eight of the 13, and then five are appointed by the City Council.  When a complaint comes in, they set up a panel of three, one from the Mayor, and one from his pal, the Commissioner, and one from the City Council.

So, they have to substantiate a complaint.  So if you have two police supporters that have to substantiate a complaint, two-to-one substantiates it, two-to-one makes it unsubstantiated.  So, they lied on a lot of these complaints.  That's why it's good to keep it all in.  And then after they substantiate a complaint, guess who it goes to who has the authority to determine their punishment?  The

227

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Commissioner.

This is a false.  This is why I support this bill, as weak as I think it is in terms of the larger issue.  We've been thanking a lot of people, Speakers, sponsors of bills and all of that, individuals, but the real sheroes and heroes are the protesters.  And, unfortunately, if the violence didn't happen, this bill of five years would not be passed today, and neither would the package.  Many of these bills have been around for years.  We protested peacefully to get some of these bills passed.  Nothing.  The minute stuff starts burning, people start rising up in larger numbers, then people start waxing militantly and eloquently like I've never seen them wax before.  And incredible how a whole package of bills are now being passed.

These aren't sufficient --

ACTING SPEAKER AUBRY:  Mr. Barron --

MR. BARRON:  -- but I do want to thank the protesters.  I want to thank them --

ACTING SPEAKER AUBRY:  And how do you vote, sir?

MR. BARRON:  And I vote yes.

ACTING SPEAKER AUBRY:  Mr. Barron in the affirmative.

Mr. Ramos.

MR. RAMOS:  Thank you, Mr. Speaker.  I thank the Speaker for advancing this bill on the floor.  Today has been an historic day.  We passed 50-a and it's been a very -- very emotional

228

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

day, emotional for many reasons.  Being a person who has lived both worlds, Hispanic man who has been subjected to the inequities in -- in this country towards people of color, and living through the police world.  Mixed emotions over what is transpiring.  It's been an emotional day because I've seen some movement from my colleagues here, which I -- I got to say I appreciate.  There are a few who talk about weaponize -- weaponizing against police.  But for the most part, I've seen some movement, and I want to say that I -- that I appreciate that.

It is a day of also anguish.  As my colleague mentioned, when we see the same playbook over and over again that after George Floyd was killed, an autopsy tries to somehow insult our intelligence and say that he had a medical problem, as if he would have died anyway had the police not shown up.  Can you think of anything so ridiculous?  The people in this country, when they decide that is -- enough is enough, the people of color in the history of this country, change has come about.  We've seen that through the '60s and after Martin Luther King was killed, people rose up and the powers that be felt it.  They felt it.  Presidents threw their hands up.  Objectors threw their hands up and said, *Okay, let's start some Civil Rights reform*.  We are at that watershed moment right now.

To the protesters, don't start -- stop marching.  This is not the end.  And don't be fooled and don't accept a false prize in 50-a.  This is not the end.  This is the beginning.  It's good legislation, but we need to do much more.  To my police colleagues - I'll end with this -

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

to my police colleagues, I know what might follow.  And a loud, sucking noise of political action money going to the people to fight against our movement.  I ask you to please --

          ACTING SPEAKER AUBRY:  Mr. Ramos.

          MR. RAMOS:  -- think about sitting with the advocates and coming to some change --

          ACTING SPEAKER AUBRY:  Mr. Ramos, how do you vote?

          MR. RAMOS:  -- with the -- thank you.

          ACTING SPEAKER AUBRY:  How do you vote?

          MR. RAMOS:  I vote in the affirmative.

          Ms. Simotas.

          MS. SIMOTAS:  Thank you.

          ACTING SPEAKER AUBRY:  Ms. Fahy.

          Oh, Ms. Simotas.

          MS. SIMOTAS:  Thank you, Mr. Speaker, for allowing me to explain my vote.  We are living in very perilous times.  We are grappling with the health pandemic, an unsound economy, and protests taking place across the nation, where everyday Americans are demonstrating that they are fed up with the criminal behaviors of those who have taken an oath to protect them.

          In response to these protests, we have witnessed video after video that documents the reprehensible behavior that some in uniform have exhibited.  It has been absolutely devastating to witness some of the police -- of the brutal police interactions that have

NYS ASSEMBLY                                    JUNE 9, 2020

occurred with protesters, and the officers involved must be held accountable for their actions.

             The law that we are repealing today, Section 50-a of the Civil Rights Law, hides police misconduct and the disciplinary action that follows as a consequence.  As the sponsor of the bill so eloquently stated, this type of law only exists in only three states because 47 other states believe in transparency and, ultimately, accountability.  During this debate we have heard a lot about the FOIL law and the ability for the public to use it to attain access to the records of police officers.  We heard that passing this bill would lead to fishing expeditions and an encroachment into police officers' personal information.  The truth is what we are -- is that we are -- that with repealing this law today, all we are doing is preventing the shielding, the shielding of disciplinary records, which only enables abuses of power.  We are choosing to protect the survivors, the loved ones and the witnesses instead of protecting the wrongdoers.

             It is time that we end the policies of secrecy that undermine public safety and foster mistrust between our communities and law enforcement.  I am so proud that we finally have an opportunity to vote on this bill, and I would like to thank the sponsor for his immense focus, determination and unwavering dedication, and I proudly vote in the affirmative.

             ACTING SPEAKER AUBRY:  Ms. Simotas in the affirmative.

             Ms. Fahy.

231

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

MS. FAHY:  Thank you, Mr. Speaker.  I rise, as well, to explain my vote, and I'll be voting in the affirmative today and I want to start by saying this is truly an historic day, it's not a joyous one, but it's an historic day.  And I want to commend the Speaker and I want to commend the sponsor on -- on many levels, but also for their perseverance.

We've heard a lot, we've been through a lot, we've talked about that is this the moment for change?  And I am proud to be a part of New York where I think we are seizing the moment for a change.  And I'd like to think on this day, when George Floyd is being buried today, that he will not have died in vain.  This is about transparency, it is about accountability, and I do believe - and I've listened to a lot of the debate - while there have been a number of concerns raised about unsubstantiated reports being made available, I do think there are protections in and if there aren't enough, we will come back.  But I do think that we've made the appropriate changes.

This is about correcting abuses and I think all of us still have a tremendous respect for authority.  We want that shield to shine.  This is about the few among our law enforcement office -- among law enforcement that have brought down the reputation of the many.  And I have tremendous, tremendous respect for our law enforcement, and I want to regain that throughout this country.  We've had bipartisan support on so many bills these last couple of days, and it's been very impressive.  We've had a lot of emotional whiplash these last few months between the COVID virus and now a lot of time to

232

NYS ASSEMBLY                              JUNE 9, 2020

reflect on the virus of racism in this country.  And I think this is just the beginning of trying to make some change.  There is more to do.  I want to see us professionalize the ranks more, I want to see us elevate, we've got to change the culture.  But I think today is about beginning that healing.

And, again, I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, Ms. Fahy.  Ms. Fahy in the affirmative.

Mr. Rodriguez.

MR. RODRIGUEZ:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  And I want to thank the Speaker for allowing this important piece of legislation to -- to move ahead.  I also recognize the good work of the sponsor who has, once again, taken on a unique challenge to equality in an effort to make our systems and our society a little bit fairer.

I think one of the concerns that we have begun to address with 50-a is that there's almost a complete lack of transparency and public accountability around law enforcement discipline, and this law takes the steps towards beginning to make the necessary changes.  You know, currently, police are allowed to conceal nearly all police records from public view with -- which exempt officers from the transparency standards that are applied to other public officials.  And this is something that has to change.

And it's not -- you know, as a Puerto Rican father of

233

two with a seven-year-old son, where we have begun to have the conversation that many people of color have with young men about what the interactions of law enforcement should look like and why, you know, they may have a propensity to be stopped or -- or approached with more frequency than other people and why the institutional viewpoint and lens looks at people of color in -- in a particular way.  And having those hard conversations reminds us that there's still a significant amount of work that needs to be done.

And this one piece of legislation is not going to change people's viewpoints on -- on people of color, and it's not going to change the way that the system addresses injustice.  But this is an important step to make sure that those people who hold the power are worthy of -- of -- of those badges, worthy of that responsibility, and it gives a little bit of transparency in an effort to identify those folks who are not worthy and -- and have abused that responsibility.  So it's an important piece of legislation.  It is time for us to make that change and, as a result, I'll be voting yes and support the legislation.

ACTING SPEAKER AUBRY:  Mr. Rodriguez in the affirmative.

Mr. McDonald.

MR. MCDONALD:  Thank you, Mr. Speaker.  I rise to support not only the repeal of Section 50-a today, but as well as many other components of the criminal justice package that we have passed and we will be passing over the next day or so.  As a former Mayor and Public Safety Commissioner for over 13 years, I am very

**NYS ASSEMBLY**                                        JUNE 9, 2020

familiar with the protections of 50-a, as I dealt with police discipline issues and public complaints more times than I care for.  The system is in need for a change.  And I believe the changes we are making today will provide greater transparency to the public and to help repair community and police relations where they are tarnished.

In the past few weeks I have received several hundred e-mails and phone calls on this legislation, and I dare say 99.9 percent is in support.  Those few who did not offer support were those in law enforcement or their family members who worried about their private information.  It is important to note that there are protections in place to protect their private lives and information of those in law enforcement and their families.  And I thank the sponsor for those protections and this legislation.  Many of those in law enforcement have been supportive, knowing what I have known for years after hiring over 25 law officers myself.  It is the actions of a few that spoil it for the many who day in and day out protect our communities.  I am appreciative of those in law enforcement who have reached out and who do their job with the utmost respect for the community.  At the same time, we need to be mindful that the repeal of 50-a alone will not stop all the issues, especially when it comes to systemic racism. We do not need to defund law enforcement, but we need to enhance community policing.

And therefore, Mr. Speaker, I support this legislation.

ACTING SPEAKER AUBRY:  Mr. McDonald in the affirmative.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Ms. Bichotte.

MS. BICHOTTE:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I want to thank my colleague, Danny O'Donnell, for being bold and introducing the repeal of 50-a and fighting for this for five years.  Repealing 50-a and revealing the activities of law enforcement officers in a more transparent manner will help to shine a light on those who act with comfort in the dark. George Floyd's death through excessive neck compression did not have to happen.  Eric Garner's death through strangulation did not have to happen.  Aaron Bailey's death from bullets following a traffic stop did not have to happen.  And it goes on.  We need comprehensive police reform to correct the long and deep-rooted bad relationships between minority communities and police force.  The repeal of 50-a is not about punishing the police force.  It is about identifying those few bad law enforcement officers.  It's about transparency and accountability.  I have a good relationship with the precincts in my district, the chiefs, the Commissioner.  And, like, many other organizations:  The Haitian-American Law Enforcement Fraternal Officers, HALEFO; Grand Council of Guardians and Latino Officers; GOAL, Gay Officers Action League New York.  However, continued excessive brutality prevents these types of relationships that could also be present with the community members.  This repeal of 50-a must be part of a comprehensive package of bills like banning racial profiling; needed -- needing to end the institutional racism causing many black and brown civilians, people, family members, fathers, mothers and

236

NYS ASSEMBLY                                    JUNE 9, 2020

children to pay their -- pay -- pay with their lives.  I call on the name

of my Haitian brother Abner Louima who was racially profiled, beaten

and sodomized.  Unlike many, he is alive to see this bill become law.

And hopefully one day he will see the banning of racial profiling with

data collection also become law.

I am a Haitian-American, and I witnessed the protests

and the participation in the march -- in the march -- in the marches.  I

see the Haitian flag wave high.  Many can tell you it is the flag of

revolution.  Today --

(Buzzer sounding)

ACTING SPEAKER AUBRY:  Ms. Bichotte.

MS. BICHOTTE:  I will vote in the affirmative.

Thank you.

ACTING SPEAKER AUBRY:  Ms. Bichotte in the

affirmative.

Ms. Linda Rosenthal.

MS. ROSENTHAL:  Thank you.  Thank you, Mr.

Speaker, to explain my vote.  Today George Floyd was laid to rest

while his family and friends celebrated his life and mourned his loss.

At the same time, the country grapples with how to reverse

generations of systemic racism that has been institutionalized over

time and reinforced by officialdom, silence and inaction.  Mr. Floyd's

murder not even the most recent in the seemingly never-ending stream

of killings of innocent black people at the hands of police has captured

the nation.  Mr. Floyd's life and death serve as a painful reminder that

237

the stain of racism is not a mess of vestige of a bloody past, but is a dangerous reality today for women and men of color in every state in the nation.  Repealing 50-a will help to shine the bright light of accountability on the police force.  Doing so will ensure that bad cops are held accountable for their actions and will change a culture of secrecy and invincibility that has permeated the force and enabled many police officers to act brutally and with impunity.  And it might help restore the trust between the community and some officers that has been broken with every act of senseless and excessive force.

I am so proud to be part of the Legislature as we vote to pass this bill.  The New York Legislature, the Caucus, the Speaker, the sponsors and everyone who participated in getting us to this day.

On the last day of 11th grade, George Floyd was asked what he wanted to do with his life, and he answered, *I want to touch the world*.  Well, Mr. Floyd, you should not have had to die to live out your childhood dream, and I hope you can sleep peacefully knowing your death has touched each and every one of us deeply and permanently, and I proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Rosenthal in the affirmative.

Ms. Reyes to explain her vote.

Two minutes, please.

MS. REYES:  Thank you, Mr. Speaker.  Very briefly to explain my vote.  As a mom of two young brown boys being raised in the Bronx, I am proud to support this piece of legislation and all of

NYS ASSEMBLY                                    JUNE 9, 2020

the pieces of legislation of police reform we have taken up the past

days and -- and -- and tomorrow to come.  I want to commend the --

the sponsor and the Speaker.  And I want to dedicate my vote to all

the families that have lost loved ones to police brutality.  To all those

mothers who have had to bury their children too soon.  This is a step

in the right direction.  We still have a lot of work to do, and I

encourage all those out there taking to the streets to keep fighting.

        Thank you.  I'll be voting in the affirmative.

        ACTING SPEAKER AUBRY:  Ms. Reyes in the

affirmative.

        Mr. Perry to explain his vote.

        Two minutes, please.

        MR. PERRY:  Okay.  Do I -- wait, wait, wait, wait --

        ACTING SPEAKER AUBRY:  Don't wait, you can

speak.

        MR. PERRY:  Thank you.  I was checking if I was

unmuted.  Thank you, Mr. Speaker.  This bill was passed into law on

the third try.  The first two times, Governor Hugh Carey vetoed the

bill.  He said it was too broad.  Senator Carol Bellamy warned us that

it was a very, very bad bill and that we should have rejected it.  I

wasn't in the Legislature, neither any of us, I hope, at that time.  But

this bill certainly grew into a big mountain that I stood in front of

every New Yorker who was fighting for some justice and to get past

the silent blue wall.  Today we have prevailed.  But we can't go

praising ourselves too much because the fight has already begun to

make sure that this bill, what we intend it to do, will be diminished as much as they can.  So we have to continue to fight.  We have to be aware that there's so much more to be done.  This is a drop in the bucket.  Whatever drop will help to fill that bucket of justice, that bucket of freedom and the ability to express ourselves and the ability to use and enjoy the environs of this great State without being worried for ourselves, our children, about police brutality and police misconduct.

Mr. Speaker, thank you for the opportunity to explain my vote, and I proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. --

MR. PERRY:  -- and certainly commend the -- the -- the -- my colleagues who pass this bill.

ACTING SPEAKER AUBRY:  Mr. Perry in the affirmative.

Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker, to explain my vote.  You know, we heard that New York is one of only three states that had this protection for police officers.  In reality, that's not accurate.  The three states did have specific for police officers, but the other states have it for all their public employees.  As a matter of fact, there's 23 states that require it all to be confidential.  There's 15 states that have limited availability, and it goes on to only put out records of substantiated serious conduct.  And the other states, 12 of them, have access, full access to public records, but it still only allows

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

substantiated.  Unsubstantiated are not allowed.  So that's one of the

reasons why I think that this bill just goes a little too far, and we need

to make sure -- I know we heard that -- many saying that it doesn't go

far enough, but I think to give it -- you know, we talk about due

process.  Having unsubstantiated in there does not allow due process

for the officers as well that did nothing wrong.  So -- and that -- if you

want to look it up, that's on project.wnyc.org, that information.

        So I will be voting in the negative.

        ACTING SPEAKER AUBRY:  Mr. Reilly in the

negative.

        Ms. Walker.

        MS. WALKER:  Thank you, Mr. Speaker, for

allowing me to explain my vote.  There are folk who feel as if this bill

has some right to privacy infringements.  And one of the things that

we understand is that New York State has a compelling State interest

to protect its citizenry, which a right to privacy claim cannot meet

muster.  What are some of those compelling State interests?  To

protect its citizenry from the chokehold.  From using a flashlight as a

club.  From using a gun as a club.  Handcuffs too tight.  Non-lethal

restraining device and pepper spray.  These are some of the categories

of complaints and are located and lodged with the CCRB.  And so I

also want to say that this is not about the police.  This bill and this

package of bills are about police officers killing black people.  Point

blank.  Good cops hate bad cops just as much as we do.  And we're

saying today that for all of those bad cops who are out there who have

**NYS ASSEMBLY**                              **JUNE 9, 2020**

been conducting themselves in a pervasively racist manner, that you're going to be exposed and you're going to be found out.  And so that when you think of committing a civil rights infraction against any person in the State of New York that your records will be released and you will no longer be able to hide behind a veil or a blue wall of silence.

I proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Walker in the affirmative.

Ms. Fernandez.

MS. FERNANDEZ:  Thank you, Mr. Speaker, for allowing me to explain my vote.  One thing that I know for sure between every single person in this Body and in this State and probably in this country is that we do not want, we do not like bad cops.  And this bill give us the opportunity to find those bad cops and to hold them accountable for their actions.  And I think that's absolutely fair.  And for our duty, even as public servants, as law enforcement, we have to protect the public at all cost.

So I vote in the affirmative of this because accountability is everything, and we need to make sure that that doesn't move.  So thank you.

ACTING SPEAKER AUBRY:  Ms. Fernandez in the affirmative.

Mr. Garbarino.

MR. GARBARINO:  Thank you, Mr. Speaker, to

242

**NYS ASSEMBLY**                              **JUNE 9, 2020**

explain my vote.  Derek Chauvin is a murderer and he'll pay for what he did.  But as the sponsor said before, this is already the law in Minneapolis and it didn't stop the death of George Floyd.  I don't understand the remedy that is being sought here.  This legislation is going to release unsubstantiated, unfounded complaints against law enforcement officers.  These are complaints that haven't been proven to be true, but they're going to be released and they're going to tarnish an officer's name.  In the Senate and the Assembly here in this House, we -- we have an Ethics Committee that oversees complaints that are against us.  Those are only released when they are substantiated.  The -- the Ethics Committee, they -- they-- they hear the files and they hear complaints.  Those aren't released.  We don't -- we don't release complaints against us when they're unsubstantiated.  They're only -- they're only released when they're substantiated.  Education Law says that unfounded complaints against teachers are expunged from their record.  I don't know what we're doing here today by allowing unsubstantiated complaints to be released.  I don't know who this -- who this helps.  It's going to put targets on the backs of police officers.  I know a lot of police officers.  I know a lot of firemen.  I know a lot of correctional officers.  They don't have an evil or racist bone in their body.  But this will unfairly put targets on their backs, and for that reason I cannot support it and I'm voting in the negative.

ACTING SPEAKER AUBRY:  Mr. Garbarino in the negative.

Ms. Nolan to explain her vote.

243

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

MS. NOLAN:  Thank you, Mr. Speaker and my colleagues.  I want to really thank our Speaker Carl Heastie and Majority Leader Peoples-Stokes and all of my colleagues in the Caucus, Tremaine Wright, for doing such a wonderful package that was so important to be done and respond to people quickly and handling it well.  I want to also acknowledge the incredible insight, legal mind and tremendous speaking ability and dedication of my dear friend Danny O'Donnell, who led the debate with such distinction today.  Just as I explain my vote would like to point out that it is a journey, as Danny said, to understand issues within the community and within the black community, which I have been privileged to represent for many years.  I want this vote to be in memory of Richard Luke, a young man, my very first year in office, who died in police custody and his mother never really got an explanation, was never able to get any information.  She had actually called the police because he was not feeling well and it just cascaded into a very, very tragic situation.  I'll never forget that.  I want to also say I -- I -- how important it was -- and I want to add my voice to so many of my colleagues who said this is not about all people in law enforcement.  I come from a law enforcement family.  My district office chief's brother died in service to this City as a NYPD detective after 9/11 as a -- a first responder, and their service and their honor, their honorable service can never be forgotten and must always be cherished.  But here we have a situation of a terrible tragedy, and it's important for us in the Legislature to move forward with new laws that will address

NYS ASSEMBLY                                    JUNE 9, 2020

these things so that we can show people we are moving to a new

social justice and racial justice in our State.

So thank you, Mr. O'Donnell, thank you, Mr.

Speaker, thank you all my colleagues.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Nolan in the

affirmative.

Ms. Griffin.

MS. GRIFFIN:  Thank you, Mr. Speaker.  Thank you

for the opportunity to explain my vote.  Over the past two days I

supported and voted in favor of every reform measure in this

important package of bills.  In passing them, we seek to halt the

systematic racism that has been a poison allowed to flourish unabated

for far too long.  I don't believe that legislation alone can change the

hearts and minds of people.  I believe the bill before me now won't

accomplish our shared mission of preventing police brutality and

misconduct.  I don't believe simply making personal records public

while including unsubstantiated claims will bring about the

accountability and transparency we seek.  It's not enough, and falls

short of what is truly needed to eradicate inequality and racism in our

justice system and really true reform.

While I do fully support the other initiatives in our

package and look forward to initiating more ways we can make

proactive and effective change through collaboration with all

stakeholders, I am voting in the negative on this one.  Thank you for

giving me the opportunity.

245

**NYS ASSEMBLY**                                  **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  Ms. Griffin in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please ensure that Mr. Ashby is noted as a yes vote on this legislation.  Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  If you could please record our colleagues Mr. Santabarbara, Ms. Buttenschon and Mr. Jones in the negative.

ACTING SPEAKER AUBRY:  So noted.  Thank you, Mrs. Peoples-Stokes.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

My colleagues, before we proceed to the consideration of the next bill, it is only right and proper that we pause for a moment of silence in the memory of George Floyd, who was murdered last week and was laid to rest today during our work here in this Chamber.

Let us rise.

(Whereupon, a moment of silence was observed.)

Thank you, my colleagues.

MRS. PEOPLES-STOKES:  Mr. Speaker.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

246

MRS. PEOPLES-STOKES:  If we can continue our work, we're going to go to Rules Report No. 64 and it's on page 16 by Ms. Walker.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A08674-A, Rules Report No. 64, Walker, Heastie, Peoples-Stokes, Aubry, Richardson, Rodriguez, Blake Mosley, Ortiz, Frontus, Magnarelli, Arroyo, Bichotte, Bronson, Carroll, Crespo, Cruz, DenDekker, Epstein, Fall Fernandez, Gottfried, Hunter, Hyndman, Jacobson, Jaffee, Lifton, McDonald, Nolan, Otis, Pichardo, Pretlow, Ramos, Reyes, D. Rosenthal, L. Rosenthal, Seawright, Simon, Steck, Taylor, Thiele, Weinstein, Wright.  An act to amend the Executive Law, in relation to the use of body-worn cameras by New York State Police officers.

ACTING SPEAKER AUBRY:  On a motion by Ms. Walker, the Senate bill is before the House.  The Senate bill is advanced.

An explanation is requested, Ms. Walker.

MS. WALKER:  Thank you, Mr. Speaker.  A.8674 [sic] is a bill that will create within the State -- New York State Police a body-worn camera program which would aim to increase accountability and evidence for law enforcement and the residents of the State by providing body-worn cameras to all New York State Police officers while on patrol.  This bill would also provide provisions on when a body camera must be used and the exceptions, the preservation of body camera footage, and the maintenance of the

247

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

body camera.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Walker, will you yield?

MS. WALKER:  Yes.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you, Ms. Walker.  I note that your bill calls for this legislation to be effective April 1st next year.  Why did you select April 1st next year?

MS. WALKER:  So, there is a cost associated with providing body-worn cameras to the New York State Police Department.  And the next opportunity for us to be able to budget for that is in the '20-'21 budget negotiations.  And so we've extended its effective date until that -- until that time.

MR. GOODELL:  Do you have an estimate of what that cost might be?

MS. WALKER:  Not at the moment.

MR. GOODELL:  Do you envision that this would be an additional appropriation for the State Police next budget year, or would you anticipate that -- that they would have to find that money within their own budget?

MS. WALKER:  I think that's a conversation that we can discuss considering whatever those circumstances are.  We know

248

NYS ASSEMBLY                                        JUNE 9, 2020

that we are in extraordinary times and it's hard to foresee what may be the case at that time.

MR. GOODELL:  As you might understand and appreciate, there's a lot of concern, particularly among the State Police, that we might fund the cameras by laying off State Troopers. And if it's a choice between laying off State Troopers and having fewer Troopers but having cameras, that's a much different discussion than if we keep the State Troopers intact in terms of their manpower and provide them with additional cameras.

MS. WALKER:  That's a conversation that we can have at that time, Mr. Goodell.

MR. GOODELL:  I see.  This bill requires the State Police Department to keep this data, obviously.  But doesn't have any time frame on it.  And there's a concern that's been raised that the amount of data that we would be saving is -- is pretty massive.  I -- I no longer have my stepson on my phone plan, so the number of gigabytes I need has gone down since we don't stream.  But video takes a lot of data.  Can you give us some sense of what you anticipate in terms of recordkeeping requirements?

MS. WALKER:  So, Mr. Goodell, the State archivist will have to work with any State agency which will be working with the body cameras - in this case, the New York State Police - to work out a record retention schedule.  But I will suggest that normal record retention rules will apply.

MR. GOODELL:  Thank you very much, Ms.

249

**NYS ASSEMBLY**                                        **JUNE 9, 2020**

Walker.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, Mr. Goodell.

Read the last section.

THE CLERK:  This act shall take effect April 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 64.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Ms. Walker to explain her vote.

MS. WALKER:  Thank you, Mr. Speaker.  It's an honor and a privilege today to explain my vote.  It is well-settled that body-worn cameras not only protect the individual who is being arrested, anyone who is in the area, but it also protects the police officer.  So there are a number of individuals who are concerned about 50-a releasing of records where they're unsubstantiated.  Well, body-worn cameras are a tool that may be able to be used in order to make sure that the truth of whatever the circumstances is will come to light.

So it is my honor and my privilege today to sponsor this piece of legislation, and really to state that while we all recognize that we are not weeding out racism and we cannot legislate morality, but we will also acknowledge that in these extreme times that I am proud that we are moving from agitation to legislation, and I proudly

NYS ASSEMBLY                                    JUNE 9, 2020

vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Walker in the affirmative.

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker.  I rise to explain my vote.  We talked about transparency and truth.  And what cameras do is let us all see what's happening.  It can't be your story or my story, it is the truth through the camera's lens.  And that's what we learned from George Floyd last week, the truth of his execution on the streets.  Body cameras will help us get to the answers we need.

I applaud the sponsor of this bill.  I'll be voting in the affirmative and I encourage all my colleagues to do the same.  In the name of social justice, we need to be with this, support this and ensure this is a critical piece of legislation.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Epstein in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Please note that Mr. Fitzpatrick will be voting no on this bill.  Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

251

**NYS ASSEMBLY**                                    JUNE 9, 2020

MRS. PEOPLES-STOKES:  Mr. Speaker, I want to thank my colleagues for the long and arduous work we have been doing so far today.  But we do have a little bit more work to do.  It's going to be on consent.  It's going to be from our A-Calendar which we moved forward earlier.  It's mostly local bills, Mr. Speaker, and we're going to start at Rules Report No. 69 and just go straight through as far as we can go.  So members should really pay attention.  If there's something that comes up that you would not be interested in voting on in a fast roll call, you should make sure you call our office, my office and/or Mr. -- the Minority Leader's office.  So again, we're going to start at Rules Report No. 69 which is on page 3 on consent, Mr. Speaker.

ACTING SPEAKER AUBRY:  Certainly, Mrs. Peoples-Stokes.  We will try to move in expeditious speed.

The Clerk will read.

THE CLERK:  Assembly No. A06979-A, Rules Report No. 69, Stec.  An act to authorize Jaime Laczko to elect to participate in the optional 25-year retirement plan for forest rangers in the service of the Department of Environmental Conservation.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 69.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

NYS ASSEMBLY                                    JUNE 9, 2020

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  I -- I wanted to remind my colleagues that we want to move quite quickly through these local bills.  We had a couple of colleagues that voted no in committee.  We intend to stay on a local bill only for a minute or two before we close the roll.  So now is a good time to set down your coffee and pay close attention, grab your cell phone, make sure your -- your speed dial is set because we want to speed through these.  And if you have any concerns, you need to act quickly.

Thank you so much, sir, for that announcement.

ACTING SPEAKER AUBRY:  Absolutely, Mr. Goodell.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07888-B, Rules Report No. 70, Byrne.  An act in relation to designating a portion of the State highway system as the "Putnam County Workers Memorial Bridge."

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 70.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the

253

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08295-A, Rules

Report No. 71, Salka.  An act relating to the miscalculation of benefits

paid to Katherine Sweeney.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report No. 71.  This is a fast roll call.  Any member

wishing to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08353, Rules Report

No. 72, Fitzpatrick.  An act to amend the Highway Law, in relation to

the limitation on certain highway expenses in the Town of Smithtown,

Suffolk County.

ACTING SPEAKER AUBRY:  Home Rule is at the

desk.

Read the last section.

254

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 72.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08555, Rules Report No. 73, Mosley.  An act authorizing the Commissioner of General Services to sell certain land to TCH Holdings, LLC; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. Mosley, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 73.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. -- Mrs. --

MRS. PEOPLES-STOKES:  Mr. Speaker, if you

**NYS ASSEMBLY**                                      **JUNE 9, 2020**

could please record Mike Miller as a no on this one.

ACTING SPEAKER AUBRY:  Thank you, Mrs. Peoples-Stokes.  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08643, Rules Report No. 74, Fitzpatrick.  An act to authorize the Town of Smithtown to extend the boundaries of the St. James Fire District to include the Village of Head of the Harbor.

ACTING SPEAKER AUBRY:  On a motion by Mr. Fitzpatrick, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 74.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08666-A, Rules Report No. 75, Lifton.  An act to amend the Environmental

Conservation Law, in relation to authorizing hunting big game by rifle in the County of Tompkins; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 75.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could please record members --

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  If we could please record members Glick, Weinstein and Barron in the negative.

ACTING SPEAKER AUBRY:  So noted.  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08695-A, Rules Report No. 76, Crouch.  An act to amend the Village Law, in relation to exempting the Village of Port Dickinson Fire Department from the requirement that the percentage of non-resident fire department members not exceed 45 percent of the membership.

257

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

ACTING SPEAKER AUBRY:  On a motion by Mr. Crouch, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 76.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER DENDEKKER:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08771, Rules Report No. 77, Stec.  An act to amend the Executive Law, in relation to designating Brant Lake as an inland waterway for the purposes of waterfront revitalization.

ACTING SPEAKER DENDEKKER:  On a motion -- on a motion by Mr. Stec, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 77.  This is a fast roll call.  Any

258

NYS ASSEMBLY                                    JUNE 9, 2020

member wishing to be recorded in the negative is reminded to contact

the Majority or Minority Leader at the number previously provided.

           (The Clerk recorded the vote.)

           Are there any other votes?  Announce the results.

           (The Clerk announced the results.)

           The bill is passed.

           THE CLERK:  Assembly No. A08787-A, Rules

Report No. 78, Byrnes.  An act granting retroactive membership in the

New York State and Local Employees' Retirement system to Shawn

Covey -- Coveny.

           ACTING SPEAKER DENDEKKER:  Read the last

section.

           THE CLERK:  This act shall take effect immediately.

           ACTING SPEAKER DENDEKKER:  The Clerk will

record the vote on Rules Report No. 78.  This is a fast roll call.  Any

member wishing to be recorded in the negative is reminded to contact

the Majority or Minority Leader at the number previously provided.

           (The Clerk recorded the vote.)

           Are there any other votes?  Announce the results.

           (The Clerk announced the results.)

           The bill is passed.

           THE CLERK:  Assembly No. A08818, Rules Report

No. 79, Byrnes.  An act to amend the Highway Law, in relation to

designating a portion of the State highway system as the "Savannah

Marie Williams Memorial Highway."

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

ACTING SPEAKER DENDEKKER:  On a motion by Mr. [sic] Byrnes, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 79.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08827, Rules Report No. 80, Jones.  An act to amend the Executive Law, in relation to designating St. Regis River as an inland waterway for the purposes of waterfront revitalization.

ACTING SPEAKER DENDEKKER:  On a motion by Mr. Jones, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 80.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact

260

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08896, Rules Report No. 81, Stern.  An act in relation to legalizing, validating, ratifying and confirming a transportation contract of the Cold Spring Harbor Central School District.

ACTING SPEAKER DENDEKKER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 81.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08898, Rules Report No. 82, Stern.  An act to legalize, validate, ratify and confirm the actions of the Huntington Union Free School District notwithstanding the failure to timely file final building cost reports with the Education Department.

261

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

ACTING SPEAKER DENDEKKER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 82.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08917, Rules Report No. 83, Finch.  An act to amend the Navigation Law, in relation to allowing the Village and Town of Skaneateles in the County of Onondaga to regulate the construction and location of certain boathouses, moorings and docks.

ACTING SPEAKER DENDEKKER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 83.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

262

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08926, Rules Report No. 84, Goodell.  An act to legalize, validate, ratify and confirm the actions of the Panama Central School District notwithstanding the failure to timely file final building cost reports with the Education Department.

ACTING SPEAKER DENDEKKER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 84.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09052, Rules Report No. 85, Blankenbush.  An act to authorize the Towns of Lorraine and Worth in Jefferson County to elect a single town justice to preside in the town courts of such towns.

ACTING SPEAKER DENDEKKER:  On a motion by Mr. Blankenbush, the Senate bill is before the House and the Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 85.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09145, Rules Report No. 86, McDonald.  An act in relation to authorizing the assessor of the City of Albany to accept from the Koinonia Primary Care, Inc. an application for exemption from real property taxes.

ACTING SPEAKER DENDEKKER:  On a motion by Mr. McDonald, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 86.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09595, Rules Report No. 87, Pheffer Amato.  An act to amend the Environmental Conservation Law, in relation to the filling of borrow pits in Jamaica Bay; and to amend Chapter 288 of the Laws of 2014 amending the Environmental Conservation Law relating to the filling of borrow pits in Jamaica Bay, in relation to making the provisions of such chapter permanent.

ACTING SPEAKER DENDEKKER:  On a motion by Ms. Pheffer Amato, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 87.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09614, Rules Report No. 88, Garbarino.  An act in relation to creating the Davis Park Fire Department Benevolent Association.

265

ACTING SPEAKER DENDEKKER:  On a motion by Mr. Garbarino, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER DENDEKKER:  The Clerk will record the vote on Rules Report No. 88.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09663, Rules Report No. 89, Ryan.  An act to authorize William J. Cooley to receive certain service credit under Section 384-d of the Retirement and Social Security Law.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 89.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09682, Rules Report No. 90, Burke.  An act to authorize Patrick Humiston to receive certain service credit under Section 384-d of the Retirement and Social Security Law.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 90.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09738, Rules Report No. 91, Hunter.  An act to amend the Tax Law, in relation to imposing an additional 2 percent occupancy tax in the County of Onondaga.

ACTING SPEAKER AUBRY:  Home Rule message

267

is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 91.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, Mr. Speaker.  I will be voting in favor of this local bill, but I would note that it does impose an additional 2 percent occupancy tax on Onondaga County.  For those who are concerned about tax increases, please note this, although an occupancy tax is one of the best taxes that you can have that doesn't tax your local residents, but those who are visiting.

For that reason I will be voting in favor of this.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the affirmative.

(Pause)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The following Republican members would like to have their vote recorded in the negative:  That would include Mr. Palumbo, Mr. DiPietro, Mr. Manktelow -- I'm sorry, I apologize.  Not Mr. Manktelow, Mr.

NYS ASSEMBLY                                    JUNE 9, 2020

Montesano.  I was trying to get all the "Os" in at one time.  Mr.

Friend, Mr. Schmitt, Mr. Byrne, Mr. DeStefano and Ms. Malliotakis.

ACTING SPEAKER AUBRY:  So noted, sir.

MR. GOODELL:  Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if you

could please record my colleagues in the negative:  Members

Buttenschon, Burke, Barrett, Stern, Gunther, McMahon, Mike Miller,

Wallace, Griffin, Santabarbara and Barnwell.

ACTING SPEAKER AUBRY:  So noted, ma'am.

MRS. PEOPLES-STOKES:  Thank you.

ACTING SPEAKER AUBRY:  Are there any other

votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09744, Rules Report

No. 92, Santabarbara.  An act to amend the Public Officers Law, in

relation to qualifications for holding the office of Corporation Counsel

in the City of Amsterdam.

ACTING SPEAKER AUBRY:  On a motion by Mr.

Santabarbara, the Senate bill is before the House.  The Senate bill is

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

269

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

the vote on Rules Report No. 92.  This is a fast roll call.  Any member

wishing to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if you

could please note Mr. Epstein in the negative.  Epstein in the negative.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09795, Rules Report

No. 93, Giglio.  An act to amend the Town Law and the Public

Officers Law, in relation to authorizing the town justice of the Town

of Angelica, County of Allegany, to be a nonresident of such town.

ACTING SPEAKER AUBRY:  On a motion by Mr.

Giglio, the Senate bill is before the House.  The Senate bill is

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report No. 93.  This is a fast roll call.  Any member

wishing to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

270

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09802-A, Rules Report No. 94, Jaffee.  An act relating to validating -- to validating certain acts by the Pearl River Union Free School District relating to final building cost reports required to be filed with the State Education Department.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 94.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09810, Rules Report No. 95, Lupardo.  An act to authorize the Town of Union in the County of Broome to convey to New York State Electric & Gas, an easement through land located in the town's West Endicott Park to be used to convey an existing overhead electrical transmission line and anchoring facilities.

ACTING SPEAKER AUBRY:  On a motion by Ms.

271

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Lupardo, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 95.

(The Clerk recorded the vote.)

This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

Are there any other votes?  Hold on.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, could you please record colleagues Glick, Barnwell, Barron and Walker in the negative on this one?

ACTING SPEAKER AUBRY:  So noted, Mrs. Peoples-Stokes.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09814, Rules Report No. 96, LiPetri.  An act in relation to authorizing the Good Samaritan Hospital Medical Center to file an -- an application for a real property tax exemption.

ACTING SPEAKER AUBRY:  On a motion by Mr.

272

**NYS ASSEMBLY**                              **JUNE 9, 2020**

LiPetri, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 96.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09816, Rules Report No. 97, Lifton.  An act to amend the Tax Law, in relation to the imposition of an occupancy tax in the City of Cortland; and providing for the repeal of such provisions upon the expiration thereof.

ACTING SPEAKER AUBRY:  Home Rule -- Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 97.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

NYS ASSEMBLY                                    JUNE 9, 2020

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  As with a previous

bill, this does impose a new occupancy tax in the City of Cortland.  It's

a local Home Rule request, and I will be supporting it.  But I did want

to note to my colleagues this is a new occupancy tax for the City of

Cortland.  So if you're planning to visit there, put a few extra dollars in

your wallet.  Thank you, sir.

ACTING SPEAKER AUBRY:  Certainly.  Mr.

Goodell in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Please

record the following Republican members in the negative:  Mr.

Montesano, Mr. Schmitt, Mr. Tague, Mr. Palumbo, Mr. Ra, Ms.

Malliotakis, Mr. DiPietro, Mr. Fitzpatrick, Mr. Friend, Mr. Byrne and

Mr. DeStefano.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if you

could please record the Majority colleagues in the negative on this

one:  Mr. Burke, Mrs. Barrett, Mr. Stern, Ms. McMahon, Mr. Mike

Miller, Ms. Wallace, Mr. Barnwell, Mr. Ramos, Ms. Griffin, Ms.

Buttenschon, Mr. Santabarbara, Mr. Cusick, Mr. Barron and Ms.

Fahy.

ACTING SPEAKER AUBRY:  So noted.

274

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09826, Rules Report No. 98, Lifton.  An act relating to the dissolution of the Village of Groton Industrial Development Agency and the disposition of the assets thereof.

ACTING SPEAKER AUBRY:  On a motion by Ms. Lifton, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 98.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09884, Rules Report No. 99, Goodell.  An act to authorize the Towns of Mina and French Creek in Chautauqua County to elect a single town justice to preside in the town courts of such towns.

ACTING SPEAKER AUBRY:  On a motion by Mr.

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

Goodell, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 99.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09905-A, Rules Report No. 100, Hawley, Norris.  An act to amend the Public Officers Law, in relation to the qualifications for holding the office of assistant district attorney in the County of Orleans.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

MRS. PEOPLES-STOKES:  Mr. Speaker, could you

276

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

record Mr. Epstein in the negative on this one?

               ACTING SPEAKER AUBRY:  Mr. Epstein in the

negative.  Duly noted --

               MRS. PEOPLES-STOKES:  Thank you.

               ACTING SPEAKER AUBRY:  -- Madam Majority

Leader.

               Are there any other votes?  Announce the results.

               (The Clerk announced the results.)

               The bill is passed.

               THE CLERK:  Assembly No. A09922, Rules Report

No. 101, Stirpe.  An act in relation to authorizing the Liverpool

Central School District to receive State aid for certain approved

capital-funded projects.

               ACTING SPEAKER AUBRY:  Read the last section.

               THE CLERK:  This act shall take effect immediately.

               ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report No. 101.  This is a fast roll call.  Any

member wishing to be recorded in the negative is reminded to contact

the Majority or Minority Leader at the number previously provided.

               (The Clerk recorded the vote.)

               Are there any other votes?  Announce the results.

               (The Clerk announced the results.)

               The bill is passed.

               THE CLERK:  Assembly No. A09936-A, Rules

Report No. 102, Crouch.  An act to amend the Highway Law, in

277

**NYS ASSEMBLY**                                          **JUNE 9, 2020**

relation to designating a portion of the State highway system as the

"Colchester Veterans Memorial Bridge."

ACTING SPEAKER AUBRY:  On a motion by Mr.

Crouch, the Senate bill is before the House.  The Senate bill is

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report No. 102.  This is a fast roll call.  Any

member wishing to be recorded in the negative is reminded to contact

the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09937-A, Rules

Report No. 103, Woerner.  An act to amend the Public Officers Law,

in relation to qualifications for holding certain offices in the Village of

South Glens Falls.

ACTING SPEAKER AUBRY:  On a motion by Ms.

Woerner, the Senate bill is before the House.  The Senate bill is

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Rules Report No. 103.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

   (The Clerk recorded the vote.)

   Are there any other votes?  Announce the results.

   (The Clerk announced the results.)

   The bill is passed.

   THE CLERK:  Assembly No. A09951, Rules Report No. 104, Barclay.  An act relating to legalizing, validating, ratifying and confirming a transportation contract of the Fulton City School District.

   ACTING SPEAKER AUBRY:  Read the last section.

   THE CLERK:  This act shall take effect immediately.

   ACTING SPEAKER AUBRY:  The Clerk will record the vote on Rules Report No. 104.  This is a fast roll call.  Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

   (The Clerk recorded the vote.)

   Are there any other votes?  Announce the results.

   (The Clerk announced the results.)

   The bill is passed.

   THE CLERK:  Assembly No. A09952-B, Rules Report No. 105, McDonald, Fahy, Steck, D'Urso, Thiele, Dickens, Darling, Epstein, Jacobson, Glick, Galef, Simon, Cahill, Lentol, Gottfried, Schmitt, DeStefano.  An act prohibiting the incineration of

aqueous film-forming foam containing perfluoroalkyl and
polyfluoroalkyl substances in certain cities.

ACTING SPEAKER AUBRY:  On a motion by Mr.
McDonald, the Senate bill is before the House.  The Senate bill is
advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  This is a fast roll call.
Any member wishing -- oh.

The Clerk will record the vote on Rules Report No.
105.  This is a fast roll call.  Any member wishing to be recorded in
the negative is reminded to contact the Majority or Minority Leader at
the number previously provided.

(The Clerk recorded the vote.)

Mr. McDonald, tell me something.

First you have to spell that word.

(Laughter)

MR. MCDONALD:  Well, thank you, Mr. Speaker.
And I rise to, first of all, thank you, to thank Chairman Englebright,
Lou Ann Ciccone and the team for recognizing this important
legislation.  This legislation prohibits the burning or incineration of
perfluoroalkyl and polyfluoroalkyl substances, otherwise known as
firefighter foam, but we'll call it AFFF to make it a little bit easier on
the ears this evening.  As you know, these substances, known as PFOS
and PFASs, have had some detrimental health impacts here in our

Capital Region and Hoosick Falls.  And it became -- brought to my
attention by the Mayor of my hometown of Cohoes that an
organization was burning this back in February of this past year.
Immediately we put this legislation in -- in effect, and the bottom line
is this:  There's uncertainty both at the EPA and the DEC on whether
this can truly be incinerated without having a negative impact on
public health.  And, therefore, this legislation strikes to prohibit that
incineration until science can prove otherwise.

        So, I want to thank you for your support, for
expediting this legislation.  And as you might ask, I am supporting this
bill.  Thank you.

        ACTING SPEAKER AUBRY:  Mr. McDonald in the
affirmative.

        Are there any other votes?  Announce the results.

        (The Clerk announced the results.)

        The bill is passed.

        Mrs. Peoples-Stokes.

        MRS. PEOPLES-STOKES:  Mr. Speaker, do you
have any housekeeping or resolutions to take up?

        ACTING SPEAKER AUBRY:  None that we can
find, Mrs. Peoples-Stokes.

        (Laughter)

        MRS. PEOPLES-STOKES:  Well, Mr. Speaker, now
I want to commend my colleagues on both sides of the aisle for having
a very deliberate but good conversation today and passing some good

281

**NYS ASSEMBLY**                                    **JUNE 9, 2020**

legislation.  And I also want to remind people that we do have one more day in Session.  So we're going to start in the morning with a Ways and Means Committee at 9:00.  Immediately following that we will be doing Rules at 9:30, and then a 10:00 a.m. Session, Mr. Speaker.  A 10:00 a.m. Session will allow us to move out a little earlier in the day.

        So with that, I want to move that the Assembly stand adjourned until 10:00 a.m. Wednesday morning, June the 10th, tomorrow being a Session day.

        ACTING SPEAKER AUBRY:  The Assembly Session is over.

        (Whereupon, at 9:12 p.m., the House stood adjourned until Wednesday, June 10th at 10:00 a.m., that being a Session day.)