UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION, <br><br> Plaintiffs, <br><br> -against- <br><br> BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD, <br><br> Defendants. | Case No. 1:20-CV-05441-KPF <br><br> **DECLARATION OF ASSEMBLYMAN MICHAEL BLAKE IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION** |

Michael Blake declares under penalty of perjury as follows.

1.      I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Opposition to Plaintiff's Request for a Preliminary Injunction.  I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief.  As to those, I believe them to be true.

### My Work as Assemblyman

1.      I currently serve as the New York State Assemblyman from the 79th District in the Bronx.  This is a position I have held since November 17, 2014, when after a career in national politics—including serving in the Obama Administration as the Associate Director of Public Engagement and the Deputy Associate Director of the Officer of Intergovernmental Affairs—I transitioned to local politics to represent the community where I grew up.

2.      In my role as Assemblyman, I was involved in the efforts to repeal § 50-a.  I was a lead speaker on the importance of repealing § 50-a, and ultimately co-sponsored A02513, the bill sixty-three assembly members co-sponsored during the 2019-2020 General Assembly to repeal § 50-a.  Additionally, I was a co-sponsor and voted for A10611, the bill that ultimately repealed § 50-a.  I have also been very active within the Black, Puerto Rican, Hispanic, and Asian Caucus.

3.      My advocacy for repealing § 50-a was motivated by concerns voiced by my constituents—but further fueled when I myself experienced NYPD misconduct.

### My Personal Experience with Police Misconduct

4.      In 2016, in my official capacity as Assemblyman, I attended a family day event at Morris Houses, a public housing project located in my district.  In speaking to residents there, I

-2-

heard that many residents were having issues with the officers who had been assigned to the housing project.  I left the family day event for several hours to attend other events within my district, but later returned to the family day event.  When I returned, multiple officers had several of the housing's residents in handcuffs.  Aware of the policing issues in this community, I approached to see what was happening.  A commotion broke out and I attempted to intervene to deescalate the situation.  At that moment, I was grabbed by an NYPD officer and thrown against the wall.  Despite pleading with the officer to let me go, he continued to hold me against the wall.  Only when a second officer recognized me as an Assemblyman did he instruct the first officer to let me go.

5. Immediately after, I asked both officers for their name and badge number.  Both of the officers refused—even though officers are required to give this information.  I was able to look at one officer's uniform and see his name and badge number.  The other officer, however, turned away from me, refusing to let me see the front of his uniform.  Immediately, the officers began claiming that their training teaches them to treat everyone as a threat initially, and that they tackled me for that reason: I was a perceived threat.

6. Following this incident, I organized a press conference, where I detailed my experience and my inability to get information from the offices involved.  I recognize that the only reason the officer stopped assaulting me was my name and title—factors which I strongly believe should not dictate whether a citizen is violently detained.

7. After the press conference, I had a meeting with then Police Commissioner Bratton.  I received no additional information from the Commissioner.  I had to find out from media coverage of an event the Commissioner went to after our meeting that he had no intention of apologizing.  I complained to CCRB, who investigated the case.  It was only because of my

attorney's continual pressure that I received justice.  The entire process was a black box, where apart from my interview with the CCRB investigator, I had no idea what was happening on the other side.

8. This incident spurred my commitment police accountability efforts, including the repeal of § 50-a and open discovery laws.  It showed me firsthand (although not for the first time in my life) that the system of secrecy within the NYPD and disciplinary bodies allowed officers to act violently against innocent citizens, and to do so with impunity when they should be held to a higher standard.  It is not a coincidence that the officers released me only when they realized my position within the city.

### The Unions' Arguments Were Already Rejected by the Legislature – And They Do Not Hold Water

9. What became increasingly clear during my work on repeal efforts was that for both the unions and the statewide law enforcement departments, the repeal of § 50-a and open discovery were nonstarters. They simply would not agree to this.  But despite the unions and departments stonewalling all attempts at reform, those of us who fought relentlessly for its repeal secured a significant victory in June 2020 with the repeal of § 50-a.  Now, the unions seek to rollback this victory, by making the same arguments that they made in opposition to repeal.

### Any Concerns Regarding Police Safety are Just Speculation

10. But concealing records of misconduct does harm the community's safety.  In no other profession do we expect society to be comfortable interacting with an individual who has multiple complaints of professional misconduct; for example, I would not feel comfortable interacting with a doctor with numerous malpractice claims.  But, when it comes to law enforcement, the public is expected to interact willingly with armed officers who may have numerous complaints that the department actively shields from disclosure.

11.     It is impossible for the community to feel safe if we do not know, and are in fact, prevent from knowing, if we are in an environment in which law enforcement engages in a pattern or form of behavior against the community's safety.  This is especially true when the department spends considerable time and resources to specifically hide previous behaviors.  This raises the questions of who the department is trying to protect: themselves or the community?  That fosters distrust, and leaves citizens feeling unsure and unsafe.

12.     It is crucially important that all records are publicly available.  For unfounded or unsubstantiated complaints, just because the conduct was not proven does not mean it did not happen.  Because police misconduct is often only revealed if citizens come forward to complain about officers who abuse their station, there is a very real fear of retaliation amongst community members.  In these cases the person coming forward to file a complaint faces more risk than the officers and the department involved in covering up the information.

13.     This fear is not speculative.  During June 2020, I was on the streets during the early days of the protests that stemmed from George Floyd's murder.  I observed that whenever an officer was interacting with a community member, a line of citizens would form—so there would be witnesses.  But on the other side of the interaction stood members of the police's Strategic Response Group, wearing full military equipment, staring down these would-be witnesses, likely intimidating them.  That a citizen would still file a complaint in the face of this intimidation and the other forms of police intimidation and retaliation is itself telling.

14.     Additionally, the release of all records is critical to identifying patterns of behavior.  Whereas something happening once or twice may be characterized as a mistake, it is less likely that the conduct be a random occurrence if there are multiple complaints involving the same type of conduct, regardless of the ultimate outcome.  Because officers are public servants,

the public should be aware of instances of both perceived and actual misconduct, because any misconduct leads to mistrust.

15. Finally allowing the release of all information regarding *officer* conduct is consistent with the police's expectation of disclosure from *citizens*. That is, if an individual is a witness to a crime, the police expect that individual to prove a full and truthful account of events. Failure to do so when asked could be viewed as obstruction. Yet when it comes to investigating bad actors within the police, the police department's status quo is to hide everything. It is entirely inconsistent to promote "see something, say something" in the community but then aggressively fight for silence regarding a "something" possibly done by officers.

16. When the unions and the department fight adamantly for silence, they make the community continually fearful, because any interaction with law enforcement could be with an officer whose long history of misconduct complaints has been adamantly protected for years. This raises questions of what the department is so afraid of the public knowing. At the core, concealing misconduct investigations and complaints covers furthers the violence the community experiences. Only in making all the records publicly available can community members feel safe walking the streets, and safe walking into the precinct to report or help solve crimes.

Executed on this 13th day of August, 2020, in *The Bronx, New York*

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____
Michael Blake