UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNIFORMED FIRE OFFICERS
ASSOCIATION; UNIFORMED
FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK; CORRECTION
OFFICERS' BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC.;
POLICE BENEVOLENT ASSOCIATION OF
THE CITY OF NEW YORK, INC.;
SERGEANTS BENEVOLENT
ASSOCIATION; LIEUTENANTS
BENEVOLENT ASSOCIATION; CAPTAINS
ENDOWMENT ASSOCIATION; and
DETECTIVES' ENDOWMENT
ASSOCIATION,

                Plaintiffs,

              -against-

BILL de BLASIO, in his official capacity as
Mayor of the City of New York; THE CITY
OF NEW YORK; FIRE DEPARTMENT OF
THE CITY OF NEW YORK; DANIEL A.
NIGRO, in his official capacity as the
Commissioner of the Fire Department of the
City of New York; NEW YORK CITY
DEPARTMENT OF CORRECTION;
CYNTHIA BRANN, in her official capacity as
the Commissioner of the New York City
Department of Correction; DERMOT F.
SHEA, in his official capacity as the
Commissioner of the New York City Police
Department; THE NEW YORK CITY
POLICE DEPARTMENT; FREDERICK
DAVIE, in his official capacity as the Chair of
the Civilian Complaint Review Board; and
THE CIVILIAN COMPLAINT REVIEW
BOARD,

                Defendants.

Case No. 1:20-CV-05441-KPF

**DECLARATION OF BRENDAN COX
IN SUPPORT OF COMMUNITIES
UNITED FOR POLICE REFORM'S
OPPOSITION TO PLAINTIFF'S
REQUEST FOR PRELIMINARY
INJUNCTION**

Brendan Cox declares under penalty of perjury as follows.

1.      I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Oppositions to Plaintiff's Request for Preliminary Injunction. I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

### Summary of Opinions

2.      I am the retired Police Chief of the Albany Police Department, where I began my 23-year career in law enforcement as a rank-and-file officer. Like so many young officers, I first joined the police force because I wanted to be out in my community, helping people and making a positive difference. After many years with the Albany Police Department, I was promoted to Police Chief, a position I held until 2017, when I retired from law enforcement.

3.      I am currently the Director of Policing Strategy for Law Enforcement Assisted Diversion's National Support Bureau and a Speaker with Law Enforcement Action Partnership ("LEAP"). LEAP is a nonprofit group of police, prosecutors, judges, and other law enforcement officials working to improve the criminal justice system. My work focuses on police transparency and accountability issues, including advocating for the repeal of § 50-a.

4.      In January 2020, I authored an op-ed, published in *The Times Union*, titled "Commentary: Open Misconduct Records to Improve Public Trust in Police."[1] In the op-ed I detail how transparency plays a vital role in building community trust and safety. I called for § 50-a to be repealed because I think that the law serves to lump honest, hard-working police

---

[1] Available at https://www.timesunion.com/opinion/article/Commentary-Open-misconduct-records-to-improve-14948648.php.

officers in with officers who have betrayed the public trust by allowing their misconduct to be shielded by outdated legislation.

5.      Throughout my career, and in particular during my work to advocate for the repeal of § 50-a, I encountered many of the same arguments that the unions raise in this litigation.  Based on my experience, these arguments regarding officer safety, officer reputation, and the ability of upstanding officers to secure future employment do not ring true.  Specifically, the arguments that releasing records will jeopardize officer safety, reputation, and employment are not true.  In fact, the opposite is true: the transparency that comes from releasing misconduct records increase officer safety by increasing public trust in the police generally; officers already have a reputation in the community based on how they treat community members; and honest officers who uphold their responsibilities and are able to acknowledge when they have made mistakes will almost always be able to secure future employment.

## My Observations During My Career in Law Enforcement

6.      In the early years of my career, when an officer in the Albany Police Department received a complaint, the officer was required to submit an incident memo to Internal Affairs. During those mid-1990 years, it was customary amongst the rank-and-file to write "I didn't do it" in every incident memo—even if that was not the truth.  This created a culture where individual officers were not held accountable for their actions, and it allowed the department to ignore system-wide problems.

7.      I also observed inconsistent disciplinary procedure based more on an officer's popularity within the department than on the severity of misconduct.  Often, a well-liked officer or one who had a connection to leadership would not be disciplined to the same extent as officers without those connections.  This led to distrust within the department.  I myself did not trust the

brass and their ability to discipline fairly, so I became involved in the police union. This is where I formed my first opinions about § 50-a.

8.      Initially I believed that § 50-a was beneficial to the officers, protecting them from having their misconduct records used to attack their credibility when they testified in connection with cases in which they had been an investigating or arresting officer.

9.      But my opinions about § 50-a shifted dramatically over time. Most officers had not had significant misconduct complaints or investigations—and so I learned that the risk that misconduct records could discredit otherwise credible officers' testimony is not as grave as I once thought. To the contrary: when an officer is able to admit that a minor disciplinary infraction shows an incident in which they—like all humans—made a mistake, and when that officer acknowledges it and take steps to behave better in the future, that bolsters that officer's credibility (both in and out of court). By comparison, when misconduct records show a pattern of similar complaints or extensive misconduct complaints, this raises legitimate concerns about the officer's credibility—and that information should be available for the court to consider.

10.     As I advanced within the leadership of the Albany Police Department, I saw firsthand the harms that a lack of transparency and accountability cause. Secrecy around police misconduct and any resulting discipline gives the impression that there is a lack of oversight and accountability within the department. Community members believe that problems are being ignored or not taken seriously. Internally, the secrecy fosters mistrust within the department; officers do not feel supported. And, working in a community that does not trust police officers leads to morale issues.

## My Efforts to Increase Transparency, and the Results I Saw, While Police Chief

11.     When I became Chief, I made it my mission to focus on building both trust and transparency.  The two go hand-in-hand: the more transparent a department can be, the more trust the community will have.

12.     For police to effectively prevent and solve crime, officers need the community members to come forward and provide information regarding crimes they have witnessed.  The community will only do that when they have trust in the police department.  This trust comes in large part from the community seeing that, if they make complaints about officers who abuse their position, those complaints are taken seriously, investigated, and that the officers are corrected and disciplined.  When an officer engages in misconduct and the discipline process is kept secret, the community has no way of knowing if the misconduct was properly addressed.  And, when the community believes that police departments are withholding information regarding police misconduct, the community will not report crimes or come forward as witnesses in open investigations.  If members of the community feel that the police are not being open and transparent, those citizens themselves are less likely to be open and transparent.

13.     I saw proof of this during my tenure as chief.  During my second day as acting chief in Albany, an individual died while in our custody.  Instead of retreating behind § 50-a, we openly shared information with both the victim's family and directly with the community.  It was important for me and my department to show our commitment to improving public trust.  Most importantly it was critical to show that we were committed to thoroughly investigating the incident and holding officers accountable.

14.     Once the community saw that we were open about investigating complaints of all scale and that we were not trying to hide misconduct, the community became more receptive to

forging relations with the department.  Members of the community more readily came forward to report crime or to provide witness information, because the trust with the community had been repaired.  And citizens were less apprehensive about being associated with the police department.

15.     One vivid example of how increased transparency built trust and improved the relationship between the community and the department is illustrated by the simple example of a t-shirt:  Every year the Albany Police Department runs a Summer Cadet program for youth ages 13-18 to participate in a junior police academy.  The participants would receive a t-shirt with the department's logo.  When the program started, it was common for the students to walk to the program in their normal attire, change into the shirt and wear it during the program, and remove the shirt before leaving for the day.  They did not want to be seen walking the streets in a shirt showing their affiliation with the police.  But by 2016, the last year that I ran the program before I retired, I noticed that the students were now wearing the shirt *outside* the program.  As the community became more trusting of the police, the youth became more comfortable being associated with the department.

### Advocacy Efforts and Work Surrounding the Repeal of § 50-a

16.     Following my retirement from the police force, I became involved in LEAP, where I have focused my attention on reform related to police transparency and accountability. As part of my advocacy efforts, I supported the repeal of § 50-a because I do not think that § 50-a allowed law enforcement to be held accountable to the public; and that in turn prevented addressing systemic issues within the police system.

17.     A majority of officers go to work each day and serve their communities with honor and do not abuse their authority.  For these officers, the repeal of § 50-a has a positive

effect, not a negative one.  However, there *are* officers who disrespect the community, abuse their authority, and engage in misconduct.  It is important to protect the majority of officers who are upstanding public servants that the law enforcement system is transparent about those officers who are not—and allow the public to understand the degrees and nuances of accused misconduct.

18.     Repealing § 50-a removed a key barrier to transparency, which now the unions are fighting in this litigation.  Many of the arguments that the unions made during the repeal § 50-a process are the same that they are making now.  But these arguments do not ring true, based on my experience.

### Transparency Promotes Officer Safety by Increasing Public Trust in the Police

19.     As a member of law enforcement for 23 years, officer safety has always been a priority for me.  I simply do not believe that releasing the misconduct histories of police officers will put them at risk.  To the contrary: increased transparency directly leads to increased officer safety.  The release of misconduct records would make policing safer, because officers are always safer when community members trust us and have our backs.  And when the disciplinary process is transparent, the public has increased confidence in the results of the disciplinary process.  By comparison, an officer is most at risk when the community believes that the police department is shrouded in secrecy and working to hide misconduct.  It is when misconduct goes unchecked that the community becomes frustrated and distrusting.  That is when officers and the department face the most risk.

### Transparency is Crucial for Future Employers and Will Not Ruin the Employment Prospects of Good Officers

20.     The Unions' argument that making misconduct records public will prevent officers from obtaining future employment is also misplaced.  During my time as Chief, I was

directly involved in the hiring process of both new recruits and laterals from other departments.

I know from that experience that good officers who wish to lateral departments will almost

always be able to obtain employment.  Officers with minor disciplinary records will also be able

to move to a new department, so long as the record shows that the issue was dealt with and

corrected.

21.     When considering a potential lateral hire, it is critical to have records of all

complaints regardless of disposition.  Of course, I would never reflexively assume that a

complaint that was unsubstantiated, unfounded, or exonerated was actually valid.  But I might

nevertheless ask an officer about it.  If a prospective lateral had, for example, numerous

complaints, but all were unsubstantiated, I would still view those complaints as significant in the

mix of things I might ask the officer about and ultimately consider.   And indeed, a pattern of

numerous, similar complaints could raise important questions about fitness regardless of the

disposition.  As someone charged with protecting both the citizens in my community and the

officers working alongside any new hire, I strove to get the fullest picture I could of an officer's

past performance, including misconduct and disciplinary history.

22.     Of course, during my own tenure, when it came to lateral officer hiring, I found

that § 50-a blocked my access to candidates' personnel records.  I often was able to find more

information about a prospective candidate through Google than through their official records.  I

would also have the Office of Professional Standards directly ask candidates about complaints

against them and the outcomes of the complaints.  I had to trust that they were being forthcoming

with the process.  I would like to think that job candidates are honest with prospective

employers—so I do not see why the unions believe the continued secrecy around this

information is necessary.  If anything, full and ready access to misconduct and disciplinary

history will simply provide a fuller and more accurate assessment of all relevant factors.

23.     As Chief, I would not have been doing my job—to protect the community and

department—if I did not further investigate misconduct and disciplinary histories that raised red

flags before making my ultimate decision.  There are simply circumstances in which an officer

should not be hired by a new department because of that officer's record.  And if that officer is

hired, the department may be held accountable for hiring someone that endangers the many

interests a police department must protect.  If my department hired an officer that had a pattern

of abusing authority, that could jeopardize the safety of the officers who will be working side-by-

side with that individual, the safety of the community, and the trust and collaboration between

the community and my department.

### Officers' Reputations are Dictated by Their Interactions with the Community – Not their Misconduct Records

24.     I am highly skeptical of the idea that releasing misconduct records will impact an

officer's reputation.  The community is already aware of an officer's reputation based on how

that officer interacts with the community.  While I was Chief, community members could easily

identify officers with a good reputation and those with a bad reputation.  An officer who treats

the community fairly, who respects citizens' rights, and who is a good officer will have a good

reputation, regardless of minor misconduct records.  But, for an officer who already has a bad

reputation in the community, releasing the lengthy misconduct records will not change people's

viewpoint.  Providing outcomes to the community to show corrective actions can also show the

community that officers are willing to own up to their actions, learn from them, and improve.

### Releasing All Records of Police Misconduct Protects both the Police and the Public

25.      Finally, I believe the public, the department, and the officers benefit when all misconduct records are released.  Complaints that have not been resolved are important because that may point to failures within a department's disciplinary and investigative process.  Where a complaint is adjudicated, it is important for the public to know the final result, regardless of outcome.  Where a complaint is substantiated, the public will see that complaints are taken seriously and that bad behaviors will be addressed.  If the claim is unfounded, then the officer can say that a thorough investigation occurred, and it was found that the officer did not engage in the conduct.

Executed on this 11th day of August, 2020, in Saratoga Springs, New York.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____

Brendan Cox