UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association,<br><br>          Petitioners/Plaintiffs,<br><br>    -against-<br><br>Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board,<br><br>          Respondents/Defendants. | Case No. 1:20-cv-05441-KPF |

AMICUS BRIEF OF NEW YORK STATE BLACK, PUERTO-RICAN, HISPANIC, AND
ASIAN LEGISLATIVE CAUCUS IN SUPPORT OF PROPOSED INTERVENOR
COMMUNITIES UNITED FOR POLICE REFORM'S MOTION TO INTERVENE

Pamela S.C. Reynolds
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450
Tel: (585) 203-3400

*Attorneys for Amicus Curiae*
*New York State Black, Puerto Rican, Hispanic &*
*Asian Legislative Caucus*

TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   ARGUMENT ............................................................................................... 2

      A.   The History of Civil Rights Law § 50-a and its Growth into a Near-Total
           Barrier to Police Transparency ............................................................. 2

           1.   The Legislature Passed § 50-a to Mitigate Police Union Backlash
                Against the Civil Rights Movement ............................................. 2

           2.   Originally modest, CRL § 50-a Evolved to Hide Virtually All
                Police Discipline from Public Oversight ....................................... 3

           3.   Delays Resulting from Law Enforcement Using § 50-a as a Shield.......... 4

      B.   CPR takes a Leading Role in Fighting to Repeal 50-a ............................. 5

           1.   CPR and its Allies Brought Necessary Community Insights
                Essential to the Legislative Deliberation and this Litigation, that no
                other Party could Provide........................................................... 6

           2.   Unlike the Parties, CPR Represents the Struggles of Citizens
                Directly Affected by § 50-a and its Barriers to Police Transparency ...... 10

      C.   CPR's Intervention is Essential to Adjudicating Petitioners' Challenges to
           Respondents' Intended Disclosures Under § 50-a's Repeal .............................. 11

           1.   The Threats of Harm to Officers were Thoroughly Considered by
                the Legislature, as CPR will help Demonstrate ....................................... 11

           2.   Petitioners' Arguments Concerning Due Process and the Propriety
                for Injunctive Relief Necessitate CPR's Intervention.............................. 12

      D.   As the Proponent of 50-a's Repeal, and the Advocate for its Beneficiaries,
           CPR Has a Right to Intervene .............................................................. 13

           1.   CPR's Has Legally Protectable Interests at Stake .................................. 13

           2.   CPR's Interests Will Be Impaired Absent Intervention........................... 14

           3.   Respondents cannot adequately represent CPR's interests..................... 15

      E.   Even if CPR Cannot Intervene by Right, Permissive Intervention is proper....... 16

III.  CONCLUSION.................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brennan v. N.Y.C. Bd. of Educ.*,
  260 F.3d 123 (2d Cir. 2001) ............................................................................................13

*Bridgeport Guardians v. Delmonte*,
  602 F.3d 469 (2d Cir. 2010) ............................................................................................13

*Brumfield v. Dodd*,
  749 F.3d 339 (5th Cir. 2014) ..........................................................................................14

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
  No. 18 CIV. 11657 (ER), 2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020) .........................15

*Coakley v. Jaffe*,
  49 F. Supp. 2d 615 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000) ....................13

*Commack Self-Service Kosher Meats, Inc. v. Rubin*,
  170 F.R.D. 93 (E.D.N.Y. 1996) .......................................................................................14

*Daily Gazette Co. v. City of Schenectady*,
  93 N.Y.2d 145 (1999) .....................................................................................................3, 4

*Dow Jones & Co, Inc. v. United States Dept. of Justice*,
  161 F.R.D. 247 (S.D.N.Y. 1995) .....................................................................................16

*Floyd v. City of New York*,
  959 F. Supp. 2d 540 (S.D.N.Y. 2013) ...............................................................................9

*Luongo v. CCRB Records Officers and Daniel Pantaleo*,
  150 A.D.3d 13 (1st Dep't 2017), *leave den.*, 30 N.Y.3d 908 (2017) ................................4

*Luongo v. Records Access Appeals Officer, NYPD*,
  160232/2016, 2017 N.Y. Misc. LEXIS 2102 (Sup. Ct. N.Y. Co. June 1, 2017),
  *aff'd*, 168 A.D.3d 504 (1st Dep't Jan. 17, 2019) ..............................................................5

*Malcolm v. New York City Police Dep't*,
  100466/2017, 2018 ...........................................................................................................3

*Mathews v. Eldridge*,
  424 U.S. 319 ....................................................................................................................13

*Miller v. Silbermann*,
  832 F. Supp. 663 (S.D.N.Y. 1993) ..................................................................................16

*N.Y. Civil Liberties Union v. N.Y. City Police Dep't*,
  32 N.Y.3d 556 (2018) ............................................................................4

*N.Y. Pub. I.R.G. v. Regents of Univ. of N.Y.*,
  516 F.2d 350 (2d Cir. 1975)...................................................................14

*Raymond v. City of New York*,
  15 Civ. 6886 (LTS) (HBP), 2017 U.S. Dist. LEXIS 31742 (S.D.N.Y. March 6,
  2017) ......................................................................................................13

*United States v. Pitney Bowes, Inc.*,
  25 F.3d 66 (2d Cir. 1994) ......................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).....................................................................................13

**Statutes and Rules**

Federal Rules of Civil Procedure Rule 24 ....................................................16, 17, 20

New York Pub. Off. Law § 84.................................................................. *passim*

New York Civil Rights Law § 50-a .......................................................... *passim*

New York Pub. Off. Law § 8.................................................................................12

**Other Authorities**

Brendan J. Lyons, *Court rulings shroud records*, TIMES UNION (Dec. 10.
  2016), https://www.timesunion.com/tuplus-local/article/Court-rulings-shroud-
  records-10788517.php .............................................................................3

City of New York, *Transcript: Mayor de Blasio Appears Live on The Brian
  Lehrer Show* (Oct. 18, 2019), available at https://www1.nyc.gov/office-of-the-
  mayor/news/495-19/transcript-mayor-de-blasio-appears-live-the-brian-lehrer-
  show ....................................................................................................7, 15

Communities United for Police Reform, *Campaign Members*, available at
  https://www.changethenypd.org/campaign/intro-members ........................6

New York State Senate, *Transcript of Reg. Ses. – Jun. 9, 2020* at 1894:14-16,
  https://www.nysenate.gov/transcripts/floor-transcript-060920txt .............9

New York City Bar, Report on Legislation by the Civil Rights Committee, NEW
  YORK CITY BAR ASSOCIATION 1, 2 (2020), https://bit.ly/3jK6O2O;...............3

Nick Pinto, *How New York's Law Shielding Cops From Scrutiny Became One of
  the Toughest in the Country*, GOTHAMIST (March 10, 2020),
  https://gothamist.com/news/ny-police-nypd-50a-cops-crime ....................2

NYC Dep't of investigation, Off. of the Inspector Gen., Complaints of biased Policing in New York City: an Assessment of NYPD's Investigation, Policies, and Training 2 (2019), http://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf ..........................9

Rocco Parascandola & Graham Rayman, EXCLUSIVE: NYPD suddenly stops sharing records on cop discipline in move watchdogs slam as anti-transparency, N.Y. DAILY NEWS (Aug. 24, 2016), https://www.nydailynews.com/new-york/exclusive-nypd-stops-releasing-cops-disciplinary-records-article1.2764145..............................................................................4

Senate Standing Committee on Codes, *Testimonies on Policing S3695 Repeals Provision* at 46, available at https://www.nysenate.gov/sites/default/files/testimonies_on_policing_s3695_r epeals_provisions_101719.pdf.........................................................................................9, 10

Senate Standing Committee on Codes, *Oct. 24 Public Hearing on Discovery Reform Written Testimony* at 44, available at https://www.nysenate.gov/sites/default/files/oct_24th_public_hearing_on_disc overy_reform.pdf ............................................................................................. *passim*

Senate Standing Committee on Codes, *Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers* (Oct. 17, 2019), available at https://www.nysenate.gov/calendar/public-hearings/october-17-2019/public-hearing-policing-s3695-repeals-provisions-relating ................................................................6

Senate Standing Committee on Codes, *Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers* (Oct. 24, 2019), available at https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-hearing-policing-s3695-repeals-provisions-relating ....................................................... *passim*

The Honorable Mary Jo White, The Honorable Robert L. Capers, The Honorable Barbara S. Jones, *The Report of the Independent Panel on the Disciplinary System of the New York City Police Department*, at 19 (Jan. 25, 2019) https://www.independentpanelreportnypd.net/ assets/report.pdf...........................................4, 5

# I. PRELIMINARY STATEMENT

The New York State Black, Puerto Rican, Hispanic & Asian Legislative Caucus (the "Caucus") files this brief, pursuant to the Court's leave to assist in adjudicating Communities United for Police Reform's ("CPR") motion to intervene in the above-captioned matter.

The Caucus is a 62-member body of New York State legislators, from both the Senate and Assembly, representing approximately 25% of residents across the entire State. Its members share a common responsibility in effectuating the purpose and function of the legislative process, specifically, the manner in which that process affects the lives and well-being of the people, in particular, those persons with ties in the Black, Puerto Rican, Hispanic and Asian communities. In furtherance of its mission, and on behalf of its members' constituents, the Caucus was instrumental in passing the recent legislation repealing New York Civil Rights Law ("CRL") § 50-a.

Throughout the course of deliberating that legislation, the Caucus was assisted by CPR's advocacy as an organization and coalition representing communities impacted by the lack of police transparency. CPR has a profound and justiciable interest that could be impaired in this litigation absent their intervention, and which the current parties, no matter how sincere their positions, cannot adequately represent. As the legislators responsible for the drafting, negotiating, and passing of §50-a, we seek to support and advance CPR's desire to intervene in this litigation, based on their interest and ability to do so. This amicus curiae brief details the origin of § 50-a as a legislative reaction to the civil rights movement, its expansion and interpretation by the courts into a near boundless obstruction on police transparency, and its ultimate repeal. It details the perspectives CPR presented the Legislature, informed and driven by its deep roots in the communities § 50-a most sorely impacted. The brief then touches on why Petitioners' arguments

further necessitate intervention and closes by explaining why the governing procedural standard under which CPR's motion to intervene should be granted.

## II. ARGUMENT

**A.    The History of Civil Rights Law § 50-a and its Growth into a Near-Total Barrier to Police Transparency**

### 1.    The Legislature Passed § 50-a to Mitigate Police Union Backlash Against the Civil Rights Movement

"50-a was passed at a distinctive moment in American history," following the battles and early triumphs of the civil rights movement. Nick Pinto, *How New York's Law Shielding Cops From Scrutiny Became One of the Toughest in the Country*, GOTHAMIST (March 10, 2020), https://gothamist.com/news/ny-police-nypd-50a-cops-crime. Those battles transformed public discourse around law enforcement, and strengthened support for expanded police transparency. *Id.* In 1966, for example, New York City Mayor John Lindsay tried restructuring the Civilian Complaint Review Board ("CCRB") to allow civilian oversight at the highest level for the first time in City history. *Id.* In response to such a modest reform, "police unions rebelled." *Id.* More than 5,000 officers, led by the Patrolman's Benevolent Association ("PBA"), stormed City Hall. *Id.* The PBA President at the time, John Cassese, commented: "I am sick and tired of giving in to minority groups, with their whims and their gripes and shouting." *Id.* Mayor Lindsay was forced to concede to the PBA's power when it advocated for and won a referendum barring civilians from having oversight of the police. *Id.*

In 1973, when the New York Legislature passed the Freedom of Information Law ("FOIL"), granting public access to government records, the police unions objected as before, and lobbied legislators to qualify FOIL's purpose by passing CRL § 50-a "over the objections of legislators, civil liberties groups, and law enforcement officials who accurately predicted the kind of unaccountability for police violence and corruption the law would foster." *Id.*

The sponsors of this legislation endeavored to limit any restrictions on the public's access to police records.  As enacted in 1976, § 50-a provided that "all personnel records used to evaluate performance toward continued employment or promotion, under the control of any police agency . . . shall be considered confidential and not subject to inspection or review without the express written consent of such police officer . . . except as may be mandated by lawful court order."  *See* CRL § 50-a(1) (repealed June 12, 2020).  While the legislature assumed this would limit criminal defense attorneys from sidetracking prosecutions with irrelevant impeachment of police officers for prior acts, it was ***never*** intended to hide police misconduct records from the public, as Section 50-a's chief sponsor, the late Senator Frank Padavan made clear.  *See* New York City Bar, Report on Legislation by the Civil Rights Committee, NEW YORK CITY BAR ASSOCIATION 1, 2 (2020), https://bit.ly/3jK6O2O; Brendan J. Lyons, *Court rulings shroud records*, TIMES UNION (Dec. 10. 2016),  https://www.timesunion.com/tuplus-local/article/Court-rulings-shroud-records-10788517.php (quoting Padavan in 2016, who stated "That was the intent…If the law is being misused then obviously an amendment might be in order.")

### 2.  Originally modest, CRL § 50-a Evolved to Hide Virtually All Police Discipline from Public Oversight

Despite the Legislature's original intent, the law enforcement community sought with success to "expand[] [§ 50-a] in the courts to allow police departments to withhold from the public virtually any record that contain[ed] any information that could conceivably be used to evaluate the performance of a police officer."  *Daily Gazette Co. v. City of Schenectady*, 93 N.Y.2d 145, 155 (1999).  CRL § 50-a came to be interpreted as a rule of secrecy rather than an exception to open disclosure.  Subsequent courts would rule the following as insulated from disclosure:

- Officer training information and settlements for the disciplined officer.  *Malcolm v. New York City Police Dep't*, 100466/2017, 2018 NYLJ LEXIS 2874, *22 (Aug. 29, 2018);

- Records of off-duty misconduct. *Daily Gazette Co.*, 93 N.Y.2.d at 159 ;

- CCRB records regarding whether officers have been accused of misconduct, whether the allegations were substantiated, and even whether officers were disciplined for proven misconduct. *Luongo v. CCRB Records Officers and Daniel Pantaleo*, 150 A.D.3d 13 (1st Dep't 2017), *leave den.*, 30 N.Y.3d 908 (2017) (reversing order granting access to former NYPD Police Officer Daniel Pantaleo's substantiated CCRB disciplinary history);

- Personnel records, even with redactions. *N.Y. Civil Liberties Union v. N.Y. City Police Dep't*, 32 N.Y.3d 556, 570 (2018).

Emboldened and compelled by these decisions, police departments like the NYPD increasingly cited § 50-a to end their own longstanding voluntary disclosure programs. *See, e.g.,* Rocco Parascandola & Graham Rayman, EXCLUSIVE: NYPD suddenly stops sharing records on cop discipline in move watchdogs slam as anti-transparency, N.Y. DAILY NEWS (Aug. 24, 2016), https://www.nydailynews.com/new-york/exclusive-nypd-stops-releasing-cops-disciplinary-records-article1.2764145.  More and more, communities affected by police misconduct have been denied access to information about officers who patrol their streets, as well as their hard-won roles in overseeing police agencies.

### 3.    Delays Resulting from Law Enforcement Using § 50-a as a Shield

The impact § 50-a has had in recent years has been devastating.  Police agencies and unions were able to weaponize § 50-a to delay and refuse to disclose accusations of police misconduct under FOIL.  *See* The Honorable Mary Jo White, The Honorable Robert L. Capers, The Honorable Barbara S. Jones, *The Report of the Independent Panel on the Disciplinary System of the New York City Police Department*, at 19 (Jan. 25, 2019) https://www.independentpanelreportnypd.net/ assets/report.pdf (describing obstacles faced by a mother who fought for 6 years to obtain results of disciplinary cases against the officers who shot her son to death, and reports from citizens who were never informed that officer disciplinary cases were closed).  *See, e.g., Luongo*, 150 A.D.3d at 26 (denying application to disclose police officer's disciplinary history due to alleged risk of

"hostility and threats" resulting from the Eric Garner case, despite that case having no relation to the litigation at bar); *Luongo v. Records Access Appeals Officer, NYPD,* 160232/2016, 2017 N.Y. Misc. LEXIS 2102 (Sup. Ct. N.Y. Co. June 1, 2017), *aff'd*, 168 A.D.3d 504 (1st Dep't Jan. 17, 2019) (holding § 50–a bars disclosure of Personnel Orders, finding they are used to evaluate performance and a potential for harassment might materialize if disclosed).

The public's only avenue to secure an exemption from § 50-a's mandatory confidentiality provision is to obtain a "lawful court order."  CRL § 50-a(1).  But as the Caucus knows well from its own members' experience and from CPR's testimony (detailed below), this paper exception means little to the families that must balance personal and societal challenges against the years it takes fighting the entrenched systems to obtain restricted information.  *See The Report of the Independent Panel on the Disciplinary System of the New York City Police Department*, at 19. Even upon disclosure, several layers of in camera review stand between the police and the public they serve, providing additional opportunities for law enforcement to impinge transparency.  *Id.* The culture of delay and obfuscation that evolved out of the broadening interpretation of § 50-a by courts and police departments spun out of the Legislature's own hands.  This is the system Petitioners seek to restore and perpetuate.

**B.      CPR takes a Leading Role in Fighting to Repeal 50-a.**

Driven by the grief and outrage of communities across New York State, especially Black and Brown communities who suffer disproportionately from police misconduct, CPR has driven the long effort for more transparent justice.  CPR's strength lies in the Black and Brown communities it serves, as well as the broad-based coalition including the NAACP, Center for Constitutional Rights, MomsRising, VOCAL-NY, and other organizations (collectively referred to as "CPR" for convenience, unless otherwise specified), it assembled to advocate for the full

5.

repeal of § 50-a in Albany. *See* Communities United for Police Reform, *Campaign Members*, available at https://www.changethenypd.org/campaign/intro-members (last visited Aug. 13, 2020).

CPR worked integrally with the Caucus to highlight the policy it evinced in FOIL: "The people's right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society." *See* N.Y. Pub. Off. Law § 84.

In the last year, CPR lobbied Caucus member Senator Jamaal Bailey to sponsor the Senate's § 50-a repeal bill and maintained consistent communication as the bill's final language took shape. Throughout the legislative process, together they assisted the Caucus, its members, and their colleagues in both chambers of the Legislature to witness and understand how § 50-a impacted New Yorkers affected by police misconduct and eroded the public's trust in law enforcement. These experiences leave the Caucus distinctly able to gauge how vital CPR's voice is in this litigation and emphasize the necessity of CPR's intervention.

### 1.    CPR and its Allies Brought Necessary Community Insights Essential to the Legislative Deliberation and this Litigation, that no other Party could Provide

In October 2019, CPR testified in two hearings on the repeal of § 50-a before the New York State Senate Standing Committee on Codes ("the Committee"), chaired by Caucus member Senator Jamaal Bailey. *See* Senate Standing Committee on Codes, *Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers* (Oct. 17, 2019), available at https://www.nysenate.gov/calendar/public-hearings/october-17-2019/public-hearing-policing-s3695-repeals-provisions-relating ("Oct. 17 Hearing"); Senate Standing Committee on Codes, *Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers* (Oct. 24, 2019), available at https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-hearing-policing-s3695-repeals-provisions-relating ("Oct. 24 Hearing"). In doing so,

it diverged in critical respects not only from Petitioners' positions, but also from several of Respondents' positions as presented. Those points of divergence helped drive the resulting legislation to passage.[1] Two examples are illustrative.

First, CPR explained why, in opposition to the NYPD's position, even the most seemingly trivial and unsubstantiated disciplinary violations should be subject to disclosure. NYPD Assistant Deputy Commissioner Oleg Chernyavsky, speaking on the Commissioner's behalf at the hearing, affirmed the Department's support for § 50-a. *See* Senate Standing Committee on Codes, *Oct. 24 Public Hearing on Discovery Reform Written Testimony* at 44, available at https://www.nysenate.gov/sites/default/files/oct_24th_public_hearing_on_discovery_reform.pdf (last visited Aug. 13, 2020) ("Oct. 24 Written Testimony"). Chernyavsky noted that the "[t]he safeguards imposed by section 50-a promote the fair administration of justice" and that "repeal of the law would extinguish the officer's voice in a process centered on disclosure of their own personnel records and provide defense counsel access to records irrelevant to the case before the court." *Id. at* 43. These concerns led the NYPD to vocally oppose repeal, proposing an amendment to allow release of only certain documents, including "the complaint, allegations or charges, the transcript of the hearing, any written opinion, and final disposition and penalty" for only that misconduct which the NYPD defines as "serious," and only after adjudication. *Id.* at 44. The NYPD, he explained, did not want disclosure of low-level administrative violations. *Id.*

---

[1] Despite the focus below on the NYPD's position, other Respondents made comments that, while supporting repeal, targeted its advocates. Respondent Mayor Bill de Blasio, the day after the committee's first hearing, stated that advocates "are being immature about their facts" who "need to start talking about the issues in an honest, intelligent, and fact—based way." City of New York, *Transcript: Mayor de Blasio Appears Live on The Brian Lehrer Show* (Oct. 18, 2019), available at https://www1.nyc.gov/office-of-the-mayor/news/495-19/transcript-mayor-de-blasio-appears-live-the-brian-lehrer-show. Perhaps unsurprisingly, Plaintiff New York City PBA President Patrick J. Lynch seized upon Plaintiff Mayor de Blasio's statement, quoting it to support the PBA's own opposition to repeal. *See* Oct. 24 Written Testimony at 79.

Informed by improperly and overly policed communities, however, CPR explained how the public may disagree with the NYPD's characterization of what misconduct is "serious," and further highlighted how even low-level violations could result in a pattern of practice, as officers feel they can "get away" with increasingly worse misconduct. Oct. 24 Hearing at 3:07:13.  The disciplinary record of Daniel Pantaleo, the former police officer who infamously killed Eric Garner via chokehold, provided one glaring example.  The Committee heard testimony that prior to the Garner incident, Panteleo had faced four (4) substantiated individual allegations, ten (10) unsubstantiated individual allegations, and seven (7) disciplinary complaints. *Id.* at 2:52:13.  CPR explained that the NYPD's proposed approach would keep the cascade of unsubstantiated allegations hidden so that the public would be none-the-wiser until that officer committed substantiated misconduct, possibly escalating to the point of tragic violence.  *Id.* at 2:52:29. Keeping determinations of "seriousness" or substantiation behind closed doors, CPR noted, thoroughly erodes the public trust.  *Id.* at 3:13:25.  The public, CPR explained, has the right to review these incidents, and is capable and poised enough to distinguish material from immaterial instances of misconduct.  *Id.* at 3:06:58.  In other words, it is unacceptable to limit the public's access to information based on the false assumption that the public lacks the sophistication to know the difference between an allegation and confirmed misconduct.

Second, CPR explained why transparency of ***officer*** misconduct without transparency of police departments' (including certain Respondents here) internal accountability processes, cannot sufficiently remedy the community concerns motivating calls to repeal § 50-a.  Throughout the hearings, both Petitioners and Respondents testified at length about how officers are kept accountable by the agencies they serve.  *See e.g. id.* at 1:17:47.  CPR explained to the committee how the NYPD, in fact, has consistently failed to actually enforce that accountability.  It cited this

Court's finding in *Floyd v. City of New York* (litigated by CPR allies), which noted that "when confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct." *Id.* at 2:41:34; Oct. 24 Written Testimony at 47 (quoting *Floyd v. City of New York*, 959 F. Supp. 2d 540, 617 (S.D.N.Y. 2013)).

CPR also detailed recent report findings by New York City's Office of the Inspector General that showed "disturbing and continuing problems with regards to addressing racial profiling allegations in the NYPD—not one of nearly 2,500 complaints of racial profiling or biased policing between 2014 and 2017 has been substantiated by the department."[2] *Id* at 47-48 (citing NYC Dep't of investigation, Off. of the Inspector Gen., Complaints of biased Policing in New York City: an Assessment of NYPD's Investigation, Policies, and Training 2 (2019), http://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf).

This testimony demonstrated to the Committee that for every complaint substantiated, considerably more lie behind unsubstantiated, and behind those even more are left unreported by New Yorkers who have lost all trust in the process.[3] Full transparency, as CPR explained, is the only solution.

The unique community-rooted insights CPR raised prompted Senator Bailey to thank such advocates helping "correct misconceptions that many of us have carried for too long for things that we can never experience." New York State Senate, *Transcript of Reg. Ses. – Jun. 9, 2020* at

---

[2] Even the NYPD admitted in written Committee testimony that "police discipline is inherently arbitrary—those who get brought up on charges are generally not so-called "bad apples," but rather are those police officers who fall victim to the biases of their supervisors (based on race, gender, appearance, popularity etc.)." Senate Standing Committee on Codes, *Testimonies on Policing S3695 Repeals Provision* at 46, available at https://www.nysenate.gov/sites/default/files/testimonies_on_policing_s3695_repeals_provisions_101719.pdf (last visited Aug. 13, 2020) ("Oct. 17 Written Testimony").

[3] At least one Respondent, Reverend Frederick Davie, Chair of the Civilian Complaint Review Board agreed, noting how community members had told him that filing complaints with the CCRB was "not worthwhile." Oct. 24 Hearing at1:08:50.

1894:14-16,   https://www.nysenate.gov/transcripts/floor-transcript-060920txt   ("Senate   Floor

Transcript").  It is imperative that CPR is allowed to continue doing so in this litigation.

> **2.     Unlike the Parties, CPR Represents the Struggles of Citizens Directly Affected by § 50-a and its Barriers to Police Transparency.**

In addition to the various groups in its coalition, CPR organized several mothers of children

slain by police violence to share with the Committee their struggles to obtain disciplinary records

and even the identities of the officers responsible.  Every single testifying mother attributed her

struggle, and some fraction of her pain, to § 50-a:

- Gwen Carr, the mother of Eric Garner, who died on Staten Island due to the use of a chokehold by NYPD officer Pantaleo.  Oct. 24 Written Testimony at 35.  *See also* Oct. 24 Hearing at 00:10:19.  Ms. Carr explained that she did not find out information about Pantaleo's discipline history until 3 years after her son's killing due to "a widespread cover-up related to the scope of misconduct in my son's murder" by Respondents.  *Id.*  She pled for the Committee "to repeal 50-a because mothers like me shouldn't have to rely on whistleblowers risking their job to find out about the misconduct record of a public employee – a police officer – who killed our children" and remarked that "[i]f Pantaleo had been disciplined the right way earlier, maybe he would not have still been NYPD and maybe my son would be alive today."  *Id.* at 37.

- Valerie Bell, the mother of Sean Bell, who died on the morning of his wedding in 2006 after NYPD officers fired nearly 50 shots at him as he approached his vehicle.  Oct. 17 Written Testimony at 2; *See also* Oct. 24 Hearing at 00:4:10.  Prosecutors would not tell Ms. Bell the name of the officers who took her son's life, and she had to wait until the officers' criminal trials, which occurred ***two years*** after her son's death.  *Id.*  She explained that "[n]ot being able to get answers was like losing Sean over and over again. You cannot imagine the pain this causes parents and family members, unless you go through it."  *Id.*  She stated that that was why she "ha[s] been fighting to repeal 50-a.  People of color continue to be killed by the police and I understand what it's like for the families who have fought tooth and nail for transparency."  Oct. 24 Written Testimony at 85.

- Victoria Davis, the mother of Dellrawn Smalls, who died in July 2016 due to an NYPD officer's road rage.  Oct. 17 Written Testimony at 8; *see* Oct. 24 Hearing at 00:19:58.  She testified that, "50-a keeps us from knowing the extent to which the NYPD and other New York police departments are failing to discipline officers that are killing, beating, and harassing us and letting them keep their jobs."  *Id.*

10.

- Constance Malcolm, the mother of Ramarley Graham, an unarmed teen gunned down by an NYPD officer in 2012. *See* Oct. 24 Written Testimony at 27. Like Ms. Carr and Ms. Bell, she struggled to obtain information about her son's killers due to § 50-a's restriction. After unsuccessfully accessing these documents, she turned to CPR, which expended significant resources helping Ms. Malcolm seek information about the officers who killed her son, including the names, misconduct and discipline history of officers. *Id.* at 27-30.

The testimony of these mothers demonstrated how § 50-a has impacted their families and communities— devastating life changes that Petitioners would ask this Court to ignore. Their courage prompted Senator Bailey to name them in his floor speech: "[T]o Gwen Carr and Valerie Bell, Constance Malcolm and more, I'm in debt to you for permitting me the opportunity to learn from you and learn your strength and resolve." Senate Floor Transcript at 1891:20-24.

CPR helped bring important insight and highlight the stories of community members such as these in a way that no existing party in this litigation could. As this Court's precursor in considering the propriety of repealing § 50-a, the Caucus firmly believes that CPR's voice, and intervention, are essential.

## C.    CPR's Intervention is Essential to Adjudicating Petitioners' Challenges to Respondents' Intended Disclosures Under § 50-a's Repeal

The insight, experience, and interest CPR demonstrated throughout the legislative process has left the Caucus confident that CPR must be a party to this litigation if the Court is to fully adjudicate Petitioners' challenges to the disclosures at issue. The Caucus takes this opportunity, therefore, to examine those challenges, leaving CPR to elaborate once its motion is granted.

### 1.    The Threats of Harm to Officers were Thoroughly Considered by the Legislature, as CPR will help Demonstrate

Petitioners focus at length on threats to their privacy and persons, which the Caucus generally appreciates with all due gravity. In repealing § 50-a, however, the Legislature contemplated that FOIL already precludes from disclosure any records that: (1) might constitute

11.

an unwarranted invasion of privacy; (2) are compiled for legitimate law enforcement purposes; (3) or endanger the life or safety of an individual. *See* Pub. Off. L. § 87(2)(b), (e), (f).  The Legislature also considered that courts in every system retain discretion to limit the inappropriate admission or use of evidence concerning police discipline. *See e.g.* Oct. 24 Hearing at 1:35:10.

Nor did the legislature neglect to consider the threats of harm to officers, which Petitioners detailed through the Committee's two hearings.  Senator Bailey and his colleagues responded by repeatedly affirming their commitment to officer safety, sharing their own experiences living under credible death threats, and asking Petitioners to also consider the harms that lack of transparency has historically posed communities of color. *Id.*  Indeed, Caucus Member and Assembly Member Philip Ramos, who served as a Suffolk County Police Detective long before he was elected to the Assembly, sponsored the bill to repeal § 50-a.

Petitioners affirmed they felt their concerns heard. *Id.* at 1:36:52  (President of the New York State Troopers Thomas H. Mungeer explaining to Senator Bailey, "I just want to say, I appreciate the open-door policy, and we will definitely take advantage of that because, again, as in prior issues, we've always had a very good relationship.  And that will continue").  Legislative opponents of repeal did also. *E.g.*, Senate Floor Transcript at 1849:23-1850:5 (Repeal opponent Senator Patrick Gallivan explaining "We've talked, we talked in committee -- we had an hour 45 minute Codes Committee that really was among the best discussions that I heard in my time here. Clearly there's points of disagreement amongst the members here, but I think we share many common goals in trying to right wrongs and ensure a system is in place to ensure accountability").

> **2.    Petitioners' Arguments Concerning Due Process and the Propriety for Injunctive Relief Necessitate CPR's Intervention.**

Petitioners contend that disclosure of personnel records would deprive them of rights protected by the Due Process Clauses of the United States and New York State Constitutions.  In

analyzing these, the rights afforded by the State Constitution mirror the federal. *See Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000); *Raymond v. City of New York*, 15 Civ. 6886 (LTS) (HBP), 2017 U.S. Dist. LEXIS 31742 at *25 (S.D.N.Y. March 6, 2017) (dismissing plaintiffs' state constitutional claims as superfluous where they were also brought under federal law). These challenges require CPR's intervention for full adjudication, as the Court must balance Petitioners' asserted interests against the public's in determining the extent of constitutionally required process. *See Mathews v. Eldridge*, 424 U.S. 319, 347(1976). That analysis demands the public's representation, through CPR's intervention, *per se*.

Likewise, in adjudicating whether a preliminary injunction should be issued, this Court will have to determine that an injunction serves the public interest, which goes to the heart of CPR's interests and potential to contribute to this litigation. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**D. As the Proponent of 50-a's Repeal, and the Advocate for its Beneficiaries, CPR Has a Right to Intervene**

Rule 24 of the Federal Rules of Civil Procedure ("FRCP") provides that courts "must" grant intervention to "anyone" seeking to intervene by a timely motion who can "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (citing Fed. R. Civ. P. Rule 24). As demonstrated by CPR's motion, it has more than met its burden, and the Caucus provides herein further support for intervention.

**1. CPR's Has Legally Protectable Interests at Stake**

A movant must show a "direct, substantial, and legally protectable interest" in the action. *Bridgeport Guardians v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010). "[O]rganizations may have

sufficient interest to support intervention as a matter of right in actions involving legislation or regulations previously supported by the organization." *Commack Self-Service Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 102 (E.D.N.Y. 1996). *See also N.Y. Pub. I.R.G. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (Holding that an association "has a sufficient interest to permit it to intervene since the validity of the regulation from which its members benefit is being challenged"). "The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014).

Here, CPR, its member organizations and partners, and the communities they serve have a profound and imperative need for the disclosure of records at issue in this case, and the promise of greater transparency that the repeal of §50-a provides. One need only review the gut-wrenching testimony of the mothers of men and women slain by the police who fought to obtain information to see that interest. But the Court must also recall that these the vast majority of families never learn about the officers who took their loved ones. Restoring § 50-a and the restrictions it imposes leaves communities without the ability to oversee law enforcement, including the failure to disclose crucial information about the officers tasked to protect and serve them. CPR, accordingly, has an interest and the right to litigate on behalf of these communities.

### 2. CPR's Interests Will Be Impaired Absent Intervention

Without intervention, CPR's interests, and therefore the public interest, will be impaired. Blocking repeal of § 50-a will deprive CPR's members and the communities it serves of access to police disciplinary records, despite their thorough legislative efforts. *See* CPR Brief, at 16-19. If Petitioners succeed, the task of assisting families and the victims of police misconduct becomes more difficult. *See id.* at 16-17. But even if Petitioners do not prevail, respectfully, the mere denial of intervention will serve as just one more confirmation that adjudication of these disclosures is a

14.

matter for courts and government agencies, not the public.  The Legislature has signaled a different intent, to raise up the people of New York as an equal actor in police oversight.  Denial of intervention would impede that goal, and further silence the community.

### 3.    Respondents cannot adequately represent CPR's interests.

As explained in detail herein, existing parties in this litigation cannot adequately represent CPR's interests because their own positions are too varied, too inconsistently advanced, and diverge too widely from CPR's stakeholders.  Only a few months ago, this Court held that New York City government actors could not adequately represent the interests of communities of color that sought to intervene to defend the government's own policies where the government might "show[] a reticence to any defense . . . that might implicate the [government]'s own purported history of discrimination."  *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, No. 18 CIV. 11657 (ER), 2020 WL 1432213, at *7 (S.D.N.Y. Mar. 24, 2020).

That concern is particularly poignant here.  The questions posed by Petitioners' motion demand full consideration of the public interest involved in repealing § 50-a and upholding that legislation.  There is reason for concern that Respondents like the NYPD may work towards some negotiated resolution or consent decree with the unions that staff their Department that might mirror the halfway measures the NYPD earlier proposed.  As made plain in the contrast between their position and that of CPR, they would prefer to block disclosure of unsubstantiated or minor police misconduct.  CPR must be present to explain why that is insufficient.  Further, just like the government parties in *McAuliffe Intermediate Sch. PTO*, there is reason to doubt whether Respondents will fully present their own history in matters of police accountability to anywhere near the extent CPR can.  The Caucus does not intend to comment on the sincerity of Respondents' defense, but only the real possibility for conflicts of interest, and the likelihood that Petitioners' zealous advocates will hold Respondents to their own past positions.

### E.    Even if CPR Cannot Intervene by Right, Permissive Intervention is proper.

Even if this Court determines that CPR does not have a right to intervene under FRCP Rule

24(a), the Court should nevertheless grant permissive intervention under Rule 24(b).  On timely

motion, courts may grant permissive intervention to anyone who "has a claim or defense that shares

with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  "[T]he

words claim or defense are not to be read in a technical sense, but only require some interest on

the part of the applicant."  *Dow Jones & Co, Inc. v. United States Dept. of Justice*, 161 F.R.D. 247,

254 (S.D.N.Y. 1995).  Even where interveners would take the ***exact same*** legal position as an

existing party, permissive intervention is proper if the intervener has been so affected by the issues

in litigation that its "knowledge and concern will greatly contribute to the Court's understanding

of this case."  *Miller v. Silbermann*, 832 F. Supp. 663, 672 (S.D.N.Y. 1993).  *See also United States

v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994) (granting permission to interveners who might

"significantly contribute to [the] full development of the underlying factual issues in the suit and

to the just and equitable adjudication of the legal questions presented").

The Caucus need hardly elaborate how CPR meets this standard.  It is deeply involved and

its members are deeply affected by the state of police transparency that reigned under § 50-a and

which Petitioners seek to perpetuate.  Its insight and experience will greatly contribute to the

Court's adjudication, and will render that process only more just and equitable.  CPR played this

very role for the Legislature, and has secured the Caucus's gratitude.  The Caucus prays this Court

seizes the same opportunity.

### III. CONCLUSION

For or the reasons presented above, the Caucus, as amicus, urges this Court to grant CPR's

motion to intervene.  The Legislature never intended § 50-a to displace the people from their

crucial role in overseeing the police.  CPR struggled and prevailed in returning them to that role,

and  Petitioners should not be permitted to exclude the communities represented by CPR.

Date:   August 14, 2020
        Fairport, New York

                                                /s/ Pamela S. C. Reynolds
                                                Pamela S. C. Reynolds
                                                LITTLER MENDELSON, P.C.
                                                375 Woodcliff Drive, Suite 2D
                                                Fairport, NY  14450
                                                preynolds@littler.com
                                                585.203.3400

                                                /s/ Jeremy F. Wood
                                                Jeremy F. Wood (Pro Hac Vice Pending)
                                                LITTLER MENDELSON, P.C.
                                                One Union Square
                                                600 University Street, Suite 3200
                                                Seattle,  WA 98101
                                                jfwood@littler.com
                                                206.623.3300

                                                /s/ Cassandra N. Branch
                                                LITTLER MENDELSON, P.C.
                                                290 Broadhollow Road, Suite 305
                                                Melville, NY  11747
                                                cbranch@littler.com
                                                631.247.4700

                                                /s/ Joseph Flanagan
                                                LITTLER MENDELSON, P.C.
                                                900 Third Avenue
                                                New York, NY  10022
                                                jflanagan@littler.com
                                                212.583.9600
                                                *Attorneys for Amicus Curiae*
                                                *New York State Black, Puerto Rican, Hispanic*
                                                *& Asian Legislative Caucus*

17.