UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION, <br><br> Plaintiffs, <br><br> -against- <br><br> BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD, <br><br> Defendants. | Case No. 1:20-CV-05441-KPF <br><br> **DECLARATION OF DR. DELORES JONES-BROWN IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION** |

Delores Jones-Brown declares under penalty of perjury as follows.

1.     I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Opposition to Plaintiff's Request for a Preliminary Injunction. I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2.     I am an academic with decades of experience and research related to police practices. In this declaration, I explain that it is readily apparent that: increased transparency and accountability only makes a police department and the community it serves healthier, for *many* specific reasons I detail below; that § 50-a has stood in the way of these goals; and that police unions have opposed the release of misconduct, investigatory and disciplinary records for reasons that lack any evidentiary support.

## My Career Related to Policing Practices

3.     I am currently a Practitioner in Residence at the University of New Haven's Department of Criminal Justice and affiliated with the university's Center for Advanced Policing. I am also a Professor Emeritus at the CUNY Graduate Center for the Doctoral Program in Criminal Justice. Previously I was employed by the Department of Law, Police Science and Criminal Justice Administration at John Jay College of Criminal Justice. While at John Jay, I founded the College's Center on Race, Crime, and Justice, which I ran for ten years. Based on my decades of experience related to police practices, and my experience as an assistant prosecutor, I submit this declaration opposing the law enforcement unions' attempt to continue a practice of shielding police officer misconduct despite the harms that a lack of transparency causes.

4.     I received my master's degree from Rutgers University, School of Criminal Justice concurrent with my J.D. from the Rutgers University School of Law-Newark. I subsequently received my Ph.D. in Criminal Justice, from the Rutgers University Graduate School-Newark.  Early in my career as a criminal justice practitioner, I served as  an assistant prosecutor and certified police academy instructor, working closely with police.  I have  focused my academic career on issues relating to police practices and police accountability.  My experience includes: testifying before President Obama's Task Force on 21st Century Policing in 2015, serving on consent decree monitoring teams in Ferguson, Missouri and Newark, New Jersey addressing issues of police accountability and community engagement in those jurisdictions, and authoring two often-cited reports on NYPD's stop and frisk practices.  I was also previously involved in CPR's steering committee and was a founding executive board member of the  Consortium for Police Leadership in Equity now the Center for Policing Equity, an unprecedented partnership between academic researchers and police departments aimed at improving police accountability, community engagement, and public safety through evidence-based practices   My current work focuses on officers' duty to intervene in  excessive force incidents.

5.     During my time at John Jay, for ten consecutive years I taught classes to NYPD sworn officers that focused on constitutional policing, implicit racial bias, police accountability and transparency, use of force, criminal and civil liability, and improving police-community relations based on ethical, constitutional and humanitarian police practices.  The program was hosted at John Jay College and funded by the State and City of New York with an aim towards producing police leaders who fairly and effectively police a multi-cultural city.

**Lack of Transparency Jeopardizes the Health of the Community and the Department**

6. Policing is a public service profession, and as public servants, the police department and its officers must always be accountable to the public. They are paid with taxpayer dollars. Because of the police role in protecting public safety, a lack of accountability harms the health of the police department and the health of the community. Transparency is necessary to improve department and community health and to ensure that officers continue to see policing as a responsibility not an entitlement.

7. For years, § 50-a stood in the way of achieving accountability. It was immensely problematic to have any procedure or practice that keeps records about misconduct, misconduct investigations and discipline private. The lack of transparency hurts civilians, non-offending officers, and the reputation of and public trust in the police as a department. By keeping disciplinary and misconduct records secret, many officers with lengthy records can simply move between police departments and then reengage in the same behavior. This is true of the officers involved in the shootings of Tamir Rice—a 12-year-old killed in Cleveland, Ohio in 2014—and Michael Brown—a 18-year-old killed in Ferguson, Missouri. The officers responsible had a history of problematic behavior, yet were hired by a new department. Had these records been disclosed, the departments would have been on notice not to hire these individuals and the shootings could have been avoided.

8. Releasing officer names in conjunction with records of misconduct complaints is instrumental in tracking officers and identifying warning signs that an officer is a risk to the public. The research of Dr. Samuel Walker traced the path between multiple misconduct complaints and use of deadly force. Walker's studies examine officers' history of misconduct to discern the pattern of escalation that leads to the unwarranted use of deadly force. His research

demonstrates the need for monitoring repeat offenders, by flagging and taking into account, the early warning signs.  But all too often, police departments do not adequately conduct this monitoring, and conceal rather than expose unlawful behavior; consequently, officers continue to engage in misconduct leaving their non-offending fellow officers to be judged by their peers' excessive behavior.  Having individualized information protects non-offending officers from being judged unfairly by the public when their own personal histories do not create cause for concern.  For example, in 1994, NYPD officer Frances Livoti killed Anthony Baez using a banned chokehold.  Following his conviction under federal authority—he was not convicted in New York State court—his reputation amongst his peer officers based on previous misconduct suggested that this fatal outcome was predictable and avoidable.

9. Finally, the lack of transparency makes it harder for the police to solve crime.  In urban communities where police officers have the reputation of being aggressive or abusive toward the community, the officers face greater difficulty in solving violent crime, because the public is apprehensive about cooperating with the same officers who abuse them.  When the police are seen as being above the law and free from repercussions for their unlawful and abusive conduct, the community will not trust law enforcement to keep them safe from criminals or abusive officers.  Only when the department is transparent and allows public access to these records will the community begin to believe that the NYPD cares enough to weed out officers who violate the law and department guidelines.  The residents of New York have a right to be protected from this minority of officers.

10. Public access to all records, regardless of investigatory or disciplinary outcome, is crucial.  This includes records where the determination was that the complaint was unfounded, unsubstantiated, exonerated, truncated or otherwise non-final.  This is because there are many

obstacles in the investigative process that may lead to non-substantiated outcomes. For example, significant research has demonstrated that when an officer is accused of misconduct, cultural forces within the police department will create a "blue wall of silence," in which officers who witnessed the misconduct will not come forward, even in cases where the officers are aware of unlawful conduct. In these situations, of course the outcome is "unfounded" or "unsubstantiated," because witnesses to the misconduct are unwilling to come forward. Similarly, it is not uncommon for the police department to use intimidation tactics to scare away potential civilian complainants or witnesses through fear of retaliation. This is what happened when Kalief Browder, a teenager who was held at Rikers for three years, without trial, and spent two of those years in solitary confinement all for allegedly stealing a backpack, attempted to contest his unlawful treatment. The police harassed his family and friends who tried to come forward with evidence of prosecutorial and police misconduct. The charges against him were eventually dropped, but Kalief Browder committed suicide two years after his release from Rikers.

11.  In these circumstances, an unfounded, exonerated, unsubstantiated determination or investigations that are not completed does not mean that the misconduct did not occur. And, the public should not be saddled with the task of trying to discern which unfounded or non-substantiated complaints are the result of a legitimate investigative process and which are the product of the police providing false evidence, withholding evidence, or intimidating witnesses. Releasing all records means that this information will be public.

### The Release of Records Do Not Harm Officers

12.  It is important that the names of offending officers are released. Concealing names of officers is unwarranted and simply allows bad officers to stay in their jobs. This sets

up circumstances in which the same community may be repeatedly victimized.  The public is more at risk from a consistently problematic officer than the officer would be from having their misconduct records publicized.

13. Despite these realities, the unions devote significant energy to making claims that releasing disciplinary records will harm officer safety.  In my years of researching and teaching police practices, I have found that despite these claims, officers are generally hard pressed to establish with any level of certainty that the release of records will harm officers.  Usually, officers can only point to random acts of violence against officers with no causal connection to the release of records.

14. The failure of the NYPD to support their claims with evidence is something that I am particularly familiar with as a result of my considerable research regarding NYPD's stop and frisk practices.  NYPD defended stop and frisk based on claims that criminal activity would skyrocket without stop and frisk.  In the process of their adamant defense, the department refused to listen to any of the complaints about this practice.  In the aftermath of the federal court decision in *Floyd v. City Of New York*, the number of reported stop and frisk cases decreased from the hundreds of thousands to about 15,000.  The catastrophic crime increase that NYPD predicted did not materialize.  Similarly, it is not enough for the unions to make unsupported claims about the safety and reputation of officers, when there is ample proof that New York residents are being seriously injured and sometimes killed by officers with prior complaints about their conduct.  Speculation about what might happen if their information is made public does not override the reality of the injury being suffered by an unsuspecting  public because of the protection that 50-a has provided in the past.

15. The unions' claims that the release of records will sully officers' reputations is indicative of how the police have for so long operated above the law.  It assumes that an abusive officer can and should have a sterling reputation, regardless of misconduct (either memorialized in a written personnel file or merely known through the experiences of the citizens they police).  For ordinary citizens, encounters with law enforcement, arrests, and exonerations are all a matter of public record and discoverable through a background check.  Yet, police officers, when they are accused of misconduct, believe that the public should not be made aware and cannot reasonably interpret the records associated with that complaint.  In my opinion, officers' concerns about reputational issues ignores the countervailing problem, which is that non-disclosure hurts the public trust in police generally and has contributed to members of the public being hurt physically.

16. As it relates to an officer's reputation, it is insulting that the unions believe that the general public cannot make the distinction between a good officer with a good reputation in the community and a few non-serious complaints and an officer who has many use-of-force complaints.  Of course, where an officer has non-serious complaints, the public will not vilify the officer based on those complaints alone.  But to protect the reputation of reoffending, abusive officers, the police department has adopted an all or nothing approach, where they will give the public nothing so that all officers, regardless of their demonstrated character and actions, are shielded.

17. Finally, police officers are entrusted with tremendous responsibility; as a result, the job is a demanding one.  Not all officers are cut out for this profession—certainly not the ones who accrue misconduct complaint after misconduct complaint.  No one benefits—neither community nor officers—when the system is designed to protect the bad officers and allow them

to stay employed until their pension vests, turning a blind eye to the harm they cause to the public and the reputation of the department.

Executed on this 14th day of August, 2020, in ___Richmond, Virginia___.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____
Dr. Delores Jones-Brown