UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------

UNIFORMED FIRE OFFICERS
ASSOCIATION; UNIFORMED
FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK; CORRECTION
OFFICERS' BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC.;
POLICE BENEVOLENT ASSOCIATION OF
THE CITY OF NEW YORK, INC.;
SERGEANTS BENEVOLENT
ASSOCIATION; LIEUTENANTS
BENEVOLENT ASSOCIATION; CAPTAINS
ENDOWMENT ASSOCIATION; and
DETECTIVES' ENDOWMENT
ASSOCIATION,

     Plaintiffs,

    -against-

BILL de BLASIO, in his official capacity as
Mayor of the City of New York; THE CITY
OF NEW YORK; FIRE DEPARTMENT OF
THE CITY OF NEW YORK; DANIEL A.
NIGRO, in his official capacity as the
Commissioner of the Fire Department of the
City of New York; NEW YORK CITY
DEPARTMENT OF CORRECTION;
CYNTHIA BRANN, in her official capacity as
the Commissioner of the New York City
Department of Correction; DERMOT F.
SHEA, in his official capacity as the
Commissioner of the New York City Police
Department; THE NEW YORK CITY
POLICE DEPARTMENT; FREDERICK
DAVIE, in his official capacity as the Chair of
the Civilian Complaint Review Board; and
THE CIVILIAN COMPLAINT REVIEW
BOARD,

     Defendants.

-------------------------------------------------

Case No. 1:20-CV-05441-KPF

**DECLARATION OF JAMIE KALVEN
IN SUPPORT OF COMMUNITIES
UNITED FOR POLICE REFORM'S
OPPOSITION TO PLAINTIFF'S
REQUEST FOR A PRELIMINARY
INJUNCTION**

Jamie Kalven declares under penalty of perjury as follows.

1.      I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Opposition to Plaintiff's Request for a Preliminary Injunction.  I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief.  As to those, I believe them to be true.

2.      I submit this declaration based on my experience as Executive Director of Invisible Institute, which publishes and manages a public-facing database documenting police abuse and misconduct related to the Chicago Police Department.  I have seen firsthand the public good that comes from releasing police misconduct and disciplinary records.  It is critically important that the public have access to this information, and the law enforcement unions' unsupported safety arguments should be rejected.

**My Experience as a Journalist and Human Rights Activist Document Police Abuse**

3.      I am the Executive Director of Invisible Institute, a Chicago-based organization that arose out of my work with public housing as the last of the high-rise public housing complexes in Chicago were being demolished.  My work focused on the Stateway Gardens Public Housing Development, which based on the 1990 census, was the single poorest community in the nation.  Until its demolition in 2007, I served as a consultant to the Stateway Gardens Local Advisory Council—the resident council elected by residents.  During this time, as both a writer and human rights activist, I focused extensively on patterns of police abuse and the subsequent impunity in Chicago.

4.      As part of my advocacy, I was involved in the creation of a loose network of collaborators, which became the Invisible Institute.  As the Invisible Institute evolved, we

partnered with civil rights attorneys and law students at the Mandel Legal Aid Clinic of the University of Chicago Law School.  Through this partnership we have filed or otherwise have been involved with many civil rights cases on behalf of residents who have suffered repeat abuse by the police.

5.　　One such case was *Bond v. Chicago Police Officer Utreras*, in which Diane Bond alleged that multiple officers invaded her home at the Stateway Gardens public housing development, forced her to strip naked and destroyed some of her possessions.  During the course of the litigation, Ms. Bond's attorney received data regarding police records for any officers with 10 or more complaints.  However, the Court issued a protective order that sealed those records.  Given my involvement with Stateway Gardens' Resident Council, which focused on advocacy on behalf of residents who suffered police abuse, I sought to intervene in the case to challenge the protective order, arguing that under Illinois' Freedom of Information Act ("FOIA"), these records were public information and disclosure was in the public interest.  Although United States District Court Judge Joan Lefkow agreed with my arguments and ruled in favor of disclosure—finding that the public has "a significant interest in monitoring the conduct of its police officers and a right to know how allegations of misconduct are being investigated and handled"—the United States Court of Appeals for the Seventh Circuit overturned the result, because the case had settled, ending any live controversy.  However, the Seventh Circuit made clear that nothing in its opinion would preclude my ability to request these records under the Illinois Freedom of Information Act.

**My Involvement in Litigation Relating to Seeking Police Disciplinary and Misconduct Records and the Creation of the Citizens Police Data Project**

6.　　So, I did.  In 2009 I filed a FOIA lawsuit seeking an order compelling the City of Chicago to turn the records over to me.  After years of litigation, in which the City offered

myriad reasons for refusing to disclose the police records, the Illinois State Appellate Court found that neither the repeat offender list nor the Complaint Register files (the record cataloguing the complaint against the officer, the investigation, and any disposition) were exempt from disclosure under FOIA, subject to redaction of personal information.

7.      Following this significant legal victory, the Invisible Institute evolved from a loose collaborative to a formal organization to advocate for transparency of police records. Rather than simply keeping the released records for our own organization's use, we sought to curate the records in a way that would allow the public to effectively utilize the data. This became the Citizens Police Data Project (available at, https://cpdp.co/), which is a database that organizes law enforcement records and is an effective tool for holding the police accountable to the public they serve.

8.      Initially, the database only included records from the previous four years. The reason for this limitation was that soon after the database was launched, the law enforcement unions launched a counterattack against the City of Chicago, arguing that their collective bargaining agreement included a provision that police misconduct records would be destroyed after five years. Finally, however, in June 2020, the Illinois State Supreme Court found that destroying the documents would violate the state's public records law, expressly rejecting the unions' claim that their CBA required the documents to be destroyed. After over a decade of litigation, the Invisible Institute finally had access to all existing police misconduct and disciplinary records, and we were therefore able to create a robust database for the public.

9.      As a result of my experience in successfully litigating the release of police misconduct and disciplinary records, I am intimately familiar with, and have successfully opposed the very arguments that the law enforcement unions are presently making in this case in

the wake of the repeal of § 50-a. Against this background, I believe I am qualified to explain why the unions' arguments in this case lack merit and how the public good is advanced through full disclosure of all disciplinary records.

10.     The most common argument I faced during the Illinois litigation and in public discourse since the initial database release in 2014 is that release of misconduct and disciplinary records harms officer safety. However, the officers and the law enforcement unions have never pointed to concrete examples in support of their raw conclusions. If they had *even a single instance* where they could connect violence against an officer to the release of records, the union would have vigorously used that single instance to fight against disclosure. The first iteration of the database coincided with the release of the video footage of Laquan McDonald's murder. (On October 20, 2014 Laquan McDonald was fatally shot by Chicago Police Officer Jason Van Dyke. The Chicago Police initially claimed that McDonald was wielding a knife towards Officer Van Dyke; thirteen months later, the dash cam footage was released, showing, in fact, that McDonald had been walking away from the police when he was shot 16 times.) As a result, the media provided extensive coverage of the database. Even still, officers could only point to general feelings of distrust by the community against the police when arguing against disclosure instead of offering concrete examples of police officers being harmed by disclosure. The union in Chicago never provided any factual support for their claim that release of disciplinary records would compromise officer safety.

**Releasing All Records of Police Misconduct and Discipline is in the Public Good**

11.     The public nature of police records allows the public to ensure that the oversight agencies tasked with law enforcement reform are actually doing their job. In discussions concerning reform, the public availability of misconduct and discipline records is powerful

because it allows for a common evidentiary basis for public debate—compared to pre-release discussion when only the police department would have data about the records.

12.     When records are released, civil rights attorneys and public defenders can, for the first time, use the records to track patterns of behavior similar to the conduct that is presently complained about.  Journalists who seek to report on Chicago's policing practices now have a body of evidence directly from law enforcement.  Similarly, researchers can now rely on a sample size of thousands of complaints.  Local government has used this data when addressing police accountability efforts, including use of the records by the Police Accountability Task Force, the Citizens' Office of Police Accountability, and the Officer of the Inspector General.  Finally, the map function in the database allows citizens to find out about the officers who patrol their neighborhoods, allowing for increased community trust and safety.

13.     Additionally, the utility of the  database for police officers in Chicago hinges on the fact that we include the entire universe of records, regardless of disciplinary outcome.  It is incredibly important that all records are publicly available both to diagnose institutional level problems and to also identify repeat offenders.  Having access to the full scope of disciplinary records provides useful and comprehensive data, in comparison to the small number of sustained complaints if that is all that is available to the public.

14.     For example, many times "non-substantiated" complaints simply mean that the internal investigators found an officer to be more credible than the citizen complainant.  Of course, this outcome is often not surprising because the investigations are not subject to independent review.  Or, in cases of an "exonerated" complaint, an officer may have done everything the complainant said, but the conduct is sanctioned as a matter of law.  Knowledge of exonerated outcomes is key for identifying problematic department policies.  Only releasing

sustained complaints (complaints that are both factually true and in violation of police rules of conduct) presumes that the accountability system is high functioning and beyond reproach.  But, if the system tasked with accountability is not robust, or worse, has its own institutional failures, then a determination of "sustained" does not result in accountability because this finding has no objective meaning.

15.     As it relates to individual officers, it is critical that all officer misconduct and disciplinary records are made available to identify and track officers who repeatedly commit misconduct.  From an oversight perspective, there is an interest in cataloguing the early warning signs.  In my review of the Chicago Police Department records, I have found that those officers who engage in unlawful and thus criminal acts resemble the trajectory of other criminals.  For example, an officer may first engage in minor violations of the law that are unchecked, and over time the behavior escalates.  In the cases where police officers have criminal charges brought against them, the escalation of unlawful behavior is often quite stark and clear.

16.     In summary, the experience of the Invisible Institute in Chicago successfully advocating for the release of police records has taught us three lessons: there is a social good to have the records disclosed publicly; assessing police accountability demands the entire records of complaints, regardless of investigation or disciplinary outcome; and the parade of horribles that the unions predicted would harm police officers did not materialize.

Executed on this 13TH day of August, 2020, in _Underhill Center, Vermont,_

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Jamie Kalven