UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION, | Case No. 1:20-CV-05441-KPF  **DECLARATION OF KADIATOU DIALLO IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| -against- | |
| BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD, | |
| Defendants. | |

Kadiatou Diallo declares under penalty of perjury as follows.

1. I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Oppositions to Plaintiff's Request for a Preliminary Injunction. I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2. My son, Amadou Diallo, was killed by New York City Police Officers Sean Carroll, Richard Murphy, Edward McMellon, and Kenneth Boss in 1999.

3. I have spent the last 20 years fighting for justice for Amadou and for future generations. Access to misconduct and disciplinary records is a very personal issue for me. And one that I will continue to advocate for. While nothing will fully bring justice to my son, the repeal of § 50-a at least gave me some sense of empowerment, after years of feeling like I had no power to obtain information that police shielded. Allowing the law enforcement unions to now seek to keep their black box would be a devastating blow to myself and the many other families who are denied not only justice, but basic information about the deaths of their loved ones at the hands of police.

### My Son's Death and the Resulting Trial

4. On February 4, 1999, my son Amadou was standing in the vestibule outside his Bronx apartment when four plainclothes officers drove by. Based on the officer statements used to justify the shooting, one of the officers "believed" that Amadou fit the "general description" of a rapist and therefore approached him. It is my understanding that on February 4th there was no 911 call or report that suggested that the serial rapist was in the general vicinity of my son's

apartment, and that the last rape committed by the individual in question had occurred a year prior.

5. The officers also claimed that they believed that Amadou reached for a gun. After firing 41 shots and killing my son, no gun was ever found. Instead the officers only found my son's wallet in the hand that supposedly held the "gun."

6. After killing my son, the officers brought his roommate in for questioning and for hours tried to get information about whether Amadou had enemies (none that his roommate or anyone else knew of) or possessed a gun (he didn't). Without a warrant, officers ransacked his apartment, trying to find anything they could use to paint Amadou as the villain. Even though my son was the victim of police's violence, the police tried after the fact to dig up dirt on him to make their actions seem ok. Most traumatizing was their argument that what happened was his fault, that his movements when approached by the plain clothes officers and reaching for his wallet caused his own death.

7. My son's murder caused a media frenzy. Yet despite the very public nature of my son's killing, I was unable to get information from any official source. The Assistant District Attorney tasked with investigating the shooting was not transparent with me about the status of the investigation. I was unable to obtain any information from the NYPD directly. Any information that I did receive came from news reporting. For example, I learned that Officer Boss had been involved in a fatal shooting only two years before killing my son. Through the media, I also found out that none of the four officers had ever worked together before the night they killed Amadou. When one of the officers was subsequently promoted, I found out that information from the media too. Learning facts about my son's murder through the media

instead of being told directly through official channels was incredibly painful.  However, if the newspapers had not written these articles, I might never have learned much that information.

8.      A grand jury in the Bronx indicted the four involved officers on charges of second-degree murder and reckless endangerment.  But my son never received justice and the officers were not ultimately held accountable.  Before the trial, the court ordered a change of venue from the Bronx to Albany, New York.  I came to learn that the residents of Albany have very different experiences in interacting with law enforcement than those living in the Bronx.  After I relived the trauma of my son's murder during the trial, all four officers were acquitted.  As I later learned, this should not have come as a surprise, because no Albany jury had ever convicted an officer who was involved in a fatal shooting.  It is my understanding that all four officers remained employed by the NYPD until their voluntary retirement, where they retired with full benefits, and that some of the officers were even promoted at some point after the acquittal.

9.      Following the trial, I travelled to Washington D.C. to testify in support of my request that the Department of Justice launch a federal investigation into the shooting.  I was hopeful that a federal investigation would result in Federal charges against the officers involved.  After my request was denied, I filed a civil suit with the City of New York, which subsequently settled.  I used the money from the settlement to start a school in Africa and to start the Amadou Diallo Foundation.[1]

### My Advocacy for Police Transparency

10.     The struggle I faced in trying to obtain justice for my son traumatized me.  But it also motivated my advocacy efforts.  Seeing NYPD's response to my son's murder showed me the many ways the police officers protect themselves to avoid being accountable to the public.

---

[1] This declaration is submitted only on my own behalf in my personal capacity, and I do not speak for the Amadou Diallo Foundation.

Officers can rely on qualified immunity to protect themselves.  When my son was killed, the "48-hour rule" prevented speaking to any officer involved in the shooting until 48 hours later.  And, until only recently § 50-a allowed the department to protect any information about an officer's misconduct or disciplinary records, including the most basic of information.  These laws all hindered my ability to seek justice for Amadou and they continue to harm the families of other victims of NYPD violence.  Early into my advocacy, I was involved in supporting legislation to eliminate the 48-hour rule.

11. My advocacy led me to become involve with Justice Committee.  Through Justice Committee, I became connected with Communities United for Police Reform and many families who have lost their loved ones due to police violence, including the families of Ramarley Graham, Eric Garner, and Mohamed Bah.  The complete lack of transparency from the NYPD and our inability to obtain any information about our sons' murders was a common thread in all of our shared trauma.  We began to organize our advocacy efforts, committed to fighting against the injustice and seeking reform.  Recently our efforts have focused on repealing § 50-a and advocating for a special prosecutor to independently investigate police killings.

12. We have spent years fighting for reform.  We have lobbied elected officials, spoken at public events, and travelled to Albany, New York—the place where the officers who killed my son were exonerated—to provide testimony to the Legislature.

### The Importance of § 50-a's Repeal to Victims' Families

13. After years of organizing and lobbying, § 50-a was finally repealed in June 2020.  The repeal gave me and other families whose children have died at the hands of the police some sense of empowerment, even if it didn't give us a full sense of justice.  After years of fighting against an unfair, imbalanced system that protects officers at all cost, the repeal meant that we

would finally have clarity about so many things that had been kept in the dark about our most personal losses.  At the hands of police, our children have been denied the right to live.  Although having this information will not bring our children back, having the clarity and all the information is important for us to be able to seek justice.  There is a sense of fairness that came from finally having access to the information that was withheld from us for so very long.

14. After years of advocacy, it is crushing that the law enforcement unions are trying to obtain a ruling that would have the same effect of reinstating § 50-a.  We (myself, my family, the families of other victims, and our advocates) would have to start our advocacy all over from the beginning, and the work that we have already put in would feel meaningless.  Unless someone has experienced the agony of a family member dying and not having any ability to obtain information or seek justice, they simply cannot understand how important the repeal of § 50-a is to these families.

15. The pattern of unfairness and the pattern of allowing officers who commit misconduct to continue to hurt our community must end.  The officers have been shielded for too long.

Executed on this 14th day of August, 2020, in Germantown, Maryland.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*Kadiatou Diallo*

Kadiatou Diallo