UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNIFORMED FIRE OFFICERS ASSOCIATION; UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK; CORRECTION OFFICERS' BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.; SERGEANTS BENEVOLENT ASSOCIATION; LIEUTENANTS BENEVOLENT ASSOCIATION; CAPTAINS ENDOWMENT ASSOCIATION; and DETECTIVES' ENDOWMENT ASSOCIATION, <br><br> Plaintiffs, <br><br> -against- <br><br> BILL de BLASIO, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; FIRE DEPARTMENT OF THE CITY OF NEW YORK; DANIEL A. NIGRO, in his official capacity as the Commissioner of the Fire Department of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; CYNTHIA BRANN, in her official capacity as the Commissioner of the New York City Department of Correction; DERMOT F. SHEA, in his official capacity as the Commissioner of the New York City Police Department; THE NEW YORK CITY POLICE DEPARTMENT; FREDERICK DAVIE, in his official capacity as the Chair of the Civilian Complaint Review Board; and THE CIVILIAN COMPLAINT REVIEW BOARD, <br><br> Defendants. | Case No. 1:20-CV-05441-KPF <br><br><br> **DECLARATION OF SENATOR JULIA SALAZAR IN SUPPORT OF COMMUNITIES UNITED FOR POLICE REFORM'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION** |

Julia Salazar declares under penalty of perjury as follows.

1. I submit this sworn statement in support of Communities United for Police Reform's ("CPR") Opposition to Plaintiff's Request for a Preliminary Injunction. I have personal knowledge of the facts contained in this declaration, and, if called as a witness, am competent to testify to those facts, except as to matters expressly stated to be upon opinion and belief. As to those, I believe them to be true.

2. I currently serve as New York State Senator from the 18th District, which covers a majority of North Brooklyn, a position I have held since 2018. Prior, I was staff organizer for Jews for Racial and Economic Justice ("JFREJ"), a partner organization in CPR's community organizing coalition. Most of my work with JFREJ focused on advocating for greater police accountability and transparency, including specifically advocating for the repeal of § 50-a and urging the Mayor and Police Commissioner to support the release of police misconduct and disciplinary records. My work in community organizing further motivated my commitment to repealing § 50-a—a commitment I brought to my seat in the New York State Senate.

3. I submit this declaration to describe my own community advocacy; my participation in public senate hearings where opponents to repeal efforts were given the explicit opportunity to provide the factual bases for their claims that a repeal would harm police officers yet chose not to provide such evidence (or more likely were simply unable to); and the reasons why the public benefits from the repeal of § 50-a.

**My Support for the Repeal of § 50-a Began While Community Organizing, a Commitment I Made a Top Priority During My First Senate Term**

4. Throughout my community advocacy work, which began during my time with JFREJ, I saw firsthand the harm that § 50-a was causing. My work with CPR and JFREJ included advocating alongside the families of citizens NYPD officers had killed. The struggle

those families faced when trying to obtain even very basic information like the names of the officers who were involved in the killing—information that was routinely withheld on the basis of § 50-a—drove my support for the repeal of § 50-a.

5. In my capacity at JFREJ, I attended the disciplinary hearings or criminal trials of officers who had killed or brutalized New Yorkers. One such hearing was the hearing of Officer Richard Haste, who killed Ramarley Graham. Although Officer Haste's conduct resulted in a disciplinary hearing, for years after Ramarley was killed the NYPD still withheld the names of the other officers who were directly involved. I was troubled by the fact that this information was withheld from the public and the family. The public should know if the officers patrolling their neighborhoods have been involved in killing citizens. And I found it particularly disturbing that even Ramarley's own family was prevented from obtaining this most basic information about the individuals who stood by while their colleague shot Ramarley.

6. In another instance, after Mohamed Bah was killed by NYPD officers in his apartment, I provided support to his mother as she tried to get the same sorts of basic information about her son's murder. Seeing her attempts rejected by the Mayor and the Police Commissioner further fueled my support for the repeal of § 50-a.

7. Even when the public knew about officer misconduct—for example, when video of Officer Daniel Pantaleo using an illegal, ultimately fatal chokehold on Eric Garner was widely released—NYPD still used § 50-a as an excuse to protect officers (both by shielding Officer Pantaleo's records from disclosure and by withholding the names of the other officers present) and to ultimately deny accountability. And in all of the cases I can think of, the fact that families could not obtain the full misconduct records of officers was always something that added to their pain, and increased public mistrust of the government and police.

8. So, when I was elected to New York State Senate, it was a key priority for me to co-sponsor Senator Jamaal Bailey's bill to repeal § 50-a. In addition to Senator Bailey's bill which supported a full repeal, there was also a second bill introduced, which was simply a modification of § 50-a that would keep the vast majority of misconduct records secret for an extended period time—achieving essentially what the law enforcement unions are currently seeking. I made very clear, both in my public statements and in conversation with my colleagues, that my support was for a full-scale repeal of §50-a. I believed, as I still do, that anything less than a full repeal would allow law enforcement to continue to hide officers' disciplinary and misconduct records. As a related part of my advocacy for police accountability, I also announced my support for the #SaferNYAct, a package of bills in the New York State Legislature aimed at increasing police transparency and accountability.

**During Public Hearings on Repeal § 50-a, Law Enforcement Had Opportunity to Support Claims of Officer Harm, But Failed to Do So**

9. The arguments that the Unions are raising in this litigation are the same arguments they raised during public hearings related to § 50-a, and the same positions I refuted while community organizing with JFREJ. And, in each instance, the Unions have advanced these arguments without any data to support them.

10. During the 2019-2020 legislative session, the Senate held multiple public hearings regarding § 50-a. Both the police and other law enforcement unions, as well as the police departments participated in these hearings and provided sworn testimony in opposition to the repeal. During these hearings my colleagues and I *directly* asked for examples to support the claims that repealing § 50-a would jeopardize officer safety. Even in response to the direct invitation to provide even a single example to support these claims, they had no incident to point to—from New York or from any other jurisdiction—where the release of misconduct and

discipline records had been linked to jeopardizing officer safety. Not only could they not provide such examples; they *admitted* to not having any. The purpose of these hearings was to create the public record – for both sides to present their case in favor of or in opposition to the repeal. In such a context, if the opponents of repeal did have any non-speculative evidence showing that it would lead to officer harm, they would have presented it.

11. But information from other jurisdictions shows what the repeal's opposition did not want to admit. When it comes to concealment of police misconduct and disciplinary records, New York has been the most restrictive; yet even in jurisdictions that broadly release records, I do not know of any reported incidents where the release of records caused threats to officer safety. Nor do I know of any reason why New York would be any different than those other jurisdictions—and the opponents of § 50-a were unable to offer any reasons.

12. The legislature was in no way indifferent to *legitimate* concerns regarding officer safety. During the repeal process, many discussions within the Senate and the Democratic Conference regarding Senator Bailey's bill focused on officer safety concerns stemming from the release of an officer's personal contact information. There was a clear consensus that the intent of repealing § 50-a was not to provide officers' personal contact information or addresses to the public. Providing such information is not in the public interest and doing so would cause legitimate concerns. Supporters of repealing § 50-a, including myself, made clear that the final version of legislation would continue to protect personal contact information—of officers, complainants, and family members of those killed by the police— from disclosure. Senate Bill S8496, the final repeal § 50-a bill that the Senate passed and Governor Cuomo signed into law explicitly ensures that personal contact information such as an officer's address when

misconduct records are released. In the minds of the prevailing legislature, this accounted for any countervailing concerns about officer safety.

### It is in the Public Interest to Have All Records Released to Assess the Efficacy of the Investigative Process

13.     The release of *all* police misconduct and discipline records, regardless of ultimate disciplinary outcome, is important because the taxpaying public has a right to examine the effectiveness of law enforcement's internal investigative process. The current process inherently favors the officer over the complainant: we know that despite the volume of complaints related to police conduct, the number of instances where the investigative process validates the complaint is exceptionally low – and this is true even when there is public knowledge of the egregious conduct. This indicates that an unsubstantiated, truncated, or otherwise non-substantiated or non-final complaint outcome is likely to evidence failures within the investigative process. Even more so when there are thousands of non-substantiated complaints, or non-final complaint outcomes, which indicates a pattern within the department.

14.     These internal failures, where an officer who commits misconduct gets away with it because the complaint is never formally substantiated or does not result in disciplinary charges, pose a threat to the public. Failure to reprimand, correct, and if necessary, take further disciplinary action is a warning sign that the officer will commit similar misconduct in the future. There is little incentive to change behavior that is not punished or corrected. And when the public does not know about the misconduct *and* there was no discipline for the misconduct, there is no accountability mechanism to drive changes in officer behavior and there is no effective tracking of the early warning signs of an officer who may repeat such behavior.

15.     Additionally, because police officers are public servants, they should be held to a high standard—especially because they are tasked with carrying a deadly weapon and protecting

the public and are authorized to use deadly force in those endeavors.  For years, § 50-a effectively held police officers who engage in misconduct to a *lower* standard than other public servants.  There is no logical reason to do that.  Section 50-a allowed police officers' misconduct to be shielded.  But when there is an allegation of misconduct against a legislator, no section of the law prevents those allegations from being made public—nor do I believe there should be.  Repealing § 50-a finally subjects police officers to a standard no lower than that which applies to other public servants who are accused of misconduct.

16. Similarly, the argument that disclosing misconduct and discipline records would harm officers' reputations does not hold up.  The reputation of ordinary citizens is impacted whenever they have an encounter with law enforcement, regardless of ultimate outcome.  Arrest records, mug shots, and indictments that never result in guilty verdicts are all publicly accessible.  But officers argue that their reputation should be shielded at all costs, including by allowing those who continually violate public trust to be protected.

17. Officers chose a career in which they directly interact with members of the public.  So of course they will have a reputation among the public.  It is the same for me.  As an elected official, I do not have the right to control my reputation.  I can impact public perception based on my own actions, but I cannot ultimately dictate what the public will think of me—and withholding certain information is not a magic trick that will meaningfully shape my reputation.

18. When it comes to police officers, the public interest in obtaining information about the officers' misconduct supersedes any desire to keep their reputation clean.  A public-facing reputation comes with the territory when you select a career in public service.  Officers are entrusted with a lot of power and influence.  It is reasonable to expect that they also be subject to scrutiny, and that they assume that risk when they take the job.

-8-

Executed on this 13th day of August, 2020, in Brooklyn, New York.

I declare under penalty of perjury that the foregoing is true and correct.

                                            Respectfully submitted,

                                            Senator Julia Salazar