# EXHIBIT C

# EXCLUSIVE DOCUMENTS: Officer had an 'unusual' number of complaints before he killed Ramarley Graham

archive.thinkprogress.org

8 mins read

**New York City has shielded Richard Haste's disciplinary history, yet publicly released his trial outcome.**

O n Sunday, former [NYPD Officer Richard Haste quit the police department before he could be fired](#) for the deadly shooting of Ramarley Graham, an unarmed black teenager, in the Bronx in 2012. His resignation came two days after Deputy Commissioner of Trials Rosemarie Maldonado concluded that Haste was guilty of tactical errors during the fatal encounter—a verdict reached after the NYPD launched an internal disciplinary trial in January.

Maldonado [determined](#) that Haste had used "poor judgment" and should have done more to prevent the shooting from happening. She also recommended the officer's termination. However, Haste was given advanced warning and stepped down of his own accord.

"It's been a nightmare for the last five years," Graham's mother, Constance Malcolm, told ThinkProgress on Monday. "I've been sitting through trial after trial and getting nowhere. What happened yesterday is even more disturbing: how the NYPD [deals] with family that goes through tragedy and continues to disrespect them," she said, in reference to the decision to let Haste to step down.

In addition to exiting on his own terms, Haste left the department before his full disciplinary history was divulged to the public, despite the family's quest for his records and public calls for greater police transparency in his case. However, an anonymous former employee for the New York City Civilian Complaint Review Board (CCRB) sent ThinkProgress a copy of the officer's disciplinary record. It matches the same format as NYPD Officer Daniel Pantaleo's records, which were published by ThinkProgress and authenticated by the CCRB last week. According to those records and experts who analyzed them, Pantaleo showed a pattern of problematic behavior that would have stood out to the NYPD even before he killed Eric Garner.

Andrew Case, a former policy director and spokesman for the CCRB, told ThinkProgress that the Haste document appears authentic.

The document reveals that Haste had six complaints lodged against him before he killed Graham with a single shot. All of them were submitted in the span of 13 months, yet none were substantiated.

Neither the NYPD nor the CCRB responded to requests for comment. ThinkProgress was unable to reach Haste for comment.

The Patrolmen's Benevolent Association (PBA), the police union that represented Haste, declined to talk to ThinkProgress. Communications Director Albert O'Leary said all questions should be directed to the NYPD and that a New York state law prevented the office from discussing disciplinary records.

ThinkProgress' findings come at a time when civil rights attorneys in New York City are fighting several legal battles for more officer transparency, citing the need for greater accountability over police.

[View this document on Scribd](#)

### *An 'unusual' number of complaints*

Between September 2009 and October 2010, Haste had six complaints—a total of 10 allegations—filed against him with the CCRB, the independent agency tasked with investigating complaints against the city's officers. In that time, he was accused of using physical force, pepper spray, and offensive language, as well as making an abusive frisk. Four allegations (submitted in two separate complaints) were removed from the document, so it is unclear what the reported offenses were.

The CCRB was unable to verify any of the allegations.

Haste was exonerated for using physical force, which [means](#) the CCRB determined he committed the act lawfully. Three allegations—two for using offensive language and one for making an abusive frisk—were deemed "unfounded," [meaning](#) the CCRB found "sufficient credible evidence to believe that the subject officer did not commit the alleged act." An allegation about offensive language was unsubstantiated, [defined](#) as not having enough evidence to conclude that Haste did something wrong. The CCRB ended its investigation of the pepper spray allegation when the complainant was found uncooperative. (As ThinkProgress previously [reported](#), "uncooperative" is defined as missing two interviews with an investigator or not responding to a request for an interview—a process that can be intimidating for many complainants who are wary of law enforcement.)

The CCRB attempted to resolve two cases with redacted allegations through its [informal mediation process](#), during which a complainant meets with the accused officer and a third, neutral party "for the purpose of fully and frankly discussing alleged misconduct and attempting to arrive at a mutually agreeable resolution of a complaint." Per the CCRB definition, both cases were dropped when mediation was agreed to by both parties but the complainant did not follow through.

# EXCLUSIVE DOCUMENTS: The disturbing secret history of the NYPD officer who killed Eric Garner

Official disciplinary records have been hidden from public scrutiny until now.

Case also said that mediation is not an option in cases involving allegations of serious misconduct, such as firing a weapon or causing serious injury. A complainant will rarely agree to mediation if they want a full investigation.

Still, the number of complaints made against Haste is highly unusual. Roughly 8.8 percent of more than 36,000 NYPD officers have that many complaints, based on publicly available data spanning 2006 to 2017 on the CCRB website. The timing of Haste's complaints also stands out, with all six occurring in just over a year. By contrast, Pantaleo's CCRB records indicate that he had eight complaints, including four substantiated allegations, in nearly five years.

The number of complaints lodged against Haste in such a short time span is "unusual," according to Case. "I would say that six complaints in one year, regardless of their outcome, is an extremely high number of complaints," he said.

Nearly 15 months after the last recorded complaint was submitted against him, Haste charged into Graham's home without a warrant and fired a single shot at the 18-year-old. Minutes before his death, Graham had been hanging out with friends near a local bodega. Haste said Graham was suspected of carrying a gun by some of his colleagues on an NYPD narcotics squad, so he followed the teenager home. He claimed to have burst in because the Graham was presumed to have a firearm. In reality, the teeanger was unarmed.

Two members of Haste's Bronx narcotics unit later testified that they'd reported Graham to their colleagues when they saw him on the street "walking with purpose" with his hands on his waistband—language that's often used to validate an officer's behavior.

During Haste's disciplinary hearing, the NYPD's lawyers argued that he should have waited for backup and found cover if he thought his life was in danger.

❌ Supporters for the family of Ramarley Graham chanted 'Hands up!

Supporters for the family of Ramarley Graham chanted 'Hands up! Don't Shoot' during a gathering in 2014.
CREDIT: AP Photo/Bebeto Matthews

### *A search for justice*

"That many complaints in such a short time should've been a huge red flag, especially since he had just joined the force in 2008," Graham's mother said. "This clearly shows that this officer was very aggressive." The NYPD did not respond to the claim that this record suggested a pattern of aggressive behavior; the police union directed ThinkProgress back to the NYPD. ThinkProgress was unable to reach Haste for comment.

The administrative trial was the latest development in a legal saga between Graham's family and the NYPD that spanned several years.

In 2012, Haste was indicted by a grand jury for involuntary manslaughter, but a judge called for a new grand jury because of an administrative error. The second one convened in 2013, but jurors decided not to indict Haste. In March 2016, the Department of Justice declined to file federal charges based on its own investigation of the shooting.

Malcolm filed a 24-page Freedom of Information Act request to obtain records about Haste's time on the police force. As the *Village Voice* reported earlier this month, Malcolm sought "everything from Unusual Occurrence reports, police radio transmission records, and officers' activity logs to NYPD policy documents, grand jury statements, and the notes police leadership relied on when speaking to the press about the incident."

To her dismay, no information was turned over. Instead, NYPD Records Access Officer Richard Mantellino informed her that handing over the records would violate Public Officers Law Section 87(2)(e)(i). That law states that such records would "interfere with law enforcement investigations or judicial proceedings" if they were released.

"There is no transparency related to CCRB and other complaints against officers," Malcolm told ThinkProgress. "I have wondered: If Haste's record had been transparent, and if [Daniel] Pantaleo's record had been transparent… is it possible that Ramarley and Eric Garner would be alive today?"

Both the CCRB and NYPD were sued in the past couple of years by the Legal Aid Society for the release of disciplinary records and NYPD personnel orders, which included updated information about disciplinary actions taken against officers. The agencies abruptly stopped releasing the information towards the end of 2014 and 2016, respectively, citing a New York civil rights code. Section 50-a of the code prohibits the release of an officer's records without consent, and the CCRB, NYPD, and lawyers for the city of New York have said police officials stopped the practice of sharing such information once they realized they were violating the law. Civil rights attorneys dispute that argument, citing the decades in which the NYPD voluntarily released records and the period of time between 2013 and 2014 that the CCRB shared disciplinary records upon request.

It is unclear if Haste granted the NYPD permission to discuss his disciplinary trial verdict, and he could not be reached for comment on the matter. If he didn't grant permission, Case said, the NYPD is violating the law to its own advantage.

"It seems as though the department is releasing disciplinary outcomes—including the outcomes of trial-room verdicts, which they have said are barred by 50-a—when it makes them look good," he said. "That's really the whole problem with civil rights law 50-a. It's almost impossible not to enforce it haphazardly or even strategically."

Malcolm applauds Legal Aid's decision to sue for disciplinary records and personnel orders. "I think [50-a] is taking us in the wrong direction. It's taking us backward instead of going forward," she said. "People see Richard Haste for who he is and see the department—how they protect these officers after they abuse people and kill people."

> Constance Malcolm responding to the news that Richard Haste resigned. CREDIT: AP Photo/Richard Drew

## More questions than answers

If Haste had been fired, it would have been the first time someone was formally disciplined for the shooting, besides being placed on modified duty. But his resignation allowed him to avoid an official punishment—a move that Malcolm called a "slap in the face" during a press conference on Monday.

The Graham estate received $3.9 million from the city in January 2015 after filing a wrongful death lawsuit. But that sum of money hasn't deterred Malcolm from seeking officer accountability for Haste and others.

"This was a perfect case to show us that our young men and women matter when they've been killed unjustly by police," she said during the news conference. "But instead, you took the easy way out by letting this man resign."

Malcolm and her relatives are now waiting to see if the NYPD disciplines two other officers who barged into her home before Graham was shot, Sgt. Scott Morris and Officer John McLoughlin. Malcolm told ThinkProgress that she has no idea when their disciplinary trials will begin. But seeing Haste's disciplinary record has made her angrier than before.

"How did this man even get on the force and how he stay on the force?" she said. "It's taken a toll on my family, but at the same time, I can't give up because my son is worth the fight and I will never give up as a mother. I need justice and I need answers."

**CORRECTION:** The CCRB declined to comment on the document. This post originally stated that the agency did not respond to request for comment. Haste could not be reached for comment.

*Jack Jenkins contributed reporting to this story.*

∎