# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association, | Index No.: |
| | **MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION/COMPLAINT AND PROPOSED ORDER TO SHOW CAUSE SEEKING TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
|        Petitioners/Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
|     -against- | |
| Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board, | |
|        Respondents/Defendants. | |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................... ii

FACTUAL BACKGROUND ...................................................... 4

ARGUMENT ...................................................................... 4

I.    The Court Should Grant a Preliminary Injunction and Temporary Restraining Order Enjoining Any Public Release of Unsubstantiated and Non-Final Allegations Pending the Outcome of This Proceeding. ........................................................................... 4

   A.  Legal Standard ..................................................................... 4

   B.  Petitioners' Members Will Be Irreparably Injured by the Public Release of Unsubstantiated and Non-Final Allegations, Which Is Imminent and Irreversible. .......... 6

   C.  The Balance of the Equities Favors Petitioners Because an Injunction Merely Preserves the Status Quo and Will Not Prejudice Respondents, Whereas a Denial of Relief May Extinguish Petitioners' Rights. ........................................................................ 9

   D.  Petitioners Are Likely to Succeed on Multiple Claims for Relief. .................................... 11

      1.  Respondents' Release Would Interfere with Collective Bargaining Rights. ................. 11

      2.  Publication of Unsubstantiated and Non-Final Allegations Would Violate Petitioners' Members' Constitutional Rights to Due Process of Law Under the Federal and New York State Constitutions. .............................................................................. 13

      3.  Publication of Unsubstantiated and Non-Final Allegations Would Violate Petitioners' Members' Constitutional Rights to Equal Protection of Law Under the Federal and New York State Constitutions. ................................................................... 19

      4.  Release of the Documents Would Constitute a Breach of Settlement Agreements. ..... 21

      5.  Respondents' Decision to Release Unsubstantiated and Non-Final Allegations Was Affected By Errors of Law or Was Arbitrary and Capricious. ..................................... 23

         a)  It Is an Error of Law to Release Unsubstantiated and Non-Final Allegations, which Violates the Legally Protected Interests of Petitioners' Members. .......................... 24

         b)  It Is Arbitrary and Capricious To Break with Long-Established Practice Without a Sound Basis in Reason or Due Regard to the Relevant Facts. ................................. 27

CONCLUSION ................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Able v. United States*,
   155 F.3d 628 (2d Cir. 1998)...........................................................................19, 20

*Aetna Ins. Co. v. Capasso*,
   75 N.Y.2d 860 (1990) ...............................................................................................4

*AIU Ins. Co. v. Robert Plan Corp.*,
   44 A.D.3d 355 (1st Dep't 2007) ..............................................................................9

*Am. Economy Ins. Co. v. State of New York*,
   30 N.Y.3d 136 (2017) .............................................................................................17

*Barbes Rest., Inc. v. ASRR Suzer 218*,
   140 A.D.3d 430 (1st Dep't 2016) ...................................................................6, 9, 11

*Bd. of Educ. of Middletown Enlarged City Sch. Dist. v. Douglas*,
   No. 4305/06, 2006 WL 6851993 (Sup. Ct., N.Y. Cnty. July 7, 2006) ....................6

*Bd. of Regents of State Colls. v. Roth*,
   408 U.S. 564 (1972).................................................................................................13

*Brandt v. Bd. of Coop. Educ. Servs.*,
   820 F.2d 41 (2d Cir. 1987).......................................................................................15

*Bursac v. Suozzi*,
   22 Misc. 3d 328 (Sup. Ct., Nassau Cnty. 2008)...................................7, 15, 16, 17

*In re Charles A Field Delivery Serv. Inc.*,
   66 N.Y.2d 516 (1985) ..............................................................................................27

*In re Cohoes City Sch. Dist. v Cohoes Teachers Assn.*,
   40 N.Y.2d 774 (1976) ...............................................................................................8

*Matter of Crawford v New York City Dep't of Info. Tech. & Telecomm.*,
   2017 N.Y. Slip Op. 30982(U), 21 (Sup. Ct., N.Y. Cnty. 2017)..............................23

*In re Cullman Ventures, Inc.*,
   252 A.D.2d 222 (1st Dep't 1998) ..............................................................................5

*DiBlasio v. Novello*,
   344 F.3d 292 (2d Cir. 2003)...............................................................................13, 14

*Doe v. Greco*,
    62 A.D.2d 498 (3d Dep't 1978) ................................................................................7

*Dolman v. U.S. Trust Co.*,
    2 N.Y.2d 110 (1956) ..............................................................................................21

*Dorsett v. Cnty. of Nassau*,
    289 F.R.D. 54 (E.D.N.Y. 2012) .............................................................................25

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) .....................................................................................24, 28

*Felix v. Brand Serv. Grp. LLC*,
    101 A.D.3d 1724 (4th Dep't 2012) .........................................................................9

*FTI Consulting, Inc. v. PWC LLP*,
    8 A.D.3d 145 (1st Dep't 2004) ...............................................................................6

*Gambale v. Deutsche Bank AG*,
    377 F.3d 133 (2d Cir. 2004) ....................................................................................6

*Gen. Motors Corp. v. Romein*,
    503 U.S. 181 (1992) ..........................................................................................17, 18

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ..............................................................................................14

*Held v. Hall*,
    190 Misc. 2d 444 (Sup. Ct., Westchester Cnty. 2002)............................................7

*Hughes Hubbard & Reed LLP v. Civilian Complaint Review Bd.*,
    53 Misc. 3d 947 (Sup. Ct., Kings Cnty. 2016).................................................2, 28

*Klein, Wagner & Morris v. Lawrence A. Klein, P.C.*,
    186 A.D.2d 631 (2d Dep't 1992) ............................................................................6

*Knox v. N.Y. City Dep't of Educ.*,
    85 A.D.3d 439 (1st Dep't 2011) ...........................................................................13

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ..........................................................................................17, 18

*Lee TT. v. Dowling*,
    87 N.Y.2d 699 (1996) ...........................................................................................14

*In re Liquidation of Union Indem. Ins. Co. of N.Y.*,
    92 N.Y.2d 107 (1998) ...........................................................................................27

*Matter of Luongo v. Records Access Appeals Off.*,
    168 A.D.3d 504 (1st Dep't 2019) .......................................................................26

*Matter of Luongo v. Records Access Off.*,
    150 A.D.3d 13 (1st Dep't 2017) .........................................................................28

*Madison Ave. v. Madison Bentley*,
    30 A.D.3d 1 (1st Dep't 2006) ............................................................................21

*Masjid Usman, Inc. v. Beech 140, LLC*,
    68 A.D.3d 942 (2d Dep't 2009) ...........................................................................6

*McCain v. Koch*,
    70 N.Y.2d 109 (1987) ........................................................................................5

*Melvin v. Union Coll.*,
    195 A.D.2d 447 (2d Dep't 1993) .......................................................................10

*Merscorp, Inc. v. Romaine*,
    295 A.D.2d 431 (2d Dep't 2002) .......................................................................11

*Morgan Stanley & Co. Inc. v. Archer Daniels*,
    570 F. Supp. 1529 (S.D.N.Y. 1983)...................................................................21

*Mulgrew v. Bd. Of Educ. of the City of N.Y.*,
    87 A.D.3d 506 (1st Dep't 2011) ........................................................................23

*Myers v. Schneiderman*,
    30 N.Y.3d 1, 85 N.E.3d 57 (2017).....................................................................19

*N.Y. City Lawyers' Ass'n v. State*,
    192 Misc. 2d 424 (Sup. Ct., N.Y. Cnty. 2002) ...................................................5

*New York v. City of N.Y.*,
    275 A.D.2d 740 (2d Dep't 2000) ...................................................................10, 11

*Nestle Waters N. Am., Inc. v. City of N.Y.*,
    121 A.D.3d 124 (1st Dep't 2014) ......................................................................24

*N.Y. Times Co. v. City of N.Y. Fire Dep't*,
    4 N.Y.3d 477 (2005) ........................................................................................25

*Novus Partners, Inc. v. Vainchenker*,
    32 Misc. 3d 1241(A), 2011 N.Y. Slip Op. 51666 (U)
    (Sup. Ct., N.Y. Cnty. 2011) ...............................................................................6

*Paloger v. Cohen*,
  37 Misc. 3d 1220(A), 2012 N.Y. Slip Op. 52098(U)
  (Sup. Ct., Nassau Cnty. 2012)..............................................................................6

*Patterson v. City of Utica*,
  370 F.3d 322 (2d Cir. 2004)..................................................................................15

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984)..............................................................................................17

*People v. David W.*,
  95 N.Y.2d 130 (2000) ......................................................................................15, 16

*People v. Gissendanner*,
  48 N.Y.2d 543 (1979) ...........................................................................................26

*Red Ball Interior Demolition Corp. v. Palmadessa*,
  173 F.3d 481 (2d Cir. 1999)..................................................................................21

*Saferstein v. Wendy*,
  137 Misc.2d 1032 (Sup. Ct., N.Y. Cnty. 1987) .....................................................5

*Sciolino v. City of Newport News, Va.*,
  480 F.3d 642 (4th Cir. 2007) ................................................................................14

*Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*,
  422 F.3d 141 (3d Cir. 2005)..................................................................................19

*Skandia America Reinsurance Corp. v. Schenck*,
  441 F. Supp. 715 (S.D.N.Y. 1977) .......................................................................21

*Swinton v. Safir*,
  93 N.Y.2d 758 (1999) ......................................................................................13, 15

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*,
  5 Misc. 3d 285 (Sup. Ct., N.Y. Cnty. 2004) ..........................................................5

*Terrell v. Terrell*,
  279 A.D.2d 301 (1st Dep't 2001) ...........................................................................5

*U.S. Dep't of Justice v. Reporters Comm.*,
  489 U.S. 749 (1989)..............................................................................................14

*Valmonte v. Bane*,
  18 F.3d 992 (2d Cir. 1994)........................................................................14, 15, 17

*Westchester Cnty. Dep't of Pub. Safety Police Benev. Ass'n, Inc. v. Westchester Cnty.*,
35 A.D.3d 592 (2d Dep't 2006) ............................................................................1

*Yung Bros. Real Estate Co., Inc. v. Limandri*,
26 Misc. 3d 1203(A), 2009 N.Y. Slip Op. 52653(U) (Sup. Ct., N.Y. Cnty.
Dec. 29, 2009)........................................................................................................5

**Statutes**

CPL § 160.50 ..............................................................................................................20

CPLR §§ 6301 ...............................................................................................................5

CPLR § 6313(a) ............................................................................................................5

CPLR § 7502(c) ....................................................................................................5, 9, 11

CPLR § 7803(3) ..........................................................................................3, 23, 24, 27

CPLR § 7805 .................................................................................................................5

CSL § 201(4).............................................................................................................12

CSL § 203 ..................................................................................................................12

N.Y. Civil Rights Law § 50-a et seq. .................................................................. *passim*

**Other Authorities**

Benjamin Mueller & Al Baker, *Police Officer Is 'Murdered for Her Uniform' in the Bronx*, N.Y. Times (July 5, 2017),
*available at* https://tinyurl.com/y7ngmdth..............................................................20

Comm. on Open Gov't, Adv. Op. No. FOIL-AO-12005 (Mar. 21, 2000),
*available at* https://docs.dos.ny.gov/coog/ftext/f12005.htm...................................27

Comm. on Open Gov't, Adv. Op. No. FOIL-AO-17195 (May 29, 2008),
*available at* https://docs.dos.ny.gov/coog/ftext/f17195.html .................................26

Developments in the Law, *Injunctions*,
78 Harv. L. Rev. 994, 1056 (1965) .......................................................................11

*Enforcement Actions*, Office of the Professions,
*available at* http://www.op.nysed.gov/opd/rasearch.htm# ....................................20

John Kelly & Mark Nichols, *We found 85,000 cops who've been investigated for misconduct. Now you can read their records*,
USA Today (June 11, 2020), *available at* https://www.usatoday.com/in-depth/news/investigations/2019/04/24/usa-today-revealing-misconduct-records-police-cops/3223984002/ .........................................................................10

N.Y. Const. Art. 1, § 6 ...........................................................................................13

N.Y. Const. Art. 1, § 11 .........................................................................................13

N.Y. Senate Bill S8496,
*available at* https://www.nysenate.gov/ legislation/bills/2019/s8496 ...................................25

*Office of the Professions*, New York State,
*available at* http://www.op.nysed.gov/home.html (last accessed July 5, 2020).....................19

U.S. Const. amend. XIV .........................................................................................13

11 Williston on Contracts § 30:19 (4th ed. 2020).........................................................22

## PRELIMINARY STATEMENT

For more than four decades, all disciplinary records of firefighters, corrections officers, and police officers were treated as confidential and not subject to public disclosure under New York law.  Until the repeal of N.Y. Civil Rights Law § 50-a[1] last month, Respondents/Defendants ("Respondents")[2] recognized that release of certain of these disciplinary records would not only violate that law, but would constitute an unwarranted invasion of the officers' privacy rights.  Now, Respondents have indicated that, as early as July 15, 2020, they intend to conduct a massive data dump to include, among others, the very records that the City previously recognized could not be disclosed without violating the privacy rights of those firefighters, corrections officers, and police officers.  Petitioners/Plaintiffs ("Petitioners")[3] therefore move for a temporary restraining order and preliminary injunction to prevent Respondents from releasing and publicizing these databases, including allegations that are non-final, unsubstantiated, unfounded, exonerated, or that resulted in a finding of not guilty ("Unsubstantiated and Non-Final Allegations") brought against New

---

[1] Section 50-a provided that "[a]ll personnel records used to evaluate performance toward continued employment or promotion" of police officers, corrections officers, paid firefighters, and others, "shall be considered confidential and not subject to inspection or review without the express written consent" of the employee or as "mandated by lawful court order."  Civ. Rights Law § 50-a(1).

[2] "Respondents" is defined herein as Bill de Blasio, the City of New York (the "City"), the Fire Department of the City of New York, Daniel A. Nigro, the New York City Department of Correction, Cynthia Brann, Dermot F. Shea, the New York City Police Department ("NYPD"), Frederick Davie, and the Civilian Complaint Review Board ("CCRB").

[3] "Petitioners" and "the Unions" are each defined herein as the Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York, the Correction Officers' Benevolent Association of the City of New York, Inc., the Police Benevolent Association of the City of New York, Inc., the Sergeants Benevolent Association, the Lieutenants Benevolent Association, the Captains Endowment Association, and the Detectives' Endowment Association.

The Unions have associational standing to sue here because (1) one or more of every unions' members has standing to sue; (2) the interests advanced by vindicating the rights of the members are sufficiently germane to the Petitioners' purposes to demonstrate that Petitioners will appropriately represent the members' interests; and (3) the participation of the individual members is not required to assert the claim or to afford the Petitioners complete relief. *See Westchester Cnty. Dep't of Pub. Safety Police Benev. Ass'n, Inc. v. Westchester Cnty.*, 35 A.D.3d 592, 594 (2d Dep't 2006).

York City's firefighters, corrections officers, and police officers, and confidential settlement agreements. These Unsubstantiated and Non-Final Allegations—unproven allegations at best and false allegations at worst—and records relating to confidential settlement agreements will be "data dumped" on the internet, resulting in the publishing and promotion of information, without any concern that the Respondents will destroy the reputation and privacy, and imperil the safety, of many of those firefighters and officers. If it is allowed to proceed, this public plastering of the allegations will violate the City's Collective Bargaining Agreements with the Petitioners, violate the United States and New York State Constitutions, breach contractual settlement agreements, and trample the firefighters and officers' privacy rights through errors of law and arbitrary and capricious decision making. Injunctive relief is warranted because Petitioners will suffer irreparable injury in its absence, the balance of equities strongly favors preservation of the status quo, and Petitioners are likely to succeed on the merits of their claims.

There can be no dispute that release of Unsubstantiated and Non-Final Allegations will irreparably injure the Petitioners if the action is not enjoined. The widely promoted release prizes maximum transparency above all other interests, including the very real risk that officers called out by name will be targeted, harassed, threatened, harmed, or attacked. It ignores the important safety and privacy concerns implicated for both the named officers and their families, leaving them with *less* privacy protection than other licensed professionals in the state. Indeed, as the City recognized just four years ago, the public release of unsubstantiated allegations against officers would "represent an unreasonable invasion of privacy."[4] The firefighters and officers will be irreparably harmed if this Court does not act to preserve the status quo because once the Respondents dump the data publicly on the internet, there is nothing anyone can do to unring that

---

[4] *Hughes Hubbard & Reed LLP v. Civilian Complaint Review Bd.*, 53 Misc. 3d 947, 950 (Sup. Ct., Kings Cnty. 2016).

bell.

Just last week, the Appellate Division of the Superior Court of New Jersey temporarily and correctly enjoined that state's attorney general from ordering public disclosure of the identifies of officers who have been sanctioned for serious disciplinary violations—*i.e.*, officers with records of proven misconduct.[5]  Recognizing the "sea change" in the attorney general's position on the confidentiality of police records, the court applied "well-settled law to preserve the officers' challenge by staying implementation of the Directives pending [its] disposition of the appeal."[6]  Here, too, Petitioners seek to preserve the status quo, but the requested relief is comparatively modest: Petitioners seek to preliminarily enjoin the disclosure of only Unsubstantiated and Non-Final Allegations.  With respect to these unproven, unfounded, and potentially false accusations, the officers' privacy interests are at their zenith and the public's legitimate interest in disclosure (if it exists at all for such allegations) is at its lowest ebb.

On the merits, Petitioners are likely to succeed on each of their claims.  Respondents' data dump will destroy valuable collectively bargained-for rights to have certain records removed from personnel files.  It will violate the Due Process Clause of the U.S. and N.Y. State Constitutions because it will cause serious reputational harm and interfere with future employment opportunities without adequate procedures for individuals to contest inclusion in the database.  It will violate the Equal Protection Clause of the U.S. and N.Y. State Constitutions because it unreasonably treats firefighters, corrections officers, and police officers differently than other public employees.  It will breach disciplinary settlement agreements, which incorporated § 50-a by operation of law and require continued confidentiality.  And it constitutes either an error of law or arbitrary and

---

[5] Order on Motion at 2, No. A-003950-19T4 (N.J. Super., App. Div. July 8, 2020) (attached as Exhibit A to this Memorandum of Law).

[6] *Id.*

capricious action under CPLR § 7803(3) because it ignores legally protected privacy interests and breaks from long-settled agency practice and court decisions without a sound basis in reason.

Petitioners' application should be granted, including the Temporary Restraining Order set out in the accompanying Order to Show Cause.  An immediate TRO is necessary to maintain the status quo pending resolution of Petitioners' claims or else there will be no possibility of meaningful relief for Petitioners.  Respondents have indicated they intend to begin releasing disciplinary records, including Unsubstantiated and Non-Final Allegations, beginning on Wednesday, July 15.

## FACTUAL BACKGROUND

The facts of this case are explained in detail in the accompanying Verified Petition (the "Petition"), including the disciplinary process and handling of complaints and Respondents' announcement of their planned data dump of previously confidential records.

## ARGUMENT

I.   **The Court Should Grant a Preliminary Injunction and Temporary Restraining Order Enjoining Any Public Release of Unsubstantiated and Non-Final Allegations Pending the Outcome of This Proceeding.**

Petitioners are entitled to preliminary restraints to prevent Respondents from publishing the Unsubstantiated and Non-Final Allegations on the Internet or elsewhere – an act that will irreparably harm Petitioners' members and cannot be undone.  When this matter is decided, Petitioners are likely to succeed on multiple claims for relief, and the status quo must be maintained in the interim to ensure meaningful relief can be granted.

### A.   Legal Standard

A preliminary injunction is appropriate when the party seeking injunctive relief establishes: (1) likelihood of ultimate success on the merits; (2) irreparable injury if the injunction is not granted; and (3) a balancing of the equities in its favor.  *Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860,

862 (1990); *see also Yung Bros. Real Estate Co., Inc. v. Limandri*, 26 Misc. 3d 1203(A), 2009 N.Y. Slip Op. 52653(U), *4 (Sup. Ct., N.Y. Cnty. Dec. 29, 2009) (stating that CPLR § 7805 allows the Court to "preserve the status quo" in an Article 78 proceeding until it is resolved); CPLR §§ 6301, 6313(a). The decision to grant a motion for a temporary restraining order and preliminary injunction "is committed to the sound discretion of the trial court." *N.Y. Cnty. Lawyers' Ass'n v. State*, 192 Misc. 2d 424, 428-29 (Sup. Ct., N.Y. Cnty. 2002); *see also Terrell v. Terrell*, 279 A.D.2d 301, 304 (1st Dep't 2001) (trial court abused its discretion in failing to grant a preliminary injunction to maintain the status quo during the pendency of the action). This discretion includes power to grant relief in the form of an injunction directing a government entity to abide by its statutory responsibilities. *See, e.g.*, *McCain v. Koch*, 70 N.Y.2d 109, 116-17 (1987). "The existence of a factual issue on a motion for a preliminary injunction is not, standing alone, a sufficient basis for its denial." *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 295 (Sup. Ct., N.Y. Cnty. 2004).

In addition, CPLR § 7502(c) authorizes this Court to issue "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced . . . but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." The purpose of an Article 75 preliminary injunction is to "maintain the status quo pending arbitration in order to protect the viability of an award in favor of the applicant." *In re Saferstein v. Wendy*, 137 Misc. 2d 1032, 1034-35 (Sup. Ct., N.Y. Cnty. 1987). The same three-factor test for a preliminary injunction outlined above—likelihood of success, irreparable injury, and balancing of equities—also governs the issuance of a preliminary injunction under CPLR § 7502(c). *See In re Cullman Ventures, Inc.*, 252 A.D.2d 222, 230-31 (1st Dep't 1998).

**B.    Petitioners' Members Will Be Irreparably Injured by the Public Release of Unsubstantiated and Non-Final Allegations, Which Is Imminent and Irreversible.**

In establishing irreparable injury, Petitioners must present facts establishing an injury for which money damages are insufficient.  *Barbes Rest., Inc. v. ASRR Suzer 218*, 140 A.D.3d 430, 432 (1st Dep't 2016) (affirming showing where "plaintiff's restaurant . . . will be closed, its 19 employees will lose their jobs, and plaintiff will lose its substantial investment in improvements"); *FTI Consulting, Inc. v. PWC LLP*, 8 A.D.3d 145, 146 (1st Dep't 2004) (affirming finding that "the agreement's breach entailed irreparable harm, the loss of goodwill not being readily quantifiable"); *see also Masjid Usman, Inc. v. Beech 140, LLC*, 68 A.D.3d 942, 943 (2d Dep't 2009) (affirming determination that "imminent threat of the plaintiff's loss of a valuable long-term leasehold" constitute irreparable harm).  Importantly here, "damage to one's reputation is often sufficient to justify a finding irreparable injury[.]"  *Paloger v. Cohen*, 37 Misc. 3d 1220(A), 2012 N.Y. Slip Op. 52098(U), *7  (Sup. Ct., Nassau Cnty. 2012); *see also Klein, Wagner & Morris v. Lawrence A. Klein, P.C.*, 186 A.D.2d 631, 633 (2d Dep't 1992) (finding irreparable harm where defendant's actions "affect the plaintiffs' reputation").  And once information is public, it can never be made private again.  *See, e.g.*, *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again."); *Bd. of Educ. of Middletown Enlarged City Sch. Dist. v. Douglas*, No. 4305/06, 2006 WL 6851993 (Sup. Ct., N.Y. Cnty. July 7, 2006) (disclosure of confidential student information constitutes irreparable harm); *Novus Partners, Inc. v. Vainchenker*, 32 Misc. 3d 1241(A), , *5 (Sup. Ct., N.Y. Cnty. 2011) ("The likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm.") (brackets, citation, and internal quotation marks omitted).  The law is clear that "[p]ublic disclosure of what is now confidential and should remain confidential would lead to an irreversible breach of that confidentiality.  The

harms which would naturally flow from disclosure could not be redressed nor could the parties ever be returned to the status quo ante." *Doe v. Greco*, 62 A.D.2d 498, 501 (3d Dep't 1978).

Petitioners' irreparable injury may be mere hours away. Immediate judicial intervention is necessary to maintain the status quo pending resolution of Petitioners' claims or else there will be no possibility of meaningful relief for Petitioners. Respondents have indicated they intend to begin releasing disciplinary records, including Unsubstantiated and Non-Final Allegations, beginning on Wednesday, July 15. (Petition ¶ 50.) Today, the injury from the release of Unsubstantiated and Non-Final Allegations is "threatened and imminent." *Held v. Hall*, 190 Misc. 2d 444, 457 (Sup. Ct., Westchester Cnty. 2002) (citation omitted). Tomorrow, the injury may be swift and irreversible.

The data to be released include unsubstantiated accusations related to serious crimes. These allegations may be false, yet Respondents intend to include them without regard for their veracity. Respondents have signaled no intention of making individual determinations regarding the legitimate privacy and safety concerns of officers. Once officers are identified in this database and associated with this conduct, their injuries can neither be quantified nor remedied with damages. Indeed, in the absence of emergency relief, no remedy will be adequate. *See Bursac v. Suozzi*, 22 Misc. 3d 328, 340 (Sup. Ct., Nassau Cnty. 2008) (stating that county executive's public posting of identifying information about DWI arrestees "on an Internet Web site with unlimited access to the public" could "affect a legal status and impose specific harm by being available to, *inter alia*, search engines, credit agencies, landlords and potential employers, for a lifetime, regardless of the underlying outcome of the case") (emphasis added).

Release of the data not only will irreparably injure important reputational, liberty, and privacy interests of the officers, but also will destroy valuable collectively bargained-for rights.

Nearly all the CBAs give each individual officer the contractual right to have investigative reports that are classified "exonerated" and/or "unfounded" removed from his or her personnel file.  For example, section 7(c) of Article XV of the Sergeants Benevolent Association CBA requires: "The Department will upon written request to the Chief of Personnel by the individual employee, remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified 'exonerated' and/or 'unfounded.'"  (SBA CBA, Art. XV, § 7(c)). Except for the DEA, the other police and the correction Petitioners' CBAs have substantively identical provisions.[7]  If these personnel records are released publicly, then this contractual right will be nullified.  No officer would be able to have "exonerated" or "unfounded" reports removed from the file, even though the City is contractually obligated to remove such reports upon request.

As another example, the CBAs have provisions that allow employees to seek expungement of records of disciplinary cases where "disposition of the charge at trial or on review or appeal therefrom is other than 'guilty.'"  (SBA CBA, Art. XV, § 8; PBA CBA, Art. XVI, § 8; LBA CBA, Article XVI, § 8; COBA CBA Art. XVI, § 11; DOC Directive 4257R-A, VI(6) and X, a violation of which may be grieved; *see also* UFOA CBA, Art. XVII, § 9; UFA CBA, Art. XVII, § 9.)  It will likewise be impossible for officers to exercise this contractual right if all the records are released publicly.  Without a preliminary injunction to prevent release of the records of Unsubstantiated and Non-Final Allegations, the City will inflict irreparable injury on the officers' contractual rights.  The planned release also would irreparably harm the officers' broader right to engage in collective bargaining over the terms and conditions of their employment.  *See In re*

---

[7] *See* LBA CBA, Art. XVI, § 7(c); CEA CBA, Art. XIV, § 6(c); PBA CBA, Art. XVI, § 7(c); COBA CBA, Art. XVI, § 11.

The COBA CBA also states: "The past disciplinary or work record of an employee may not be revealed during a Section 75, Civil Service Law, disciplinary proceeding until a determination as to guilt or innocence of the member has been determined."  COBA CBA, Art. XVI, § 12.  In addition, a violation of DOC Directive 4257R-A, VI(6) may be grieved.

*Cohoes City Sch. Dist. v Cohoes Teachers Ass'n*, 40 N.Y.2d 774, 778 (1976) (emphasizing the "strong and sweeping policy of the State to support collective bargaining under the Taylor Law").

Finally, the City's release of the records would render meaningless the officers' contractual right to arbitrate grievances that have been or are about to be filed under the CBAs to prevent the release of the records.  (SBA CBA, Article XX; PBA CBA, Article XXI; LBA CBA, Article XXI; CEA CBA, Article XVIII; COBA UFA, Article XXI; UFA CBA, Article XVIII; UFOA CBA, Article XVIII; *see also* Ex. 1 (grievances filed by the PBA, SBA, LBA, CEA and COBA on July 13, 2020).)  This irreparable harm also supports the issuance of a preliminary injunction "in connection with an arbitration that is pending or that is to be commenced" because any arbitration award "may be rendered ineffectual without such provisional relief."  CPLR § 7502(c).

### C.   The Balance of the Equities Favors Petitioners Because an Injunction Merely Preserves the Status Quo and Will Not Prejudice Respondents, Whereas a Denial of Relief May Extinguish Petitioners' Rights.

The balance of equities in this case militates strongly in favor of granting emergency injunctive relief to preserve the status quo.  The risk of irreparable harm to Petitioners is both serious and imminent, while Respondents will suffer no hardship or prejudice by delaying the release of their databases while the Court considers this matter.

"The balancing of the equities requires the court to determine the relative prejudice to each party accruing from a grant or denial of the requested relief."  *Barbes*, 140 A.D.3d at 432.  Put differently, the inquiry is "whether the irreparable injury to be sustained is more burdensome [to the plaintiff] than the harm caused to defendant through imposition of the injunction."  *Felix v. Brand Serv. Grp. LLC*, 101 A.D.3d 1724, 1726 (4th Dep't 2012) (alterations in original) (internal quotation marks omitted).  When an injunction would simply preserve the status quo, this weighs in favor of granting the relief requested.  *See AIU Ins. Co. v. Robert Plan Corp.*, 44 A.D.3d 355, 356 (1st Dep't 2007) ("A balancing of the equities, as well as the need to preserve the status quo

between the parties, further warrants the relief granted by the court"); *Melvin v. Union Coll.*, 195 A.D.2d 447, 448-49 (2d Dep't 1993) (granting preliminary injunctive relief precluding enforcement of suspension where college had "not shown that it will suffer any harm as a result [thereof] ... during the pendency of this matter").

Here, the equities weigh heavily in favor of the requested preliminary relief.  If the motion is denied, Petitioners' members face the prospect of immediate and permanent reputational harm, loss of privacy, and even threats to their safety.  Any future victory removing the Unsubstantiated and Non-Final Allegations from the databases would be hollow.  The moment these allegations become publicly available, the data will cease to be confidential, and the entire world will be able to access and download or duplicate it.  News organizations will move quickly to gather the data and fold it into their own databases.[8]  In other words, "denial of injunctive relief would render the final judgment ineffectual."  *New York v. City of New York*, 275 A.D.2d 740, 741 (2d Dep't 2000).

Likewise, as explained in the irreparable harm section above, the officers' contractual rights to remove "exonerated" and/or "unfounded" investigative reports from their personnel files and seek expungement of certain case files cannot be restored once those records are released.  No countervailing equities outweigh the unfairness of destroying of this valuable, collectively-bargained-for right.  The same is true of the CBA right to arbitrate grievances based on the contractual right to have these reports removed from their files.  If ever ruled permissible, the reports can be released at a later time.  But once disseminated publicly, they can never be "removed" in any meaningful sense.  The equities therefore strongly favor the preservation of the

---

[8] John Kelly & Mark Nichols, *We found 85,000 cops who've been investigated for misconduct. Now you can read their records*, USA Today (June 11, 2020), *available at* https://www.usatoday.com/in-depth/news/investigations/2019/04/24/usa-today-revealing-misconduct-records-police-cops/3223984002/ (describing USA Today's database of police misconduct records pulled from various sources).

officers' existing contractual rights, including the right to arbitrate grievances such that any award will not be rendered ineffectual.  *See* CPLR § 7502(c).

If the motion is granted, no party would suffer prejudice or hardship.  Rather, enjoining Respondents will simply preserve the status quo.  Under these circumstances, a temporary restraining order and preliminary injunction "should be granted to maintain the status quo while the legal issues are determined in a deliberate and judicious manner."  *Merscorp, Inc. v. Romaine*, 295 A.D.2d 431, 434 (2d Dep't 2002).

### D.     Petitioners Are Likely to Succeed on Multiple Claims for Relief.

Finally, Petitioners' claims are likely to succeed on the merits.  In establishing likelihood of success on the merits, a "prima facie showing of reasonable probability of success is sufficient; actual proof of the petitioner's claims should be left to a full hearing on the merits."  *Barbes*, 140 A.D.3d at 431 (internal quotation marks omitted).  But this showing "need not be conclusive."  *Id.* And "[w]here, as here, the denial of injunctive relief would render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be reduced."  *New York v. City of New York*, 275 A.D.2d at 741 (2d Dep't 2000); Developments in the Law, *Injunctions*, 78 Harv. L. Rev. 994, 1056 (1965) ("Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory….").

### 1.     Respondents' Release Would Interfere with Collective Bargaining Rights.

Petitioners are likely to succeed on their claims for interference with their collective bargaining rights, both in this Court and in the arbitration of individual grievances that have been filed or are about to be filed under the CBAs.  Because it is a term and condition of their employment, the officers have a right to collectively bargain over the confidential treatment of their personnel files under the Taylor Law.  *See* CSL § 203 (guaranteeing public employees the

right "to negotiate collectively with their public employers in the determination of their terms and conditions of employment, and the administration of grievances arising thereunder"); CSL § 201(4) (recursively defining "terms and conditions of employment").

Moreover, the CBAs contain express provisions governing precisely this topic. Most notably, nearly all the CBAs give each individual officer the contractual right to have investigative reports that are classified "exonerated" and/or "unfounded" removed from his or her personnel file. For example, section 7(c) of Article XV of the Sergeants Benevolent Association CBA requires: "The Department will upon written request to the Chief of Personnel by the individual employee, remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified 'exonerated' and/or 'unfounded.'" (SBA CBA, Art. XV, § 7(c); PBA CBA XVI, § 7(c); LBA CBA Art. XVI, §7(c); CEA CBA Art. XIV, § 6(c); COBA CBA Art. XVI, § 11, DOC Directive 4257R-A, VI(6) and X, a violation of which may be grieved.) If these personnel records are released publicly, then this contractual right will be nullified. No officer ever would be able to have "exonerated" or "unfounded" reports removed from the file, even though the City is contractually obligated to remove such reports upon request. The only way to preserve this contractual right—and the officers' ability to enforce it through the CBAs' grievance process—is to enjoin the City's *blunderbuss* release of the records. The same is true of the officers' contractual right to seek expungement of records of disciplinary cases where "disposition of the charge at trial or on review or appeal therefrom is other than 'guilty.'" (SBA CBA, Art. XV, § 8; PBA CBA, Art. XVI, § 8; LBA CBA, Article XVI, § 8; COBA CBA Art. XVI, § 11, DOC Directive 4257R-A, VI(6) and X, a violation of which may be grieved; *see also* UFOA CBA, Art. XVII, § 9; UFA CBA, Art. XVII, § 9.) Petitioners are therefore likely to succeed on this claim.

>  **2.  Publication of Unsubstantiated and Non-Final Allegations Would Violate Petitioners' Members' Constitutional Rights to Due Process of Law Under the Federal and New York State Constitutions.**

As discussed above, Respondents' release threatens serious reputational harm to officers from the worldwide publication of allegations that are, by definition, mere accusations that either were not supported by evidence or have not been finalized through an adjudicatory process.  By promoting and publicizing these allegations, Respondents threaten not only officers' good names, but also tangibly damage their future employment opportunities.  This deprivation triggers due process protections for the identified officers, each of whom has a constitutional right to notice of their inclusion in the database and an opportunity to contest it.

Both the United States and New York State Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law.  U.S. Const. amend. XIV; N.Y. Const. Art. 1, § 6.  A plaintiff may bring a "stigma-plus" claim under the Due Process Clauses of the Federal or New York State Constitution to seek redress "for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process."  *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003); *see also Swinton v. Safir*, 93 N.Y.2d 758, 763-64 (1999).  The "stigma" prong is met when the government calls into question the plaintiff's "good name, reputation, honor, or integrity" in a defamatory way. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972); *Knox v. N.Y. City Dep't of Educ.*, 85 A.D.3d 439, 440 (1st Dep't 2011) (stating that "stigma" prong requires "defamation by the government").  The "plus" component is satisfied when there is a deprivation of a liberty interest, including when the plaintiff shows "a likelihood of dissemination of the stigmatizing material that could significantly impair [the plaintiff's] ability to gain employment" in a chosen field.  *Knox*, 85 A.D.3d at 440.

When assessing a stigma-plus claim, the Court also examines whether the plaintiff was afforded adequate process to address the deprivation – that is, notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (internal quotation marks omitted).  "Generally, due process requires that a state afford persons some kind of hearing *prior to depriving them* of a liberty or property interest."  *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (emphasis added) (internal quotation marks omitted); *Lee TT. v. Dowling*, 87 N.Y.2d 699, 713 (1996) (stating that "it makes obvious sense in most cases to 'minimize substantially unfair or mistaken deprivations' by insisting that the hearing be granted at a time when the deprivation can still be prevented ... The damage to the subject following publication of an unsubstantiated report of child abuse may be irreversible.").  With a stigma-plus claim, "the constitutional harm is not the defamation itself; rather it is the denial of a hearing … [and] an opportunity to refute the public charge."  *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 649 (4th Cir. 2007) (quotation omitted).

Here, the stigma element is satisfied because Respondents' dissemination of Unsubstantiated and Non-Final Allegations will cause serious reputational harm.  The databases at issue will include accusations that may be false or not supported by evidence as well as allegations that have not been through the adjudicatory process.  There can be no reasonable dispute that Respondents' worldwide transmission of such accusations, including those that are simply false, will stigmatize the identified officers and result in "'public opprobrium' and damage to [their] reputation[s]."  *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994); *see also U.S. Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 764 (1989) ("Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in

a single clearinghouse of information.").

Respondents' proposed release of Unsubstantiated and Non-Final Allegations also deprives the identified individuals of a protected liberty interest. For some, this will be a loss of employment. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). For others, Respondents' actions will interfere with their future employment opportunities by "plac[ing] a tangible burden on [their] employment prospects." *Valmonte*, 18 F.3d at 1001 (stating that "the dissemination of information from the Central Register to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest"); *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44 (2d Cir. 1987) (stating that if plaintiff "is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities"); *People v. David W.*, 95 N.Y.2d 130, 137-38 (2000) ("This Court has held that the mere likelihood of dissemination to prospective employers of allegations of rape and abuse in a fired public employee's personnel file sufficiently impaired that employee's liberty interest to warrant due process protections." (citing *Swinton*, 93 N.Y.2d at 764)).

*Bursac v. Suozzi* is instructive. In that case, a county executive created a "Wall of Shame" website that included photographs and identifying information of individuals arrested for DWI and DUI offenses, including the plaintiff. 22 Misc. 3d 328, 340 (Sup. Ct., Nassau Cnty. 2008). The plaintiff claimed the county executive violated her right to due process under the Federal and New York State Constitutions "by posting her name and arrest photograph on the county Web site with other DWI arrestees without a hearing and before she has been convicted of a crime[.]" *Id.* at 335. The court recognized that the plaintiff had no opportunity to prevent this invasion of privacy before the information was widely – and permanently – disseminated. The county executive's decision

to "voluntarily promote[] and publish[] arrest records, containing names, pictures and identifying information, on an Internet Web site with unlimited access to the public … may affect a legal status and impose specific harm" on the plaintiff because "search engines, credit agencies, landlords and potential employers" could access that content "for a lifetime, regardless of the underlying outcome of the case." *Id.* at 340-41.  The court concluded that "stigma plus" was present, holding that the "dissemination" of stigmatizing information about the plaintiff in a way that "results in limitless and eternal notoriety, without any controls, is sufficient to be the 'plus' in the 'stigma plus' due process analysis[.]" *Id.* at 342.

This case is *Bursac*, writ large.  The unlimited reach of Respondents' databases, coupled with publicity from the Mayor and the largest police department in the nation, is likely to interfere with Petitioners' members' efforts to secure employment with other law enforcement agencies or in the private sector.  These potential employers are likely to review Respondents' databases when considering an application for employment by a former firefighter, corrections officer, or police officer.  The information they find will be no less defamatory and stigmatizing for many officers than the "Wall of Shame" was for the plaintiff in *Bursac*.  The sample data provided by Respondents identifies officers by name and associates them with serious allegations that may not have been fully, or even partially, investigated.  These bare allegations lack any context whatsoever and are often worded in an inflammatory way, such as "engag[ing] in a road rage incident with a civilian motorist."  Others merely cast aspersions on the integrity of an officer, such as "knowingly associat[ing] with a person reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities."  This dissemination will "sufficiently impair[]" the identified officers' liberty interests to warrant due process protections.  *David W.*, 95 N.Y.2d at 137-38.

Having triggered the requirements of due process, Respondents must establish adequate

"procedural safeguards" to *prevent* this deprivation.  *Valmonte*, 18 F.3d at 1002-03.  They have

not done so.  Respondents have left no doubt that, once fully operational, the databases will include

the full panoply of charges levied against officers, regardless of outcome or veracity.  There is no

process by which officers will be able to contest the inclusion of allegations, including those that

were found to be unsubstantiated, unfounded, or exonerated in the investigation phase and that

will be posted without having gone through a hearing.  Any process must be individualized and

provide officers with a mechanism for challenging the inclusion of Unsubstantiated and Non-Final

Allegations before they are published, at which point the damage would be done.  *See Bursac*, 22

Misc. 3d at 342 (holding that government's publishing of booking photos and names of DWI and

DUI arrestees on public website, "which results in limitless and eternal notoriety, without any

controls, is sufficient to be the 'plus'").

Moreover, the release of records of past Unsubstantiated and Non-Final Allegations would

doubly violate due process because, in deciding how to respond to allegations, officers relied on

the City's guarantee that such allegations would remain confidential.  The U.S. Supreme Court has

cautioned that applying new laws to past conduct may have an impermissibly retroactive effect by

upsetting reliance interests and triggering fundamental fairness concerns.  *See Landgraf v. USI*

*Film Prods.*, 511 U.S. 244 (1994).  New York's Due Process Clause requires a similar analysis to

determine whether the application of new laws to pre-enactment conduct is permissible.  *See Am.*

*Economy Ins. Co. v. State of New York*, 30 N.Y.3d 136, 149 (2017).  "Retroactive legislation

presents problems of unfairness that are more serious than those posed by prospective legislation."

*Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).  Accordingly, a sufficient justification

for the prospective application of a new enactment may not be enough to allow retroactive

application of that same new law.  See *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S.

717, 730 (1984).

A statute has retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," thus affecting "substantive" rights. *Landgraf*, 511 U.S. at 278-80. Here, application of the repeal of § 50-a to past Unsubstantiated and Non-Final Allegations would impair officers' rights in the confidential treatment of such allegations that they possessed at the time the allegations were made. Such application of § 50-a thus has retroactive effect.

The next question is whether this retroactive effect is permissible. The retroactive application of new enactments passes due process muster only when supported by "a legitimate legislative purpose furthered by rational means." *Romein*, 503 U.S. at 191. The City's planned release of past Unsubstantiated and Non-Final Allegations fails this test. If the officers had known that the City would make Unsubstantiated and Non-Final Allegations public, they might have defended themselves against the allegations in a more vigorous, more vocal, and more resource-intensive fashion to protect their reputations, and hence their future liberty and property interests. Releasing records of Unsubstantiated and Non-Final Allegations that pre-date the repeal of § 50-a therefore would upset the officers' reliance on the City's guarantee to protect their reputations and privacy from the harms associated with public disclosure of such allegations. Destroying these reliance interests is not a rational means of advancing any legitimate purpose of the repeal. Application of the repeal of § 50-a to existing records thus would have an impermissible retroactive effect on the officers' liberty and property interests in violation of the Due Process Clauses.

Because Respondents have not offered adequate procedural protections, they are in violation of the Due Process Clauses of the Federal and New York State constitutions.

     **3.**      **Publication of Unsubstantiated and Non-Final Allegations Would Violate Petitioners' Members' Constitutional Rights to Equal Protection of Law Under the Federal and New York State Constitutions.**

The decision to release Unsubstantiated and Non-Final Allegations also violates the Equal Protection Clause of the United States and New York Constitutions. New York State "equal protection guarantees are coextensive with the rights protected under the Federal Equal Protection Clause," *Myers v. Schneiderman*, 30 N.Y.3d 1, 13, 85 N.E.3d 57, 62 (2017), which requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005). Thus, to establish an equal protection claim, the plaintiffs must show that firefighters and officers have "received different treatment from that received by other individuals similarly situated." *Id.* (emphasis omitted).

"As a general rule, the equal protection guarantee of the Constitution is satisfied when the government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest." *Able v. United States*, 155 F.3d 628, 631 (2d Cir. 1998). The defendants here cannot meet even that deferential standard. As the petition explains, the defendants have singled out firefighters, police and correctional officers for disclosure of unfounded disciplinary records, but have not done so for the myriad other state-licensed professionals. *See Office of the Professions*, New York State, *available at* http://www.op.nysed.gov/home.html (last accessed July 5, 2020) (noting that the list of state-licensed professionals who have unsubstantiated complaints kept confidential includes, *inter alia*, engineers, medical physicists, mental health practitioners, nurses, and psychologists). In addition, other similarly situated individuals, including other employees and elected officials of the City and

other police officers who work in the City (e.g., those employed by the Port Authority, MTA, and New York State Troopers) are not being singled out.  Of course, firefighters and officers are different from other professionals in many ways, which may—in certain circumstances not presented here—require different treatment.  But the critical inquiry is whether the particular disparate treatment in question bears "a rational relationship to an appropriate governmental interest."  *Able*, 155 F.3d at 631.  Here, these allegations, which by definition are unsubstantiated and potentially untrue, would do nothing but harm the firefighters, police, and correctional officers and their families—and, by extension, the government they serve—by subjecting them to retaliation for unproven wrongs.  This harm is not speculative: it already happens, even without these records being publicized.  *See*, *e.g.*, Benjamin Mueller & Al Baker, *Police Officer Is 'Murdered for Her Uniform' in the Bronx*, N.Y. Times (July 5, 2017), *available at* https://tinyurl.com/y7ngmdth.  No legitimate government interest justifies the City's decision to single out the officers in this way.

Indeed, the City does not release Unsubstantiated and Non-Final Allegations for other professionals.  In New York's online database of professional misconduct, the City only includes those allegations that result in an adverse disciplinary action against the professional.  *See Enforcement Actions*, Office of the Professions, *available at* http://www.op.nysed.gov/opd/rasearch.htm# (listing only actions against professionals that result in an adverse action).  Respondents have no practical reason to treat Petitioners any differently.

Finally, even those charged with criminal offenses, have their records automatically sealed when they are found not guilty. *See* CPL § 160.50 (automatically sealing cases on "the termination of a criminal action or proceeding against a person in favor of such person").  The firefighters, police officers, and correction officers who protect the City should be given at least the same

protections.  The release of these documents thus violates equal protection.

>        **4.      Release of the Documents Would Constitute a Breach of Settlement
>                 Agreements.**

Respondents' proposed release is also an anticipatory breach of negotiated settlement agreements between police officers and the NYPD that were entered into before the repeal of § 50-a (the "Settlement Agreements").  By operation of law, the Settlement Agreements include the confidentiality protection provided by § 50-a.

"Settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999).  Here, the Settlement Agreements will be breached if they are not kept confidential.  Under New York law, "[u]nless the contract provides otherwise, the law in force at the time it is entered into becomes a part of the contract.  It is presumed that the parties had that law in contemplation when the contract was made, and the contract must be construed in that light." *Skandia America Reinsurance Corp. v. Schenck*, 441 F. Supp. 715, 724 (S.D.N.Y. 1977), citing *Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 116 (1956); *see also, e.g.*, *Morgan Stanley & Co. Inc. v. Archer Daniels*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983) (same).  "With respect to reasonable expectations, it is axiomatic that the parties to an agreement will interpret the instrument governing their relationship in accordance with existing law." *Madison Ave. v. Madison Bentley*, 30 A.D.3d 1, 8 (1st Dep't 2006).

Williston's treatise agrees, confirming that this is a well-established rule of law, and in particular that the rule applies to contracts with the government:

> [T]he incorporation of applicable existing law into a contract does
> not require a deliberate expression by the parties. Except when a
> contrary intention is evident, the parties to a contract—*including the
> government*, in a contract between the government and a private
> party—are presumed or deemed to have contracted with reference

> to existing principles of law.  An intention not to adopt existing law
> may be manifested by a contractual provision to such effect, and in
> most jurisdictions, the intent to modify applicable law by contract is
> effective only when it is expressly exercised by a valid contractual
> stipulation.

11 Williston on Contracts § 30:19 (4th ed. 2020) (citing cases; emphasis added; footnotes omitted).  "Under this presumption of incorporation, valid applicable laws existing at the time of the making of a contract enter into and form a part of the contract *as fully as if expressly incorporated in the contract*."  *Id.* (citing cases; emphasis added; footnotes omitted).  The rationale for this rule is that "the parties to the contract would have expressed that which the law implies 'had they not supposed that it was unnecessary to speak of it because the law provided for it.'"  *Id.* (citation omitted).  "The principle that existing law is incorporated into a contract even when the parties make no reference to it has been applied in a wide variety of circumstances."  *Id.*

Here, the Settlement Agreements, which were entered into before repeal of § 50-a, must be construed to incorporate the confidentiality protections provided by that law.  Section 50-a's requirement of confidentiality was incorporated by operation of law in the Settlement Agreements, and therefore it was "unnecessary to speak of it because the law provided for it."  11 Williston on Contracts § 30:19.  Respondents' proposed data dump would make public Settlement Agreements which, because of binding contracts, must be kept confidential.  The officers who entered into the Settlement Agreements reasonably expected those agreements would remain confidential indefinitely, are they are legally entitled today to demand that continued protection notwithstanding the repeal of § 50-a.

The threatened release is an anticipatory breach of the Settlement Agreements.  Because of the serious consequences of the imminent public disclosure of those matters, Petitioners are

entitled to preliminary and permanent injunctive relief enforcing the right to confidentiality in the Settlement Agreements.

        **5.**       **Respondents' Decision to Release Unsubstantiated and Non-Final Allegations Was Affected By Errors of Law or Was Arbitrary and Capricious.**

Finally, Petitioners are likely to succeed on the merits of their claims under Article 78 to annul Respondents' determinations to release Unsubstantiated and Non-Final Allegations and prohibit the release of any police disciplinary records that implicate the privacy and safety concerns of officers.[9]  Based on the legal claims above and, in addition, because these records cannot be released without considering the potential privacy interests at stake, the decision to release them all at once was affected by errors of law under CPLR § 7803(3).  But even if no error of law is found, it nonetheless was arbitrary and capricious for Respondents to break with established practice on the protections afforded Unsubstantiated and Non-Final Allegations – under the pretext of the repeal of § 50-a – without a sound basis in reason or regard for the relevant facts.

This proceeding implicates two provisions and standards of review under CPLR § 7803(3).  First, the Court must determine whether Respondents' imminent proposed action is "affected by an error of law."  CPLR § 7803(3).  "[C]ourts apply a less deferential standard, deciding whether decisions were 'affected by an error of law' rather than whether they were 'arbitrary and capricious'" when reviewing an agency's decision to release or withhold public records."  *Matter of Crawford v. N.Y. City Dep't of Info. Tech. & Telecomm.*, 2017 N.Y. Slip Op. 30982(U), *21 (Sup. Ct., N.Y. Cnty. 2017) (citation omitted).  Second, the Court must determine whether Respondents' action or inaction "was arbitrary and capricious or an abuse of discretion."  CPLR §

---

[9] An Article 78 proceeding enables a party to challenge a threatened or actual determination in violation of law that was carried out by an administrative body.  It is a proper mechanism for challenging Defendants' decision. *See Mulgrew v. Bd. Of Educ. of the City of N.Y.*, 87 A.D.3d 506, 507 (1st Dep't 2011) (Article 78 proceeding brought by teachers' union to block release of teacher performance data by the Department of Education).

7803(3).  An agency action is arbitrary "if it is taken without a sound basis in reason and generally without regard to the facts."  *Nestle Waters N. Am., Inc. v. City of N.Y.*, 121 A.D.3d 124, 127 (1st Dep't 2014); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016) ("One basic procedural requirement of administrative rulemaking is that an agency must give adequate reasons for its decisions.  Where the agency has failed to provide even a minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.").

> a)      **It Is an Error of Law to Release Unsubstantiated and Non-Final Allegations, which Violates the Legally Protected Interests of Petitioners' Members.**

In public statements, Respondents have directly tied their decision to release these records with the recent repeal of § 50-a.  Respondents' conclusion that these records may now be released legally, and en masse, because of that repeal is erroneous as a matter of law under CPLR § 7803(3).  In addition to the legally protected interests described above, as is widely recognized, including by the proponents of § 50-a's repeal and the Court of Appeals, § 50-a was never the only source of Respondents' obligation to protect the privacy and safety of Petitioners' members.

First, Respondents' decision ignores legislative intent regarding the repeal of § 50-a.  While that law provided an express prohibition to disclosure of all police, firefighter, and corrections officer personnel records, regardless of their contents,[10] the history of the legislation demonstrates a clear understanding that other sources of law would provide continuing protections for certain types of police personnel records.   As even the most vocal advocates for repeal of § 50-a recognized, other laws are intended to prevent the release of records when disclosure will result in

---

[10] Section 50-a provided that "[a]ll personnel records used to evaluate performance toward continued employment or promotion" of police officers, corrections officers, paid firefighters, and others, "shall be considered confidential and not subject to inspection or review without the express written consent" of the employee or as "mandated by lawful court order."  Civ. Rights Law § 50-a(1).

unwarranted invasions of personal privacy.  Indeed, these protections were expressly cited by the sponsor of the enacted Senate bill to repeal § 50-a as a reason that law was "unnecessary."  Sponsor Mem., N.Y. Senate Bill S8496, *available at* https://www.nysenate.gov/legislation/bills/2019/s8496.  As a backdrop for the repeal, these statements signal that the legislature did not intend the release of *all* personnel records previously protected by § 50-a. Rather, they indicate an expectation that agencies judiciously review such records before release to ensure proper protection of officer privacy and safety.

Moreover, the Court of Appeals has held that individuals may have a "legally protected privacy interest" in ensuring public records disclosures do not violate their privacy interests.  In *New York Times Co. v. City of New York Fire Department*, the Court held that "surviving relatives [of 911 callers on September 11, 2001] have a legally protected privacy interest" in nondisclosure of tapes and transcripts of those calls.  4 N.Y.3d 477, 485 (2005).  In determining whether any invasion of privacy is unwarranted, the Court "balance[d] the privacy interests at stake against the public interest in disclosure of the information."  *Id.*  While recognizing the "legitimate public interest in the disclosure of these 911 calls," the Court concluded that this interest was "outweighed by the interest in privacy of those family members and callers who prefer that those words remain private."  *Id.* at 486, 487; *see also Dorsett v. Cnty. of Nassau*, 289 F.R.D. 54, 60 (E.D.N.Y. 2012) (noting that officers' "privacy interests would be seriously jeopardized with the publication" of internal reports to the public at large).  Here, Petitioners' members have a privacy interest in nondisclosure of allegations that may tarnish their reputations despite being, in many cases, without merit; this outweighs any public interest in reviewing and relying on allegations that could be misleading or simply false.  At bottom, those with a "legally protected privacy interest" in nondisclosure of government records must have a means of enforcing that interest.  Respondents'

data dump deprives the identified individuals of that opportunity.

Section 50-a was never the only source of the privacy protections for Unsubstantiated and Non-Final Claims.  For example, in 1979, shortly after § 50-a was codified, the Court of Appeals observed that § 50-a "fairly reflects the pre-existing judicial consensus" regarding the confidentiality of police personnel records.  *People v. Gissendanner*, 48 N.Y.2d 543, 551 (1979).  In other words, the privacy protections pre-existed § 50-a in the common law and likewise survive its repeal.  More recently, in *Luongo v. Records Access Appeals Officer*, 168 A.D.3d 504 (1st Dep't 2019), the court considered a request for NYPD personnel orders, which contain summaries of employment updates for both officers and civilian employees of the NYPD, including transfers, promotions, retirements, and disciplinary dispositions.  The First Department affirmed the decision to withhold the records under § 50-a, noting that the records contained "material ripe for degrading, embarrassing, harassing or impeaching the integrity of [the] officer[s]."  *Id.* (alterations in original) (internal quotation marks omitted).  Respondents committed an error of law by failing to consider the privacy rights of officers separate from § 50-a, particularly in light of the legislative history suggesting the repeal of § 50-a should not be understood to upend officers' privacy rights.

Moreover, the Committee on Open Government has long taken the position that the release of unsubstantiated allegations constitutes an unwarranted invasion of privacy.  As one advisory opinion explained: "when allegations or charges of misconduct have not yet been determined or did not result in disciplinary action, the records relating to such allegations may … be withheld, for disclosure would result in an unwarranted invasion of personal privacy ….  Further, to the extent that charges are dismissed or allegations are found to be without merit, I believe that they may be withheld based on considerations of privacy."  Comm. on Open Gov't, Adv. Op. No. FOIL-AO-17195 (May 29, 2008), *available at* https://docs.dos.ny.gov/coog/ftext/f17195.html (internal

citations omitted).  Another opinion states: "In numerous contexts, it has been advised that records relating to unsubstantiated charges, complaints or allegations may be withheld to protect the privacy of the accused."  Comm. on Open Gov't, Adv. Op. No. FOIL-AO-12005 (Mar. 21, 2000), *available at* https://docs.dos.ny.gov/coog/ftext/f12005.htm.

Because Respondents' failed to consider these other sources of protection for information in government records, which exist independently of § 50-a, as well as because of the legally protected interests identified above, their decision was affected by an error of law.

> **b)**   **It Is Arbitrary and Capricious To Break with Long-Established Practice Without a Sound Basis in Reason or Due Regard to the Relevant Facts.**

At a minimum, by proceeding without due consideration of the many authorities counseling against disclosure of Unsubstantiated and Non-Final Allegations and even their own past treatment of such records – separate and apart from § 50-a – Respondents' decision was arbitrary and capricious under CPLR § 7803(3).

Absent reasoned analysis, Respondents are not free to set aside legislative intent, their previous judgments on the same issue, statements by the Committee on Open Government, and the expectation set by the courts of this State in considering the privacy and safety implications of releasing personnel records.  While Respondents are free to change policies, they may not do so at the expense of the long-settled reliance interests of firefighters and officers in the confidentiality of Unsubstantiated and Non-Final Allegations.  *See In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 92 N.Y.2d 107, 122 (1998) ("The Superintendent must adopt policies in a coherent and consistent manner with appropriate regard for those previously taken or must explain the reasons for variations among policies."); *In re Charles A Field Delivery Serv. Inc.*, 66 N.Y.2d 516, 520 (1985) (stating that "when an agency determines to alter its prior stated course it must set forth its

reasons for doing so[.] … Absent such an explanation, failure to conform to agency precedent will, therefore, require reversal on the law as arbitrary…").

Only four years ago, the City stated that disclosure of police personnel records "concerning any matters that were not substantiated … would … represent an unreasonable invasion of privacy." *Hughes Hubbard & Reed.*, 53 Misc. 3d at 950 (Sup. Ct., Kings Cnty. 2016) (citation omitted). And in 2014, the City denied a request for disclosure of allegations brought against a specific police officer, not only on § 50-a grounds, but because a "request for records relating to unsubstantiated matters would constitute 'an unreasonable invasion of privacy.'" *Luongo v. Records Access Off.*, 150 A.D.3d 13, 16 (1st Dep't 2017) ("In addition to the statutory exemptions, CCRB noted that the request for records relating to unsubstantiated matters would constitute 'an unreasonable invasion of privacy.'"). Their reversal lacks "even a minimal level of analysis" beyond the erroneous conclusion that the repeal of § 50-a permits disclosure. *Encino Motorcars*, 136 S. Ct. at 2120.

This invasion of privacy also has implications for the safety of officers. As the First Department has explained, the release of police personnel records may pose a "possibility of endangerment" to officers. *Luongo*, 150 A.D.3d at 25-26. Naming officers in an easily accessible database and listing every charge ever levied against them, regardless of outcome or substantiation, will provide motivated and unstable individuals with all the information they need to track down specific police officers. The news is replete with examples of police officers who have been targeted and killed because of their uniform. In recent years, three New York City police officers have been targeted and assassinated. In 2014, Officers Wenjian Liu and Rafael Ramos were ambushed and killed while sitting in a patrol car in Brooklyn. (Petition ⁋ 74.) In 2017, Officer Miosotis Familia was shot at point-blank range while sitting in her patrol car. (*Id.*) And in 2018,

federal authorities arrested a Brooklyn resident for targeting NYPD officers with an improvised explosive device, and killing an innocent civilian in the process. (*Id.*) As these incidents continue and even accelerate, officers have a reasonable interest in ensuring their safety and the safety of their families.

Because Respondents' sudden turnabout in policy was effected without regard for its established practices and settled expectations, and made without even a minimal level of analysis, it was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant the motion in its entirety, including the TRO requested in the Proposed Order to Show Cause accompanying this Memorandum of Law.

Dated: July 14, 2020
     New York, New York

DLA PIPER LLP (US)

By: /s/ *Anthony P. Coles*
Anthony P. Coles
Michael R. Hepworth
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com
Email: michael.hepworth@dlapiper.com

Courtney G. Saleski
   (*pro hac vice* to be filed)
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Telephone: (215) 656-2431
Facsimile: (215) 606-2046
Email: courtney.saleski@dlapiper.com

*Attorneys for Petitioners/Plaintiffs*