UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York; Police Benevolent Association of the City of New York, Inc.; Sergeants' Benevolent Association; Lieutenants' Benevolent Association; Captains' Endowment Association; and Detectives' Endowment Association, <br><br> Plaintiffs, <br><br> -against- <br><br> Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board, <br><br> Defendants, <br><br> Communities United for Police Reform, <br><br> Intervenor-Defendant. | No. 1:20-CV-05441 (KPF) (RWL) <br><br> **FIRST AMENDED COMPLAINT** |

Plaintiffs Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York, Correction Officers' Benevolent Association of the City of New York, Inc., Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Lieutenants Benevolent Association, Captains Endowment Association, and Detectives' Endowment Association ("Plaintiffs" or the "Unions"), by and through their undersigned attorneys, as and for their First Amended Complaint ("FAC"), allege as follows:

## PRELIMINARY STATEMENT

1.      This case challenges Defendants' ("Defendants" or "the City") unilateral pronouncements that they will release records concerning disciplinary matters against retired and active individual New York City police officers, firefighters, and corrections officers, including those that are non-final, unsubstantiated, unfounded, exonerated, or resulted in a finding of not guilty ("Unsubstantiated and Non-Final Allegations") and confidential settlement agreements, in the wake of the repeal of Civil Rights Law § 50-a.  These Unsubstantiated and Non-Final Allegations—unproven allegations at best and false allegations at worst—will be "data dumped" on the internet, resulting in the publication and promotion of information that will absolutely destroy the reputation and privacy—and imperil the safety—of many of those firefighters and officers.  These allegations will be publicized and promoted in massive online registries, as well as released in large numbers in response to FOIL requests.  This indiscriminate release would, among other harms:

- Violate Plaintiffs' Collective Bargaining Agreements with Defendants;

- Violate the Due Process Clauses of the United States and New York State Constitutions by irrevocably and unfairly stigmatizing Plaintiffs' members and interfering with future employment opportunities and creating other material burdens;

- Breach thousands of settlement agreements entered into in good faith with the Defendants with the promise and expectation of confidentiality; and

- Arbitrarily and capriciously reverse longstanding city and State practice of deeming unsubstantiated allegations to be protected from disclosure, separate and apart from the provisions of § 50-a.

2.      It takes no evidence to make a complaint against a firefighter, corrections officer, or police officer.  Baseless claims can be levied for any number of nefarious motivations.  Without the safeguards of proof and finality, the lives of firefighters, officers, and their families may be irreparably ruined.  If Defendants are permitted to promote and publish these Unsubstantiated and Non-Final Allegations in online registries, Plaintiffs' members will suffer irreparable harm.  The Unsubstantiated and Non-Final Allegations will remain in the registries forever, creating limitless and eternal notoriety, even if they are false and unproven.

3.      NYPD plans to release Charges and Specifications filed against officers, even though they are not the result of a process based on any articulated standard of proof and do not constitute a final determination that the allegation is true.  These records will be promoted in an online registry that will be viewable by anyone, including potential future employers.  Charges and Specifications are not the product of a due process hearing or anything remotely similar and would not protect due process rights if this information is made public.  As a matter of due process, officers are entitled to a hearing before Charges and Specifications are released publicly.

4.      CCRB will create its own public registry of officer histories, including allegations the agency deems to be unsubstantiated, unfounded, or exonerated.  Officers will not receive notice and an opportunity to be heard before allegations against them are published in the registry.  There is not a mechanism for officers to avoid having their names or any allegations

included in the registry.

5.      Although the repeal of Civil Rights Law § 50-a eliminates a categorical prohibition to the public review of law enforcement records, it does not obliterate pre-existing contractual rights or constitutional and common law protections that all citizens, including the Plaintiffs, share, which forbid Defendants from promoting unproven, defamatory allegations to the world at large.  These rights include:

- **Rights under collective bargaining agreements, the right to arbitrate disputes, and the right to injunctive relief to prevent arbitration from being rendered ineffectual**: Each of the Plaintiffs has entered into a Collective Bargaining Agreement ("CBA") with their respective agencies and the City governing the terms and conditions of their employment.  With one exception, these CBAs protect Plaintiffs against the release of Unsubstantiated and Non-Final Allegations.  The Defendants have no lawful right to unilaterally violate those terms, and render them null and void, or to impose new terms, without following the provisions of the NYC Collective Bargaining Law, including those laws relating to the arbitration of grievances. Four police unions and the corrections union have initiated the grievance and arbitration process to challenge the City's disclosure of certain disciplinary records as a violation of their CBAs. Under N.Y. CPLR § 7502(c), the unions have the right to injunctive relief to prevent the arbitration process from being rendered ineffectual by Defendants' release of Unsubstantiated and Non-Final Allegations.  Pending final determination of those grievances through the collective bargaining process, Defendants must be enjoined under Article 75 of the CPLR.

- **Due Process and Equal Protection Rights**: Defendants' indiscriminate disclosure of unproven and false allegations in online registries will unfairly stigmatize officers,

4

causing lasting reputational harm.  In addition, the decision to disseminate these allegations in online registries will substantially impact officers' future employment prospects and create other substantial burdens, depriving them of a liberty interest without due process of law.  Defendants do not provide officers with notice of their inclusion in the database or an opportunity to contest publication and avoid this deprivation of a liberty interest.  Also, the planned releases will violate officers' rights to equal protection because they will treat some law enforcement officers different than other city employees (including other law enforcement officers) for whom unsubstantiated allegations are maintained as private.

- **Contract Rights for Past Settlements**: The data dump will also include allegations that resulted in settlement agreements.  Such disclosure will breach those settlement contracts.  Any settlement agreement entered into before June 12, 2020—when § 50-a was repealed—necessarily and as a matter of law incorporated § 50-a's protections against disclosure of this very type of information.  All parties to those agreements understood at the time they were executed that they would remain confidential, and officers reasonably relied upon this mutual understanding of confidentiality in forming these agreements.  New York's recent repeal of § 50-a does not alter these existing contracts, nor was it ever intended to do so.

- **CPLR Article 78**: Release of Unsubstantiated and Non-Final Allegations would also constitute errors of law and be arbitrary and capricious agency action under CPLR § 7803(3).  First, it is an error of law and arbitrary and capricious to conclude that the repeal of § 50-a justifies the wholesale and indiscriminate release of Unsubstantiated and Non-Final Allegations without individualized and particularized review for safety and

privacy concerns.  Second, it is an error of law and arbitrary and capricious for Defendants to break with longstanding practice in determining not to assert the privacy and safety exemptions as a basis for withholding Unsubstantiated and Non-Final Allegations.  Defendants themselves have asserted for decades that release of Unsubstantiated and Non-Final Allegations would be an unwarranted invasion of privacy. This change cannot be justified by the repeal of § 50-a.  The legislature removed a categorical barrier to disclosure of these records, but it did not mandate the release of records.  Thus, Defendants' actions violate Article 78 of the CPLR.

6.      Defendants have not made any determination of the consequences to the safety, reputation, or privacy of the implicated officers.  Pending a determination of the claims asserted in this action, Defendants must be restrained from the release and promotion on the internet of Unsubstantiated and Non-Final Allegations and confidential settlement agreements—otherwise, the Defendants would make this lawsuit an empty ritual, incapable of protecting the reputation, privacy, and safety of hundreds of New York City's firefighters, police, and corrections officers. There would be no material prejudice to the Defendants from the entry of provisional relief, but in the absence of provisional relief, the damage to the Plaintiffs would be irreversible.  To protect Plaintiffs' rights, Plaintiffs respectfully request injunctive relief on all claims, barring the release of records regarding Unsubstantiated and Non-Final Allegations or that regard settlement agreements entered into prior to June 12, 2020.

## PARTIES

7.      Plaintiff Uniformed Fire Officers Association ("UFOA") is the duly certified collective bargaining representative of officers of the Fire Department of the City of New York in the rank of Lieutenant, Captain, Battalion Chief, Deputy Chief (except those Deputy Chiefs

designated as Deputy Assistant Chief of Department, Assistant Chief of Department and Chief in Charge), Fire Medical Officer, and Supervising Fire Marshal.  Upon information and belief, UFOA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, UFOA seeks to protect the interest of these and other UFOA members.

8.      Plaintiff Uniformed Firefighters Association of Greater New York ("UFA") is the duly certified collective bargaining representative of officers Fire Department of the City of New York in the rank of Firefighter and Fire Marshal.  Upon information and belief, UFA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, UFA seeks to protect the interest of these and other UFA members.

9.      Plaintiff Correction Officers' Benevolent Association of the City of New York, Inc. ("COBA") is the duly certified collective bargaining representative of officers of the New York City Department of Correction in the rank of Correction Officer.  Upon information and belief, COBA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, COBA seeks to protect the interest of these and other COBA members.

10.     Plaintiff Police Benevolent Association of the City of New York, Inc. ("PBA") is the duly certified collective bargaining representative of all officers of the New York City Police Department in the rank of Police Officer.  Upon information and belief, PBA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, PBA seeks to protect the interests of these and other PBA members.

11.     Plaintiff Sergeants Benevolent Association ("SBA") is the duly certified collective bargaining representative of all officers of the New York City Police Department in the rank of Sergeant.  Upon information and belief, SBA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, SBA seeks to protect the interests of these and other SBA members.

12.     Plaintiff Lieutenants Benevolent Association ("LBA") is the duly certified collective bargaining representative of all officers of the New York City Police Department in the rank of Lieutenant.  Upon information and belief, LBA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent.  By this action, LBA seeks to protect the interests of these and other LBA members.

13.     Plaintiff Captains Endowment Association ("CEA") is the duly certified collective bargaining representative of all officers of the New York City Police Department in the rank of Captain.  Upon information and belief, CEA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent. By this action, CEA seeks to protect the interests of these and other CEA members.

14.     Plaintiff Detectives' Endowment Association ("DEA") is the duly certified collective bargaining representative of all officers of the New York City Police Department in the rank of Detective. Upon information and belief, DEA members will be named in the data that Defendants plan to make public and would suffer a concrete and particularized injury by the release, which is imminent. By this action, DEA seeks to protect the interests of these and other

DEA members.

15.     Defendant Bill de Blasio is the Mayor of the City of New York (the "Mayor") and is named in his official capacity. The Mayor's principal place of business is located at City Hall, New York, New York 10007.

16.     Defendant City of New York (the "City") is a municipal corporation organized and existing under New York state law.  The City's principal place of business is located at City Hall, New York, New York 10007.

17.     Defendant Daniel A. Nigro ("Commissioner Nigro") is the Commissioner of the Fire Department of the City of New York and is named in his official capacity.  Commissioner Nigro's principal place of business is located at 9 MetroTech Center, Brooklyn, New York 11201.

18.     Defendant Fire Department of the City of New York ("FDNY") is a municipal fire department administered under the New York Administrative Code, Title 29 of the City of New York.  FDNY's principal place of business is located at 9 MetroTech Center, Brooklyn, New York 11201.

19.     Defendant New York City Department of Correction ("DOC") is a municipal fire department administered under the New York Administrative Code, Title 9 of the City of New York.  DOC's principal place of business is located at 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

20.     Defendant Cynthia Brann ("Commissioner Brann") is the Commissioner of the New York City Department of Correction and is named in her official capacity.  Commissioner Brann's principal place of business is located at 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

21.     Defendant Dermot F. Shea ("Commissioner Shea") is the Commissioner of the New York City Police Department and is named in his official capacity.  Commissioner Shea's principal place of business is located at One Police Plaza, New York, New York 10038.

22.     Defendant New York City Police Department ("NYPD") is a law enforcement agency administered under the New York Administrative Code, Title 14 of the City of New York.  NYPD's principal place of business is located at One Police Plaza, New York, New York 10038.

23.     Defendant Frederick Davie ("Chair Davie") is the Chair of the Civilian Complaint Review Board and is named in his official capacity.  Chair Davie's principal place of business is located at 100 Church Street, 10th Floor, New York, New York 10007.

24.     Defendant Civilian Complaint Review Board ("CCRB" or "the Board") is an independent municipal agency constituted under § 440 of the Charter of the City of New York. CCRB's principal place of business is located at 100 Church Street, 10th Floor, New York, New York 10007.

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. This Court has personal jurisdiction over all Defendants under the United States Constitution and CPLR § 301 because Defendants work in or conduct substantial business within New York. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

26.     This action is brought against the City and the Mayor in his official capacity under Articles 75 and 78 of the CPLR to challenge their role in directing Defendants to publicly release Unsubstantiated and Non-Final Allegations in violation of applicable law and in an

arbitrary and capricious manner, and in violation of the terms of Plaintiffs' CBAs and applicable settlement agreements.

27.    This action is brought against NYPD and Commissioner Shea in his official capacity under Articles 75 and 78 of the CPLR to challenge the NYPD's planned release of Unsubstantiated and Non-Final Allegations in violation of applicable law and in an arbitrary and capricious manner, and in violation of the police Plaintiffs' CBAs and applicable settlement agreements.

28.    This action is brought against FDNY and Commissioner Nigro in his official capacity under Articles 75 and 78 of the CPLR to challenge the FDNY's planned release of Unsubstantiated and Non-Final Allegations in violation of applicable law and in an arbitrary and capricious manner, and in violation of the firefighter Plaintiffs' CBAs and applicable settlement agreements.

29.    This action is brought against DOC and Commissioner Brann in her official capacity under Articles 75 and 78 of the CPLR to challenge any planned DOC's release of Unsubstantiated and Non-Final Allegations in violation of applicable law and in an arbitrary and capricious manner, and in violation of correction Plaintiffs' CBA and applicable settlement agreements.

30.    This action is brought against CCRB and Chair Davie under Article 78 of the CPLR to challenge the CCRB's release of Unsubstantiated and Non-Final Allegations in violation of applicable law and in an arbitrary and capricious manner.

31.    This action is timely under CPLR § 217(1) because it was brought within four months of June 16, 2020, the first time Mayor de Blasio announced the City's intention to release unsubstantiated resolved complaints against NYPD officers, including law enforcement officers

represented by Plaintiffs.

32.     The Unions have associational standing to sue here because (1) one or more of every unions' members has standing to sue; (2) the interests advanced by vindicating the rights of the members are sufficiently germane to the Plaintiffs' purposes to demonstrate that Plaintiffs will appropriately represent the members' interests; and (3) the participation of the individual members is not required to assert the claim or to afford the Plaintiffs complete relief. *See Westchester Cnty. Dep't of Pub. Safety Police Benev. Ass'n, Inc. v. Westchester Cnty.*, 35 A.D.3d 592, 594, 828 N.Y.S.2d 412, 414 (2d Dep't 2006).

## **BACKGROUND**

**A.     The Disciplinary Process and Handling of Complaints Against Officers**

33.     Complaints against NYPD, FDNY, and DOC officers may be brought by civilians, inmates, other officers, or by the Departments themselves.  There are numerous avenues for complaints to be made against officers, and it can be done as easily as anonymously calling 311 or sending an anonymous email:

- **NYPD**: In addition to being reported internally through the chain of command, complaints against any NYPD office may be reported in person, by telephone via NYC's 311 hotline, or via the CCRB's dedicated hotline, by email or mail to the CCRB, the Internal Affairs Bureau of NYPD, or directly to the New York City Inspector General for the NYPD.

- **FDNY**: A complaint against an FDNY officer may be reported internally through chain of command, to the FDNY confidential complaint telephone line, or directly to the Inspector General for the FDNY.

- **DOC**: A complaint against a DOC officer may be reported by an inmate grievance

through the Office of Constituent and Grievances Services, internally through chain of command, through the NYC Board of Corrections, or directly to the Inspector General for DOC.

34.     The disciplinary processes of the FDNY, DOC, and NYPD are similar. For police, the NYPD procedures involve complaints and investigations, followed potentially by a proceeding where necessary and a final discretionary decision by the Commissioner.

35.     For example, a complaint against an NYPD officer may be reported to the CCRB, the Internal Affairs Bureau of NYPD ("NYPD-IAB"), or the Office of Inspector General for NYPD ("NYPD-OIG"). Complaints may be brought by fellow officers, civilians, or the NYPD itself.  Civilian and officer complaints may be made anonymously.

36.     Once a complaint is lodged, it is investigated by the CCRB, NYPD-IAB, or the NYPD's Force Investigation Division ("NYPD-FID").  NYPD-IAB investigates most complaints alleging serious misconduct brought against officers.  CCRB investigates complaints made by members of the public against officers involving allegations of use of force (with the exception of those in the category of "readily capable of causing death or serious physical injury," which will be investigated by NYPD-IAB or NYPD-FID), abuse of authority, discourtesy, and offensive language.  NYPD-FID investigates all firearms discharges, fatalities related to police action, and cases when a subject of police action is seriously injured and death is likely.

37.     CCRB uses certain terms to describe the outcomes of their investigations into alleged misconduct.  An allegation is designated as "unfounded" when the investigation determines that it did not occur.  An allegation is designated as "unsubstantiated" if the investigators do not believe a preponderance of the evidence supports that the conduct described in the complaint occurred.  An officer may be "exonerated" if the investigation finds that the

conduct occurred but was not improper.

38.     If the investigation concludes that the conduct occurred in whole or in part and was at least somewhat improper, the investigating entity will make a recommendation for the officer to be subject to certain discipline and/or training or, in serious cases, for the officer be served with Charges and Specifications.  Charges and Specifications detail the specific provisions of the Department's rules and regulations alleged to have been violated.

39.     If Charges and Specifications are filed, the officer may elect to proceed to trial before an appointed Trial Commissioner, whose responsibility it is to determine whether the charges were proven by a preponderance of the credible evidence and, if so, what penalty should be imposed.  The Trial Commissioner provides a written recommendation which summarizes the evidence and recommends a finding and, if appropriate, a disciplinary penalty.  The Commissioner makes the final determination on whether to accept the Trial Commissioner's recommendation, and whether and to what degree discipline should be imposed.  Although some Charges and Specifications filed against officers relate to purely technical infractions, such as lateness, record keeping, and lost/damaged property, many of the Charges filed relate to significantly more serious allegations.

40.     A January 2019 Independent Panel Report regarding the NYPD Disciplinary System reported that approximately 55,000 annual complaints are made against NYPD officers through the CCRB and NYPD's Advocate Office.  *See* Mary Jo White, et al., *Report of the Independent Panel on the Disciplinary System of the New York City Police Department* (Jan. 25, 2019), at p. 7 (the "2019 Panel Report").  However, less than one percent of those complaints resulted in a disciplinary trial or settlement, presumably reflecting both the vast number of frivolous complaints made, and the fact that most disciplinary measures are instituted for

violation of department rules, many of which are appropriately dealt with through command discipline. "[O]ver 60% of the Department's disciplinary cases are settled." 2019 Panel Report at 7. As discussed below, officers who entered into settlement agreements did so on the assumption that that these settlement agreements would remain private pursuant to § 50-a.

41.     By one metric, over 92 percent of the 290,649 allegations recently released by the CCRB to the New York Civil Liberties Union fall into the category of Unsubstantiated and Non-Final Allegations.

42.     Although they vary in some respects, FDNY and DOC have similar tiered procedures to investigate complaints against firefighters and correctional officers, but also provide for further review by the Office of Administrative Trials and Hearings.

**B.      The Investigation Stage Does Not Provide Opportunities for Officers to Contest Allegations**

43.     It takes zero evidence to file an allegation of misconduct against a firefighter, police officer, or corrections officer. The vast majority of NYPD complaints are never proven, even by the relatively low preponderance-of-the-evidence standard.

44.     Even so, officers do not have meaningful opportunities to refute allegations or provide input during the investigative phase. In police investigations, officers are interrogated, but they are not permitted to cross-examine accusers or present exculpatory evidence. When an investigation concludes that the conduct occurred in whole or in part and was at least somewhat improper, Charges and Specifications may be served on the officer. Charges and Specifications detail the specific provisions of the Department's rules and regulations alleged to have been violated. But they are not subject to any articulated standard of proof and do not constitute a final determination that the allegation is true. Charges and Specifications are not the product of a due process hearing or anything remotely similar and do not protect the officers' due process

rights, if this information is made public.

45.     The CCRB investigative process similarly fails to provide officers with adequate procedural protections.  The process for issuing an investigative disposition by CCRB does not include a pre-deprivation hearing.  Officers do not have an opportunity to present or contest evidence in the CCRB investigative process.

## C.     Release of Unsubstantiated and Non-Final Allegations Violates Collective Bargaining Agreements Between the Parties

46.     The release of Unsubstantiated and Non-Final Allegations would nullify important contractual rights in the collective bargaining agreements ("CBAs") between most Plaintiffs and the City.  The CBAs entered into by Plaintiffs SBA, PBA, LBA, CEA, COBA, UFA, and UFOA—expired but currently controlling pursuant to the Triborough Amendment— provide their members with a contractual right to have investigative reports that are classified as "exonerated," "unfounded," or—in the case of the FDNY, otherwise "not guilty"—removed from their personnel folders.

47.     For example, Article XV, section 7(c) of the CBA entered into between the SBA and the City states that the NYPD "will upon written request to the Chief of Personnel by the individual employee, remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified 'exonerated' and/or 'unfounded'."  With the exception of the DEA, the other police and also the correction Plaintiffs' CBAs have substantively identical provisions.[1]

---

[1] *See* LBA CBA, Art. XVI, § 7(c); CEA CBA, Art. XIV, § 6(c); PBA CBA, Art. XVI, § 7(c), COBA CBA, Art. XVI, § 11.  The COBA CBA also notes that: "The past disciplinary or work record of an employee may not be revealed during a Section 75, Civil Service Law, disciplinary proceeding until a determination as to guilt or innocence of the member has been determined."  COBA CBA, Art. XVI, § 12.

48.     The purpose, intent, and meaning of section 7(c) of the SBA CBA, and of the substantively identical provisions in the CBAs of the other police Plaintiffs, is that removal of the investigative reports from the Personal Folder will eliminate those records and make them unavailable for any purpose.  The purpose, intent, and meaning of "remove" cannot mean merely to move records from one place to another, or mean that when records are moved to another place those records can be made publicly available and used for any purpose.  The purpose, intent, and meaning of section 7(c) would be violated and its terms rendered meaningless if the covered records could be made publicly available.

49.     The police Plaintiffs' CBAs also permit them to petition the Police Commissioner to expunge the records of certain cases heard in the Trial Room where the disposition of the charge at trial or on review or appeal is other than "guilty," after 2 years have passed.  *See*, *e.g.*, LBA CBA Article XVI, § 8 ("Disciplinary Records").

50.     The purpose, intent, and meaning of section 8 of the LBA CBA, and of the substantively identical provisions in the CBAs of the other police Plaintiffs, is that expunging the records will eliminate those records and make them unavailable for any purpose.  The purpose, intent, and meaning of section 8 would be violated and its terms rendered meaningless if the covered records could be made publicly available.

51.     Similarly, Article XVII Section 9 of the CBA entered into between the UFA and the City states:

> If an employee is found not guilty in a disciplinary hearing, the record of the proceedings shall not become part of that employee's personal record. An employee who is found not guilty shall have the right to examine that employee's personal record in the presence of an official of the Department after written request to the Department to ascertain compliance.

UFA CBA, Article XVII, § 9.  The UFOA CBA contains an identical provision.  *See* UFOA

17

CBA, Article XVII, § 9.  Likewise, under COBA's CBA Article XVI, any member may have removed from her or her personnel folder investigative reports that are classified exonerated or unfounded. Under DOC Directive 4257R-A, VI(6), a violation of which is grievable under the CBA, when at a command disciplinary hearing a Hearing Officer determines that the allegations are not substantiated, no record of the command disciplinary charges is to be maintained except in the command discipline log.  Under that same directive, article X, a substantiated command discipline shall be expunged from the member's personnel folder after one year if they have not been penalized thereafter in a separate disciplinary matter during that time.

52.    The purpose, intent, and meaning of these sections of the UFA, UFOA, and COBA CBAs would be violated and their terms rendered meaningless if the covered records could be made publicly available.

53.    Defendants' planned action of dumping all pending and historical disciplinary complaints against New York City police, fire, and corrections officers in a public-facing online registry, without proper review or analysis, would functionally negate the rights of officers to clear their disciplinary records of unfounded and unsubstantiated allegations because that information would forever be publicly available in the future.

54.    The rights contained in Plaintiffs' CBAs were negotiated by Plaintiffs' respective Unions specifically because of the significant harm and embarrassment having inaccurate complaints and allegations on Plaintiffs' records could cause Plaintiffs, where personnel records are used for future promotions and job transfers.

55.    On July 13, 2020, four of the police union plaintiffs (PBA, SBA, CEA, and LBA) filed grievances with John P. Beirne, the Deputy Commission for the NYPD's Office of Labor Relations, in response to the anticipated one-sided nullification of their bargained for contractual

rights, demanding that Respondents "cease and desist."  The corrections officers' union, COBA, filed a grievance with New York City's Office of Labor Relations Commissioner Renee Campion.  In grieving Respondents' planned data dump, these plaintiffs argued that the release of Unsubstantiated and Non-Final Allegations against active and retired members would deprive members of the benefit of contractual provisions allowing them to expunge from their personnel files records relating to any investigations resulting in a not-guilty finding.  Given the scope of these plaintiffs' rights potentially impacted by Respondents' action, the grievances were filed directly at Step III, in accordance with the provisions of the unions' respective CBAs.  Upon denial of their Step III grievances, the four police unions filed Step IV grievances requesting arbitration of their complaints before the New York City Office of Collective Bargaining ("OCB").  The City subsequently filed separate Petitions Challenging Arbitrability, in connection with the Step IV grievances filed by the PBA, LBA, and CEA, requesting that the OCB dismiss the requests for arbitration in their entirety.  No decision has been rendered on those Petitions, and these matters are going through the grievance and arbitration process under the CBAs.

**D.     Release of Unsubstantiated and Non-Final Allegations Violates the U.S. and N.Y. Constitutions**

56.     The United States and New York State Constitutions each provide that no person shall be deprived of life, liberty, or property without due process of law.  U.S. Const. amend. XIV; N.Y. Const. s. 1, art. 6.  Defendants' disclosure of Unsubstantiated and Non-Final Allegations will violate those Due Process Clauses because it will stigmatize the identified officers and deprive them of a liberty interest in future employment opportunities and create other substantial burdens without adequate process.

57.     First, the publication of Unsubstantiated and Non-Final Allegations against police

officers will "call[] into question their good name, reputation, honor, or integrity" and thus

stigmatize the firefighters and officers. *Lee TT. v. Dowling*, 87 N.Y.2d 699, 708 (1996) (internal

quotation marks omitted). Such stigmatization will include Unsubstantiated and Non-Final

Allegations related to serious crimes and serious misconduct.

58.     Many Unsubstantiated and Non-Final Allegations are based in whole or in part on

false statements. Defendants intend to publicize allegations they investigated and determined to

be false (such as those designated as unfounded) as well as allegations that fell short of the

preponderance-of-the-evidence standard (such as those designated as unsubstantiated). The

falsity of these underlying allegations is at issue in this case, even if they are published alongside

a term that accurately describes the outcome of the related investigation. The investigative

terms, based on Defendants' definitions of the terms, do not inherently confirm or refute the truth

of underlying allegation. They simply state the outcome of the related investigation and do not

cleanse falsity embedded in the allegations themselves. These allegations may be completely

false, and yet Defendants intend to include them without regard for their veracity.

59.     These false allegations will stigmatize officers, negatively affecting their

professional reputations by imputing to them misconduct or unfitness for the profession. A

reasonable person could conclude that the allegations convey facts that are susceptible of a

defamatory connotation. The mere accusation of misconduct is enough to call an officer's good

name and reputation into question.

60.     Officers will separately face deprivation of a liberty interest in the form of

interference with future employment opportunities and other material burdens. Defendants have

not simply chosen to make these records available in response to FOIL requests but will

proactively publish and promote them on a worldwide scale in massive registries. The Mayor

himself has drawn attention to these registries.  Records already released by Defendants have been republished and amplified in other databases, including as part of a new effort to create a national database of police misconduct.  Potential future employers, credit agencies, landlords, bank officers, and others will have ready access to these registries.

61.     If released, allegations of officer misconduct will follow the identified officers, affecting their reputations for professionalism and integrity years later, even in cases where the agency did not substantiate the allegation or the officer was not disciplined.  A single allegation of misconduct—substantiated, unsubstantiated, or otherwise—could cause an officer to lose out on a future job.  The damage to these future job opportunities is concrete and real, and it impairs a liberty interest that requires due process prior to such deprivation.

62.     Under well-settled law, Defendants must provide adequate procedural protections for officers before depriving them of this liberty interest.  But on information and belief, officers will have no opportunity to clear their names and avoid inclusion in the registries.  There is no opportunity for officers to challenge publication of allegations against them, which, as to some records, will occur regardless of the outcome of the investigation.  Procedures within the investigatory or adjudicatory process are not relevant to avoiding this deprivation.  And in any case, NYPD's procedures for issuing Charges and Specifications and CCRB's investigative procedures do not meet the strictures of due process.

63.     This harm is far from speculative.  The harm from these disclosures is illustrated by the recent harassment of Richard Taylor, who retired as a NYPD police officer in 2007 after ten years of service.  Taylor is now an adjunct professor at St. John's University.  Despite the fact that he has been retired for approximately thirteen years, in September 2020, a student group at St. John's posted a screenshot on its Instagram page of Taylor's record of CCRB allegations.

The group claims to have downloaded the allegations, none of which were substantiated, from the NYCLU database of CCRB allegations.[2]  The group publicly called for Taylor's dismissal and seeks to hold him accountable for this "misconduct."  This harassment, and the framing of unsubstantiated allegations as "misconduct" by third parties, demonstrate the defamatory effect of publicizing these records.  Taylor's experience, coming more than a decade after he left the NYPD, demonstrates a likelihood of both immediate and long-term interference with future employment opportunities for many of the approximately 65,000 officers represented in this lawsuit.  This incalculable harm will be long-lasting and widespread and cannot possibly be remedied by money damages.

64.     Press coverage following CCRB's recent public disclosures demonstrates the ramifications for officer reputations.  Following CCRB's releases of disciplinary records in June and July, the Guardian published a cartoon of "NYPD's 10 Most unWanted" officers, depicting and identifying ten police officers and purporting to list the number of allegations lodged against each officer, with citation to CCRB data.  But the underlying data reveals that very few of the allegations listed for each officer were substantiated.  For example, one officer was accused in 73 allegations but just six were substantiated.  The vast majority of the rest were unfounded (meaning by the CCRB's own standard there was a preponderance of the evidence that the acts alleged did not occur) or unsubstantiated (meaning, according to the CCRB, there was insufficient evidence to establish whether or not there was an act of misconduct).  The damage to reputation of guilt by accusation, including those the agency investigated and found to be without merit, is done.  These allegations are susceptible of a defamatory connotation.

––––––––––––––––––––

[2] Instagram, SJURadicals, https://www.instagram.com/p/CE-RzrvJNep/ (last visited Sept. 25, 2020).

65.     Moreover, the detrimental consequences of releasing Unsubstantiated and Non-Final Allegations were recognized by at least two of the Defendant agencies.  The NYPD representative testified that the NYPD has "contemplated certain consequences that might flow to somebody by release of our records" and has "thought about whether or not there will be post-employment consequences based on records that we could release."  (NYPD Dep. Tr. 89:6-20.)  The DOC representative stated that "the department is aware [it] is a concern" both that the release of unsubstantiated allegations could damage officer reputations and affect future employment opportunities.  (DOC Dep. Tr. at 65:18-66:20.)

66.     In addition, the release of records of past Unsubstantiated and Non-Final Allegations would doubly violate the Due Process Clauses because officers relied on the City's guarantee of the confidentiality of such allegations in deciding how to respond to them.  If the officers had known that the City would make such allegations public, they might have defended themselves against the allegations in a more vigorous, more vocal, and more resource-intensive fashion to protect their reputations, and hence their future liberty and property interests.  Releasing records of Unsubstantiated and Non-Final Allegations that pre-date the City's announced intent to publicize such records therefore would upset the officers' reliance on the City's guarantee to protect their reputations and privacy from the harms associated with public disclosure of such allegations.  Application of the repeal of § 50-a to existing records thus would have an impermissible retroactive effect on the officers' liberty and property interests in violation of the Due Process Clauses.

67.     Separately, the release of Unsubstantiated and Non-Final Allegations will violate the Equal Protection Clauses of the U.S. and N.Y. State Constitutions.  The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection

of the laws."  U.S. Const. amend. XIV, § 1.

68.     Defendants treat officers differently than similarly situated public employees without a rational basis for doing so.  In a recent advisory opinion, the Committee on Open Government stated that, "[i]n light of the repeal of § 50-a, a request for disciplinary records relating to a police officer must be reviewed in the same manner as a request for disciplinary records of any other public employee."[3]  Defendants' plans ignore this simple command and subject law enforcement records to a lesser degree of protection.  By releasing Unsubstantiated and Non-Final Allegations without considering, on an individual basis, whether such release would constitute an unwarranted invasion of privacy, Defendants offer fewer protections to law enforcement officers than other public employees.

69.     Moreover, Defendants' disparate disclosure plans suggest starkly different treatment across New York City law enforcement agencies that cannot be rationally explained by a legitimate government interest.  Police officers are inexplicably afforded fewer privacy protections than firefighters or corrections officers.  Police officer records even appear to be treated differently depending on whether a complaint was investigated by the CCRB or one of the investigative arms of NYPD.  The City offers no justification (rational or otherwise) for closely shielding the disciplinary records of corrections officers but not police officers.

70.     This case does not involve state actions which by their nature involve discretionary decision-making based on subjective, individualized assessments.  Rather, it concerns the treatment of distinct groups of individuals in categorically different ways based on class-based decisions.

_____

[3] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020), https://docs.dos.ny.gov/coog/ftext/f19775.html.

71.     The City's decision to differentiate among law enforcement officers in this way lacks a rational relationship to an appropriate governmental interest.  These class-based distinctions are not based on "subjective and individualized" analysis, but instead raise classic group-based equal protection issues.  *Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal protection' ... emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.").

**E.      Release of Unsubstantiated and Non-Final Allegations Violates Settlement Contracts**

72.     The release of these documents, some of which contain settled cases, also violates the settlement contracts negotiated by Plaintiffs and Defendants.

73.     For decades, these settlements were made against the backdrop of Civil Rights Law § 50-a, which required that the disciplinary files be kept confidential.  That law, in force at the time of the settlement agreements, is a part of the contract. Releasing these documents would breach settlement contracts entered into before the repeal of § 50-a.

74.     Section 50-a was a "valid applicable law existing at the time" the settlement agreements were executed.  11 Williston on Contracts § 30:19 (4th ed. 2020).  There were no express confidentiality provisions in the settlement agreements because there was no need for them.  The agreements were executed against the backdrop of existing law, which expressly protected police personnel records from disclosure.  The parties to the contract reasonably expected that the confidentiality protections of § 50-a would be incorporated, and the officers relied on that understanding in executing the agreements.

75.     On information and belief, the pending disclosure will include even those cases where officers have entered into settlement agreements, which would constitute a breach of the settlement agreement.

25

**F.     Defendants' Decision to Indiscriminately Release Unsubstantiated and Non-Final Allegations Without Performing Individualized Review Is an Error of Law and Arbitrary and Capricious Under CPLR § 7803(3)**

76.     Release of Unsubstantiated and Non-Final Allegations would also constitute an error of law and be arbitrary and capricious agency action under CPLR § 7803(3).

77.     First, it is an error of law and arbitrary and capricious to conclude that the repeal of § 50-a justifies the wholesale and indiscriminate release of Unsubstantiated and Non-Final Allegations without individualized and particularized review.

78.     In repealing § 50-a, the legislature merely removed one barrier to the release of disciplinary records.  Far from mandating the release of records, the legislature highlighted continuing protections for certain records provided by other laws.  Thus, the repeal does not justify Defendants' plan to indiscriminately release Unsubstantiated and Non-Final Allegations without performing an individualized and particularized review for application of the privacy and safety exemptions in FOIL.  While § 50-a provided an express means for protecting all police, firefighter, and corrections officer personnel records, regardless of their contents, that law was never the sole basis for keeping confidential significant portions of those files.  Defendants' conclusion that these records may now be released legally, and en masse, because of that repeal is erroneous as a matter of law and arbitrary and capricious under CPLR § 7803(3).

79.     For decades, New York police, fire, and corrections departments were required under Civil Rights Law § 50-a to keep personnel records, including the disciplinary files discussed above, largely confidential.  Civil Rights Law § 50-a was enacted in 1976 and provided that "[a]ll personnel records used to evaluate performance toward continued employment or promotion . . . shall be considered confidential and not subject to inspection or review."  The statute contained only two exceptions to confidentiality: officer consent (Civil Rights Law § 50-a[1]) and court authorization (Civil Rights Law § 50-a[3]).  Section 50-a "was

26

sponsored and passed as a safeguard against potential harassment of officers through unlimited access to information contained in personnel files." *Luongo v. Records Access Officer*, 150 A.D.3d 13, 20 (1st Dep't 2017).

80.     On June 12, 2020, New York State repealed § 50-a.  Senate Bill S8496 to repeal § 50-a went from introduction to passage by both houses of the New York State Legislature in just three days, including a weekend.  The Governor signed the bill into law three days later.[4]

81.     For at least two reasons, it is clear the legislature did not intend for disciplinary records to be released indiscriminately and on a wholesale basis in a public registry.  First, Senate Bill S8496 does not evince any legislative intent to mandate or direct law enforcement agencies to release disciplinary records of any kind.  Rather, the repeal removed the statutory basis for categorically withholding all police personnel records from public disclosure.  Second, the legislative history of Senate Bill S8496, as well as a similar repeal effort in the New York State Assembly, make clear that the FOIL exemptions for privacy and safety should be applied to protect law enforcement officers in the absence of § 50-a.  The Sponsor Memorandum for Senate Bill S8496 states that § 50-a was an "unnecessary" law that could be removed because there are "additional safeguards" and "protections" in New York law that are intended to protect the rights of officers, including the exemptions in FOIL.[5]  The Sponsor Memorandum for Assembly Bill A9332 states that "FOIL already provides all public employees, including those protected under § 50-a, the protections necessary to guard against unwarranted invasions of privacy and from

_____

[4] Senate Bill S8496 to repeal § 50-a was introduced on Saturday, June 6, 2020.  Three days later, on June 9, 2020, it was passed by both houses.  Governor Cuomo signed the bill into law on June 12, 2020.

[5] Sponsor Mem., N.Y. Senate Bill S8496, https://www.nysenate.gov/legislation/bills/2019/s8496.

disclosures that could jeopardize their security or safety."[6]  Thus, agencies have a continuing responsibility, even absent § 50-a, to conduct careful, record-by-record review to ensure proper application of these additional safeguards and protections in the law.

82.     Put simply, recent legislative developments do not create any affirmative duty or obligation on the part of Defendants to release Unsubstantiated and Non-Final Allegations to the public, let alone in a central online registry, and in fact confirm the continuing vitality of the FOIL exemptions.

83.     CCRB has admitted it does not review records individually before releasing them. For the 81,000 officer records released by the CCRB to NYCLU, CCRB's Rule 30(b)(6) witness testified that those records were not reviewed individually for either safety or privacy issues. CCRB's position was that there was that "there was no need to do a line by line of every—of all 81,000-plus officers" to determine individual privacy or safety protection.  (CCRB Dep. Tr. 41:21-23; *see also id.* at 47:3-12; 48:14-49:19; 53:12-19.)

84.     This practice contradicts CCRB's own website, which states that "[a]ll government records are subject to the exemptions stipulated in FOIL" and links to the website of the Committee on Open Government.  A recent advisory opinion from the Committee emphasizes that, both before and after the repeal of § 50-a, the law "*requires* an agency to determine if an unsubstantiated or unfounded complaint against an employee would, if disclosed, constitute an unwarranted invasion of personal privacy."[7]

85.     Defendants cannot possibly meet this requirement without reviewing records

---

[6] Sponsor Mem., N.Y. Assembly Bill A9332, https://nyassembly.gov/leg/?default_fld=&bn=9332&term=2015&Summary=Y&Memo=Y.

[7] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020), https://docs.dos.ny.gov/coog/ftext/f19775.html (emphasis added).

individually before they are irretrievably released.  Such actions are, and threaten to continue to be, arbitrary and capricious and based on an error of law.

**G.     Defendants' Break from Their Long-Established Practice of Applying the Privacy or Safety Exemptions in FOIL to Unsubstantiated and Non-Final Allegations Is an Error of Law and Arbitrary and Capricious Under CPLR § 7803(3)**

86.     It also is an error of law and arbitrary and capricious for Defendants to break with longstanding practice in determining not to assert the privacy and safety exemptions in FOIL as a basis for withholding Unsubstantiated and Non-Final Allegations.

87.     Defendants themselves have long asserted that release of Unsubstantiated and Non-Final Allegations would be an unwarranted invasion of privacy.  Defendants cannot cast aside privacy and safety issues in favor of wholesale, indiscriminate releases outside of the FOIL request process.

88.     Defendant CCRB has repeatedly recognized that disclosure of unsubstantiated disciplinary records would itself constitute an "unreasonable invasion of privacy."  *Hughes Hubbard & Reed LLP v. Civilian Complaint Review Bd.*, 53 Misc.3d 947 (Sup. Ct., Kings Cnty. 2016) (citation omitted); *see also Luongo v. Records Access Officer*, 150 A.D.3d 13, 25-26 (1st Dep't 2017) ("In addition to statutory exemptions, CCRB noted that the request for records relating to unsubstantiated matters would constitute 'an unreasonable invasion of privacy.'").

89.     In addition, courts in New York have long recognized the importance of protecting against unwarranted invasions of privacy in the disclosure of government records. Shortly after § 50-a was codified, the Court of Appeals observed that § 50-a "fairly reflects the pre-existing judicial consensus" regarding the confidentiality of police personnel records. *People v. Gissendanner*, 48 N.Y.2d 543, 551 (1979).  In other words, the privacy protections pre-existed § 50-a in the common law and likewise survive § 50-a's repeal.  Also, the New York Court of Appeals has held that individuals may have a "legally protected privacy interest" in

ensuring public records disclosures do not violate their privacy interests.  In *New York Times Co. v. City of New York Fire Department*, the Court held that "surviving relatives [of 911 callers on September 11, 2001] have a legally protected privacy interest" in nondisclosure of tapes and transcripts of those calls.  4 N.Y.3d 477, 485 (2005).  Under this reasoning, those with a "legally protected privacy interest" in nondisclosure of government records must have a means of enforcing that interest.

90.      This position is supported by the Committee on Open Government, which is the executive branch authority on the correct interpretation of FOIL and similar state laws.  The Committee has long taken the position that the release of unsubstantiated allegations of misconduct constitutes an unwarranted invasion of officer privacy.  Most recently, in its July 27, 2020 advisory opinion, the Committee emphasized its "long-standing interpretation that *requires* an agency to determine if an unsubstantiated or unfounded complaint against an employee would, if disclosed, constitute an unwarranted invasion of personal privacy."[8]  Another Committee on Open Government advisory opinion explained: "when allegations or charges of misconduct have not yet been determined or did not result in disciplinary action, the records relating to such allegations may . . . be withheld, for disclosure would result in an unwarranted invasion of personal privacy . . . Further, to the extent that charges are dismissed or allegations are found to be without merit, I believe that they may be withheld based on considerations of privacy."[9]  An earlier opinion states: "In numerous contexts, it has been advised that records

---

[8] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020), https://docs.dos.ny.gov/coog/ftext/f19775.html (emphasis added).

[9] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-17195 (May 29, 2008), https://docs.dos.ny.gov/coog/ftext/f17195.html (internal citations omitted).

relating to unsubstantiated charges, complaints or allegations may be withheld to protect the privacy of the accused."[10]

91.     Defendants' planned releases would fail to protect (and in some cases even fail to consider) the privacy and safety rights that continue to be protected after the repeal of § 50-a. CCRB admitted that it does not analyze whether privacy or safety are implicated in the release of Unsubstantiated and Non-Final Allegations, despite its past practice of doing so.  (CCRB Dep. Tr. 23:12-16 ("[T]he CCRB does not assert the unwarranted invasion of privacy exception based on [what] the outcome of the case was.  That does not factor into whether or not that exception is asserted.").)  CCRB claims it can choose not to conduct any review for the privacy and safety exemptions because applying any FOIL exemption is always optional.  (CCRB Dep. Tr. 33:17-25.)

92.     Defendants neglect their statutory duty to consider whether disclosure of Unsubstantiated and Non-Final Allegations would constitute an unwarranted invasion of privacy, such that the documents should be withheld under the privacy exemption to FOIL.  This failure disregards legislative intent, Defendants' previous judgments on the same issue, statements by the Committee on Open Government, and the expectation set by the courts of this State in considering the privacy implications of releasing personnel records.

93.     Defendants also neglect their statutory duty to consider whether disclosure of Unsubstantiated and Non-Final Allegations would threaten the life or safety of any person, such that the documents should be withheld under the safety exemption to FOIL.  Officers accused of misconduct have been subject to threats, harassment, and reprisals in recent years.  Naming

---

[10] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-12005 (Mar. 21, 2000), https://docs.dos.ny.gov/coog/ftext/f12005.htm.

firefighters and officers in an easily accessible database and listing every charge ever levied against them, regardless of outcome or substantiation, will provide motivated and unstable individuals with all the information they need to track down specific police officers.

94.     There is concrete evidence of increasing threats of violence and harassment against officers.  According to Joseph Alejandro, a veteran New York City police officer, officers face a rising number of threats, in some cases based on perceptions of officer misconduct.  According to statistics available from NYPD's Threat Assessment and Protection Unit ("TAPU"), which investigates threats against police officers, threats against police officers are more often than not motivated by the subject's previous interactions with police officers.  On information and belief, threats and harassment against NYPD officers have increased substantially in 2020.

95.     A recent confrontation in Queens demonstrates the harassment and threats officers now face, as well as the confusion that the City's recent data dumps to third parties, including ProPublica and NYCLU, is causing among members of the public.  On August 19, 2020, approximately fifty to seventy protestors converged on the Queens home of Police Officer Patrick Lynch, who serves as President of Plaintiff PBA.  The home was being guarded at the time by approximately six on-duty, uniformed police officers.  Some hurled insults and threats, with one protestor even threatening to rape the wives of the officers.  Another protestor approached an officer with a phone in her hand.  The officer's name was visible on the nameplate affixed to his uniform.  The protestor then began to yell, directly into the officer's face, the details of CCRB complaints that she was reading off her phone, and which she apparently believed to have been made against the officer.  Other protestors soon joined in the harassment, calling him an abuser.  According to available records, the officer who was berated

32

has had no CCRB complaints made against him in the 18 months since he was appointed as a police officer. The database published by ProPublica includes CCRB complaints against an NYPD sergeant with the same last name as the police officer. The details of these complaints are consistent with the accusations of misconduct made by the protestor. The sergeant's CCRB record in the ProPublica database goes back to 1996—some 23 years before the police officer assigned to the protest was appointed, and two years before he was born.

96.     Defendants ignore the clear dangers to officers of releasing Unsubstantiated and Non-Final Allegations against officers in a way that identifies the officers by name. To be sure, New York Public Officers Law now requires that certain personal identifying information, including home addresses, be redacted from records before they are released. But this amendment was little comfort for officers. It is common knowledge that an officer's name can be used to quickly turn up a home address on the internet. Driving home the point, one activist stated at a legislative hearing: "Finding the home address for police officers, that's not a 50-a issue, that's a Google issue. You name a police officer to me right now, and I will find their address, their phone number, and their relatives. I will find them all through Google."[11] Coupled with NYPD's requirement that officers reside in New York City or an adjacent county in New York, those who wish to target officers will be able to quickly identify where specific officers live.

97.     On information and belief, Defendants have not modified their plan to release Unsubstantiated and Non-Final Allegations to account for increasing incidents of targeted

_____

[11] Statement of Loyda Colon, N.Y. Senate Public Hearings (Oct. 24. 2019), https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-hearing-policing-s3695-repeals-provisions-relating (beginning at the 2:53:39 mark).

assaults and harassment of police officers and their families.  For example, NYPD does not take into account assassinations of police officers in determining whether disclosure of disciplinary records will affect officer safety.  (NYPD Dep. Tr. 83:12-85:19.)

98.     Although Defendants are free to change policies, they may not do so at the expense of the long-settled reliance interests of firefighters, police officers, and correction officers in the nondisclosure of Unsubstantiated and Non-Final Allegations.  Defendants' reversal is not based on sound reason and lacks even a minimal level of analysis beyond the erroneous conclusion that the repeal of § 50-a permits unlimited disclosure (which it does not).

99.     To be sure, New York City would not be alone in releasing law enforcement disciplinary records to the public.  And it has done so in limited ways in the past, such as the physical posting of police charges on a bulletin board inside NYPD headquarters and in a database maintained by a law school, all with little publicity or attention.  But the planned publications through a central public registry come at a fraught moment for New York City law enforcement officers and their families.  The recent and ongoing experience of former NYPD officer Richard Taylor—an officer-turned-academic who is enduring harassment on the basis of a handful of unfounded and unsubstantiated complaints many years after the fact—serves as a warning sign of what is to come.  The new and disturbing trend of protestors showing up at the homes of officers also demonstrates that some elements of society are beginning to use access to public records as a tool for harassment and threats.[12]  Past releases or leaks of misconduct records, in New York or otherwise, are of little predictive value in this environment.

––––––––––––––––––––

[12] *See, e.g.*, Dan Boyce, *Anniversary Of De'Von Bailey Shooting Marked With Tense Protest In Officer's Colorado Springs Neighborhood*, CPR News (Aug. 4, 2020), https://www.cpr.org/2020/08/04/anniversary-of-bailey-shooting-marked-with-tense-protest-in-colorado-springs-neighborhood/.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### Injunctive Relief Under CPLR § 7502(c) to Prevent
### CBA Arbitration Rights from being Rendered Ineffectual

100.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

101.    Without injunctive relief preventing disclosure of allegations covered by the CBA provisions discussed above, Plaintiffs' members will be irreparably injured because their right to arbitrate CBA claims will be "rendered ineffectual," contrary to New York arbitration law in CPLR 7502(c), the policy of enforcing arbitration rights, and New York's "strong and sweeping" public policy supporting collective bargaining rights.  *City of Watertown v. State of N.Y. Pub. Relations Bd.*, 95 N.Y.2d 73, 78 (2000).  Plaintiffs will be irreparably harmed both by the irreparable loss of their right to meaningful arbitration, and by the irreparable violation of their CBAs, when Defendants publish disciplinary records protected by the CBA provisions at issue. Public release of records will render the bargained-for CBA rights meaningless.  Any future removal of the reports covered by CBA provisions will have no practical effect because the information will already be public.

102.    In executing CBAs with Plaintiffs, the City agreed that all members of the SBA, PBA, LBA, CEA, COBA, UFA and UFOA have a contractual right to have investigative reports that are classified as "exonerated," "unfounded" or, in the case of the FDNY, otherwise "not guilty," removed from their personnel folders.[13]  The City further agreed that officers in the

_____

[13] *See* LBA CBA, Art. XVI, § 7(c); CEA CBA, Art. XIV, § 6(c); PBA CBA, Art. XVI, § 7(c), COBA CBA, Art. XVI, §§ 11, 12 & DOC Directive 4257R-A, Arts. VI(6) & X; UFA CBA, Article XVII, § 9; UFOA CBA, Article XVII, § 9.  While each of the referenced CBAs are expired, their terms continue uninterrupted pursuant to The Triborough Amendment.

employ of the police Plaintiffs would be permitted to petition the Police Commissioner to expunge the records of certain cases heard in the Trial Room where the disposition of the charge at trial or on review or appeal is other than "guilty," after 2 years have passed. *See, e.g.*, LBA CBA Article XVI, § 8 ("Disciplinary Records").

103.    Defendants' planned action of dumping all pending and historical disciplinary complaints against New York City police, fire and corrections officers on a public-facing online database, without proper review or analysis, would functionally negate the rights of officers to clear their disciplinary records of unfounded and unsubstantiated allegations, leaving their bargained-for rights null and void.

104.    The rights at issue in Plaintiffs' CBAs were negotiated by Plaintiffs specifically because of the significant harm and embarrassment having inaccurate complaints and allegations on Plaintiffs' records could cause Plaintiffs, where personnel records are used for future promotions and job transfers, and where such protections have been long recognized as important to officer safety.

105.    Because use of officers' personal records is a term and condition of their employment, the officers have a right to collectively bargain over the confidential treatment of their personnel files under the Taylor Law.  See CSL §§ 203; 201(4).

106.    The CBA rights at issue are based on privacy interests and are proper subjects of collective bargaining.  They are not themselves "police discipline" that is outside collective bargaining rights.  The CBA provisions at issue relate to the treatment of complaint allegations and officers' ability to remove and expunge related complaint records.  The CBA provisions concern the officers' privacy interests.  These CBA provisions are not provisions governing the ability to punish for wrongdoing.

107.    Plaintiffs PBA, SBA, LBA, CEA and COBA have filed grievances in accordance with the provisions of their respective CBAs demanding arbitration in response to this anticipated one-sided nullification of their bargained-for contractual rights.

108.    Plaintiffs are pursuing their collective bargaining rights through the administrative process, and four Plaintiffs are waiting for arbitration dates to be scheduled.  CPLR § 7502(c) specifically authorizes the issuance of "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced . . . upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."

109.    The broad arbitration clauses in the CBAs cover everything that can be the subject of a grievance concerning "a claimed violation, misinterpretation or inequitable application of the provisions of this Agreement."  (*E.g.*, PBA CBA, Art. XXI, § 1 (grievance), § 8 (arbitration of grievance).)  As explained above, Plaintiffs contend that CBA provisions must be read to preserve confidentiality of certain records.  This requires the arbitrator to interpret key terms, the purpose and intent of the parties, and CBA practice and context.

110.    Injunctive relief is required to enjoin Defendants from engaging in a data dump while the parties arbitrate this issue pursuant to the terms of their CBAs, because Defendants have both publicly and privately indicated that they intend to begin releasing this personal data, or have failed to promise and guarantee that they will not release that data, including Unsubstantiated and Non-Final Allegations.  If this information is made available to the public online, it will be reviewed and analyzed, reported on, and widely disseminated by the media, ensuring that it will remain publicly available forever whether or not the City later decides to remove it or is required to remove it because of arbitration awards.

## SECOND CAUSE OF ACTION:

### 42 U.S.C. § 1983 - Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution

111.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

112.    The publication of Unsubstantiated and Non-Final Allegations will call into question the good name, reputation, honor, and integrity of the identified law enforcement officers, causing them lasting stigma.  A reasonable person could conclude that the allegations convey facts that are susceptible of a defamatory connotation.  The mere accusation of misconduct is enough to call an officer's good name and reputation into question.

113.    These allegations are based in whole or in part on false accusations.  The falsity of these underlying allegations is at issue in this case, even if they are published alongside a term that accurately describes the outcome of the related investigation.  The investigative terms, based on Defendants' definitions of the terms, do not inherently confirm or refute the truth of underlying allegation.  They simply state the outcome of the related investigation and do not cleanse falsity embedded in the allegations themselves.  These allegations may be completely false, and yet Defendants intend to include them without regard for their veracity.

114.    Officers will separately face deprivations of a liberty interest in the form of interference with future employment opportunities and other substantial burdens.  The publication of these allegations in massive online registries will result in future employers consulting and relying on those allegations when considering officers for potential employment. If published and promoted in this manner, allegations of officer misconduct will follow the identified officers, affecting their reputations for professionalism and integrity years later, even in cases where the agency did not substantiate the allegation or the officer was not disciplined.

The damage to these future job opportunities is concrete and real, and it impairs a liberty interest that requires due process prior to such deprivation.

115.    Defendants' disciplinary processes do not provide sufficient procedures to address these deprivations.  The issuance of Charges and Specifications, which NYPD plans to release and promote in a public registry, is not based on a process that provides due process rights to officers.  Similarly, officers do not have an opportunity to present or contest evidence in the CCRB investigative process.  The process for issuing an investigative disposition by CCRB does not include adequate procedural protections for officers to satisfy due process.

116.    Defendants will not provide pre-deprivation procedures that would give notice and an opportunity to be heard before allegations against them are published in the databases. There is not a mechanism for officers to avoid having their names or any allegations included in the databases.

117.    Any post-deprivation remedy would be insufficient to address the professional and reputational consequences of being included in the registries.

118.    Defendants made these decisions under color of state law and will deprive the rights of Plaintiffs' members while acting under color of state law.

119.    Therefore, the Court should enjoin the determinations of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations as well as any other disciplinary records that implicate the privacy and safety concerns of officers.  Injunctive relief is required to protect Plaintiffs' rights.

## THIRD CAUSE OF ACTION:

### N.Y. Const. s. 1 art. 6 - Violation of the Due Process Clause of the N.Y. State Constitution

120.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

121.     The publication of Unsubstantiated and Non-Final Allegations will call into question the good name, reputation, honor, and integrity of the identified law enforcement officers, causing them lasting stigma.  A reasonable person could conclude that the allegations convey facts that are susceptible of a defamatory connotation.  The mere accusation of misconduct is enough to call an officer's good name and reputation into question.

122.     These allegations are based in whole or in part on false accusations.  The falsity of these underlying allegations is at issue in this case, even if they are published alongside a term that accurately describes the outcome of the related investigation.  The investigative terms, based on Defendants' definitions of the terms, do not inherently confirm or refute the truth of underlying allegation.  They simply state the outcome of the related investigation and do not cleanse falsity embedded in the allegations themselves.  These allegations may be completely false, and yet Defendants intend to include them without regard for their veracity.

123.     Officers will separately face deprivations of a liberty interest in the form of interference with future employment opportunities and other substantial burdens.  The publication of these allegations in massive online registries will result in future employers consulting and relying on those allegations when considering officers for potential employment.  If published and promoted in this manner, allegations of officer misconduct will follow the identified officers, affecting their reputations for professionalism and integrity years later, even in cases where the agency did not substantiate the allegation or the officer was not disciplined.

40

The damage to these future job opportunities is concrete and real, and it impairs a liberty interest that requires due process prior to such deprivation.

124.    Defendants' disciplinary processes do not provide sufficient procedures to address these deprivations.  The issuance of Charges and Specifications, which NYPD plans to release and promote in a public registry, is not based on a process that provides due process rights to officers.  Similarly, officers do not have an opportunity to present or contest evidence in the CCRB investigative process.  The process for issuing an investigative disposition by CCRB does not include adequate procedural protections for officers to satisfy due process.

125.    Defendants will not provide pre-deprivation procedures that would give notice and an opportunity to be heard before allegations against them are published in the databases. There is not a mechanism for officers to avoid having their names or any allegations included in the databases.

126.    Any post-deprivation remedy would be insufficient to address the professional and reputational consequences of being included in the registries.

127.    Defendants made these decisions under color of state law and will deprive the rights of Plaintiffs' members while acting under color of state law.

128.    Therefore, the Court should enjoin the determinations of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations as well as any other disciplinary records that implicate the privacy and safety concerns of officers.  Injunctive relief is required to protect Plaintiffs' rights.

## FOURTH CAUSE OF ACTION:

### 42 U.S.C. § 1983 - Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

129.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

130.    Defendants treat officers differently than similarly situated public employees without a rational basis for doing so.  In a recent advisory opinion, the Committee on Open Government stated that, "[i]n light of the repeal of § 50-a, a request for disciplinary records relating to a police officer must be reviewed in the same manner as a request for disciplinary records of any other public employee."[14]  Defendants' plans ignore this simple command and subject law enforcement records to a lesser degree of protection.

131.    By releasing Unsubstantiated and Non-Final Allegations without considering, on an individual basis, whether such release would constitute an unwarranted invasion of privacy, Defendants offer fewer protections to law enforcement officers than other public employees. These distinctions are not rationally related to a legitimate government interest.

132.    Defendants also create distinctions among New York City law enforcement agencies that cannot be rationally explained by a legitimate government interest.  Police officers are inexplicably afforded fewer privacy protections than firefighters or corrections officers. Police officer records even appear to be treated differently depending on whether a complaint was investigated by the CCRB or one of the investigative arms of NYPD.  The City offers no justification (rational or otherwise) for closely shielding the disciplinary records of corrections officers but not police officers.

————————————

[14] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020), https://docs.dos.ny.gov/coog/ftext/f19775.html.

133.    Defendants made these decisions under color of state law and will deprive the rights of Plaintiffs' members while acting under color of state law.

134.    Therefore, the Court should enjoin the determinations of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations as well as any other disciplinary records that implicate the privacy and safety concerns of officers.  Injunctive relief is required to protect Plaintiffs' rights.

## FIFTH CAUSE OF ACTION:

## N.Y. Const. s. 1 art. 11 - Violation of the Equal Protection Clause of the N.Y. State Constitution

135.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

136.    Defendants treat officers differently than similarly situated public employees without a rational basis for doing so.  In a recent advisory opinion, the Committee on Open Government stated that, "[i]n light of the repeal of § 50-a, a request for disciplinary records relating to a police officer must be reviewed in the same manner as a request for disciplinary records of any other public employee."[15]  Defendants' plans ignore this simple command and subject law enforcement records to a lesser degree of protection.

137.    By releasing Unsubstantiated and Non-Final Allegations without considering, on an individual basis, whether such release would constitute an unwarranted invasion of privacy, Defendants offer fewer protections to law enforcement officers than other public employees. These distinctions are not rationally related to a legitimate government interest.

138.    Defendants also create distinctions among New York City law enforcement

_____

[15] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020), https://docs.dos.ny.gov/coog/ftext/f19775.html.

agencies that cannot be rationally explained by a legitimate government interest.  Police officers are inexplicably afforded fewer privacy protections than firefighters or corrections officers.  Police officer records even appear to be treated differently depending on whether a complaint was investigated by the CCRB or one of the investigative arms of NYPD.  The City offers no justification (rational or otherwise) for closely shielding the disciplinary records of corrections officers but not police officers.

139.    Defendants made these decisions under color of state law and will deprive the rights of Plaintiffs' members while acting under color of state law.

140.    Therefore, the Court should enjoin the determinations of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations as well as any other disciplinary records that implicate the privacy and safety concerns of officers.  Injunctive relief is required to protect Plaintiffs' rights.

## SIXTH CAUSE OF ACTION:

### Breach of Settlement Agreements

141.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

142.    Plaintiffs and Defendants negotiated and executed settlement agreements that incorporated a then-present confidentiality law.  There were no express confidentiality provisions in the settlement agreements because there was no need for them.  The agreements were executed against the backdrop of existing law, which expressly protected police personnel records from disclosure.  The parties to the contract reasonably expected that the confidentiality protections of § 50-a would be incorporated, and the officers relied on that mutual understanding in executing the agreements.

143.     Public release of these settlement agreements would violate those agreements.

144.     On information and belief, Defendants have not evaluated, and do not intend to evaluate, the individual police disciplinary records before they are released, and thus will release cases that have settled under these settlement agreements.

145.     Therefore, the Court should enjoin the determinations of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations as well as any other police disciplinary records that contain settlement agreements.  Injunctive relief is required to protect Plaintiffs' rights.

**SEVENTH CAUSE OF ACTION:**

**Violation of CPLR § 7803(3) – Error of Law and Arbitrary and Capricious Agency Action**

146.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated herein.

147.     Release of Unsubstantiated and Non-Final Allegations would constitute an error of law and would be arbitrary and capricious under CPLR § 7803(3).

148.     First, it is an error of law and arbitrary and capricious to conclude that the repeal of § 50-a justifies the wholesale and indiscriminate release of Unsubstantiated and Non-Final Allegations without individualized and particularized review for safety and privacy concerns. Defendants' planned releases would fail to protect (and in some cases even fail to consider) the privacy and safety rights that continue to be protected after the repeal of § 50-a.

149.     Second, it is an error of law and arbitrary and capricious for Defendants to break with longstanding practice in determining not to assert the privacy and safety exemptions as a basis for withholding Unsubstantiated and Non-Final Allegations.  Defendants themselves have asserted for decades that release of Unsubstantiated and Non-Final Allegations would be an

unwarranted invasion of privacy.  Defendants cannot cast aside privacy and safety issues in favor

of wholesale, indiscriminate releases without a sound basis in reason.  This failure disregards

legislative intent, Defendants' previous judgments on the same issue, statements by the

Committee on Open Government, and the expectation set by the courts of this State in

considering the privacy implications of releasing personnel records.

150.    These decisions cannot be justified by the repeal of § 50-a.  In repealing § 50-a,

the legislature merely removed one barrier to the release of disciplinary records.  Far from

mandating the release of records, the legislature highlighted continuing protections for certain

records provided by other laws.  The legislature did not intend for disciplinary records to be

released indiscriminately and on a wholesale basis in a public registry. Defendants' conclusion

that these records may now be released legally, and en masse, because of the repeal of § 50-a is

erroneous as a matter of law and arbitrary and capricious.

151.    Therefore, because Defendants' decisions were affected by an error of law and

were arbitrary and capricious under CPLR § 7803(3), the Court should annul the determinations

of Defendants and prohibit the release of Unsubstantiated and Non-Final Allegations.  Injunctive

relief is required to protect Plaintiffs' rights.

## EIGHTH CAUSE OF ACTION:

### Declaratory Judgment

152.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully stated

herein.

153.    An actual case or controversy exists between Plaintiffs and Defendants regarding

the claims raised above.

154.    Absent clarification from the Court, the dispute between Plaintiffs and Defendants

is capable of, and likely to be, recurring.

155.    Accordingly, Plaintiffs are entitled to a declaration that publication of Unsubstantiated and Non-Final Allegations (1) would violate the collective bargaining agreements between the City and Plaintiffs; (2) would violate the Due Process Clauses of the U.S. and N.Y. State Constitutions; (3) would violate the Equal Protection Clauses of the U.S. and N.Y. State Constitutions; (4) would constitute a breach of contract in violation of settlement agreements; and (5) would be an error of law and arbitrary and capricious.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order:

1. Permanently enjoining the publication of any records concerning Unsubstantiated and Non-Final Allegations or that regard settlement agreements entered into prior to June 12, 2020;

2. Declaring that publication of Unsubstantiated and Non-Final Allegations (1) would violate the collective bargaining agreements between the City and Plaintiffs; (2) would violate the Due Process Clauses of the U.S. and N.Y. State Constitutions; (3) would violate the Equal Protection Clauses of the U.S. and N.Y. State Constitutions; (4) would constitute a breach of contract in violation of settlement agreements; and (5) would be an error of law and arbitrary and capricious; and

3. Granting whatever other relief the Court deems necessary and just.

Dated: September 25, 2020
      New York, New York

**DLA PIPER LLP (US)**

By: */s/ Anthony P. Coles*
Anthony P. Coles
Michael R. Hepworth
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com
Email: michael.hepworth@dlapiper.com

Courtney G. Saleski
   (admitted *pro hac vice*)
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Telephone: (215) 656-2431
Facsimile: (215) 606-2046
Email: courtney.saleski@dlapiper.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Anthony P. Coles, hereby certify that, on this 25th day of September, 2020, the foregoing document was served via ECF on all counsel of record.


*/s/ Anthony P. Coles*
Anthony P. Coles

*Attorney for Plaintiffs*