UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Correction Officers' Benevolent Association of the City of New York; Police Benevolent Association of the City of New York, Inc.; Sergeants' Benevolent Association; Lieutenants' Benevolent Association; Captains' Endowment Association; and Detectives' Endowment Association, | |
| Plaintiffs, | No. 1:20-CV-05441 (KPF) (RWL) |
| -against- | |
| Bill de Blasio, in his official capacity as Mayor of the City of New York; the City of New York; Fire Department of the City of New York; Daniel A. Nigro, in his official capacity as the Commissioner of the Fire Department of the City of New York; New York City Department of Correction; Cynthia Brann, in her official capacity as the Commissioner of the New York City Department of Correction; Dermot F. Shea, in his official capacity as the Commissioner of the New York City Police Department; the New York City Police Department; Frederick Davie, in his official capacity as the Chair of the Civilian Complaint Review Board; and the Civilian Complaint Review Board, | |
| Defendants, | |
| Communities United for Police Reform, | |
| Intervenor-Defendant. | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 4

ARGUMENT ....................................................................................................................... 4

I.    THE UNIONS' CLAIM FOR PRELIMINARY INJUNCTIVE RELIEF IN AID OF
      ARBITRATION UNDER CPLR 7502(c) IS ON APPEAL AND CANNOT BE
      DISMISSED (FIRST CAUSE OF ACTION). ......................................................... 5

      A.  The motion to dismiss should be denied or deferred because the same issues raised by
          the motion are pending before the Second Circuit in the interlocutory appeals. ............. 6

      B.  The CPLR 7502(c) claim cannot be dismissed because the FAC pleads all facts
          necessary to obtain relief. ....................................................................................... 9

          1.  The Unions filed CBA grievance and arbitration demands on the interpretation and
              application of CBA §§ 7(c) and 8. ................................................................... 9

          2.  The Unions will suffer irreparable harm if arbitration of the CBA claims is not
              protected with an injunction. ......................................................................... 9

          3.  The Unions are likely to succeed in arbitration. ............................................. 10

          4.  The balance of equities favors relief to protect the Unions' CBA rights. ............... 15

II.   THE UNIONS' DUE PROCESS CLAIMS UNDER NEW YORK AND FEDERAL LAW
      CANNOT BE DISMISSED (SECOND AND THIRD CAUSES OF ACTION). ................ 16

      A.  The release of Unsubstantiated and Non-Final Allegations will stigmatize identified
          officers. ................................................................................................................ 17

      B.  The registries will deprive the identified officers of a liberty interest in future
          employment opportunities. ..................................................................................... 23

      C.  The City does not provide adequate pre-deprivation procedures for officers to avoid this
          constitutional deprivation........................................................................................ 26

      D.  The due process claims cannot be dismissed based on state law immunities applicable
          in defamation actions. ........................................................................................... 30

III.  THE UNIONS' EQUAL PROTECTION CLAIMS UNDER NEW YORK AND FEDERAL
      LAW CANNOT BE DISMISSED (FOURTH AND FIFTH CAUSES OF ACTION). ....... 33

IV.  THE UNIONS' CLAIM FOR ANTICIPATORY BREACH OF SETTLEMENT
     AGREEMENTS CANNOT BE DISMISSED (SIXTH CAUSE OF ACTION). ................ 36

     A.  The confidentiality protections of former § 50-a were incorporated into disciplinary
         settlement agreements. .................................................................................. 36

     B.  The Unions have associational standing to bring a contract claim on behalf of their
         members. ...................................................................................................... 38

     C.  The Unions are not required to exhaust contractual remedies. ..................................... 39

     D.  The unmistakability doctrine does not apply. ............................................................ 40

V.   THE UNIONS' CLAIM THAT THE CITY'S RELEASES ARE ARBITRARY AND
     CAPRICIOUS OR ERRONEOUS AS A MATTER OF LAW CANNOT BE DISMISSED
     (SEVENTH CAUSE OF ACTION). ................................................................... 40

     A.  It is an error of law and arbitrary and capricious to conclude that the repeal of § 50-a
         justifies the indiscriminate release of disciplinary records without individual
         consideration, including for exemptions in FOIL. ....................................................... 42

     B.  The City's break from its past practice of applying the FOIL exemptions to
         unsubstantiated allegations of misconduct is arbitrary and capricious. ......................... 44

CONCLUSION ............................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*,
  924 F.2d 1247 (2d Cir. 1991) ................................................................... 36

*Able v. United States*,
  155 F.3d 628 (2d Cir. 1998) ..................................................................... 33

*Alwan v. City of N.Y.*,
  311 F. Supp. 3d 570 (E.D.N.Y. 2018) .................................................. 16, 17

*Anonymous v. Comm'r of Health*,
  801 N.Y.S.2d 302 (N.Y. App. Div. 2005) .................................................. 41

*Assoc. Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*,
  159 F.3d 1178 (9th Cir. 1998) .................................................................. 39

*Baden v. Koch*,
  1984 WL 664 (S.D.N.Y. July 25, 1984) .................................................... 23

*Baker v. Cawley*,
  459 F. Supp. 1301 (S.D.N.Y. 1978) .......................................................... 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 4

*Bona v. Barasch*,
  2003 WL 21222531 (S.D.N.Y. May 27, 2003) .......................................... 36

*Brandt v. Bd. of Coop. Educ. Servs.*,
  820 F.2d 41 (2d Cir. 1987) ....................................................................... 17

*Buffalo Police Benevolent Ass'n, Inc. v. Brown*,
  2020 WL 6039110 (N.Y. Sup. Ct. Oct. 9, 2020) ...................................... 17

*Campbell v. N.Y. Evening Post*,
  157 N.E. 153 (N.Y. 1927) ........................................................................ 31

*Celle v. Filipino Reporter Enters.*,
  209 F.3d 163 (2d Cir. 2000) ..................................................................... 23

*Matter of Charles A. Field Delivery Serv., Inc.*,
  488 N.E.2d 1223 (N.Y. 1985) .................................................................. 44

*Ciechon v. City of Chicago*,
    686 F.2d 511 (7th Cir. 1982) ..................................................................33

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..............................................................................33

*City of Troy Unit of Rensselaer Cty. Chapter of Civil Serv. Emp. Ass'n v. City of Troy*,
    319 N.Y.S.2d 106 (N.Y. App. Div. 1971) ..............................................36

*D.S. v. Hogan*,
    874 N.Y.S.2d 711 (N.Y. Sup. Ct. 2008) ................................................41

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..........................................................................44

*DiBlasio v. Novello*,
    344 F.3d 292 (2d Cir. 2003)......................................................16, 26, 27

*DiLaura v. Power Auth.*,
    982 F.2d 73 (2d Cir. 1992).....................................................................20

*Doe v. Pataki*,
    481 F.3d 69 (2d Cir. 2007).....................................................................40

*Duck v. Jacobs*,
    739 F. Supp. 1545 (S.D. Ga. 1990)........................................................30

*Elias v. Rolling Stone LLC*,
    872 F.3d 97 (2d Cir. 2017).......................................................................5

*Engquist v. Oregon Department of Agriculture*
    553 U.S. 591 (2008)..............................................................................35

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)...................................................................13

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992)...................................................................14

*Geiger v. Town of Greece*,
    311 F. App'x 413 (2d Cir. 2009) ...........................................................31

*Greenberg v. Spitzer*,
    62 N.Y.S.3d 372 (N.Y. App. Div. 2017) ....................................17, 21, 22

*Griggs v. Provident Consumer Disc. Co.*,
    459 U.S. 56 (1982)..................................................................................6

*Gronowski v. Spencer*,
   424 F.3d 285 (2d Cir. 2005)......................................................................................29, 30

*In re Gruber*,
   674 N.E.2d 1354 (N.Y. 1996)...............................................................................................41

*Harry Schein v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019)...........................................................................................................12

*Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*,
   101 F.3d 877 (2d Cir. 1996)................................................................................................27

*Hogan v. Herald Co.*,
   84 A.D.2d 470 (N.Y. App. Div. 1982) ...............................................................................32

*Howlett v. Rose*,
   496 U.S. 356 (1990).............................................................................................................30

*Hughes Hubbard & Reed LLP v. CCRB*,
   53 Misc. 3d 947 (N.Y. Sup. Ct. 2016) ...............................................................................44

*Hunt v. Wash. Apple Advert. Comm'n*,
   432 U.S. 333 (1977).............................................................................................................39

*Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO v. Eastern Airlines, Inc.*,
   847 F.2d 1014 (2d Cir. 1988)................................................................................................8

*Karedes v. Ackerley Grp., Inc.*,
   423 F.3d 107 (2d Cir. 2005)...........................................................................................32, 33

*Keiler v. Harlequin Enters., Ltd.*,
   751 F.3d 64 (2d Cir. 2014)........................................................................................5, 18, 19

*Kelly Kare, Ltd. v. O'Rourke*,
   930 F.2d 170 (2d Cir. 1991)................................................................................................24

*Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*,
   706 F.3d 733 (6th Cir. 2013) ..............................................................................................37

*Knox v. N.Y.C. Dep't of Educ.*,
   924 N.Y.S.2d 389 (N.Y. App. Div. 2011) ..........................................................................24

*Kurcsics v. Merchants Mut. Ins. Co.*,
   403 N.E.2d 159 (N.Y. 1980)...............................................................................................41

*Larocca v. Board of Education*,
   220 A.D.2d 424 (N.Y. App. Div. 1995) .............................................................................14

*Lee TT. v. Dowling*,
    664 N.E.2d 1243 (N.Y. 1996)......................................................................24, 27, 29

*Liberty Synergistics Inc. v. Microflo Ltd.*,
    718 F.3d 138 (2d Cir. 2013)..........................................................................30

*Luongo v. Records Access Officer, CCRB*,
    150 A.D.3d 13 (N.Y. App. Div. 2017) ...........................................................45

*Martinez v. California*,
    444 U.S. 277, 284 (1980)..............................................................................30

*May v. Sheahan*,
    226 F.3d 879 (7th Cir. 2000) ..........................................................................6

*McMinn v. Town of Oyster Bay*,
    488 N.E.2d 1240 (N.Y. 1985)........................................................................17

*Miller v. DeBuono*,
    689 N.E.2d 518 (N.Y. 1997)....................................................................24, 25

*Monserrate v. N.Y. State Senate*,
    599 F.3d 148 (2d Cir. 2010)..........................................................................26

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)......................................................................6, 7

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................................23

*Nestle Waters N. Am., Inc. v. City of N.Y.*,
    121 A.D.3d 124 (N.Y. App. Div. 2014) .........................................................41

*New York v. U.S. Dep't of Homeland Sec.*,
    2020 WL 4347264 (S.D.N.Y. Jul. 29, 2020) ...................................................6

*O'Brien v. Leidinger*,
    452 F. Supp. 720 (E.D. Va. 1978) ............................................................33, 34

*Palmer v. City of Monticello*,
    31 F.3d 1499 (10th Cir. 1994) .......................................................................30

*Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
    2003 WL 23641529 (S.D.N.Y. June 4, 2003) ................................................10

*Partridge v. State*,
    100 N.Y.S.3d 730 (N.Y. App. Div. 2019) ................................................17, 21

*Paterno v. City of N.Y.*,
   2018 WL 3632526 (S.D.N.Y. July 31, 2018) ........................................................17

*Patterson v. City of Utica*,
   370 F.3d 322 (2d Cir. 2004).................................................................................20

*Paul v. Davis*,
   424 U.S. 693 (1976)...............................................................................................22

*Pell v. Bd. of Educ.*,
   313 N.E.2d 321 (N.Y. 1974)..................................................................................43

*People v. David W.*,
   733 N.E.2d 206 (N.Y. 2000)..................................................................................16

*Perreca v. Gluck*,
   295 F.3d 215 (2d Cir. 2002)..................................................................................13

*Pioneer Transp. Corp. v. Kaladjian*,
   481 N.Y.S.2d 136 (N.Y. App. Div. 1984) .............................................................37

*Ratner v. Fountains Clove Road Apartments, Inc.*,
   118 A.D.2d 843 (N.Y. App. Div. 1986) ................................................................20

*Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Servs.*,
   962 F. Supp. 385 (S.D.N.Y. 1997) ........................................................................10

*ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*,
   564 F.3d 81 (2d Cir. 2009)....................................................................................12

*Sadallah v. City of Utica*,
   383 F.3d 34 (2d Cir. 2004)....................................................................................23

*Sagendorf-Teal v. Cty. of Rensselaer*,
   100 F.3d 270 (2d Cir. 1996)..................................................................................29

*Sahu v. Union Carbide Corp.*,
   548 F.3d 59 (2d Cir. 2008).....................................................................................4

*Selective Beauty SAS v. Liz Claiborne, Inc.*,
   2010 WL 11685041 (S.D.N.Y. May 27, 2010) .......................................................4

*SG Cowen Sec. Corp. v. Messih*,
   224 F.3d 79 (2d Cir. 2000)...........................................................................5, 7, 11

*Siegert v. Gilley*,
   500 U.S. 226 (1991)...............................................................................................22

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)........................................................................................4

*Sisters of St. John the Baptist, Providence Rest Convent v. Phillips R. Geraghty Constructor, Inc.*,
   494 N.E.2d 102 (N.Y. 1986)....................................................................................11

*Sperry Int'l Trade, Inc. v. Gov't of Israel*,
   689 F.2d 301 (2d Cir. 1982)...................................................................................11

*Sprinzen v. Nomberg*,
   389 N.E.2d 456 (N.Y. 1979)...................................................................................12

*Thomas v. City of N.Y.*,
   2018 WL 5791965 (E.D.N.Y. Nov. 5, 2018).........................................................31

*Thomas v. N.Y.C. Dep't of Educ.*,
   962 N.Y.S.2d 29 (N.Y. App. Div. 2013)................................................................45

*Uniformed Fire Officers Ass'n v. de Blasio*,
   No. 20-2789 (2d Cir. Sept. 17, 2020) .....................................................................7

*United States v. Brooker*,
   976 F.3d 228 (2d Cir. 2020)...................................................................................31

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)................................................................................................20

*Valmonte v. Bane*,
   18 F.3d 992 (2d Cir. 1994)..............................................................24, 25, 28, 29

*Velez v. Levy*,
   401 F.3d 75 (2d Cir. 2005).............................................................................17, 20

*Warren v. City of Junction City*,
   207 F. Supp. 2d 1216 (D. Kan. 2002) ...................................................................23

*Wasserman v. Haller*,
   627 N.Y.S.2d 456 (N.Y. App. Div. 1995) .............................................................17

*Wiese v. Kelley*,
   2009 WL 2902513 (S.D.N.Y. Sept. 10, 2009)................................................21, 22

*WN Partner, LLC v. Baltimore Orioles Ltd. P'ship*,
   179 A.D.3d 14 (N.Y. App. Div. 2019) ...................................................................12

## Statutes & Rules

Fed. R. Civ. P. 62.1 ........................................................................................................8

Fed. R. Civ. P. 62(d) ..........................................................................................7, 8

CPLR 78...........................................................................................14, 27, 40, 41

CPLR 7501 .............................................................................................................11

CPLR 7502.............................................................................................................11

CPLR 7502(c) .................................................................................................. *passim*

CPLR 7803(3) .............................................................................................2, 41, 42

N.Y. Civil Rights Law § 50-a ........................................................................ *passim*

N.Y. Civil Rights Law § 74 ...........................................................30, 31, 32, 33

NYC CBL § 12-309(a)(3) ...................................................................................12

**Other Authorities**

38 RCNY 15-03, 15-04...............................................................................29

38-A RCNY 1-23 .........................................................................................28

@SJURadicals, INSTAGRAM, https://www.instagram.com/p/CE-RzrvJNep/ ..............................18

CCRB, FOIL Subject Matter List,
    https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/FOILSubject%20
    Matter%20List.pdf (last accessed Nov. 6, 2020) ....................................................46

Comm. on Open Gov't, Adv. Op. No. FOIL-AO-12005 (Mar. 21, 2000),
    https://docs.dos.ny.gov/coog/ftext/f12005.htm..........................................................45

Comm. on Open Gov't, Adv. Op. No. FOIL-AO-17195 (May 29, 2008),
    https://docs.dos.ny.gov/coog/ftext/f17195.html .........................................................46

Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020),
    https://docs.dos.ny.gov/coog/ftext/f19775.html ....................................................34, 45

*Expunge*, Black's Law Dictionary (11th ed. 2019)........................................................13

16 Fed. Prac. & Proc. Juris. § 3921.2 (3d ed.) ...........................................................7

FIRE (Foundation for Individual Rights in Education), *Teaching history not
    permitted: St. John's bulldozes academic freedom, punishes professor for
    posing question about 'Columbian Exchange'* (Oct. 8, 2020),
    https://bit.ly/31SBHuD ....................................................................................18

N.Y. Senate Bill S8496, https://www.nysenate.gov/legislation/bills/2019/s8496........................44

NYPD Patrol Guide § 206-13, *Interrogation of Members of the Service*,
  https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page ...................................28

Public Hearing: Policing (S3695), repeals provisions relating to personnel records
  of police officers, firefighters, and correctional officers (Oct. 24. 2019),
  https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-
  hearing-policing-s3695-repeals-provisions-relating ...............................................................47

*Remove*, Am. Heritage Dictionary,
  https://ahdictionary.com/word/search.html?q=remove (last visited Nov. 5,
  2020) .........................................................................................................................................13

*Remove*, Merriam-Webster, https://www.merriam-webster.com/dictionary/remove
  (last visited Nov. 5, 2020) .......................................................................................................13

Sponsor Memorandum for Assembly Bill A9332 ...........................................................................43

Sponsor Memorandum for Senate Bill S8496 ................................................................................43

11 Williston on Contracts § 30:19 (4th ed. 2020) ...................................................................36, 37

11 Williston on Contracts § 30:23 ..................................................................................................37

## INTRODUCTION

The First Amended Complaint ("FAC") asserts detailed factual and legal claims that, if proved on a full record based on full discovery, entitle Plaintiffs ("the Unions") to relief preventing Defendants (the "City") from creating novel public registries that brand police, firefighters, and corrections officers with accusations of misconduct that are unsubstantiated, unfounded, exonerated, non-final, or resulted in a finding of not guilty ("Unsubstantiated and Non-Final Allegations").  The City claims these registries are permitted by the repeal of § 50-a, but the FAC is based on other legal rights unaffected by the repeal of § 50-a.  The FAC explains facts and law showing how those other rights protect police, firefighters, and corrections officers from indiscriminate, unjustified public branding by the City.  None of the causes of action can be dismissed:

- *The first cause of action* is for a preliminary injunction under CPLR 7502(c) in aid of arbitrations demanded by the Unions.  The arbitrations are based on rights in collective bargaining agreements ("CBAs").  Without a preliminary injunction, the arbitrations will be rendered ineffectual when the City publishes its registries.  This claim cannot be dismissed because it is being considered by the Second Circuit in the appeals from this Court's preliminary injunction order.  Even if this Court could consider this claim, the FAC alleges facts about the negotiation and purpose of CBA provisions that prevent dismissal.

- *The second and third causes of action* allege in detail how the registries will violate officers' due process rights under the federal and state constitutions by tarnishing their professional reputations and creating material burdens to their future employment, all without providing any procedures at all that might allow the officers to avoid this

deprivation.  These claims cannot be dismissed because they allege facts showing how officers face "guilt by accusation" (FAC ¶ 64) when NYPD and CCRB publicize bare allegations that "are not the result of a process based on any articulated standard of proof and do not constitute a final determination that the allegation is true."  (*Id.* ¶ 3.)  As to NYPD, "Charges and Specifications are not the product of a due process hearing or anything remotely similar and would not protect due process rights if this information is made public."  (*Id.* ¶¶ 3, 44.)  As to CCRB, officers do not have an opportunity to present or contest evidence.  (*Id.* ¶¶ 4, 45.)

- *The fourth and fifth causes of action* allege violation of equal protection based on disparate treatment of similarly situated law enforcement officers without a rational basis. (*Id.* ¶ 68.)  These claims cannot be dismissed because they raise fact issues.  "The City offers no justification (rational or otherwise) for closely shielding the disciplinary records of corrections officers but not police officers."  (*Id.* ¶ 69.)

- *The sixth cause of action* alleges anticipatory breach of contract by the release of disciplinary settlement agreements that incorporated the confidentiality protections of § 50-a.  (*Id.* ¶ 73.)  This cause of action cannot be dismissed because well-accepted law holds that contracts incorporate as a matter of law "valid applicable law existing at the time" they were executed, and here the settlement agreements incorporated § 50-a because § 50-a was in effect at that time.  (*Id.* ¶ 74.)

- *The seventh cause of action* alleges that the City's decision to promote public registries branding individual officers was arbitrary and capricious under CPLR 7803(3).  This claim cannot be dismissed because it raises fact issues.  "Far from mandating the release of records, the legislature highlighted continuing protections for certain records provided

by other laws." (*Id.* ¶ 78.)  "[A]gencies have a continuing responsibility, even absent §

50-a, to conduct careful, record-by-record review to ensure proper application of these

additional safeguards and protections in the law."  (*Id.* ¶ 81.)

- *The eighth cause of action* is for declaratory relief.  It cannot be dismissed because each
  of the other causes of action state a claim that cannot be dismissed.

The FAC specifically alleges how the City's registries will permanently brand the

identified officers with Unsubstantiated and Non-Final Allegations of misconduct and jeopardize

their privacy and safety.  The FAC's serious allegations are not speculation and cannot be

summarily disregarded.  Recent CCRB releases, representing a fraction of what the City plans to

release, have already caused concrete "guilt by accusation" harm that has been publicly reported,

as the FAC explains:

- A student group at St. John's University posted a handful of unsubstantiated allegations
  against a former NYPD officer to its Instagram page.  (*Id.* ¶ 63.)  The group publicly
  called for the former officer's dismissal from the university, where he teaches history.
  (*Id.*)  The group cited the allegations—none of which were substantiated—as evidence of
  dangerous and predatory behavior.  (*Id.*)

- A newspaper "published a cartoon of 'NYPD's 10 Most unWanted' officers, depicting
  and identifying ten police officers and purporting to list the number of allegations lodged
  against each officer, with citation to CCRB data."  (*Id.* ¶ 64.)  "But the underlying data
  reveals that very few of the allegations listed for each officer were substantiated."  (*Id.*)

- On August 19, 2020, an officer was harassed at his post and called an abuser by
  protestors.  (*Id.* ¶ 95.)  One protestor, noting the officer's last name from his nameplate,
  read out loud the details of CCRB complaints lodged against a different officer with the

same last name, apparently believing them to have been made against the officer standing

post.  (*Id.*)

The Unions are entitled to a fair opportunity to prove how this and other harm threatens

officers' safety and privacy, and why the law protects them from that harm.  No one is fairly

served by quick dismissal that ignores the facts asserted in the FAC.

## FACTUAL BACKGROUND

The facts relevant to this motion are alleged in the FAC.  (ECF No. 226.)  The City's

statement of facts improperly refers the Court to its memorandum of law, declarations, and

exhibits filed in opposition to the Unions' motion for a preliminary injunction.  (City Br. at 3.)

These documents are outside the four corners of the complaint and should not be considered for

purposes of deciding the motions to dismiss.[1]

## ARGUMENT

A court must deny a motion to dismiss for failure to state a claim where a plaintiff pleads

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  "[A] complaint does not need to contain detailed or elaborate factual

---

[1] Some allegations in the FAC are based on facts developed in expedited discovery.  The declarations and transcripts relevant to these allegations were filed at the preliminary injunction stage.  The FAC occasionally refers to and quotes limited parts of these documents "for the purpose of indicating that evidence exist[s] to support the complaint's assertions" and "to establish that the complaint's factual assertions are plausible."  *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67-68 (2d Cir. 2008) (quotation omitted).  While the FAC includes citations to those documents for convenience and ease of reference, the underlying documents are not incorporated into the complaint.  *Sira v. Morton*, 380 F.3d 57, 67-68 (2d Cir. 2004) ("Limited quotation or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); *Selective Beauty SAS v. Liz Claiborne, Inc.*, 2010 WL 11685041, at *3 (S.D.N.Y. May 27, 2010) (declining to consider, on motion to dismiss, a document submitted by the defendant on a motion to dismiss that had been quoted by the plaintiff in the complaint).

allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)).

## I.      THE UNIONS' CLAIM FOR PRELIMINARY INJUNCTIVE RELIEF IN AID OF ARBITRATION UNDER CPLR 7502(c) IS ON APPEAL AND CANNOT BE DISMISSED (FIRST CAUSE OF ACTION).

The Unions' first cause of action is for preliminary injunctive relief under CPLR 7502(c) to protect the right to arbitrate the interpretation and application of what are referred to as "Section 7(c)" and "Section 8" of their respective collective bargaining agreements ("CBAs"). (FAC ¶¶ 46-55, 100-110.)  CPLR 7502(c) authorizes preliminary injunctive relief to prevent an arbitration from being "rendered ineffectual."  Relief is proper under CPLR 7502(c) when a movant demonstrates irreparable harm, likelihood of success on the merits, and a balance of the equities in favor of the party seeking relief.  *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 81-84 (2d Cir. 2000).

Four plaintiff unions have filed grievances and arbitration demands asserting that their CBAs give their members rights to limit publication of Unsubstantiated and Non-Final Allegations covered by CBA §§ 7(c) and 8.  If the City publicly discloses that information before the arbitrations decide those CBA rights, the arbitrations will be ineffectual because the information the Unions seek to protect will already be public.  Therefore, the Unions have asserted a CPLR 7502(c) claim for preliminary injunctive relief preventing public disclosure of information covered by CBA §§ 7(c) and 8 pending determination in arbitration of the Unions'

rights under CBA §§ 7(c) and 8.  As explained below, the CPLR 7502(c) claim should not be dismissed.

A.     **The motion to dismiss should be denied or deferred because the same issues raised by the motion are pending before the Second Circuit in the interlocutory appeals.**

The question of whether the Unions have a viable claim for a preliminary injunction under CPLR 7502(c) is currently pending in the Second Circuit in two interlocutory appeals of this Court's order granting in part and denying in part the Unions' motion for a preliminary injunction (the "Preliminary Injunction Order").[2]  This Court should deny or defer the motion to dismiss the Unions' CPLR 7502(c) claim because the issues in the pending appeals are the same as the issues raised in the motions to dismiss.

When an interlocutory appeal is taken from an order on a preliminary injunction, the appeal "divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989) (same).  "[T]he district court retains jurisdiction to act only if the order being appealed or the proceeding before the district court is a discrete matter ancillary to the issues under consideration in the other court."  *May v. Sheahan*, 226 F.3d 879, 878 (7th Cir. 2000).  The divestiture of jurisdiction is "'not a per se rule,'" but is "judicially crafted" and "'rooted in the interest of judicial economy.'"  *New York v. U.S. Dep't of Homeland Sec.*, 2020 WL 4347264, *8 (S.D.N.Y. Jul. 29, 2020) (quoting *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996)).  The rule recognizes that "it is a waste of judicial

---

[2] On August 24, 2020, the Unions appealed from the denial of the preliminary injunction (2d Cir. No. 20-2789).  On September 21, 2020, CPR appealed the portion of this Court's order that granted preliminary injunctive relief (2d Cir. No. 20-3177).  The City did not appeal.

resources for two courts to be considering the same issues in the same case at the same time." *Terry*, 886 F.2d at 1349-50.  Although the district court retains jurisdiction on issues that are not on appeal, "it would be advisable for the district court to determine whether the same issue has been presented on appeal, and to defer action when it seems reasonably probable that appellate decision of the same question is imminent."  16 Fed. Prac. & Proc. Juris. § 3921.2 (3d ed.).  The district court should also "consider the possibility that the issues framed on appeal may change the context of the matters presented for district-court action."  *Id.*

A CPLR 7502(c) claim is statutorily limited to "provisional remedies," which include "a preliminary injunction in connection with an arbitration."  CPLR 7502(c).  The statute does not provide for permanent relief.  This Court previously decided the Unions' motion for a preliminary injunction in aid of arbitration by applying the required factors for a preliminary injunction under this statute, which include (1) the risk of irreparable harm, (2) likelihood of success on the merits in the arbitrations, and (3) the balance of the equities.  *See SG Cowen*, 224 F.3d at 81-84.  In the pending appeals of the Preliminary Injunction Order, the Second Circuit will address those same issues.  As there is no need to test the Unions' entitlement to eventual permanent relief, there is nothing left for this Court to consider on a motion to dismiss that is not on appeal.  Any further consideration of the merits of this claim would amount to reconsideration of the order on appeal.

Deciding a motion to dismiss on this claim also would improperly change the status quo and conflict with the Second Circuit's order staying the Preliminary Injunction Order pending appeal.  Order, *Uniformed Fire Officers Ass'n v. de Blasio*, No. 20-2789 (2d Cir. Sept. 17, 2020) (Doc. 171).  Dismissing the CPLR 7502(c) claim would change the status quo by eliminating the basis for any preliminary injunction under CPLR 7502(c).  Although Fed. R. Civ. P. 62(d)

provides that "[w]hile an appeal is pending from an interlocutory order" a district court may

"suspend, modify, restore, or grant an injunction," the rule is limited to preserving the status quo:

> This rule [Fed. R. Civ. P. 62(d), formerly 62(c)] has been narrowly
> interpreted to allow district courts to grant only such relief as may
> be necessary to preserve the status quo pending an appeal where
> the consent of the court of appeals has not been obtained.

*Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO v. Eastern Airlines, Inc.*, 847 F.2d

1014, 1018 (2d Cir. 1988).  There are no new developments in this case that justify acting on the

motion to dismiss the CPLR 7502(c) claim, particularly because the Unions have not made any

new motion for preliminary injunctive relief.  Moreover, when a district court lacks authority to

decide a motion on issues that are part of a pending appeal, Rule 62.1 provides that the district

court may "defer considering the motion," "deny the motion," or indicate what it would rule.

Rule 62.1 applies generally and "does not attempt to define the circumstances in which an appeal

limits or defeats the district court's authority to act in the face of a pending appeal."  Adv.

Comm. Note, Fed. R. Civ. P. 62.1 (2009, when the Rule was adopted).  Therefore, this Court

should deny the motion to dismiss the CPLR 7502(c) claim.[3]

---

[3] CPR is wrong in suggesting there are additional declaratory judgment issues separate from the
issues to be decided in granting a CPLR 7502(c) preliminary injunction.  (CPR Br. at 19.)  The
only declaration sought by the Unions is what must be part of a CPLR 7502(c) preliminary
injunction: that a preliminary injunction is warranted because there is (1) risk of irreparable
harm, (2) sufficient likelihood of success on the merits in the arbitrations, and (3) a balance of
the equities in favor of the Unions.  There is no separate request for a declaration on CBA §§
7(c) and 8.  The Unions have always asserted that the CBAs require an arbitrator, not this Court,
to decide the CBA claims.  (*E.g.*, FAC ¶¶ 101, 107-108.)

**B.    The CPLR 7502(c) claim cannot be dismissed because the FAC pleads all facts necessary to obtain relief.**

If the Court nonetheless addresses the arguments for dismissal of this claim, dismissal should be denied.  The FAC plausibly alleges facts showing (1) irreparable harm, (2) sufficient likelihood of success in the arbitrations, and (3) a balance of the equities in favor of the Unions.

**1.    The Unions filed CBA grievance and arbitration demands on the interpretation and application of CBA §§ 7(c) and 8.**

Four police unions have started the grievance and arbitration process to challenge the City's planned disclosure of records because it will violate §§ 7(c) and 8 of their CBAs.

Section 7(c) is in the Police, Sergeants', Lieutenants', Captains', and Corrections' CBAs in substantively the same form.  (FAC ¶¶ 46-48.)  Section 7(c) says the NYPD "will, upon written request to the Chief of Personnel remove from the Personal Folder investigative reports which, upon completion of the investigation, are classified 'exonerated' and/or 'unfounded.'" (*Id.* ¶ 47.)  The Unions have demanded arbitration on whether § 7(c) bars the City from "publishing information regarding unfounded, exonerated, unsubstantiated, unadjudicated and non-final allegations of misconduct against police officers."  (*Id.* ¶ 55.)

Section 8 of the CBAs allows employees to seek expungement of records of disciplinary cases where "disposition of the charge at trial or on review or appeal therefrom is other than 'guilty.'"  (*Id.* ¶ 49.)  The Unions have filed grievances and demanded arbitration on whether the City's plans to disclose Unsubstantiated and Non-Final Allegations violates § 8 because disclosure would render § 8's rights meaningless. (*Id.* ¶¶ 55, 107-108.)

**2.    The Unions will suffer irreparable harm if arbitration of the CBA claims is not protected with an injunction.**

The FAC explains how the Unions will be irreparably harmed by loss of their right to meaningful arbitration when the City publishes disciplinary records subject to CBA §§ 7(c) and

8.  (FAC ¶¶ 100-110.)  If the City can release records before completion of arbitration, the arbitration will be meaningless because the records will already be public.  "The deprivation of [a party's] contractual right to arbitrate its claims, a right protected by international, federal, and state law, constitutes irreparable harm."  *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 2003 WL 23641529, at *12 (S.D.N.Y. June 4, 2003), *amended in part*, 2003 WL 21697884 (S.D.N.Y. July 21, 2003); *see also, e.g.*, *Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Servs.*, 962 F. Supp. 385, 391 (S.D.N.Y. 1997) (plaintiff "will suffer irreparable harm if it is deprived of its federal and state contractual right to arbitrate its disputes").  The Unions also will suffer all the irreparable harm from public disclosure discussed in connection with the Unions' other causes of action.  (*E.g.*, FAC ¶¶ 104, 112-114, 121-123.)

### 3.      The Unions are likely to succeed in arbitration.

The allegations in the Complaint show sufficient likelihood of success in the arbitrations:

*First*, the FAC alleges the purpose, intent, and meaning of CBA §§ 7(c) and 8 that show entitlement to an arbitration award in the Unions' favor.  (FAC ¶¶ 46-55.)  These include, for example:

> The purpose, intent, and meaning of section 7(c) of the SBA CBA, and of the substantively identical provisions in the CBAs of the other police Plaintiffs, is that removal of the investigative reports from the Personal Folder will eliminate those records and make them unavailable for any purpose. The purpose, intent, and meaning of "remove" cannot mean merely to move records from one place to another, or mean that when records are moved to another place those records can be made publicly available and used for any purpose. The purpose, intent, and meaning of section 7(c) would be violated and its terms rendered meaningless if the covered records could be made publicly available.

(*Id.* ¶ 48.)  Similar allegations about the purpose, intent, and meaning are made about CBA § 8 and similar sections in the other CBAs.  (*Id.* ¶¶ 50-52.)  The Complaint also alleges these rights were negotiated:

> The rights contained in Plaintiffs' CBAs were negotiated by
> Plaintiffs' respective Unions specifically because of the significant
> harm and embarrassment having inaccurate complaints and
> allegations on Plaintiffs' records could cause Plaintiffs, where
> personnel records are used for future promotions and job transfers.

(*Id.* ¶ 54.)

*Second*, the court must consider that an arbitrator can act in equity and award relief a

court would not, and therefore under CPLR 7502 the likelihood-of-success factor has "greatly

reduced influence." *SG Cowen*, 224 F.3d at 84.

In general, "[i]n determining any matter arising under this article [titled 'Arbitration'], the

court shall not consider whether the claim with respect to which arbitration is sought is tenable,

or otherwise pass upon the merits of the dispute." CPLR 7501.  Normally, "[i]n disputes subject

to arbitration, interpretation of particular contract terms must be left for the arbitrators." *Sisters*

*of St. John the Baptist, Providence Rest Convent v. Phillips R. Geraghty Constructor, Inc.*, 494

N.E.2d 102, 103 (N.Y. 1986).  This is modified to some extent when a court decides whether to

issue a preliminary injunction because one factor that is considered is the likelihood of success in

arbitration.  However, likelihood of success in arbitration is a special situation because of the

role in arbitration of equitable analysis, procedure, and relief.  *SG Cowen*, 224 F.3d at 84.  In

considering injunctive relief under CPLR 7502 and the likelihood of success in arbitration, the

Second Circuit has held that "this element of the analysis will naturally have *greatly reduced*

*influence*." *Id.* (emphasis added).

"Under New York law arbitrators have power to fashion relief that a court might not

properly grant." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 689 F.2d 301, 306 (2d Cir. 1982).

"[T]he arbitrator is not bound to abide by, absent a contrary provision in the arbitration

agreement, those principles of substantive law or rules of procedure which govern the traditional

11

litigation process." *Sprinzen v. Nomberg*, 389 N.E.2d 456, 458 (N.Y. 1979). "An arbitrator's paramount responsibility is to reach an equitable result, and the courts will not assume the role of overseers to mold the award to conform to their sense of justice." *Id.* "Thus, an arbitrator's award will not be vacated for errors of law and fact committed by the arbitrator[.]" *Id.*; *see also, e.g.*, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (arbitration award will be upheld if there is a "barely colorable" justification for it) (internal quotation marks and citation omitted). As the U.S. Supreme Court has insisted, "[w]hen the parties' contract assigns a matter to arbitration, a court may not resolve the merits of the dispute even if the court thinks that a party's claim on the merits is frivolous." *Harry Schein v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (applying Federal Arbitration Act) (citation omitted).

*Third*, dismissing the Unions' claim for injunctive relief in aid of arbitration in effect decides arbitrability, contrary to law barring courts from deciding arbitrability. Arbitrability of the CBA claims is not for the Court to decide, but for the arbitrator or the New York Board of Collective Bargaining. Under NYC CBL § 12-309(a)(3), the Board of Collective Bargaining is empowered "to make a final determination as to whether a dispute is a proper subject for grievance and arbitration." New York law does not delegate to courts the power to make initial determinations of arbitrability. The Supreme Court has insisted that when arbitrability questions are delegated rather than left to the court to decide, a court may not "override the contract, even if the court thinks that the arbitrability claim is *wholly groundless*." *Harry Schein*, 139 S. Ct. at 529-30 (emphasis added); *see also, e.g.*, *WN Partner, LLC v. Baltimore Orioles Ltd. P'ship*, 179 A.D.3d 14, 16-17 (N.Y. App. Div. 2019) (citing *Henry Schein*). Dismissing the CPLR 7502(c)

claim would in effect deny them the right to have the arbitrator or Collective Bargaining Board decide arbitrability.

*Fourth*, the CPLR 7502(c) claim should not be dismissed because there are factual disputes about the meanings of CBA terms. "[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178, 190 (2d Cir. 2004); *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (where the contract is subject to varying reasonable interpretations, intent is an issue of fact and summary judgment is inappropriate).

Contrary to what the City and CPR assert (City Br. at 30-33; CPR Br. at 20-22), the key terms are ambiguous and contested, including the meanings of "remove," "expunge," "investigative report," and "Personal Folder." The ordinary meaning of "remove" (used in § 7(c)) is not limited to "move to a different place," such that what is removed from the Personal Folder under § 7(c) can at the same time be broadcast in a public registry. The ordinary meanings of "remove" include "to get rid of" and "eliminate" entirely, and therefore the ordinary meaning of "remove" supports the Unions' position that records covered by § 7(c) are eliminated completely, not broadcast publicly.[4] One meaning of "expunge" is "to remove." Black's Law Dictionary (11th ed. 2019). A right to "remove" records that still allows those records to be broadcast in a public registry has no purpose or point. "Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)

---

[4] *See* definitions of "remove" at https://www.merriam-webster.com/dictionary/remove, and https://ahdictionary.com/word/search.html?q=remove.

(internal quotation marks and citation omitted).  The term "Personal Folder" in § 7(c) is not

defined in the CBA and should not be interpreted to make § 7(c) meaningless by allowing full

public disclosure of what is "removed."  The term "investigative reports" in § 7(c) is also

undefined and ambiguous, and the ordinary meanings of these words are broad.  Information in

investigative reports may be part of NYPD Charges and Specifications whose disclosure should

be protected.  In § 8, the key terms "record" and "expunge" are also undefined and cannot be

decided on a motion to dismiss.  The meaning is for an arbitrator or the Collective Bargaining

Board to decide, not the Court in a decision that dismisses the claim before trial and before a

complete record after full discovery.

  *Fifth*, CPR is wrong when it asserts that the CPLR 7502(c) claim should be dismissed

because "a government agency cannot contract around what FOIL requires."  (CPR Br. at 20.)

The City has discretion to withhold documents under FOIL, and privacy and safety continue to

be protected under FOIL after repeal of § 50-a.  (*See infra* at 40-41 (discussing the Unions'

Article 78 claims).  The case cited by CPR, *Larocca v. Board of Education*, 220 A.D.2d 424

(N.Y. App. Div. 1995), concluded that an agency should not disclose records of disciplinary

"charges which were denied and/or not admitted" by the accused because release of such

allegations "would constitute an unwarranted invasion of privacy."  *Id.* at 427.  In the CBAs, the

City and the Unions are not "contracting around" FOIL: they are recognizing important privacy

and safety concerns that are not automatically barred by FOIL, and that, at a minimum, must be

balanced against whatever public disclosure FOIL may (subject to the City's discretion) allow.

The CBA concerns for privacy and safety are not mere agreements about confidentiality that

might conflict with FOIL.  The FAC specifically alleges privacy and safety concerns were

behind the negotiation of the CBA provisions:

> *The rights at issue in Plaintiffs' CBAs were negotiated by Plaintiffs specifically because of* the significant harm and embarrassment having inaccurate complaints and allegations on Plaintiffs' records could cause Plaintiffs, where personnel records are used for future promotions and job transfers, and where such protections have been long recognized as important to *officer safety*.
>
> ...
>
> *The CBA rights at issue are based on privacy interests and are proper subjects of collective bargaining*. They are not themselves "police discipline" that is outside collective bargaining rights. The CBA provisions at issue relate to the treatment of complaint allegations and officers' ability to remove and expunge related complaint records. The CBA provisions concern the officers' privacy interests. These CBA provisions are not provisions governing the ability to punish for wrongdoing.

(FAC ¶¶ 104, 106 (emphasis added).)  Therefore, the CBA based claims cannot be dismissed merely because the City and the Unions agreed in their CBAs on lawful concerns not in conflict with FOIL.

### 4.     The balance of equities favors relief to protect the Unions' CBA rights.

The risk of irreparable harm to the Unions stems not only from the loss of rights to meaningful arbitration, but also the irreparable harm to privacy and employment that is discussed in the Unions' other causes of action.  (*E.g.*, FAC ¶¶ 104, 112-114, 121-123.)  In contrast, other parties will experience only a delay until the arbitration determines if publication is lawful. Public policy strongly favors arbitration rights.  The public interest is not served by rushing to what is in effect a final determination on the merits before a full hearing on the merits in the arbitration.  Therefore, the motion to dismiss the CPLR 7502(c) claim should be denied.

## II.   THE UNIONS' DUE PROCESS CLAIMS UNDER NEW YORK AND FEDERAL LAW CANNOT BE DISMISSED (SECOND AND THIRD CAUSES OF ACTION).

The FAC plausibly alleges that the City's releases of Unsubstantiated and Non-Final Allegations, including in public online registries, will deprive the identified officers of a liberty interest without due process of law.  (FAC ¶¶ 111-28.)  This release of false and defamatory accusations will (1) stigmatize the subject officers and, separately, (2) materially burden their future employment opportunities.  The City does not provide any procedure by which an officer accused of misconduct could avoid this reputational harm or the damage to future employment opportunities associated with being included in registries of misconduct.  This arrangement is unconstitutional under both the U.S. and New York Constitutions, which prohibit "injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process."  *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003); *see also People v. David W.*, 733 N.E.2d 206, 213 (N.Y. 2000) (concluding that state procedures for registry "failed to comport with minimum *State and Federal* constitutional requirements of due process" (emphasis added)).[5]

_____

[5] The City is incorrect that the state constitutional claims are barred because there is no right of action under a state constitution when the "alternative remedy" of a § 1983 claim is available. (City Br. at 19-20.)  As one court recently recognized in a case against the City, "§ 1983 cannot be used to vindicate the rights guaranteed to New Yorkers by their state constitution," and it is far from settled that "a plaintiff may not assert a claim under the New York State Constitution based on the same factual allegations that support a parallel § 1983 claim."  *Alwan v. City of N.Y.*, 311 F. Supp. 3d 570, 587 n.6 (E.D.N.Y. 2018) (citing cases).  Also, the Unions' decision to "assert their due process and equal protection claims under both" constitutions cannot be dispositive of whether a state claim is available, as the City suggests.  (City Br. at 19.)  Both federal and state courts in New York enforce the state due process and equal protection provisions, and the viability of the state claim is not affected by the presence or absence of a federal claim.  *See, e.g.*, *Alwan*, 311 F. Supp. 3d at 587; *McMinn v. Town of Oyster Bay*, 488 N.E.2d 1240, 1244 (N.Y. 1985) (finding zoning ordinance that restricted single-family housing to persons related by blood, marriage, or adoption violated due process and equal protection clauses of the state constitution).  Indeed, in a recent challenge to the City of Buffalo's plans to

**A.    The release of Unsubstantiated and Non-Final Allegations will stigmatize identified officers.**

The "stigma" prong requires "the utterance of a statement about [the plaintiff] that is injurious to ... reputation, that is capable of being proved false, and that [the plaintiff] claims is false." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks omitted). Courts look to state defamation law in analyzing the derogatory nature and falsity of a statement. *See Paterno v. City of N.Y.*, 2018 WL 3632526, at *4 (S.D.N.Y. July 31, 2018). Under New York law, a statement is actionable when "a reasonable listener could have concluded that the statement was conveying a fact about [the plaintiff] that was susceptible of a defamatory connotation." *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 389 (N.Y. App. Div. 2017). A statement is sufficiently derogatory when it would "affect a person in his or her profession by imputing to him or her any kind of fraud, dishonesty, misconduct, or unfitness in conducting one's profession." *Wasserman v. Haller*, 627 N.Y.S.2d 456, 457 (N.Y. App. Div. 1995). As to falsity, a plaintiff need not prove that the statement is false. *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987). A statement that is not literally false but "premised on 'false suggestions, impressions and implications arising from otherwise truthful statements'" may constitute "defamation by implication." *Partridge v. State*, 100 N.Y.S.3d 730, 734 (N.Y. App. Div. 2019) (quoting *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995)).

The Unions adequately allege that "publication of Unsubstantiated and Non-Final Allegations will call into question the good name, reputation, honor, and integrity of the

---

release law enforcement disciplinary records, the court denied the city's motion to dismiss the plaintiffs' claims under the due process and equal protection clauses of the New York State Constitution. *Buffalo Police Benevolent Ass'n, Inc. v. Brown*, 2020 WL 6039110, at *3 (N.Y. Sup. Ct. Oct. 9, 2020).

identified law enforcement officers, causing them lasting stigma." (FAC ¶ 112.) The FAC demonstrates how the mere accusation of misconduct is enough to call an officer's good name and reputation into question. (*Id.* ¶ 59.) Specifically, it describes the recent experience of Richard Taylor, a retired veteran NYPD officer turned academic who has faced harassment in his new career based on unsubstantiated allegations of misconduct that are now more than a decade old. (*Id.* ¶ 63.) A student group at St. John's University, which was already targeting Taylor for termination from his academic post, used a screenshot from the NYCLU database of CCRB allegations in its campaign against Taylor. The group claimed this handful of stale, unproven allegations—*none of which were substantiated*—evidenced Taylor's "extensive history of dangerous predatory behavior."[6] This characterization belies the City's argument that Unsubstantiated and Non-Final Allegations "cannot possibly" cause officers reputational harm. (City Br. at 6.) It did not matter that the allegations were "unfounded," meaning an investigation determined the misconduct *did not occur*. (FAC ¶ 37.)

---

[6] *See* @SJURadicals, INSTAGRAM, https://www.instagram.com/p/CE-RzrvJNep/ (cited at FAC ¶ 63).

       The City and CPR downplay the relevance of Taylor's experience by calling out other aspects of the student group's campaign of harassment. Taylor was initially targeted for a classroom discussion about global trade that a student found offensive. *See* FIRE (Foundation for Individual Rights in Education), *Teaching history not permitted: St. John's bulldozes academic freedom, punishes professor for posing question about 'Columbian Exchange'* (Oct. 8, 2020), https://bit.ly/31SBHuD. The group then posted Taylor's CCRB record with a new call to action: "Richard Taylor has an extensive history of dangerous predatory behavior. Taylor must be terminated and held accountable immediately." See Instagram, *supra*. The Unions include this story as an example of the stigmatizing effect of publishing Unsubstantiated and Non-Final Allegations in registries, thus "rais[ing] an entitlement to relief above the speculative level." *Keiler*, 751 F.3d at 70. It is not included to show that Taylor has a due process claim against the City or that he was disciplined by the University because of his CCRB record, as CPR posits.

The FAC provides a second example from recent press coverage demonstrating the defamatory connotations of Unsubstantiated and Non-Final Allegations.  Following CCRB's releases of disciplinary records in June and July, the Guardian published a cartoon of "NYPD's 10 Most Unwanted" officers, depicting and identifying ten police officers and purporting to list the number of allegations lodged against each officer, with citation to CCRB data.  (*Id.* ¶ 64.)  But the underlying data reveals that the vast majority of the allegations were unfounded or unsubstantiated.  (*Id.*)  The reputations of these officers were tarnished without any regard for the veracity of the underlying allegations.  CCRB has done nothing to quell the misleading and defamatory impressions these releases will cause.  The damage to reputation of guilt by accusation—particularly where the agencies intend such damage and including those the agency investigated and found to be without merit—is done.  These concrete examples, while anecdotal, demonstrate that the Unions are not merely speculating that officers will be targeted—and have their reputations unfairly tarnished—when thousands more Unsubstantiated and Non-Final Allegations are published in public registries.  (*Id.* ¶¶ 63-64; *see Keiler*, 751 F.3d at 70 (requiring pleading of facts sufficient to "raise an entitlement to relief above the speculative level").)

The FAC sufficiently alleges the falsity of Unsubstantiated and Non-Final Allegations.  As defined by the City, the categories of allegations at issue are based in whole or in part on false statements.  (FAC ¶ 58.)  CCRB intends to publicize allegations they investigated and determined to be false (such as those designated as exonerated and unfounded) as well as allegations that fell short of the preponderance-of-the-evidence standard (such as those designated as unsubstantiated).  (*Id.*)  These allegations may be completely false, yet the City intends to include them without regard for their veracity.  The Unions have met their minimal burden at this stage of raising falsity as an issue as to statements that are capable of being proven

false.  *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (stating that, at the pleading stage, plaintiff must "raise the falsity of these stigmatizing statements as an issue, not prove they are false"); *see also Velez*, 401 F.3d at 88 (concluding that plaintiff adequately raised falsity at pleading stage based on defendant's "false charges of harassment and terrorism").

The Unions' factual allegations belie the City's argument that labeling a false allegation with words like "exonerated" or "unfounded" either diminishes any defamatory connotation or affects the falsity inquiry.[7]  The City trains its attention on these dispositional terms, explaining that they cannot be false because they accurately describe the outcomes of investigations.[8]  (City Br. at 6-7.)  That is beside the point.  These terms "simply state the outcome of the related investigation and do not cleanse falsity embedded in the allegations themselves."  (FAC ¶ 58.) "The investigative terms, based on Defendants' definitions of the terms, do not inherently confirm or refute the truth of underlying allegation."  (*Id.*)  Take, for example, a registry entry that says Officer Smith had an unsubstantiated rape complaint in 2020.  Unsubstantiated,

---

[7] The City only argues that "unfounded" and "exonerated" allegations cannot possibly be stigmatizing.  (*See* City Br. at 5-8.)  The City does not explain how the Court should treat the other categories of allegations at issue, including allegations determined to be "unsubstantiated" and any non-final allegations.

[8] Here and elsewhere, the City relies on this Court's findings and conclusions from the preliminary injunction phase to support its argument.  (City Br. at 7-8.)  But a party "is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).  "'[T]he decision of both the trial and appellate court on whether to grant or deny a temporary injunction does not preclude the parties in any way from litigating the merits of the case.'"  *DiLaura v. Power Auth.*, 982 F.2d 73, 77 (2d Cir. 1992) (quoting *Liona Corp. v. PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)).  A "denial of a motion for a preliminary injunction does not constitute the law of the case or an adjudication on the merits of the claim for a permanent injunction and, therefore, the issues must be tried as if no application for a preliminary injunction had been made."  *Ratner v. Fountains Clove Road Apartments, Inc.*, 118 A.D.2d 843, 843 (N.Y. App. Div. 1986) (citations omitted).

according to the City, means the investigatory process did not determine the conduct occurred by enough evidence to warrant formal charges.  (FAC ¶ 37.)  The publication and promotion of that complaint through a registry—despite the unsubstantiated tag, which actually makes no comment on veracity—is capable of misleading and "susceptible of a defamatory connotation." *Greenberg*, 62 N.Y.S.3d at 389.  This is exactly what the FAC alleges in two concrete examples involving former NYPD officer Richard Taylor and the officers identified in the Guardian's "10 Most Unwanted" cartoon, which show the real-world reputational effect of publication of Unsubstantiated and Non-Final Allegations.  (FAC ¶¶ 63-64.)  Moreover, it is actionable even if it is not false in and of itself but rather "premised on 'false suggestions, impressions and implications arising from otherwise truthful statements.'"  *Partridge*, 100 N.Y.S.3d at 734.  The stigma-plus claims are premised on the false and defamatory nature of the underlying allegations, which the City admittedly intends to promote and publish in registries.

The falsity of these allegations, coupled with the reputation-damaging prospects of the registries, makes this case distinguishable from the primary case relied upon by the City.  In *Wiese v. Kelley*, 2009 WL 2902513 (S.D.N.Y. Sept. 10, 2009), a former government employee brought a stigma-plus claim against his former employer for making defamatory statements in the course of his termination.  *Id.* at *1.  The allegedly defamatory statements were included in personnel letters that were leaked to the press.  The court concluded that the statements in question "merely announced changes to [the plaintiff's] employment status" and thus were not "capable of being proven false."  *Id.* at *4.  The court also determined that the letters were "not stigmatizing" because they did not "contain allegations of dishonest, illegal, or immoral conduct."  *Id.* (quotation marks omitted).

This case is distinguishable in both respects.  First, unlike in *Wiese*, these allegations are stigmatizing because they necessarily call into question the professionalism and integrity of the identified officers.  As the *Wiese* court noted, that case did not involve charges that the plaintiff "was guilty of dishonesty or immorality, or accusations that called into question [his] good name, reputation, honor, or integrity."  *Id.* (internal quotation marks, alteration and citation omitted).  The FAC alleges that "[t]he mere accusation of misconduct is enough to call an officer's good name and reputation into question."  (FAC ¶ 59.)  These accusations are actionable because members of the public could reasonably conclude they are conveying facts that are "susceptible of a defamatory connotation."  *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 389 (N.Y. App. Div. 2017).  Second, unlike the reporting of objective facts in *Wiese*, the City will publish accusations of misconduct that are capable of being proven false.  For example, in "unfounded" cases, the City has reason to believe the accusation is false based on an investigator's determination that the alleged misconduct did not occur.  The FAC sufficiently alleges the falsity of these and other allegations.  As explained above, tagging false allegations with a description of the outcome of a related investigation does nothing to change or sufficiently communicate the falsity of the allegation to remove the defamatory implication or connotation.

Finally, contrary to CPR's contention, the stigma prong does not turn on evidence of the City's intent, and a showing of actual malice is not required.  (CPR Br. at 7-8.)  It is well-established that a defendant's state of mind is irrelevant to the stigma-plus inquiry.  *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (stating that the Supreme Court's "decision in *Paul v. Davis* did not turn ... on the state of mind of the defendant" (citing *Paul v. Davis*, 424 U.S. 693 (1976))).  While "federal courts in New York often look to New York defamation law when analyzing a 'stigma-plus' claim," (CPR Br. at 7 (quoting *Sharpe v. City of N.Y.*, 2013 WL 2356063, at *6

22

n.10 (E.D.N.Y. May 29, 2013)), the actual malice standard derives from the First Amendment, not New York law.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  CPR's position that the actual malice standard applies in stigma-plus cases has been consistently rejected by federal courts.  *See Warren v. City of Junction City*, 207 F. Supp. 2d 1216, 1222 (D. Kan. 2002) (concluding that former police chief need not show former employer acted with actual malice to support stigma-plus claim and stating that "no federal court that this court is aware of has held that the *New York Times* actual malice standard should apply to a liberty interest claim"); *Baden v. Koch*, 1984 WL 664, at *3 (S.D.N.Y. July 25, 1984) (stating that "[n]o Supreme Court or lower court case analyzing liberty interest claims holds or even suggests that *Sullivan* limits or affects" liability of a public employer).  Thus, the Court need not consider any defendant's intent in analyzing this claim.[9]

### B.   The registries will deprive the identified officers of a liberty interest in future employment opportunities.

The "plus" prong of a stigma-plus claim requires "a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."  *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).  In the context of interference with future employment opportunities, courts require "a likelihood of dissemination of the stigmatizing material that could significantly impair [the plaintiff's] ability to gain employment" in a chosen field.  *Knox v. N.Y.C. Dep't of*

---

[9] Even if actual malice is somehow required, the Unions meet that standard.  The FAC specifically alleges that the City will publish allegations that it has *investigated and determined to be false*, as well as allegations that fell short of the preponderance-of-the-evidence standard. (FAC ¶ 58.)  "These allegations may be completely false, and yet Defendants intend to include them without regard for their veracity."  (*Id.*)  This demonstrates the City acted with "a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of the its truth or falsity."  *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 183 (2d Cir. 2000).

*Educ.*, 924 N.Y.S.2d 389, 389 (N.Y. App. Div. 2011).  "The injured party's liberty is at stake when governmental action places on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities."  *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir. 1991) (quotation omitted).

Courts recognize that registries with stigmatizing allegations may pose a particular threat to individual liberty interests.  In *Miller v. DeBuono*, the New York Court of Appeals held that placement on a state registry of nurses suspected of patient abuse implicates a liberty interest. 689 N.E.2d 518, 521-22 (N.Y. 1997).  The plaintiff's placement in the registry "clearly calls into question her reputation, honor or integrity."  *Id.*  "Moreover, once a finding has been entered in the Registry, that information is then made accessible to health care providers and future employers, and also to the public-at-large without restriction."  *Id.* at 522 (citation omitted). Under a state regulation, nursing homes were not permitted to employ nurse aides who have had a finding entered into the registry.  *Id.* at 520.  The court's "plus" analysis focused on the enduring consequences of the state's "public[] branding," which would not only hinder the plaintiff's employment in the nursing field, "but also may well extend to prevent future employment opportunities in any arena, thereby placing a tangible burden on her employment prospects."  *Id.*  Similarly, both the Second Circuit and the New York Court of Appeals have held that a plaintiff's listing on New York's Statewide Central Register of Child Abuse and Maltreatment (the "Central Register") implicates a liberty interest by placing "a tangible burden" on employment prospects.  *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994); *Lee TT. v. Dowling*, 664 N.E.2d 1243, 1250 (N.Y. 1996).  Access to the Central Register is highly restricted.  *Valmonte*, 18 F.3d at 1001.  Certain employers in the childcare field in New York are statutorily required to consult it before hiring someone.  *Id.*

Like the registry in *Valmonte*, the City's registries will ensure "potential employers will be informed specifically about [each officer's] inclusion[.]"  *Id.*  As in *Valmonte*, the City's registries "will result in future employers consulting and relying on those allegations when considering officers for potential employment."  (FAC ¶¶ 114, 123.)  *Valmonte* found it significant that a state law required certain employers to consult the registry, but here the burden is equally devastating.  The Unions allege and will prove that potential employers will consult a public registry that by design promotes allegations of officer misconduct.  (*Id.* ¶ 61.)  The City's registry will disclose allegations to the general public, including potential employers of the identified officers.  What matters for due process is that by design the information goes to potential employers.  That is true both for *Valmonte* and this case.  It is a tangible burden on future employment.

The allegations in the City's public registries will "will follow the identified officers, affecting their reputations for professionalism and integrity years later, even in cases where the agency did not substantiate the allegation or the officer was not disciplined."  (*Id.*)  These burdens will be at least as onerous and enduring as those in the Central Register cases.  Unlike the Central Register, which is confidential and generally restricted to covered employers within the state, the City's public registries will result in "public branding" of officers not only in New York but across the country.  *Miller*, 689 N.E.2d at 521.  Accusations against officers will be publicly released by operation of law, including to potential employers across the country that will access these records when considering current and former NYPD officers for new positions.  (FAC ¶¶ 60-61, 114.)  NYPD and DOC recognize that there are post-employment consequences of disseminating these allegations (*id.* ¶ 65), but as explained below there is no pre-deprivation process to prevent the damage.

The City mischaracterizes the inquiry framed by the Unions as whether "a liberty interest arises when the government *makes public statements* that potentially interfere with future job prospects." (City Br. at 8 (emphasis added).) Many stigma-plus cases involve fleeting defamatory statements by the government that directly cause reputational and professional harm, which does not implicate a liberty interest. But the government "statements" in this case go well beyond a defamatory press release or comments to the press. Officers may never escape the public branding of the City's registries, which future employers will consult in determining a prospective officer's fitness for the job. This unique method of dissemination results in a tangible burden on employment prospects. Far from arguing that "stigma itself is the plus," (CPR Br. at 7), or that officers will suffer only the "typical consequences of a bad reputation" (City Br. at 9), the Unions sufficiently allege deprivation of a liberty interest that is separate and distinct from stigmatization. Because inclusion in a registry of officer misconduct will stigmatize officers and interfere with their future employment opportunities, the City is constitutionally required to provide those officers with adequate process.

### C. The City does not provide adequate pre-deprivation procedures for officers to avoid this constitutional deprivation.

"'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 158 (2d Cir. 2010) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (alteration in original). "Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). As an exception to this rule, due process only requires an after-the-fact remedy when the government is not "in a position to provide for predeprivation process" because the deprivation was "random and unauthorized." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)). But when a

deprivation is the result of "the more structured environment of established state procedures, rather than random acts, the availability of post deprivation procedures will not, ipso facto, satisfy due process." *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996).  Thus, a post deprivation name-clearing hearing, through an Article 78 proceeding or otherwise, is insufficient in these circumstances.  *See id.*; *Lee TT.*, 664 N.E.2d at 1252 (stating that "it makes obvious sense in most cases to 'minimize substantially unfair or mistaken deprivations' by insisting that the hearing be granted at a time when the deprivation can still be prevented" (citation omitted)).

The FAC alleges, quite simply, that there is no process by which officers can avoid being included in the registries.  (FAC ¶ 62.)  The City's failure to provide *any* procedures in this regard—let alone the required pre-deprivation remedy—violates the federal and state due process clauses.  The City points to a "panoply of remedies" it purportedly gives to employees, claiming these are "all the process that is due."  (City Br. at 10.)  But, of course, the City cannot point to a single rule or guideline that provides officers with an opportunity to be heard as to why an allegation should not be included in the registry, which would be necessary to protect an officer's due process rights.  CCRB has already stated through its 30(b)(6) representative that it releases allegations of misconduct regardless of the outcome of its investigation.  (FAC ¶ 91.)  With public release preordained once a complaint is filed, the procedures in CCRB's investigations are simply irrelevant to the stigma-plus analysis.  As to NYPD's registry, there is no way for officers to contest the issuance of Charges of Specifications.  "[O]fficers do not have the opportunity to refute allegations or provide input during the investigative phase."  (*Id.* ¶ 44.)  The City's contention that officers receive all the process that is due is completely baseless.

Officers have no opportunity, in the investigative phase or otherwise, to prevent the stigmatizing information from being released.

Even if procedures related to the investigation of misconduct are somehow relevant (which they clearly are not), they do not satisfy due process.  The issuance of Charges and Specifications is "not the product of a due process hearing or anything remotely similar."  (*Id.*)  There is no articulated evidentiary standard for issuance of Charges and Specifications in the NYPD Patrol Guide or rules.  (*Id.*)  The Patrol Guide requires officers to answer all questions posed in "interrogations," but it does not permit officers to present evidence of their own.[10]  The City does not dispute this.  However, as to CCRB, the City claims that the agency's rules for conducting investigations disprove the Unions' allegation that "officers do not have an opportunity to present or contest evidence in the CCRB investigative process."  (City Br. at 14 (emphasis added).)  But the rules cited by the City actually bolster the Unions' claims.  As with NYPD's process for issuing Charges and Specifications, CCRB investigators interview officers and collect evidence, basing their recommendation on a one-way interrogation, as would a detective or other investigator.  38-A RCNY 1-23; 1-24.  CCRB does not hold a hearing, permit cross-examination or confrontation of accusers, or provide other basic procedural protections.  (FAC ¶ 45.)

The lack of procedural protections here is similar to what the Court considered in *Valmonte*.  In that case, there was an "unacceptably high risk" of individuals being added to the Central Register in error because the state relied on inadequate procedures and a low standard of proof that merely required "'some credible evidence.'"  18 F.3d at 1004.  This standard did not

---

[10] NYPD Patrol Guide §206-13, *Interrogation of Members of the Service*, https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page.

satisfy due process because it did "not require the factfinder to weigh conflicting evidence" or

"judge competing versions of events" and gave one side a "greater ability to assemble its case."

*Id.* at 1004; *see also Lee TT.*, 664 N.E.2d at 1246 (concluding that "some credible evidence"

standard does not satisfy due process and holding that reports of child abuse "must be

substantiated by a fair preponderance of the evidence before information regarding the subject

may be disseminated" to potential employers).  Here, the City provides officers accused of

misconduct with far less in the way of procedural protections.  Unlike the Central Register, there

is no mechanism for officers to challenge their inclusion on the list.  And instead of a low

standard of proof, there is *no* standard of proof: even totally baseless allegations will be added to

the CCRB's database without regard for evidentiary showing.  Meanwhile, NYPD's evidentiary

standard for issuing Charges and Specifications is undefined, and there is no hearing provided

until after charges are issued.  *See* 38 RCNY 15-03, 15-04.[11]

---

[11] The City suggests it could not possibly provide the requested procedures because (1) individual officers do not have a statutory right under FOIL to challenge disclosure of allegations against them, and (2) there is a general presumption in favor of public access to government documents in FOIL.  (City Br. at 15.)  This is misdirection.  Rights of action and presumptions under state law have no bearing whatsoever on the City's constitutional obligations.  *See Gronowski v. Spencer*, 424 F.3d 285, 297 (2d Cir. 2005) ("Regardless of the City officials' conformity with [state] law, they must still refrain from violating rights protected under the United States Constitution."); *cf. Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 276 (2d Cir. 1996) (stating that "although a probationary [government] employee may usually be discharged with or without cause, she may not be discharged in violation of her First Amendment rights").  Thus, it is unsurprising that the City cites no case for the proposition that a state statutory scheme can affect the availability of a federal (or state) constitutional remedy.

**D.      The due process claims cannot be dismissed based on state law immunities applicable in defamation actions.**

CPR contends that § 74 of the New York Civil Rights Law bars stigma-plus claims

against the City based on "fair and true" reports of "official proceedings."  (CPR Br. at 8-12.)

This argument is wholly without merit for at least four reasons.

*First*, state-law defenses to federal causes of action are preempted.  "The elements of,

*and the defenses to*, a federal cause of action are defined by federal law."  *Howlett v. Rose*, 496

U.S. 356, 375 (1990) (emphasis added).  "The Supremacy Clause of the Constitution guarantees

that state law will not *preempt or otherwise erode* § 1983 causes of action and state law may not

be used to immunize conduct violative of § 1983."  *Gronowski v. Spencer*, 424 F.3d 285, 297 (2d

Cir. 2005) (emphasis added); *see also Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138,

156 n.19 (2d Cir. 2013) ("As a general matter, the substantive immunities and defenses available

against a particular cause of action are governed by the same source of law that provides the

cause of action.").  For example, in *Martinez v. California*, the Supreme Court held that a state

statute purporting to immunize public entities and employees from liability for parole release

decisions was preempted by § 1983.  444 U.S. 277, 284 (1980).  The Court explained that

elevating a state-law defense above a federal cause of action would violate the Supremacy

Clause: "A construction of the federal statute which permitted a state immunity defense to have

controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy

clause of the Constitution insures that the proper construction may be enforced."  *Id.* at 284 n.8

(internal quotation marks omitted).  Applying this general principle, courts have rejected the

application of state defamation privileges to federal stigma-plus claims.  *Palmer v. City of

Monticello*, 31 F.3d 1499, 1504 (10th Cir. 1994) (stating that a "federal constitutional claim of

violation of a liberty interest is not restricted by the privilege contours of state defamation law");

*Duck v. Jacobs*, 739 F. Supp. 1545, 1551 (S.D. Ga. 1990) (holding that state law providing absolute privilege to defendants in defamation actions does not restrict a "reputational liberty claim" under § 1983). Therefore, § 74 has no bearing on the Unions' federal stigma-plus claim, and CPR's entire multipage discussion of the elements of this privilege is irrelevant.

*Second*, § 74 is inapplicable to both the federal and state due process claims because it is facially limited to state libel and defamation claims. The title of the statute—"Privileges in action for libel"—delineates its intended application. *See United States v. Brooker*, 976 F.3d 228, 235 n.4 (2d Cir. 2020) (stating that "the Supreme Court has recognized that titles can be especially valuable as devices to resolve doubt about the meaning of a statute" (quoting *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring)) (internal quotation marks omitted)). Consistent with this limitation, courts in the Second Circuit have applied § 74 to bar defamation claims brought under New York law *but not stigma-plus claims*. *See, e.g.*, *Geiger v. Town of Greece*, 311 F. App'x 413, 416-17 (2d Cir. 2009) (applying § 74 to defamation claim but analyzing stigma-plus claim on a different ground); *Thomas v. City of N.Y.*, 2018 WL 5791965, at *15 (E.D.N.Y. Nov. 5, 2018) (same).[12] New York State courts have similarly applied the statute as it is written. *See Campbell v. N.Y. Evening Post*, 157 N.E. 153, 156 (N.Y. 1927) ("The privilege thus extended must be kept strictly within proper bounds, and not extended beyond the limits of the statute." (citation omitted)).

*Third*, and more generally, state defamation law is only relevant to stigma-plus analysis insofar as it informs inquiries into falsity and defamatory connotation. Other aspects of

_____

[12] CPR relies upon dicta in *Bertuglia v. City of New York*, where the district court assumed without analysis that § 74 applies to a federal claim. *See* 133 F. Supp. 3d 608, 648-49 (S.D.N.Y. 2015). In affirming, the Second Circuit did not address that dicta. 672 F. App'x 96 (2d Cir. 2016).

defamation law—both state and federal—have no bearing on the stigma-plus analysis.  For example, the actual malice standard, a First Amendment protection grafted onto state law, does not apply to stigma-plus due process claims.  (*See supra* at 22 (discussing inapplicability of actual malice standard).)  Privileges in libel actions are similarly inapposite to liberty interest analysis.[13]

*Fourth*, even if a state-law privilege for a libel action could be applied to bar a due process claim (it cannot), it is unavailable here because the allegations to be published are not substantially accurate.  By its plain text, § 74 applies only to "publication of a fair and true report" of an official proceeding.  "A publication is deemed 'fair and true' if it is 'substantially accurate.'"  *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (quoting *Glendora v. Gannett Suburban Newspapers*, 608 N.Y.S.2d 239, 240 (N.Y. App. Div. 1994)).  That is, the report of the proceeding must not "produce a different effect on a reader than would a report containing the precise truth."  *Id.* (quotation omitted).  "In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, suggest[] more serious conduct than that actually suggested in the official proceeding."  *Id.* (quotation omitted).  Here, it is beyond dispute that the City plans to release allegations they determined to be false as well as allegations that fell short of the preponderance-of-the-evidence standard.  (FAC ¶ 58.)  In the case of false allegations that denigrate the character and professionalism of the identified

---

[13] CPR argues in passing that state common law immunizes the City from liability.  (CPR Br. at 12-13.)  This argument fails for the same reasons.  *See Hogan v. Herald Co.*, 84 A.D.2d 470, 477-78 (N.Y. App. Div. 1982) ("In New York the [common law] privilege [of fair report] has been codified in section 74 of the Civil Rights Law which provides that publication of a fair and true report of any judicial, legislative or other official proceeding is absolutely privileged.").  CPR does not cite a single case applying common-law immunity under New York law to a due process claim.

officer, the "precise truth" of these false allegations would surely "produce a different effect" on

the public.  *Karedes*, 423 F.3d at 119.  Accordingly, the records would not be "substantially

accurate" and thus fall well outside the scope of § 74.

## III.   THE UNIONS' EQUAL PROTECTION CLAIMS UNDER NEW YORK AND FEDERAL LAW CANNOT BE DISMISSED (FOURTH AND FIFTH CAUSES OF ACTION).

The Unions adequately allege that the release of Unsubstantiated and Non-Final

Allegations would violate the Equal Protection Clauses of the United States and New York

Constitutions.  (FAC ¶¶ 67-71.)

Equal protection requires that "all persons similarly situated should be treated alike."

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Any disparate

treatment of similarly situated individuals by the government must bear "a rational relationship

to an appropriate governmental interest."  *Able v. United States*, 155 F.3d 628, 631 (2d Cir.

1998).  In particular, there must be a rational relationship between the differences in the

government's treatment and any differences between the groups.  *See Ciechon v. City of

Chicago*, 686 F.2d 511, 522 (7th Cir. 1982) (holding that city's "arbitrary, irrational decision to

discriminate" among similarly situated employees violated equal protection); *O'Brien v.

Leidinger*, 452 F. Supp. 720, 723-24 (E.D. Va. 1978) (holding that defendants violated plaintiffs'

right to equal protection by refusing to discuss employment matters with some union

representatives while engaging in similar discussions with agents of other labor organizations

where defendants "offered no explanation whatever for this disparate treatment").

The City's inexplicably disparate treatment of the disciplinary files of police officers,

firefighters, and corrections officers bears no rational relationship to an appropriate

governmental interest.  Based on facts learned in discovery, police officers are afforded fewer

privacy protections than firefighters or corrections officers.  (FAC ¶ 69.)  Police officer records

even appear to be treated differently depending on whether a complaint was investigated by the

CCRB or one of the investigative arms of NYPD.  (*Id.*)  The City also leaves officers with fewer

protections than other public employees, whose disciplinary records are individually reviewed

before release.  As the Committee on Open Government recently explained, "[i]n light of the

repeal of §50-a, a request for disciplinary records relating to a police officer must be reviewed in

the same manner as a request for disciplinary records of any other public employee."[14]

The City's proffered justifications—"to fulfill the legislative intent behind repealing §

50-a, to comply with FOIL, and to 'help regain the public trust'"—do not support the City's

distinctions among law enforcement officers.  (City Br. at 18.)  These justifications do nothing to

explain why, for example, the City would release unfounded allegations against police officers

but not unsubstantiated allegations against corrections officers.  Both of these groups were

previously covered by § 50-a, and both are entrusted with tremendous power within their

respective domains.  At any rate, whether there is a greater need to "regain the public trust" in

the NYPD than the DOC is a question of fact that cannot be resolved on a motion to dismiss.

Moreover, FOIL holds no answers for why some law enforcement records should be

categorically entitled to greater protection than others.  All the City can muster is a conclusory

statement that there are "obvious and significant differences between their job duties."  (City Br.

at 19.)  But this misses the point that the differences in treatment of disciplinary records are not

rationally related to any occupational differences.  That is, the question "is not simply whether

---

[14] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020),
https://docs.dos.ny.gov/coog/ftext/f19775.html.

New York City police officers are different from all other civil service employees, but whether the different treatment they receive is rationally related to the difference between them." *Baker v. Cawley*, 459 F. Supp. 1301, 1306 (S.D.N.Y. 1978).  The City's arbitrary and irrational line-drawing does not serve the City's proffered governmental interests or any other legitimate interest.

The case the City cites to suggest that claims such as the Unions' have "specifically been rejected by the Supreme Court" (City Br. at 16) is inapposite.  In *Engquist v. Oregon Department of Agriculture*, the Supreme Court stated that "[t]here are some forms of state action . . . which by their nature involve discretionary decision making based on a vast array of subjective, individualized assessments.  In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted."  553 U.S. 591, 603 (2008).  But the Unions do not bring "a challenge based on the arbitrary singling out of a particular person."  *Id.*  The Supreme Court drew a contrast to cases— like this one—which involve "treating distinct groups of individuals categorically differently" based on "class-based decisions."  *Id.* at 605.  The Unions' claims are not based on "subjective and individualized" analysis, but instead raise classic group-based equal protection issues.[15]  At bottom, because the City cannot rationally justify its differential treatment of law enforcement agencies, the Unions adequately plead an equal protection violation.

_____

[15] The Unions' use of the phrase "class-based distinctions" in the FAC was not a "crafty" attempt to trigger heightened constitutional scrutiny based on a protected class argument, as the City suggests.  (City Br. at 17.)  It is an accurate description of the City's decision to treat groups of similarly situated public employees differently.  The Unions have never contended that the City's distinctions implicate protected classes, nor that any standard other than rational basis review applies to their claims.

IV.   **THE UNIONS' CLAIM FOR ANTICIPATORY BREACH OF SETTLEMENT AGREEMENTS CANNOT BE DISMISSED (SIXTH CAUSE OF ACTION).**

The FAC plausibly alleges a breach of contract claim based on the City's anticipatory breach of disciplinary settlement agreements.  (FAC ¶¶ 72-75.)  The City's release of negotiated settlement agreements between police officers and NYPD would breach the confidentiality protection expected by the parties and afforded to those contracts by § 50-a, which was incorporated into the contracts as a valid applicable law existing at the time they were executed.

A.   **The confidentiality protections of former § 50-a were incorporated into disciplinary settlement agreements.**

Bedrock contract law holds that "the parties to a contract—*including the government*, in a contract between the government and a private party—are presumed or deemed to have contracted with reference to existing principles of law."  11 Williston on Contracts § 30:19 (4th ed. 2020) (emphasis added).   "Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein." *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991); *see also Bona v. Barasch*, 2003 WL 21222531, at *6 (S.D.N.Y. May 27, 2003) (concluding that provisions mandated by ERISA should be read into agreements as implied terms).  Incorporation of existing law "does not at all depend upon the parties' having mentioned the statute in the contract."  5 Corbin on Contracts § 24.26 (citing cases); *see also City of Troy Unit of Rensselaer Cty. Chapter of Civil Serv. Emp. Ass'n v. City of Troy*, 319 N.Y.S.2d 106, 108 (N.Y. App. Div. 1971) ("Whether the ordinance is incorporated into the contract by reference or not is immaterial.").

It is undisputed that § 50-a expressly prohibited public disclosure of law enforcement personnel records, including disciplinary settlement agreements, when it was in force.  (FAC ¶ 73.)  This statutory protection of confidentiality was built into settlement agreements entered into

before June 12, 2020—the date § 50-a was repealed—by operation of law.  (*Id.* ¶¶ 73, 80.)  In light of this mutual expectation of confidentiality, there was no need to to incorporate § 50-a by express reference, nor to bargain for a separate confidentiality provision of any kind.  (*Id.* ¶ 74.)  Indeed, Williston recognizes that "the parties to the contract *would have expressed* that which the law implies 'had they not supposed that it was unnecessary to speak of it because the law provided for it.'"  11 Williston on Contracts § 30:19 (citation omitted).  All parties understood the agreements to be confidential.  (FAC ¶ 74.)

This protection of confidentiality was not erased when § 50-a was repealed because "changes in the law subsequent to the execution of a contract are not deemed to become part of agreement unless its language clearly indicates such to have been intention of parties."  11 Williston on Contracts § 30:23; *see also Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013) ("Contracting parties are free to agree that their rights and duties will track the law as it changes, but because the terms of their bargain could be significantly altered, they must make their intent to do so clear."); *Pioneer Transp. Corp. v. Kaladjian*, 481 N.Y.S.2d 136, 137 (N.Y. App. Div. 1984) ("In the absence of a clear expression in the contract that such is the parties' intention, a court may not construe an agreement so that it is modified by a subsequent statutory enactment which changes the rights and obligations of the parties.").  This rule of construction "limits the applicability of changes in the law" to preexisting contracts.  11 Williston on Contracts § 30:23.  No party suggests the agreements express any intention to track the law as it changes.  Thus, the Unions have established that the proposed release of settlement agreements is an anticipatory breach of the confidentiality protections of § 50-a, which was incorporated into those agreements and continues to bind the City.

The City contends the court will not be able to ascertain which "contractual language" was allegedly breached because the Unions neither attached a settlement agreement to the FAC nor quoted relevant language.  (City Br. at 34-35.)  CPR makes the same argument, adding only that the Unions have not adduced "any witness or declarant testimony" on the content of the agreements.  (CPR Br. at 23.)  None of this is necessary to state a contract claim.  Of course, the lack of testimonial evidence about officers relying on the protections of § 50-a in entering the agreements is not relevant to any element of a contract claim.  At any rate, testimonial evidence is not required at the pleading stage.  And because the Unions do not rely on any contractual language expressed in the agreements, examination of the agreements would have no bearing on the merits of the claim.  The Unions need not "quote[] or even paraphrase[] any language from the settlement agreements" because the only language that matters to this claim is in former § 50-a, which is quoted in the FAC and well known to all parties.[16]  (CPR Br. at 23.)

### B.   The Unions have associational standing to bring a contract claim on behalf of their members.

The City argues in passing that the Unions lack standing to bring this claim because "[o]nly parties to a contract have standing to assert a breach of contract claim."  (City Br. at 33.) But the City's cases simply provide that individuals who are not parties to a contract (or intended beneficiaries) generally cannot sue for a breach of that contract.  (*See id*.)  The City does not cite a single case denying standing to a labor union or even addressing associational standing principles.

---

[16] The City and CPR cite inapposite cases for the uncontroversial proposition that a plaintiff must allege which provision of a contract has been breached.  (*See* City Br. at 34-35; CPR Br. at 23-24.)  The FAC clearly states the basis for the anticipatory breach is a violation of § 50-a.  (FAC ¶¶ 72-75.)  Moreover, the cited cases do not involve incorporation of existing law.

Each of the plaintiff unions has associational standing to assert a breach of contract claim on behalf of its members because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). First, as the City recognizes, those union members who entered into disciplinary settlement agreements with the City would have standing to sue the City for a breach of those agreements. (City Br. at 33.)  Second, each plaintiff union's organizational purpose is to represent the interests of its members, including in legal matters, which the City also does not dispute.  Third, there is no need for individual officers to participate in this lawsuit because their claims are all identical.  There is no individualized proof because the obligation in question is the same as to each agreement, and the requested injunctive relief does not require individualized assessments, as is often necessary in damages cases.  *Assoc. Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998) (stating that individualized proof is not needed where declaratory and injunctive relief is sought rather than monetary damages); *see also Hunt*, 432 U.S. at 342-43 ("[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.").  Thus, the Unions may assert contract claims on behalf of their members who entered into settlement agreements that incorporated the confidentiality protection of § 50-a.

### C.    The Unions are not required to exhaust contractual remedies.

The City advances a vague and conclusory argument that the breach of contract claim is barred because the Unions failed to exhaust remedies under their CBAs.  (City Br. at 34.)  But aside from referencing New York's "strong policy favoring internal grievance mechanisms," the

City does not explain, even generally, how the breach of settlement agreements is a dispute arising under the CBAs. The Unions are not barred from seeking relief in Court any time they have a claim against the City simply because the CBAs exist. The City cites no case to the contrary, nor does it cite the particular provision of any CBA that purportedly applies. The City's threadbare exhaustion argument thus fails.

### D. The unmistakability doctrine does not apply.

Finally, the doctrine of unmistakability does not bar the Unions' claims. (CPR Br. at 24-25.) This doctrine provides that "sovereign power ... will remain intact unless surrendered in unmistakable terms." *Doe v. Pataki*, 481 F.3d 69, 79 (2d Cir. 2007) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)). CPR does not explain how this doctrine plausibly applies here. Even so, the Unions do not contend that the state's sovereign power to repeal § 50-a was somehow abrogated by the settlement agreements. And the state could not possibly have waived its sovereign power in settlement agreements to which it was not a party. But the parties to the contract understood and expected that they would remain confidential under § 50-a, and this expectation formed a part of the bargain with the same force as the explicit terms of the agreements.

## V. THE UNIONS' CLAIM THAT THE CITY'S RELEASES ARE ARBITRARY AND CAPRICIOUS OR ERRONEOUS AS A MATTER OF LAW CANNOT BE DISMISSED (SEVENTH CAUSE OF ACTION).

Finally, the Unions challenge the City's decision to release Unsubstantiated and Non-Final Allegations under Article 78 of New York Civil Practice Law and Rules. The FAC adequately alleges that it is an error of law and arbitrary and capricious to release these records without individualized and particularized review, including for exceptions under the FOIL statutory scheme. (FAC ¶¶ 76-85.) It also adequately alleges that the City's break from past

practice of deeming unsubstantiated allegations to be protected from disclosure, separate and apart from the protections of § 50-a, is arbitrary and capricious.  (*Id.* ¶¶ 86-98.)

Under the "error of law" standard of CPLR 7803(3), government decisions based on "pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent," are entitled to little, if any, deference.  *Kurcsics v. Merchants Mut. Ins. Co.*, 403 N.E.2d 159, 163 (N.Y. 1980).  In such a case, courts are "free to ascertain the proper interpretation from the statutory language and legislative intent."  *In re Gruber*, 674 N.E.2d 1354, 1358 (N.Y. 1996). A decision is "arbitrary and capricious" under CPLR 7803(3) when it is made "without a sound basis in reason and generally without regard to the facts."  *Nestle Waters N. Am., Inc. v. City of N.Y.*, 121 A.D.3d 124, 127 (N.Y. App. Div. 2014).  Even when a statute vests an agency with discretion, the agency's "refus[al] to perform a discretionary act for improper reasons" is arbitrary and capricious.  *Anonymous v. Comm'r of Health*, 801 N.Y.S.2d 302, 305 (N.Y. App. Div. 2005) ("Irrespective of the Director's 'untrammeled' discretion, the court can review and annul a determination that was 'irrational, arbitrary, or capricious.'"); *D.S. v. Hogan*, 874 N.Y.S.2d 711, 719 (N.Y. Sup. Ct. 2008) ("The fact that the agency is vested with discretion, however, does not mean that such a discretionary determination is not reviewable by a court in an Article 78 petition.").

A.    **It is an error of law and arbitrary and capricious to conclude that the repeal of § 50-a justifies the indiscriminate release of disciplinary records without individual consideration, including for exemptions in FOIL.**

The City's plan to release Unsubstantiated and Non-Final Allegations is based on a fundamental misinterpretation of its ongoing legal obligations, including under FOIL, which continues to protect disciplinary records from public disclosure.  The City's interpretation of the repeal of § 50-a and the continuing application of FOIL is erroneous as a matter of law under CPLR 7803(3).

The FAC alleges that the City erroneously interpreted the repeal of § 50-a as a license to bypass case-by-case review of records, thus ignoring the potential applicability of other protections including FOIL exemptions.  (FAC ¶¶ 78, 81.)  Evidence in the record bears out this interpretation.  CCRB claims it can choose not to conduct any review for the privacy and safety exemptions because applying any FOIL exemption is always optional.  (*Id.* ¶ 91.)  This clear disclaimer of any obligation to consider exemptions in FOIL belies the argument that the City "complied with the requirements of FOIL in determining that" no FOIL exemption applied.  (CPR Br. at 15.)  CCRB's representative also testified that a large tranche of 81,000 officer histories released to a FOIL requestor in July 2020 were not reviewed individually.  (FAC ¶ 83.)  CCRB's position was that "there was no need to do a line by line of every—of all 81,000-plus officers" to determine the need for individual privacy or safety protection.  (*Id.*)  Thus, CCRB has staked out a clear position that the repeal of § 50-a mandates (or at least permits) the wholesale release of law enforcement disciplinary records *without considering* the potential application of any particular FOIL exemptions or other protection.

This interpretation cannot be reconciled with the legislation to repeal § 50-a.  The repeal legislation does not evince any intent to mandate or direct law enforcement agencies to release disciplinary records, let alone in an indiscriminate and wholesale manner in public registries.

42

(*Id.* ¶ 81.)  On June 12, 2020, the New York State Legislature repealed § 50-a when the Governor signed Senate Bill S8496 into law.  The clear purpose of the repeal legislation was to eliminate the statutory basis for categorically withholding all police personnel records.  The Sponsor Memorandum for Senate Bill S8496 states that § 50-a was an "unnecessary" law that could be removed because there are "additional safeguards" and "protections" in New York law that are intended to protect the rights of officers, including the exemptions in FOIL.  The Sponsor Memorandum for Assembly Bill A9332 states that "FOIL already provides all public employees, including those protected under § 50-a, the protections necessary to guard against unwarranted invasions of privacy and from disclosures that could jeopardize their security or safety."  Thus, in repealing § 50-a, the Legislature removed one barrier to the release of disciplinary records while emphasizing the continuing application of other protections.  (*Id.* (discussing legislative history).)  It certainly did not *require* the City "to adopt practices in support of broad disclosure and transparency," as CPR claims without support.  (CPR Br. at 18.)

The City's plans are also an erroneous and arbitrary and capricious interpretation of the FOIL statutory scheme.  The City cannot ignore these protections completely because it has discretion to determine when specific exemptions apply in individual cases.  CPR contends that "when, as here, a government agency affirmatively decides to release its own records, it can do so without being forced to apply certain *permissive* exemptions."  (*Id.* at 16 (emphasis in original).)  The Unions have never disputed that the exemptions in FOIL are discretionary.  But that discretion is not boundless.  *Pell v. Bd. of Educ.*, 313 N.E.2d 321, 326 (N.Y. 1974) ("Generally speaking, discretionary issues are not issues of law, but even in such cases it may be urged that the bounds of discretion were exceeded.").  The legislature clearly intended for agencies to consider whether disciplinary records formerly subject to § 50-a should be withheld

under the privacy and safety exemptions in FOIL.[17]  Failure to even consider the potential

applicability of these exemptions is inimical to the legislative purpose.  Thus, it is erroneous as a

matter of law and arbitrary and capricious for the City to conclude that, in the absence of § 50-a,

it may release disciplinary records without conducting "careful, record-by-record review to

ensure proper application of these additional safeguards and protections in the law."  (FAC ¶ 81.)

### B. The City's break from its past practice of applying the FOIL exemptions to unsubstantiated allegations of misconduct is arbitrary and capricious.

It also was arbitrary and capricious for the City to change its long-established position of

withholding unsubstantiated allegations on privacy or safety grounds without providing a sound

basis in reason for the shift.  Under New York law, it is "per se arbitrary and capricious" for an

agency to reach different conclusions based on similar facts and law without explaining the

reason for the inconsistent decisions.  *Matter of Charles A. Field Delivery Serv., Inc.*, 488 N.E.2d

1223, 1225 (N.Y. 1985).  The same rule applies in cases under the federal Administrative

Procedure Act.  *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913

(2020) (stating that it is arbitrary and capricious for an agency to ignore "that longstanding

policies may have engendered serious reliance interests").

The City previously articulated privacy concerns as a justification for denying access to

unsubstantiated allegations of misconduct.  In one case, it stated that disclosure of police

personnel records "'concerning any matters that were not substantiated'" would "'represent an

unreasonable invasion of privacy.'"  *Hughes Hubbard & Reed LLP v. CCRB*, 53 Misc. 3d 947,

---

[17] Sponsor Mem., N.Y. Senate Bill S8496,
https://www.nysenate.gov/legislation/bills/2019/s8496 ("FOIL already provides that agencies
may redact or withhold information whose disclosure would constitute an unwarranted invasion
of privacy.").

950 (N.Y. Sup. Ct. 2016) (citation omitted).  In another case, the City denied a request for

disclosure of allegations brought against a specific police officer, not only on § 50-a grounds, but

because a "request for records relating to unsubstantiated matters would constitute 'an

unreasonable invasion of privacy.'"  *Luongo v. Records Access Officer, CCRB*, 150 A.D.3d 13,

16 (N.Y. App. Div. 2017) ("In addition to the statutory exemptions, CCRB noted that the request

for records relating to unsubstantiated matters would constitute 'an unreasonable invasion of

privacy.'").  The FAC alleges that these two examples were part of a longstanding course of

conduct.  (FAC ¶ 87.)  At this early stage of the case, and without the benefit of discovery on this

issue, the Unions sufficiently allege that the City had a preexisting practice of applying the

privacy exemption of FOIL to unsubstantiated allegations.

  The City's previous position was consistent with statements by the Committee on Open

Government.  As the Committee is the executive branch authority on the proper application of

FOIL, its opinions "may be considered to be persuasive based on the strength of their reasoning

and analysis."  *See Thomas v. N.Y.C. Dep't of Educ.*, 962 N.Y.S.2d 29, 32 (N.Y. App. Div.

2013).  In several opinions, the Committee has explained why the release of unsubstantiated

allegations of misconduct constitutes an unwarranted invasion of officer privacy.  Most recently,

the Committee emphasized its "long-standing interpretation that *requires an agency to determine*

if an unsubstantiated or unfounded complaint against an employee would, if disclosed, constitute

an unwarranted invasion of personal privacy."[18]  Another advisory opinion explained that "when

---

[18] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-19775 (July 27, 2020),
https://docs.dos.ny.gov/coog/ftext/f19775.html (emphasis added); *see also* Comm. on Open
Gov't, Adv. Op. No. FOIL-AO-12005 (Mar. 21, 2000),
https://docs.dos.ny.gov/coog/ftext/f12005.htm ("In numerous contexts, it has been advised that
records relating to unsubstantiated charges, complaints or allegations may be withheld to protect
the privacy of the accused.").

allegations or charges of misconduct have not yet been determined or did not result in

disciplinary action, the records relating to such allegations may ... be withheld, for disclosure

would result in an unwarranted invasion of personal privacy ... Further, to the extent that charges

are dismissed or allegations are found to be without merit, I believe that they may be withheld

based on considerations of privacy."[19]

The City abruptly changed this practice—upsetting the reliance interests it had

engendered—in the wake of the repeal of § 50-a, and it did so without a sound basis in reason or

regard for the relevant facts.  In a 30(b)(6) deposition, the representative for CCRB

acknowledged that the agency does not analyze whether privacy or safety are implicated in the

release of Unsubstantiated and Non-Final Allegations.  (FAC ¶¶ 83, 91.)  This practice

contradicts a document on the agency's own website, which states that "[a]ll government records

are subject to the exemptions stipulated in FOIL" and links to the website of the Committee on

Open Government.[20]

The City also failed to account for the safety exemption, ignoring the clear dangers to

officers of releasing unsubstantiated allegations against officers in a way that identifies the

officers by name.  The redaction of personal identifying information—now required by law—

fails to protect officers when such information can easily be found on the internet.  As one

activist, Loyda Colon, stated at a legislative hearing: "Finding the home address for police

officers, that's not a 50-a issue, that's a Google issue. You name a police officer to me right now,

---

[19] Comm. on Open Gov't, Adv. Op. No. FOIL-AO-17195 (May 29, 2008),
https://docs.dos.ny.gov/coog/ftext/f17195.html (internal citations omitted).

[20] CCRB, FOIL Subject Matter List,
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/FOILSubject%20Matter%20List.pdf (last accessed Nov. 6, 2020).

and I will find their address, their phone number, and their relatives.  I will find them all through Google."[21]  Coupled with NYPD's requirement that officers reside in New York City or an adjacent county in New York, those who wish to target officers will be able to quickly identify where specific officers live.  The Unions allege concrete evidence of increasing threats of violence and harassment against officers, including statistics available from NYPD's Threat Assessment and Protection Unit ("TAPU"), which indicate a rising tide of threats against officers that has coincided with protests against police misconduct.  (*Id.* ¶ 94.)  The FAC also details a recent confrontation in Queens where an officer was harassed about CCRB allegations pertaining to a different officer with the same last name.  (*Id.* ¶ 95.)

The repeal of § 50-a did not affect the City's continuing responsibility to conduct careful, record-by-record review to ensure proper application of these additional safeguards and protections in the law.  The City's abrupt reversal is irrational and ignores both long-established reliance interests and clear legislative intent that FOIL exemptions and other protections be considered before disciplinary records are released.

---

[21] The City claims "Ms. Colon never made any such statement, nor did anyone else for that matter."  (City Br. at 20 n.9.)  The New York State Senate's website includes a full video recording of the hearing where Ms. Colon made this statement.  *See* Public Hearing: Policing (S3695), repeals provisions relating to personnel records of police officers, firefighters, and correctional officers (Oct. 24. 2019), https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-hearing-policing-s3695-repeals-provisions-relating.  Ms. Colon's testimony begins at time marker 2:53:39, as indicated in the FAC.  (FAC ¶ 96 n.11.) Ms. Colon makes the quoted statement—verbatim—at time marker 2:56:31.  The following alternative link pinpoints the quoted statement: https://youtu.be/h6I3xxmTYDw?t=10591.

**<u>CONCLUSION</u>**

For the foregoing reasons, the motions to dismiss the FAC should be denied.  To the

extent the Court dismisses any claim as insufficiently pled, the Unions respectfully request that

such dismissal be without prejudice to a motion for leave to file a second amended complaint.


Respectfully submitted,


Dated:  November 6, 2020                    **DLA PIPER LLP (US)**
       New York, NY

By: _/s/ Anthony P. Coles_
Anthony P. Coles
Michael R. Hepworth
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com

Courtney G. Saleski
  (admitted *pro hac vice*)
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Telephone: (215) 656-2431
Facsimile: (215) 606-2046
Email: courtney.saleski@dlapiper.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I, Anthony P. Coles, hereby certify that, on this 6th day of November, 2020, the foregoing document was served via ECF on all counsel of record.


Dated: November 6, 2020                          <u>/s/ *Anthony P. Coles*                     </u>
                                                 *Counsel for Plaintiffs*